## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHABTIR SCOTT SHATSKY, et al. | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | 02 CV 2280(RJL) |
| | : | |
| SYRIAN ARAB REPUBLIC, et al. | : | |
| | : | |
| Defendants | : | |
| _____ | : | |

**Revised Memorandum of Points and Authorities By Defendants PLO
and PA in Support of Their Motion Pursuant To Fed.R.Civ.P. 12(b)
To Dismiss The Complaint**

### I. Introduction

This is an action for damages arising from a fatal suicide
bombing on February 16, 2002, at a pizzeria in a West Bank
settlement in Palestinian territory Israel has occupied since
1967.  The action is not brought against the estate of the
deceased bomber, whom the complaint purports to name, nor against
any militant group, nor any person alleged to have participated
in the execution or the planning of the bombing.  Instead,
plaintiffs are suing the PLO, the PA, the government of Syria,
and Syrian governmental entities and officials.  The complaint
alleges that the Syrian defendants and the PA provide a wide
range of support of all kinds to the PLO, and that the PLO for
decades has been the behind-the-scenes mastermind of virtually
all violence by Palestinians in the occupied territories.  This

broad support is alleged in general terms, is not specifically tied to the bombing and is surely unconnected with it.

This action is one of several cases filed in U.S. courts in recent years against the PA and PLO and Palestinian officials by American citizens who are settlers living in the Palestinian territories or who are living in Israel, or their representatives, alleging claims for damages for fatal and other personal injuries stemming from violence in the Palestinian territories or in Israel during the on-going Israeli-Palestinian conflict. In each of these actions the statehood of Palestine and the immunity of the PLO and PA under sec. 1604 of the FSIA and 18 U.S.C. sec. 2337(2) are at issue.  The other cases are Ungar, 00 CV 0105(L)(D.R.I.), Gilmore, 01 CV 0853 (D.D.C.) (GK), Biton, 01 CV 0382 (D.D.C.) (RMC), and Knox, 03 CV 4466(S.D.N>Y.)(VM).  The same attorneys are representing plaintiffs in all of these actions working with the support of a legal team that includes Israeli attorneys.

Palestine's statehood and related issues, including justiciability, are contested in all of the actions.  The issues of immunity have thus far been addressed by two courts, the District Court and the First Circuit Court of Appeals in Ungar. In its decision reported at 228 FS2d 40 (D.R.I. 2002) the District Court in Ungar ruled against sovereign immunity relying erroneously, in defendants view, on the factually outdated precedent of Klinghoffer, v. S.N.C. Achille Lauro, 937 F.2d 44 (2d Cir. 1991), and erroneously finding decisive, despite Palestine's unique and active role as U.N. Permanent Observer,

2

its less than full membership in the U.N.  On defendants'
interlocutory appeal from this decision the First Circuit Court
of Appeals issued a judgment on May 27, 2003 which stated with
respect to sovereign immunity: "We take no view as to the merits
of that defense."  A copy of the judgment is attached hereto as
Exhibit 1.

After the Court of Appeals rendered this judgment,
defendants on June 13, 2003 filed in the District Court the fully
supported Rule 12(b)(1) motion, suggested by the judgment of the
Court of Appeals.  This motion has been briefed and is pending,
subject only to a motion by defendants for leave to file a
response to plaintiffs surreply.  Rule 12(b) motions to dismiss
are pending in <u>Biton</u> and <u>Gilmore</u> and will be filed in <u>Knox</u>.

The principle ground for dismissal being urged by the PLO
and PA on the present motion is lack of subject matter
jurisdiction based on sovereign and governmental immunity under
sec. 1604 of the Foreign Sovereign Immunities Act (FSIA) 28
U.S.C. 1330 and 1602-11, and 18 U.S.C. sec. 2337(2).  Palestine
has a valid claim to statehood that should be judicially upheld
and PLO and PA must be treated as part of Palestine and accorded
sovereign and governmental immunity based on Palestine's
statehood.

It is important to efficient judicial administration and is
usually required for issues of subject matter jurisdiction to be
determined first.  Subject matter jurisdiction implicates the
power of the Court to decide all other issues.  This first
priority is especially appropriate where the lack of subject

matter jurisdiction is asserted on grounds of sovereign or
governmental immunity.  See In re Papandreou, 139 F.3d 247, 254
(D.C.Cir. 1998), but see Rhurqas AG v. Marathon Oil Co., 526 U.S.
574 (1999), upholding a dismissal for personal jurisdiction even
though subject matter jurisdiction had not been determined.
Defendants asserting such immunity are entitled to a final
determination of their claims, including interlocutory appellate
review, before they are forced to bear "the burdens of
litigation".  See In re Papandreou, supra, 139 F.3d at 251. See
also, Price v. Socialist People's Libyan Arab Jamahiriya, 294
F.3d 82, 91 (D.C. Cir. 2002); Foremost-McKesson, Inc., v. The
Islamic Republic of Iran, 905 F.2d 438, 443 (D.C. Cir. 1990); and
Junqquist v. Sheikh Sultan Binkhalifa Al Nahyan, 115 F.3d 1020,
1025-27 (D.C. Cir. 1997).

