UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, et al.

Plaintiffs,

02 CV 2280 (RJL)

vs.

THE SYRIAN ARAB REPUBLIC, et al.

Defendants.

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ENTRY OF JUDGMENT BY DEFAULT AGAINST DEFENDANTS PALESTINE LIBERATION ORGANIZATION AND PALESTINIAN AUTHORITY**

**Introduction**

This is a civil action pursuant to the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* ("ATA"), and supplemental causes of action, brought by United States citizens, and by the guardians, family members and the personal representatives of the estates of United States citizens, who were killed and injured by a terrorist bombing at a pizzeria in the town of Karnei Shomron, in the Samaria region of the West Bank, on February 16, 2002.

The Complaint in this action, which was filed on November 18, 2002, alleges that the bombing was carried out by the Palestine Liberation Organization ("PLO"), with the cooperation and the material support and assistance of the Palestinian Authority ("PA"), the Syrian Arab Republic, and a number of Syrian government agencies and officials ("Syrian parties").

The PLO, the PA and the Syrian parties were all named as defendants in the Complaint. Plaintiffs subsequently dismissed the Syrian parties without prejudice from this action pursuant to Fed.R.Civ.P. 41(a)(1)(i). Dkt. #55.[1]

The PLO and PA are thus the only defendants remaining in this action.

In November 2003, the PLO and PA moved under Fed.R.Civ.P. 12(b) to dismiss this action for lack of subject-matter jurisdiction (on grounds of sovereign immunity and nonjusticiability), lack of personal jurisdiction, and lack of process and service of process ("defendants' Rule 12(b) motion"). Dkt. nos. 26, 28.

The plaintiffs submitted a detailed memorandum in opposition to defendants' Rule 12(b) motion, supported by extensive exhibits. Dkt. #32.

On February 7, 2005, this Court denied defendants' Rule 12(b) motion.[2]

Neither the PLO nor the PA filed an answer following the denial of their Rule 12(b) motion, and their default was accordingly entered pursuant to Fed.R.Civ.P 55(a) on April 12, 2005. Dkt. #52.[3]

---

[1] Plaintiffs have initiated a separate action in this Court under 28 U.S.C. §1605(a)(7) against the Syrian defendants. *See Shatsky et al. v. Syrian Arab Republic, et al.*, No. 06-cv-00724-RJL.

[2] Notably, the PLO and PA have raised the identical jurisdictional challenges in numerous other ATA actions brought against them in the federal courts, which have been repeatedly rejected. *See Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424 (S.D.N.Y. 2004); *Knox v. Palestine Liberation Organization*, 229 F.R.D. 65 (S.D.N.Y. 2005); *Ungar v. Palestinian Authority*, 315 F. Supp.2d 164 (D.R.I. 2004); *Ungar v. Palestinian Authority* 325 F. Supp.2d 15 (D.R.I. 2004) aff'd 402 F.3d 274 (1st Cir. 2005); *Biton v. Palestinian Interim Self- Government Authority*, 310 F.Supp.2d 172 (D.D.C. 2004); *Biton v. Palestinian Interim Self-Government Authority*, 412 F.Supp.2d 1 (D.D.C. 2005); *Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153 (D.D.C. 2006); *Gilmore v. The Palestinian Interim Self-Government Authority*, 422 F.Supp.2d 96 (D.D.C. 2006); *Saperstein v. Palestinian Authority*, (Civ. No. 04-20225) (S.D.Fla.), Order Granting in Part and Denying in Part Motion For Default Judgment, entered July 11, 2006, dkt. #61.

Thus, this Court's denial of the Rule 12(b) motion filed by the PLO and the PA is fully supported by unanimous previous and subsequent authority.

[3] The PLO and PA have similarly elected to default other ATA actions brought against them following denial of their Rule 12(b) motions to dismiss. *See e.g. Knox v. Palestine Liberation Organization*, 230 F.R.D. 383, 384 (S.D.N.Y. 2005) (the PLO and PA informed the court "that they 'have instructed counsel to present only their position that U.S. courts have no jurisdiction over them and not to answer on the merits. Therefore no answer on the

Plaintiffs have now moved for entry of judgment by default against the PLO and PA pursuant to Fed.R.Civ.P. 55(b)(2).

As discussed *infra*, the Court will grant plaintiffs' motion and order entry of judgment by default in favor of plaintiffs and against the PLO and PA in the amounts set forth below.

## I.   FINDINGS OF FACT

### A.   The Bombing

At approximately 7:30 pm on Saturday evening, February 16, 2002, a suicide bomber entered the Karnei Shomron pizzeria and detonated his explosive pack.  He killed three children, and maimed, burned, and otherwise destroyed the lives of dozens of other victims. Transcript of the Deposition of Chana Friedman ("C. Friedman") at 16-17. The list of victims includes not only those who were murdered or injured in the attack but their parents and other family members as well.  All of the victims suffered, and those who survived continue to suffer immense emotional pain.

### B.   The Victims

Two of three children killed, Keren Shatsky and Rachel Thaler were American citizens, as were several of the wounded, including plaintiffs Leor Thaler, Chana Friedman, Hillel Trattner and Steven Braun.[4] Leor Thaler, Rachel's teenaged younger brother, received severe burns and shrapnel wounds over most of his body. Chana Friedman, then 14-years old, also

---

merits of the complaint will be filed.'"); *Ungar v. Palestinian Authority* 215 F.R.D. 36, 40 (D.R.I. 2003) ("Defendants candidly admitted that, even if the motion for reconsideration were denied, they would not file an answer to the Amended Complaint but would continue with their present course of action and seek relief in the Court of Appeals"); *Gilmore v. The Palestinian Interim Self-Government Authority*, 01-853-GK, Order of January 29, 2007, directing entry of default.

[4] To prove their U.S. citizenship and that of the decedents, plaintiffs have submitted copies of United States passports and certificates of death abroad issued by the United States embassy in Israel. The Court notes at the outset that the decedents were, and all the plaintiffs except for plaintiffs Ginette Thaler and Ronit Trattner are, American citizens. As discussed below, Ginette Thaler is entitled to bring an action under §2333 of the ATA because her daughter, U.S. citizen Rachel Thaler, was killed in the bombing. Ronit Trattner asserts a non-federal cause of action for battery.

survived the bombing, but like many of the survivors she required several operations to remove shrapnel. Chana underwent plastic surgery to reconstruct her face and months of painful treatment for her burns. Like Leor Thaler's suffering, Chana Friedman's physical wounds were mirrored by emotional and psychological injuries.

Hillel and Ronit Trattner, a recently-married couple, were finishing their meal at the pizzeria when the bomb went off. Both were severely injured in the bombing; Hillel lost the use of one eye and suffered permanent disfigurement of his face and head. Steven Braun was wounded in both legs by shrapnel and projectile debris.

Most of these victims continue to suffer from moderate to severe Post-Traumatic Stress Disorder ("PTSD") and associated depression. These psychological injuries severely impact the victims' lives in drastic ways. They interfere with personal relationships and academic and career advancement; they cause recurring nightmares, crying bouts, flashbacks, sleep disorders, anxiety attacks, and even death ideation.

Because the bombing was so destructive and the list of victims so lengthy, the following list is provided for reference. The names of those who were killed or physically injured in the bombing appear in bold type, and their family members are listed in the column below. The findings of fact and conclusions of law will be organized in a similar fashion.

1. **Keren Shatsky, 14 years old. Keren was killed in the attack when a piece of shrapnel ripped through her neck**.

    a. Shabtai (Scott) Shatsky, father.
    b. Jo Anne Shatsky, mother.
    c. Tzippora Shatsky, sister
    d. Yoseph Shatsky, brother
    e. Sara Shatsky Tzimmerman, sister
    f. Miriam Shatsky, sister
    g. David Shatsky, brother

2.      **Rachel Thaler, 16 years old. Rachel suffered severe head injuries and burns. She died of her wounds twelve days after the attack**.

    a. Ginette Thaler, mother.
    b. Michael Thaler, father.
    c. **Leor Thaler**, brother (injured in the attack, see below).
    d. Zvi Thaler, brother.
    e. Isaac Thaler, brother.

3.      **Leor Thaler, 14 years old at the time of the attack, brother of Rachel Thaler. Leor was severely wounded in the bombing**.

    a. Ginette Thaler, mother.
    b. Michael Thaler, father.

4.      **Chana ("Chanie") Friedman, 14 years old at the time of the attack. Chanie was severely wounded in the bombing**.

    a. Bella Friedman, mother.
    b. Yehiel Friedman, brother.
    c. Ilan Friedman, brother.
    d. Zvi Friedman, brother.
    e. Miriam Friedman, sister.

5.      **Hillel Trattner, 27 years old at the time of the attack and newly married. Hillel was severely wounded in the bombing**.

    a**. Ronit Trattner**, wife, (injured in the attack, see below).
    b. Shelly Trattner, mother
    c. Aron Trattner, father

6.      **Ronit Trattner, 22 years old at the time of the attack, Hillel Trattner's bride. Ronit was also wounded in the bombing**.

    a. **Hillel Trattner**, husband (injured in the attack, see above)

7.      **Steven Braun, 46 years old at the time of the attack. Steve was injured in the bombing**.


C.      **Findings of Fact.**

1.      **Keren Shatsky and family.**

*"Well, I mean, it's kind of perverse, hoping your daughter is wounded in a hospital."*
S. Shatsky at 24.

1.      Early in the evening of Saturday, February 16, 2002, Shabtai Shatsky, joked with his youngest daughter, Keren, then 14, while he packed his suitcase. Mr. Shatsky and another daughter, Sara, would soon be boarding a flight for New York to visit his mother and ailing father. S. Shatsky[5]. at 13-14; S. Tzimmerman at 9.

2.      At some point, Keren told her mother and sister that she was going out for pizza with her friends. J. Shatsky at 11; M. Shatsky at 9.

3.      It had been a rare Sabbath, with all six Shatsky children at home. J. Shatsky at 13. Shabtai took a break from his packing to drive his oldest daughter, Tzippora to the bus stop for her return trip to Jerusalem. S. Shatsky at 12.

4.      As Mr. Shatsky and Tzippora drove towards the bus stop, someone told them a bomb had exploded at the mall. S. Shatsky at 12. Mr. Shatsky believed that Keren was still at home. S. Shatsky at 15. But, as a member of the community's emergency response team, he rushed Tzippora back to the house, donned his response team vest and returned to the mall. S. Shatsky at 16.

5.      Mr. Shatsky arrived to find the small shopping center in a state of chaos, people running back and forth trying to rescue survivors and locate relatives and friends. S. Shatsky at 11 -12, 17. He approached the inner area of the pizza parlor where the bomb had exploded. It was nighttime and the lights of the mall had been blown out by the explosion; he could not see inside the pizzeria. S. Shatsky at 21.

6.      Someone told him that the scene had already been cleared of any additional security risks, meaning explosives. And, having no idea that his youngest daughter Keren lay

---

[5] All references herein containing a first initial and last name refer to the deposition transcript of the witness.

dying on the floor, Mr. Shatsky backed off to allow the medical personnel to do their work. S. Shatsky at 17-18.

7.      At the Shatsky home, Jo Anne and the other children were trying to find Keren. J. Shatsky at 10-11. Because of the attack, the phone lines were down and the cellular networks were also not functioning properly. J. Shatsky at 11. Some of the Shatsky children went out searching for Keren. J. Shatsky at 11. While the Shatskys knew that Keren had intended to go to the pizza shop, they did not know whether she had arrived before the bomb went off. J. Shatsky at 10-11. As Jo Anne Shatsky explained, "Usually, when she left the house, they'd do this whole routine of going around house to house to pick up their friends. I kept wanting to believe she hadn't gotten there yet." J. Shatsky at 10-11.

8.      Giving up on the telephones, Tzippora and Sara Shatsky went out looking for Keren. J. Shatsky at 12-14; T. Shatsky at 10-12. They started at some friends' houses and then went to the mall. J. Shatsky at 12-14. There, the sisters met the high school principal, who told them some of the injured children had been taken to area hospitals. J. Shatsky at 14; T. Shatsky at 13. The principal was going to Meir Hospital in nearby Kfar Saba and suggested that Tzippora and Sara join her. J. Shatsky at 14. They notified their parents and went. J. Shatsky at 14.

9.      Mr. Shatsky, still at the bomb scene, saw Bella Friedman, the mother of Keren's best friend, Chanie. Mrs. Friedman was "fairly hysterical." S. Shatsky at 18. Rumors were already circulating that the bombing caused fatalities and there were many injured. S. Shatsky at 18. But there were still no names. In the minutes and hours after the bombing, information was hard to come by.

10.     After seeing Mrs. Friedman and hearing bits and pieces from others, the Shatskys began to realize that Keren had probably been at the mall as well. S. Shatsky at 21. Unable to

locate Keren, the Shatsky family regrouped at home. S. Shatsky at 22-23. They decided to split up and search the area hospitals to see whether she had been evacuated to one of them. Id. at 23. Shabtai Shatsky recalls his thoughts as they headed for one of the hospitals: "Well, I mean it's kind of perverse, hoping your daughter is wounded in a hospital. But at that point, that was basically our best hope." S. Shatsky at 24.

11.     Shabtai, Jo Anne, and one or two of the Shatsky children got into one car and headed for Meir Hospital. S. Shatsky at 24. On the way to Meir Hospital, the Shatskys received a phone call from Tzippora and Sara, who were already there with the school principal. J. Shatsky at 18-19. The daughters reported that Keren was not at Meir Hospital. J. Shatsky at 18-19. The Shatskys decided to pick up Tzippora and Sara and together look in another hospital.

12.     At the hospital, the authorities had released a list identifying the injured and where they were taken. T. Shatsky at 15. When Tzippora saw that Keren was not on the list, she began to cry. T. Shatsky at 15. It was obvious to Tzippora that her sister had been killed. Id.

13.     Meanwhile, an information center had been established back in Karnei Shomron. J. Shatsky at 19. Jo Anne called a social worker stationed there and asked for information on Keren. Jo Anne told her that they were on their way to Meir Hospital to pick up their daughters and then search the other hospitals. Id. The social worker responded that the Shatskys should instead go to Meir Hospital, and wait there. Psychological counselors would meet the Shatskys at Meir Hospital. Id. Few doubts remained for Jo Anne. Id.

14.     When they arrived at Meir Hospital, the Shatskys were told to sit in a crowded waiting room until information became available. S. Shatsky at 24-25. They all just sat, cried, prayed, and waited. J. Shatsky at 22; Y. Shatsky at 16.

