**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SHABTAI SCOTT SHATSKY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:02cv02280 (RJL) |
| | ) | |
| THE SYRIAN ARAB REPUBLIC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO
VACATE CLERK'S ENTRY OF DEFAULT**

Defendants The Palestinian Authority and The Palestine Liberation Organization hereby move pursuant to Rule 55(c) of the Federal Rules of Civil Procedure to vacate the April 12, 2005, entry of default by the clerk.  For the reasons stated in the accompanying memorandum of points and authorities and supporting exhibits, and for any other reason the Court deems appropriate, we urge the Court to vacate the entry of default and to permit expedited litigation on the merits of this case subject to conditions discussed more fully in the memorandum of points and authorities.  Defendants have submitted a verified answer along with these pleadings as is required by Local Rule 7(g).

Defendants further note that, in the accompanying memorandum of points and authorities, they have encouraged the Court to seek a Statement of Interest from the United States, *see* 28 U.S.C. § 517, regarding the foreign policy implications of denying the Palestinian Authority's motion to vacate.  Defendants made a similar request in support of their motion for relief from default judgment in *Knox v. PLO,* No. 03cv4466 (S.D.N.Y.) (VM).   On December 11, 2007, the *Knox* court directed the filing within 45 days of "an expression from the United States of

America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in *any of the other similar cases pending in other Districts*." Exh. C (Judge Marrero's Order in *Knox*) at 2 (emphasis added).  If the Court has any doubts about the foreign policy implications of this case, it should similarly seek input from the United States about how its interests are affected in these matters.

Pursuant to Local Rule 7(f), oral argument is requested on the motion.  If the Court determines that a request for the Statement of Interest may be warranted, Defendants request oral argument on that issue as well.

Respectfully submitted,

Dated:  December 21, 2007

/s/ Richard A. Hibey
Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Laura G. Ferguson (D.C. Bar # 433648)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 21st day of December 2007, a true and genuine copy

of the foregoing was filed by ECF, which automatically provided service to the following:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> Djs@mtlhlaw.com
> *Attorneys for Plaintiffs*

/s/ Charles F. B. McAleer, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SHABTAI SCOTT SHATSKY, *et al.*,   ) | |
|   ) | |
|        Plaintiffs,   ) | |
| v.   ) | Civil Action No. 1:02cv02280 (RJL) |
|   ) | |
| THE SYRIAN ARAB REPUBLIC, *et al.*,   ) | |
|   ) | |
|        Defendants.   ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO**
**VACATE CLERK'S ENTRY OF DEFAULT**

Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Laura G. Ferguson (D.C. Bar #433648)
Timothy P. O'Toole (D.C. Bar #469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

*Attorneys for the Palestinian Authority and the*
*Palestine Liberation Organization*

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

PROCEDURAL BACKGROUND.............................................................................. 6

A.  Plaintiffs Seek and Obtain Defaults Against the Syrian and Palestinian
    Defendants Shortly After Purportedly Effectuating Service, Which the Court
    Summarily Vacates ........................................................................................... 6

B.  Complex Litigation over Jurisdictional Issues Follows in the Case Against the
    PA and PLO Defendants. .................................................................................. 8

C.  Proceedings Following Denial of the Motion to Dismiss Against the PA and
    PLO Defendants................................................................................................. 8

ARGUMENT ............................................................................................................ 11

I.   DEFENDANTS ARE COMMITTED TO LITIGATING THE CASE ON THE
     MERITS AND SHOULD BE ALLOWED TO DO SO, ESPECIALLY IN
     LIGHT OF THE FOREIGN POLICY CONSEQUENCES OF A DEFAULT
     JUDGMENT. ................................................................................................. 11

     A.   Introduction.......................................................................................... 11

     B.   The PA/PLO's Commitment to Litigate the Case on the Merits, and the
          United States' Commitment to Support the Current Leadership of the
          Palestinian Authority............................................................................ 12

     C.   U.S. Law Recognizes the Importance of Giving Foreign Governments an
          Opportunity to Litigate on the Merits and Avoid Default Judgments.  .............. 14

     D.   It Is Imperative that a Foreign Government Be Given a Second Chance
          at Having Its Day in Court Where, as Here, as a Result of Terrorism
          Allegations and the Sheer Size of the Judgment, the Default Judgment
          Would Have Serious Foreign Policy Consequences............................ 17

II.  DEFENDANTS SATISFY THE GOVERNING LEGAL STANDARD UNDER
     FEDERAL RULE 55 FOR VACATING THE DEFAULT............................ 20

     A.   Rule 55's "Good Cause Shown" Standard............................................ 20

     B.   This Record Will Not Support a Finding of Willfulness That Deprives a
          Governing Entity of the Opportunity to Present a Full Defense to Charges
          That It Has Sponsored Terrorist Acts. ................................................ 22

C.     Plaintiffs Will Not Be Unfairly Prejudiced by Setting Aside the Default, Particularly Under the Defendants' Proposed Conditions for Vacatur................ 30

D.     Meritorious Defenses Exist............................................................................... 33

CONCLUSION.................................................................................................................... 40

EXHIBITS:

Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES (Dec. 18, 2007)........ A

John Ward Anderson, *Conferees Pledge $7.4 Billion in Aid to Palestinian Authority*," WASHINGTON POST (Dec. 18, 2007) ..................................................................... B

*Knox v. PLO,* No. 03cv4466 (S.D.N.Y.) (VM), Order of December 11, 2007............................ C

Declaration of Palestinian Authority Prime Minister Fayyad........................................ D

Text of President Bush's November 27, 2007, remarks at the Annapolis Conference................. E

Graham Usher, *PFLP Threatens To Kill Arafat Aides If Leader Is Not Freed*, THE GUARDIAN (Jan. 18, 2002). ...................................................................... F

Secretary of State Rice's January 12, 2007, to President Abbas................................... G

Country Profile of the "Occupied Palestinian Territories" from the U.K.'s Foreign & Commonwealth Office's Website.................................................................. H

July 16, 2007, Speech of President Bush........................................................... I

Defendants' Verified Answer ...................................................................... J

John Turley-Ewart, *Fighting Terrorism in Court: Israeli Lawyer Sues in Bid to Cut off Funds to Palestinian Authority*, NATIONAL POST (Nov. 23, 2002)................................. K

Secretary of State Rice's "Remarks with Palestinian Authority President Mahmoud Abbas," (Oct. 15, 2007) ............................................................................. L

*Suicide Bombing Kills 2 Israelis,* CNN.com (Feb. 16, 2002)....................................... M

James Bennet, *West Bank Suicide Bombing Kills 2 Israelis and Hurts 30,* NEW YORK TIMES, (Feb. 17, 2002) ................................................................. N

U.S. Department of State, "Significant Terrorist Incidents, 1961-2003: A Brief Chronology"........................................................................... O

Israeli Ministry of Foreign Affairs: "Background Information on the Popular
Front for the Liberation of Palestine" ........................................................................ P

*PFLP Military Wing Outlawed*, CNN.com (Oct. 22, 2001) ......................................... Q

Amnesty International Public Statement, *Israel/Occupied Territories/
Palestinian Authority: Ahmad Sa'adat Must Be Released and His Safety Ensured,*
(June 13, 2002),.......................................................................................................... R

CDI Terrorism Project, *In the Spotlight: the Popular Front for the Liberation
of Palestine*, cdi.org (Oct. 23, 2002) ......................................................................... S

Ilene R. Prusher, *Prison Raid Fallout Spreads*, CHRISTIAN SCIENCE MONITOR (Mar.
15, 2006) ..................................................................................................................... T

Congressional Research Service Report for Congress, *The PLO and Its Factions*
(June 10, 2002)............................................................................................................ U

Executive Order 12947, *Prohibiting Transactions With Terrorists
Who Threaten to Disrupt the Middle East Peace Process* (January 23, 1995)............. V

*Background on the PFLP - 17 Oct- 2001*, Israel Ministry of Foreign Affairs............. W

Declaration of Ahmad Abdel-Rahman ........................................................................ X

Shurat HaDin Israel Law Center website, "About Us"................................................. Y

# TABLE OF AUTHORITIES

## FEDERAL AND STATE CASES

*Candido v. District of Columbia,*
    242 F.R.D. 151 (D.D.C. 2007).........................................................................21, 27, 31, 34

*\*Capital Yacht Club v. Vessel Aviva,*
    228 F.R.D. 389 (D.D.C. 2005)....................................................................................... *passim*

*Commercial Bank of Kuwait v. Rafidain Bank,*
    15 F.3d 238 (2d Cir. 1994)....................................................................................................15

*Compania Interamericana v. Campania Dominica,*
    88 F.3d 948 (11th Cir. 1996) ..........................................................................................15, 17

*\*FG Hemisphere Assocs., LLC v. Democratic Rep. of Congo,*
    447 F.3d 835 (D.C. Cir. 2006)......................................................................................4, 17, 26

*First Fidelity Bank v. Gov't of Antigua & Barbuda-Permanent Mission,*
    877 F.2d 189 (2d Cir. 1989)................................................................................................17

*Gregorian v. Izvestia,*
    871 F.2d 1515 (9th Cir. 1989) ............................................................................................17

*H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe,*
    432 F.2d 689 (D.C. Cir. 1970).............................................................................................21

*Hester Int'l Corp. v. Fed. Rep. of Nigeria,*
    879 F.2d 170 (5th Cir.1989) ..........................................................................................12, 17

*Hutton v. Fisher,*
    359 F.2d 913 (3d Cir. 1966).................................................................................................12

*Info. Sys. & Networks Inc. v. United States,*
    994 F.2d 792 (Fed. Cir. 1993)..............................................................................................30

*\*Jackson v. Beech,*
    636 F.2d 831 (D.C. Cir. 1980)..................................................................................... *passim*

*Jackson v. Nat'l Football League,*
    No. 92 Civ. 7012, 1994 U.S. Dist. LEXIS 8303 (S.D.N.Y. June 21, 1994)............................36

*Jackson v. People's Rep. of China,
    794 F.2d 1490 (11th Cir. 1986) ...................................................................18, 21, 28, 29

James Electric Co. v. Cougar Enterprises, Inc.,
    111 F.R.D. 324 (D.D.C. 1986)............................................................................................33

KPS & Assocs. Inc. v. Designs by FMC, Inc.,
    318 F.3d 1 (1st Cir. 2003).................................................................................................31

