UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SHABTAI SCOTT SHATSKY, et al.

Plaintiffs,

02 CV 2280 (RJL)

vs.


THE SYRIAN ARAB REPUBLIC, et al.

Defendants


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO VACATE DEFAULT**


"*No one ever has to file an answer. You just face the consequences if you don't.*"

Defendants' counsel, former United States Attorney General Ramsey Clark,
status conference transcript, March 29, 2005, pp. 20-21.


## Introduction

Defendants Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA")
have moved to set aside the default entered in this matter on April 12, 2005. Dkt. # 77.

As shown below, defendants' motion should be denied because their default was willful
and strategic, because vacating the default would cause plaintiffs serious and irreparable
prejudice, and because defendants have failed to present a meritorious defense. Defendants'
motion should be denied for the further reason that it is egregiously untimely.

## BACKGROUND AND TRAVEL

On Saturday night, February 16, 2002, a terrorist detonated a large explosive device at a packed pizzeria in the town of Karnei Shomron in the Samaria region of the West Bank. Two teenaged American girls, Keren Shatsky and Rachel Thaler, were killed by the blast. Four other American citizens, plaintiffs Hillel Trattner, Steven Braun, Leor Thaler and Chana Friedman (the latter two young teenagers), suffered severe burns, blast injuries, shrapnel wounds and other serious injuries in the bombing. Ronit Trattner, Hillel's Israeli wife, was also wounded in the blast.

The "Popular Front for the Liberation of Palestine" ("PFLP") immediately admitted responsibility for the bombing, and even published a formal notice lauding the bomber with an "abundance of pride" as a "heroic" martyr. *See* Exhibits A, B.

The PFLP faction is one of the several constituent political factions which together comprise the PLO, which as defendants concede is an "umbrella" organization made up of several political factions. Def. Memo at 5, dkt #77. The PFLP faction of the PLO considers itself quasi-Marxist and opposes any semblance of negotiations with Israel, and therefore disagreed with the decision of the majority faction in the PLO (the Fatah faction led by Yasser Arafat) to sign the Oslo Accords with Israel in 1993.

However, despite the tactical disagreement which arose over the Oslo Accords in 1993, the PFLP faction remains an integral part of the PLO and – crucially for the instant case – *continued to share in the PLO's budget* at least until 2008. This fact was recently confirmed in a statement made by PFLP leader Jamil Mizher on March 14, 2008, and currently published by the PFLP on its own website. Mizher was asked, during an interview on Al-Jazeera, about:

> [T]he question of the PLO leadership's cutting the
> PFLP's financial allocations from PLO funds.

Exhibit C.[1] Mizher responded by rejecting efforts to apply financial pressure to the PFLP. *Id*.

Clearly, then, as of March 2008, the PFLP was still receiving "financial allocations from

PLO funds." *Id*.

The PLO, in turn, is funded by defendant PA. As the defendants themselves expressly

verified in a sworn declaration submitted by them in *Knox v. Palestine Liberation Organization*,

Civ. No. 03-4466 (SDNY):

> Since 1993, the PA has been the primary revenue
> source for the PLO, and the PLO is dependent on
> the monetary support of the PA in order to meet the
> PLO's basic operational needs.

Exhibit D at ¶ 10.

Thus, the February 16, 2002 bombing was carried out by a constituent faction of

defendant PLO, which shares in the PLO's budget. And the PLO budget – including the PFLP's

share – is funded by defendant PA.

Notably, the provision of funds by defendants PA and PLO to the PFLP faction of the

PLO is sufficient, standing alone, to render them civilly liable to victims of PFLP terrorist attacks

such as the instant plaintiffs under the civil provisions of the Antiterrorism Act ("ATA"), 18

U.S.C. §2331 *et seq.*. That is because the provision of funds to the PFLP is a violation of 18

U.S.C. §2339B, which criminalizes the provision of "material support or resources" – including

money – to any entity designated as a terrorist organization under §219 of the Immigration and

---

[1] Available at http://www.pflp.ps/english/?q=comrade-mizher-al-jazeera-pflp-will-not-bow-pressu.

3

Nationality Act ("INA"). §2339(g)(6). The PFLP faction was designated as a "terrorist organization" under §219 of the INA in 1997. *See* 62 Fed. Reg. 52650 (1997).[2]

Thus, defendants' funding of the PFLP violates §2339B and violations of §2339B are *per se* civilly actionable under §2333(a) of the ATA. *See Boim v. Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331.").

Nor its there the slightest question that the Karnei Shomron bombing was carried out pursuant to the official policies and directives of the PA and PLO. The United States government has explicitly confirmed that during the first half of this decade – i.e. during the wave of terrorist violence between 2000 and 2005 known as the "Intifada" – the PA and PLO, led by Yasser Arafat, were heavily and directly involved in terrorism. For example, in June 2002 – shortly after the bombing at issue here – Secretary of State Powell stated:

> [A]fter the Israelis pulled back from the latest occupation, then we thought maybe we'd have some movement [to halt terrorism].What we saw instead were more bombings, ***bombing after bombing after bombing***, day after day.
>
> And frankly, ***we also saw a continuing indication that there was complicity with the senior levels of the Palestinian Authority***.

---

[2] The fact that certain factions of the PLO, including the PFLP, are separately designated as "terrorist organizations" under the INA in no way implies that the PFLP is legally separate from the PLO. On the contrary, as a matter of federal law, "the PLO and its constituent groups" – including the PFLP – constitutes a single terrorist organization. 22 U.S.C. §5201. Moreover, the INA designations are not based on notions of corporate personality; on the contrary, any "group of two or more individuals, *whether organized or not*" which engages in terrorism may be designated as a terrorist "organization." 8 U.S.C. §1182(a)(3)(B)(vi) (emphasis added).

Exhibit E at p. 2 (emphasis added).[3]

Likewise, Secretary of State Rice has confirmed that during the early part of this decade "Arafat ... had one foot in terror and one foot in politics" and the "Palestinian Authority … was … overrun by its ties with terrorism." Exhibit F at p. 3.[4]

Similarly, in April 2003 the White House spokesman officially verified that:

> Yasser Arafat was not a party to peace. Yasser Arafat was a part of the problem … ***Yasser Arafat lied to President Bush … and actively worked on behalf of the terrorists***, lying to the President of the United States about Palestinian support, ***led by Yasser Arafat, for terrorism***.

Exhibit G at p. 6 (emphasis added).[5]

In light of these explicit findings by our own government, it should come as no surprise that during the Intifada, the PA, PLO and Arafat openly supported, assisted and encouraged the PFLP faction to carry out terrorist attacks. The most egregious public example of this support involved the PFLP's murder of the Israeli tourism minister. As the Israeli Foreign Ministry explained in an official communiqué:

> In October 2001, terrorists of the Popular Front for the Liberation of Palestine (PFLP) shot to death tourism minister Rehavam Ze'evi as he left his room in a Jerusalem hotel. ***The murderers were then harbored by Yasser Arafat in his command compound in Ramallah***.

Exhibit H (emphasis added)[6].

---

[3] Downloaded from www.cbsnews.com/stories/2002/07/01/ftn/main513907.shtml?source=search_story.

[4] Downloaded from www.state.gov:80/secretary/rm/2007/79038.htm.

[5] Downloaded from http://www.whitehouse.gov/news/releases/2003/04/print/20030430-10.html

[6] Available at:

Ultimately, after Israeli troops surrounded his compound in April 2002, Arafat was forced – essentially to save his own skin and in the face of an imminent Israeli invasion of his compound – to surrender the PFLP murderers into the custody of American and British wardens. *Id*.

Thus, between October 2001 and April 2002 – i.e. during the very period in which the PFLP faction of the PLO planned and carried out the Karnei Shomron bombing – the PA was harboring PFLP terrorist murderers in Arafat's command compound.

