**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| SHABTAI SCOTT SHATSKY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:02cv02280 (RJL) |
| | ) | |
| THE SYRIAN ARAB REPUBLIC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THE PALESTINIAN AUTHORITY'S AND PALESTINE LIBERATION
ORGANIZATION'S MEMORANDUM IN REPLY TO PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO MOTION TO VACATE CLERK'S ENTRY OF DEFAULT**

"Strong policies favor[] the resolution of genuine disputes on their merits." *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980). Defendants' Motion to Vacate Clerk's Entry of Default, DE 77, showed why those policies apply with particular force here. The strength of the meritorious defense proffered by Defendants, the absence of any cognizable forms of prejudice to Plaintiffs resulting from vacatur, and the indisputable public and foreign policy concerns presented by enforcement of the default in this and other similar cases, all weigh heavily in favor of granting Defendants' motion.

In the sections below, Defendants' fully detail the failings in Plaintiffs' Opposition Memorandum [DE 97], which does not rebut or even confront Defendants' case for vacatur. At the outset, two of the Opposition's most critical failings are worth highlighting.

First, with respect to the meritorious defense criterion, the Motion to Vacate described how Defendants issued a decree declaring the likely culprits (the PFLP's military wing) to be outlaws and began arresting them in the months before the attack -- a fact that almost single-handedly destroys Plaintiffs' case for liability against the PA and PLO. DE 77 at 34-41. Indeed,

882404.1

even Plaintiffs acknowledged during briefing and argument the importance of a decree by Defendants outlawing the PFLP military wing -- stating at one point that the "linchpin of their case is this outlawing" [Tr. 6/13/08 at 22:18-19] and at another that the information was "vital" and "crucial for the Court to consider." *Id.* at 7:25-8:2.[1] Plaintiffs took the position, however, that no decree existed and that "defendants' spokesman simply lied to CNN" in connection with a story reporting the decree. DE 93 at 6.

Attached as Exhibit A is a certified translation of the Palestinian Supreme Council on National Security's decree declaring the military wing of the PFLP to be a "suspect and illegal group." The decree is dated October 22, 2001, and was issued by Yasser Arafat, as Chairman of the Executive Committee of the PLO, President of the Palestinian National Authority, and Commander-in-Chief-of the Security Forces. It also directs all security agencies to execute and comply with the decree. *Id.* This decree provides ample support for the PA/PLO's position that they cannot be held liable for the acts of the PFLP's military wing. Moreover, the contemporaneous Arab-language news stories triggered by the decree, including one in which militant groups like Hamas forcefully condemned the PA and PLO for outlawing the PFLP military wing, make very clear that this action was taken in the face of substantial political opposition, and that the militant groups believed (rightly) that it had the full force of law. *See* Ex. B. This fact alone establishes the meritorious defense criterion of the Rule 55 standard, and will likely form the basis of a summary judgment motion at a later date if vacatur is granted.

---

[1] *See* also DE 93 at 5-6 (Plaintiffs' briefing arguing importance of decree to defense case and suggesting that absence of decree undermined case).

882404.1

Second, Plaintiffs' Opposition Memorandum fails to deal with *Knox v. Palestine Liberation Organization*, 248 F.R.D. 420 (S.D.N.Y. 2008).[2] In *Knox*, these same Defendants moved under Rule 60(b)(6) of the Federal Rules of Civil Procedure to vacate a $193,000,000 default *judgment* that had been entered after prior counsel sent a letter to the Court suggesting that Defendants would not participate further in the proceedings by filing an answer. 248 F.R.D. at 424. In support of vacating the judgment, Defendants argued that any willfulness in precipitating the default judgment was overcome by the existence of a meritorious defense, the lack of cognizable prejudice, the amount of money at stake, the change in Palestinian leadership, and the historical and public policy factors implicated by adhering to a default resolution of the case. *Id.* The *Knox* court found a willful default but nonetheless agreed that the judgment must be conditionally vacated, summarizing its analysis as follows:

> Given the transcendental scope of these issues and interests, a judgment concerning such questions, involving liability assessed in hundreds of millions of dollars, ordinarily should not be decided by default. This conclusion follows all the more where, as is now the case here, the principal defaulting officials are no longer on the scene and their litigation strategies have been rejected by successors. Rather, if fair means exist, without causing undue prejudice to Plaintiffs' rights, to reach the truth and set the record straight in respect of Plaintiffs' claims, such a course would better comport with the ends of justice that reflect the greater range of relevant concerns.

*Id.* at 431-32.

