UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SHABTAI SCOTT SHATSKY, ET AL.,    :    Docket No. CV02-2280
                                  :    (RJL)
              Plaintiffs,         :
                                  :    July 28, 2008
                                  :
v.                                :    3:00 p.m.
                                  :
SYRIAN ARAB REPUBLIC, ET AL.,     :
                                  :
              Defendants.         :
. . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:            RICHARD A. HIBEY, ESQ.
                               CHARLES F.B. McALEER, JR., ESQ.
                               Miller Chevalier
                               655 Fifteenth Street, NW
                               Washington, DC 20005


For the Defendants:            DAVID J. STRACHMAN, ESQ.
                               McIntyre, Tate, Lynch & Holt
                               321 South Main Street
                               Providence, Rhode Island 02903


Court Reporter:                PATTY ARTRIP GELS, RMR
                               Official Court Reporter
                               Room 4700-A, U.S. Courthouse
                               Washington, D.C. 20001
                               (202) 962-0200

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

PROCEEDINGS

1

2          COURTROOM DEPUTY:  Calling civil case 02-2280, Shabtai

3  Scott Shatsky, et al. versus Syrian Arab Republic, et al.  Would

4  counsel please come forward and identify yourselves for the

5  record?

6          MR. STRACHMAN:  Good afternoon, your Honor, David

7  Strachman for the Plaintiffs.

8          THE COURT:  Welcome back.

9          MR. STRACHMAN:  Thank you, your Honor.

10          MR. HIBEY:  Good afternoon, your Honor, Richard Hibey

11  and my partner Charles McAleer for the Palestinian Authority and

12  the Palestinian Liberation Organization, PLO.

13          THE COURT:  Welcome back.

14          MR. HIBEY:  Thank you, your Honor.

15          THE COURT:  All right.  Well, we are here for argument

16  on the Defendant's Motion to vacate entry of default.  I

17  normally hear from the moving party first and then the opposing

18  party and then the moving party gets a few minutes to rebut.

19  So, Mr. Hibey, when you are ready.

20          MR. HIBEY:  Thank you, your Honor.

21          THE COURT:  You may proceed.

22          MR. HIBEY:  We are asking for the default to be

23  vacated.  We believe there is good cause for doing that.  The

24  cases recognize that there are essentially three elements to be

25  addressed in the context of good cause.

1        The three elements are whether the default was willful.

2    The second element is whether there is a meritorious defense.

3    The third element is whether if a default is set aside, what

4    prejudice if any would the Plaintiffs in this case endure?

5        I am not going to take up the Court's time on the

6    question of willfulness.  It is safe to say and we are prepared

7    to go into this in depth if you wish, that there is evidence

8    that at a point in time during the litigation which preceded the

9    appearance of myself and my law firm in the case, the Palestine

10   Authority had indicated to the Court a couple of I think salient

11   facts.

12       The first was that they wanted to litigate certain

13   jurisdictional issues, and those were addressed.  In addition,

14   they indicated to the Court after having lost Motions

15   challenging the jurisdiction and I believe also service in that

16   regard, that they were likely not to participate.

17       But then subsequent to that, they had requested an

18   abatement to the proceedings because there was so much turmoil

19   in the region at the time, that they were experiencing

20   difficulty, that's to put it mildly, in being able to obtain any

21   instructions from their clients seven time zones away because

22   the chaos at that particular time in the political situation had

23   reached a pitch, if you will, that disabled the lawyers back

24   here from being able to take any instructions.

25       There came a time when that default was registered and

1    thereafter, I would say probably almost two years thereafter, we

2    on the eve of entering our appearance in this and a number of

3    other cases in a number of jurisdictions where the authority has

4    been sued by counsel's various clients, the Plaintiffs then

5    moved for a default here.  We opposed it.

6         THE COURT:  Let me just stop there for a second.  Mr.

7    Hibey, the PLO, PA in other jurisdictions had defaults entered

8    against them under somewhat similar litigation situations,

9    right?

10        MR. HIBEY:  Yes, in the sense that what was common to

11   those cases was suits under the Anti-Terrorism Act --

12        THE COURT:  Right.

13        MR. HIBEY:  -- against the PA and the PLO --

14        THE COURT:  Right.

15        MR. HIBEY:  -- on behalf of Plaintiffs alleging injury

16   and death in various circumstances, in different events --

17        THE COURT:  American citizens?

18        MR. HIBEY:  They were Israeli citizens with American

19   citizenship and the fact of their American citizenship entitled

20   them under the ATA to cause actions to be brought for civil

21   liability.

22        THE COURT:  So at least one was in New York, right?

23        MR. HIBEY:  I will tell you.  I think I can do this

24   because there are about 11 of them.

25        THE COURT:  Oh.

1          MR. HIBEY:  There is one in Rhode Island that went to a

2     default judgment.  There is one in New York that went to a

3     default judgment.  That's the Knox case.

4          THE COURT:  Right.

5          MR. HIBEY:  The Unger case in Rhode Island.  Then in

6     New York there are probably three or four other cases that

7     basically allege a violation of the ATA, and I am lumping in

8     there with them a couple of cases brought by a lawyer other than

9     Mr. Strachman where he has alleged slightly different

10    jurisdictional bases, not to be concerned here.  Then in this

11    Court --

12         THE COURT:  Right.

13         MR. HIBEY:  -- I hope I get them all, but I am if I

14    don't, I will be corrected -- there is this case, there is the

15    Gilmore case in front of Judge Kessler, there is the Biton case

16    in front of Judge Collyer.  Indulge me, your Honor.

17         THE COURT:  Not a problem.

18      (Pause.)

19         MR. HIBEY:  The cases I have just identified were in

20    default.  We have the Klieman case in front of Judge Friedman

21    and the Parsons case in front I think of Judge Robertson.  Those

22    cases are not in default.