Defendants are filing in support of the present Rule 12(b)
motion a copy of the affidavit of Ambassador Nasser Al-Kidwa that
was filed on June 13, 2003 in support of the June 13, 2003 motion
in Ungar, the 19 documents attached to the affidavit, and a copy
of a law review article by Prof. John Quigley that was included
in defendants reply on the motion.  The affidavit and documents
attached thereto are attached hereto as Exhibit 2, the article is
attached as Exhibit 3.

The History and Elements of Palestine Statehood are
presented in Amb. Al-Kidwa's affidavit beginning with GA Res. 181
(II), adopted in 1947. (Aff. at p. 2)  This resolution
partitioned Mandated Palestine into a Jewish and an Arab state
intended to become the states of Israel and Palestine. (Tab 1)

4

(Tab references herein are to the documents attached to Amb. Al-Kidwa's affidavit.)  GA Res. 181(II) and many other documents relevant to Palestinian statehood and the peace process, susceptible of judicial notice, are published and appear on several internet websites, including the website of the Permanent Observer Mission of Palestine to the United Nations, www.palestine-un.org.

Defendants request the Court to take judicial notice of the evidence provided by all relevant United Nations documents and proceedings on the Question of Palestine and related matters demonstrating Palestinian statehood, many of which are submitted with or cited in Amb. Al-Kidwa's supporting affidavit. Defendants also ask the Court to take judicial notice of the roadmap publicly announced by the U.S. State Department on April 30, 2003, which is the latest international effort in the peace process, and other relevant public statements and actions of the United States and sponsors of the road map and other participants in the new and ongoing peace process.  All of these materials demonstrate and confirm Palestine's longstanding satisfaction of the elements of statehood, as well as the nonjusticiability of the complaint's extreme allegations against the PLO and PA.  A New York Times editorial evaluating the present status of the peace talks, dated October 31, 2003, is Exhibit 4, hereto.

The complaint alleges 13 counts in all, paras. 66-165, twelve against all defendants, and one, the third count, for international terrorism pursuant to 18 U.S.C. sec. 2333 against the PLO and PA and John Does 1-99.  The complaint's wherefore

5

clause demands judgment against all defendants, jointly and severally, as to each count.  Compensatory and punitive damages, and attorneys fees and costs are demanded.

## II   Palestine Has Long Satisfied The Definition Of Statehood

Ambassador Al-Kidwa's affidavit presents and refers to salient portions of Palestine's public history, relevant documentation and judicially noticeable facts that establish that Palestine satisfies each of the four elements of the controlling definition of a state set forth in sec. 201 of the Restatement (Third), Foreign Relations Law of the United States (AL1 1987). The affidavit is supported by documents attached and cited which verify its text.

## A.   The Four Elements Of Statehood Have Long Been Satisfied By Palestine

The four elements of Palestinian statehood as set forth in the generally accepted definition in sec. 201 of the Restatement are:

1.   That Palestine has a defined territory

2.   That Palestine has a permanent population

3.   That the PA and PLO function effectively as the a Government of Palestine

4.   That Palestine conducts formal relations with other states

Statehood is not dependent on recognition.  <u>Restatement</u>s, sec. 202, comment b.  Cases that cite the <u>Restatement</u> as the

authoritative test of statehood include in addition to
Klinghoffer, supra, 937 F.2d at 47; Matimak Trading Co. v.
Khalily, 118 F3d 76, 80 (2d Cir. 1997) and Kadic v. Karadzic, 70
F3d 232, 244 (2d Cir. 1995), among others.

1. **Defined Territory**

Beginning at least with the Palestinian state described at
length in U.N. General Assembly (GA) Resolution 181 adopted on
November 29, 1947 partitioning mandated Palestine, (Tab 1),
Palestine has always had defined borders and territory, though
they have been disputed and  changed from time to time.
References beginning with "Tab" are to the documents attached to
Amb. Al-Kidwa's affidavit, which is Exhbit 2 hereto.

Palestine's defined territory today, as commonly recognized,
consists of the West Bank, the Gaza Strip and East Jerusalem.
There may be disagreement about the exact boundaries of the
territory of Palestine, and Israel too, but there can be no doubt
there is a Palestinian state with defined borders and territory
though border disputes may exist.  As the United States
representative maintained at the United Nations on  December 2,
1948 in speaking in favor of the admission of Israel to UN
membership:

> Israel was clearly an independent state having a people
> and a territory. Both reason and history demonstrated
> that the concept of territory did not necessarily
> include precise delimitations of the boundaries of that
> territory.

See 1948-49 Yearbook of the United Nations.

The West Bank, including lands Israeli settlers are
illegally occupying, has an area of approximately 5860 sq. Km,

7

consisting of land of 5,640 and water 220 sq. Km, an area slightly smaller than the State of Delaware.  The Gaza Strip is approximately 360 sq. km, which is all land with no water, slightly more than twice the size of Washington, D.C.. Source, CIA World Book.  East Jerusalem is approximately 7 sq. km.

**2.    Permanent Population**

The second element, of permanent population is satisfied by the millions of Palestinians living in Palestine.

More than two millenniums before Palestine became the British mandate that existed when the United Nations was created there was and has always been a permanent Palestinian population living in Palestine as it now exists and the much broader adjacent lands.  The United Nations has always acknowledged the permanence of the Palestinian people since its establishment in San Francisco in 1945.  The Question of Palestine became a continuing concern of the United Nations at the time of its creation before Resolution 181 was adopted in the fall of 1947, and has remained so continuously thereafter.  Estimated as of July 2002 the population of the West Bank was 2,163,667 and the Gaza Strip 1,225,911. Source: CIA World Book.  It is generally considered that over 200,000 Palestinians live in East Jerusalem.