15.     As time passed, the pressure grew, and Keren's father lost all composure.

8

> And I just--at that point, I guess I was really losing hope, and I just went to some nearby room where I could just be alone. And I remember kind of like just laying on the floor and just like kind of banging my head against the floor on the nearby wall.
>
> My son came over and tried to get me to stop. I was just really so depressed at that point.

S. Shatsky at 25.

16.     Finally, Keren's body was identified.

17.     The Shatskys were sent to the Abu Kabir forensic institute to positively identify the body of their young daughter. S. Shatsky at 26. Abu Kabir is approximately a one-hour drive from Kfar Saba, but for the Shatskys, time ceased to exist. Id. at 26; J. Shatsky at 24; T. Shatsky at 17.

18.     After positively identifying Keren by a birthmark on her little finger, the family was allowed in to see her. Id.

19.     The cause of death was determined to be a piece of shrapnel that tore through Keren's neck from behind, severing her esophagus. Id.

20.      Keren Shatsky was the "baby" of the Shatsky family and in many ways the focus of the family's attention. S. Shatsky at 30-31; J. Shatsky at 39; T. Shatsky at 18; S Tzimmerman at 8; M. Shatsky at 22-24; D. Shatsky at 9. The Shatsky family pulled together after Keren's murder, but neither the individuals nor the family as a whole has recovered. S. Shatsky 38-42, 44; Y. Shatsky at 19, 21, 25; As Jo Anne Shatsky testified, "When something like that happens, in a certain respect, the whole family dies with her. Nothing's the same." J. Shatsky at 40.

21.     Shabtai Shatsky continues to suffer from chronic dysthymia (depression) and pathological bereavement. Affidavit of Dr. Rael Strous, M.D., incorporating by reference the

9

Psychiatric Evaluation of Shabtai Shatsky at page 4-5.[6] He no longer enjoys life or social interactions. Id. at 3, 4. Mr. Shatsky no longer has any professional ambition, and finds life meaningless. Id. at 3, 4. And, while he does not express any intention to commit suicide, he feels that he would be happy to die. Id. at 3. According to Plaintiffs' psychiatric expert, Mr. Shatsky will continue to suffer from this chronic symptomology. Id. at 5.

22.     Jo Anne Shatsky, like her husband, continues to suffer from chronic dysthymia and pathological bereavement. Strous, Evaluation of J. Shatsky at 4. Unlike her husband, Mrs. Shatsky attempts to conceal her suffering. For an entire year following Keren's murder, Jo Anne forced herself to put on an "act" in front of others. But, inside, she felt as if she did not exist. Strous, Evaluation of J. Shatsky at 3. Plaintiffs' psychiatric expert predicts that Mrs. Shatsky will continue to suffer from this chronic symptomology. Id. at 5.

23.     Each of the Shatsky children suffered severe mental anguish, both on the night of their sister's murder and during the years that followed. Their family has been forever changed by the loss of their sister and the trauma suffered by all of the survivors. Keren Shatsky came from a close-knit family and her older siblings all testified as to their intense feelings of loss over the murder of their youngest sister. T. Shatsky at 18-23; S Tzimmerman at 8, 28-30, 32-33; M. Shatsky at 22-32; D. Shatsky at 9-10, 18-19, 23-25; Y. Shatsky at 19, 21-25.

### 2.     Rachel and Leor Thaler and family.

*"My G-d, am I going to lose two children tonight."* G. Thaler at 10.

24.     Ginette Thaler remembers February 16, 2002 as a warm Saturday night in Karnei Shomron. G. Thaler p. 7. Ms. Thaler had her windows open for air as she sat in front of her

---

[6] Hereafter, Dr. Strous's affidavit will be referred to by citation to the individual Psychiatric Evaluations incorporated therein, and the page number in each particular evaluation.

computer. Id. Suddenly, she heard a loud explosion and emailed a friend, who lived in another section of town. Id. At first the friend speculated that the noise came from a nearby Arab village, but two minutes later the friend corrected herself. A bomb had gone off in the mall. Id.

25.     Ms. Thaler immediately thought of her daughter, Rachel, two weeks past her sixteenth birthday, who had gone to the pizza shop in the mall with a group of friends. Id. at 8; L. Thaler at 7. A single mother, Ginette grabbed her youngest son, Zvi, and hurried to the mall to find Rachel. G. Thaler at 8. She was not yet concerned about Leor, her middle child. He was at a friend's house, she thought. Id.

26.     Ginette and Zvi Thaler arrived at the mall and began searching for Rachel. The area where the pizza parlor once stood had been cordoned off, and only security and medical personnel were permitted inside. G. Thaler at 8. Ms. Thaler began asking around to see whether anyone had seen Rachel. Id. She saw the injured being carried into ambulances and looked to see if Rachel was among them. Id. at 8-9. Ms. Thaler testified, "I was half-looking, but I didn't really want to see. I wanted to see and I didn't want to see." Id. at 9.

27.     Then, Zvi told his mother that he had seen one of Rachel's friends being taken into an ambulance. Id. at 10. Until that point Ms. Thaler could still hope that her daughter had not been in the pizza parlor during the blast. Now she knew for sure. Id.

28.     Then more bad news came. A list of people who were at the mall at the time of the blast was being compiled. Zvi saw that Leor's friend Nehemiah was on the list. Id. That meant that Leor was probably there, too. Id. at 10. Ms. Thaler recalled, "The thought that went through my head at that point was, my G-d, am I going to lose two children tonight." Id.

29.     Earlier that evening, Leor Thaler had gone to the home of his friend, Nehemiah. L. Thaler at 12. But, after a few hours at Nehemia's house, the boys received a call from some friends inviting them to the pizzeria. Id.

30.     When they arrived, Nehemia sat at one table and Leor at another. Id. at. 15. Leor remembers standing to walk towards Nehemia's table. Id. The next thing he remembers is picking himself up from the floor after being thrown 4 or 5 meters against a wall. Id. at 15, 18, 19.

31.     Leor did not even hear the explosion that his mother had heard several blocks away. Id. at 19. He remembers only the prolonged silence, followed by screams of horror. Id. at 19, 21.

32.     Leor stood up and saw shattered glass everywhere. "Everything was black. The whole place was full of nails, shrapnel, bolts, like full of holes on the walls." L. Thaler at 21. In shock, Leor started walking out of the mall towards the town's security station. Id. at 27-28. At first, he felt no pain from the dozens of pieces of shrapnel that had torn through his body; but he sensed burning on his face, arms, legs, and torso. Id. at 22, 26. As he walked away from the mall, Leor reached across to scratch his right arm and pulled out a nail. Id. at 23. Only then did Leor realize he was covered with blood. Id. at 22-23, 27.

33.     Leor started walking back towards the mall. Nehemia's brother saw that the blast had embedded a second nail in Leor's neck and forced Leor to lie down with the other wounded "in a row of bodies." Id. at 23-24. As Leor talked with an injured girl lying next to him, he realized that he could no longer hear. Id. at 24. Then, he passed out. Id. Leor was in and out of consciousness until he arrived at the hospital where the doctors anesthetised him for surgery. Id. at 24-26.

34.     Back at the bomb scene, Ginette learned that Leor had been sent to Meir hospital in Kfar Saba, but Rachel was taken to Beilinson Hospital in Petach Tikva. G. Thaler at 11. She recalls, "The next thought in my head was, how do I split myself into two and be with both of them." Id.

35.     Ginette does not remember who told her that she must go to Beilinson to be with Rachel, but that is what she did. Ginette sent a friend to Meir Hospital, where Leor was. Id. On her way to Beilinson, someone from Meir Hospital called Ginette to have her describe Leor. When she did, she was told that he was being taken into surgery. Ginette knew that she should go to Leor's side. G. Thaler at 13. However, the person accompanying her in the car spoke with someone at Beilinson and was told that despite Leor's surgery, Ginette must continue to Beilinson to be with Rachel. Id.

36.     As Doctor Strous explained, the conflicting demands of her two seriously-injured children "further deepened her panic and sense of loosing control and overwhelming confusion, panic, anxiety and sense of inner terror." Strous, Evaluation of G. Thaler at 2. Dr. Strous added: "Being exposed to all this, with two children severely injured, placed Ginette in 'another world,' intensely traumatized, feelings of unreality, feeling that she is forced to function." Strous, Evaluation of G. Thaler at 2.

37.     At the time of the bombing, Rachel and Leor's father, Michael, was living in Jacksonville, Florida. M. Thaler at 7. On the evening of February 16, 2002, Michael turned on his computer to check the news. The top story was the bombing in Karnei Shomron. M. Thaler at 11. Jacksonville is located in the Eastern Standard time zone and is seven hours behind Israel. Because of the time delay, news outlets were already reporting that 2 were killed and 29 wounded. M. Thaler at 11. An observant Jew, Michael Thaler did not use electronic media, such

as television or the Internet during the Sabbath. M. Thaler at 11. As a result, this was the first he heard of the attack.

38.     Michael immediately tried calling Ginette. M. Thaler at 11. It was around 3:00 a.m. in Israel when he called, and nobody answered at Ginette's house. M. Thaler at 11-12. Ginette soon called him and told him about their children. M. Thaler at 13.

39.     After not sleeping all night, Michael boarded a Sunday morning flight to New York, and from there he transferred to a flight to Israel. M. Thaler at 15. On the second leg of the flight, he read about his own children in the Israeli newspapers. M. Thaler at 15.

40.     Michael was a Holocaust survivor and a veteran of the Vietnam and Yom Kippur wars, as a member of the United States and Israeli armed forces, respectively. But he was not prepared for this tragedy. M. Thaler at 28.

41.     He arrived in Israel Monday morning and went straight to Rachel at Beilinson Hospital. She was unconscious and would remain so until being removed from the life support machinery. M. Thaler at 20, 22.

42.     Michael was given a room at a guest house near the hospital. M. Thaler at 25. He would sit *shiva,* the traditional Jewish seven-day mourning period, in that room during the week after Rachel died. M. Thaler at 25. This locale for *shiva* enabled him to be near Leor, with whom he would spend the nights while Ginette was back in Karnei Shomron. M. Thaler at 25.

43.     Upon her arrival at Beilinson Hospital on the night of the attack, Ginette was told by a nurse that Rachel's "face had been torn apart," and that her jaw was broken. G. Thaler at 14. But she did not receive much more information.

44.     Ginette waited with families of two other victims who were also undergoing surgery. G. Thaler at 14-15. Medical personnel were occasionally updating the other families, but Ginette heard nothing about Rachel. G. Thaler at 14-15.

45.     While she was waiting, Ginette received a phone call. Leor's friend Nehemiah was dead, she was told. G. Thaler at 15. Ginette testified that Leor and Nehemia had been extremely close and that Nehemia was always at the Thaler home. Id. "[H]e was like a brother to Leor, he was like a son to me." G. Thaler at 15.

46.     Then, in another phone call, Ginette was told that Leor had undergone the first two of what would be several operations; a nail had been removed from his neck. G. Thaler at 16.

47.     Finally, a neurosurgeon came out to update Ginette on Rachel's condition: a piece of metal had entered Rachel's brain and caused severe injuries including brain contusion and subdural hematoma. Her jawbone and clavicle were fractured. And she sustained multiple shrapnel and burn wounds. G. Thaler at 16; Affidavit of Dr. Alan Friedman regarding Rachel Thaler, para. 12, 17.

48.     Rachel was unconscious and unresponsive when she arrived at the hospital. Affidavit of Dr. Alan Friedman at para. 13. However, Chana Friedman, who had been sitting next to Rachel in the pizza shop, distinctly heard Rachel scream "very very hard" and cry "in a terrible voice that sounded like it came from her soul." C. Friedman at 18; Declaration of Chana Friedman at para. 4, 5, 7.

49.     Dr. Friedman, the Plaintiffs' medical expert, found that Rachel's injuries were not immediately life-ending. He opined that the brain swelling and subsequent complications that

ultimately killed Rachel would take several minutes or hours to develop. Dr. Alan Friedman, Declaration and Report on Rachel Dina Thaler at ¶ 19.

50.     Based on his evaluation of Rachel's injuries and Chana's testimony regarding Rachel's screaming and crying following the explosion, Dr. Friedman concluded that Rachel "suffered at least one, and possibly several minutes of extreme pain and suffering from the time of the blast until she succumbed to her injuries and lost consciousness forever." Id. at ¶ 20.

51.     On the second day after the attack it became clear that Rachel would not survive. Ginette was told to have any family come to Israel from abroad. G. Thaler at 24. In the following days, the doctors began running tests to determine whether Rachel was brain dead. G. Thaler at 25-26. Approximately eleven days after the attack Ginette was asked whether she would donate Rachel's organs. G. Thaler at 25. She consented, and on February 28, 2002, the doctors removed Rachel from the life support machinery and she died. G. Thaler at 26.

52.     Because Leor's needs were still so great, Ginette was not able to observe the seven-day mourning period known as *shiva*. G. Thaler at 42.

53.     As of the morning following the attack, Ginette had not yet been able to visit Leor in Meir Hospital. He had undergone several operations during the night and was still anesthetised. G. Thaler at 19. With Rachel in critical condition, Ginette could not leave her. G. Thaler at 19

54.     Around mid-day Sunday, someone at Meir Hospital called Ginette to tell her that Leor was awake. She immediately went to Meir Hospital. G. Thaler at 19. The travelling back and forth between her children at Beilinson and Meir Hospitals was taking a toll on Ginette. She wanted to move Leor to Schneider Children's hospital, which was connected to Beilinson, but

like his sister, Leor was in ICU and could not be moved until the Thursday after the attack. G.

Thaler at 28.

55.     Leor was badly injured. He had received multiple shrapnel wounds and severe

burns. Dr. Alan Friedman, Declaration and Report on Leor Thaler, ¶¶ 16-18. One of his ears had

been nearly torn off. He could not speak and was in intense pain. Leor wrote on a pad asking

about Rachel and Nehemia. G. Thaler at 20-22. Ginette did not think Leor was emotionally

prepared to hear that Nehemia had died. She told him that Rachel was in a different hospital and

left it at that. Id.

56.     He had tubes inserted in his stomach and down his throat. L. Thaler at 33, 42. He

was unable to drink liquids for the first five days after the attack. L. Thaler at 34. Despite all the

morphine, the pain was dreadful. L. Thaler at 32; G. Thaler at 28.

57.     Leor's recovery was slow. The doctors kept finding more shrapnel in his body,

and they also found indications that there was additional shrapnel that they could not locate. L.

Thaler at 33-35; G. Thaler at 29-30. To this day, Leor has a piece of shrapnel in his chest that

causes him pain. L. Thaler at 42-44. When asked about his scars from the shrapnel, Leor's

accounting took up several pages of deposition transcript. L. Thaler at 42-47, 51-52, 54-55.