*Keegel v. Key West & Caribbean Trading Co.,
    627 F.2d 372 (D.C. Cir. 1980)................................................................................... passim

Lawton v. Rep. of Iraq,
    No. 02-0474, 2006 U.S. Dist. LEXIS 94335 (D.D.C. Dec. 6, 2006)........................................29

Lewis v. Univ. of S. Miss.,
    No. 06-60375, 2007 U.S. App. LEXIS 8451 (5th Cir. Apr. 12, 2007) ....................................36

Livingston Powdered Metal, Inc. v. NLRB,
    669 F.2d 133 (3d Cir. 1982).................................................................................................12

Nat'l Bank of Kuwait, S.A.K. v. Rafidain Bank,
    No. 93civ3324, 1994 U.S. Dist. LEXIS 9817 (July 18, S.D.N.Y. 1994)..................................30

*Owens v. Rep. of Sudan,
    374 F. Supp. 2d 1 (D.D.C. 2005).............................................................................18, 21, 28

Peak v. District of Columbia,
    236 F.R.D. 13 (D.D.C. 2006)...............................................................................................23

*Practical Concepts, Inc. v. Rep. of Bolivia,
    811 F.2d 1543 (D.C. Cir. 1987)......................................................................................16, 17

Rooks v. Am. Brass Co.,
    263 F.2d 166 (6th Cir. 1959) ...............................................................................................12

Thorpe v. Thorpe,
    364 F.2d 692 (D.C. Cir. 1966)..............................................................................................33

Transaero v. La Fuerza Area Boliviana,
    24 F.3d 457 (2d Cir. 1994)...................................................................................................18

*United States v. Schofield,
    197 F.R.D. 6 (D.D.C. 2000)...........................................................................................27, 30

*Welzel v. United States,*
    No. 06-838, 2007 U.S. Dist. LEXIS 35087 (D.D.C. Mar. 30, 2007)......................................30

*Whelan v. Abell,*
    48 F.3d 1247 (D.C. Cir. 1995) .................................................................................20, 22, 34

## FEDERAL STATUTES

Anti-Terrorism Act,
    18 U.S.C. § 2333 ................................................................................................11, 14

28 U.S.C. § 517 .............................................................................................................2, 41

Foreign Sovereign Immunities Act.
    28 U.S.C. § 1608 .............................................................................................................15

## MISCELLANEOUS

Fed. R. Civ. P. 41 ...........................................................................................................9

Fed. R. Civ. P. 55 .................................................................................................. *passim*

62 Fed. Reg. 52,650 (Oct. 8, 1997)............................................................................39

66 Fed. Reg. 51,088 (Oct. 5, 2001)............................................................................39

67 Fed. Reg. 12,633 (Mar. 19, 2002)..........................................................................39

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHABTAI SCOTT SHATSKY, *et al.*,     )
                                    )
                                    )
          Plaintiffs,     )
v.                               )     Civil Action No. 1:02cv02280 (RJL)
                                    )
THE SYRIAN ARAB REPUBLIC, *et al.*,    )
                                    )
          Defendants.    )
                                    )

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO**
**VACATE CLERK'S ENTRY OF DEFAULT**

The Court should vacate the April 12, 2005, clerk's entry of default and allow the remaining Defendants, the Palestinian Authority and the Palestine Liberation Organization (the "PA" and the "PLO") to challenge the Plaintiffs' claim that the Defendants sponsored the February 16, 2002, attack of a suicide bomber in a shopping mall in the West Bank settlement of Karnei Shomron. Defendants are mindful of the age of this lawsuit, the current stage of the proceedings, and the nature of the default. Yet, for good and sufficient reason, Defendants submit that the Court should vacate the default and permit merits litigation.

**INTRODUCTION**

Plaintiffs seek to impose a $350 million default judgment against the PA and PLO. Plaintiffs here, along with plaintiffs in other terrorism cases pending against the PA and PLO, collectively seek over $4 billion. Just this week, at the December 17, 2007, gathering of 90 donor countries and international organizations in Paris, the international community pledged $7.4 billion over three years to the impoverished Palestinian Authority, with the U.S. pledging $555 million for 2008 alone. Exh. A (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*,

NEW YORK TIMES, Dec. 18, 2007).  As Secretary of State Rice explained at the conference: "The Palestinian Authority is experiencing a serious budgetary crisis . . . . This conference is literally the government's last hope to avoid bankruptcy." *Id.* at 1.  Secretary Rice emphasized: "This is the most promising opportunity to seek peace that we have had in nearly seven years, and we need to seize it." Exh. B at 1 (John Ward Anderson, *Conferees Pledge $7.4 Billion in Aid to Palestinian Authority*, WASHINGTON POST, Dec. 18, 2007).

Given the PA's "serious budgetary crisis," the international community's commitment of substantial aid to the PA, and the relationship between the PA's financial situation and the prospects for peace in the region, Defendants encourage the Court to seek a Statement of Interest from the United States, *see* 28 U.S.C. § 517, regarding the foreign policy implications of denying the Palestinian Authority's motion to vacate.  Defendants made a similar request in support of their motion for relief from default judgment in *Knox v. PLO,* No. 03cv4466 (S.D.N.Y.) (VM). On December 11, 2007, the *Knox* court directed the filing within 45 days of "an expression from the United States of America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in *any of the other similar cases pending in other Districts*." Exh. C (Judge Marrero's Order in *Knox*) at 2 (emphasis added).

This is not a typical default case.  The stakes here are high.  Providing a handful of plaintiffs -- many of them settlers antagonistic to the very idea of a Palestinian state -- billions of dollars in default judgments against the PA and PLO in the absence of any showing of PA and PLO responsibility for the alleged terrorist attacks would undo many of the recent efforts by the United States and others to support the new leadership of the Palestinian Authority, with a potentially devastating impact on the development of a stable, peaceful Palestinian state.  If the

Court has any doubts about the foreign policy interests of this case, it should similarly seek input from the United States about how its interests are affected in these matters.

The attached Declaration of Palestinian Authority Prime Minister Fayyad provides an additional basis for vacating the default. *See* Exh. D. In his Declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward. In his Declaration, Prime Minister Fayyad states: "I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts." *Id.* at ¶ 13.

A sworn statement provided by the Prime Minister of a foreign government to a U.S. court would be noteworthy under any circumstances. Prime Minister Fayyad's declaration is entitled to special consideration because of the trust and confidence the United States has placed in him and his vital role in the Israeli-Palestinian peace process. Just last month, President Bush spoke at the Annapolis Conference, urging the "strong backing" of the international community to support the Palestinian government in its efforts to "build the free institutions that will support a free Palestinian State." Exh. E at 4 (Text of President Bush's November 27, 2007, remarks at the Annapolis Conference). In particular, President Bush asked support for Prime Minister Fayyad's important work: "Prime Minister Fayyad is finalizing a plan to increase openness and transparency and accountability throughout Palestinian society -- and he needs the resources and support from the international community." *Id.*.

Viewed against this backdrop, Defendants easily satisfy the "good cause shown" standard for vacating defaults. *See* Fed. R. Civ. P. 55(c). There is no talismanic formula for determining

"good cause," and no single factor is dispositive.  In this circuit, however, the U.S. Court of

Appeals has directed courts to be particularly liberal in their application of the "good cause

shown" standard when the default might threaten the public fisc or interfere with an important

foreign policy interest of the United States. *FG Hemisphere Assocs., LLC v. Democratic

Republic of Congo,* 447 F.3d 835, 838-39 (D.C. Cir. 2006).  Given Secretary Rice's recent

comments at the Paris conference about the $7.4 billion aid package being the PA's "last hope to

avoid bankruptcy," Exh. A at 1, and the need to seize the "most promising opportunity to seek

peace that we have had in nearly seven years," it is difficult to imagine a case that presents a

stronger reason to provide a defaulting defendant another opportunity to litigate on the merits.

The Court of Appeals has identified three criteria relevant to the "good cause shown"

standard, criteria that must be examined in the context of the law's strong preference for merits

litigation.  These factors are (1) the willfulness of the default, (2) the cognizable prejudice to the

Plaintiffs, and (3) presence of meritorious defenses. *See generally Jackson v. Beech*, 636 F.2d

831, 835 (D.C. Cir. 1980).   Each of these factors counsels strongly in favor of vacatur here.

With regard to the willfulness factor, the extraordinary political turmoil in the Occupied

Territories during the course of the litigation greatly impaired Defendants' ability to defend the

lawsuit.  At the very time of the default, no decision making apparatus was in place, and thus

Defendants could not have had a "will," much less acted willfully, with regard to the default.

Courts have shown particular flexibility with foreign governments whose ability to defend is

impeded by political turmoil particularly where, once the turmoil subsides, the governments

subsequently make an unequivocal commitment to defend on the merits going forward.  Such is

the case here, as discussed in Prime Minister Fayyad's Declaration.  On the question of prejudice,

Defendants demonstrate below that cognizable legal prejudice is absent, commit to post a $1

million penalty bond to ensure no future default will occur in the event of vacatur, and agree to

reimburse Plaintiffs for reasonable costs and expenses sustained as a result of the default.

The PA's and PLO's strong meritorious defenses provide further "good cause" for

vacating the default. As discussed in the Argument, multiple sources, including the U.S. State

Department, identify a radical militant wing of the Popular Front for the Liberation of Palestine

("PFLP") as having claimed responsibility for the attack. If a militant wing of the PFLP is

indeed responsible for the attack, then the Plaintiffs cannot possibly establish PA or PLO liability

for the Karnei Shomron pizzeria bombing. The PA has no relationship to the PFLP. To the

contrary, shortly before the terrorist attack at issue here, the PA had *outlawed* the PFLP's military

wing and arrested 33 of PFLP's members. Exh. Q (*PFLP Military Wing Outlawed*, CNN.com,

Oct. 22, 2001). Just a month before the incident, the PA *arrested* the Secretary-General of the

PFLP, Ahmad Sa'adat, in connection with the killing of an Israeli cabinet minister. Exhibit F at

1 (Graham Usher, *PFLP Threatens To Kill Arafat Aides If Leader Is Not Freed*, THE GUARDIAN,

(Jan. 18, 2002)). Immediately after the arrest, the PFLP's military arm -- the presumptive

perpetrator of the attack at issue in this case -- threatened to kill PA security chiefs if Sa'adat was

not released. *Id.* Nonetheless, the PA continued to hold Sa'adat even after the Palestinian courts

ordered his release, and even after Sa'adat went on a hunger strike to protest his continued

detention.