Accordingly, in November 2002, just nine months after the bombing, plaintiffs brought this suit, which asserts the federal civil cause of action for international terrorism under the ATA, 18 U.S.C. §2333(a), as well as various supplemental causes of action.

Plaintiffs' complaint alleges that the bombing was carried out by the PLO, with the material support and assistance of the PA. Complaint at ¶¶ 45-65.[7]

Defendants moved to dismiss the action under Fed.R.Civ.P. 12(b) on grounds of lack of lack of subject-matter jurisdiction (sovereign immunity and nonjusticiability), lack of personal jurisdiction, and lack of process and service of process. Dkt. # 26-28.

On February 7, 2005, the Court denied defendants' Rule 12(b) motion, which triggered defendants' time to file an answer.[8] However, at a status conference on March 29, 2005,

---

http://www.mfa.gov.il/MFA/About+the+Ministry/Behind+the+Headlines/Behind+the+headlines+-+Recapturing+Zeevis+murderers+15-Mar-2006.htm

[7] In Rule 55(c) motions filed in other ATA actions, defendants have substantively misstated the allegations of the complaints in those actions, claiming without basis that the plaintiffs in those cases had alleged that the PA and PLO are automatically liable for all attacks carried out by Palestinian terrorists. Any characterizations of plaintiffs' complaint or allegations in this case should therefore be carefully checked against the actual text of the complaint.

[8] Though the Court denied the Rule 12(b) motion by order without opinion, that order is fully supported by the numerous detailed opinions issued by other federal courts denying identical Rule 12(b) motions filed by these defendants. *See e.g. Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424 (S.D.N.Y. 2004); *Knox v. Palestine Liberation Organization*, 229 F.R.D. 65 (S.D.N.Y. 2005); *Ungar v. Palestinian*

defendants' counsel informed the Court "it has been clear and stated from the Unger [sic] case and all of these cases that both Palestine and Syria have come to courts in the United States to protest that the courts have no jurisdiction over them" and that "No one ever has to file an answer. You just face the consequences if you don't." Tr. 3/29/05 at 18-21.

Accordingly, and consistent with their policy in numerous other ATA cases (discussed in detail below), defendants refused to file an answer following denial of their Rule 12(b) motion, and their default was therefore entered pursuant to Rule 55(a) on April 12, 2005. Dkt. # 52.

In a bad-faith effort to excuse their own contumacious conduct, defendants now assert that following the default "Plaintiffs took no further action in the case to secure entry of judgment against the PA and PLO Defendants." Def. Memo at 9.

This claim is utterly false. In fact, just *weeks* after default was entered, on May 2, 2005, plaintiffs filed an Application Pursuant to Fed.R.Civ.P. 28(b)(4) to Appoint a Commissioner for the Taking of Depositions Abroad. Dkt. # 54. In that application, plaintiffs stated that:

> [I]n light of the default of the PLO and PA (and the earlier denial of their Rule 12(b) motion and the dismissal of the other defendants) plaintiffs are entitled to entry of final judgment against the PLO and PA as soon as they provide proof of their damages. Fed.R.Civ.P. 55(b)(2).
>
> Plaintiffs estimate that at least four full days of testimony would be required in order to prove their

---

*Authority*, 315 F. Supp.2d 164 (D.R.I. 2004); *Ungar v. Palestinian Authority*, 325 F. Supp.2d 15 (D.R.I. 2004) aff'd 402 F.3d 274 (1st Cir. 2005); *Biton v. Palestinian Interim Self- Government Authority*, 310 F.Supp.2d 172 (D.D.C. 2004); *Biton v. Palestinian Interim Self-Government Authority*, 412 F.Supp.2d 1 (D.D.C. 2005); *Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153 (D.D.C. 2006); *Gilmore v. The Palestinian Interim Self-Government Authority*, 422 F.Supp.2d 96 (D.D.C. 2006); *Saperstein v. Palestinian Authority*, (Civ. No. 04-20225) (S.D.Fla.), Order Granting in Part and Denying in Part Motion For Default Judgment, entered July 11, 2006, dkt. # 61.

> damages. This case involves two decedents and twenty-three other plaintiffs, all of whom suffered a broad range of medical, emotional and economic damages as result of the terrorist bombing from which this case arose.
>
> *Plaintiffs would like to spare the Court this expenditure of trial time, and to simplify and expedite as much as possible the entry of final judgment in this matter*, and therefore respectfully intend to provide their damages through deposition testimony pursuant to Fed.R.Civ.P. 32(a)(3).

*Id*. at 2 (emphasis added).

As time passed without a decision on this application, the plaintiffs grew concerned that the damages testimony, particularly that regarding the immediate aftermath of the bombing, would become stale. Plaintiffs were also anxious to do whatever possible to move the case toward final judgment. Accordingly, the plaintiffs came up with a creative but fully valid means of both preserving their testimony abroad in the absence of a commissioner and rendering it admissible in this Court as a sworn statement: the plaintiffs gave oral depositions before a court reporter in Israel, and then executed and attached to the deposition transcripts a declaration under penalty of perjury given pursuant to 28 U.S.C. §1746, confirming that the testimony contained in the transcript is true and accurate.

Once the depositions were completed and the transcripts received and proofread by the plaintiffs (a task which took many months given the number of plaintiffs and other witnesses), plaintiffs prepared extremely detailed proposed findings of fact and conclusions of law (consuming hundreds of hours of attorney time), and on April 30, 2007, filed a motion for entry

of default judgment accompanied by copies of all the deposition transcripts, declarations and other evidence. Dkt. # 64.[9]

In May 2007, defendants filed an opposition to plaintiffs' motion for default judgment, asserting their intention to contest plaintiffs' damages claims and raising various jurisdictional defenses to entry of judgment. Dkt. ## 67, 69. Defendants also requested discovery regarding plaintiffs' damages claims. *Id*. at 2.

**Notably, defendants' opposition papers neither challenged the earlier entry of default, nor indicated that defendants intended to seek to vacate that default**. *Id*.

On June 25, 2007, the Court directed the parties to prepare a joint discovery schedule for damages, and they did so on August 9, 2007. Dkt. # 72. The Court endorsed that schedule with some modifications on August 22, 2007. The parties then conducted and completed discovery pursuant to the Court's order. The plaintiffs invested hundreds of hours of attorney time and significant out-of-pocket expenses to provide the discovery sought by the defendants.

On December 21, 2007 – with discovery nearly complete and the case ready for a damages hearing and entry of final judgment – **defendants switched course 180 degrees** and filed the instant motion to vacate the default entered against them almost three years earlier. Dkt. # 77.

For the reasons set forth below, defendants' motion should be denied.

**ARGUMENT**

**I.    DEFENDANTS' DEFAULT WAS WILLFUL AND STRATEGIC AND
       RULE 55(c) RELIEF IS THEREFORE UNAVAILABLE**

---

[9] Plaintiffs informed the Court of their intention to proceed in this manner at a status conference held on January 11, 2007.

It is well established that relief should not be granted from willful and strategic defaults. In a case exactly on point here, the Court of Appeals held:

> [Defendant] took no action *until some three years* later to set aside the entry of default or defend against the complaint … We can only conclude that [defendant's] persistent default was *willful and intentional and, therefore, that 'good cause' for setting aside the entry of default could not be shown*.

*Draisner v. Liss Realty Co.*, 211 F.2d 808, 809 (D.C. Cir. 1954). *See also e.g. Ackermann v. U.S.*, 340 U.S. 193, 198 (1950) ("free, calculated, deliberate choices are not to be relieved from"); *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) ("The first factor to be considered is whether the default was willful."); *International Painters and Allied Trades Union and Industry Pension Fund v. H.W. Ellis  Painting Company*, 288 F.Supp.2d 22, 26 (D.D.C. 2003) ("a deliberate decision to default … is generally not excusable.").