Just as in *Knox*, the totality of pertinent factors cuts in favor of the Defendants here, particularly when measured under Rule 55(c)'s forgiving standard: (1) the strong meritorious defense, including evidence establishing that the PA/PLO, far from supporting the militia group responsible for the incident, had acted to outlaw it; (2) the absence of cognizable prejudice; (3)

---

[2] Defendants have attached a copy of the *Knox* decision as Exhibit C.

882404.1

the over $350 million Plaintiffs seek in damages from a financially distressed PA, which depends on international donor aid for its survival; and (4) the foreign and public policy concerns associated with imposing such a large judgment on the PA/PLO in a terrorism suit by default.  If vacatur of a *judgment* was warranted on the record presented in *Knox* (as it was), there can be no doubt that vacatur of a default under Rule 55 is similarly warranted on this record.

## ARGUMENT

The parties agree three factors guide the Court's exercise of discretion under Rule 55(c)'s "good cause" standard: (1) the willfulness of the default, (2) the cognizable prejudice to the Plaintiffs, and (3) the presence of meritorious defenses.  But, from that point of agreement, the parties' legal arguments diverge.  Most importantly, Plaintiffs overstate the importance of the willfulness factor, they ignore the black-letter rule requiring the Court to view "all ambiguous or disputed facts in the light most favorable to the defendants," *Jackson v. Beech*, 636 F.2d at 838; *see also*, *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373-74 (D.C. Cir. 1980); *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995), and they seek to distinguish away *Knox* with a sleight of hand that is unfaithful to the law that governs vacatur motions.

Plaintiffs' purported distinction of *Knox* is the most telling, as it is never made explicitly. Instead, Plaintiffs argue only that "never has *a Rule 55(c) motion* been granted in anything approaching these circumstances." DE 97 at 25 (emphasis added).  By carefully limiting this sentence to "Rule 55(c) motions," Plaintiffs try to exclude *Knox* from the universe of relevant cases because the vacatur there was from a default judgment under Rule 60(b), rather than a default under Rule 55.  There is a reason, however, that Plaintiffs never expressly try to distinguish *Knox* as a Rule 60(b) case -- the distinction favors Defendants, not Plaintiffs.  It is black-letter law around the country that "there is a distinction between the appropriate standard

4

for setting aside a default and that appropriate for setting aside a default judgment," in that the standard for setting aside a default is substantially lower when judgment has not yet been entered. *Jackson v. Beech*, 636 F.2d at 835; *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1982) (noting that Rule 55 standard is "less rigid" and requires a "more liberal attitude" than Rule 60 allows); *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 393 (D.D.C. 2005) ("courts grant vacatur of default more freely than vacatur of default judgment"). In other words, the one court that has considered the question of vacatur in something "approaching these circumstances" -- to use Plaintiffs' words -- has *granted* vacatur under the more demanding Rule 60(b) standard that applies to judgments. Vacatur is also appropriate here, given Rule 55's more lenient standard, and given that this case presents at least as strong a record for vacatur.

## I.    THE PA AND PLO SATISFY THE MERITORIOUS DEFENSE PRONG OF RULE 55(c).

In order to satisfy the meritorious defense prong of Rule 55(c), "the movant is not required to prove a defense, but only to assert a defense that it may prove at trial." *Whelan v. Abell*, 48 F.3d 1247, 1259 (D.C. Cir. 1995); *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. at 394. Thus, the operative question is not whether the defendant will ultimately carry the day but whether a defendant's proffered defense "give[s] the factfinder some determination to make." *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996).

Defendants have more than amply set forth a defense that gives the factfinder "some determination to make." As noted in the vacatur motion, the PA's and PLO's defense to liability will rely on at least the following facts:

- Several months prior to the attack, the PA had outlawed the PFLP's military wing and arrested 33 of PFLP's members (DE 77 at 36-37);

882404.1

- Just a month before the attack, in January 2002, the PA arrested the leader of the PFLP, Ahmed Sa'adat (DE 77 at 37);

- As a result of Sa'adat's arrest, the military wing of the PFLP threatened to kill Palestinian Authority security chiefs if its leader and other PFLP prisoners were not immediately released from authority jails (DE 77 at 37);

- In June 2002, responding to Sa'adat's petition for his release, the Palestinian High Court of Justice in Gaza ordered the PA Intelligence Service to immediately release Sa'adat, because no evidence had been presented against him, but the PA continued to detain Sa'adat through 2005 (DE 77 at 37);

- Sa'adat's arrest brought to a head a breach between the PA/PLO and the PFLP that had long simmered in the national movement (DE 77 at 38);

- The breach between the PLO and PFLP dates back at least to 1993, when the two groups took opposing views on whether to recognize Israel. In the 1993 Oslo Accords, the PLO, under Yasser Arafat's leadership, agreed to recognize Israel, renounce terrorism, and enter into agreements with Israel to establish a timeline and framework for an eventual Palestinian state (DE 77 at 38);

- The PFLP, on the other hand, refused to recognize Israel, rejected the Oslo Accords, and continued to support armed resistance to the Israeli occupation (DE 77 at 38);

- Immediately after the 1993 Israel-Palestinian Declaration of Principles (one of the "Oslo Accords"), the PFLP suspended its participation in the PLO (DE 77 at 38).