23         Then in Florida, there is a case called Sapperstein and

24    the parties have shall we say contradictory contentions in that

25    regard.  Our position is that we are not in default and no

1    ruling has transpired on the basis of the parties' positions in

2    Florida.

3         THE COURT:  Now, would it be safe to say that at the

4    time that you learned of your client's interest in going forward

5    with litigation and trying to get the default vacated --

6         MR. HIBEY:  Yes.

7         THE COURT:  -- did that become a similar Government

8    policy with all the other cases extant at that time to your

9    knowledge?

10        MR. HIBEY:  Yes.  No.  No.  I can tell you.  What

11   happened in that regard was that in the fall of 2006, President

12   Mahmoud Abbas sent a letter to the Secretary of State

13   Condoleezza Rice essentially seeking some kind of help or

14   guidance with respect to the fact that these cases were

15   multiplying and were in various procedural stages markedly at

16   the disadvantage of the Authority and the PLO.

17        Secretary Rice wrote to President Abbas in or about

18   January of 2007 and basically said I encourage you to engage in

19   the litigation process rather than not.  We think it is in your

20   interest to do so.  We think it is important that you engage in

21   the process.

22        They took that to heart.  When I say they, I mean the

23   Palestinian Authority and the PLO, and as a result after a

24   search retained our law firm and replaced our -- the predecessor

25   counsel, Mr. Ramsey Clark and Mr. Lawrence Schilling who were

1    appearing for our clients in these various suits and defaulting.

2         We became engaged after a period of procedure that

3    needed to be completed, and it went something like this.  Once

4    we indicated our willingness to enter an appearance on behalf of

5    our clients and to litigate the cases according to the policy to

6    be implemented, which was to accept the Secretary of State's

7    encouragement and to defend and to defend vigorously, we needed

8    to meet the requirements of the Federal Government in -- under

9    OFAC, the Office of Foreign Asset Controls, and we had the get a

10   license to be able to represent our clients because at that time

11   the authority was -- included within its governance Hamas, Hamas

12   having been elected apparently in a free and democratic election

13   into the Government.

14        So we had this situation where we had to get a license

15   and we couldn't do anything until that license was granted.

16        THE COURT:  Right.

17        MR. HIBEY:  Then there were accountability disclosures

18   that we had to make as we proceeded through that case.  And so

19   under those circumstances, we undertook the representation and

20   in due course --

21        THE COURT:  In all of these courts or just --

22        MR. HIBEY:  No. All of the courts.

23        THE COURT:  All of the courts.  Okay.

24        MR. HIBEY:  That was the plan and that's what we

25   executed over the period of the year 2007.  Now, the way that

1    happened was we would enter our appearance and then we would

2    engage on whatever that immediate issue was.  For example, there

3    was I think a Motion to go to judgment in this case and I think

4    we opposed it, and then there was a hearing on damages in the

5    Gilmore case in front of Magistrate Deborah Robinson so we

6    immediately had to shift to that.

7            But in the course of all of this, we were preparing

8    ourselves to file vacatur motions as and when we could and so it

9    was a very hectic time.  The situation changed slightly.  Let me

10   withdraw the word slightly.  It changed dramatically, but with a

11   very quick development.  It was this, that Hamas undertook the

12   violent takeover of Gaza; and in response to that, President

13   Abbas expelled them from their Government.  They were out.

14           The effect for us was now that they were out we didn't

15   have to be reporting to OFAC on a regular basis as to what was

16   going on and what we were doing --

17           THE COURT:  Right.

18           MR. HIBEY:  -- because a license was no longer needed

19   for us to represent and provide legal services to the PA and to

20   the PLO.

21           THE COURT:  All right.

22           MR. HIBEY:  And so over the course of 2007, where there

23   was a case that was in a default posture, we moved to vacate.

24   This is one of those cases.  We have argued in our papers, and I

25   will state it here, that the political turmoil in the region at

1    the time when judgments should have been made by the clients and

2    instructions given to their counsel, the communication was

3    impossible.

4         In '07 that situation changed dramatically because

5    there was a new, not only -- there was new leadership within the

6    Abbas Government headed up by Salam Fayyad who was then the

7    finance minister but later became, when Hamas was thrown out in

8    or about June or July of '07, became the prime minister.  And as

9    you know from the papers, Shalom Fayyad is the party in the

10   Government that is authorized by the President to instruct us to

11   defend and to defend vigorously, and he has made a host of

12   commitments within his statements to the Court to indicate that

13   we have a vastly different situation than the one that the Court

14   encountered at the time of the default, that the default was

15   entered.

16        I know that in my heart I can argue that there may have

17   been a default, but how willful it was under the circumstances

18   is a serious question in my mind.  I know also in candor that we

19   have at least two judges now who felt that for various reasons,

20   some stated and apparently some unstated, that there was a

21   default and the default was willful.

22        I leave that to you in your own evaluation of the

23   record because I think each of these cases is distinctly

24   different, and we have laid out the facts in this case and you

25   can readily see the distinction if you choose to of the

1    situation and the degree of willfulness, if you will, that may

2    or may not appear in this case versus some other case.

3           I like to use the phrase "somewhat willful" because I

4    read that in the opinion that Judge Bates wrote in the Sudan

5    case in this Court.

6           Whatever you feel or decide about the degree of

7    willfulness that you find exhibited on this record, it is

8    overcome by the fact that we have a meritorious defense and that

9    there is no prejudice that cannot be mollified if not outrightly

10   cured.  That would allow this case , this very important case to

11   go forward.

12          Now, with respect to the meritorious defense, in

13   exhibits to our vacatur motion M, N, O and P, we laid out the

14   CNN of the security -- the Palestinian Authority's security

15   council outlawing the military wing of the PFLP, the Popular

16   Front for the Liberation of Palestine, an organization which has

17   been described elsewhere in the pleadings in various exhibits as

18   a rejectionist group that is militantly opposed to the continued

19   existence of Israel.

20          In Exhibit N, there is a report of the PFLP

21   acknowledging its responsibility for the bombing that is the

22   factual center of this case.  Exhibit O is a report of the

23   Department of State which identifies that bombing as one -- the

24   responsibility of the PFLP and Exhibit P is another report, if

25   you will, of the Government of Israel which accepts and verifies

1    the fact that in their view this was a PFLP bombing.