As with any state, there will be questions about whether specific individuals in Palestine are part of the permanent population.  This does not negate the existence of the permanent population.

**3.    The Functioning Government**

The functions of the Palestine government are set forth in
Ambassador Al-Kidwa's affidavit and accompanying exhibits which
describe the founding in 1964 of the PLO as the representative of
the Palestinian people, the establishment of the PA under the
Oslo peace accords in 1993 and the governmental activities and
responsibilities they have exercised and are exercising.  The PA
and PLO are parts of the functioning government of Palestine
today albeit under extremely difficult circumstances of
occupation.  The government services are complete, limited only
by intervention and compulsion by the occupying power.

**4.   Palestine Engages In Foreign Relations**

The fourth element, engaging in foreign relations and
possessing the capacity to do so, is shown, among many other
things, by the many nations that have established full formal
diplomatic relations with Palestine.  See e.g. para. 13 and 14 of
Ambassador Al-Kidwa's affidavit.

On November 15, 1988 the Palestine National Council declared
the independence of the State of Palestine, Tab 5.  A month later
the declaration of independence was acknowledged by the U.N.
General Assembly in Resolution 43/177, 15 Dec 1988.  Tab 6.
This Resolution, among other things, affirmed the need to enable
the Palestinian people to exercise their sovereignty over
Palestinian territories occupied by Israel, as have many other
U.N.  resolutions both before and since, and decided that the
designation "Palestine" should be used in place of the "PLO" as
of December 15, 1988 throughout the UN system for all UN purposes
including the observer status that had been conferred upon the

PLO in November 1974. (Tab 4).   Palestine has at all times since
December 15, 1988 been the accepted referent for all U.N.
purposes.   The number of nations conducting full formal
diplomatic relations with Palestine has increased since its
Declaration of Independence in 1988.

The status and activities of Palestine as U.N. Observer and
its right to participate in UN matters first granted to the PLO
in November 1974 (Tab 4) has been much expanded over the years.
In November 1998 the status of its Mission at the United Nations
was upgraded by the Secretariat in various ways and use of the
title "Ambassador" was authorized.   Palestine's right to
participate in UN activities became tantamount to that of full
members except for the right to vote and eligibility to fill one
of the rotating seats on the Security Council.   The diplomatic
recognition which more than a majority of states worldwide extend
is overwhelming accorded to "Palestine".   The General Assembly
has time and again recognized the sovereignty of Palestine, see
as one recent example GA Res. 57/269, March 5, 2003 recognizing
the permanent sovereignty of the Palestinian people over their
water and other natural resources notwithstanding the Israeli
occupation of Palestinian territory (Tab 19).

Palestine's substantial and increasing participation in the
work of the United Nations itself shows capacity and engagement
in foreign relations, both with the U.N. and member nations. see,
e.g. para. 15.

**B.   Palestine's Sovereignty Over The West Bank And The Gaza
      Strip Demonstrates Its Statehood**

10

Palestine's statehood also arises from its sovereignty over the Gaza Strip and West Bank before and after the commencement of Israel's belligerent occupation.  See Quigley, Making Peace Agreements Work: The Implementation And Enforcement Of Peace Agreements Between Sovereigns And Intermediate Sovereigns: Article: The Israel-PLO Interim Agreements: Are They Treaties? 30 Cornell Int'l L.J. 717 (1997), pointing out that while Israel disputes Palestine's sovereignty it does not claim sovereignty itself, but substitutes its control under occupation as a temporary sovereignty, concluding that Israel is an occupant only and that Palestine is sovereign in the Gaza Strip and West Bank and hence a state, see pp. 726-29.

The tragic failure of the Oslo Accords to achieve their announced objectives within the initially prescribed 5 year period was a failure of the peace process, not of Palestine's sovereignty.  The PA and PLO, during and after the period in which the Oslo Accords faltered and failed, continued to constitute and function as the sovereign government of Palestine and did so with increasing effectiveness in the provision of all the services of government under the  extremely difficult conditions of occupation.

**C.   Israel's Illegal Occupation Of The Palestinian Territories And Oppressive Measures Under The Occupation Have No Legal Effect On Palestine's Statehood.**

The statehood of Palestine is established under the Restatement's definition notwithstanding Israeli occupation of

11

Palestinian territories since 1967 and Israel's oppressive
measures against the Palestinian people and government.  The
occupation has not and cannot extinguish the State of Palestine
under international law.  Israel's oppressive policies and
measures under the occupation are universally deemed illegal
under the Fourth Geneva Convention and other relevant instruments
of international humanitarian law. See Ardi Imseis, On the Fourth
Geneva Convention and the Occupied Palestinian Territory, 44
Harv. Int'l Law J. 65 (2003).  The nature and extent of the
occupation has changed frequently and the physical intrusion and
oppression varies constantly, but statehood survives.