58.     Leor sustained first and second degree burns on his body, face, legs and hands.

Dr. Alan Friedman, Declaration and Report on Leor Thaler at ¶¶ 19. Shrapnel injuries were

scattered throughout his body and he had nails embedded in his body in several places. Two nails

that the doctors feared might paralyze him were removed from his neck. Furthermore, he was

found to have bowel injuries as well as a ruptured gallbladder that was subsequently removed.

Id. ¶ 16.

59.     His ear was "torn off" with his tympanic membrane ruptured. To this day he suffers diminished hearing. Id. at ¶ 21. He also hears constant ringing or buzzing in his ears. L. Thaler at 56-57.

60.     In addition to being painful, Leor's injuries were a source of extreme embarrassment to him. L. Thaler at 31-33, 40-43. Upon his arrival at Meir Hospital, before administering a general anesthetic, the doctors removed a nail from his buttocks. L. Thaler at 31. Leor recalls one incident two weeks after the attack when some friends took him for a brief outing near the hospital:

> In the beginning, I was like embarrassed how I looked. I was all burned. I didn't eat for two weeks, two and a half weeks, three weeks. I was looking very bad.
> Then, like I remember going out of the hospital for one time after two weeks. The kids took me out. They wanted to take me to a movie or something.
> I went out on the street for around five minutes, and everyone I saw was staring at me. I didn't understand why. When I came back, I saw myself in the mirror. I said, I'm not going out of my room again.

L. Thaler at 54-55.

61.     Leor remembered his hospitalization as an intensely uncomfortable and painful experience with complete loss of control and with several medical complications including peritonitis. During the following year Leor underwent comprehensive rehabilitation including several further surgeries, involving additional shrapnel removal and an eardrum transplant. Strous, Evaluation of L. Thaler at 2. He also required physical therapy to regain full use of his left hand. L. Thaler at 58.

62.     The burn treatment was the most painful treatment for Leor. It was administered daily by scraping off the dead skin from his face and body. L. Thaler at 40-41, 51.

63.    Leor has not fully recovered from his injuries. He continues to suffer some from hearing loss as well as buzzing in his ears. Dr. Alan Friedman, Declaration and Report on Leor Thaler at ¶¶ 22, 27. Leor suffers from numbness in his hand and a burning sensation in his feet. Id. at ¶¶ 23, 28. When Leor tries to read, he suffers from blurry vision and headaches. Id. at ¶ 24. He has scarring over much of his body. Id. at ¶ 25. Finally, Leor suffered permanent bowel injuries which, in addition to the obvious discomfort could limit his occupational choices and affect his self-esteem. Id. at ¶ 30.

64.    He continues to suffer from headaches that have interfered with his school work. L. Thaler at 59. The former A-student was barely able to complete high school, and has taken just over half of his matriculation examinations. L. Thaler at 58-61.

65.    When Leor was transferred to the Schneider Children's Hospital five days after the attack, his mother finally told him that his best friend Nehemia had been killed. G. Thaler at 28-29; L. Thaler at 30. Leor took it very hard; He wanted to die. L. Thaler at 30.

66.    Leor says that he does not care about his own life. L. Thaler at 63, 67; G. Thaler at 33. "[H]e provides a clear picture of passive chronic 'death' ideation to a significant degree however without any plan regarding any suicidal ideation. There has been some mild improvement over the past year, however the intensity continues to prevail. On probing he admits to experiencing an 'indifference and apathy to the world.'" Strous, Evaluation of L. Thaler at 3.

67.    Leor also suffers from chronic moderate to severe post-traumatic stress disorder and "major depression" as a result of the bombing. Strous, Evaluation of L. Thaler at 6. His mental state is "very fragile." Id.

68.    Dr. Rael Strous, the plaintiffs' psychiatric expert opined:

> [I]t is my opinion that unfortunately Leor will continue in
> the future to suffer chronic symptomatology in the
> aftermath of the bombing despite considerable time having
> elapsed since the event. Considering his young age and the
> bombing coming at a critical period in his development,
> during which an important educational grounding is set, it
> is clear that the bombing has resulted in irreparable harm
> from a social, educational and psychiatric standpoint. He is
> a youth who has sustained severe damage during his critical
> mid adolescent years and which appears to be now
> manifested in several aspects of his life choices and
> opportunities (or the lack thereof). It appears that it will be
> close to impossible for him to return his previous optimal
> level of functioning and that this altered level of
> functioning will continue to affect his relationships,
> occupational opportunities and life path in the future.

Strous, Evaluation of L. Thaler at 5-6.

69.     As of the date of his deposition, Leor Thaler was working as a waiter in the falafel

stand that now occupies the space that once housed the Karnei Shomron pizza parlor. L. Thaler

at 71. He engages in body piercing. L. Thaler at 62-63; G. Thaler at 31. Since the bombing Leor

has developed a substance abuse problem. G. Thaler at 31; Strous, Evaluation of L. Thaler at 3.

70.     Ginette Thaler experiences enduring psychological pain and anguish that is

pervasive and affects all aspects of her life. Following the attack, Ginette sought psychological

help. She was chronically depressed and was prescribed antidepressant drugs. Strous, Evaluation

of G. Thaler at 3.

71.     Doctor Strous found that Ginette continues to feels alone, unsafe, and empty. He

concluded that Ginette Thaler continues to suffer from "chronic depression, pathological

bereavement reaction and adjustment disorder with disturbance of mood since the death of her

16-year-old daughter and severe injury of her 14-year son." Strous, Evaluation of G. Thaler at 4.

Doctor Strous added, "It is not expected that Ginette will ever completely recover from such a

traumatic experience and painful loss." Strous, Evaluation of G. Thaler at 4.

72.     Leor, Zvi and Isaac Thaler all testified as to their sense of loss over the death of their sister. Leor and Zvi lived with Rachel, and both felt the strain on the family caused by the murder. L. Thaler at 7, 64-65, 70-71; Z. Thaler at 22-24, 27; I. Thaler at 15-18.

73.     Leor experienced the bombing with Rachel; and Zvi went through the horror of the search with their mother. L. Thaler at 64-65; Z. Thaler at 8-14, 16-18.

74.     While Isaac lived apart from the other siblings, he too felt the loss intensely, naming his daughter after Rachel. I. Thaler at 15-18.

75.     All of the brothers suffered with their parents during the 10 days that Rachel held on to life, and during the years that followed her death. L. Thaler at 64-65, 70-71; Z. Thaler at 15-16, 18, 24-27; I. Thaler at 8, 10-13 ; 15-18.


**3.      Chana ("Chanie") Friedman and Family**

*There was a big big blast. There was like a second of silence, like a scary silence. And then, right afterwards, started screeching. Rachel screamed very very hard.*
*And my eyes were covered so I couldn't really open them, and I understood that I was in a bomb. So I wanted to get up. I tried getting up.*
*And I wanted to tell Rachel to come with me because I'm going to go out to go home. And I wasn't able to talk.* C. Friedman at 18.


76.     On Saturday evening February 16, 2002, Chana "Chanie" Friedman went out for pizza with Keren Shatsky, Rachel Thaler and several other friends. She was due home at 8:00 pm to baby sit for her little sister Miriam. B. Friedman at 6.

77.     At the pizzeria, Chanie sat next to Rachel Thaler. Leor Thaler was standing nearby. Keren Shatsky, Chanie's best friend, was seated two tables over with some other girls. C. Friedman at 8-9.

78.     Chanie saw the Palestinian bomber enter the restaurant and walk to the center of the room. He stared at Chanie and Rachel. He was unfamiliar to the girls and had a bag slung over his back. For a moment, Chanie thought, "Maybe he's a terrorist." C. Friedman at 14-18.

79.     Then, as Chanie remembers, "There was a big big blast. There was like a second of silence, like a scary silence. And then, right afterwards, started screeching. Rachel screamed very very hard." C. Friedman at 18.

80.     Chanie could not see Rachel because the ceiling had collapsed and her eyes were full of debris. C. Friedman at 13, 18. Chanie thought she had been blinded in the explosion. C. Friedman at 20.

81.     Chanie got up and ran out of the mall. She just wanted to go home. Chanie ran across the street and was nearly hit by a bus. The driver stopped and looked at her, trying to figure out what had happened. She told him about the attack, and he shouted at her to get on the bus. C. Friedman at 19.

82.     As she boarded the bus, Chanie started to feel the burning all over her body. The driver rushed her to an ambulance, and Chanie became very upset because she wanted to go home and tell her mother that she was okay. C. Friedman at 19.

83.     In the ambulance she continuously moved her arms and legs to confirm that she was not paralyzed. C. Friedman at 20.

84.     Meanwhile, Chana's mother, Bella, was at home preparing to go out to a concert. She did not hear the explosion. She only learned of the attack when her son called and told her about the bombing at the mall. B. Friedman at 6-7.

85.    Like the Shatskys and Ginette Thaler, Bella Friedman rushed to the mall to try unsuccessfully to locate her daughter. Bella was so distraught, she left her youngest, Miriam, at home alone with no explanation of what had occurred. M. Friedman at 6-7.

86.    At one point after the pizzeria had been cleared, two children were still missing: Chanie and Keren Shatsky. Rumor had it that one of them was dead. Then, Bella heard that someone had told one of Keren's sisters that Keren was in the hospital in Kfar Saba. The implication was clear. Bella believed that Chanie had been killed. B. Friedman at 10, 34.

87.    During this time of uncertainty, Bella was hysterical. B. Friedman at 9; Shabtai Shatsky at 18. In her panic, she lost control over herself; friends of hers had to physically restrain her. B. Friedman at 9.

88.    Hours later a paramedic called to tell Bella that Chanie was in the intensive care unit of the Schneider Children's Hospital. B. Friedman at 8. Chanie had been badly injured with multiple shrapnel wounds and severe burns throughout her body. B. Friedman at 8.

89.    When Bella finally found her daughter, Chanie was "unrecognizable." Her whole face was swathed in bandages. The doctors had attempted to sedate Chanie, but she would not be calmed; she was screaming for her best friend, Keren. B. Friedman at 12.

90.    The doctors changed Chanie's bandages. And when Bella saw Chanie's face, she was relieved that Chanie still had a nose and lips. But the rest of her features were burned beyond recognition. B. Friedman at 12-13.

91.    The burns were Chanie's most painful injuries. C. Friedman at 23-24. However, she also received multiple shrapnel wounds all over her face and body. C. Friedman at 23-26. Some shrapnel had entered her eye, but, no matter how hard they tried, the doctors were not able to remove all of it. C. Friedman at 30, 32. They were concerned that the operation would blind

her. Nor did the doctors remove all of the shrapnel from her face because they were concerned that the surgery would cause disfigurement. C. Friedman at 30, 32. She suffered temporary hearing loss, and to this day still hears buzzing noises. B. Friedman at 13-15.

92.   Chanie was hospitalized for ten days, during which she underwent the same kind of burn treatment as Leor Thaler. The nurses had to scrub her burns, "like scrubbing a pot with steel wool." B. Friedman at 14-15; C. Friedman at 24. The treatment was necessary to avoid infection. B. Friedman at 15.

93.   She was required to undergo 3½ weeks of excruciating skin debridements (scrubbing treatment) for her burns, the first ten days of which were administered while she was in the intensive care unit of the hospital. Dr. Alan Friedman, Declaration and Report on Chana Yaffa Friedman at ¶ 13. Chanie's right ear drum was perforated from the blast and she suffered temporary hearing loss as a result. She continues to suffer from tinnitus in her left ear. Id. at ¶¶ 14-15. As a result of a piece of shrapnel that entered her eye, Chanie is predisposed to the development of cataracts, visual loss, and even glaucoma. Id. at ¶ 16. Chanie suffers from scarring as a result of the burns and multiple shrapnel wounds. She has sensory loss in her left leg. Id. at ¶ 19.

94.   Chanie underwent physical therapy for her injuries and plastic surgery to restore her appearance. Notwithstanding the plastic surgery, Chanie still has scattered body scarring from the burns. In addition to limiting some of her physical activities, such as swimming, due to the unsightly scars that bother her, she is also affected from time to time by chronic discomfort due to the scarring. C. Friedman at 27-30, 35-36; Strous, Evaluation of C. Friedman at 3.

95.   Chanie continues to suffer from her emotional and psychological scars as well. Dr. Strous found that Chanie suffers from moderate to severe chronic post traumatic stress

disorder and associated dysthymic disorder (depression). Strous, Evaluation of C. Friedman at 4. These conditions manifest themselves in many ways.

96.     She continues to experience intrusive thoughts following the event as reflected by distressing recollections, recurrent nightmares of bombing, clear flashbacks and psychological trigger reactions. In addition she is somewhat anhedonic at times and avoids certain places (e.g. the Shatskys' house) and activities associated with the event. Strous, Evaluation of C. Friedman at 4.

97.     She also demonstrates signs of intermittent sleep disturbance and hypervigilence. She still experiences some signs of chronic dysthymia as reflected by frequent tearfulness, writing to herself and visiting her friend's grave frequently when alone. C. Friedman at 36-43; Strous, Evaluation of C. Friedman at 4.

98.     Her schooling and education were significantly set back by the bombing. Strous, Evaluation of C. Friedman at 4. Chanie was an "A" student in the ninth grade when the bombing occurred. Because of her psychological injuries, she could not return to school until she was in the twelfth grade. C. Friedman at 33-35; Strous, Evaluation of C. Friedman at 4.

99.     Dr. Strous opined that Chanie's post traumatic stress disorder, depression, reluctance to discuss the attack and the emotional pain she suffers as a result will all impact on her future relationships and academic options and opportunities. Strous, Evaluation of C. Friedman at 5.

100.    As for Bella Friedman, for three months after the bombing, she could not return to work. Caring for Chanie was a full time job. She was constantly with Chanie, taking care of her at home and bringing her to various medical and psychological appointments. B. Friedman at 16-18.

101.    Miriam Friedman, Chanie's younger sister testified that she felt to an extent as if she lost both her sister and her mother in the bombing. To this day, neither relationship has returned to its former strength. M. Friedman at 17, 18, 20-21.

102.    Chanie often refused to cooperate with psychiatrists and Bella spent much time going to the appointments herself to discuss with the professionals Chanie's feelings and behavior. Bella was trying to learn from the doctors how to treat Chanie. B. Friedman at 27.

103.    Bella had to give up two jobs from which she was earning about $4,000 per month. For the next two years, Bella could return to only one part-time job, from which she was earning about $1,100 per month. Her total lost wages totaled approximately $38,900. B. Friedman at 18-21.

104.    Because Chanie suffered from drastic swings in her perception of heat and cold, Bella had to purchase special air conditioners and heaters for Chanie's room and for the house. Bella estimates that one air conditioner cost $3,000. She does not know how much the heater cost. B. Friedman at 21-22.