With regard to the PLO, it has been recognized by Israel and the United Nations as the

organization authorized to represent the interests of the Palestinian people, including the

Palestinian refugees living outside the PA. It is a large umbrella group, constituting a coalition

of a diverse group of political parties, many with widely divergent views and agendas. Although

the PFLP at times has been a nominal member of the PLO, it rejected the PLO's decision to enter

5

into the Oslo Accords with Israel in 1993.  As a result, the PFLP has since been identified as a "PLO rejectionist" group -- that is, a group that "rejects" the fundamental decision of the PLO at the time of Oslo to renounce violence and to instead achieve statehood by negotiation.  As explained below, unincorporated associations, such as the PLO, may not be held liable for the acts of member groups, unless the association directed or supported those acts.  Given the antagonism and opposing agendas of the PLO ruling party Fatah and the PFLP, Plaintiffs have not and cannot establish that the PLO leadership directed or supported the heinous act at issue in this case.

As a result, this is a case where there is far more than a "hint of a suggestion which, proven at trial, would constitute a complete defense." *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 374 (D.C. Cir. 1980).  If merits litigation is permitted, Plaintiffs will be unable to establish liability against the PA or PLO.  For that reason, and because Defendants have satisfied the other pertinent legal factors that govern the question of vacatur, Defendants respectfully request that the Court grant the motion.

## PROCEDURAL BACKGROUND

A.   **Plaintiffs Seek and Obtain Defaults Against the Syrian and Palestinian Defendants Shortly After Purportedly Effectuating Service, Which the Court Summarily Vacates.**

Plaintiffs initiated this lawsuit in November 2002 on behalf of a number of people who were injured or killed in the February 2002 suicide bombing in the West Bank settlement of Karnei Shomron.  Dkt. 3 (Complaint).  Presumably in light of the fact that the Syrian-based PFLP had taken credit for the bombing, the Complaint focuses largely on the many Syrian defendants.  *Id.* at 6-13.  Nonetheless, the Complaint also names the PA and PLO as Defendants, as well as naming John Does 1-99.  *Id.* at 13-16.

In February 2003, Plaintiffs purportedly served the Complaint on the Syrian defendants.

Dkt. 4, 5 & 6.  Two months later, in April 2003, Plaintiffs secured an entry of default against

those Defendants.  Dkt. 7.  The Syrian Defendants were represented by attorneys Ramsey Clark,

Lawrence Shilling and Abdeen Jabara, as well as local counsel Maher Hanania.  Eventually, in a

minute order entered on September 29, 2004, this Court granted the Syrian Defendants' motion

to set aside the default and permitted them to litigate their motion to dismiss.

The litigation against the PA and PLO Defendants proceeded along a similar track.  The

Plaintiffs purportedly served the PA and PLO Defendants on July 27, 2003, and secured a clerk's

entry of default on September 11, 2003.  Dkt. 18.  However, on September 25, 2003, the PA and

PLO moved to strike the entry of default on the ground that no default occurred.  Dkts. 21, 22.

The PA and PLO accordingly asked the Court to strike any entry of default, and to provide an

additional 30 days so that the PA and PLO could move to dismiss the Complaint on jurisdictional

grounds.  Dkt. 21.  The Palestinian Defendants were also represented by attorneys Ramsey Clark,

Lawrence Shilling and Abdeen Jabara, as well as local counsel Maher Hanania.  Clark and

Schilling were also handling similar lawsuits filed against the PA and PLO in federal court in

New York, Rhode Island and here, and Mr. Hanania was serving as local counsel in the other

lawsuits pending in this judicial district.[1]

On October 27, 2003, Plaintiffs conceded that the PA and PLO Defendants' motion to

strike had merit and that they had no opposition to the filing of a motion to dismiss on October

31, 2003, Dkt. 29, which Defendants timely filed.  Dkts. 24, 25, 26, 27.  On June 23, 2004, the

---

[1]   *Biton v. Palestinian Interim Self-Government Auth.*, No. 01cv382 (D.D.C.) (RMC); *Gilmore v.
Palestinian Interim Self-Government Auth.*, No. 01cv853 (D.D.C.) (GK); *Knox v. PLO*, No. 03cv4466
(S.D.N.Y.) (VM); *Saperstein v. Palestinian Auth.*, No. 04cv20225 (S.D. Fla.); *Estate of Ungar v.
Palestinian Auth.*, No. 00cv105L (D.R.I.).

Court granted the PA and PLO Defendants' motion to strike the clerk's entry of default. (*See* June 23, 2004 Minute Order).

**B.     Complex Litigation over Jurisdictional Issues Follows in the Case Against the PA and PLO Defendants.**

This Court's June 2004 minute order allowed for the PA and PLO Defendants to litigate their jurisdictional defenses in the context of their motion to dismiss.  Just as promised in their original motion to strike the default, the PA and PLO Defendants had already timely submitted such a motion, raising sovereign immunity, personal jurisdiction, improper service of process, and justiciability arguments in support of dismissal.  Dkts. 24, 25, 26, 27.  *Id.*  During argument on the motion in February 2004, the Court asked a number of questions about the incident and Plaintiffs' theory of liability for the attack.  Tr. 2/23/04 at 16-18, 24-29.  Plaintiffs' counsel claimed that Defendants were responsible because there was supposedly a "statement released I think virtually simultaneous with the attack indicating that individuals associated with the PLO and PA were responsible." *Id.* at 29:1-3.  Counsel for the PA and PLO countered by unambiguously denying that the PA and PLO had sponsored the attack.  *Id.* at 29:21-24.  At the end of the hearing, the Court praised counsel for their "thoughtful and very helpful arguments" and noted that "this is a sufficiently novel and complex issue that it warrants [careful] study on it." *Id.* at 34:12-14.

After examining the motion for approximately one year, on February 7, 2005, the Court entered an order denying the motion to dismiss.

**C.     Proceedings Following Denial of the Motion to Dismiss Against the PA and PLO Defendants**

During a scheduling conference following denial of the PA and PLO Defendants' motion to dismiss, the attorneys who were jointly representing the Syrian and the Palestinian Defendants

suggested that their clients would likely refuse to participate further in the litigation, as they had appeared only to protest the exercise of jurisdiction by the United States courts. Tr. 3/29/05 at 11:21-12:1. The Court, however, directed the Syrians to file a motion to dismiss by April 15, 2005, and scheduled oral argument on May 12, 2005. The Court also scheduled additional proceedings in the case involving the Palestinian Defendants, ordering that an oral argument would be held the same day on Plaintiffs' summary judgment motion. *Id.* at 15:3-24.

Following the conference but before the time set forth in the Court's scheduling order, the Plaintiffs sought and received another entry of default against the PA and PLO Defendants. Dkts. 51 & 52. The Clerk entered the default against the PA and PLO on April 12, 2005. Dkt. 52.

The Syrian Defendants continued to litigate the case. On April 15, 2005, the Syrian Defendants filed a motion to dismiss on a host of legal grounds. Dkt. 53. Rather than respond to this motion, on May 2, 2005, Plaintiffs chose to voluntarily dismiss the Complaint as to the Syrian Defendants pursuant to Fed. R. Civ. P. 41(a)(1), and to begin that case anew by filing a separate, related action against those defendants. Dkt. 55.

After May 2, 2005, therefore, the PA and PLO Defendants were the only remaining Defendants in this lawsuit. For the next two years, however, Plaintiffs took no further action in the case to secure entry of judgment against the PA and PLO Defendants. The Defendants, by contrast, filed a motion to hold the proceedings in abeyance for three months in light of the 2006 legislative elections, informing the Court that because of the "political turmoil" in the Palestinian Occupied Territories, counsel had been unable "to communicate with the defendants or any officials of the government." Dkt. 57. The Court denied the motion as moot on May 30, 2006.

In the time following default, President Mahmoud Abbas wrote to Secretary of State Rice for guidance concerning this and other lawsuits that had been brought against the PA and PLO. On January 12, 2007, in response to President Abbas' inquiries, Secretary Rice encouraged the Palestinian Authority to "respond to U.S. legal proceedings in a good faith and a timely manner." Exh. G (Secretary Rice's letter). Following receipt of the Secretary of State's letter, President Abbas charged Finance Minister Salam Fayyad with responsibility for engaging new counsel to defend the cases on the merits. After engaging in appropriate inquiries, Defendants retained new counsel from Miller & Chevalier Chartered, replaced predecessor counsel, and are now committed to full and complete participation in numerous cases in the United States courts. *See* Declaration of Prime Minister Salam Fayyad, attached as Exhibit D. Within the past few months, Miller & Chevalier counsel have entered appearances (or, in the non-D.C. cases, have been admitted pro hac vice) on behalf of the PA/PLO in eight cases in addition to this matter.[2]

On April 30, 2007, shortly before current counsel was retained in this case, Plaintiffs moved for entry of judgment by default, pursuant to Federal Rule of Civil Procedure 55(b)(2), and attached proposed findings of fact and conclusions of law suggesting that the Court award damages of more than $350 million without holding a hearing.

On May 30, 2007, new counsel filed an extensive opposition to Plaintiffs' motion. Dkt. 69. Following the entry of new counsel into the case, the Defendants have fully participated in

---

[2] *See Biton v. Palestinian Interim Self-Government Auth.*, No. 01cv382 (D.D.C.) (RMC); *Gilmore v. Palestinian Interim Self-Government Auth.*, No. 01cv853 (D.D.C.) (GK); *Estate of Esther Klieman v. Palestinian Auth.*, No. 04cv1173 (D.D.C.) (PLF); *Estate of Mark Parsons v. Palestinian Auth.*, No. 07cv1847 (D.D.C.) (JR); *Sokolow v. PLO*, No. 04cv397 (S.D.N.Y.) (GBD); *Knox v. PLO*, No. 03cv4466 (S.D.N.Y.) (VM); *Saperstein v. Palestinian Auth.*, No. 04cv20225 (S.D. Fla.); *Estate of Yaron Ungar v. Palestinian Auth.*, No. 00cv105L (D.R.I.).

all proceedings, including the preparation and implementation of a joint discovery plan under the

Court's supervision.  Dkts. 75 & 76.