There is no question whatsoever that the defendants' refusal to answer after denial of their Rule 12(b) motion was willful, and part of a strategy applied by these defendants in all the ATA actions pending against them between 2000-2007:

> [I]t is clear that [defendants'] failure to file an answer to Plaintiffs' Amended Complaint is the result of a deliberate choice and not due to an inability to file an answer. The Palestinian Defendants acknowledge that "[t]he drafting and filing of an answer is within defendants' limited capacities..." *Id*. at 2. Indeed, it would be almost impossible for them to contend otherwise given their extensive filings as reflected in the above stated travel. In addition, their counsel, Mr. Ramsey Clark, indicated at the hearing on April 1, 2003, that he had met with President Yasser Arafat in December of 2002 in Ramallah. It is reasonable to assume that this lawsuit was among the matters discussed.

10

*Ungar v. Palestinian Authority*, 215 F.R.D. 36, 39 (D.R.I. 2003).

Similarly:

> This Court's Order denying Defendant's supplemental Rule 12(b) motion was issued on August 22, 2005 … Under Rule 12(a)(4)(A), entry of the Order triggered Defendants' time to file their answer on or before September 6, 2005. As conceded, no answer was filed. Plaintiffs assert that the failure to answer their complaint was willful and consistent with the position Defendants took in other ATA cases at the time. *See Knox v. Palestine Liberation Org*., 230 F.R.D. 383 (S.D.N.Y. 2005).
>
> > [T]he Court directed defendants in this action, Palestine Liberation Organization and Palestinian Authority (collectively, "Defendants"), to file an answer to the complaint herein by not later than August 15, 2005, and grant plaintiffs ("Plaintiffs") leave to file for entry of judgment by default in the event Defendants failed to answer within the time specified. *Defendants responded by letter to the Court dated August 15, 2005, stating that they "have instructed counsel to present only their position that U.S. courts have no jurisdiction over them and not to answer on the merits. Therefore no answer on the merits of the complaint will be filed*."
>
> *Id*. at 384. The position taken by the Defendants in Knox was *"[c]onsistent with their position in the several cases pending in U.S. courts against them alleged to have occurred in Palestine or Israel*." *See* Pls.' Opp., Ex. A (Defendants' letter dated Aug. 15, 2005). The Defendants articulated the same position before the District Court in Rhode Island. *See Ungar v. Palestinian Auth.*, 325 F.Supp.2d 15, 65 (D.R.I. 2004), *aff'd sub nom.*, *Ungar v. Palestine Liberation Org.*, 402 F.3d 274 (1st Cir. 2005), cert. denied … 126 S.Ct. 715, 163 L.Ed.2d 575 (2005). The Defendants essentially concede that their failure to answer the complaint in the instant case can similarly be traced to their instructions to their counsel. *See* Defs.' Mot. at 1 ("A change of

11

> policy took place and the new President has informed counsel to litigate the cases."). ***It is therefore clear to the Court that the Defendants' failure to file an answer timely was not due to "excusable neglect" but to a selected strategy. These facts belie Defendants' explanations for their tardy filing***.

*Biton v. Palestinian Interim Self-Government Authority*, 239 F.R.D. 1, 4-5 (D.D.C. 2006) (emphasis added).

A copy of defendants' August 15, 2005 letter referenced in *Biton*, in which defendants informed the *Knox* court of their refusal to answer based on "their position that U.S. courts have no jurisdiction over them," is attached hereto as Exhibit I. see also Exhibit J.

The *Knox* court revisited this issue recently and found, unsurprisingly, that "[d]efendants willfully defaulted in the instant case, which was not an isolated occurrence, but rather, part of Defendants' legal strategy." *Knox v. Palestine Liberation Organization*, 248 F.R.D. 420, 432 (S.D.N.Y. 2008).

Indeed, at the status conference held shortly after their Rule 12(b) motion was denied, defendants' explicitly told this Court that they intended to follow exactly this default strategy. Defendants' counsel, Mr. Clark, explained that "it has been clear and stated from the Unger [sic] case and all of these cases that both Palestine [i.e. defendants PA and PLO] and Syria have come to courts in the United States to protest that the courts have no jurisdiction over them." Tr. 3/29/05 at 18-19.

When pressed by the Court as to whether a defendant has an obligation to file an answer once its Rule 12(b) jurisdictional defenses are rejected, Mr. Clark responded – quite correctly: "No one ever has to file an answer. You just face the consequences if you don't." *Id.* at 20-21.

12

Later in the conference, defendants' counsel reiterated defendants' position that no answer would

be filed:

> MR. CLARK:  Your Honor, on the 7[th] of February of this year, you denied in a minute order our Motion to Dismiss for the PLO and the Palestinian Authority.
>
> THE COURT:  Right.
>
> MR. CLARK:  Now, our intention is to base our entire defense on that Motion. ***That's our instruction***.

*Id*. at 25-26 (emphasis added).

And indeed, defendants did not file an answer, their default was entered a few weeks later,

and they did not move to vacate that default for nearly three years.

It is therefore crystal clear that defendants defaulted this case intentionally, pursuant to

the litigation strategy employed by them in *Ungar*, *Knox* and *Biton*. Accordingly, defendants must

now "face the consequences" of their decision – i.e. they must live with the default.

Astonishingly, despite these undeniable empirical facts demonstrating the willfulness of

their default, defendants argue that their default was not really willful. In support of this claim,

defendants submit the declaration of one of their officials, Ahmad Abdel-Rahman, whom

defendants cite and quote at length. *See* Def. Ex. X; Def. Memo at 22-26.

Abdel-Rahman asserts that Arafat was the central decision-maker in the PA in his time and

never created a system of institutional decision-making, that after Arafat's death no institutional

framework existed in the PA for handling foreign litigation, and that such a framework was

created only recently, when President Abbas placed Salam Fayyad in charge of litigation in the

United States against the PA and PLO. Def. Ex. X, *passim*; Def. Memo at 22-26. Abdel-Rahman

harps repeatedly, indeed obsessively, on the PA's lack of an "institutional" framework or structure, throughout his declaration, repeating this phrase talismanically in virtually every paragraph.

Defendants also argue, in purported reliance on Abdel-Rahman, that they were prevented from responding due to chaos and turmoil in the West Bank and Gaza Strip, and that the facts of this case are therefore similar to those in *FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 447 F.3d 835 (D.C. Cir. 2006). *Id.*

These arguments should be rejected as absolutely meritless for several reasons:

*First*, these defendants have been trying to peddle and recycle these same "chaos and turmoil" arguments to the federal courts for over five years, which have resoundingly rejected them:

> [E]ven if the court were to accept the argument that the violence and destruction around Mr. Arafat's headquarters made it impossible for the PA to find documents or to answer the interrogatories or request for admissions, the proposition that none of the seven persons noticed for deposition would ever be available to be deposed at any time in any place strains credulity. . .
>
> Indeed, Counsel for Plaintiffs noted…that the other PA officials had flown to the United States and had been deposed in other cases…Similarly, Plaintiffs presented evidence that Mr. Muhanad Aljouni, the PA "Assistant Minister of Finance," testified on March 12, 2003, in Jerusalem District Court … The fact that Mr. Aljouni was able to appear in court in Jerusalem further undermines the PA's implicit claim that none of the seven officials are available to deposed anywhere at any time. For these reasons, I find the PA's failure to answer Plaintiffs' discovery requests to have been willful.

14

*Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 63 (D.R.I. 2004). *See also Biton v. Palestinian Interim Self Government Authority*, 233 F.Supp.2d 31, 32-33 (D.D.C. 2002) ("[D]efendant's vague and unsupported explanations for their failure to respond to the complaint timely seem meritless…Defendants…say that the escalating Palestinian-Israeli conflict hampered communications necessary to prepare a response…Defendants' explanations for their delay sound more like hollow excuses."); *Knox v. Palestine Liberation Organization*, 2005 WL 712005 at *6 (S.D.N.Y. 2005) ("Defendants cited political instability, the ongoing Israeli-Palestinian conflict, and difficulty locating, or coordinating with, people in authority, as excuses for their failures to meet their litigation obligations…this Court concludes…that Defendants' failures are the result of a deliberate choice and not due to an inability to comply") (quotations omitted); *Biton*, 239 F.R.D. at 4 (rejecting defendants' claim that they were unable to file an answer due to the death of Arafat and PA elections since "Arafat died in late 2004 and elections in the PA were held in early 2005 and again in early 2006, giving no basis for Defendants' statements to the Court that those events precluded filing an answer before July 2006. Indeed, these Defendants have been actively involved in litigating other cases during the time period that counsel asserts it could not communicate with its clients.").