*See generally* DE 77 at 34-40.

These facts, if proven at a trial, would undoubtedly raise a complete defense. Evidence presented at trial showing the PFLP had broken with the PA and PLO leadership over the latter's recognition of Israel, the PA had outlawed the PFLP's military wing (the group most likely responsible for the incident), the PA and PLO leadership was detaining the PFLP's leader at the time of the attack despite calls for violent retaliation against PA security officials by PFLP's military wing, and the PA continued to detain the PFLP's leader against his protest and despite calls for his release from Amnesty International, will establish a complete defense of non-liability for the conduct.

882404.1

Importantly, moreover, these facts are supported by a copy of the actual decree outlawing the military wing of the PFLP -- a decree that Plaintiffs have repeatedly characterized as a vital component of the meritorious defense claim. Indeed, during discovery proceedings and in argument before this Court, Plaintiffs suggested that the Defendants' refusal to produce this decree through submission to unilateral discovery suggested that Defendants' defense was a "lie" and that the CNN report concerning the decree was false. *See, e.g.,* DE 93 at 5 ("Clearly, then, if the PA had really outlawed the 'radical wing' of the PFLP, there would be an official regulation, proclamation or other legal instrument issued by the PA saying so, which defendants could produce. *Yet astonishingly, the defendants have not produced such a document.*") (emphasis in original); *see also* Tr. 6/13/08 at 6-10. Plaintiffs, in fact, squarely asserted that "Defendants' failure to produce any legal instrument outlawing part of the PFLP, and their attempt to rely on CNN reports, overwhelmingly suggest that no such 'outlawing' ever occurred. Indeed, there is ample reason to believe that defendants' spokesman simply lied to CNN . . . ." DE 93 at 5-6. Plaintiffs counsel also engaged during argument in a series of reckless attacks aimed at Defendants' counsel, strongly suggesting that Defendants' counsel had fabricated the defense. *E.g.,* Tr. 6/13/08 at 9:1-5 ("The elephant in the room here is really where did this whole argument come from? Is this something that was created because researchers or paralegals or attorneys or someone did a Google search or is it something that came from the Defendants themselves?")

These reckless accusations have now proven entirely groundless. Now that Defendants have produced a certified translation of the decree, as well as the decree itself and contemporaneous Arab-language reports describing it, Plaintiffs must concede the converse -- that the Defendants entered a decree outlawing the PFLP military wing several months before the attack and that, as a result, if merits litigation is permitted, Defendants will have a complete

882404.1

defense.   Nor can there be any dispute that the decree meant what it said.   Contemporaneous news reports show that groups like Hamas were outraged by the decree, and condemned the action by Palestinian leadership as "a stab in the back to our sons the mujahideen who are circling around the resolve of the resistance."   Ex. B.

These facts, if proven, at trial, are fundamentally inconsistent with any claim that the PA and PLO "*knowingly* and *intentionally* aided and abetted those who committed the terrorist act." *Knox*, 248 F.R.D. at 427, *citing Boim v. Quranic Literacy Inst.,* 291 F.3d 1000, 1021 (7th Cir. 2002) (stating that, through the ATA, Congress intended to impose liability on those who knowingly and intentionally aided and abetted terrorists).   These facts are also fundamentally inconsistent with the governing standards for imposing associational liability -- namely, that the PA and PLO were aware of and ratified or authorized the specific actions of the culprit.  *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 920 (1982) ("[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims"); *Carbon Fuel Co. v. United Mine Workers of America,* 444 U.S. 212, 218 (1979) (holding that an international union cannot be held liable for the acts of its local under an agency theory absent evidence that the international "instigated, supported, ratified or encouraged" the local's activity, or that the local acted pursuant to an agreement with the international).

*Boim v. Quranic Literacy Institute,* 291 F.3d 1000, 1009 (7th Cir. 2002), has identified the importance of maintaining these black-letter standards for associational liability under the ATA.   As the Court of Appeals explained, a strict-liability interpretation of the statute to any defendant arguably "involved" with the underlying act would "give the statute an almost unlimited reach." *Boim*, 291 F.3d at 1011.

8

882404.1

> Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent, could be construed to "involve" terrorism. *Without also requiring the plaintiffs to show knowledge of and intent to further the [principal]'s violent criminal acts, such a broad definition might also lead to constitutional infirmities* by punishing mere association with groups that engage in terrorism . . . .