2          We have taken the position and we adhere to it that it

3    was sufficiently pled that we have a meritorious defense based

4    upon that, based upon that information; and we stressed in a

5    previous appearance here that this is a pleading requirement and

6    not a proof requirement at this stage of vacatur because the

7    case law in this jurisdiction and elsewhere recognizes that if

8    there is a hint or a suggestion, I think is a phrase that comes

9    out of Judge Markey's opinion when he sat on the Circuit here in

10   the Kegel case, if there is a hint or a suggestion of a

11   meritorious defense, then the Court should favorably take that

12   into account, and that's what we feel this information revealed.

13         However, if I may step back for a moment --

14         THE COURT:  You may.

15      (Pause.)

16         MR. HIBEY:  -- we had this period when there was a

17   Motion To Compel us to turn over the decree because it was

18   characterized as nothing more than some anonymous CNN report as

19   if that's all there was to the meritorious defense.  We had

20   pointed out other things and I will address them in a moment,

21   but this particular proceeding before you on June 13th stressed

22   the absolute need for the decree.

23         Page 22, I could quote from others, but there are

24   approximately five elements of the statement counsel made when

25   he was arguing to you in the Motion which you denied.  "It may

1    not have to be proven definitively at this stage but there has

2    to be something there.  The linchpin is they refused to provide

3    any information.  If they really came up with this argument from

4    their clients and not from themselves searching on the internet,

5    then they would have it in their file.  They could disclose it

6    and we would be done.  Thank you, your Honor."

7         Well, we resisted the discovery because there is in the

8    law no basis for it in a pending Rule 55 proceeding.  We

9    prevailed in that respect.  We were met with an opposition to

10   the vacatur motion per the direction of the Court on that day,

11   and we filed a reply to the vacatur.

12        Exhibit A to that vacatur motion -- to that opposition,

13   to the reply to the opposition, forgive me, was a copy of a

14   decree outlawing the military wing of PFLP by the security

15   council of the Palestinian Authority and Exhibit B, which was a

16   denunciation of that decree by the rejectionist group that was

17   suffering the consequence, if you will, of that decree.

18        Now, if you frame the proposition of a meritorious

19   defense as I believe you should to recognize it if there is just

20   a hint of one, then that requirement is met.  I suggest to you

21   that the word hint doesn't even begin to describe the

22   sufficiency of this defense as we have propounded it in the

23   vacatur motion.  Grant you the focus was on the decree when it

24   was objected to, but there is more than that.

25        There is a whole story associated with this outlawing

1   of this group because what followed was also the arrest of its

2   leader by the Palestinian Authority.

3           His incarceration caused PFLP to threaten to kill

4   officials of the Palestinian Authority because they had him.  A

5   Court decision of the High Court of Palestine asserted that in

6   connection with the arrest of this man there was no evidence to

7   support his arrest and ordered him released and the Authority

8   refused to do so.

9           The evidence would also show that, as I said earlier,

10  the PFLP has refused to recognize Israel, has rejected the Oslo

11  Accords and continues to support the armed resistance of Israeli

12  occupation of the territories.

13          THE COURT:  How about the issue of harm to the

14  Plaintiffs?

15          MR. HIBEY:  On the question of harm, you will note that

16  the record will show that they dismissed the case against Syria

17  because notice right from the beginning this is -- the title of

18  this case as it was announced in court was Shatsky, et al.

19  against the Syrian Republic.

20          If you review the Plaintiffs' complaint, it is replete

21  with reference to the Syrians.  They dismissed the Syrians.

22  Well, only recently they have filed the case of Shatsky against

23  the Syrian Republic, and I believe it is on your docket.  That

24  suggests to us that they are prepared to go forward on their

25  case and that, therefore, there is little if any prejudice to

1    them by your vacating this case and allowing us to litigate it

2    just as they will be litigating an undefaulted Syrian case.

3           Now, there may be some aspects of what has transpired

4    prior to this time that had to do with the taking of evidence

5    involving the family of the Shatsky Plaintiffs, et cetera; and

6    we have indicated that those kinds of issues can be addressed,

7    that perhaps some of that evidence need not be restated if it

8    has been taken under admissible circumstances.

9           So that if there is evidence out there that they have

10   that's already admitted or admissible, I think it is incumbent

11   upon us to assess that to determine whether if it is admissible,

12   we who are asking for a vacatur should be required not to go

13   beyond it, and we stand by that proposition.  We have made that

14   representation in our papers.  We don't recede from it.

15          In addition, we have offered to put up a bond, a

16   million dollar bond to secure, if you will, against our

17   defaulting again because it is our way of saying to the Court we

18   are in it and we are -- and we intend to defend this case and

19   take it all the way on the merits and on the law.

20          So we believe the prejudice here can be I use the word

21   mollified, it could be eliminated or it could be construed to be

22   non existent and, therefore, free the Court to allow the parties

23   to move forward with the litigation of the case.

24          THE COURT:  To your knowledge, are there any witnesses

25   who if your client hadn't defaulted could have been deposed that

1    are no longer available because they have passed away or because

2    they are no longer locatable?

3           Is there any specific either indication or evidence

4    that a source of evidence critical to the Plaintiffs is no

5    longer available because of this period where your prior counsel

6    and your client were in this defaulting mode?

7           MR. HIBEY:  I will have to wait to hear what Mr.

8    Strachman says in that regard.  My recollection of his papers

9    does not -- is such that I don't recall him identifying anybody

10   that fit into that category.  My recollection of what he was

11   claiming in that respect was something that had to do with Gaza

12   and the unavailability of information in Gaza because of the

13   takeover by Hamas and that that somehow constitutes a prejudice

14   to him, but I want to stress the killing did not take place in

15   Gaza.

16          So I consider that a complete stretch that he should

17   argue, well, there is Gaza and because we don't have immediate

18   access to Gaza, somehow we are prejudiced.  I don't see it.  I

19   am happy to respond to anything he says in that regard.