     The harmful effects of some oppressive measures such as
widespread use of excessive military force are obvious, resulting
in death and injury and destruction of property.  The harmful
effects of other measures, many unknown outside Palestine, are
often not self-evident or obvious and can be underestimated, as
for example, the harmful effects of measures such as impediments
to work and travel, and imposition of checkpoints and curfews.
The occupation and oppression cause constant suffering by the
Palestinian people which has produced a continuing humanitarian
crisis and anger and violence and support for violence that would
not otherwise exist.  These harmful effects of Israel's
oppressive measures were recently confirmed and deplored by
Israel's top ranking soldier, the military's Chief of Staff as
reported in the New York Times on October 30, 2003 in an article
attached as Exhibit 5 hereto.  The miserable living conditions
the Palestinian people are being forced to endure today in the

West Bank and Gaza Strip create several humanitarian crises, described in the 1 July 2002 - 30 June 2003 Report of the Commissioner - General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East.  The first three pages of the report are attached hereto as Exhibit 6 and identify the website on which the entire report is published.

It is these acts of violence and repression committed by Israel against Palestinians, and Palestinian violence against Israel that the peace process addresses.  They do not and cannot negate Palestinian statehood.

Palestine is not able to end the occupation by force, or, to date, by negotiation.  It cannot prevent many oppressive Israeli measures, even the forced confinement of the PA's President to the rubble of the PA offices in Ramallah for over two years.  It is often coerced into acceptance of conditions it opposes or would reject, many exacted by Israel in violation of international law controlling Israel as an occupying power. These conditions no doubt affected the language and substance of agreements reached including the Oslo Accords.  To the extent that the Oslo Accords or other agreements conflict with the requirements of the Fourth Geneva Convention, the Convention prevails as a matter of international law. See, Imseis, supra, 44 Harv. Int'l. Law J. at 127.

Any limitations and restrictions on the functioning of the Palestinian government to which plaintiffs might point to argue Palestine fails to meet the governance element or other aspects of the Restatement's definition of a state are caused by the

occupation and the oppressive and coercive conduct of Israel
under the occupation and do not alter the statehood of Palestine.

The Statehood of Palestine cannot be defeated on the basis
of limitations and restrictions upon the Palestinian government
and the Palestinian people caused by occupation and repression as
a matter of international law and fundamental fairness.

**D.   The PA and PLO Are Part Of The State Of Palestine And
      Must Be So Recognized For Purposes Of The Foreign
      Sovereign Immunities Act and 18 U.S.C. sec. 2337(2)**

Both the PA and PLO are entitled to the same immunity as
Palestine.  They constitute core structural elements and perform
core functions of the government of Palestine as it now operates,
crippled and compromised as it is by the Israeli occupation.
Accordingly the PA and PLO must be recognized as part of the
state of Palestine itself.  Cf. Transaero, Inc. v. La Fuerza
Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994) (2-1), cert.
denied, 513 U.S. 1150 (1995) (the armed forces of a state must in
all cases be considered as part of the foreign state itself); see
Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir.
2003) (same with respect to the Iranian Ministry of Intelligence
and Security (MOIS); see also Regier v. Islamic Republic of Iran,
2003 U.S.Dist LEXIS 15523 (D.D.C. September 8, 2003), following
Roeder, holding MOIS must be considered part of Iran, against
which punitive damages can not be awarded under the FSIA, noting
and declining to follow several District Courts in awarding
punitive damages against MOIS, notwithstanding Roeder.

The statute under which plaintiffs are proceeding in the present case purports to authorize a civil action under 18 U.S.C. sec. 2333 "against any person," see 18 U.S.C. sec. 2334, and very broadly defines person in sec. 2331(3) to mean "any individual or entity capable of holding a legal or beneficial interest in property."  While technically the PA and PLO may meet this extremely broad definition of "person," they are not proper defendants and this action against them must be dismissed because they are entitled to the same immunity as the State of Palestine itself.  This includes the bar sec. 2337(2) of Title 18 imposes against maintenance of this action as well as entitlement to sovereign immunity under sec. 1604 of the FSIA.

It should be pointed out that as far as defendants have been able to determine, no nation has claimed its courts have jurisdiction over cases against Palestine for death or personal injury based on acts occurring within the Palestinian territories, including Israel which as of this time has many such suits pending in which its courts have declined to exercise jurisdiction over Palestine and Palestine is claiming immunity, and have ruled instead that the Justice Ministry should be asked to answer the questions of jurisdiction and immunity, which to date neither the Ministry nor the Israeli government appears to have done.

Because defendants must be treated as a foreign state, they are entitled to immunity under FSIA sec. 1604.  None of the exceptions to sec. 1604's grant of immunity set forth in sec. 1605(a)(1)-(7) are applicable.  Maintenance of this action is

also barred by 18 U.S.C. sec. 2337(2), which unlike the FSIA contains no provision for its waiver.

The provision that is commonly known as the Flatow Amendment, set forth in a note following sec. 1605, entitled "Civil Liability for Acts of State Sponsored Terrorism" does not affect defendants immunity and the complaint fails to state a legally sufficient claim against defendants under this amendment for at least three reasons: (1) the Flatow Amendment by its language which omits mention of the foreign state itself creates no cause of action against foreign states, (2) the Flatow Amendment was not enacted as part of the FSIA, but was passed separately as an incomsperious part of a very large bill without hearings or other legislative consideration and was simply codified administravely to sec. 1605.  Since it not part of the FSIA it cannot create a liability against a foreign state, since the FSIA is the sole source of a foreign state's liability. Argentine Republic v. Amerada Hess, 488 U.S. 428 (1989),  and (3) the equivalence required by the last sentence of the Flatow Amendment as a matter of foreign policy to safeguard against the resentment among nations the assertion of liability against their officials might otherwise arouse, is lacking and cannot be meaningfully measured.  No liability should be imposed under the Flatow Amendment in the absence of this equivalence.