105.    Bella finds that her relationship with Chanie has changed since the attack. Before the attack, Chanie was a caring and helpful daughter and sister. Since then, other family members find her to be extremely impatient and angry. B. Friedman at 28-29, 32-33, 37.

106.    Bella Friedman continues to suffer "chronic dysthymia and adjustment disorder with disturbance of mood." Strous, Evaluation of B. Friedman at 3. Her dysthymia manifests itself in Bella's low energy levels, poor sleep, and chronic depressed moods. Strous, Evaluation of B. Friedman at 3.

107.    Chanie Friedman's siblings, all of whom had been very close with Chanie prior to the attack have also suffered palpably.

108.    Miriam, eleven years old at the time of the bombing, had been a constant and welcome tag-along with Chanie, Keren Shatsky, and their friends. M. Friedman at 9.

109.    Chanie's brothers were also very close with Chanie. Declaration of I. Friedman at ¶ 13; Declaration of Z. Friedman at ¶¶ 7, 10; Declaration of Y. Friedman at ¶¶ 7-10, 12.

110.    Learning of the attack, and Chanie's injuries was very painful for all of the Friedman children. M. Friedman at 7-8, 10, 11, 14; Declaration of I. Friedman at ¶¶ 12-14; Declaration of Z. Friedman at ¶ 7; Declaration of Y. Friedman at ¶¶ 7-11.

111.    All of the Friedman siblings similarly continue to worry about Chanie. They feel that she has changed and their relationships with her and with their mother have changed. Chanie is no longer the warm, patient and open sister that she had been before the bombing. M. Friedman at 15, 16, 19; Declaration of I. Friedman at ¶¶ 12-13; Declaration of Z. Friedman at ¶¶ 9-10; Declaration of Y. Friedman at ¶¶ 12-14.

112.    Following the attack, Miriam, the youngest Friedman child, suffered both socially and academically in school. M. Friedman at 11, 13. She says that she, herself, is no longer the happy and friendly person she was before February 16, 2002. M. Friedman at 21, 22. "I don't have a normal life anymore," Miriam says. M. Friedman at 21.

113.    All of the Friedman children are more fearful than before. Chanie's brothers also fear for their sister's well being. Declaration of I. Friedman at ¶ 15; Declaration of Z. Friedman at ¶¶ 9-10; Declaration of Y. Friedman at ¶¶ 14-15.

114.    Miriam Friedman likewise worries about her sister. She is also personally afraid to go out in public, afraid that her own home will invaded by terrorists, and afraid she will lose others close to her. M. Friedman at 18, 23, 24.

115.    Miriam wakes up at night with these fears and is plagued by dreams that she will lose loved ones. M. Friedman at 24.

**4.    The Trattner Family.**

116.    Hillel and Ronit Trattner had been visiting Hillel's parents for the weekend and decided to get something to eat on their way out of town. R. Trattner at 11. The newlyweds were finishing their meal when Ronit heard a loud explosion She knew immediately what it was. R. Trattner at 12. She looked across the table to see her young husband unresponsive with blood gushing from his head and eye. R. Trattner at 12-14.

117.    Ronit screamed for help; Hillel looked severely wounded. R. Trattner at 14. So shocked was Ronit that at first she did not even notice her own injuries, which were not minor. She would be hospitalized for 10 days with burns on her face, head, hands, and legs, and shrapnel wounds to her legs, chest, and side. R. Trattner at 12-14, 17.

118.    Hillel's parents were at home at the time of the attack. They heard the blast of the terrorist's bomb and were naturally concerned. But, they believed that Hillel and Ronit had already left town. A. Trattner at 6. But then, they learned from the Mayor of Karnei Shomron that Hillel and Ronit had been among the injured. A. Trattner at 7. For hours, the Trattners did not know whether Hillel had survived. A. Trattner at 7.

119.    When they finally found Hillel at Beilinson Hospital, he was unrecognizable. A. Trattner at 7. Hillel's face and head were so battered that his family could identify him only by his feet and wrist watch. S. Trattner at 9.

120.    Hillel's mother says she was never so scared in her entire life. S. Trattner at 13. His father agrees. "The uncertainty was one of the most frightening things I've ever undergone, not knowing." A. Trattner at 9.

121.    Hillel Trattner suffered traumatic brain injury, left ear and eye damage, facial fractures, burns, sensory loss, and shrapnel wounds. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 12.

122.    Several bones in the area of his eye were fractured and a piece of shrapnel transected his left optic nerve. These injuries caused retinal detachment, swelling, and internal bleeding. As a result, Hillel was rendered permanently blind in his left eye. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶¶ 13, 14, 32; H. Trattner at 17.

123.    Both of Hillel's ear drums were ruptured. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 15. Hillel has only partial hearing in his left ear. And this disability, like Hillel's blindness, is permanent. Id. at ¶¶ 27, 33; H. Trattner at 17.

124.    During his hospitalization, Hillel underwent two operations to remove shrapnel and repair damage caused by the bombing. H. Trattner at 19. The doctors were unable to remove some of the shrapnel that had lodged in his head, hand, and foot. H. Trattner at 17; Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 16. Hillel endured months of throbbing pain from the shrapnel wound in his foot. H. Trattner at 20. Also in the hospital, Hillel underwent painful treatment for the first and second degree burns on his face. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 17.

125.    The doctors' primary concern, however, was Hillel's head injuries, which included a brain contusion and subdural hematoma. Id. at ¶ 13; H. Trattner at 19. Hillel had shrapnel lodged in the left temporal-parietal lobe of his brain. The doctors did not even attempt

to remove it; they were concerned that the procedure would do more damage than the shrapnel, itself. H. Trattner at 19-20.

126.    Because of the head injury, Hillel was unable to talk for some time after the explosion, but his speech gradually returned over time. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 18. However, he still has difficulty speaking. Id. at ¶ 28. Additionally, Hillel does not remember the bombing or anything else that occurred that night and for the following three days. H. Trattner at 7, 13-14; Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶¶ 11, 30.

127.    Like Ronit, Hillel stayed in Beilinson Hospital for ten days after the bombing. H. Trattner at 18. Upon his release, however, Hillel did not return home. Instead, he was sent to a rehabilitation center, where he would rehabilitate his hand and learn how to walk. H. Trattner at 23-24.

128.    After approximately one week at the Rehabilitation center, Hillel experienced a severe reaction to one of his medications. Hillel was re-admitted to the intensive care unit at Beilinson Hospital where he was diagnosed and treated for toxic hepatitis. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 22. He remained hospitalized for two additional weeks before being discharged back to the rehabilitation center, where he stayed for another two months. H. Trattner at 21-22. This period was followed by another month of daily treatment at the rehabilitation center. H. Trattner at 22-23.

129.    Hillel's time at the rehabilitation center was extremely painful, both physically and emotionally. He was very frustrated at his inability to perform routine tasks. H. Trattner at 45. Hillel was separated from his wife for four months of treatment and rehabilitation. H. Trattner at 50-52. During this period, the Trattners could not have marital relations. H. Trattner

at 52; R. Trattner at 28. And even after Hillel returned home, it took time before their relationship would normalize. H. Trattner at 50-52; R. Trattner at 25-28.

130.     For Ronit too, Hillel's rehabilitation was particularly difficult. She herself was recovering at home from injuries, without the companionship of her husband. R. Trattner at 27-28. She worried that their marriage would not survive the stress. R. Trattner at 25.

131.     Both Hillel and Ronit missed several months of work, and the attack took a toll on their financial stability. Hillel testified that over the course of nearly three years following the attack, he lost approximately $33,000 in lost wages.[7] Ronit also missed time from work for her rehabilitation and during the time she was taking case of Hillel. R. Trattner at 7-9. She estimates that her total lost wages equaled approximately $4,500.[8] R. Trattner at 7-9.

132.     Hillel was left with an obvious physical disfiguration as a result of the bombing. In addition to scarring, his left eye appears opaque. And the area of his skull around his left eye is depressed. Dr. Alan Friedman, Declaration and Report on Hillel Trattner at ¶ 29. This lasting physical disfiguration has caused Hillel emotional strain. Strous, Evaluation of Hillel Trattner at 3.

133.     In addition to his feelings about his appearance, Hillel feels that he was deprived of three years of his life during which he could have made significant progress in his career. Strous, Evaluation of Hillel Trattner at 3. The attack caused Hillel intense emotional pain both for himself and for his family. He withdrew emotionally from those close to him. Hillel says that

---

[7] Hillel testified that he had been earning approximately 11,500 shekels per month at the time of the attack. For the first 6 months Hillel could not work at all; during the following 5 months he worked only half time; and until October 2004, he worked 80%. During this period the exchange rate was approximately 4.5 shekels to the dollar. H. Trattner at 34-38.

[8] Ronit testified that she had been earning 13,500 shekels per month prior to the attack. She lost approximately 50% of her salary for the first two months after the attack; and she lost approximately 25% of her salary for the next two months. Again, the exchange rate during this time was approximately 4.5 shekels to the dollar. R. Trattner at 7-9.

it took him eight months before he "slowly started to return to the world." Strous, Evaluation of Hillel Trattner at 2.

134.    Hillel's psychological injuries appear to be improving. However, he continues to suffer from mild chronic post traumatic stress disorder and mild chronic dysthymia. Strous, Evaluation of Hillel Trattner at 4. The Plaintiffs' psychiatrist found that Hillel appeared "distinctly unemotional during interview, almost cold. Appears very rigid and almost over-controlled."

135.    Ronit Trattner's most serious injuries were the first and second degree burns she sustained on her arms legs, neck, and face. Dr. Alan Friedman, Declaration and Report on Ronit Trattner at ¶¶ 12, 17. She was admitted to the burn unit of Beilinson Hospital where she received painful debridements for the duration of her stay. Id. at ¶¶ 11, 12. She also sustained shrapnel wounds on both feet, her right arm, back, pelvis, breast, and the leg. Id. at ¶ 13.

136.    The doctors were not able to remove the fragments of shrapnel and as a result they caused her severe pain for many months following the attack. Id. Some of the fragments are still palpable under her skin. Id. at ¶ 16. And because of the shrapnel in her leg, Ronit was required to undergo physical therapy to correct her gait. Id. at 13. Ronit's scarring and skin discoloration are readily apparent to this day.

137.    For 3-5 months following the bombing Ronit Trattner suffered from depression as a result of her and her husband's injuries. She felt insecure about the stability of their marriage and being alone while her husband recuperated intensified her feelings. Strous, Evaluation of Ronit Trattner at 2. Dr. Strous found that Ronit suffered from adjustment disorder with disturbance of mood, as manifested by her extended significantly low mood, anxiety, stress, diminished function and depression. Strous, Evaluation of Ronit Trattner at 3.

138.    Hillel's parents were constantly at the hospital in the beginning. A. Trattner 11-12; S. Trattner 13-14. When they first saw their son Hillel they saw no signs of life in him at all. A. Trattner at 13.

139.    Aron could not sleep for a week, and in an incident he attributes to his complete distraction with Hillel's condition, he slipped and fell, and broke his leg. A. Trattner at 12. Shelly dedicated her life for the following months to attending Hillel's needs. S. Trattner at 13-14.

140.    Both parents expressed anguish at seeing their son suffering. A. Trattner at 14. They did not know whether he would recover, and when he suffered the reaction to his medication, they relived the experience. A. Trattner at 16.

141.    Aron and Shelly Trattner still agonize over Hillel's personal and medical future. A Trattner at 14, 21-22; S. Trattner 16, 22-23.

**5.      Steven Braun**

142.    Steve Braun went to the mall that night to fill a prescription for his son, who was ill. Braun at 9. Thankfully, the Braun children were at home, engrossed in a Walt Disney movie, and were not interested in joining their father for a walk to the mall. Braun at 10.

143.    Steve arrived to find that, following the Sabbath, the pharmacy had not yet opened. Braun at 10. He decided to pass the time window shopping. Braun at 10. As Steve approached a jewelry store, the terrorist detonated his bomb. Braun at 10-11, 13.

144.    Steve saw a bluish-white flash of light and heard the explosion. Braun at 13. He was blown back several feet and then felt severe pain in his right leg. Braun at 13.

145.    He looked down and saw his pants ripped open, his leg covered with bloody flesh. Braun at 14. The pain was excruciating. Braun at 28.

146.     Between the pain and the blood, Steve thought that he would die from the wound; he thought his leg had been partially severed. Braun at 28. He later realized that much of the bloody flesh was not his own. Id. at 14, 28.

147.     Following the initial shock Steve understood that he had been injured but that his wounds were not critical. Id. at 14. Like Shabtai Shatsky, Steve Braun was a member of the town's emergency response team. Id. at 16. He composed himself enough to look for survivors and to see where he could help. Id. at 15, 27-28.

148.     He entered the food court and saw everyone on the floor. Id. at 14-15. "Basically everybody was dead. It was a pretty horrific scene." Id. at 14.

149.     Steve helped some of the wounded, including Hillel and Ronit Trattner. Id. at 15-16. Then, after speaking with Mr. Shatsky, he tried unsuccessfully to locate Keren. Id. at 16-17. When the commander of the response team learned that Steve too had been wounded, he ordered Steve to get medical attention for his own injuries. Id. at 17-18. Steve's son, a paramedic, treated him and sent him to the hospital in an ambulance. Id. at 18.

150.     The ambulance took Steve to the emergency room, where he was treated for lacerations in both hips and was released. Dr. Alan Friedman, Declaration and Report on Steven Braun at ¶ 13.

151.     Steve suffered from pain in both thighs for two months following the attack. Additionally for several weeks following the attack, Steve could not sleep. He experienced panic attacks involving intense anxiety, sweating and palpations as well as an intense feeling of doom. During that period he also experienced flashbacks to the attack and severe nightmares. Strous, Evaluation of S. Braun at 2.

152.    Steven Braun was unemployed at the time of the attack, and was unable to find work for approximately 10 months following the bombing. He had difficulty concentrating for approximately one year after the bombing, which compounded his difficulty obtaining work. Strous Evaluation of S. Braun at 3.

153.    Dr. Strous found that Steven Braun continues to suffer from moderate to severe chronic post traumatic distress disorder and chronic dysthymia. Strous Evaluation of S. Braun at 5. Dr. Strous summarized Steve Braun's psychological injuries:

> In addition to classic PTSD symptomatology as reflected by intrusive thoughts (distressing recollections, difficult dreams, flashbacks, psychological trigger reactions), avoidance (avoid thoughts, feelings or discussions, anhedonia, numb, alexithymia [emotions unknown]), hyperarousal symptoms (sleep disturbance, anger problems, startle response, "on guard" hypervigilence) he demonstrated distinct affects on prominent relationships with those close to him (wife, children).