## ARGUMENT

I.     **DEFENDANTS ARE COMMITTED TO LITIGATING THE CASE ON THE MERITS AND SHOULD BE ALLOWED TO DO SO, ESPECIALLY IN LIGHT OF THE FOREIGN POLICY CONSEQUENCES OF A DEFAULT JUDGMENT.**

### A.     Introduction

A number of cases have been brought against the PA and PLO in the United States under

the Anti-Terrorism Act, 18 U.S.C. § 2333.  The unstated premise of these cases, including this

one, is that every alleged act of violence committed within the Palestinian Occupied Territory is

assumed to be committed by a Palestinian acting at the behest of the PA or PLO, even though the

reality is that the acts are committed by individuals operating as part of militant groups or

factions who have their own agendas, agendas that are at odds with that of the PA and PLO.

Collectively, the U.S. Plaintiffs seek well over $4 billion, and they seek more than $350

million in this case alone.  Such judgments would devastate the Palestinian economy and people.

The United Kingdom Foreign Office describes the current state of the PA economy as follows:

> As a result of Israeli restrictions imposed both within the West
> Bank and Gaza Strip and on Palestinian external economic
> relations since the start of the Intifada (uprising) in September
> 2000, the economy has been fragmented.  Significant damage has
> been done to infrastructure, and economic activity and incomes
> have contracted very sharply.  Levels of poverty have increased
> dramatically, and much of the population is now dependent on
> food aid.

Exh. H at 2 (Country Profile of the "Occupied Palestinian Territories" from the U.K.'s Foreign &

Commonwealth Office's website).  At the recent donors' conference in Paris, Secretary of State

Rice underscored the dire nature of the PA's "serious budgetary crisis" by describing the $7.4

billion aid package as the "government's last hope to avoid bankruptcy." Exh. A at 1.  At the

same December 17, 2007 conference, President Abbas explained:  "Without this support, without

the payment of aid that will allow the Palestinian treasury to fulfill its role, we will be facing a

total catastrophe in the West Bank and Gaza." *Id.*

Courts disfavor the potential windfall effect of default judgments in cases involving

"large sums of money." *Livingston Powdered Metal, Inc. v. NLRB*, 669 F.2d 133, 137 (3d Cir.

1982); *Hutton v. Fisher*, 359 F.2d 913 (3d Cir. 1966); *Rooks v. American Brass Co.*, 263 F.2d

166 (6th Cir. 1959); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th

Cir.1989) ("We have recognized previously that if the amount of money involved is very great

the amount militates in favor of granting a full trial on the merits.").  These concerns are

heightened when the windfall is at the expense of the public fisc, and should be especially

heightened here in light of the desperate financial state of the PA and the foreign policy

implications of diverting financial resources urgently needed to rebuild and stabilize the PA.

**B.**      **The PA/PLO's Commitment to Litigate the Case on the Merits, and the
              United States' Commitment to Support the Current Leadership of the
              Palestinian Authority.**

When this case was brought and during the motions litigation, the PA and PLO might

rightly have wondered why they would be haled into U.S. courts to litigate claims, such as

Plaintiffs', involving an attack in the Occupied Territories that arose against the backdrop of the

Palestinian-Israeli conflict.  Despite the PA's and PLO's understandable confusion, however,

Defendants have come to appreciate that they need to address these cases head on, rather than

continuing to rely exclusively on jurisdictional defenses.

This change was impeded by a period of considerable political turmoil in the Occupied

Territories -- turmoil created by the degradation of government institutions resulting from

violence in the region and exacerbated by President Arafat's death in November 2004 and the

legislative elections in early 2006. As described more fully in the Declaration of Ahmad Abdel-

Rahman (Exh. X), this turmoil severely hampered the ability of the PA/PLO to make critical

decisions concerning the litigation. Nonetheless, a change in the litigation posture began to take

shape near the end of 2006, when President Abbas sought guidance from Secretary Rice about

how to respond to the U.S. litigation. Upon receipt of this guidance, President Abbas charged

then-Finance (now Prime) Minister Salam Fayyad with responsibility for "mak[ing] decisions for

both the PA and the PLO in connection with these lawsuits." *See* Exh. D (Prime Minister Fayyad

Declaration) at ¶ 10. As Prime Minister Fayyad describes more fully in his attached Declaration,

he reviewed President Abbas' correspondence with Secretary Rice, engaged in appropriate

inquiries, and "decided to retain new counsel for the PA and PLO to handle all of the U.S.

lawsuits, to provide them with clear instructions about their responsibilities with respect to the

litigation, and to discharge predecessor counsel." *Id.* ¶ 12.

Prime Minister Fayyad's declaration fully describes the manner in which the new

Palestinian leadership intends to conduct the litigation going forward:

> I have instructed new counsel that the Defendants will participate
> fully in this and other litigation, in a cooperative manner, including
> complete participation in the discovery process. I have further
> instructed new counsel to transmit this commitment to the United
> States courts. I personally commit to sustain this instruction
> throughout the effort to litigate these cases. It is my belief there are
> meritorious defenses to the claims brought in the United States and
> it is important to the PA to present those defenses. Moreover, it is
> important to the PA's role in the international community to
> participate in the legal process, even when it is process brought in
> the United States for actions that occurred far from the United
> States. The importance of this was not fully appreciated by the PA
> government, as a whole, until recently. Now we can act on that
> understanding, and we therefore seek to contest this litigation, fully
> and responsively.

Case 1:02-cv-02280-RJL   Document 77   Filed 12/21/07   Page 24 of 52

*Id.* ¶ 13.

Prime Minister Fayyad's Declaration deserves the Court's serious consideration. The United States has praised the new Palestinian leadership for "striving to build the institutions of a modern democracy," "working to strengthen Palestinian security services, so they can confront the terrorists and protect the innocent," and "ensuring that Palestinian society operates under the rule of law." Exh. I at 1 (July 16, 2007 Speech of President Bush). As President Bush explained in a July 2007 speech, "[b]y supporting the reforms of President Abbas and Prime Minister Fayyad, we can help them show the world what a Palestinian state would look like -- and act like." *Id.* at 1-2. One indication of the PA's and PLO's commitment to "operate[] under the rule of law," is the Defendants' unambiguous desire to fully defend this lawsuit within the American legal framework. Defendants thus ask the Court, in reviewing this motion, to weigh the importance of encouraging the designated representatives of the Palestinian people -- representatives who have won the support of our own Government -- to participate fully in the American legal process. As further evidence of Defendants' readiness to participate in the litigation, Defendants have attached as Exhibit J a Verified Answer, which the Defendants would file if the Court grants permission to do so.

### C.   U.S. Law Recognizes the Importance of Giving Foreign Governments an Opportunity to Litigate on the Merits and Avoid Default Judgments.

As noted, a number of cases have been brought against the PA and PLO in the United States under the Anti-Terrorism Act, 18 U.S.C. § 2333. Because the U.S. courts lack jurisdiction over the individuals and militant groups responsible for the acts, the plaintiffs in these cases sue the PA and PLO, hoping that the courts will take jurisdiction over the PA and PLO, and that the PA and PLO will then default due to the difficulty of defending such suits in the United States.

Plaintiffs also understand they have a greater prospect of collecting on a judgment against the PA and PLO than they do against the individuals and groups actually responsible for the acts.

Recognizing the necessity of protecting the public fisc from unfounded, unproven claims, U.S. law -- both statutory and case law -- goes to great lengths to protect foreign governments from default judgments based solely on a procedural default. Accordingly, federal law, as embodied in both the Foreign Sovereign Immunities Act (28 U.S.C. § 1608(e)) and Fed. R. Civ. P. 55(e), contains heightened safeguards where defaults threaten the domestic or foreign public fisc, reflecting "congressional recognition that public fisc should be protected from unfounded claims which would be granted solely because of government's delay in responding." *Compania Interamericana v. Campania Dominica*, 88 F.3d 948, 951 (11th Cir. 1996); (citing *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

The Palestinian Authority is not recognized as a foreign state for purposes of the Foreign Sovereign Immunities Act. But it is in fact a foreign government and any default judgment against the PA would be paid from the public fisc. The Palestinian taxpayers, many of whom live in poverty, are as deserving as other taxpayers of being protected from a procedural default. No doubt opposing counsel will assert that the satisfaction of any judgment would not come at the expense of the Palestinian people, but the U.S. plaintiffs' own collection efforts demonstrate that is not the case. Plaintiffs in *Estate of Yaron Ungar v. PA*, No. 00cv105L (D.R.I.), have, for example, sought to attach Arab League funds earmarked for humanitarian aid to the PA, garnish the Value Added Taxes collected by Israel on goods delivered into the Palestinian Territories,

and attach funds of the Palestinian Pension Fund for state employees.[3]  The Ungars' counsel (Mr. Strachman) represents Plaintiffs here, making similar collection efforts likely should the default stand.

Indeed, Plaintiffs' counsel appears to be working in these cases in conjunction with the Shurat HaDin Israel Law Center (ILC), an advocacy group whose stated goal is to "economically destroy" the PA, which it refers to on its website as a "hate group in the Middle East."  Exh. Y (Shurat HaDin Israel Law Center, "About Us").  The leader of the ILC, Nitsana Darshan-Leitner, has taken credit in the media for decisions favorable to plaintiffs in the federal litigation in Rhode Island (where Mr. Strachman is also counsel), and the ILC website similarly claims credit for the federal litigation in the United States, asserting that the ILC "won judgments of over $702 million against terrorist organizations, including the Palestinian Authority, and their state sponsors."  *Id.*  Ms. Darshan-Leitner has stated in interviews that the international legal team ultimately hopes to "bankrupt" the PA, and to "expose" what she describes as the European Union's "reckless" humanitarian subsidies to the PA.  Exh. K (John Turley-Ewart, *Fighting Terrorism in Court: Israeli Lawyer Sues in Bid to Cut off Funds to Palestinian Authority*, NATIONAL POST (Nov. 23, 2002)).

It is because foreign governments can easily be the target of these sorts of unfounded, politically-motivated lawsuits (and for other reasons as well) that courts generally exercise great caution before enforcing defaults and even default judgments against foreign governing entities.  *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 & n.19 (D.C. Cir. 1987);

---

[3]  *See, e.g., Ungar v. PA*, No. 05mc00180 (D.D.C.) (GK) (Arab League funds); *Ungar v. PA*, No. H/P 4318/05 (Jerusalem District Court) (action to domesticate *Ungar* judgment in Israel and attach VAT funds); *Estate of Yaron Ungar v. PA*, 841 N.Y.S.2d 61 (N.Y. App. Div. 2007) (discussing plaintiffs' actions with regard to Palestinian Pension Fund).

*Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989); *Gregorian v. Izvestia*, 871 F.2d 1515, 1525 (9th Cir. 1989); *First Fidelity Bank v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) ("Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside.").

This caution also stems from the "broad divergence" of "cultural, governmental and political" approaches to litigation when a foreign government is involved, and the importance of encouraging foreign entities to submit their disputes to resolution by the United States courts "on the basis of all relevant legal arguments," particularly in cases involving serious foreign policy overtones. *Practical Concepts, Inc.*, 811 F.2d at 1551-52. Just last year, the D.C. Circuit, applying Rule 60(b), vacated a default judgment against the Democratic Republic of Congo. *See FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835 (D.C. Cir. 2006). The court explained: "Intolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework." *Id.* at 838-39 (internal quotation and citation omitted).

### D. It Is Imperative that a Foreign Government Be Given a Second Chance at Having Its Day in Court Where, as Here, as a Result of Terrorism Allegations and the Sheer Size of the Judgment, the Default Judgment Would Have Serious Foreign Policy Consequences.

It is true that courts have sometimes declined to provide state-owned instrumentalities relief from default judgments in cases involving ordinary contract disputes. *See, e.g.*, *Compania Interamericana v. Campania Dominica*, 88 F.3d 948, 951-52 (11th Cir. 1996) (applying abuse of discretion standard in affirming denial of national airline's motion for relief from entry of default

17

and default judgment in breach of contract action); *Transaero v. La Fuerza Area Boliviana*, 24 F.3d 457, 462 (2d Cir. 1994) ("The case before us is fundamentally an ordinary contract dispute which has no such profound [foreign policy] implications."). This case, however, does not involve an ordinary contract dispute with a state-owned instrumentality but a claim directly against the foreign government, alleging government-sponsored terrorism.

Such claims require the courts to give special and careful consideration to the Defendants' commitment to litigate on the merits -- even if this commitment comes at what might be considered an otherwise inexcusably late stage in the litigation if an individual or corporate defendant were involved. In *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005), for example, the Court vacated a default against the Sudanese government after noting the "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists."

Moreover, though the PA does not enjoy the "foreign state" recognition enjoyed by China, the foreign policy implications of this case are far greater than those present in *Jackson v. People's Republic of China*, 794 F.2d 1490, 1496 (11th Cir. 1986), where the court vacated a default judgment against China employing the much less forgiving Rule 60(b) standard than the Rule 55 "good cause shown" standard under which Defendants seek relief. First, *Jackson* involved allegations that China had breached its obligations to holders of railroad bonds; here the PA and PLO are accused of supporting an act of international terrorism. In addition, the size of the default judgment sought in relation to the annual GDP of the defendant is vastly greater here than it was in *Jackson*. Jackson involved a $41 million default judgment against China; this case involves a potential $350 million (or more) default judgment against the Palestinian Authority, whose financial situation is so dire that it is a regular recipient of financial assistance and

humanitarian aid from other countries, including the United States. *See* Exh. I at 2 (July 16, 2007 speech of President Bush).

If the Court has any doubt about the foreign policy implications of entering a default judgment against the PA and PLO in a terrorism case, we invite the Court to seek a Statement of Interest from the State Department. As noted, Judge Marrero has already made a global inquiry in the *Knox* case concerning the State Department's interest in these cases, and has a directed a response in late January. *See* Exh. C (Judge Marrero's Dec. 11, 2007 Order). Any Statement of Interest can speak to the importance of continuing the progress toward stability being made by the current PA leadership and how the imposition of default liability in cases like this one might affect any current progress. At the recent peace summit in Annapolis, President Bush robustly praised the Palestinian leadership. *See* Exh. E at 2 (Nov. 27, 2007 Speech of Pres. Bush) ("President Abbas seeks to fulfill his people's aspirations for statehood, dignity and security. . . . He and Prime Minister Fayyad have both declared, without hesitation, that they are opposed to terrorism and committed to peace. . . . The emergence of responsible Palestinian leaders has given Israeli leaders the confidence they need to reach out to the Palestinians in true partnership."). Indeed, Secretary Rice has often described the effort to establish a Palestinian state and to achieve a peaceful resolution of the Israel-Palestinian conflict as one of President Bush's "highest priorities." *See* Exh. L at 1-2 ("Remarks with Palestinian Authority President Mahmoud Abbas," Oct. 15, 2007) ("I hope you understand and that everybody understands that the President has decided to make this one of the highest priorities of his Administration and of his time in office. It means that he is absolutely serious about moving this issue forward and moving it as rapidly as possible to conclusion.").

## II.   DEFENDANTS SATISFY THE GOVERNING LEGAL STANDARD UNDER FEDERAL RULE 55 FOR VACATING THE DEFAULT.

A fair and reasoned application of the controlling legal standards should lead the Court to vacate entry of default.  The Defendants should be permitted to contest, in open court, Plaintiffs' unfounded claims that they have supported the commission of terrorist acts.

### A.   Rule 55's "Good Cause Shown" Standard.

As noted, Federal Rule of Civil Procedure 55(c) permits the setting aside of the entry of default "for good cause shown."  As the United States Court of Appeals has explained, this provision must be interpreted in light of the "strong policies favoring the resolution of genuine disputes on their merits." *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980).  Accordingly, although a district court has some discretion in resolving a motion to set aside a default, its decision will be closely scrutinized and "an abuse of discretion need not be glaring to justify reversal, modern federal procedure favoring trials on the merits." *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373-74 (D.C. Cir. 1980); *Jackson v. Beech*, 636 F.2d at 835; *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995).

The Court of Appeals has also made clear that "there is a distinction between the appropriate standard for setting aside a default and that appropriate for setting aside a default judgment," in that the standard for setting aside a default is substantially lower when judgment has not yet been entered.  *Jackson v. Beech*, 636 F.2d at 835; *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d at 375 n.5 (noting that Rule 55 standard is "less rigid" and requires a "more liberal attitude" than Rule 60 allows); *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 393 (D.D.C. 2005) ("courts grant vacatur of default more freely than vacatur of default judgment.").

The standard for setting aside a default is also applied differently depending upon whether the Court is dealing with a "totally unresponsive party" or one who has simply missed certain deadlines. *H.F. Livermore Corp. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) ("the default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party"); *Jackson v. Beech*, 636 F.2d at 836 (suggesting that default is reserved for a "totally unresponsive party"). As Judge Walton of this Court has recently explained, "Courts do not favor default judgments and will only resolve cases in this manner when the adversary process has been halted because of an essentially unresponsive party." *Candido v. District of Columbia*, 242 F.R.D. 151, 154-55 (D.D.C. 2007).

This preference for merits litigation is at its highest where enforcing the default will have significant foreign policy overtones. Under such circumstances, courts have shown extreme reluctance to deprive a previously recalcitrant foreign defendant of its day in court. *E.g., Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005) ("strong presumption against the entry of default," as well as "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists," warrants vacatur of "somewhat willful" default); *Jackson v. People's Republic of China*, 794 F.2d 1490 at 1496 (upholding vacatur of willful default by People's Republic of China that refused for several years to litigate in United States courts and even refused to appear at oral argument to defend vacatur).

In ruling on any motion filed under Rule 55(c) to set aside a default, there is no talismanic formula but the court must at a minimum consider three criteria: whether "(1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious." *Jackson v. Beech*, 636 F.2d at 836; *Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d at

374; *Whelan v. Abell*, 48 F.3d at 1259.  The court must apply these standards so that "all ambiguous or disputed facts [are considered] in the light most favorable to the defendants." *Jackson v. Beech*, 636 F.2d at 836.  Each factor cuts in favor of the Defendants, particularly when measured under Rule 55(c)'s forgiving standard.

**B.      This Record Will Not Support a Finding of Willfulness That Deprives a Governing Entity of the Opportunity to Present a Full Defense to Charges That It Has Sponsored Terrorist Acts.**

Under the controlling law, the first factor to be considered is whether the default was willful.  In applying this factor to defaulting foreign governments, courts have expressed willingness to provide such defendants greater latitude and flexibility than would be afforded private, domestic litigants.  In addition to the fact that any default judgment would be paid from the public fisc, foreign governments, by definition, come from different legal cultures.  Often, such governments will not have fully developed the sort of mechanisms and lines of authority needed to respond to multi-million dollar litigation in a distant land.  Moreover, the PA/PLO are defendants who are brought to this Court from a legal culture that was barely formed and has been in disarray throughout the period of default.

In applying the willfulness factor here, there are two important declarations to consider.  First, the declaration of Mr. Abdel-Rahman (Exh. X) describes how turmoil in the region coincided with and affected the PA/PLO's ability to defend at critical stages of the litigation.  Second, Prime Minister Fayyad's declaration (Exh. D) provides firm, unambiguous representations as to the PA/PLO's commitment to participate fully in the litigation going forward.  As a result, this Court ought to apply the willfulness standard sensitively, as we discuss more fully below.

1. *Rule 55's Willfulness Standard.*

The standard for willfulness is a high one because it is "inherently unfair to use the

court's power to enter judgment as a penalty for filing delays." *Peak v. District of Columbia*, 236

F.R.D. 13, 15 (D.D.C. 2006). Thus, as the Court of Appeals has emphasized, "all doubts" must

be resolved "in favor of the party seeking relief" when considering whether Defendants' conduct

was sufficiently willful to warrant entry of default. *See Jackson v. Beech*, 636 F.2d at 836

(reversing default judgment because district court failed to resolve all doubts in favor of

defendant on willfulness issue). A finding of willfulness is accordingly reserved for a "totally

unresponsive" litigant or one who intentionally sought to defy the authority of this Court. *Id.*

(suggesting that default is reserved for a "totally unresponsive party").