Defendants' latest claims of "chaos" are just more of the same fiction.

**Second**, in stark contrast to *FG Hemisphere Associates*, this is not a case where a defendant never appeared. On the contrary, these defendants appeared in the case represented by a team of experienced lawyers – including the former Attorney General of the United States – and filed a motion to dismiss. Defendants walked away from the case only once that motion was denied. Thus, "[t]his is not a situation in which the foreign defendants are strangers to the court system in the United States or were caught unaware of this pending suit or were not represented

15

by counsel; they vigorously litigated [a] motion[] to dismiss before consciously deciding not to file an answer and also not to appeal this Court's ruling dismissing their claims of sovereign immunity." *Biton*, 239 F.R.D. at 4.

***Third***, this is not a case where the defendant just drifted through the case without formulating a position and then defaulted by nonfeasance. On the contrary, these defendants had an affirmative, clear and explicit policy of refusal to answer once their jurisdictional defenses were rejected, as noted by the *Biton* and *Knox* courts.

Moreover, Mr. Clark specifically told this Court at the conference on March 29, 2005, that his ***instructions*** were not to answer. Mr. Clark is presumed to have informed the defendants of the ramifications of this policy, and defendants have never so much as hinted that they were misled or left uninformed by their counsel – the former Attorney General.

***Fourth***, defendants' claim that creating an "institutional" or "organizational" framework was a necessary precondition to filing the instant motion is ludicrous. The plain fact is that Arafat, as PA president and PLO chairman, called the shots regarding this case when he was alive. If Mr. Abbas elected not to do so after he became PA president and PLO chairman that is no concern of the plaintiffs or of this Court. Nor is the fact that Mr. Abbas waited over three years to place Mr. Fayyad in charge of U.S. litigation. On the contrary, the fact that Abbas waited all those years before delegating the issue to Fayyad shows that Abbas either agreed with the intransigent position taken by Arafat in respect to this case or that the issue was just too unimportant to defendants to attend to – either way, the delay is grossly unreasonable.

***Fifth***, the alleged critical importance of an "institutional" decision-making framework is belied by the fact that ***no such "framework" was ever established***. Rather, according to defendants' own version, their change in policy came about because Mr. Abbas appointed Mr.

Fayyad – who is an economist, not a lawyer – to deal with their U.S. litigation. Appointing a single person to make decisions clearly does not constitute establishment of the "institutional framework" which defendants' claim they needed in order to file the instant motion. Defendants' whole tale thus makes no sense on its face. Indeed, defendants are back exactly where they were in the days of Arafat, with a single person making all the decisions regarding their U.S. litigation (the only difference being that Arafat was an engineer and Fayyad is an economist).

*Sixth*, the fact that Fayyad may have a different approach than Abbas or Arafat neither erases nor excuses defendants' delay one iota. An organizational or governmental defendant is fully responsible for its litigation policies, irrespective of any change in office-holders or in controlling regime. In *Socialist Republic of Romania v. Wildenstein & Co. Inc.*, 147 F.R.D. 62 (S.D.N.Y. 1993), Romania moved for Rule 60(b)(6) relief to set aside a judgment that had been entered against it for refusal to conduct discovery, arguing that the default had resulted from the litigation strategy of the previous (communist) regime, which it now repudiated. This argument was resoundingly rejected:

> Romania is not relieved of responsibility for the consequences of its litigation strategy merely because it is a nation-state whose government has changed. An analogy may be drawn to a hypothetical multi-national corporation ("Jamo, Inc.") whose management has been ousted but which, under former management, litigated a case in this Court and lost. Jamo Inc. clearly could not prevail on a Rule 60(b)(6) motion merely because it claimed that its former management was corrupt and therefore had failed to pursue a winning litigation strategy. One reason why Jamo Inc., the hypothetical corporation, could not win such a motion is that a change in management is not an extraordinary event-management changes regularly, and to allow such an event to support a Rule 60(b)(6) motion would wholly negate the finality of

judgments. *See United States v. Besser Manuf. Co.,* 125 F.Supp. 710, 713 (E.D.Mich. 1954); *see also In re 1330 19th St. Corp.,* 101 B.R. 397, 398 (D.D.C.Bankr. 1989) (change in ownership or control is not the type of changed circumstance contemplated by Rule 60(b)). Similarly, governments regularly change, yet each is in privity with its predecessor. … In the context of democratically elected governments, those who govern periodically change. In other systems, and throughout history, governments change when political systems are altered or when the regime in power falls out of favor. Such a change in government, or the fact that a former regime pursued a different litigation strategy than would the government currently in power, does not constitute an extraordinary event sufficient to support a Rule 60(b)(6) motion.

*Socialist Republic of Romania*, 147 F.R.D. at 65-66.

**Seventh**, between Arafat's death and the filing of the instant motion to vacate, defendants had no trouble whatsoever pursuing an appeal and a petition for *certiorari* in *Ungar*, or battling the *Ungar* plaintiffs' attempts to enforce their judgment. *See Ungar v. Palestinian Authority*, 05-mc-180(GK) (D.D.C.), dkt. nos. 7, 8, 17, 19, 23, 27, 35; *Ungar v. Palestinian Authority*, 2006 WL 1274986 (D.D.C. 2006). Furthermore, between Arafat's death and the filing of the motion to vacate, these defendants filed numerous and extensive pleadings in the other cases pending against them in U.S. courts. *See Biton v. Palestinian Interim Self-Government Authority*, (Civ. No. 01-0382) (D.D.C.); *Gilmore v. Palestinian Interim Self-Government Authority*, (Civ No. 01-853) (D.D.C.); *Klieman v. Palestinian Authority*, (Civ. No. 04-1173) (D.D.C.); *Saperstein v. Palestinian Authority*, (Civ. No. 04-20225) (S.D.Fla.).

Since defendants were fully capable of fighting the Ungars' collection proceedings and litigating these other cases, the claim that they were incapable of filing an answer or a Rule 55(c) motion in this case is patently absurd.

*Eighth*, even after authority for the U.S. litigation was delegated to Fayyad in "early 2007" (see Def. Ex. X at ¶ 13), defendants *waited nearly a year* to file the instant motion. Indeed, even after their new counsel appeared in this case in early 2007, defendants waited some six more months before filing this motion, all the while misleading the plaintiffs and the Court to believe that this case would proceed to a hearing on damages and default judgment.

Thus, in sum, defendants' claims that their default resulted from political turmoil and/or from the lack of an institutional decision-making apparatus, are absolutely baseless.

Finally, defendants argue that "Because the instant case involves a governmental entity, where the public fisc is at stake, the Court has additional reasons to accord Defendants some leniency on the willfulness question." Def. Memo at 27-29. This argument, too, is meritless, for the reasons below.

In the first place, the cases cited by defendants for this purported rule of leniency do not involve "governmental entit[ies]" as defendants wishfully assert, but rather full-blown **foreign states** generally entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). As the First Circuit determined in *Ungar*, and as this court found again just recently *see Biton v. Palestinian Interim Self-Gov't Auth.*, 510 F.Supp.2d 144, 147 (D.D.C. 2007)), neither the PA nor the PLO is a foreign state. Accordingly, any such rule of leniency, if it existed, would have no application to these defendants.