*Id.* (emphasis added).

The evidence presented in support of vacatur makes clear that Plaintiffs will be unable to establish scienter requirements, given the Defendants' long-standing hostile relationship to the group that likely committed the attack. Like *Knox*, therefore, this is a case in which Defendants have "sufficiently demonstrated evidence of facts that, if proven at a trial, would constitute a complete defense to Plaintiffs' aiding and abetting theory of liability. Accordingly, Defendants have established the existence of a meritorious defense." *Knox*, 248 F.R.D. at 428.

Indeed, if anything, the meritorious defense raised here is even stronger on its face than the one asserted in *Knox*, where the plaintiffs claimed that the attackers themselves were employees of the PA. Despite these allegations, *Knox* nonetheless found a meritorious defense based on potential weaknesses in plaintiffs' liability evidence, and the existence of circumstances at the time of the incident that made it easier for rogue PA employees to conceal their actions from the entity as a whole. Here, of course, the allegations of liability are far less direct; Plaintiffs at most suggest that the culprits in the attack were not part of the PLO or PA, but part of the militant wing of the PFLP, and the independent evidence presented in support of vacatur suggests not only that Defendants did not authorize, support or ratify these actions but that Defendants at the time were in the middle of an actively hostile and antagonistic relationship with the PFLP.

9

Given that a meritorious defense existed in *Knox*, there can be no reasonable dispute that a meritorious defense has also been raised here. Indeed, Plaintiffs make no meaningful attempt to explain how they might establish scienter in light of the Defendants' evidence. While Plaintiffs quarrel some with the admissibility of that evidence, for the most part, Plaintiffs' arguments on this score consist largely of claims that Defendants did not deny responsibility for the incident in sufficiently categorical terms. DE 97 at 34-35, 37. Plaintiffs are wrong on this score -- for example, the meritorious defense section begins with the sentence "Defendants are not responsible for the attack." DE 77 at 34. So there can be no doubt on the matter, however, the PA and PLO did not knowingly and intentionally authorize, support or ratify the attack, and they did not conspire with the attackers. This is why Defendants "are not responsible for the attack" and it is also why Plaintiffs cannot meet their burden to show authorization, support or ratification at a trial on the merits, if the Court vacates the default.

As a last-ditch effort to avoid merits litigation, Plaintiffs appear to suggest that they are exempt from these scienter and associational liability requirements because the PFLP was at one time a member of the PLO, and the Anti-Terrorism Act supposedly makes the PLO strictly liable for every act ever committed by the PFLP and its militant wing, including the February 2002 bombing. DE 97 at 36-37. Plaintiffs then assert that this form of strict liability also transfers automatically from the PA to the PLO because the PA, as the governing authority, provides some funding to the PLO in the post-Oslo era, largely to support the PLO's diplomatic missions abroad. DE 97 at 37-38.

This Court should not take such arguments seriously. As the *Boim* court made clear, the sort of theory under which Plaintiffs proceed -- seeking to impose strict liability on a national association for the unauthorized actions of any of its constituent members, and to then impose an

10

882404.1

even more attenuated form of strict liability against any entity (including a governmental entity) that (without scienter) provides any funding to the national association -- has no basis in the law. To the contrary, "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a *specific intent* to further those illegal aims." *Boim*, 291 F.3d at 1023 (emphasis added).

There are good reasons that associational liability is limited to those institutions that knowingly and intentionally support the tortious acts of their member groups. Basic precepts of our law generally limit organizational liability -- particularly multi-million dollar liability imposed against government actors -- to circumstances where the defendants have actively engaged in, or knowingly authorized, culpable conduct. While this principle is a universal and long-standing one, its application is especially important here, where adopting Plaintiffs' strict liability theory would undermine the foreign policy of the United States by sending a message to the leadership of the PA and PLO that, even when you outlaw groups like the PFLP military wing, arrest the group's leadership and continue to crack down despite the inherent and significant associated risks, strict liability will still attach if an attack occurs. As a matter of foreign and public policy, that would be a decidedly perverse message to send. This Court should not entertain the Plaintiffs' strict liability argument, but if it is even thinking of doing so, it should invite the views of the United States with respect to this theory of strict liability.

## II.    PLAINTIFFS SUFFER NO PREJUDICE FROM VACATUR.

In arguing that Defendants do not satisfy the prejudice prong of the Rule 55(c)'s "good cause" standard, Plaintiffs say nothing about their recently filed lawsuit against Syria. *See*

882404.1

*Shatsky v. Syrian Arab Republic*, No. 1:08-cv-496 (RJL). That lawsuit arises out of the same February 2002 suicide bombing incident that is at issue here and was originally joined with this case. The filing of the recent "08" case shows Plaintiffs are ready and able to litigate liability for the February 2002 suicide bombing incident, having chosen to commence litigation on these allegations within the past 100 days. If Plaintiffs are ready to begin litigation in the related case, as they have indicated by choosing to file the recent complaint, they are equally ready to do so here.