20          Then the other item of prejudice which I gleaned from

21   what he was saying is that the Palestinian Authority might

22   disappear when the two-state solution occurs.  He is quite

23   assiduous in pointing out that the name of the Palestinian

24   Authority includes I think the word interim, I am almost sure

25   the word interim, but since I never refer to it by its complete

1    title, its complete title is not in my recollection at this

2    point; but the idea is, according to the argument, well, once

3    they achieve a two-state solution, there won't be a Palestinian

4    Authority any more.  It will be a new Palestinian Government

5    and, therefore, I will be prejudiced.

6          Well, you know, the logic of that is would you hurry up

7    and punish us except that if the judgment he is seeking has no

8    viability after there is a two-state solution, then why are we

9    here at all? Because the commitment of Palestine and of Israel

10   and of the international community as a whole is to support the

11   creation of a Palestinian Government and nation.

12          So I don't think that that's a valid assertion of any

13   kind of prejudice as a result of a Court creating vacatur.

14          THE COURT:  All right.  Why don't you wrap it up so we

15   can give Mr. Strachman a chance.

16          MR. HIBEY:  Do you want me wrap it up?

17          THE COURT:  Yes. A couple minutes. A couple minutes.

18          MR. HIBEY:  That's all I will take.  We have changed

19   political dynamics.  We have the potential for a judgment that

20   has a big number that's attached to it.  The only reason why I

21   put it that way is because we have a couple of cases out there,

22   one for $200 million and one for $116 million that we know what

23   those numbers are like and down in Florida, there was at one

24   point a $48 million award.

25          And we think that, you know, those reasons militate

1    toward giving us the opportunity to try the case rather than to

2    suffer the enormous consequence of a default.  The impact of

3    this on the prospects of what's happening out there in the

4    Middle East and on foreign policy here I think cannot, cannot be

5    ignored.

6          I grant you that in the Knox case, the Government of

7    the United States said we are not going to file a Statement of

8    Interest after they were asked if they would, but we are

9    concerned about the financial viability and the political

10   viability of Palestine in light of a judgment of the sort that

11   we are dealing with in Knox to the tune of almost $200 million.

12         That is not lost on us, and it should not be lost on

13   you.  I will say that yesterday's Washington Post on page A16

14   said in no uncertain terms that the Palestinian Authority is in

15   a dire set of circumstances financially and economically because

16   all of the pledges that have been made are not being paid off.

17   There is an actual graph that sets out the low percentage of

18   contributions that have been made by various countries who had

19   otherwise pledged a significant amount of money to try and buoy

20   a society where its populous is 80 percent below the poverty

21   line.

22         And then there have been the recognition of the

23   historical and public interest aspects of why this case should

24   go forward because it is important historically and as matter of

25   public interest, that there be an accountability of the PA to

1    its people and concerns of the international community about

2    whether this conduct could be blamed on them.  And, of course,

3    as I said the U.S. concerns about financial and political

4    viability, all of this grounded in a public's right to know the

5    truth of what happened and who was responsible for it.

6          Now, let me close by offering a suggestion again to the

7    Court.  I think it is in our papers, but I want to stress it

8    here.  Perhaps the Court would ask the United States Government

9    whether it would file a Statement of Interest in this case.  It

10   is declination to do so in the Knox case did not foreclose its

11   ad hoc consideration of other cases and, if you feel the need,

12   we would urge that you ask the State Department, the United

13   States Government, whether it is prepared to file a Statement of

14   Interest and, if so, to do so.

15         This unlike Knox, which was a default judgment case, is

16   a Rule 55 vacatur.  It is a prejudgment case and it may very

17   well be that the United States Government would feel more

18   disposed to dealing with a case in a Rule 55 posture than in a

19   Rule 60 posture because we know they are interested.  We know

20   they have expressed their concern.  The question is whether it

21   goes to their foreign policy.

22         THE COURT:  To your knowledge, has any Judge ever asked

23   them to do that?

24         MR. HIBEY:  Not in 55.  In the 60, they were asked by

25   Judge Marrero and Judge Marrero  -- I want to be accurate about

1    this --

2              THE COURT:  Southern District of New York?

3              MR. HIBEY:  Southern District of New York, Victor

4    Marrero, District Judge, asked them if they intended to file in

5    his or any other cases, and they wrote back:  We are not going

6    to file in your case.  And I believe they said -- then they went

7    on to say:  But we are really concerned about the political and

8    financial viability of the Authority and the PLO if this case

9    went to judgment -- because this case was at judgment.

10             And I think they said they left open the prospect of

11   responding to another inquiry by another Court in another case.

12   So I think that this is certainly a case where if on the basis

13   of what we have said so far you feel you need to hear from the

14   State Department, U.S. Government, we would respectfully request

15   that that be done.

16             THE COURT:  All right.

17             MR. HIBEY:  Otherwise, we are prepared to stand on the

18   arguments that we have made in our pleadings urging a vacatur on

19   the conditions that we have discussed to be made more precise

20   once we know there is a vacatur, and we will proceed

21   deliberately with the litigation of the case.

22             THE COURT:  All right.

23             MR. HIBEY:  Thank you, your Honor.

24             THE COURT:  Thank you, Mr. Hibey.  Mr. Strachman.

25             MR. STRACHMAN:  Thank you, your Honor.  Your Honor,

1     with respect to that last point, after Mr. Hibey's firm

2     traversed the East Coast asking every Judge from Rhode Island to

3     New York to D.C. and to Florida, practically begged the Courts

4     to seek intervention by the State Department, not one of the

5     Judges sought intervention by the State Department.  After --

6               THE COURT:  I thought Judge Marrero did.

7               MR. STRACHMAN:  Well, I want to correct what he said.

8     After they kept saying the State Department has an interest in

9     this, Judge Marrero wrote to the State Department and said -- he

10    didn't ask them for their opinion -- he said if you are going to

11    get involved in this case effectively as the Defendants have

12    been suggesting, then do it already.  Several months later they

13    wrote back and they said they take no position with respect to

14    this particular case.