**III. If Subject Matter Jurisdiction Is Upheld, This Action Should Be Dismissed Pursuant To Rule 12(b)(2),(4) And (5) For Lack Of Personal Jurisdiction and Lack of Process And Service Of Process**

If defendants are correct and they must be treated as a foreign state, both the process and service of process claimed by plaintiffs are insufficient because they fail to comply with the requirements of FSIA sec. 1608(a) including the giving of notice of suit in the form prescribed by the Secretary of State. Dismissal would be necessary without regard to whether exceptions to jurisdictional immunity listed in FSIA sec. 1605 are all inapplicable.

If defendants are denied treatment as a foreign state, personal jurisdiction is lacking because defendants do not have the minimum contacts with the United States required by the Due Process Clause.  The ruling in <u>Price</u> v. <u>Socialist People's Libyan Arab Jamahiriya</u>, supra, 294 F.3d at 85, 95-100, that foreign states are not persons for purposes of the Due Process Clause would be inapplicable if defendants were denied treatment as a foreign state.

The contacts with the United States of Palestine's Mission to the United Nations and its Ambassador and staff in New York should be excluded entirely without any allocation between UN and non-UN activities, a distinction which defendants submit was incorrectly drawn in <u>Klinghoffer</u> v <u>S.N.C. Achille Lauro</u>, <u>supra</u>, 937 F.2d at 51-52 but which even if correct when made, is no longer valid, given Palestine's much greater role at the United Nations.  None of these contacts would exist in New York if the United Nations were located elsewhere.

The activities of the Foreign Mission in Washington and its staff are largely if not entirely within the exception for

government contacts recognized in <u>Klinghoffer</u>, <u>supra</u>, 937 F.2d at 51, which should exclude speeches, lectures, media appearances and other non-commercial activities.  The public importance of activities engaged in for the purpose of presenting the case for Palestine and its concerns and views to the American public as well as the U.S. government is of unprecedented importance today in view of the importance of the peace process and the heightened significance the Israeli-Palestinian conflict has for U.S. and international foreign policy.  These considerations require that the government contacts exception have this broad scope.

The service of process claimed by defendants is also disputed as a factual matter.

Issues of personal jurisdiction are secondary to this Court's subject matter jurisdiction and their resolution, and any discovery that may be appropriate with respect to them, should be deferred as "burdens of litigation" until after subject matter jurisdiction is finally resolved.

**IV.  The Complaint Is An Extreme Political Attack On The PLO and the PA Government And As Such Is Non-Justifiable.**

As is typical of the complaints in the recent cases that have been filed against the PLO and PA, arising from violence in the Palestinian territories, the complaint in this case filed in November 2002, makes wild accusations against the PLO and PA claiming a long history of terrorist activity in general and in conclusory terms spanning more than three decades.  Nearly all of these politicized allegations have nothing to do with the bombing that is the subject of this action.  They amount to an all-out

18

political attack upon the PLO and the PA, for alleged conduct
over decades and are of such wide political and emotional scope
as to be nonjusticiable, raising issues that are not appropriate
for or capable of judicial resolution.

The complaint states, for example:

28. Since its establishment in the 1960s and until the
present day, defendant PLO has funded, planned and
carried out thousands of terrorist bombings and
shootings, resulting in the deaths of hundreds of
innocent civilians and the wounding of thousands more.

The complaint further alleges that these thousands of
bombings and shootings reflect the PLO's systematic policy and
practice and are a means of advancing and achieving the PLO's
political goals. id.  It alleges that the PLO "has rarely, if
ever, carried out terrorist attacks in its own name," but has
funded, planned and carried out violent attacks through organized
agents that plan and execute attacks:

"on behalf of and for the PLO, and/or as agents and/or
as instrumentalities and/or as alter egos of the PLO,
using various and sundry appellations and noms de
guerre." para. 29.

Similar unrestrained and political charges continue in
paras. 29 and 30.  The PLO is said to have received "at all times
relevant hereto" massive support of all kinds from Syria and the
other Syrian defendants for terroristic purposes, see e.g. paras.
33-37.  The Syrian defendants are alleged to have conspired and
acted in concert with the PLO to further the PLO's terrorist
acts.

During the same "relevant period", the complaint alleges the
PA also provided the PLO with massive support and resources of

all kinds for terroristic purposes.  See e.g. paras. 45-52, and conspired and acted in concert with the PLO to commit terrorist acts, including bombings.  See para. 52.

The complaint alleges that the PLO and John Does 1-99 named as defendants at an unknown date or dates before February 16, 2002 planned and chose to carry out the bombing that occurred on that date in a town in the "Samaria region of the West Bank" where hundreds of Americans lived, para. 57.

If further alleges that the suicide bomber, which who names as one Sadek Abdel Hafeq was "an agent and/or employee" of the PLO and John Does 1-99, and that he entered a pizzeria, went directly to a table at which teenagers were conversing in English and detonated the explosive device he was carrying with "which he was provided for this specific purpose by the PLO and John Does 1-99", paras. 58-61, and which the PLO and John Does 1-99 had constructed. para. 65.