Strous Evaluation of S. Braun at 4.


## II.    CONCLUSIONS OF LAW

### 1.    Defendants' default establishes their liability

Once default is entered under Rule 55(a) each of a plaintiff's "allegations of fact [are] to be taken as true and each of his claims considered established as a matter of law." *Webb v. District of Columbia*, 146 F.3d 964, 978 n. 26 (D.C. Cir. 1998) (quoting *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir. 1985)) (internal brackets and ellipsis omitted). *See also e.g. Biton v. Palestinian Interim Self-Government Authority*, 239 F.R.D. 1, 5 (D.D.C. 2006) ("the Defendants' liability is presumed by their willful default"); *U.S. v. Gant*, 268 F.Supp.2d 29, 32 (D.D.C. 2003) ("Default establishes the defaulting party's liability for the

well-pleaded allegations of the complaint."); *Adkins v. Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001) ("A defaulting defendant is deemed to admit every well-pleaded allegation in the complaint."); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2688 ("If the court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").

Defendants PLO and PA have willfully defaulted, and have therefore conceded all well pleaded allegations of liability in the complaint. The allegations of liability set forth in plaintiffs' highly detailed complaint are well pleaded, and defendants' liability is therefore established.[9] *See Ungar v. Palestinian Authority* 325 F. Supp.2d 15, 65-66 (D.R.I. 2004) ("Plaintiffs' Amended Complaint adequately pleads the elements of liability under 18 U.S.C. § 2333 ... and the Palestinian Defendants' default relieves Plaintiffs of proving these elements ... Thus, the Palestinian Defendants' liability has been established").

Accordingly, the Court finds that defendants' liability is established for all the claims in the complaint.

**2.     The Court has subject-matter and personal jurisdiction**

Notwithstanding the defendants' intentional default, before entering judgment the Court must satisfy itself that it has subject-matter jurisdiction over this action and *in personam* jurisdiction over the PLO and PA. *See e.g. Ungar*, 325 F.Supp.2d at 45 ("A court which is asked

---

[9] Moreover, "Only 'in very narrow, exceptional circumstances' may a court find an allegation not 'well pleaded.'" *In re Crazy Eddie Securities Litigation*, 948 F.Supp. 1154 (E.D.N.Y. 1996) (quoting *Trans World Airlines Inc. v. Hughes*, 449 F.2d 51 (2nd Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)).

to enter default judgment should assure itself that it has jurisdiction both over the subject matter and the parties.") (citing cases).[10]

The Court is satisfied that it has subject-matter jurisdiction over this case and personal jurisdiction over the defendants.

### a.      Subject-Matter Jurisdiction

The Third Count of the Complaint in this action is a federal cause of action for "international terrorism" pursuant to § 2333 of the ATA, over which this Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. *See e.g. Knox v. Palestine Liberation Organization*, 442 F.Supp.2d 62, 74 (S.D.N.Y. 2006) ("The ATA created a federal cause of action for acts of international terrorism.").

This Court therefore has original subject-matter jurisdiction over the Third Count of the Complaint pursuant to 28 U.S.C. § 1331.

The Complaint also pleads supplemental claims for wrongful death, pain and suffering, battery, assault, loss of consortium and solatium, negligence and infliction of emotional distress. *See* Complaint at Counts I, II, and IV-IX.

Those supplemental claims all arise from the same terrorist attack as the federal claim brought under 18 U.S.C. § 2333 and are thus derived from the same nucleus of operative fact as the § 2333 claim. This Court therefore has subject-matter jurisdiction over the supplemental causes of action, pursuant to 28 U.S.C. § 1367. *See Biton v. Palestinian Interim Self-Government Authority*, 310 F.Supp.2d 172, 182-183 (D.D.C. 2004) (Holding that federal and

---

[10] In *Mwani v. bin Laden*, 417 F.3d 1, 7-8 (D.C. Cir. 2005), the Court of Appeals held that personal jurisdiction need only be shown prima facie when a defendant has failed to appear, but that "if the court takes evidence on the issue or rules on the personal jurisdiction question in the context of a trial … a heightened, preponderance of the evidence standard applies." Since the instant defendants contested jurisdiction in this action (despite defaulting on the merits) it appears that under *Mwani* a preponderance of the evidence standard should be applied here, and the Court applies that standard.

supplemental causes of action arising from same terrorist attack are derived from the same nucleus of operative fact and that court therefore has supplemental jurisdiction over non-federal claims under 28 U.S.C. § 1367); *Estates of Ungar v. Palestinian Authority*, 153 F.Supp.2d 76, 86 (D.R.I. 2001) (same).

Thus, this Court's subject-matter jurisdiction is clearly established for all counts of the complaint.[11]

### b.   Personal Jurisdiction

As noted, plaintiffs' suit is brought under 18 U.S.C. § 2333. Because 18 U.S.C. § 2334(a) authorizes nationwide service of process in actions under § 2333, personal jurisdiction in § 2333 actions is established whenever (i) the defendant has sufficient minimum contacts with the United States as a whole and (ii) service of process is effected pursuant to Fed.R.Civ.P. 4. *See Ungar*, 325 F.Supp.2d at 48 (Personal jurisdiction established in § 2333 action against the PA and PLO since "Defendants have minimum contacts with the United States as a whole and ... were served with process pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Fed.R.Civ.P. 4(k)(1)(D)"); *Biton*, 310 F.Supp.2d at 179-180 (same).

Plaintiffs served process in this action on the PA and PLO by in-hand service on Mr. Hassan Abdel Rahman, the Chief Representative of the PA and PLO in the United States. *See* Exhibits P, Q, R and S to Plaintiffs' Memorandum in Opposition to the Revised Motion by Defendants PLO and PA Pursuant to Fed.R.Civ.P. 12(b) to Dismiss the Complaint (docket #32) ("Plaintiffs' Memo in Opp.").

---

[11] In any event, as discussed below, the remedies provided by §2333 of the ATA render the supplemental causes of action redundant. Therefore, for those plaintiffs entitled to bring an action under §2333 (i.e. all plaintiffs except Ronit Trattner), the supplemental torts are irrelevant. Ronit Trattner asserts only a cause of action for battery, pursuant to Count IV of the complaint. Thus, at bottom, the sole supplemental cause of action for which plaintiffs seek relief in this case is Ronit Trattner's battery claim.

Mr. Abdel Rahman has repeatedly been found to be a valid agent for service of process on both the PA and PLO under Fed.R.Civ.P. 4(k)(1)(D) and 4(h). *See Ungar*, 325 F.Supp.2d at 56-59; *Biton*, 310 F.Supp.2d at 180; *Saperstein v. Palestinian Authority*, (Civ. No. 04-20225) (S.D.Fla.), Order Granting in Part and Denying in Part Motion For Default Judgment, entered July 11, 2006, dkt. #61, at 13.

Service of process on defendants has therefore been effected.

Nor is there any question that the PA and PLO have constitutionally-sufficient minimum contacts with the United States. The PA and PLO have challenged minimum contacts in other cases brought against them pursuant to §2333 of the ATA and have had that challenge rejected each time. *See Ungar*, 325 F.Supp.2d at 47-59; *Biton*, 310 F.Supp.2d at 183; *Saperstein*, *id*. at 13.

Notably, the *Ungar* court conducted an extraordinarily thorough review of the jurisdictional contacts of the PA and PLO in the United States and found the totality of contacts to be more than constitutionally adequate even under a "preponderance of the evidence" standard. *Ungar*, 325 F.Supp.2d at 47-59.

The plaintiffs have submitted into the record all of the voluminous exhibits evidencing the jurisdictional contacts of the PA and PLO that were submitted to and relied upon by the *Ungar* court, and referred to in *Ungar* 325 F.Supp.2d at 47-59. *See* Exhibits P through QQ to Plaintiffs' Memo in Opp., and accompanying text pp. 41-52.

The plaintiffs request that the Court find that defendants' minimum contacts have been shown on the basis of the evidence submitted and, additionally or alternatively, because the defendants are collaterally estopped from contesting the holdings in *Ungar*. *See* Memorandum in Support of Plaintiffs' Motion for Entry of Default.

The Court agrees, and finds on the basis of the evidence submitted that the defendants' constitutionally-sufficient minimum contacts with the United States, which are detailed in *Ungar*, have been demonstrated by a preponderance of the evidence.

The Court also finds that the PA and PLO are collaterally estopped from contesting the findings in *Ungar* regarding the existence of these contacts and the holding in *Ungar* that these same contacts are constitutionally adequate as a matter of law. *See Biton*, 412 F.Supp.2d 1 (Entering partial summary judgment rejecting defendants' jurisdictional defense, by applying collateral estoppel to a holding in *Ungar* rejecting the same defense).

The Court therefore has subject-matter and personal jurisdiction in this case, and the sole question remaining is the quantum of plaintiffs' damages.

### 3. The Plaintiffs may prove damages by deposition testimony, affidavits and other documentary evidence

Where liability is established based on the defendants' default, "[u]nless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." *Rubin v. Hamas,* 2004 WL 2216489 *2, citing Adkins v. Teseo,* 180 F. Supp. 2d 15, 17 (D.D.C. 2001) and *Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir. 1999).

This "independent determination" regarding damages need not take the form of a full-blown evidentiary hearing. "The court has considerable latitude in determining the amount of damages." *U.S. v. Gant,* 268 F. Supp. 2d 29, 32 (D.D.C. 2003) *citing Jones v. Winnepesaukee Realty,* 990 F.2d 1, 4 (1st Cir. 1993). While under Rule 55(b)(2), Fed. R. Civ. P. the court "may" conduct an evidentiary hearing, it need not do so. *Gant*, 268 F. Supp 2d at 32; *Fustok v. ContiCommodity Services, Inc*., 873 F.2d 38, 40 (2d Cir. 1989) ("By its terms, 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion of the district court");

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.,* 109 F.3d 105, 111 (2d Cir. 1997); *James v. Frame* 6 F.3d 307, 310 (5th Cir. 1993) ("The Federal Rules of Civil Procedure ... does not require an evidentiary hearing."); *cf. Pope v. United States,* 323 U.S. 1, 12; 65 S. Ct. 16, 22; 89 L. Ed. 3, 11 (1944).

Where the district court is presented with a sound evidentiary basis for determination of damages, for example, through affidavits and other detailed documentary evidence, the court need not hold an evidentiary hearing on damages. *See Stern v. Islamic Republic of Iran,* 271 F. Supp. 2d 286, 288 n.1 (D.D.C. 2003) (citing cases); *Rubin v. Hamas,* 2004 WL 2216489 *2; Fustok*, 873 F.2d at 40 (2d Cir. 1989) ("it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment.").

Establishing damages following a default based upon evidentiary submissions is particularly appropriate where the defendant has demonstrated that it has no intention of participating in a hearing on damages, *Fustok,* 873 F.2d at 39-40.

In the instant case, the defendants have represented to the Court that they will not participate in a damages hearing. *See* Transcript of Status Conference, January 11, 2007, at p. 14 ("We wouldn't appear at the hearings.")

Furthermore, as plaintiffs point out, this case involves the estates of two decedents and twenty-three other plaintiffs who suffered a broad range of medical, psychological, emotional and economic injuries, and many days of courtroom testimony would have been necessary in order to set forth plaintiffs' damages testimony. *See* Memorandum in Support of Plaintiffs' Motion for Entry of Default.

The Court agrees with the plaintiffs that conducting such a live hearing, when defendants have stated their intention not to participate, would be an unnecessary waste of judicial and party resources. *See Rubin v. Hamas,* 2004 WL 2216489 *3 (district court agrees that it "would be a massive waste of judicial resources" to conduct a live damages hearing when defendant had defaulted and would not appear).

Accordingly, plaintiffs' request to establish their quantum of damages on the basis of affidavits and other documentary evidence is legitimate, appropriate and sensible, and the Court permits them to do so.

In support of their damage claims the plaintiffs submitted deposition transcripts and affidavits containing their own testimony, and sworn opinions, reports and evaluations from their medical, psychiatric, and economic experts.

The Court notes that plaintiffs offered to make themselves and all of their other witnesses available for cross-examination on their direct deposition and affidavit testimony by defendants' counsel, either before the Court or in a deposition, and to afford defendants an opportunity to challenge plaintiffs' documentary evidence. *See* Memorandum in Support of Plaintiffs' Motion for Entry of Default.

Defendants declined this invitation, and the Court therefore finds that defendants waived their right to examine plaintiffs' witnesses and challenge plaintiffs' evidence.

### 4.      Damages available under §2333 of the Antiterrorism Act

In determining the type and scope of remedies available under §2333 of the ATA, this Court must necessarily look to the legislative history and purpose behind this provisions, and to the relevant case law.[12]

---

[12] The decision of the United States District Court for the District of Rhode Island in *Ungar v. The Palestinian Authority*, 304 F.Supp.2d 232 (D.R.I. 2004) provides an exhaustive analysis of the nature, scope and purpose of

**a.   Legislative History of 18 U.S.C. §2331** *et seq*.

Section 2333 was enacted as part of the Antiterrorism Act of 1990 ("ATA"), as an entirely new statutory tort.[13] The express goal of the ATA was to "create a new federal cause of action" and "a new civil remedy against terrorists." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session July 25 1990 ("Senate Hearing") at 34.

Congress passed the ATA as a direct response to the inadequacy of existing law:

> [T]here are currently no laws expressly providing federal civil remedies against these outrageous acts. Therefore this bill would amend Title 18 United States Code Sections 2331 by providing a plaintiff a civil cause of action in United States District Court for injuries caused by acts of international terrorism.

*Id*. at 49.

The *Ungar* court conducted an extensive review of the legislative history of the ATA and concluded that:

---

damages available under §2333. This Court finds the thorough analysis in *Ungar* well supported and persuasive, and the discussion herein closely follows *Ungar*.

Other decisions relevant to assessment of damages under 18 U.S.C. §2333 include *Knox v. Palestine Liberation Organization*, 442 F.Supp.2d 62 (S.D.N.Y. 2006) (awarding widow, child, step-children, parents, siblings and estate of American singer murdered in terrorist attack carried out by PA and PLO approximately $192 million in §2333 action); *Boim v. Quranic Literacy  Institute*, 2005 WL 433463 (N.D. Ill. 2005) (denying motion to set aside jury award of $156 million under §2333 for the terrorist murder of 17 year-old American citizen); *Rubin v. Hamas*, 2004 WL 2216489 (D.D.C. 2004) (awarding nine Americans injured in a Hamas suicide bombing a total of $214.5 million under § 2333); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005) (holding that intangible harm to American citizens resulting from acts of international terrorism is actionable under § 2333 in light of the Congressional purpose underlying the provision); *Biton v. Palestinian Authority*, 310 F.Supp.2d 172, 182 (D.D.C. 2004) (same).