2. *A Finding of Willfulness Is Not Appropriate Here, Where Defendants Were*
   *Neither Totally Unresponsive nor Intentionally Sought to Defy the*
   *Authority of the Court, but Rather Were Contending with Significant*
   *Political Turmoil.*

On its face, this may seem like a case where a willful default occurred. The reality,

however, is that, at the time of the default, the political turmoil in the Occupied Territories was

so disruptive that no decision making apparatus was in place with respect to the litigation. To

provide the Court with a fuller picture of the Defendants' mindset at the time of the default,

Defendants have provided the Court with the declaration of Ahmad Abdel-Rahman, which was

recently filed in another case against the PA and PLO in the Southern District of Florida,

*Saperstein v. Palestine Authority*, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.). *See* Exh. X

(Declaration of Ahmad Abdel-Rahman).

Mr. Abdel-Rahman is a long-time political advisor to the Palestinian government, who

has held important positions under both Presidents Arafat and Abbas. As his declaration makes

clear, the Palestinian government has never had the sort of institutional structure characteristic of

mature governments like the United States. Exh. X ¶ 3. By 2002, moreover, an escalation in

violence in the region had caused "the destruction and/or paralysis of many fledgling institutions

of the Palestinian governing system." *Id.* ¶ 4. By 2004, many government buildings and official

documents had been destroyed by the violence, and "no person within the Palestinian

governmental structure had primary responsibility for monitoring the lawsuits in the United

States or keeping records related to those lawsuits, and there was no organizational entity within

the Palestinian government that exercised such responsibility. Simply, there was no institutional

structure in place for making critical decisions with respect to these lawsuits." *Id.* ¶ 5.

In the Fall of 2004, President Arafat died. As Mr. Abdel-Rahman explains, "after he

died, there was significant disarray and instability in the government. This void in governmental

decision-making persisted well after his death." *Id.* ¶ 6.

President Abbas took office in early 2005, and his Chief of Staff, Dr. Rafiq Husseini,

took office in April 2005 -- just as the default was occurring in this case. After taking office, Dr.

Husseini assessed the state of affairs and determined that "building the institutions of modern

government would be a long-term and difficult task, particularly in light of the political turmoil

that both preceded and followed President Arafat's death." *Id.* ¶ 8. With the support of President

Abbas, Dr. Husseini began the process of creating an organizational entity within the President's

Office responsible for defending domestic and foreign lawsuits brought against the Palestinian

government, but it was a complicated task compounded by both a lack of familiarity in the

Palestinian legal community with the American legal system, and by the fact that the Palestinian

government had many other pressing problems to address. *Id.* ¶ 9. Chronic diseases had surged,

there was substantial unemployment and poverty, and access to safe-drinking water and food was

declining. Simply put, there were many urgent issues confronting the Palestinian government at the time, of which responding to this lawsuit was only one. *Id.*

In 2006, various high-level governmental decision makers were contacted about the litigation from time-to-time in response to particular problems, but the lack of institutional structure still plagued the government's ability to respond. *Id.* ¶ 10. These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit. *Id.* In addition, the HAMAS victory in the 2006 elections complicated matters even more, "particularly in light of the longstanding antagonistic relationship between the PA/PLO on the one hand, and HAMAS on the other." *Id.* ¶ 11.

By the end of 2006, however, "it became clear the Palestinian government urgently needed an institutional framework for responding comprehensively to the litigation in the United States." *Id.* ¶ 12. As Mr. Abdel-Rahman notes, "the failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment." *Id.* As a result, by January 2007, President Abbas had sought guidance about the litigation from the Secretary of State, and would soon delegate to Prime Minister Fayyad the authority to control the litigation so that clear and consistent decision making could occur. As a result of President Abbas' efforts, put into effect by Prime Minister Fayyad, the Court now has before it a repentant foreign governing entity that is making firm representations about its readiness to fully defend the case going forward, and is supporting those assurances with monetary security and sworn declarations. The Defendants have also made substantial efforts demonstrating this readiness, retaining new counsel and participating fully in all proceedings since May 2007.

In short, a view of what was going on thousands of miles away from the U.S. courthouse demonstrates the manner in which political turmoil in the Occupied Territories was inextricably intertwined with the default in this case.  During the early stages of the litigation, minimal institutional structures were in place for defending the litigation and even they was destroyed by bombing campaigns and the death of President Arafat.  Just before the default, the PA's and PLO's long-time leader had died, failing to leave behind virtually any institutional framework. At the very time of the default, a new government was taking over, and was only in the very beginning stages of constructing the institutional framework necessary to respond to complex litigation in a distant foreign land.   This process was unfortunately a lengthy one, but it was complicated by the many daunting challenges facing the government at the time and other intervening factors, such as the Hamas victory in the 2006 elections.

The D.C. Circuit has established that this Court should consider this political turmoil and the associated leadership changes in determining whether to grant the motion.  In *FG Hemisphere Associates, LLC v. Democratic Republic of Congo,* the Circuit vacated a default judgment where political turmoil hampered the foreign government's ability to defend.  447 F.3d 835, 841 (D.C. Cir. 2006).   Indeed, this case is a classic example of why foreign governments must be treated differently in the willfulness calculus because an assessment of their behavior in the courtroom can only be gleaned from gaining a fuller picture of the totality of the circumstances in the region.  A consideration of those circumstances here demonstrates that Defendants' conduct in the litigation, while regrettable, was much more understandable than it may have seemed at the time.

3.    *A Finding of Willfulness Is Not Appropriate Where Defendants Have
Expressed an Unequivocal Commitment to Litigate on the Merits,
Especially When the Case Involves Allegations of Terrorism Against a
Foreign Government.*

Another factor that is often controlling on the willfulness question is the history of

Defendants' participation in the case and any stated intention to pursue the case vigorously going

forward.  For example, in *United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000), the court

refused to find willfulness where the Defendant did nothing for 14 months in response to a

properly served complaint, and continued to do nothing for 8 months after the Clerk had entered

a default.  In refusing to find willfulness, the Court relied exclusively on the fact that plaintiff

was "now vigorously mounting a defense," explaining that "[s]uch an act cuts strongly against

any willfulness of the defendant's previous delay." *Id.*  Similarly, in *Candido v. District of

Columbia*, 242 F.R.D. 151, 154-55 (D.D.C. 2007), the court permitted relief from default where

a Defendant, after denial of its motion to dismiss, failed to timely file an answer in compliance

with the Court's scheduling order.   The court determined that the objective of the default rule is

punishment for a party's complete inaction, and was simply not appropriate where the defendant

has "actively litigated this matter." *Id.* at 156.

Because the instant case involves a governmental entity, where the public fisc is at stake,

the Court has additional reasons to accord Defendants some leniency on the willfulness question.

As previously noted, the Eleventh Circuit affirmed the district court's vacatur of the default

judgment in *Jackson v. People's Republic of China* despite China's intentional default.  The

Eleventh Circuit emphasized the nuanced nature of the situation, where the default had arisen

from:

> the misconception by an ancient and proud sovereign of its
> responsibility to reply to the demand of a United States court

> whose authority it does not recognize as a matter of international
> law, at a time when concepts of United States law and international
> law are changing.  The issues arise in the highly sensitive area of
> relations of our government with another sovereign with whom
> tolerable relations have been restored after many years.  They
> affect not only the interests of the PRC but of our own nation.

*Jackson v. People's Republic of China*, 794 F.2d at 1496.  The Court's ruling in *Jackson* is

precisely on point here.  As described above, the United States has very recently reestablished

strong diplomatic relations with the PA due to the leadership's renunciation of Hamas and the

rise to primacy of Prime Minister Fayyad and President Abbas, and is currently seeking to broker

a peace agreement in the Middle East by working with the PA's new leadership.  This matter --

which seeks to impose liability against U.S. allies for sponsoring terrorism -- accordingly

involves a "highly sensitive area of relations of our government."

The special concerns raised by the imposition of default liability against foreign

governing entities have prompted other courts to generally limit findings of willfulness to cases

of clear-cut recalcitrance and inaction.  For example, in *Owens v. Republic of Sudan*, 374 F.

Supp. 2d 1, 5-10 (D.D.C. 2005), the court vacated a default against the Sudanese government in a

case alleging it had sponsored attacks on the American embassies in Tanzania and Kenya.  The

default had been entered in May 2003 but the Sudanese government, despite filing other

pleadings in the action, had made no effort to vacate until February 2004.  The court reasoned

that the "strong presumption against the entry of default," as well as the "uniquely sensitive

nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored

terrorists," warranted vacatur of a "somewhat willful" default.  *Id.* at 9-10 & n.5.  As the court

explained, failing to hear the claims of a foreign governing entity that has appeared in the United

States courts to contest charges of sponsoring terrorism can, even after entry of a default

judgment, have a profound effect on United States' foreign policy by undermining State

Department efforts to encourage the resolution of disputes within the United States' legal

framework. *Id* at 8. *See also Lawton v. Republic of Iraq*, No. 02-0474, 2006 U.S. Dist. LEXIS

94335, at *7 (D.D.C. Dec. 6, 2006) (vacating entry of default and refusing to find willfulness in a

case alleging that Iraq should be held responsible for the 1995 bombing of a federal building in

Oklahoma City in light of political turmoil and based on representations that new leadership was

"committed to defending fully against Plaintiffs' alleged claims, on all available grounds, in

accordance with the laws, procedures and Court directives applicable to this litigation").

Indeed, unlike *Jackson v. People's Republic of China* and several of the other cases

discussed above, the instant case does not present the sort of "totally unresponsive" litigant that

courts have found default-worthy, particularly when that litigant is a governing foreign entity.  In

any event, regardless of what happened in this case previously, there can be no doubt that the

Defendants currently before the Court desire to litigate vigorously on the merits.  That alone was

the sole consideration in vacating a default judgment in *Jackson v. People's Republic of China*

and it has also been a dispositive factor in other cases involving foreign governing entities.

> 4. *Even if the Court Concludes that the Default Was Willful, the Court Nonetheless Should Vacate the Default Under Rule 55's "Good Cause Shown" Standard.*

A fair reading of this record demonstrates that the PA's default was not sufficiently

culpable to warrant a finding of willfulness in light of the foreign policy interests at stake and the

current representations from PA leadership about the intent to vigorously contest the case going

forward.  But even if the Court were to conclude otherwise, it must nonetheless address

countervailing foreign policy concerns and the other *Jackson v. Beech* factors.  As the Federal

Circuit has held, "[t]he majority of circuits balance the three [*Jackson v. Beech*] factors in

determining whether to grant relief" and it is accordingly erroneous to rely solely on willfulness to enforce a default in a case where meritorious defenses exist and where vacating the default will not result in significant prejudice. *Information Sys. & Networks Inc. v. United States*, 994 F.2d 792, 795-96 (Fed. Cir. 1993); *accord National Bank of Kuwait, S.A.K. v. Rafidain Bank*, No. 93civ3324,1994 U.S. Dist. LEXIS 9817, at *8, *30-31 (S.D.N.Y. July 18, 1994) ("[e]ven where a party's default is willful, default judgment is not appropriate if there exist meritorious defenses to the claims asserted.").