Moreover, an examination of the cases cited by the defendants reveals that they involve facts and circumstance light years from those obtaining here:

19

Defendants' repeated citations to *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986) are wholly inapposite because the default was vacated in that case in the wake of the court of appeals' holding that the FSIA does not apply retroactively – which meant that the district court never had subject-matter jurisdiction in the first place. Notably, a subsequent decision of the Eleventh Circuit, *Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996), which affirmed a district court decision refusing to set aside a default entered against a foreign state, demonstrates that *Jackson* created no rule of leniency even in the Eleventh Circuit.

Likewise, defendants' attempt to rely on *Owens v. Republic of Sudan*, 374 F.Supp.2d 1 (D.D.C. 2005) also gets them nowhere. First of all, default was entered in *Owens* only because "none of the defendants appeared." Id. at 5. Here, of course, defendants appeared and attempted to dismiss the case, and intentionally defaulted only when their motion to dismiss was denied.

Moreover, Judge Bates vacated the default in *Owens* on the specific grounds that "an entry of default should not be applied inflexibly to deny a willing foreign state the opportunity to offer a full defense to an FSIA action" since "Foreign sovereigns unfamiliar with the United States judicial system may fail to comprehend accurately what the FSIA means and how it operates." *Id*. at 8 (quoting *Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1552 & n. 19 (D.C. Cir. 1987)).

The instant defendants, by contrast, are not foreign states and are not subject to the FSIA. Indeed, by the time they defaulted this action, this Court as well as two other federal district courts and one federal court of appeals had resoundingly rejected defendants' claims to immunity under the FSIA. *See Knox v. Palestine Liberation Org.*, 306 F.Supp.2d 424 (S.D.N.Y. 2004);

20

*Ungar*, 325 F.Supp.2d 15 (D.R.I. 2004), *aff'd*, 402 F.3d 274 (1st Cir. 2005). The reasoning in *Owens* is therefore completely inapposite here.

Defendants quote *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189 (2nd Cir. 1989) as stating that "Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside." Def. Memo at 17. But defendants neglect to mention that the Second Circuit subsequently clarified that *First Fidelity* did **not** state any general rule of leniency in respect to foreign states, and was limited to the unique facts of that case:

> [R]elying on *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission,* 877 F.2d 189, 196 (2d Cir. 1989), BAF argues that the default judgment should be set aside under Rule 60(b)(6) because "default judgments are disfavored, especially those against foreign sovereigns." *Id.* at 196. It is true that the *First Fidelity Bank* court stated that "[c]ourts go to great lengths ... to permit [default] judgments against foreign sovereigns to be set aside." *Id.* But *First Fidelity Bank* was a distinctly different case than the one at hand. The issue in *First Fidelity Bank* was the extent to which the foreign sovereign defendant was bound by the actions of its ambassador to the United Nations and whether the district court had jurisdiction in the circumstances. This was a case which had "serious implications for the relationships between the United States and all foreign states that send duly accredited ambassadors to head their diplomatic missions in this country." *Id.* at 196-97 (Newman, J., dissenting). The case before us is fundamentally an ordinary contract dispute which has no such profound implications.

*Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 462 (2nd Cir. 1994).

Indeed, in *Transaero* the Second Circuit affirmed the district court's refusal to set aside a default judgment against a foreign state. Likewise, in *Commercial Bank of Kuwait v. Rafidain*

*Bank*, 15 F.3d 238 (2nd Cir. 1994), the Second Circuit affirmed the district court's refusal to grant a foreign state relief from a default judgment.

Defendants' claim that *First Fidelity* creates a special rule of leniency for foreign states (or governments) is thus meritless.

Defendants' attempt to rely on *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987) is also completely unavailing. There, the district court vacated a default judgment against Bolivia only after finding that it did not have jurisdiction (i.e. that Bolivia was immune) under the FSIA. The Court of Appeals reversed, finding that Bolivia was not immune from suit. But the court of appeals *made no decision* as to whether the default judgment should stand, and merely remanded for the district court to consider whether there was ground to vacate the judgment on the basis of other defenses asserted by Bolivia. *Id*. at 1545. Significantly, the other defenses asserted by Bolivia which concerned the court were jurisdictional defenses – not merits defenses – specifically: that the case was barred by the "act of state doctrine" and by an arbitration agreement. *See id*. at 1545; *Practical Concepts, Inc. v. Republic of Bolivia*, 613 F.Supp. 863, 865 n.1 (D.D.C. 1985). *See also Practical Concepts*, 811 F.2d at 1552 (citing U.S. amicus brief for importance of allowing a defendant foreign state to assert "legal" defenses in respect to default judgment).

Thus, not only does *Practical Concepts* provide no support for the instant defendants' demand to set aside the default in order to now litigate on the *merits*, but on the contrary, the court of appeals explained at length that a defendant which intentionally defaults *forfeits the right to litigate on the merits*. *See Practical Concepts*, 811 F.2d at 1557-1548.

Furthermore, in all of the cases cited by defendants in which default against a foreign state was vacated, the defaults were set aside specifically because the court determined as a threshold

22

matter of law that the sovereign was immune (*Jackson, Practical Concepts*) or because the sovereign immunity issue – and thus the court's subject-matter jurisdiction – had not yet been litigated (*First Fidelity, Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989), *Hester Intern. Corp. v. Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989)).

Thus, (aside from the dispositive fact that the defendants are not foreign states) none of these cases is apposite here because the defendants' immunity and the Court's subject-matter jurisdiction are *not* at issue in this case; on the contrary, as noted above, their immunity argument had been rejected *four times* before default judgment was entered (once by this Court, once each by the district courts in *Ungar* and *Knox* and by the First Circuit in *Ungar*).

Indeed, in *Gregorian*, the Ninth Circuit expressly held that a foreign state's belief that it was immune from U.S. jurisdiction would be considered "reasonable" – and its default therefore not "culpable" conduct under Rule 60(b) – only "until it has received a definitive indication to the contrary from the United States courts." *Gregorian*, 871 F.2d at 1525.

Therefore, since the instant defendants' immunity claims received not one but *multiple* "definitive indication[s] to the contrary from the United States courts" before default was entered, the defendants' default was clearly "culpable" even under the liberal rule set by the Ninth Circuit in *Gregorian* (which has not been adopted by the other circuits).[10]

Finally, the cases cited by defendants by defendants are wholly inapposite because in almost all of those cases (*Hester* appears to be the sole exception), the foreign defendant did not even appear in the case until *after* the default judgment had entered.

---

[10] Moreover, even *Gregorian* applies only to the issue of whether an *acknowledged* foreign state, which is *presumptively* subject to the FSIA, reasonably believes that none of the FSIA exceptions to immunity applies. There is not the slightest evidence that *Gregorian* would apply to an entity *claiming to be* a "foreign state".

Here, of course, defendants not only appeared by counsel from day one but filed a motions to dismiss.

Finally, defendants' attempt to rely on is *Lawton v. Republic of Iraq*, 2006 WL 3876287 (D.D.C. 2006) is similarly unavailing, since default was vacated in that case because the record was "devoid of evidence that Defendant acted with wanton or willful disregard for its legal responsibilities." *Id.* at 3 (internal quotations omitted).

*** 

In sum, defendants' default was fully informed, intentional and strategic, and Rule 55(c) relief is unavailable to them irrespective of whether they can demonstrate absence of prejudice to the Ungars and a meritorious defense (which, as will be shown *infra*, they cannot).