Instead of coming to terms with the extent to which the 2008 lawsuit against Syria undermines their claim of prejudice here, Plaintiffs spin out hypothetical and speculative scenarios under which they can imagine disadvantage created by the delay associated with the default. DE 97 at 25-34. First, Plaintiffs argue that, if the case were to be litigated now, unspecified evidence in the Gaza Strip will be unavailable to them that hypothetically would have been available had the case not gone to default. Second, Plaintiffs claim this case will be "very possibly summarily extinguished for lack of a defendant" if Palestinian statehood is achieved before completion of the litigation. Both points show more imagination than substance.

### A. Plaintiffs' Imagined Loss of Evidence Resulting From the Takeover of Gaza By Hamas Is Insufficiently Concrete to Warrant Denial of the Motion to Vacate.

Plaintiffs claim that the Hamas' takeover in Gaza precludes the PA from now producing documents located in Gaza. DE 97 at 26-30. This case has no tangible connection to Gaza, however, the suicide bombing having occurred in the West Bank.

As a matter of law, *Knox* rejected precisely this asserted form of prejudice, holding that the mere takeover of the Gaza Strip by Hamas, in a case that has no tangible connection to Gaza, did not create any cognizable form of prejudice for vacatur purposes. *Knox*, 248 F.R.D. at 429.

882404.1

As a matter of logic, Plaintiffs rely on the irrelevant motion to dismiss in *Parsons v. Palestinian Authority*, No. 1:07-cv- 1847 (JR) (D.D.C.). *See* DE 97 at 28-29. *Parsons* arose out of an October 15, 2003, incident in northern Gaza. The complaint alleges that "the bomb used in the terrorist attack which killed Mark Parsons was made at and by Palestinian Preventive Security apparatus in one of their Gaza Strip factories and was provided to the Terrorists by the defendants PA and PLO, through the Palestinian Preventive Security apparatus." Exh. D (*Parsons* Complaint) at ¶ 16. In their motion to dismiss, Defendants argued that the *Parsons* plaintiffs' four-year delay in filing the suit had prejudiced the Defendants' ability to defend the case. As a result of the June 2007 Hamas uprising in Gaza, "Gaza is now inaccessible for the purpose of conducting discovery . . . ." *See* DE 97 at 28-29. (quoting *Parsons* motion to dismiss).

Plaintiffs' counsel has seized on this argument -- made in a case that was centered in Gaza -- and wants to treat it as a sweeping concession by Defendants that they are unable to participate in discovery in any of the pending Anti-Terrorism Act cases, creating prejudice for the plaintiffs in cases in which vacatur is sought. Unlike the *Parsons* case -- which alleges that individuals or militia groups based in Gaza provided weapons made in Gaza to carry out an attack in Gaza -- the *Shatsky* case has nothing to do with Gaza.

Plaintiffs initiated this lawsuit in November 2002 on behalf of a number of people who were injured or killed in the February 2002 suicide bombing in the West Bank settlement of Karnei Shomron. DE 3 (Complaint). Presumably in light of the fact that the Syrian-based PFLP's military wing had taken credit for the bombing, the Complaint focuses largely on the many Syrian defendants. *Id.* at 6-13. Nonetheless, the Complaint also names the PA and PLO as

882404.1

Defendants, as well as naming John Does 1-99. *Id.* at 13-16. Plaintiffs do not claim that any of these individuals operated out of Gaza.

Indeed, the Plaintiffs cannot identify *any* nexus with Gaza, other than wild speculation that "[*i]f* the PA conspired with the PFLP and/or provided it with funds, weapons, training safe haven or other material support in the Gaza Strip" [DE 97 at 29-30 (emphasis added)], then those documents will have been lost by virtue of the Gaza takeover by Hamas. Plaintiffs could just have easily speculated that the funding came from individuals in Iran or the United States, areas over which the PA also has no control. Indeed, Plaintiffs expressly argue that their arguments would apply similarly to "Timbuktu." DE 97 at 29-30. Plaintiffs cannot establish prejudice sufficient to defeat Defendants' Rule 55 motion based on pure speculation about hypothetical documents and evidence in locations from "Gaza to "Timbuktu" that have no apparent or even proffered connection to the case.