15               Now, the only other Judge who sought the opinion of the

16    State Department to the best of my knowledge certainly a case

17    that I have been involved in with Judge Kessler in the Gilmore

18    case several years ago, and she sui sponte asked the State

19    Department for its position and the State Department wrote back

20    in I think two or three sentences, we are not getting involved

21    in private litigation effectively.  I am paraphrasing.

22               So this has been a strategy all along in all of these

23    cases.  Go to the Government, get the Government to intervene,

24    and try to get the Government to help us.

25               Now, noticeably missing from Mr. Hibey's presentation

1    is the fact that this case in large measure is on all fours with

2    the Biton decision of just last week which we provided to the

3    Court, and I am sure the Court is aware of.  In both cases,

4    Biton and in this case, there were two defaults.  The parties

5    defaulted twice.  In this case, in the Shatsky case the first

6    entry of default was on September 11, 2003.  Subsequently there

7    was another default on April 12, 2005.

8         Now, years later, almost three-and-a-half years later

9    they moved to vacate the latter default, the April 2005 --

10   excuse me -- it was two-and-a-half years.  Now, one of the

11   things that's important and also exactly on all fours with the

12   Biton case is that instead of first coming to the Court when

13   they got involved in this case and in the Biton case and moving

14   to vacate and saying we would like the redo, they continued to

15   litigate other issues.

16        So in the Biton case they objected to the entry of

17   default judgment, they raised jurisdictional defenses as the

18   Court found, and in September of '07 the Court rejected that as

19   quote "merely an effort to derail conclusion of this hoary

20   litigation."  That's what she wrote in September of 2007.

21        Jump ahead,in dealing with their Motion to Vacate just

22   like here we have a Motion to Vacate eight months after they get

23   involved in this case in April of '07, they wait eight months to

24   file.  That's important.  It is important for several reasons

25   because it is not the first action that they took in the case.

1    The first action was to oppose the Motion To Enter Default

2    Judgment that we had filed with all the depositions and evidence

3    that we had asked the Court to be permitted to provide to the

4    Court.

5            But it is also extremely significant because they led

6    in this case the Plaintiffs down a specific path, and that path

7    was we want to challenge the evidence that you submitted in your

8    Motion To Enter Default Judgment.  We want discovery on that

9    issue.  The Court at a status conference ordered discovery and

10   we spent the better part of six months until the December '07

11   conducting discovery.

12           I believe we had 25 sets of Interrogatory responses.

13   We had thousands of pages of documents that we produced to them.

14   We had updated Expert Reports.  We had all kinds of exchanges on

15   the discovery issue.

16           When that was on the eve of completion the end of

17   December, I believe it was a week beforehand, on December 21st,

18   they filed this Motion.  Not once in eight months hinting to the

19   Court or to the Plaintiffs that they would be moving to vacate

20   the default and in fact sent us effectively on a wild goose

21   chase with respect to discovery.  Again, harming directly these

22   victims.

23           I notice there wasn't a mention of the two children,

24   the two young girls who were killed in the Defendant's

25   presentation or the other victims who were in the attack at the

1   pizza shop or their families who have suffered this, but now as

2   a result of their litigation techniques and their strategies,

3   just as Judge Collyer found, a deliberate strategy that they

4   engaged in over time, my clients had to live through depositions

5   presenting evidence for the Court, for the default judgment.

6   They had to live through the discovery process six months of

7   obtaining more information, signing and preparing new

8   Interrogatories, requests for production of document responses,

9   et cetera, et cetera.  Thousands of pages of documents and

10  updating reports because, of course, some of it was slightly old

11  by that time.  They had to be updated.

12          THE COURT:  Wouldn't that Discovery all be of continued

13  value to you all if the Court granted their Motion? Wouldn't it

14  go to the merits of the case?

15          MR. STRACHMAN:  At some level, your Honor, but if this

16  case is litigated, a trial is likely to be several years down

17  the road after we engage in discovery and, when that happens,

18  all this has to be redone again meaning these victims have to

19  redo all of their damages discovery and testimony and

20  information for now the third time.

21          THE COURT:  Well, why would that necessarily have to

22  be? Why couldn't the Court limit it? Why couldn't the Court use

23  its authority in overseeing discovery to, unless good cause is

24  shown, to limit any depositions or any other information that's

25  been presented to them which has already been presented?

1          MR. STRACHMAN:   They have already challenged the

2     discovery.   They have already challenged the submissions that we

3     made with respect to our Motion to Enter Default Judgment in the

4     spring a year ago before they got involved in the case when the

5     prior two law firms were representing them.

6          So the problem is that, just as Judge Collyer found

7     last week, they engaged in this directed pattern.   It is not a

8     bumbling pattern.   It is not missing a deadline in the office

9     and not appearing for a couple months in the case.   Ramsey Clark

10    came into Court and told you specifically, he said in response

11    to your Honor's question, I was given instructions and that was

12    in March of 2005 when he was then 40 days late in filing an

13    answer after your Honor denied their Motion to Dismiss.   It was

14    40 days late.   It was approximately the 50 the day.   They had

15    ten days after your Honor filed -- your Honor ruled, denied

16    their Motion to Dismiss.   And he said we were instructed.

17         We provided as Exhibit I and Exhibit J into our brief

18    two letters that he wrote documenting April and I believe in

19    October of 2005 the exact same position and he said the position

20    was not just taken in the Knox case, but it says with respect

21    to, and I am paraphrasing, but with respect to the cases we are

22    involved in of this nature.

23         So all through 2005 they took that position.   They

24    continued to take that position until the spring of 2007.

25         THE COURT:   Now, Mr. Hibey offers as a counterpoint to

1    that the turmoil that the Government and, you know, that area of

2    the world was under during that period.  Why isn't that good

3    cause for the Court to look at and even rely upon in accounting

4    for the willfulness or lack thereafter in their default?

5            MR. STRACHMAN:  Because it had nothing -- because he

6    misstates their position.  It had nothing to do with lack of

7    communication or the alleged chaos.  That alleged chaos started

8    in 2000 when the very first case started and continues and every

9    day clippings are added to the pleadings of what happened last

10   night in the New York Times or a position that somebody took

11   showing that allegedly this is just an area of the world in

12   which all litigation has to stop when the Defendant is from that

13   area of the world because of that turmoil.