Plaintiffs' extreme partisan allegations of terrorism against the PLO and PA are similar to many statements of Prime Minister Sharon and the combative and hostile actions of his government, including the Israeli cabinet's action over the objection of several members in denigrating the PA as a terrorist organization.  The judicial process is not appropriate for assessing general and conclusory allegations of conduct of a distant and foreign functioning government and its officials over a period of decades which do not present a case, or controversy as defined in Article III, Section 2 of the Constitution.  Fact finding committees usually political in nature, have done their

best to examine these facts with only partial success and with great difficulty.  The Palestinian-Israel conflict, and particularly the high level of violence and antipathy over the months since September 2000 have created a situation akin to the conflict which supported the ruling of non justiciabliity in Linder v. Portocarrero, 963 F.2d 332 (11th Cir. 1992).  Linder was an action for damages arising from the brutal killing in Nicaragua in April 1987 of a U.S. citizen by Contra forces during what the Court described as a civil war.  The Defendants were three organizations, the Nicaraguan Democratic Force, the United Nicaraguan Opposition, and the Nicaraguan Resistance, controlling the Nicaraguan anti-government military forces (contras), and four individuals alleged to be leaders of the organizations. Linder was wounded, captured, then stabbed repeatedly in the face and shot in the chest at point blank range.  The District Court dismissed the entire case on defendant's Rule 12(b)(6) motion as nonjusticiable.  The Court of Appeals reversed as to the individual defendants, but affirmed the dismissal of the defendant organizations on grounds of non-justiciability, stating:

> "We do, however, agree with the district court that the broad allegations of the claims in the amended complaint against the defendant organizations, FDN, UNO and NR, which comprise the entire military and political opposition in Nicaragua, are non-justiciable, and the motion to dismiss them was properly granted."

Plaintiffs in Linder did not have a statute available to them as basis for a claim, similar to 18 USC sec. 2333 the statute plaintiffs here are relying on.  This makes no difference

21

because the reasons for nonjusticiability in <u>Linder</u> would have been unaffected by such a statute.

The complaint in effect proposes that this Court or a jury assesses the Palestinian-Israeli conflict over the years in order to adopt the complaint's political and prejudiced view that all the violence in the region and beyond was by the PLO and PA was pure terrorism, instigated, conducted and orchestrated by them and that they bear sole responsibility for all violent acts alleged to have been committed by Palestinians anywhere over the past three decades or more.

Contentions of this type and scope are not only a fabricated and false reading of history and current events, they are non justiciable.  They raise subjects and issues that courts cannot appropriately and competently address and resolve - - matters with which politicians and diplomats and governments have been struggling for years and that are currently frustrating the faltering peace process.  The issues are the subject of virtually daily extensive coverage in the media and constant political commentary.  The Court can take judicial notice of authoritative reports of the Palestinian-Israeli conflict which demonstrate that contrary to the complaint's one-sided perspective, there are two sides to the conflict.  These reports point to many factors, unmentioned in the complaint that must be taken into account in seeking a balanced explanation and assessment of violence over the years in the occupied territories.  But still they are not proper subject matter for cases in U.S. Courts.

One factor crucially important to understanding the political struggle and the quagmire the judiciary will enter if it seeks to adjudicate history in progress, is that the Israeli occupation of the Palestinian territories in the West Bank, the Gaza Strip and East Jerusalem as it is implemented and enforced is illegal.  Both the occupation and the ever expanding Israeli settlements in the Palestinian territories are deemed overwhelmingly by the international community to be illegal and violate the 4th Geneva Convention.

The U.S. State Department's Country Report on Human Rights Practices in the Occupied Territories for the year 2000 ("the DOS 2000 report"), Exhibit 7 hereto, adverts to the illegality:

> The international community considers Israel's authority in the occupied territories to be subject to the Hague Regulations of 1907 and the 1949 Geneva Convention relating to the Protection of Civilians in Time of War.  The Israeli Government considers the Hague Regulations applicable and states that it observes the Geneva Convention's humanitarian provisions.

Even this description by the U.S. State Department glosses over Israel's rejection of the important restraints the Geneva Conventions impose on an occupying power such as Israel.  The Geneva Conventions fully apply and are being openly and blatantly violated by Israel.  The United States shies away from facing this reality as is evidenced for example by its absence, together with Israel, from the recent conference of the High Contracting Parties to the 4th Geneva Convention in Switzerland convened to cope with Israel's actions with respect to the Convention, and votes the United States has cast and vetoes it has exercised in the Security Council to protect Israel from the lawful

23

consequences of its illegal actions.  See e.g., the U.S. veto on December 15, 2001 of a U.N. Security Council draft resolution condemning excessive Israeli violence in the Occupied Palestinian Territory and urging establishment of a monitoring mechanism (12 votes in favor, 2 abstentions, Norway and the United Kingdom), the U.S. veto on October 15, 2003 of a Security Council resolution condemning the 400 mile security barrier Israel is constructing in the West Bank and its vote the next week, on October 21, 2003, against a similar General Assembly resolution which passed on a 144-4 vote with 12 abstentions.  The other 3 votes against the resolution were cast by Israel, Micronesia and the Marshall Islands.