[13] "Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub.L. No. 101-519, §132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency. They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506 (1992)." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1009 (7th Cir. 2002).

> The legislative history of 18 U.S.C. § 2333 evinces
> a clear congressional intent to deter and punish acts
> of international terrorism.

*Ungar v. The Palestinian Authority*, 304 F.Supp.2d 232, 238 (D.R.I. 2004) (emphasis added).

*See also id.* at 262-264.

The legislative history also makes clear that the ATA was intended to be construed broadly in order to maximize its effectiveness in compensating victims of terrorism and deterring terrorist attacks on Americans. Senator Grassley, the bill's co-sponsor, indicated that "it empowers victims with all the weapons available in civil litigation." *Antiterrorism Act of 1991*, Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, 102nd Congress, September 18 1992 at 10 (emphasis added). Thus, Congress intended that the full gamut of legal tools available in civil litigation would be harnessed to the task of providing remedies to victims of terrorism.

Indeed, the legislative history is replete with statements by the congressional sponsors and supporters of the ATA as well as representatives of the executive branch who testified in support of the bill, praising the wide scope and broad effect of the bill's provisions. The only circuit court to discuss the purpose of §2333 noted that,

> [Its] history, in combination with the language of
> the statute itself, evidences an intent by Congress to
> codify general common law tort principles and to
> extend civil liability for acts of international
> terrorism to the full reaches of traditional tort law.

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) (emphasis added).

**b.      Types of Damages Available Under §2333**

As noted, 18 U.S.C. §2333 "extends civil liability for acts of international terrorism to the full reaches of traditional tort law." *Boim,* 291 F.3d at 1010; *accord Ungar*, 304 F. Supp. 2d 232 at 264*; accord Rubin v. Hamas,* 2004 WL 2216489 *3.

Accordingly, §2333(a) allows for recovery of both pecuniary damages and non-economic damages, including the loss of companionship and society and the mental anguish experienced by the victim's family members. *See e.g. Biton v. Palestinian Interim Self-Government Authority*, 310 F.Supp.2d 172, 181-182 (D.D.C. 2004) (holding that "emotional distress, a loss of consortium, and a loss of solatium constitute injuries" to "person" within the meaning of § 2333); *Knox v. Palestine Liberation Organization*, 442 F.Supp.2d 62 (S.D.N.Y. 2006) ("the deterrent purpose of the ATA is maximized if it is interpreted to subject terrorists to the broadest range of economic damages. Thus, §2333(a) has been interpreted as entitling plaintiffs to a full range of economic and non-economic pecuniary damages") (citations omitted); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005) (holding that intangible harm to American citizens resulting from acts of international terrorism is actionable under §2333 in light of the Congressional purpose underlying the provision); *Ungar,* 304 F. Supp. at 261-264; *Rubin v. Hamas,* 2004 WL 2216489 *3 (awarding damages under §2333 for broad range of non-pecuniary damages).[14]

---

[14] *Rubin* involved a bombing attack carried out by Hamas terrorists with the material support of the Islamic Republic of Iran. The *Rubin* plaintiffs initially brought suit and obtained a judgment against Iran under the Foreign Sovereign Immunities Act. *See Campuzano v. Islamic Republic of Iran,* 281 F. Supp.2d 258 (D.D.C. 2003). The *Rubin* plaintiffs then brought an action against Hamas under § 2333 of the ATA. Hamas defaulted, the plaintiffs moved for default judgment, the district court adopted the damages findings it had made in *Campuzano*, trebled those findings pursuant to §2333(a), and entered judgment accordingly. *See Rubin v. Hamas,* 2004 WL 2216489 *3. Thus, any consideration of the substance of the damages awarded in *Rubin* requires an examination of the specific findings made in *Campuzano*.

Permitting recovery for loss of society and companionship, and for mental anguish, is particularly appropriate in suits arising from acts of terrorism, and is consistent with the remedies available under other federal statutes allowing civil actions for terrorism and torture.[15] It fulfills the goal of allowing recovery to all those who are impacted by terrorism.[16]

Indeed, the very purpose of a terrorist attack is to terrorize, and to inflict severe mental anguish and suffering on the victim's family members. Thus, this Court, too, finds that § 2333 allows recovery for both pecuniary damages and for non-economic damages, including the loss of consortium and society and the mental anguish experienced by the victim's family members.[17]

**c.      The Class of Plaintiffs Under §2333**

The original language of §2333 "was intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity and lost profits." Senate Hearing at 86. Yet, because the original language allowed compensation only for "any national of the United States" (possibly excluding family members of terrorism victims), the Justice Department urged Congress to modify the text of the bill to explicitly allow suits by the

---

[15] Likewise, other federal causes of action such as the Death on the High Seas Act, 46 U.S.C. §762, the Federal Employers' Liability Act, 45 U.S.C. §51, and the Jones Act, 46 U.S.C. App. §688 permit recovery of non-pecuniary damages.

[16] Congress clearly intended to allow all measures of damages to victims, as the bill "empowers victims with all the weapons available in civil litigation…" Remarks of Senator Grassley, Senate Journal p. S4511 April 16, 1991. (emphasis added). As noted above, the language of the ATA was specifically modified in order to clarify that claims of family members would be recognized.

[17] Precisely because §2333 "extends civil liability for acts of international terrorism to the full reaches of traditional tort law," *Boim,* 291 F.3d at 1010, it renders redundant the supplemental torts asserted by those plaintiffs entitled to bring an action under §2333. *See Ungar*, 325 F.Supp.2d at 67 ("The court finds that no additional damages are due for the claims pled under Israeli law as the injuries sustained by the Plaintiffs are the same and have already been addressed by the award" under §2333).

Accordingly, the damages analysis and awards set forth below will relate only to § 2333, except in regard to plaintiff Ronit Trattner, who asserts a supplemental cause of action for battery.

family members of victims (as "survivors" and "heirs" of the victim). Senate Hearing at 8, 38.

Thus,

> The Department supports legislation to provide a
> new civil remedy against terrorists and a federal
> forum for the <u>families and relatives</u> of victims to
> pursue claims for compensatory damages.

*Id*. at 34 (emphasis added).

Testifying before the Senate Subcommittee on Courts and Administrative Practice,

Deputy Assistant Attorney General Steven R. Valentine specifically requested,

> [T]hat this provision be amended to include, in
> addition to the individual directly affected, such
> additional parties as the estate of the decedent,
> survivors, and heirs. This will ensure that the bill is
> fully protective of the interests of all relevant parties
> to the civil suit.

*Id*. at 38. In response to a question posed by Senator Thurmond about whether the suggested

modification in the language of the bill would "make certain the ability of family members to file

a lawsuit," Valentine responded, "It would make clear that which is already implied in the bill. It

would remove any doubt that anyone would have as to whether or not they could bring the

litigation." *Id*. at 46.

Congress accepted the recommendation of the Justice Department, and modified the

language of §2333 to create a cause of action for "any national of the United States injured in his

or her person, property, or business by reason of an act of international terrorism, or his or her

estate, survivors, or heirs . . . ".

The final, expanded language of §2333 reflects the intention of Congress to allow the

largest possible class of victims to be made whole. Hence, direct victims, family members

(survivors and heirs) as well as those not traditionally considered terrorism victims (business and property owners) are able to recover under the act.

Further, as noted, by including "survivors" in the class of plaintiffs, Congress permitted recovery under §2333 for the widest scope of damages possible, including both economic damages and recovery for loss of comfort and society and mental anguish. Thus, both those personally injured or killed by an act of international terrorism, and their family members and survivors, are entitled to relief under §2333.[18]

After an extensive review of the legislative history and a survey of analogous cases – and after noting that the purpose of § 2333 is to deter terrorism – the court in *Ungar* found that:

> By including the term "survivors" in the class of persons eligible to bring an action, Congress evidenced an intention that family members who are not legal heirs (such as the parents and siblings of a decedent who leaves children) many bring an action pursuant to the statute. If this were not the case, there would have been no need to include the term "survivors."

> Based on the foregoing legislative history and on the substantial policy considerations that allowing parents and siblings to bring actions in their own right (regardless of whether the decedent is survived by a spouse and/or children) increases the deterrent effect of the legislation, this court concludes that the term "survivors" as used in §2333(a) includes parents and siblings of a U.S. national killed by an act of international terrorism.

*Ungar*, 304 F.Supp.2d at 263-264 (emphasis added).

The *Knox* court reached the identical conclusion:

---

[18] All of the federal provisions dealing with civil claims against terrorists and their sponsors recognize recovery by relatives of the victims. In addition to 18 U.S.C. §2333(a), both the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(7) and §1605 note, and the Torture Victim's Protection Act, 28 U.S.C. §1350 note (expanding claim beyond the direct victim to include "any person who may be a claimant in an action for wrongful death.") allow relatives of victims to seek damages.

> Plaintiffs' … seek damages for Aharon's parents and adult siblings, as Aharon's surviving family members. In *Ungar,* the court undertook an exhaustive analysis of the scope of the term "survivor" as used § 2333(a). Looking at the legislative history of § 2333, the *Ungar* court concluded that "Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly." *Ungar,* 304 F. Supp 2d at 263. The court further noted that by "including the term 'survivors' in the class of persons eligible to bring an action, Congress evidenced an intention that family members who are not legal heirs (such as parents and a sibling of a decedent who leaves children) may bring an action pursuant to [§ 2333(a)]." *Id.* The *Ungar* court concluded that, based on the legislative history of the ATA and the underlying purpose of the ATA to deter and punish acts of international terrorism, the term "survivors" as used in § 2333(a) includes parents and grown siblings of United States nationals killed by an act of international terrorism. *See id.* at 264-65.
>
> <u>This Court agrees that a victim's parents and adult siblings properly fall within the class of individuals that may claim damages under § 2333 as survivors.</u> Therefore, Aharon's parents and siblings may advance claims for damages under § 2333. *Cf. Boim v. Quranic Literacy Inst.,* No. 00 C 2905, 2005 WL 433463, at *5 (N.D.Ill. Feb.18, 2005) (upholding jury award under § 2333 to parents of victim of terrorist attack); *Ungar,* 304 F. Supp 2d. at 275-76 (granting non-economic damages pursuant to § 2333 to parents and adult siblings of terrorism victim).

*Knox v. Palestine Liberation Organization*, 442 F.Supp.2d 62, 75 (S.D.N.Y. 2006) (emphasis added).[19] *See also Rubin v. Hamas*, 2004 WL 2216489 (D.D.C. 2004) (awarding six Americans

---

[19] Indeed, the *Knox* court found, noting the remedial purpose of §2333, that the term "survivors" encompasses even the step-children of the victim:

> It is apparent that Leslye's children were both financially and emotionally dependent upon Aharon. Based upon <u>the broad remedial purpose of section 2333</u>, and the close, dependent

injured in a Hamas suicide bombing, and the parents of two of the injured, a total of $214.5 million in action under § 2333).

### 5.    Plaintiffs' damages

In light of the above, the Court makes the following conclusions regarding damages:

**a. Estate of Keren Shatsky**.

**i. Lost future earnings**.

Plaintiffs seek damages on behalf of the Estate of Keren Shatsky in the amount of the present-day value of the income Karen would have earned throughout her lifetime, had she not been murdered.[20]

In support of this claim the plaintiffs have submitted to the Court a detailed and highly credible report prepared by Professor Avi Weiss, the chairman of the Department of Economics at Bar Ilan University in Israel, regarding the estimated lost income of Keren Shatsky. Among other things, Professor Weiss took into account the impressive professional accomplishments of Keren's parents and siblings, and the fact that her parents together earn 1.877 times the average Israeli household. Affidavit of Dr. Avi Weiss, Ph.D, incorporating by reference the Report titled, "Estimation of Economic Losses Due to the Death of Keren Shatsky," *see* report at pages 3-4.[21]

Professor Weiss concluded: "Application of standard and conservative economic estimation methodology and procedures indicates that the present value of the loss of future

---

relationship Leslye's children had with Aharon, the Court concludes that they are "survivors" who are entitled to compensatory damages for Aharon's murder.

*Knox*, 442 F.Supp.2d at 76 (emphasis added).

[20] The action on behalf of the estate of Keren Shatsky is brought by plaintiffs Shabtai and Jo Anne Shatsky, who were appointed administrators of Keren's estate by an Israeli court. *See* Declaration of Avraham Colthof, and attached Order of September 6, 2002. The Israeli court also named Shabtai and Jo Anne Shatsky as the heirs of Keren Shatsky. *See id.* at Order of October 6, 2002.

[21] Hereafter, Professor Weiss's affidavit will be referred to by citation to the individual Economic Evaluation Reports incorporated therein, and the page number in each particular Report.

after-tax income resulting from the death of Keren Shatsky is $899,745." Weiss, Estimation of Economic Losses Due to the Death of Keren Shatsky at 7.

The Court finds Professor Weiss' estimate to be convincing and reasonable, and finds that the value of Keren Shatsky's lost lifetime income is $899,745.

**ii. Pain and suffering**. There was no evidence as to whether Keren Shatsky survived the bombing for any period of time. Since any pain and suffering endured by Keren Shatsky cannot be determined, the Court awards no damages for her pain and suffering.

**b. Shabtai and Jo Anne Shatsky.**

Keren Shatsky's parents described how Keren's murder has devastated them and their family. Keren was the youngest of their children, and was in many ways the center of their attention. Shabtai's and Jo Anne's testimony was supplemented by the report of the psychiatrist Dr. Strous, who detailed Shabtai Shatsky's depression and his inability to enjoy life in the aftermath of his daughter's murder. As discussed above, Mr. Shatsky has lost all interest in social interactions and in professional accomplishment. He finds life meaningless and even feels that he would be happy to die. Dr. Strous concluded that given the persistence of these feelings four years after the murder, they are not likely to abate in the future.

Dr. Strous found that both Jo Anne and Shabtai Shatsky suffer from chronic depression and pathological bereavement, which are unlikely to abate. The agony of losing their daughter to a suicide bomber will remain with the Shatskys and permeate every aspect of their lives.

In *Ungar*, the court awarded each parent $5,000,000 for the loss of society and companionship and mental anguish caused by the murder of their adult, married son. 304 F. Supp. 2d at 275. The court found this award to be in line with other judgments for parents of

*emancipated* children who were murdered. *Id*. Keren Shatsky however, was only 14 at the time of her murder, and was not close to emancipation.

The *Knox* court awarded the same amount ($5 million) to each of the parents of the murder victim who, like the *Ungar* decedent, was a married adult. *See Knox*, 442 F.Supp.2d at 81.