The law is the same in this Circuit. *See Keegel*, 627 F.2d at 374 (reversing in part because district court failed to consider all three "listed criteria" in considering motion to vacate); *United States v. Schofield*, 197 F.R.D. at 8 (vacating despite indications of initial willfulness based on subsequently stated representations of intent to litigate going forward); *Owens v. Republic of Sudan*, 374 F. Supp. 2d at 9-10 (vacatur of "somewhat willful" default based on absence of prejudice and potentially meritorious defense). This Court must accordingly consider the other *Jackson v. Beech* factors regardless of its determination on willfulness.

**C.      Plaintiffs Will Not Be Unfairly Prejudiced by Setting Aside the Default, Particularly Under the Defendants' Proposed Conditions for Vacatur.**

   1.      *The Nature of the Prejudice at Issue*

The second factor that the Court must consider is whether the Plaintiffs were prejudiced by any delay. On this point, it is well-established that "delay in and of itself does not constitute prejudice." *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 393-94 (D.D.C. 2005); *Welzel v. United States*, No. 06-838, 2007 U.S. Dist. LEXIS 35087 (D.D.C. Mar. 30, 2007) (same); *see also Keegel v. Key West*, 627 F.2d at 374 ("[t]hat setting aside the default would delay satisfaction of plaintiffs' claim, should plaintiffs succeed at trial, is insufficient to require

affirmance of the denial."). Rather, the question in determining prejudice is whether the plaintiff can demonstrate tangible harm from any delay such as "loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. at  394, *quoting in part*, *KPS & Assocs. Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003).

> 2.    *Plaintiffs Will Not Be Tangibly Harmed, in a Legally Cognizable Way, from any Delay Associated with Vacating the Default.*

Here, Plaintiffs did not suffer any of these injuries as a result of the default in April 2005. There is no indication that evidence has been lost, that discovery has become more difficult, or that anything happened to make fraud or collusion likely.  In addition, the years of active litigation that occurred prior to April 2005 make it unlikely that Plaintiffs would suffer any prejudice from delay. *Candido v. District of Columbia*, 242 F.R.D. at 154-55 (active litigation indicates lack of prejudice because plaintiff is on notice of need to pursue claims).

Rather than focus on the lost evidence or discovery, the Plaintiffs will likely claim prejudice as a result of the on-going damages litigation and factual development.  However, the prejudice caused by the commencement of the damages litigation should not suffice to prevent merits litigation.

First, any effort expended on the damages litigation can and should still be utilized if, after the default is vacated, the Defendants are ultimately found liable.  Thus, from Plaintiffs' perspective, none of the effort expended in developing facts related to damages hearing will be wasted.  If Plaintiffs succeed on the merits, they would have had to present evidence of damages anyway, and they can now do so using any admissible evidence they have developed rather than starting from scratch.  By contrast, if Defendants prevail, Plaintiffs cannot complain about

prejudice from preparing for a damages hearing when Defendants were never liable in the first place.

Second, Plaintiffs can be easily reimbursed for reasonable costs unnecessarily incurred in the damages hearing if there are any such costs. The situation here, in fact, is largely identical to the one the Court of Appeals addressed in *Jackson v. Beech*, where the only asserted prejudice was a damages proceeding that had occurred after the default. The Court of Appeals rejected the notion that any prejudice occurred from having held such a hearing in the interim:

> It is true that time and energy have been spent on the damages hearing . . . But [i]t cannot be argued that justice requires the enforcement of a judgment based on that report to save the time consumed in two days of hearings and in preparing the eight-page report.

*Jackson v. Beech*, 636 F.2d at 837 (footnote omitted).

It similarly cannot be argued here that justice requires the enforcement of a potentially multi-million dollar default in order to save the time consumed in developing facts related to damages, particularly when those facts can be used later if liability is found.

3. *Defendants Agree to Take Appropriate Measures to Minimize Any Prejudice to Plaintiffs.*

As Judge Urbina explained in *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 395 (D.D.C. 2005), "[i]n determining whether to exercise its discretion to set aside a default, a district court has inherent power to impose a reasonable condition on the vacatur in order to avoid undue prejudice to the opposing party." The two most common conditions imposed in these circumstances are that the defendant (1) reimburse the plaintiff for reasonable costs-- typically court costs and attorney fees -- incurred as a result of the default, and (2) post a bond as evidence of good faith. *Id.*

Defendants agree that Plaintiffs should be compensated for reasonable costs incurred as a result of the default. Defendants, however, suggest that the Court would be warranted in imposing *only* the condition of reimbursement of reasonable costs as part of any order vacating the default. This is a case, like *James Electric Co. v. Cougar Enterprises, Inc.*, 111 F.R.D. 324, 326 (D.D.C. 1986), where "prejudice to plaintiff can largely be ameliorated by requiring [defendant] to pay the costs incurred by plaintiff in obtaining the default . . . ." Consequently, Defendants do not believe that any bond is necessary in this case for purposes of security.

Nonetheless, to demonstrate that the motion to vacate is not an effort to delay the litigation with the plan of again defaulting in the future, Defendants would agree to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the April 12, 2005 entry of default so that the Defendants can litigate on the merits -- the Defendants again default. The $1 million would not reduce the amount of damages to which the Plaintiffs are entitled, but instead would be intended to compensate Plaintiffs for any delay caused by the vacatur of the current default.

This bond is unusually high. Indeed Defendants, were they not consenting to it, could argue that it is too high. *See Thorpe v. Thorpe*, 364 F.2d 692, 694-95 (D.C. Cir. 1966) (approving bond condition generally but noting that amount of bond ordered by court was so high that it could potentially give rise to due process concerns). Defendants' strong desire to litigate this matter, however, brings them to propose such a high bond.

**D.    Meritorious Defenses Exist.**

1.    *The Meritorious Defense Standard.*

The final factor in the *Jackson v. Beech* analysis cuts strongly in favor of the Defendants because meritorious defenses exist to the underlying charges. The threshold for this factor is a

low one: "the movant is not required to prove a defense, but only to assert a defense that it may prove at trial." *Whelan v. Abell*, 48 F.3d 1247, 1259 (D.C. Cir. 1995); *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. at 394. As the Court of Appeals has explained, "[l]ikelihood of success is not the measure. Defendants' allegations are meritorious if they contain even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d at 374 (internal quotation omitted).

Courts in this district have thus found the "meritorious defense" criterion satisfied in a variety of circumstances. For example, the Court of Appeals determined in *Keegel*, 627 F.2d at 374, that "broad and conclusory" allegations of jurisdictional defenses "adequately meet the meritorious defense criterion." Likewise, in *Jackson v. Beech*, 636 F.2d at 835, the Court of Appeals found the standard satisfied by an affidavit in which defendants alleged that plaintiffs' claims were false and motivated by bias. And, in *Capital Yacht Club*, 228 F.R.D. at 394, the district court found the standard satisfied by the recitation of a potential legal defense to the charges. Finally, in *Candido*, 242 F.R.D. at 157, the court found the factor met merely by a "broad and conclusory" allegation that the defendants would dispute the amount of damages claimed by the plaintiffs, reasoning that such allegations sufficed because "the Court cannot conclude that any possible defenses [defendants] may raise will be entirely without merit." In the instant case, the meritorious defense described below far out-distances the showings in these previously decided cases.

### 2. *Defendants Are Not Responsible for the Attack.*

Defendants are not responsible for the attack. Thus, without waiving any of the defenses raised in the verified answer, Defendants have confined their discussion here to their lack of responsibility, a defense that easily suffices to meet the meritorious defense threshold set forth in

the controlling law.  If the default is vacated, Defendants will vigorously contest the allegations against them.  Their defense is, viewed objectively, a strong one that warrants full and fair litigation.

Despite the fact that the bombing at the Karnei Shomron pizzeria was a high profile, widely condemned incident, to Defendants' knowledge, Israel has never identified any PA or PLO officials as having any role in planning or supporting the attack.  Accordingly, it is highly unlikely Plaintiffs will be able adduce to evidence of PA or PLO wrongdoing when the Israelis apparently found none.

In fact, it is likely that a radical militant wing (Abu Ali Mustafa Brigades) of the Popular Front for the Liberation of Palestine ("PFLP") committed the attack.  According to contemporaneous news accounts, the suicide bomber was a member of the Abu Ali Mustafa Brigades, which formed after the former leader of the PFLP was killed in an Israeli missile strike in August 2001. *See* Exh. M at 1 (*Suicide Bombing Kills 2 Israelis*, CNN.com, Feb. 16, 2002). Numerous contemporaneous news accounts reported that the PLFP claimed responsibility for the attack.  *See, e.g.*, Exh. N at 1 (*West Bank Suicide Bombing Kills 2 Israelis and Hurts 30*, NEW YORK TIMES, Feb. 17, 2002) ("The Popular Front for the Liberation of Palestine claimed responsibility for the bombing in a call to the Qatar-based television station Al Jazeera.  It identified the bomber as an 18-year old man from the town of Qalqilya, west of Karnei Shomron."); Exh. O at 8, 11 (U.S. Department of State, "Significant Terrorist Incidents, 1961-2003:  A Brief Chronology") (noting, "based entirely on public sources" that the PFLP "claimed responsibility" for the February 2002 Karnei Shomron suicide bombing attack).  For its part, the Israel Ministry of Foreign Affairs identifies the PFLP as "responsible" for the Karnei Shomron

incident. Exh. P (Israeli Ministry of Foreign Affairs: "Background Information on the Popular

Front for the Liberation of Palestine," Nov. 1, 2004).