## II.   DEFENDANTS' MOTION IS EGREGIOUSLY UNTIMELY

While Rule 55(c) does not contain an express provision governing the time in which a motion to vacate should be filed, it is well established that timeliness is one of the factors to be considered in evaluating "good cause" under Rule 55(c):

> A motion to vacate a default must be made within a reasonable time after discovery of the entry of default. *See Dow Chem. Pac. Ltd. v. Rascator Maritime, S.A.*, 782 F.2d 329, 336 (2d Cir. 1986); 10A Wright Miller & Kane, *Federal Practice and Procedure*, § 2698, at 164. Undue delay on the part of the party moving to vacate a default justifies denial of the motion. *Id.* Keeping with its discretionary, flexible nature, Rule 55 does not establish a strict time limit for "reasonable time." The Second Circuit, however, has upheld a district court's determination that waiting seven months after the entry of default is an unreasonable amount of time. *See Dow Chemical*, 782 F.2d at 336. Other circuit courts have held that three and one-half months and five months are too long to wait before moving to vacate a default. *See General*

24

> *Contracting [v. Interpole Inc.]*, 899 F.2d [109,] 112
> [1st Cir. 1990] (three and one-half months); *Merrill lynch Mortgage Corp. v. Narayan*, 908 F.2d 246, 252 (7th Cir. 1990) (five months).

*American Centennial Ins. v. Seguros La Republica*, 1998 WL 748648 at *2 (S.D.N.Y. 1998). *See also Consolidated Masonry & Fireproofing, Inc. v. Wagman Const. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967) (affirming denial of Rule 55(c) motion because "a default should be set aside where the moving party acts with reasonable promptness and alleges a meritorious defense … In this case the defendant did not act promptly. The default was entered on August 26, 1964, and the motion to set is aside was not made until November 10, 1964, after more than two and one-half months had elapsed.").

Thus, a Rule 55(c) motion should not be granted when the defendant delays seeking *vacatur* even by a few *months*. Here, of course, the defendants waited **nearly three years** to do so. Moreover, astoundingly and unforgivably, even **after** they renewed their participation in this case by new counsel in mid-May 2007, defendants took no action to vacate the default for over half a year; on the contrary, defendants spent seven months demanding and receiving discovery on damages in preparation for a damages hearing and entry of default judgment, and then suddenly reversed course and filed the instant motion only in December 2007.

Defendants' motion is therefore grossly, wildly and unprecedentedly untimely, and can and should be denied on that ground as well.

Never has a Rule 55(c) motion been granted in anything approaching these circumstances.

## III.    GRANTING THE MOTION WILL SEVERELY PREJUDICE THE PLAINTIFFS

Defendants' motion should also be denied because granting the motion would cause the plaintiffs irreparable prejudice in at least two respects.

**A.      An Entire Universe of Responsive Documents Has Become
          Unavailable Since the Default**

It is well established that a loss of evidence constitutes the type of "prejudice" that precludes Rule 55(c) relief. *See e.g. Reilly v. Keystone Health Plan East, Inc.,* 1998 WL 422037 at *2 (E.D.Pa. 1998) ("Prejudice is demonstrated where circumstances have changed since the entry of the default such that plaintiff's ability to litigate its claim is now impaired in some material way or if evidence has become lost or unavailable.") (quotations omitted); *Snyder v. Talbot*, 836 F.Supp. 26, 30 (D.Me. 1993) ("[P]rejudice cannot be inferred merely from the passage of time but, instead, relates to whether 'witnesses have died,' 'memories have dimmed beyond refreshment,' a 'discovery scheme has been thwarted,' or 'evidence has been lost' during the time that elapsed from a party's default." *Snyder v. Talbot*, 836 F.Supp. 26, 30 (D.Me. 1993) (quoting *Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)).

That is exactly the situation here: vacating the default in this action would cause the plaintiffs extreme prejudice – indeed, would leave them with no effective means of litigating this case – because since entry of default in this case in April 2005 an entire universe of relevant documents – i.e. all of defendants' documents and records in the Gaza Strip – has been lost:

Plaintiffs allege that the Karnei Shomron bombing was planned and carried out by the PLO, using a wide variety of material support and assistance provided by the PA for the specific purpose of carrying out such terrorist attacks. Complaint ¶¶ 45-65. That material support included "massive financial support; specialized and professional military training for the planning and execution of terrorist attacks; explosives, firearms and other weapons; training bases and facilities; safe haven; lodging; means of communication and communications equipment; financial services, including banking and wire transfer services and means of transportation." *Id*. at ¶ 46.

26

Plaintiffs also allege that the bombing was carried out further to a conspiracy and joint plan between the PA and the PLO/PFLP bombers. *Id.* at ¶ 53.

As discussed *supra* and in defendants' papers on the instant motion, the parties agree that it was the PFLP faction of the PLO which executed the bombing, but disagree about the nature of the relationship between the PFLP faction and the PLO as a whole.

Thus, in light of the above, in order to demonstrate defendants' liability in this case the plaintiffs would require and be entitled to discovery regarding *inter alia*:

> (a) Any documents or evidence reflecting the provision of material support by the PA to the PLO/PFLP, including funds, weapons, training, safe haven and the other types of support alleged in the complaint, in the years preceding the bombing;
>
> (b) Any documents or information supporting plaintiffs' allegations of a joint agreement between the PA and the PLO/PFLP to carry out terrorist attacks, in the years prior to the bombing; and
>
> (c) Any documents or evidence reflecting the nature of the relationship between the PFLP faction and the PLO as a whole – particularly regarding the funding of the PFLP through the PLO's budget (*see* Exhibit C) – in the years prior to the bombing.

During the relevant period – i.e. the years prior to the bombing – the PA and PLO operated in two completely different and non-contiguous geographical areas: the West Bank and the Gaza Strip. Obviously, the *situs* of defendants' conduct prior to the bombing is completely irrelevant to their liability.

27

For example, if the PA provided the PLO/PFLP with funds or explosives in the Gaza Strip, and those funds or explosives were used to facilitate the terrorist attack in Karnei Shomron in the West Bank in which the plaintiffs were harmed, defendants are liable.

Likewise, if PA and PLO/PFLP leaders met in the Gaza Strip and entered into a joint plan of action to carry out terrorist attacks, and the Karnei Shomron bombing resulted from that conspiracy, defendants will be liable.

So, too, if the relationship between the PFLP and the PLO as a whole in the years before the bombing involved activities in the Gaza Strip – e.g. transfer of funds from the PLO budget to the PFLP's bank account in Gaza – those activities are highly relevant to defendants' liability.

In short, plaintiffs' would clearly require discovery about defendants' activities in both the West Bank and the Gaza Strip during the years preceding the bombing.

But the defendants are utterly incapable of producing any documents or witnesses located in the Gaza Strip, because in June 2007 – over two years after the default and several months before the instant motion was filed – the PA was driven out of Gaza by Hamas, and today exercises no authority in Gaza whatsoever.

Furthermore, the defendants have openly admitted that they are unable to provide any discovery in Gaza. The instant defendants are also currently defendants in *Parsons v. Palestinian Authority et al.*, No. 07-1847 (JR) (D.D.C.). On February 15, 2008, the defendants filed a motion to dismiss *Parsons* on grounds, *inter alia*, of laches. *See* Exhibit K, at 42-44. In support of their laches argument the defendants argued as follows:

> Plaintiffs waited nearly four years after the death of Mr. Parsons to file the instant action …
>
> There … can be no dispute that Defendants are severely prejudiced by the delay. As widely

28

> publicized, in June 2007, a Hamas uprising in the Gaza Strip expelled the PA from the territory, and effectively isolated Gaza from the rest of the world. The PA currently has no authority in Gaza, and Israel and Egypt have almost completely sealed all borders with Gaza. Currently, Gaza is a Hamas controlled "no-mans' land" with PA authorities unable to venture into the area due to border controls and grave threats to their individual security. Moreover, ***Gaza is now inaccessible for the purpose of conducting discovery*** or otherwise gathering facts and information that may be relevant to defending against Plaintiffs' claims in this case.
>
> The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed. ***Absent a dramatic change in circumstances in Gaza … Defendants will remain unable to conduct any meaningful discovery or investigation within Gaza***.

Exhibit K at 43-44 (emphasis added).

Thus, defendants have admitted that "Gaza is now inaccessible for the purpose of conducting discovery" – which means that even if the defendants wanted to produce relevant documents located in Gaza, they are unable to do so.