In sum, Plaintiffs' contention that "an entire universe of relevant documents -- *i.e.*, all of defendants' documents and records in the Gaza Strip -- has been lost" [DE 97 at 26] is unfounded and rests entirely on rampant conjecture. This Court should reject this asserted form of prejudice, just as the *Knox* court did.

**B.    Plaintiffs' Notion That "The Palestinian Authority Is Now Scheduled to Be Superseded by a 'State of Palestine' Within a Year" Is Speculative and, In Any Event, Is Not A Legally Cognizable Form Of Prejudice In The Vacatur Context**

In another exercise in speculation, Plaintiffs assert that "if defendants' Rule 55(c) motion is granted and then a Palestinian state is established and the Palestinian Authority ceases to exist," the Plaintiffs would be "severely prejudiced" because their action "against the PA would be pointless at best, and very possibly summarily extinguished for lack of a defendant." DE 97 at

14

882404.1

33. Thus, Plaintiffs ask the Court to deny Defendants' request for vacatur motion because (1) a State of Palestine *may* be established at some unspecified date; (2) such a State *may* be created in such a way that the Palestinian Authority is dissolved; and (3) *assuming (1) and (2) happen,* Plaintiffs' claims *may* be extinguished. A vacatur motion cannot, however, be defeated simply because Plaintiffs are able to imagine a hypothetical scenario which leaves them disadvantaged, especially where that scenario is based on a series of unfounded assumptions. It is again worth noting that this identical argument was raised (almost verbatim) by the Plaintiffs in the *Knox* case, *see* DE 120 at 5-8 in *Knox v. PLO*, No. 03-Civ-4466 (S.D.N.Y.), which is attached (without the bulky exhibits) at Exhibit E, and that the district court in *Knox* granted vacatur in the face of these arguments. *See* Exhibit C.

### III. THE PA'S AND PLO'S EARLIER CONDUCT OF THE LITIGATION DOES NOT AMOUNT TO LEGAL WILLFULNESS AND IN ANY EVENT IS NOT DISPOSITIVE ON THE QUESTION OF RULE 55 RELIEF.

Plaintiffs' 25 pages of argument on willfulness should not detain the Court long. In the motion to vacate the default, Defendants did not attempt to soft-peddle their prior blameworthy conduct, providing a full procedural history of the proceedings, including the nature of the prior default. DE 77 at 6-11. Defendants merely argued that this Court ought to apply the willfulness standard "sensitively," DE 77 at 22, by considering in the calculus that, at the time of default, the nascent Palestinian government had not fully developed the sort of mechanisms and lines of authority needed to respond to multi-million dollar litigation in a distant land. DE 77 at 22-30. Defendants further argued that, even if the Court found that the earlier conduct in the litigation amounted to legal willfulness, that determination was not dispositive on the ultimate question of vacatur because any willfulness was outweighed by the balance of other factors, including the meritorious defense, the absence of cognizable prejudice, the amount of money at stake, the

15

changed leadership and the policy implications of adhering to the default. DE 77 at 29-30 (arguing that willfulness not dispositive) and 11-17 and 30-41 (discussing other factors).

In response, Plaintiffs' Opposition argues at length that "defendants' default was fully informed, intentional and strategic," DE 97 at 24, and that the Court should accordingly ignore the amount of money potentially at stake, the public policy implications of the default, the importance of a changed Palestinian leadership and the firm intention to contest this case on the merits proffered by the sworn declarations of the Palestinian leadership. According to Plaintiffs, the willfulness of the default alone should foreclose any consideration of these other factors. DE 97 at 24. Ironically, as part of this discussion, Plaintiffs rely on the portion of the *Knox* in which the district court concluded that "defendants willfully defaulted in the instant case, which was not an isolated occurrence but rather, part of Defendants' legal strategy." *Knox*, 248 F.R.D. at 432, *cited* by Plaintiffs in DE 97 at 12. Plaintiffs fail to acknowledge, however, that *after finding willfulness*, the district court in *Knox* went on to consider all of the other factors relied on by Defendants here, finding that, on balance, those factors warranted vacatur. *Id.* at 427-32.

Defendants submit their willfulness arguments are stronger here than they were in *Knox*. Those arguments are fully discussed in Defendants motion, DE 77 at 22-30, and Defendants see no need to repeat them here. Even if the Court disagrees with Defendants' willfulness arguments completely and concludes that the default here was similarly willful to the one in *Knox*, vacatur is nonetheless warranted. Indeed, the *Knox* court went on to vacate a *judgment* despite the finding of willfulness referenced by Plaintiffs, expressly holding that "despite Defendants' willful default, however, the Court may nonetheless grant Defendants relief." *Knox*, 248 F.R.D. at 426.