14           They took that position not because of turmoil, but

15   because of explicit instructions.  Ramsey Clark told Judge

16   Lagueux in Rhode Island I personally met with Yasser Arafat.  He

17   told me what to do about this, the Unger case and other cases.

18   That's a paraphrase but he said the principal case, the Unger

19   case, and he also referenced other cases.

20           He was instructed.  Parties can't simply get out of the

21   postures that they took and the positions that they take because

22   now retroactively in hindsight they could conjure up some

23   articles talking about difficulties.  Mr. Clark never said,

24   never informed, never said to this Court I am taking this

25   position because of turmoil.  He said just the opposite, because

1    of a deliberate choice that my clients made.  He told your Honor

2    I was instructed.

3           Now, this very position was rejected again just last

4    week where Judge Collyer found that again this was just

5    effectively a hollow excuse, and she found that again last

6    summer and again effectively Judge Marrero when he entered a

7    conditional order vacating the judgment, conditions on paying

8    the entire judgment, a security plus interest plus attorneys

9    fees plus submitting to jurisdiction, et cetera; but even when

10   he did that, he disregarded the so-called turmoil or chaos

11   argument, and he found specifically that it was a deliberate

12   choice that the Defendants took when they told the Court that

13   they were only defending the case on jurisdictional grounds and

14   would not further participate.

15          Now, Mr. Clark told you specifically in March of 2005

16   we are taking this position but we have to quote "live by the

17   consequences" and now he wants a redo.  They don't want to live

18   by the consequences.  They want the Plaintiffs to have suffered

19   through their choices.  Real prejudice exists and it is very

20   easy to sort of gloss over some of that.

21          This case is now here in 2008 not because of anything

22   the Plaintiffs did, but simply because of the delays and the

23   posture and the position taken by the Defendants.  They have

24   admitted, as we provided in our brief, we provided their own

25   representation saying they can't do discovery.  They can't

1    defend a certain case and provide discovery because they can't

2    obtain any information at all in Gaza which is one half of the

3    area that they control.

4         Now, we have alleged a systematic detailed provision of

5    materials to support in assistance to the PLO and the PFLP over

6    the years.  That support occurred in all the territories that

7    they control.  That support occurred in territories outside of

8    the Middle East as well, but here they are saying that this

9    gigantic area, which is approximately half of the area that they

10   control with well over a million people in it, we just don't

11   have to and can't provide any discovery there.

12        And that's like saying, you know, in the United States

13   we just don't have access to Government records in Virginia so

14   you just can't get them.

15        THE COURT:  Is this a change? Is there any reason to

16   believe that Discovery unavailability such as it is is any worse

17   today than it was two or three years ago?

18        MR. STRACHMAN:  Sure.

19        THE COURT:  Is it about the same?

20        MR. STRACHMAN:  Well, I think they are alleging, they

21   are acknowledging that they can't do discovery in half of their

22   territory as of last year.

23        THE COURT:  Well, Mr. Hibey suggested to the Court, and

24   he can correct me if I misunderstood him, that the Government

25   such as it is now for Palestine through its prime minister and

1    at the suggestion of our Secretary of State is prepared to go

2    forward, wants to go forward with litigation in this case, at

3    least that's the impression I just got, and going forward and

4    engaging I think was the verb he used in the litigation process

5    by definition means making, you know, people available and

6    enabling lawyers such as yourself to go there and gather

7    discovery.

8            MR. STRACHMAN:  But they can, and they have told us

9    they can.  We are prejudiced as a result of their delay.  If

10   this case had been litigated years ago in March instead of -- in

11   March of 2005 if they had filed an answer and your Honor had

12   fashioned a discovery order, we would have received documents

13   30 days later from Gaza and all the other areas that they

14   control.

15           Now we are here three years later and as a result of no

16   fault of the Plaintiffs, we are now precluded from obtaining any

17   information about their material support to the PFLP in Gaza and

18   there are widespread reports that the PFLP was directing

19   attacks, directing gangs, if you will, or cells of terrorists

20   from Gaza.  I have them right here right from the Israeli

21   foreign ministry.

22           THE COURT:  So what if that's no longer their position?

23   We will let him speak for them in a minute.

24           MR. STRACHMAN:  That they can get the discovery?

25           THE COURT:  Yes. Discovery is doable now that they are

1    "engaging" quote/unquote.

2              MR. STRACHMAN:  It may be doable in principle.  It is

3    not doable from that area.  They are telling us they can't get

4    any document from Gaza.  They have said that.  They have said

5    that in the Parsons case which we have attached to our brief,

6    and he has effectively told that to us today.  They can't get

7    anything from Gaza and yet that's one of the forms -- that's

8    where the Government offices are, that's where some of the

9    employees are, that's where some of the records are, that's

10   where the training camps were, the training facilities where

11   they supported the PFLP so we are precluded as a result of their

12   actions.

13             THE COURT:  And what is the basis for the Court to

14   conclude that you could have got that from Gaza in '05?

15             What can I look to in the record to give me solace let

16   alone proof that in '05 you could have got all that stuff from

17   Gaza?  How do I know that?

18             MR. STRACHMAN:  Because they controlled it.

19             THE COURT:  Not just because you say it.

20             MR. STRACHMAN:  Well, they controlled Gaza.  It is not

21   in dispute that they controlled Gaza.  That was one of the areas

22   that they administered.

23             THE COURT:  Right.

24             MR. STRACHMAN:  They have Government offices there.

25             THE COURT: Right.

1          MR. STRACHMAN: There are government entities operated

2     there. They have employees there.

3          THE COURT:  Right.

4          MR. STRACHMAN:  And they were ousted a year ago.

5          THE COURT:  Right.

6          MR. STRACHMAN:  And they are telling the Court in the

7     Parsons case and here they have said since we have been ousted,

8     we can't get information from that area any more.  So any

9     Government office that shows how PFLP -- by the way, just so we

10    are clear, the PFLP is still on the payroll of the Palestinian

11    Authority.  We have demonstrated that.

12         Just in March of this year, one of their leaders in a

13    very public forum informed the press that they would not be

14    pressured by the cut off of '08.  They are still partners of the

15    PA.  They are still members of the PFLP -- excuse me -- of the

16    PLO.  They concede that the PLO is an umbrella organization

17    which embraces groups like the PFLP.