The Conference of High Contracting Parties to the 4th Geneva Convention issued a Declaration on December 5, 2001, sharply critical of Israel's violations of the Convention.  The Declaration which is submitted on this motion as Exhibit 8 reads in part:

> 12.  The participating High Contracting Parties call upon the Occupying Power to fully and effectively respect the Fourth Geneva Convention in the Occupied Palestinian Territory, including East Jerusalem, and to refrain from perpetrating any violation of the Geneva Convention.  They reaffirm the illegality of the settlements in the said territories and of the extension thereof....
>
>        *       *       *
>
> 14.  The participating High Contracting Parties also call upon the Occupying Power to refrain from perpetrating any other violation of the Convention, in particular reprisals against protected persons and their property, collective penalties, unjustified restrictions of free movement, and to treat the protected persons

24

humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

Another compelling and authoritative assertion of the U.N. has repeatedly found Israel to be in continuous violation of the 4th Geneva Convention.  A representative and authoritative example is provided by a resolution of the U.N. Commission on Human Rights, Geneva, Resolution 2001/7 (E/CN.4/RES/2001/7 dated 18 April 2001, submitted on this motion as Exhibit 9.  The resolution reads in part:

6.   Expresses its grave concern at the Israeli settlement activities in the occupied territories, including Jerusalem, such as the construction of new settlements and the expansion of existing ones, the expropriation of land, the biased administration of water resources, the construction of roads and house demolitions, all of which violate human rights and international humanitarian law, besides being major obstacles to peace, urges the Government of Israel to implement the relevant United Nations resolutions as well as the recommendation of the Commission regarding the Israeli settlements, and calls on the Israeli security forces to ensure the protection of the population in the occupied territories, including preventing, investigating and prosecuting acts of violence committed by Israeli settlers;

7.   Reaffirms that the Geneva Convention relative to the Protection of Civilian Persons in Time of War is applicable to the Palestinian territory and other Arab territories occupied by Israel since 1967, including East Jerusalem, and considers any change in the geographical and demographic status of the city of East Jerusalem from its situation prior to the June 1967 war to be illegal and void;

8.   Condemns the expropriation of Palestinian homes in Jerusalem, the revocation of identity cards of the citizens of the Palestinian city of Jerusalem, the imposition of fabricated and exorbitant taxes, with the aim of forcing the Palestinian citizens of Jerusalem, who cannot afford to pay these high taxes, out of their homes and out of their city,

25

> preparing in this way the path for the Judaization
> of Jerusalem, and calls upon the Government of
> Israel to put an end immediately to these
> practices;

As diplomatic, neutral and objective as the DOS 2000 report strives to be, it does not ignore the oppressive violence and conduct committed by the Israeli military and Israeli civilians against Palestinians in the occupied territories.  It states:

> Israeli's overall human rights record in the occupied
> territories was poor; although the situation improved
> slightly during the first 9 months of the year, it
> worsened in several areas late in the year, mainly due
> to the sustained violence that began in September.
> Israeli security forces committed numerous serious
> human rights abuses during the year.  Security forces
> killed 307 Palestinians and four foreign nationals and
> injured at least 11,300 Palestinian and other persons
> during the year.  Israeli security forces targeted for
> killing a number of Palestinians whom the Israeli
> Government stated had attacked or were planning future
> attacks on Israeli settlements or military targets; a
> number of bystanders reportedly also were killed during
> these incidents.  Since the violence began, Israeli
> security units often used excessive force against
> Palestinian demonstrators.  Israeli security forces
> sometimes exceeded their rules of engagement, which
> provide that live fire is only to be used when the
> lives of soldiers, police, or civilians are in imminent
> danger.  IDF forces also shelled PA institutions and
> Palestinian civilian areas in response to individual
> Palestinian attacks on Israeli civilians or settlers; 7
> Palestinians and 1 foreign national were killed, and
> 131 Palestinians were injured in these attacks.

> *          *          *

> Israeli civilians, especially settlers, harassed,
> attacked, and occasionally killed Palestinians in the
> occupied territories.  There were credible reports that
> settlers killed at least 14 Palestinians during the
> year.  In one case, an Israeli civilian killed a
> Palestinian who previously had attacked a settlement
> and killed an IDF soldier.  Settlers also caused
> economic damage to Palestinians by attacking and
> damaging greenhouses and agricultural equipment,
> uprooting olive trees, and damaging other valuable
> crops.  The settlers did not act under government
> orders in the attacks; however, the Israeli Government

did not prosecute the settlers for their acts of
violence.  In general settlers rarely serve prison
sentences if convicted of a crime against Palestinians.

Unlike the complaint in this action, the DOS 2000 report

maintains some balance, mentioning violence and misconduct by

Palestinians as well as Israelis.

The DOS 2000 report refers to the provocative visit on

September 28, 2000 to the Temple Mount by the then opposition

leader and now Prime Minister Ariel Sharon, and the unrest and

violence that followed the next day at the site and thereafter

throughout the occupied territories and continues to this date.

It is generally accepted that Prime Minister Sharon's visit to

the Temple Mount accompanied by approximately 1000 police

officers was intentionally provocative and triggered the violence

that has persisted thereafter to this day, thus encompassing the

alleged October 30, 2000 assault that is the nominal subject of

this action.