In *Boim v. Quranic Literacy Institute*, 2005 WL 433463 (N.D. Ill. 2005), the district court affirmed a $52 million jury verdict (before trebling) for the parents of a 17-year old American boy who was gunned down by Hamas operatives in Israel. The district court found that as much as $22 million dollars could have been attributed to lost future earnings. But, the court found that "the bulk of the award" – i.e. $30 million – was based upon the parents' mental anguish. *Id*. at *5. Thus, in *Boim* each parent was awarded roughly $15 million in damages (before trebling) for mental anguish for the loss of a minor child.

In analyzing the quantum of damages, the courts in both *Ungar* and *Knox* referenced *inter alia* the detailed decisions issued by Judge Royce C. Lamberth of this court in *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 32 (D.D.C. 1998) and *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1, 9 (D.D.C. 2000), awarding $5 million to each of the parents of American college students murdered in terrorist attacks in Israel.

In his thorough decision in *Flatow,* 999 F. Supp. at 29-32, Judge Lamberth analyzed the method for calculating damages for loss of consortium and solatium and mental anguish resulting from the murder of a child and sibling in a terrorist attack, and explained that a court should consider several factors in computing an award in such case. These factors include: (a) the suddenness and violence of the death; (b) how the claimant learned of the decedent's death; (c) whether there was an opportunity to say good-bye or view the body; (d) whether the decedent

held onto life for an extended period, thereby amplifying the pain of the claimant; (e) whether the claimant had to decide to terminate life support; (f) the claimant's testimony regarding his or her pain and sense of loss; (g) the loss of society and comfort of the decedent. *Id*.

It is clear, as detailed in the findings of fact set forth above, that all of these factors (except for factors (d) and (e)) were and are present in painful abundance in respect to the murder of Karen Shatsky.

Moreover, the Shatsky family suffered the additional horrific pain of uncertainty during the hours that passed between the time they heard about the attack until they were finally informed that Keren had been killed. The Shatskys saw the bomb scene immediately after the attack, knew Keren had been there, yet they had no idea what had become of her. In *Ungar*, by contrast, there was no evidence that the parents suffered while awaiting word of their son's fate.

Furthermore, *Ungar* and *Knox* must be distinguished in light of the fact that the decedents were married adults. The decedents in *Flatow* and *Eisenfeld* were also adults. Keren Shatsky, by contrast, was a 14-year old schoolgirl. In light of the factors discussed in *Flatow* for calculating damages in terrorism cases, it is fair to assume that the mental anguish and the loss of consortium suffered by a parent by the murder of minor child living at home will, generally, tend to be greater than that suffered by the parent of an adult, married child. Certainly in the instant case, Keren's parents have suffered, and will unfortunately continue to suffer, egregiously, the worst imaginable nightmare of any parent. Their lives are irreparably shattered.

Accordingly, a damage award greater than that granted for the death of the adult victims in *Ungar* and *Knox* is warranted in this case.

At the same time, the Court does not believe an award like that upheld in *Boim* is appropriate here.

Under these circumstances, the Court finds that Shabtai Shatsky and Jo Anne Shatsky should each be awarded $8 million dollars for the loss of consortium and solatium, and the mental anguish, inflicted on them by the brutal murder of their daughter Keren Shatsky.

**c. Tzippora, Yoseph, Sara, Miriam and David Shatsky.**

As Judge Lamberth held in *Flatow*, "The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium." 999 F. Supp. at 30. As discussed above, the Shatsky family is close-knit, Keren was the baby of the family, and Keren's siblings suffered and all continue to suffer from her murder. And all of the siblings went through the ordeal with their parents on the night of the attack. The Court finds that each of Keren Shatsky's siblings (Tzippora Shatsky, Yoseph Shatsky, Sara Shatsky, Miriam Shatsky and David Shatsky) is to be awarded $3,000,000 for their profound loss and the intense pain they suffered and continue to suffer. This sum is well within the range of similar awards to siblings of terror victims. *See Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000) ($5,000,000 awarded to adult siblings of adult victim); *Knox*, 442 F.Supp.2d at 80-81 ($2.5 million awarded to adult siblings of adult victim); *Ungar*, 304 F. Supp. 2d at 276-77 ($2.5 million awarded to adult siblings of adult victim). It also accounts for the additional anguish inflicted upon Keren's siblings on the night of her murder.

**d. Estate of Rachel Thaler**.

**i. Lost future earnings**.

The Plaintiff's economist, Professor Weiss estimated the lost future earnings of Rachel Thaler.[22] Because Rachel was so young when she was murdered, Professor Weiss had little at his

---

[22] The action on behalf of the estate of Rachel Thaler is brought by plaintiffs Ginette Lando Thaler and Michael Thaler, who were appointed administrators of Keren's estate by an Israeli court. *See* Declaration of Avraham Colthof, and attached Order of May 18, 2006. The Israeli court also named Ginette Lando Thaler and Michael Thaler as the heirs of Keren Shatsky. *See id.* at Order of October 20, 2002.

disposal with which to formulate an estimate. He took into account that Rachel's parents are "fairly average wage-earners." Weiss, Estimation of Economic Losses Due to the Death of Rachel Thaler at 3. Professor Weiss concluded: "Application of standard and conservative economic estimation methodology and procedures indicates that the present value of the loss of future after-tax income resulting from the death of Rachel Thaler is $577,589." Weiss, Estimation of Economic Losses Due to the Death of Rachel Thaler at 7.

The Court accepts Professor Weiss' well-reasoned and conservative estimate, and awards the estate of Rachel Thaler $577,589 in lost future earnings.

### ii. Pain and suffering.

Plaintiffs presented credible evidence of Rachel Thaler's suffering in the moments after the explosion. Chana Friedman, who was sitting next to Rachel at the time of the bombing testified that an instant after the blast, she heard Rachel scream "very very hard." C. Friedman at 18. She then heard Rachel "crying in a terrible voice that sounded like it came from her soul." Declaration of Chana Friedman. Chana Friedman recalled that the crying lasted approximately one minute. *Id*. Based on this testimony and his own evaluation of Rachel's injuries, Dr. Friedman concluded that Rachel Thaler suffered at least one and possibly several minutes of extreme pain before losing consciousness. During this time, it is likely that Rachel had some awareness of the attack, the severity of her injuries, and those of her brother. This recognition surely caused her intense emotional anguish in her last conscious minutes.

In other terrorism cases in which victims suffered for relatively short periods of time, courts in this jurisdiction and elsewhere have compensated the estates of the victims for their suffering. Thus, in *Eisenfeld*, 172 F. Supp. 2d at 5, 8, Judge Lamberth awarded $1 million to each of the estates of two victims of a bus bombing in Israel. There, Judge Lamberth found that

the victims had experienced several minutes of conscious suffering. Similarly, in *Elahi,* 124 F. Supp. 2d at 113, the court awarded the victim's estate $1 million where the victim suffered for approximately 30 seconds from the time he was first shot until he succumbed to his wounds. The *Knox* court awarded the victim's estate $1 million for one minute of conscious suffering. *Knox*, 442 F.Supp.2d at 79. Finally, in *Ungar*, 304 F. Supp. 2d at 270, the court awarded the victim's estate $500,000 for approximately 30 seconds of suffering that followed the shooting.

While it is not entirely clear how long Rachel Thaler suffered prior to losing consciousness, the testimony of Chana Friedman and Dr. Alan Friedman make clear that she suffered for at least one, and possibly several minutes. Taking into account this testimony and the judgments in other comparable cases, I award the estate of Rachel Thaler $1 million for the conscious pain and suffering she endured between the bombing and her loss of consciousness.

### e. Leor Thaler.

Leor Thaler was victimized doubly in the attack. He was severely injured in the bombing, and his sister was murdered. The Court will address his damages for each injury separately.

### i. Pain and suffering from Leor's personal injuries.

The extent of Leor's injuries is recounted above. Here the Court will merely summarize. Leor sustained multiple shrapnel wounds and severe burns in the attack. The shrapnel caused severe bowel injuries, and tore off part of his ear. His tympanic membrane ruptured causing permanent hearing loss. Due to his first and second degree burns, Leor under went painful burn treatment and skin transplants. As a result of injuries sustained in the blast, Leor had two pins surgically inserted into his hip. Leor was hospitalized for three weeks immediately following the attack, but over the course of the following year, he continued rehabilitative treatment including additional surgeries to remove shrapnel and replace his ear drum.

Leor's physical injuries were embarrassing to him. But even more significantly, he continues to suffer from severe chronic post traumatic stress disorder. He finds little meaning or enjoyment in life, and has been unable to move forward in life.

In assessing the appropriate award of damages to Leor Thaler and the other plaintiffs who survived the bombing, the Court finds helpful the decision of Judge Ricardo Urbina of this court in *Campuzano v. Islamic Republic of Iran,* 281 F. Supp. 2d 258 (D.D.C. 2003).[23] The *Campuzano* decision is instructive as it involves a large number of plaintiffs who suffered a broad range of blast, shrapnel and burn injuries, as well as post traumatic stress disorder and other psychological trauma, as the result of a suicide bombing in Jerusalem. *See Campuzano*, 281 F. Supp. 2d 263-267. As in *Campuzano*, the survivors of the Karnei Shomron attack suffered severe blast injuries, burns, and, with the exception of Ronit Trattner, post traumatic stress disorder. Furthermore, as in *Campuzano*, the parents of the victims have suffered terribly. They witnessed the scene of the attack moments after the blast; they experienced the chaos following the attack; they endured painful hours while they searched for their children; and they accompanied and continue to accompany their children through the long recovery.

In *Campuzano*, the court awarded between $10 and $17 million to victims physically injured in the terror attack. 281 F. Supp. 2d at 274-75. Other than the most severely injured and the least severely injured, most of the *Campuzano* plaintiffs were awarded $12 million in damages for their injuries. These consisted of shrapnel injuries, burns, post traumatic stress disorder, and associated injuries. *See Campuzano*, 281 F. Supp. 2d at 274-75. Considering the severity and permanency of Leor's physical and psychological injuries, the pain he endured in

---

[23] As noted, *supra*, nine of the *Campuzano* plaintiffs later brought suit against Hamas under § 2333, and the district court adopted the damages findings it had made in *Campuzano*, trebled those findings pursuant to §2333(a), and entered judgment accordingly. *See Rubin v. Hamas,* 2004 WL 2216489 *3.

the attack and in his lengthy rehabilitation, the Court finds that his injuries are comparable to those suffered by most of the *Campuzano* plaintiffs. Accordingly, the Court will award Leor Thaler $12,000,000 for his injuries sustained in the bombing.

### ii. Loss of consortium, solatium and mental anguish due to the murder of Rachel Thaler

Additionally, Leor Thaler's sister Rachel was murdered in the attack. The Court finds that, like the Shatsky siblings, Leor and his sister had a close relationship. As evidenced by the very circumstances of the attack, they even socialized together. For the reasons stated above with regard to the damages awarded to Keren Shatsky's siblings, I find that Leor Thaler is to be awarded $3,000,000 for his profound loss and the intense pain he suffered and continues to suffer due to the murder of his sister.

### f. Ginette Thaler.

Ginette Thaler's daughter was murdered and her son was severely injured in the attack. This single mother went through Purgatory on the night of the attack, not being able to locate either of the children. Once she managed to locate them, she could not be with Leor because of the need to be with the critically injured Rachel. This tormented Ginette in the days before Leor was transferred to the same hospital as Rachel. Ginette was forced to witness her daughter hang on to life for twelve days. And then, when she was sure there was no hope for recovery, Ginette made the decision to remove Rachel from life support and donate her organs to save the lives of others.

Since Rachel's death, Ginette Thaler has accompanied Leor through his recovery and has dealt, together with her surviving children, with Rachel's murder and Leor's injuries. Dr. Strous, the plaintiffs' psychiatrist, found that Ginette suffers from chronic depression, pathological

bereavement, and adjustment disorder. He concluded that Ginette Thaler will never recover from this emotional trauma.

For the reasons discussed with respect to Shabtai and Jo Anne Shatsky, the Court awards Ginette Thaler $8 million for the mental anguish and loss of consortium and solatium suffered as a result of the murder of her daughter Rachel. [24]

### g. Michael Thaler.

Like Ginette, Michael Thaler lost his daughter in the bombing, and his son was severely injured physically and emotionally. While he was not present in Karnei Shomron at the time of the bombing, and obviously did not hear the explosion, he suffered great emotional trauma from the time he read online about the bombing until he arrived in Israel to find his daughter at death's door and his son in intensive care. Since then, he has also suffered from the murder of his daughter and the suffering of his son. While Michael did not have custody of Rachel he did visit and certainly had a strong parental bond of love and attachment to her, and his damages should be no less than the parents of the decedents in *Ungar* and *Knox*, who, unlike Rachel Thaler, were married adults at the time of their murders. Accordingly, Michael Thaler is awarded $5,000,000 for the mental anguish and loss of consortium and solatium suffered by him as a result of the murder of Rachel Thaler.

### h. Isaac and Zvi Thaler.

---

[24] Though Ginette Thaler is not an American citizen she is entitled to bring an action under § 2333 because Rachel was an American citizen. *See Ungar* 304 F.Supp.2d at 271 ("18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute. *Cf. Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 113 (D.D.C. 2000)(allowing claim of Lebanese wife of American hostage pursuant to 28 U.S.C. § 1605(a)(7)); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 64, 68 n. 7 (D.D.C. 1998)(finding that court had jurisdiction over claims brought pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(7) of non-citizen spouses of U.S. citizens who had been kidnapped)").

Isaac and Zvi Thaler, Rachel's and Leor's brothers, also seek damages for loss of solatium based on Rachel's death. Zvi, like Leor, lived with Rachel and Ginette in Karnei Shomron. He rushed to the scene of the bombing with his mother and searched for his siblings. The Court finds that Zvi suffered comparably to Leor as a result of Rachel's death. Zvi Thaler is therefore awarded $3,000,000 for his profound loss and the intense pain he suffered and continues to suffer from the murder of his sister.

Isaac Thaler did not live with his younger siblings. And, although he did not see them frequently, he testified that he felt close to Rachel and even named his daughter after her. As discussed above, "The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium." 999 F. Supp. at 30. Isaac's relationship with Rachel seems comparable to that of adult siblings in that they did not live together, but were nonetheless close. *See Ungar*, 304 F. Supp. 2d at 275-277; *Knox*, 442 F.Supp.2d at 80-81. The Court awards Isaac Thaler $2,500,000 in solatium damages for the murder of his sister. This amount is the same as was awarded to the adult siblings of the decedents in *Ungar* and *Knox*. *Id*.