Plaintiffs presumably are proceeding under the theory that, because the PFLP was at least

at one time a member of the PLO, the PLO is responsible for the acts of the PFLP. Plaintiffs,

however, lack both a factual and legal basis to proceed under such a theory. As an

unincorporated association, the PLO may not be held liable for the unauthorized acts of its

members. As the U.S. Court of Appeals for the Fifth Circuit explained earlier this year,

"[g]enerally, unincorporated associations . . . are not liable for the wrongful acts of their

members unless they encouraged, promoted, or subsequently ratified them." *Lewis v. Univ. of S.*

*Miss.*, No. 06-60375, 2007 U.S. App. LEXIS 8451, at *2-3 (5th Cir. Apr. 12, 2007). *Accord*

*Jackson v. National Football League*, No. 92 Civ7012, 1994 U.S. Dist. LEXIS 8303, *15-17

(S.D.N.Y. June 20, 1994) (in the absence of ratification by the membership, plaintiff must show

that the unincorporated association authorized the alleged conduct in order for the association to

be liable for the acts of an individual member organization). Thus, as a legal matter, Plaintiffs

cannot establish that PFLP's nominal membership in the PLO creates per se liability for the PLO

for the unauthorized acts of PFLP.

Nor can Plaintiffs offer any support for the proposition that either the PA or PLO

authorized or supported the acts of the PFLP's militant military wing, the Abu Ali Mustafa

Brigades. To the contrary, shortly before the terrorist attack at issue here, the PA had outlawed

the PFLP's military wing and arrested 33 of PFLP's members. Exh. Q (*PFLP Military Wing*

*Outlawed*, CNN.com, Oct. 22, 2001). *See also* Exh. M at 1 (*Suicide Bombing Kills 2 Israelis*,

CNN.com, Feb.16, 2002) ("While the PFLP has been a member of Arafat's Palestinian

Liberation Organization since the late 1960s, its military wing was outlawed by the Palestinian

National Security Council following [Israeli Tourism Minister] Zeevi's assassination," an assassination for which the Abu Ali Mustafa Brigades claimed responsibility).

Just a month before the attack, in January 2002, the PA arrested PFLP leader Ahmed Sa'adat in connection with Zeevi's assassination. *See* Exh. F (Graham Usher, *PFLP Threatens to Kill Arafat Aides If Leader not Freed*, THE GUARDIAN (Jan. 18, 2002)). As a result of Sa'adat's arrest, the military wing of the PFLP "threatened to kill Palestinian Authority security chiefs if its leader, Ahmed Saadat, and other PFLP political prisoners were not 'immediately released' from authority jails." *Id.* at 1. Concerned that Sa'adat would be assassinated, PA President and PLO Chairman Arafat apparently was reluctant to turn Sa'adat, a Palestinian, over to Israeli custody. *See* Exh. R at 1 (Amnesty International Public Statement, *Israel / Occupied Territories / Palestinian Authority: Ahmad Sa'adat Must Be Released and His Safety Ensured*, June 13, 2002). In March 2002, Israeli Defense Forces attacked Arafat's compound, where Sa'adat was being held, and kept it under siege for a month. On May 1, 2002, the siege was lifted, under an agreement whereby six PFLP detainees, including Sa'adat, would be transferred to the Palestinian Jericho prison where their detention would be monitored by U.S. and U.K. observers. *Id.* at 2. In June 2002, responding to Sa'adat's petition for his release, the Palestinian High Court of Justice in Gaza ordered the PA Intelligence Service to immediately release Sa'adat, because no evidence had been presented against him. *Id.* at 1. In August 2002, Sa'adat went on a hunger strike to protest his detention in the Palestinian prison. Exh. S at 3 (CDI Terrorism Project, *In the Spotlight: The Popular Front for the Liberation of Palestine*, cdi.org, Oct. 23, 2002). However, despite the order of the High Court and calls for Sa'adat's release from Amnesty International, the PA continued to detain Sa'adat through 2005, instead choosing to follow the agreement with Israel. In March 2006, soon after the January 2006 elections in which

Hamas gained control of the Palestinian Parliament, Israeli forces raided the Jericho prison and took Sa'adat into custody. Exh. T (Ilene Prusher, *Prison Raid Fallout Spreads*, THE CHRISTIAN SCIENCE MONITOR, Mar. 15, 2006).

As one contemporaneous news report explained at the time of Sa'adat's arrest, "in arresting Mr. Saadat, [Arafat] has brought to a head a breach that has long simmered in the national movement." Exh. F at 2 (Graham Usher, *PFLP Threatens to Kill Arafat Aides If Leader not Freed*, THE GUARDIAN, Jan. 18, 2002). The breach between the PLO and PFLP dates back at least to 1993, when the two groups took opposing views on whether to recognize Israel. In the 1993 Oslo Accords, the PLO, under Yasser Arafat's leadership, agreed to recognize Israel, renounce terrorism, and enter into agreements with Israel to establish a timeline and framework for an eventual Palestinian state. The PFLP, on the other hand, refused to recognize Israel, rejected the Oslo Accords, and continued to support armed resistance to the Israeli occupation. *See* Exh. U at 2 (Congressional Research Service Report for Congress, *The PLO and Its Factions*, June 10, 2002). In fact, immediately after the 1993 Israel-Palestinian Declaration of Principles (one of the "Oslo Accords"), the PFLP suspended its participation in the PLO. *Id.* Because of its opposition to "the September 13, 1993 Israel-PLO mutual recognition and subsequent Israeli-Palestinian interim agreements," the PFLP is characterized as a PLO "rejectionist" group. *Id.*

Following the PLO and PA's agreement to embark on the path toward peace with the Israelis in 1993, the PFLP almost immediately began attempting to sabotage the peace process -- and the PA/PLO role in it -- by committing acts of Anti-Israeli violence. Thus, by January 23, 1995, President Clinton had determined that the PFLP constituted a terrorist organization that was threatening to disrupt the Middle East Peace Process. *See* Exh. V (Executive Order 12947,

*Prohibiting Transactions With Terrorists Who Threaten to Disrupt the Middle East Peace Process* (January 23, 1995)). In 1997, then-Secretary of State Albright exercised her new powers under the Anti-Terrorism and Effective Death Penalty Act by naming the PFLP as one of the first designated foreign terrorism organizations. *See* 62 F.R. 52650 (designating 30 Foreign Terrorist Organizations, including PFLP).

Although there was a brief rapprochement with the PLO in 1999, when the PFLP made an "apparent acceptance of eventual peace with Israel," Exh. U at 2, the PFLP "returned to [its] original principles" when its leader Mustafa was assassinated and Sa'adat resumed leadership. Exh. S at 2-3 (CDI Terrorism Project, *In the Spotlight: The Popular Front for the Liberation of Palestine*, Oct. 23, 2002) ("Sada[a]t subsequently worked to increase the involvement of the PFLP in terrorist activities and diminished the role of the pragmatic faction within the PFLP that continued to negotiate with the PLO."). At the time of the 2002 incident here, the PFLP was designated as an FTO. *See, e.g, Designation of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001*, 67 Fed. Reg. 12,633 (March 19, 2002) (redesignating PFLP as FTO); *Redesignation of Foreign Terrorist Organizations*, 66 Fed. Reg. 51,088 (Oct. 5, 2001) (same).[4] The Israel Ministry of Foreign Affairs describes Sa'adat as "a leader of the extreme faction of the PFLP in the territories, [who] supports the continuation of the armed struggle and staunchly opposes the Oslo Accords. He sees himself loyal to the 'original' principles of the PFLP . . . . Exh. W at 3 ("Background on the PFLP - 17 Oct- 2001," Israel Ministry of Foreign Affairs). According to the Israeli Ministry, the:

---

[4] In contrast, the Department of State has never designated the PA or the PLO as foreign terrorist organizations, and in fact has continued to describe those organizations as vital to the on-going Middle East Peace Process. The United States thus recognized at the time of the incident that the PFLP and the PA and PLO are separate and distinct entities for the purpose of terrorist activities.

choosing of Sa[a]dat expresses the radicalization of the PFLP's policy, especially following the killing of their leader Abu Ali Mustafa. His position as Secretary General has lead to an increase in the PFLP's involvement in carrying out terrorist attacks, and the brushing aside of the "pragmatic" faction of the organization, that attempted to negotiate with the Palestinian Authority.

*Id.* at 4.

At this juncture, the only question before the Court is whether there is "even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Keegel,* 627 F.2d at 374. Defendants easily meet this standard. Plaintiffs will need to prove not only that the PFLP committed the attack but also that the PA and PLO can be held responsible for the acts of the PFLP. Plaintiffs will face a substantial hurdle given that the PFLP had broken with the PA and PLO leadership over the latter's recognition of Israel, the PA had outlawed the PFLP's military wing (the group most likely responsible for the incident), the PA and PLO leadership was detaining the PFLP's leader at the time of the attack despite calls for violent retaliation against PA security officials by PFLP's military wing, and the PA continued to detain the PFLP's leader against his protest and despite calls for his release from Amnesty International. Far from supporting a theory that the PA/PLO collaborated or supported the PFLP, the facts will show that the PFLP had broken ranks with and was antagonistic to the PA/PLO leadership.

## CONCLUSION

Prime Minister Fayyad's declaration demonstrates the seriousness with which the Defendants take this litigation, and provides strong evidence of their good faith desire to participate fully, in a cooperative and complete manner, including compliance with lawful discovery. The Court should afford the declaration great weight and, in light of the declaration,

the law's strong preference for merits litigation, and other tangible evidence of Defendants' desire to litigate on the merits, the Court should vacate entry of the default.

If the Court has any doubts about the important foreign policy interests at stake in this litigation, it should request a statement of interest from the United States pursuant to 28 U.S.C. § 517. Defendants do not presume to speak for the United States, but Defendants submit that it is in the United States' short and long term interest to permit the new, reform-minded leadership of the PA to defend this case on the merits. An SOI would allow the Court to fully consider this interest in determining whether to vacate the default.

Regardless of whether the Court solicits and receives an SOI, however, it should vacate the default and permit merits litigation to occur. Defendants recognize that the Court has already exercised considerable patience in this litigation and thank the Court for its full and fair consideration of the arguments raised in this motion.

<div style="margin-left:40%;">

Respectfully submitted,

</div>

Dated:  December 21, 2007

<div style="margin-left:40%;">

/s/ Richard A. Hibey _____
Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Laura G. Ferguson (D.C. Bar #433648)
Timothy P. O'Toole (D.C. Bar # 469800)
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 21st day of December 2007, a true and genuine copy

of the foregoing was filed by ECF, which will automatically send notification and a copy of such

filing to:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> Djs@mtlhlaw.com
> *Attorneys for Plaintiffs*

/s/ Charles F. B. McAleer, Jr.