Defendants will likely argue that this admission is of no moment in this case, because the bombing at issue occurred in the West Bank. The Court should reject any such argument because, as discussed above, the *situs* of the defendants' conduct is completely irrelevant. If the PA conspired with the PFLP and/or provided it with funds, weapons, training, safe haven or other material support in the Gaza Strip – or for that matter in Timbuktu – and that conspiracy and/or material resulted in the PLO/PFLP carrying out the bombing in Karnei Shomron, the defendants are liable under 18 U.S.C. §2333(a). *See generally Boim*, 291 F.3d 1000, 1015 (7th Cir. 2002)

(analyzing elements of civil liability under §2333(a) in respect to provision of material support for terrorist attacks).

Indeed, *Boim* provides a useful analogy in this respect. The *Boim* defendants were putative charities located in the United States alleged to have transferred funds from the United States to Hamas thereby facilitating the murder of an American teenager in the West Bank. *Id.* Obviously, the evidence of those funds transfers would be located in the United States. So too, here, records reflecting the instant defendants' provision of material support to the PFLP in Gaza, would be located in Gaza.

Clearly, then, documents located in the Gaza Strip evidencing defendants' relationship with the PFLP would be absolutely vital to the question of defendants' liability in this case. But as defendants admit, those documents became unavailable in June 2007.

Accordingly, defendants' Rule 55(c) motion must be denied. *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2nd Cir. 1991) (denying motion to vacate in light of "the long delay in mounting this attack on the judgment, which has seriously weakened appellees' case by making it less likely that they will be able to recover documents and records that show a shortfall in the oil delivered"); *McKenna v. Ward*, 1997 WL 66779 at *6 (S.D.N.Y. 1997) (denying motion to vacate because "Considering the length of time that has passed…the Defendants' ability to present their defense would be hindered by witnesses' fading memory, destroyed or lost documents, and the fact that parties and witnesses have moved away.").

### B.   The Palestinian Authority Is a Merely Temporary Entity and Is Scheduled to Be Superseded by a "State of Palestine" in the Near Future

30

If defendants' Rule 55(c) motion is granted the plaintiffs would suffer severe and irreparable prejudice for an additional reason, which is unique to cases against the Palestinian Authority:

The full legal name of the Palestinian Authority is "Palestinian *Interim* Self-Government Authority." *See* Interim Agreement on the West Bank and the Gaza Strip, September 28, 1995, 36 I.L.M. 551, 558, Preamble (emphasis added).

This name reflects the fact that the Palestinian Authority was created to be a merely temporary entity, established to administer the West Bank and Gaza Strip only until conclusion of negotiations regarding the permanent status of those territories. "In 1993, the PLO and the government of Israel agreed to a Declaration of Principles on Interim Self-Governing Arrangements (DOP) that established a framework for limited Palestinian self-government *during an interim period*, pending resolution of the permanent status of the territory occupied by Israel since 1967." Omar M. Dajani, *Stalled Between Seasons:  The International Legal Status of Palestine During the Interim Period,* 26 Denv. J. Int'l L. & Pol'y 27, 27-28 (1997) (emphasis added).

Thus, "[t]he terms of the DOP … characterize the PA as an *interim measure* pending the conclusion of permanent status negotiations." *Id*. at 90 (emphasis added). Moreover, "[t]he powers, structure, and jurisdiction of the PA are defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip . . . The Interim Agreement, as its name suggests, *is a self-consciously temporary arrangement*." *Id*. at 61 (emphasis added). *See also e.g.* Addendum to Report by the Special Representative of the Secretary-General on the Situation

of Human Rights Defenders, Exhibit L, at ¶ 7 ("The Palestinian Authority is an interim

administrative organization established in 1994 pursuant to the Oslo Accords.")[11]

Indeed, as the Palestinian Authority itself explains on one of its own official websites:

> The Palestinian Authority is a temporary administrative body . . .
> intended only to serve during the interim period prior to the
> establishment of a Palestinian state…

*See* Exhibit M, downloaded from http://www.mofa.gov.ps/day.php?m=3&y=2003&d=10. [12]

Thus, the PA is a *temporary* legal entity, which will be supplanted and superseded – i.e.

will cease to exist – once a Palestinian state is established.

In late November 2007, Israeli and Palestinian leaders held a summit at Annapolis,

Maryland, and committed themselves – with the full backing of the United States – to establish a

Palestinian state by the end of 2008:

> After seven years without progress toward Mideast peace, Israeli
> Prime Minister Ehud Olmert and Palestinian President Mahmoud
> Abbas yesterday pledged to launch immediate negotiations aimed *at*
> *creating a Palestinian state by the end of next year*.

*See* "Mideast Peace Talks Advance, Palestinian State in 2008 is Goal; US Assumes Monitoring

Role," Boston Globe. November 28, 2007, Exhibit N (emphasis added). *See also* "Israel and

Palestinians Set Goal of a Treaty in 2008," New York Times, November 28, 2007, Exhibit O.

In early January 2008, President Bush visited the Middle East and reiterated that he

expects a Palestinian state to be established by the end of his term. *See* "Bush Outlines Mideast

Peace Plan," New York Times, January 11, 2008, Exhibit P.

---

[11] Downloaded from http://daccessdds.un.org/doc/UNDOC/GEN/G06/117/43/PDF/G0611743.pdf?OpenElement

[12] Notably, this official statement by the PA directly contradicts the PA's claim in its Rule 12(b) motion in this action that it constitutes a "foreign state," thus demonstrating that that argument was not made in good faith.

Thus, if all goes as planned, a Palestinian state will be established by the end of this year. Notably, on July 13, 2008, Israeli Prime Minister Olmert stated that the two sides were "closer than ever" to an agreement. Exhibit Q.

Upon establishment of a Palestinian state, the Palestinian Authority – which as the PA itself explains is merely "a temporary administrative body…intended only to serve during the interim period prior to the establishment of a Palestinian state" (Exhibit M) will have finished its historical role and will be superseded by the Palestinian state and cease to exist.

Notably, none of the parties to the negotiations – Palestinian, Israeli or American – refer to the PA itself *becoming* the Palestinian state. Rather, their repeatedly declared goal is to "establish" or "create" a Palestinian state – i.e. an entirely *new* legal entity. This careful phraseology is completely consistent with the fact that the PA was intended all along to be a "temporary" and "interim" legal entity meant to exist only until a Palestinian state is created.

Clearly, it would take several years to complete discovery and a trial in this case. Thus, if defendants' Rule 55(c) motion is granted and then a Palestinian state is established and the Palestinian Authority ceases to exist – this year, next year, or even the year after  – the plaintiffs will be severely prejudiced. With the Palestinian Authority no longer in existence as a legal entity, the action against the PA would be pointless at best, and very possibly summarily extinguished for lack of a defendant.[13]

---

[13] We note for the record that if the PA were *itself* to achieve statehood – contrary to both its organizational purpose and the consistent public statements of its leaders regarding their intent to create a Palestinian state as a *new* entity – this case would *not* be affected, because sovereign immunity is determined at the time of the filing of the suit. *See Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).

The prejudice that would be inflicted on the plaintiffs in this case is therefore unique, overwhelming and dispositive: if the Rule 55(c) motion is granted, defendant Palestinian Authority is likely to cease to exist long before any future judgment could be entered.[14]

That fact, standing alone, is sufficient reason to deny the motion.

## IV.     DEFENDANTS HAVE FAILED TO PRESENT A MERITORIOUS DEFENSE

In support of their motion, defendants purport to assert a single meritorious defense, i.e.: "Defendants are not responsible for the attack." Def. Memo at 34.

A Rule 55(c) movant "defendant is not required to prove a defense, but only to assert a meritorious defense that it may prove at trial." *International Painters*, 288 F.Supp.2d at 28.