This conclusion was undoubtedly correct even viewed through the lens of the law of this jurisdiction. *See Keegel*, 627 F.2d at 374 (reversing in part because district court failed to

16

882404.1

consider all three "listed criteria" in considering motion to vacate); *United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000) (vacating despite indications of initial willfulness based on subsequently stated representations of intent to litigate going forward); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9-10 (D.D.C. 2005) (vacatur of "somewhat willful" default based on absence of prejudice and potentially meritorious defense).[3]  Although Plaintiffs attempt to distinguish cases from this and other jurisdictions in which a willful default has been vacated -- by arguing that the PA/PLO engaged in supposedly more egregious conduct in the underlying litigation or by attempting to confine those cases in which a willful default is overcome to cases involving foreign sovereigns or to situations where the defaulting party never acceded to the Court's jurisdiction, DE 97 at 19-24 -- the *Knox* court rejected such simplistic distinctions and this Court should as well.  Regardless of whether this Court determines the earlier default was willful, it can and should consider all of the other pertinent factors in deciding whether to vacate the default, just as the *Knox* court did, and just as the controlling law in this Circuit requires. Consideration of the complete picture leads inevitably to the conclusion that vacatur is warranted, which is why Plaintiffs try so hard to limit the Court's consideration to the willfulness of the default.

---

[3] Just as Defendants were preparing to file this reply brief, we received Judge Collyer's order in *Biton v. Palestinian Interim Self-Government Authority*, No. 1:01-cv-382 (RMC) (JMF) (D.D.C.) denying the PA/PLO's motion to vacate.  After taking time to fully review this order, Defendants may file supplemental briefing and will, in any event, address the import of this order at argument scheduled for July 28.  Defendants do not view Judge Collyer's decision as informing the outcome here because *Shatsky* is procedurally and factually distinguishable from *Biton*. Although Judge Collyer "decline[d] to follow" *Knox*, Defendants respectfully submit that this Court should follow the better reasoned decision in *Knox* rather than the summary ruling in *Biton*, which was not the product of full briefing and, in Defendants' view, did not fairly apply the controlling law requiring consideration of all three Rule 55(c) factors.

17

882404.1

## IV.    THE COURT SHOULD REJECT PLAINTIFFS' TIMELINESS ARGUMENTS OUT OF HAND.

In a separate argument that reads as if it were part and parcel with its arguments on willfulness, Plaintiffs castigate the conduct of current counsel, asserting that bad faith representations and strategic delay by current counsel purportedly warrant denial of the vacatur motion.  DE 97 at 24-25.  According to Plaintiffs' counsel, current counsel misled Plaintiffs into believing that no merits litigation would occur, but then "astoundingly and unforgivably" reversed course 180 degrees and "filed the instant motion" to vacate the default.  DE 97 at 9, 24-25.  Plaintiffs then go on to complain that current counsel did not file the motion until "half a year" after their entry into the case.  *Id.* at 25.

As officers of the Court, Defendants' counsel take exception to this attack on their professionalism, and can represent that these motions were filed as expeditiously as possible, given the daunting task of reviewing the files, conducting preliminary investigations, and preparing vacatur motions in six complex cases throughout the country.  Plaintiffs' counsel was the same in all but one of those cases, and the vacatur motions began with the *Knox* filing in July 2007.  Plaintiffs can hardly have been surprised when Defendants moved for vacatur in this case.

Indeed, it is somewhat ironic that Plaintiffs are complaining about Defendants' current counsel having taken "half a year" to file the vacatur motion, when it took a little over two years from the time of the default before Plaintiffs filed a motion for entry of default judgment.  The Court entered default on April 12, 2005.  Several weeks later, on May 2, 2005, Plaintiffs filed an application to take depositions overseas and informed this Court in that motion that "Plaintiffs are therefore *preparing and will shortly file a motion for entry of final default judgment* against defendants PLO and PA."  DE 54 at 1 (emphasis added).  On that same day, May 2, 2005,

882404.1

Plaintiffs voluntarily dismissed the original action against Syria. DE 55. For the next 18 months or so, the Court's docket reflects absolutely no action by Plaintiffs to perfect the default. Thus, when the Plaintiffs appeared before the Court at a status hearing in January 2007, the Court asked Plaintiffs' counsel "where [he saw] the case going at this point," noting that "it seems to have been in a state of limbo for too long a period. The Court is curious as to where we are going here." Tr. 1/11/07 at 3:12-16.

In response, Plaintiffs' counsel explained that they had dismissed the Syria case "[a]pproximately 18 months ago," and at the same time filed a motion to take depositions overseas. Tr. 1/11/07 at 3-4. Counsel then represented that, while the Court kept the motion for depositions under advisement, "we have obtained testimony from all of our clients, expert witnesses, and we would like to present that in the form of a Motion for Entry of Default Judgment now that default has entered. Tr. 1//11/08 at 4:9-12. Plaintiffs' counsel next suggested that "what we would like to do is *in the next few weeks* provide a Motion for Default Judgment." Tr. 1/11/07 at 4:17-18.