18         Now, one of the things that is vitally absent in a

19    large lacuna in their presentation is this idea that they have

20    come up with a defense.  They rely mostly -- most of their brief

21    and certainly most of their presentation today relies on this

22    idea that the -- that an alleged faction of the faction known as

23    the PFLP was allegedly excluded from the PLO 12 weeks before the

24    murder and the bombing in this case.

25         It is curious that we had six months of discovery and

1    we repeatedly asked and demanded and sought a document and

2    curiously it only was found when a reply brief in violation of

3    the rules stating that reply briefs cannot bring new material,

4    and we are with not given the opportunity to address it and we

5    filed a Motion.  Your Honor ruled on our Surreply Motion.

6         But they have 30 years of work, cooperation,

7    partnership, supplying arms, training, weapons, safe houses,

8    uniforms with the PFLP.  What they seem to rely on is this two

9    sentence statement unauthenticated which shows up for the first

10   time in their reply completely unauthenticated, clearly made on

11   a computer, not part of a printed governmental, you know, book,

12   if you will, a book of laws or decrees.  There is no affidavit

13   attached to it indicating that it is authentic.  There was an

14   affidavit indicating that it was translated, but there is no

15   indication that's authentic in any way, and they suggest that

16   that forms the entire basis of their defense, but they entirely

17   missed the whole point.

18        As the Boim case said and as virtually all the cases

19   dealing with Anti-Terrorism Act have said that you can't

20   simply -- the law does not allow them to simply cut off, if you

21   will, aid to a faction of a faction.  It can't exclude the

22   Ladies Auxiliary and the Ku Klux Klan and then come in and say,

23   well, see, we excluded the Ladies Auxiliary so the Ku Klux Klan

24   and we don't have a relationship with them.  They related with

25   them.  They supplied them, provided under the statute material

1    support and assistance for 30 years.

2         We detailed that in 21 paragraphs in our complaint,

3    paragraphs 45 to 65.  No where do they say, do they come out and

4    say we did not provide material support and assistance to the

5    PFLP.  What they say is we are not legally responsible.

6         They say repeatedly the Plaintiffs are going to have a

7    hard time proving their case.  It is not our burden on this

8    Motion.  It is their burden to prove a meritorious defense.  The

9    Whittaker's case says, from this District, says you can't simply

10   come up with a general denial.  You have to be specific.  We

11   have 21 paragraphs of specificity.  They have not once said we

12   never gave them money, we didn't train their terrorists.  They

13   have never said that the individual who committed this terrorist

14   act  we had no relationship with.

15        In other words, they should have been able to come up,

16   if what they said is true, they should have been able to come up

17   with a meritorious defense in specifics and they chose not to do

18   that.  They tried to hide behind this idea of, well, we excluded

19   them 12 weeks earlier.  If they trained the individual who did

20   this attack and they excluded an alleged faction, there is no

21   evidence that the PFLP itself a faction of the PLO is further

22   really divided into a series of subfactions, but if it is true

23   that they excluded them but trained the terrorists who did this

24   attack, they surely would be liable.

25        But they are hiding behind this unauthenticated decree

1    apparently issued by Yasser Arafat whose credibility should be

2    hugely suspect in this Court to suggest that that resolves the

3    issue.  The decree itself, it is hard to even give credence to

4    it as we have is extremely vague.  It doesn't say that they are

5    not supplying weapons, arms.  In fact, we have indication just

6    as of March of this year that they are still on the payroll of

7    the PLO.

8         So that's a huge lacuna despite the fact that they have

9    the willfulness which they -- it is sort of easy to come up to

10   the Court and say, yes, there was some evidence of willfulness,

11   but let's get to something else.  That's the key, and that

12   willfulness is what Judge Collyer found.  And this case is

13   similar to the Biton case in 8 or 10 separate points as I

14   indicated.

15        And then when you get to the meritorious defense issue,

16   it is actually, it is shocking that the entirety of their

17   argument really comes down to a simple statement that here there

18   is some sort of factional exclusion, some family fight amongst

19   terrorists this Court has to give credence to, unauthenticated,

20   undocumented that shows up in a CNN article and then after six

21   months of us trying to get it, it shows up in fashion in

22   violation of the rules as part of a reply brief.

23        Meritorious defense clearly under the Whittaker case

24   and all the jurisprudence talk about meritorious defense clearly

25   means more than a denial, and they have just not done that here.

1          I just want to go back to this sort of chaos argument

2     for a minute.

3          THE COURT:  You have got about five minutes.

4          MR. STRACHMAN:   Thank you. They repeatedly suggest that

5     this chaos argument should have some extra meaning because it is

6     the Palestinian Authority.  It is as if sort of the, you know,

7     entities who are already found to be terrorists by our

8     Government, that are listed as terrorists by our Government and

9     under  U.S. law are terrorists sometimes that's extra status.

10    It is as if the kid who is in the back of class who disrupts the

11    class and gets an F as they have done now comes forward and

12    says, well, you can't blame me for getting an F because I

13    disrupted the class.  I wasn't paying attention.

14         All the cases that they cite that talk about giving any

15    kind of leniency in this type of context occur only with states,

16    proven states, not non states who have been told by the First

17    Circuit, the Federal Courts of Rhode Island, New York, D.C.,

18    Florida, they are not a state.  There is no Court that has ever

19    ruled that they are a state.

20         They know that.  They are precluded.  Judge Collyer

21    found that they are estopped from alleging that they are a

22    state.  So all the cases that they cite are completely

23    inappropriate.  In virtually all the cases, the Sudan case and

24    some of the other ones, you have Defendants who never appear.

25    They didn't come to Court and effectively challenge this Court

1    by saying I have to live by my instructions three-and-a-half

2    years ago.