The DOS 2000 Report states:

On September 28, Israeli opposition leader Ariel Sharon
visited the Temple Mount (Haram al-Sharif) in
Jerusalem.  On September 29, Palestinians held large
demonstrations and threw stones at police in the
vicinity of the Western Wall.  Police used rubber-
coated metal bullets and live ammunition to disperse
the demonstrators, killing 4 persons and injuring
approximately 200.  Following this incident,
Palestinians began violent demonstrations against IDF
soldiers, settlers, and other Israeli civilians
throughout the occupied territories; these
demonstrations and ensuing clashes-known to
Palestinians and many Israelis as the "al-Aqsa
Intifada" –between Palestinians and IDF soldiers
occurred daily through the end of the year.

The Mitchell Report issued on April 30, 2001 by an international fact finding committee appointed by President Clinton in October 2000, headed by former U.S. Senator and Federal District Judge George Mitchell and attached hereto at Exhibit 10 describes Prime Minister Sharon's visit to Temple Mount as follows:

> In late September 2000, Israeli, Palestinian, and other officials received reports that Member of the Knesset (now Prime Minister) Ariel Sharon was planning a visit to the Haram al-sharif/Temple Mount in Jerusalem. Palestinian and U.S. officials urged then Prime Minister Ehud Barak to prohibit the visit.  Mr. Barak told us that he believed the visit was intended to be an internal political act directed against him by a political opponent, and he declined to prohibit it.
>
> Mr. Sharon made the visit on September 28 accompanied by over 1,000 Israeli police officers.  Although Israelis viewed the visit in an internal political context, Palestinians saw it as highly provocative to them.  On the following day, in the same place, a large number of unarmed Palestinian demonstrators and a large Israeli police contingent confronted each other. According to the U.S. Department of State, "Palestinians held large demonstrations and threw stones at police in the vicinity of the Western Wall. Police used rubber-coated metal bullets and live ammunition to disperse the demonstrators, killing 4 persons and injuring about 200."  "According to the GOI, 14 Israeli policemen were injured."
>
> Similar demonstrations took place over the following several days.  Thus began what has become known as the "Al-Aqsa Intifada" (Al-Aqsa being a mosque at the Haram al-Sharif/Temple Mount). (footnotes omitted).

The Mitchell Report is generally considered to be a responsible, authoritative attempt to understand and assess  the months of violence that began at the end of September 2000 and have continued to this date.  It is considered to be a fair and balanced view of the Palestinian-Israeli conflict.  President Bush, among many others, has publicly expressed approval of the

Report and urged the parties to follow its recommendations.  The

Report states in part:

> Despite their long history and close proximity, some
> Israelis and Palestinians seem not to fully appreciate
> each other's problems and concerns.  Some Israelis
> appear not to comprehend the humiliation and
> frustration that Palestinians must endure every day as
> a result of living with the continuing effects of
> occupation, sustained by the presence of Israeli
> military forces and settlements in their midst, or the
> determination of the Palestinians to achieve
> independence and genuine self-determination.  Some
> Palestinians appear not to comprehend the extent to
> which terrorism creates fear among the Israeli people
> and undermines their belief in the possibility of co-
> existence, or the determination of the GOI to do
> whatever is necessary to protect its people.

> Fear, hate, anger, and frustration have risen on both
> sides.  The greatest danger of all is that the culture
> of peace, nurtured over the previous decade, is being
> shattered.  In its place there is a growing sense of
> futility and despair, and a growing resort to violence.

> * * *

> Palestinians are genuinely angry at the continued
> growth of settlements and at their daily experiences of
> humiliation and disruption as a result of Israel
> presence in the Palestinian territories.  Palestinians
> see settlers and settlements in their midst not only as
> violating the spirit of the Oslo process, but also as
> an application of force in the form of Israeli's
> overwhelming military superiority, which sustains and
> protects the settlements.

> * * *

> Neither side will be able to achieve its principal
> objectives unilaterally or without political risk.  We
> know how hard it is for leaders to act -- especially if
> the action can be characterized by political opponents
> as a concession -- without getting something in return.
> The PA must -- as it has at previous critical junctures
> -- take steps to reassure Israel on security matters.
> The GOI must -- as it has in the past -- take steps to
> reassure the PA on political matters. Israelis and
> Palestinians should avoid, in their own actions and
> attitudes, giving extremists, common criminals and
> revenge seekers the final say in defining their joint

29

future.  This will not be easy if deadly incidents
occur in spite of effective cooperation.
Notwithstanding daunting difficulties, the very
foundation of the trust required to re-establish a
functioning partnership consists of each side making
such strategic reassurances to the other.

The foregoing materials are presented not to persuade the

Court of the nature and merits of the conflict but to demonstrate

the non-justiciability of the issues plaintiffs are attempting to

litigate by their all-out political attack upon the PLO and PA

going far beyond the suicide bombing that is the subject of this

action.  The conflict is the subject of worldwide headline news

in the media on a daily basis.  These issues are the essential

subject matter of the ongoing, fragile and all important peace

process and should not be inflamed by judicial intervention which

is both impermissible and incapable of resolving them.


                              Respectfully submitted,


                              _____
                              Maher H. Hanania Bar # 464766
                              Hanania & Nawash
                              6066 Leesburg Pike
                              Suite 101
                              Falls Church, VA 22014
                              703-778-2400

                              Ramsey Clark
                              Lawrence W. Schilling
                              36 East 12th Street
                              New York, NY 10003
                              212-475-3232

                              Attorneys for Defendants