### i. Chana Friedman.

Like Leor Thaler, Chana Friedman suffered multiple and severe shrapnel wounds and first and second degree burns over much of her body. In addition, Chana's psychological injuries are many and deep. She suffers from moderate to severe chronic post traumatic stress disorder and chronic dysthymia (depression). She has withdrawn from the close relationships with her mother and siblings. Chana has also distanced herself from friends. Following the attack, Chana broke up with her boyfriend and has not dated since. She is embarrassed by her scarring and injuries. Chana continues to visit the grave site of her best friend, Keren Shatsky, on a weekly basis, where she cries and talks to Keren.

Considering the severity and permanency of Chana's physical and psychological injuries, the pain she endured in the attack and in her lengthy rehabilitation, the Court finds that her injuries are comparable to those suffered by most of the *Campuzano* plaintiffs. Accordingly, the Court awards Chana Friedman $12,000,000 for her injuries sustained in the bombing.

**j.  Bella Friedman**.

**i**. **Loss of consortium and mental anguish**

Bella Friedman experienced the death of her daughter in the aftermath of the bombing. As discussed above, she was informed that two children were unaccounted for, one of whom had been killed in the bombing. Then, while she was still searching for her daughter, she heard what proved to be a false report – that Keren Shatsky had been found alive. Bella made the logical deduction that Chana had been killed. Only later did she discover that Chana had survived, although she was severely injured.

Bella was at her daughter's side while Chana underwent the painful burn treatments. Bella dedicated all of her time in the months following the attack to nursing Chana back to health. But Bella testified that because of changes in Chana as a result of her psychological injuries, their relationship has been changed. Bella, herself, has also changed. She experiences trouble sleeping and her appetite is chronically diminished. Strous, Evaluation of B. Friedman at 2. She feels chronic low mood since the event. Strous, Evaluation of B. Friedman at 2. Dr. Strous, the plaintiffs' psychiatric expert, diagnosed Bella with chronic dysthymia and adjustment disorder with disturbance of mood. Strous, Evaluation of B. Friedman at 3.

Bella Friedman is entitled to damages for the mental anguish and loss of consortium she suffered as a result of Chana being wounded the bombing and its aftermath. Damages for such harm were awarded to the parents of injured victims in *Campuzano*, 281 F. Supp. 2d at 276

(awarding parents of injured bombing victims $2.5 million) and in *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56. 75-76 (D.D.C. 2006) (awarding father of injured adult bombing victim $3.5 million).

Like the parents of the victims in *Campuzano* and *Haim*, Bella Friedman suffered and suffers severe mental anguish from the physical and emotional changes to Chana caused by the bombing. Unlike the parents in *Campuzano* and *Haim*, Bella Friedman was in close proximity to the bombing; she rushed to the scene immediately upon hearing of the attack and witnessed the physical devastation and ensuing chaos. Further, Bella experienced the death of her child when, in the confusion following the attack, she was misinformed that Chanie had been killed. Bella Friedman should be compensated for that suffering. The Court concludes that Bella Friedman is entitled to recover damages for the loss of consortium and the mental anguish caused to her, in the amount of $3,500,000. *See Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d at 75-76.

**ii. Lost earnings and expenses.**

Bella Friedman also lost $38,900 of income due to the demands of caring for Chana. She also testified to having spent at least $3,000 for a specialty air conditioner to help ease Chana's discomfort while recovering from her burns. The Court finds that Bella Friedman is entitled to compensation for these losses and expenses.

**k.       Yehiel, Zvi, Ilan and Miriam Friedman.**

Chana Friedman's siblings all testified to their own anguish at the injuries to their sister and the effect of the attack on themselves personally and their family. They all expressed pain and dismay at the way in which the bombing has altered their relationships with Chana. They all testified that they fear for her well being, and have difficulty coping with this tragedy. In *Haim*,

the court awarded $1.5 million in damages for the mental anguish suffered by the adult brother of an adult injured in a terrorist bombing. *Haim*, 425 F. Supp. 2d at 76.

The Court finds that each of Chana's siblings (Yehiel Friedman, Zvi Friedman, Ilan Friedman and Miriam Friedman) is due a comparable award for the considerable mental anguish they suffered as a result of Chana's injuries.

**l.    Hillel Trattner.**

**i. Injuries.**

Hillel Trattner suffered the most severe physical injuries among the survivors. He is permanently blind in one eye and has diminished hearing in one ear. Hillel's head and face are permanently disfigured. Additionally, like Leor Thaler and Chana Friedman, he suffered severe shrapnel and burn injuries.

Hillel's recovery was the longest of the victims. Between his hospitalization and rehabilitation, he could not return home for over four months following the attack. In *Campuzano*, Judge Urbina found the duration of treatment to be a significant indicator of the severity of the plaintiff's injuries. *See* 281 F. Supp. 2d at 274-75. However, Hillel's psychological injuries, while by no means minor, appear to be less severe than those of his co-plaintiffs.

Considering the severity and permanency of Hillel's physical and psychological injuries, and the pain he endured in the attack and during his lengthy rehabilitation, the Court finds that his injuries are comparable to those suffered by most of the *Campuzano* plaintiffs. Accordingly, I award Hillel Trattner $12,000,000 for his injuries sustained in the bombing.

**ii. Loss of consortium.**

Hillel also suffered as a result of the loss of the companionship of his wife, Ronit who was physically and emotionally injured in the attack. The couple could not live together for a period of four months, and when they resumed their marital life they were each burdened with intense psychological pain that interfered with their relationship. Comparing Hillel Trattner's loss of consortium to that of other spouses of survivors of terrorist attacks, his appears less severe. *See Campuzano*, 281 F. Supp. 2d at 276-77 and cases discussed therein. He and Ronit have resumed a "normal" marital relationship; they have had two children since the attack. Further, at the present neither requires intensive long-term care. However, both Hillel and Ronit were seriously injured and they both suffered and continue to suffer emotional trauma. Their various injuries took and continue to take a toll on their marriage. The Court awards Hillel Trattner $1,000,000 in damages for loss of consortium. *Cf. Campuzano*, 281 F. Supp. 2d at 276-77 ($6 million awarded to wife of American injured in bomb blast).

### iii. Lost earnings.

Hillel Trattner also lost $33,000 of income while he was recovering from his injuries for which he is entitled to compensation.

### m.    Ronit Trattner

Ronit Trattner is not a United States national. Accordingly, she has abandoned her claims under 18 U.S.C. § 2333, and assets a non-federal claim for battery over which, as discussed *supra*, the Court has supplemental jurisdiction.

Plaintiffs' complaint does not identify the law of the jurisdiction under which this supplemental claim is pled, nor were plaintiffs required to do so. See e.g. Shah v. Inter-Continental Hotel Chicago Operating Corp., 314 F.3d 278, 282 (7th Cir. 2002) (plaintiffs are not

required to identify the governing law in a complaint); 8 Wright & Miller, Federal Practice and Procedure 3d. § 1253 (2004).

It is well-established that "Generally, when parties do not raise the issue of the applicability of foreign law, a court is under no obligation to apply foreign law and may instead apply the law of the forum." Bechtel & Cole v. Graceland Broadcasting Inc., 18 F.3d 953 (Table) (D.C. Cir. 1994) (quoting Rymer v. Pool, 574 A.2d 283, 285 (D.C. 1990)). See also Oparaugo v. Watts, 884 A.2d 63, 68-72 (D.C. 2005); Joeckel v. Disabled American Veterans, 793 A.2d 1279, 1282 n. 7 (D.D.C. 2002); Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 860 (2nd Cir. 1981) (citing cases); Restatement (Second) of Conflict of Laws § 136 cmt. h (1971).

The District of Columbia recognizes a cause of action for battery, *see e.g. Marshall v. District of Columbia,* 391 A.2d 1374, 1380 (D.C. 1978), and it is clear that the bombing which injured Ronit Trattner constitutes a battery. *See id.* at 1380 (defining battery as "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it.").

The defendants have not objected to the application of D.C. law, despite having had "a meaningful opportunity" to do so. Oparaugo, 884 A.2d at 72. Furthermore, pleading and proving the law of a foreign jurisdiction is the duty of the party which seeks to invoke foreign law. Fed.R.Civ.P. 44.1.

Indeed, in the absence of such proof, the Court may assume that the law of the forum and the law of the foreign jurisdiction are the same. Riffe v. Magushi, 859 F.Supp. 220, 223 (S.D.W.Va. 1994).

Moreover, in the District of Columbia, a party seeking to apply foreign law must demonstrate as a threshold requirement that a "true conflict" exists between the law of the forum and that of the foreign jurisdiction. GEICO v. Fetisoff, 958 F.2d 1137, 1141 (D.C.Cir. 1992).

Since defendants have not asserted, much less shown, that a true conflict exists between D.C. law and that of any foreign jurisdiction, defendants "have acquiesced in the application of the local law of the forum." Oparaugo, 884 A.2d at 71 (citing Rymer, 574 A.2d at 285).

Finally, it beggars the imagination to assume that Israeli law – or for that matter the law of any other jurisdiction – does not recognize a cause of action for battery, or that the bombing attack in which Ronit Trattner was injured would not constitute a battery under Israeli or any other modern system of law.

Accordingly, since no "true conflict" has been demonstrated and the Court has no reason to believe one exists, no choice of law analysis is necessary for Ronit Trattner's battery claim.

**i. Injuries.**

Ronit Trattner suffered many severe shrapnel injuries and first and second degree burns. She was hospitalized for ten days during which time she underwent several operations to remove shrapnel and was subjected to the extremely painful burn treatment. Her scars and skin discoloration continue to be apparent. And, she still has shrapnel embedded in her body that will never be removed. Additionally, Ronit endured several months of separation from her husband and she was diagnosed with depression and adjustment disorder.

Considering the severity and permanency of Ronit's physical and psychological injuries, the pain she endured in the attack and in her lengthy rehabilitation, the Court finds that her injuries, though severe, are not quite as severe as those suffered by most of the *Campuzano* plaintiffs. Accordingly, the Court awards Ronit Trattner $8,000,000 for her injuries sustained in the bombing.

**ii. Lost earnings.**

Ronit Trattner also lost $4,500 of income while she was recovering from her injuries, for which she is entitled to compensation.

**n.      Shelly and Aron Trattner.**

Hillel Trattner's parents, plaintiffs Aron and Shelly Trattner, heard the explosion and for hours did not know whether their son had survived the blast. They suffered unimaginable anguish during those hours and during the following weeks and months during which they feared for Hillel's survival. They witnessed his brush with death in the days immediately following the attack and again when he nearly died from the reaction to his medication. Their lives have been forever changed by the brutal and senseless suicide bombing. In *Haim*, 425 F. Supp. 2d 56, 75-76 (D.D.C. 2006), the court awarded $3.5 million in damages for mental anguish suffered by the father of an adult injured in a suicide bombing. Because the Court finds Aron and Shelly Trattner's mental anguish to be at least comparable to the suffering of the surviving victim's father in *Haim*, it will award each of these plaintiffs the same amount of damages, i.e. $3.5 million.

**o.      Steven Braun.**

Steven Braun's physical injuries were less severe than those of the other plaintiffs present at the pizzeria at the time of the bombing. He suffered injuries to his legs that required medical treatment, but he was released from the hospital immediately after being treated. He experienced leg pain for approximately 2 months thereafter. Thankfully, following the initial shock, Steven Braun was able to assist in the rescue efforts along with Shabtai Shatsky and the other members of the emergency response team. These efforts by Steven, however, exposed him to additional horrors of the bombing, including witnessing the bodies strewn across the floor of the pizzeria in the moments immediately after the explosion.

As a consequence, Steve Braun did not fare as well psychologically as he did physically. Dr. Strous testified that, like many of the other plaintiffs, Steven Braun suffers from moderate to severe chronic post traumatic stress disorder and dysthymia. These conditions have significantly interfered with his family and professional life. In *Campuzano*, one of the plaintiffs present at the bombing, Jenny Rubin, suffered ***no*** physical injuries whatever. Yet like Mr. Braun, Jenny Rubin sustained serious psychological injuries from the carnage she witnessed. 281 F. Supp. 2d at 265. The *Campuzano* court awarded Ms. Rubin $7,000,000 for her past and future pain and suffering.

While Steven Braun, unlike Jenny Rubin, suffered some physical injuries and pain in addition to his emotional injuries, this is balanced by the fact that Mr. Braun's emotional trauma appears to be less than that suffered by Ms. Rubin. Accordingly, the Court finds that Steven Braun should be awarded $7,000,0000 in damages.

**p.    Trebling**

Section 2333(a) of the ATA requires that the damages set forth above (except those awarded to Ronit Trattner) be trebled. *See e.g. Knox*, 442 F.Supp.2d at 81 ("As statutorily mandated under section 2333, each of the awards set forth above should be trebled.")

**CONCLUSION**

Final judgment shall enter in favor of the Plaintiffs and against the Defendants, jointly and severally, for the following amounts:

| | |
|---|---|
| Estate of Keren Shatsky | $899,745, trebled to $2,699,235; |
| Shabtai Shatsky | $8 million, trebled to $24 million; |
| Jo Anne Shatsky | $8 million, trebled to $24 million; |
| Tzippora Shatsky | $3 million, trebled to $9 million; |
| Yoseph Shatsky | $3 million, trebled to $9 million; |

| | |
|---|---|
| Sara Shatsky Tzimmerman | $3 million, trebled to $9 million; |
| Miriam Shatsky | $3 million, trebled to $9 million; |
| David Shatsky | $3 million, trebled to $9 million; |
| Estate of Rachel Thaler | $1,577,589, trebled to $4,732,767; |
| Leor Thaler | $15 million, trebled to $45 million; |
| Ginette Thaler | $8 million, trebled to $24 million |
| Michael Thaler | $5 million, trebled to $15 million |
| Zvi Thaler | $3 million, trebled to $9 million |
| Isaac Thaler | $2.5 million, trebled to $7.5 million |
| Chana Friedman | $12 million, trebled to $36 million |
| Bella Friedman | $3,541,900, trebled to $10,625,700 |
| Ilan Friedman | $1.5 million, trebled to $4.5 million |
| Yehiel Friedman | $1.5 million, trebled to $4.5 million |
| Zvi Friedman | $1.5 million, trebled to $4.5 million |
| Miriam Friedman | $1.5 million, trebled to $4.5 million |
| Hillel Trattner | $13,033,000, trebled to $39,099,000 |
| Ronit Trattner | $8,004,500. Not trebled. |
| Aron Trattner | $3.5 million trebled to 10.5 million |
| Shelly Trattner | $3.5 million, trebled to 10.5 million |
| Steven Braun | $7 million, trebled to $21 million |

An order consistent with this Memorandum Opinion is separately and contemporaneously issued this __ day of _____, 2007.

_____
Richard J. Leon
United States District Judge