Thus, in a tort case (as opposed, say, to a contract case), a "meritorious defense" should be extremely easy to present, since the defendant need only deny the specific relevant factual elements of the tort. Absent a prior admission or criminal conviction, virtually any defendant in a tort case would be able to make this showing. This is especially so where, as here, the defendant is not an individual but a legal entity. An organizational defendant facing allegations of a tort need only assert that the employee or official alleged to be involved acted outside his agency and employment.

Thus, virtually any defendant which is a corporation or association, facing allegations analogous to those in this action, would be able to assert a "meritorious defense" for the purpose of Rule 55(c), simply by making specific denials of the relevant factual elements of the tortious conduct alleged and/or by disputing that the employee involved was acting in the scope of his employment.

---

[14] Indeed, that may well be defendants' intention, and precisely why they waited all these years to bring their motion.

Yet, despite this extremely low standard, a *careful* reading of their motion reveals that the defendants have *failed* to assert a meritorious defense to the allegations of the complaint.

As discussed above, plaintiffs allege that the bombing at issue was planned and carried out by the PLO, using a wide variety of material support and assistance provided by the PA for the specific purpose of carrying out such terrorist attacks. Complaint ¶¶ 45-65. Plaintiffs also allege that the bombing was carried out further to a conspiracy and joint plan between the PA and the PLO/PFLP bombers. *Id.* at ¶ 53.

Clearly, then, in light of the detailed and specific allegations of the complaint, if defendants sought to assert a meritorious defense to this action, they needed to proffer equally specific factual assertions disputing each of the relevant allegations. Mere general denials of liability (e.g., "Defendants are not responsible for the attack") do not constitute a meritorious defense. "No authority supports the proposition that a mere general denial of a plaintiff's allegations may be deemed a 'meritorious defense'…" *Whittaker v. District of Columbia*, 228 F.R.D. 378, 381 (D.D.C. 2005).[15]

Thus, for example, defendants should have asserted that during the years immediately prior to the bombing, they *never* provided the PFLP faction of the PLO with *any* funds or *any* of the other many other types of material support alleged by plaintiffs.

Likewise, defendants should have asserted that during the years immediately prior to the bombing, the PA *never* conspired with the PLO/PFLP to carry out terrorist attacks, or that it withdrew from any such conspiracy.

---

[15] It is true that *Whittaker* was a Rule 60(b) case, but the meritorious defense standard under Rule 60(b) is identical to that under Rule 55(c).

But defendants do *not* provide any such clear, unambiguous and comprehensive denials. Rather, defendants make the following assertions, none of which constitutes a meritorious defense to the allegations of the complaint:

*First*, defendants assert that "as a legal matter, Plaintiffs cannot establish that PFLP's nominal membership in the PLO creates per se liability for the PLO for the unauthorized acts of PFLP." Def. Memo at 36.

But stating that plaintiffs "cannot establish" a point cannot substitute for a *denial*. And the defendants do *not* deny that the PFLP's acts were authorized by the PLO.

*Second*, defendants assert that: "Nor can Plaintiffs offer any support for the proposition that either the PA or PLO authorized or supported the acts of the PFLP's militant military wing, the Abu Ali Mustafa Brigades." *Id*.

Here again, defendants do not *deny* that they provided such support – they claim only that plaintiffs cannot *prove* it. Clearly, such a statement does not constitute a meritorious defense.

*Third*, defendants spend the next few pages of their brief describing how "shortly before the terrorist attack at issue here" the PA purportedly outlawed the "military wing" of the PFLP, and arrested PFLP leaders and members. Def. Memo at 36-38.

But these assertions, even if taken as true, in no way whatsoever constitute a defense to the allegations of the complaint. The complaint alleges that over a period of time prior to the bombing, the PA provided the PLO/PFLP with a wide range of material support and resources for the purpose of carrying out terrorist attacks, and that the bombing was facilitated and caused by that material support. *Id*. at ¶¶ 45-54, 65.

Thus, even if "shortly before the terrorist attack at issue here" the PA cracked down on the PFLP, as defendants assert, that would not relieve the PA of liability for a terrorist attack

36

facilitated in some way by the provision of material support and resources to the PFLP prior to the crackdown. Simply put, if defendants provided material support to PFLP in the first half of 2001, and cracked down on the PFLP during the second half of 2001, they will still be liable for terrorism committed by the PFLP subsequent to the crackdown which was somehow facilitated by the material support provided before the crackdown.

Therefore, it is insufficient as a matter of law for defendants to claim as a purported meritorious defense that there were periods in which they fought the PFLP; rather, defendants would have to assert that during the years prior to the bombing (a) they *never once* provided any material support to the PFLP or (b) that if they provided such support it did not in any way facilitate the PFLP's execution of the bombing.

Defendants nowhere make any such denials, and the entire discussion of the purported crackdown is therefore irrelevant because it ignores the actual allegations of the complaint.

*Fourth*, defendants discuss at length the history of the friction between the PFLP faction and the PLO following the signing of the Oslo Accords. Def. Memo 37-40. This entire discussion is irrelevant, because it carefully focuses on the relations between these groups in the 1990's and just as carefully ignores the crucial period between 2000-2005 when (according to the U.S. government, as discussed *supra*), the PA and PLO openly returned to terrorism.

Furthermore, critically, the defendants *nowhere deny the actual allegations of the complaint* in this discussion, and instead focus on the alleged difficulties plaintiffs will have in proving their case. *Id*. at 40 ("Plaintiffs will face a substantial hurdle given that the PFLP had broken with the PA …").

Thus, examined carefully, defendants' assertions (even if assumed to be true for the purpose of this motion) do not add up to a meritorious defense to the actual allegations of the complaint.

## V.    THE CONDITIONS FOR *VACATUR* OFFERED BY DEFENDANTS ARE GROSSLY INADEQUATE; PLAINTIFFS REQUEST TO BE HEARD ON THIS ISSUE IF THE COURT IS INCLINED TO GRANT THE MOTION

Recognizing that this Court has inherent power to condition *vacatur* on reimbursement of costs and the posting of a bond, defendants offer to compensate the plaintiffs "for reasonable costs incurred as a result of the default" and to post a $1 million bond "payable to the Plaintiffs if – after the Court vacates the April 12, 2005 entry of default so that the Defendants can litigate on the merits – the Defendants again default." Def. Memo at 32-33.

It is unclear what defendants intend by the phrase "reasonable costs" and the parties would no doubt disagree about which costs should be included.

Furthermore, defendants' offer of a $1 million bond in case of a future default is absurd, both because any bond should cover not only default but actual payment of any future judgment, and because the sum is wildly low given the quantum of damages involved here. Indeed, in *Knox*, the court ordered the posting of a bond in the amount of approximately $200 million as a condition of *vacatur* and "necessary to protect Plaintiffs' rights." *Knox*, 248 F.R.D. at 432. Notably, *Knox* involves a single death, whereas this case involves two deaths and numerous plaintiffs with serious physical injuries. The bond suggested by defendants would therefore be woefully inadequate.

However, plaintiffs are, respectfully, hopeful that defendants' motion will be denied and that the disputes regarding the costs and the bond will be mooted. Accordingly, plaintiffs believe it would be wasteful to address these issues at this time.

38

Thus, solely in the alternative, i.e. in the event that the Court concludes that default must

be set aside, plaintiffs request to be heard on the amount of the bond and the matter of the costs.

**VI.    CONCLUSION**

Defendants' motion should be denied.


Plaintiffs, by their Attorney,


/s/David J. Strachman
David J. Strachman
D.C. Bar No. D00210
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

CERTIFICATION

I hereby certify that on July 14, 2008 a true copy of the within memorandum and exhibits were sent via ECF to the following counsel of record:


Richard A. Hibey
Mark J. Rochon
Charles F.B. McAleer, Jr.
Laura G. Ferguson
Timothy O'Toole
MILLER & CHEVALIER CHARTERED
655 15th Street, NW
Washington, DC 20005

/s/ David J. Strachman