Plaintiffs' counsel did not file such a motion "in the next few weeks." Instead, Plaintiffs' counsel took no further action to perfect the default for another four and a half months. Only on April 30, 2007, when it had become clear that the changed Palestinian leadership would be entering the case with new counsel, did Plaintiffs' counsel finally file a motion for entry of default judgment and then demand that that motion move forward expeditiously. DE 64.

It is in this context that the Court should view Plaintiffs' argument that Defendants' motion to vacate, filed approximately six months after current counsel entered a host of complex cases, is "grossly, wildly and unprecedentedly untimely." DE 97 at 25. Such complaints should fall on deaf ears, particularly given that in explaining his own delay, Plaintiffs' counsel *blames*

19

882404.1

*the Court.* Thus, in response to Defendants' arguments concerning the two-year gap between the entry of default and the motion for default judgment, Plaintiffs now point to the time that "passed without a decision" -- claiming this Court's tardiness forced them to take additional steps time to "[come] up with a creative but fully valid means of . . . preserving their testimony abroad . . . ." DE 97 at 8.

Now is not the proper time to determine whether the puzzling manner in which Plaintiffs describe the way they purported to secure evidence in the case is as "fully valid" as Plaintiffs' claim. For current purposes, it is enough to point out that in the January 2007 status conference, when the Court expressly raised the issue of Plaintiffs' delay, Plaintiffs' counsel did not point to the Court's purported tardiness in issuing a ruling but instead claimed that the 18-month period had been spent preparing the motion for entry of default judgment, and that that motion would be filed in only a few more weeks. Defendants have no idea why it took Plaintiffs that amount of time to file their motion, but if Plaintiffs' own representations at the time of the hearing on the subject are to be believed, it is because it took Plaintiffs' counsel that long to prepare it. Given that Plaintiffs claimed to need approximately two years to prepare a motion for entry of default judgment, it is strange that the Plaintiffs now ask the Court to deny Defendants' motion, filed only six months after current counsel entered the case and needed to get up to speed, on timeliness grounds.

## V. THE MEASURES PROPOSED IN DEFENDANTS' MOTION ARE MORE THAN SUFFICIENT TO MINIMIZE ANY PREJUDICE TO PLAINTIFFS GOING FORWARD.

In the motion to vacate, Defendants agreed that Plaintiffs should be compensated for reasonable costs incurred as a result of the default, and agreed to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the April 12, 2005 entry of default so that the

882404.1

Defendants can litigate on the merits -- the Defendants again default. DE 77 at 31-33. As Defendants explained, the $1 million would not reduce the amount of damages to which the Plaintiffs are entitled, but instead would be intended to compensate Plaintiffs for any delay caused by the vacatur of the current default. These conditions are more than adequate to protect Plaintiffs against any risk of future default. This Court should accordingly decline Plaintiffs' request to delay further litigation of this case by holding hearings over the conditions under which vacatur would occur. Although a higher bond requirement was imposed in *Knox*, such a requirement stemmed from the fact that that case involved vacatur of a *final judgment* under Rule 60(b). Moreover, Defendants have moved to reduce the bond in the *Knox* case on the ground that the bond was substantially higher than they can afford, and have already presented sworn evidence to the *Knox* court to support this argument. Nonetheless, Plaintiffs are seeking additional discovery on the amount of the bond in *Knox*, and that matter remains on-going.

There is no reason to engage in similar proceedings here with regard to the amount of the bond. Unlike *Knox*, this case involves no final judgment, and it involves a situation where the same Plaintiffs have only recently filed a related case that is in the early stages of litigation, and it involves Defendants who are continuing to demonstrate their good faith intention to litigate these matters responsively and in good faith. Both the finality interests and the risks to Plaintiffs of subsequent default are minimal in such circumstances, and the conditions agreed to by Defendants more than suffice to meet them.

**CONCLUSION**

For the reasons stated above and in the Motion To Vacate Clerk's Entry of Default, the Court should vacate the default and should permit full and fair merits litigation to go forward forthwith.

21

Respectfully submitted,

Dated:  July 21, 2008

_____/s/ Richard A. Hibey_____
Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Laura G. Ferguson (D.C. Bar #433648)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

*Attorneys for the Palestinian Authority and the
Palestine Liberation Organization*

882404.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 21st day of July 2008, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> Djs@mtlhlaw.com
> *Attorneys for Plaintiffs*

/s/ Charles F. B. McAleer, Jr.

882404.1