3            You have the Romania case which we cite which deals

4    with a change in regime, and the Second Circuit said there is no

5    leniency for change in regime.  Regimes change all the time.

6    Governments change all the time.  Corporate officers change all

7    the time.  It can't be that every time there is a new president

8    of a corporation or of a real state that they get a redo.

9    That's exactly what they are suggesting here.  They are

10   suggesting here that, you know, there is a new policy.

11           And that's an awfully convenient argument to bring

12   three-and-a-half years later after all of the submissions were

13   made by the Plaintiffs, and that's why this case is on all fours

14   with Biton.

15           In Biton there was testimony last summer, in this case

16   in the spring we chose because there were so many Defendants --

17   excuse me -- Plaintiffs, we figured it take up so much time, a

18   week of the Court's time that we had asked the Court to submit

19   affidavits and deposition transcripts, et cetera, to rule.  So

20   just as in the Biton case all the evidence was already submitted

21   and now they come and say, well, you know what?  There is a

22   whole change of policy.  Well, if states can't get that and if

23   states clearly have a deference under the Foreign Sovereign

24   Immunities Act that these Defendants don't have, then that sort

25   of chaos argument, if you will, should not apply.

1          That has also been rejected.  They have raised that

2     argument in Rhode Island, New York, D.C. Every Court that has

3     looked at it has rejected it and I believe in Sapperstein in

4     Florida as well.

5          They also indicate that all -- that the chaos argument

6     was dependent on this idea of Yasser Arafat being in control.

7     He died November 11, 2004.  Counsel was retained in the spring

8     of 2007 so all through 2005, 2006, a good part of 2007, a

9     portion of 2004 after Arafat's death, they would like the Court

10    to believe that there was this horrible chaos and nothing could

11    have happened, but they neglect to tell the Court but what we

12    show in our brief, they were able to file appeals, they were

13    able to take positions in all of these cases.  They were able to

14    litigate and file briefs, filed dozens of briefs.

15         They were able to get affidavits from their certain

16    staff members.  In this very Court, they had a case that they

17    litigated the Bucheit case, a commercial case involving their

18    confiscation of a cement factory.  They were able to bring

19    witnesses to the United States to testify.  They were able to do

20    depositions over in Gaza that they obviously can't do now.  I am

21    almost positive the deposition occurred in Gaza in the Bucheit

22    case.

23         So it is a very selective idea and it is nice to have a

24    strategy that sort of allows you to get out of jail free for

25    many years until the ax drops and then you come in and say you

1    want to start all over again at the expense of, not just the

2    material expense of the Plaintiffs, but the emotional turmoil

3    and expense having been told that this case was going to be

4    ready to submit to the Court for a damage hearing in January of

5    2008 and to do six months of discovery through 2007 only to be

6    told at the last minute that they are changing their tact and

7    are moving to vacate the default.  Thank you, your Honor.

8           THE COURT:  All right.  Mr. Hibey, I am going to give

9    both sides a chance to review the transcript and submit a

10   supplemental pleading if you would like.  You are not required

11   to, but we have been going about an hour and 10 or 15 minutes

12   which is more than I thought we would need, but it is important

13   to the parties and I am sure both sides have raised arguments

14   that the other side may not have anticipated so I want to give

15   each side a chance to submit a supplemental pleading based on

16   issues raised during the arguments.  That's it.  Not outside the

17   arguments.

18          So it usually takes about a week or so to get a

19   transcript from my very able Court Reporter, and after you

20   review it if you would like to submit a supplemental response or

21   whatever to arguments that were raised by either side, the

22   Plaintiff -- yours,  yours to the Plaintiffs, you are free to do

23   that.  I want to give you a chance to do that.

24          I don't really have time now to go forward with any

25   more reply arguments, but I want to give you a chance to put it

1    in writing because I know it is important to your client and to

2    you and also to the Plaintiffs and their clients.

3         So what I am going to do is suspend today's hearing,

4    give you a chance to file whatever you would like.  Again, it is

5    not required.  It is optional, but it is up to you.  You make

6    your own decision. We are not going to have rounds of responses.

7    I mean each side can do one fuller supplement to the earlier

8    briefing and to today's argument.

9         MR. HIBEY: Your Honor, I take it that would be

10   simultaneous responses.

11        THE COURT:  Yes, simultaneous.

12        MR. HIBEY:  Simultaneous filing so we need to pick a

13   day; is that correct?

14        THE COURT:  Right.  I can tell you what it will be.  It

15   will be due ten days from when you receive the transcript.  You

16   should both receive the transcript the same day.  It usually

17   takes Ms. Gels about a week or so to do a transcript on an

18   expedited bases.  So that gives you probably a week from today

19   before you get it and then you have ten days after that to file

20   whatever you need to file.  Okay.

21        But, remember, limit it to responses or replies to

22   issues raised, arguments raised in this proceeding.  I don't

23   want to get outside of that.  It is not fair.

24        MR. HIBEY:  Would you do me one request, your Honor?

25   That is tell me the precise date based upon the estimate that

1    the parties are to file simultaneous briefs.

2           THE COURT:  Well, Ms. Gels, would a week be realistic

3    with your other burdens?

4           THE COURT REPORTER: Yes.

5           THE COURT: Okay. Well, if a week is realistic, a week

6    from today is the 4th so you will have until Friday the 15th.

7    How is that? That's a Friday.

8           MR. HIBEY:  Thank you, your Honor.

9           THE COURT:  Get them in by Friday the 15th.  There

10   won't be any responses after that now so just that one shot as

11   they say.  All right?

12          MR. HIBEY:  Thank you, your Honor.

13          MR. STRACHMAN:  Thank you, your Honor.

14          THE COURT:  All right, counsel. Thank your for your

15   arguments and your pleadings.  We are going to take a

16   five-minute recess to get the Court set up and give my able

17   Reporter a break.  She has been working awfully hard and we will

18   be back in about five minutes.

19          (Whereupon, at 4:19 p.m., the proceedings were

20   concluded.)

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Patty A. Gels, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9                                    _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25