**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHABTAI SCOTT SHATSKY, et al.,

     Plaintiffs,       Civ. No. 02-2280-RJL

   v.           **HEARING REQUESTED**

THE SYRIAN ARAB REPUBLIC, et al.,

     Defendants.

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**RETURN OR DESTRUCTION OF AN INADVERTENTLY PRODUCED DOCUMENT**
**(DE 170) AND DEFENDANTS' SUPPLEMENTAL MEMORANDUM (DE 174)**

**INTRODUCTION**

On October 31, 2012, Defendants filed a Motion, DE 170, seeking the return or

destruction of a document Defendants produced to Plaintiffs on September 12, 2012, in

connection with the deposition of one of Defendant's Rule 30(b)(6) designees, Mr. Dahbour.  On

November 7, 2012, Defendants filed a Supplemental Memorandum, DE 174, in further support

of their motion.[1]

---

[1] Defendants filed as an exhibit to their Motion a Declaration from Mr. Hamid, the person
they now claim, in sharp contrast to their representations on September 12, 2012, is the source of
the document at issue.  (DE 170-5)  That Declaration is in English and was signed by Mr. Hamid
subject to the penalty for perjury; yet by his own admission, Mr. Hamid does not speak or read
English.  (DE 170-5 at Para. 3)  Upon receipt of the filing, Plaintiffs asked defense counsel for a
copy of the purported Arabic version of the document which the Declarant said he had reviewed
prior to signing the English language document.  Defense counsel refused to provide the Arabic
version; yet days later, filed what the defense claims to be the Arabic version, in connection with
their Supplemental Memorandum (DE 174).  Plaintiffs requested a one week extension of time to
file their Response to the Motion due to the call-up to national service of the translators and
consultants who were to assist Plaintiffs' counsel in connection with this document and who have
*(continued next page)*

1

Plaintiffs now file their Response in Opposition to Defendants Motion, as supplemented.

## RELEVANT BACKGROUND

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, brought by U.S. citizens, and the family members and the estates of U.S. citizens – including two teenaged American girls – who were murdered or injured by a terrorist bombing carried out on Saturday night, February 16, 2002, in a packed pizzeria in the Israeli town of Karnei Shomron. The bombing was carried out by a cell of the PFLP terrorist organization headquartered in the nearby Palestinian town of Qalqilya, located within the jurisdiction of defendant PA. The suicide bomber himself was a young PFLP operative named Sadeq Hafez and, as plaintiffs subsequently discovered, the bombing was planned by Captain Raed Nazal (a/k/a "Raed Mahdi") who was both a salaried officer in the PA's security services and a leader of the PFLP cell in Qalqilya.  As other 30 (b)(6) testimony established, Nazal was promoted to the rank of Major, posthumously, after the horrific suicide bombing at issue in this case and the PA paid his family.

On March 9, 2012, plaintiffs served defendants with a request for production seeking, *inter alia*, documents "that relate to and/or reference the February 16, 2002, bombing," and documents evidencing "all payments made to and all benefits provided to Sadek Abdel Hafez's

---

expertise in the appearance of documents from the Defendants' General Intelligence Service. They were expected to provide important testimony by way of a Declaration with respect to the document in question - including, but not limited to, the fact that it is consistent with the appearance of such a document as it would appear in the GIS files (See Dahbour's testimony at Tr. 141); but these translators and consultants have not yet returned from their call-up; so Plaintiffs are unable to address that aspect of the Motion or the Supplemental Memorandum at all.  To be clear, Plaintiffs do not concede the validity of any assertion in Defendants' Motion or Supplemental Memorandum by virtue of not specifically responding to it; rather this Response focuses only on the primary assertions in the Motion at issue.

relatives by the PA and/or PLO at any time after February 16, 2002, in relation to, as a result of and/or due to Sadek Abdel Hafez's death." Exhibit A at ¶¶ 1, 4.

As defendants have now admitted, no later than May 3, 2012, defense counsel received from defendants a memorandum regarding a full investigation into the February 16, 2002 bombing that had been prepared at some time in the past by the Qalqilya office of the PA's General Intelligence Service ("GIS") ("GIS Qalqilya Memorandum"). Declaration of John C. Eustice, DE 170-4, ("Eustice Decl.") at ¶ 5.[2]  Defendants claim this memorandum was prepared by GIS Major Hamid.

Defendants' claim of privilege as to the Memorandum is entirely without merit and its newly concocted claim that those portions of Mr. Dahbour's deposition transcript that discuss the memorandum now ought to be treated as privileged somehow is complete nonsense. Nevertheless, for purposes of Response, Plaintiffs will not disclose the contents of the Memorandum in this open record, so long as the issue is being litigated.

Plaintiffs wish to be clear at all times, however:  Plaintiffs do not believe there is any basis whatsoever for defendants' privilege claim as to the Memorandum, let alone as to the deposition transcript, which reflects testimony defense counsel fully invited, licensed, initiated, opened the door to, never objected to as it progressed, and never took any steps whatsoever to even ask that it be treated as confidential.[3]

_____

[2] As discussed *infra*, defendants' counsel previously claimed that they received this document only on September 10, 2012, and the admission by Mr. Eustice that counsel had the document as early as May 3, 2012, represents a completely new and different version of events.

[3] During his September 12, 2012 deposition, Ibrahim Dahbour, the PA's Deputy GIS Director in Qalqilya, read into the record the text of the GIS Qalqilya Memorandum with the agreement of defense counsel and with no objection as it continued in detail.  As noted, defendants have never asked plaintiffs or the court reporter to sequester the deposition transcript under Rule 26(b)(5)(B) and

*(continued next page)*

Similarly, to date, defendants, knowingly full well that Dahbour's deposition was video and audio taped, have never taken any steps toward having the audio or video of the deposition considered to be confidential or privileged – and of course defendants know that Mr. Dahbour read the Memorandum into the record of the audio and video- taped deposition (with defense counsel's agreement and with no objection to the same as the deposition continued on the subject of the Memorandum).

Plaintiffs' hands are tied to some degree here by defendants' phony claim and that is most frustrating for the Court truly needs to know what this Memorandum provides to get a full picture of just how outrageous is the defendants' conduct in withholding it, in failing to reflect it in a privilege log (as even defense counsel has acknowledged was required), and for withholding the documents, information, and other witnesses on whom the report about the bombing, as defendants have characterized the memorandum, was based.

---

the filing of defendants' motion (especially 6 weeks after the events) does not constitute sufficient "notice" to Plaintiffs under Rule 26(b)(5)(B).  *See Diesel Machinery v. Manitowoc Cranes*, 2011 WL 1343121 at *3 (D.S.D. 2011)("Manitowoc's Motion … was the first written notice to DMI that the specific document at issue was an inadvertently produced privileged document.  DMI never subsequently complied with the requirements of Rule 26(b)(5)(B) concerning the document.").  Thus, Plaintiffs have no duty to refrain from discussing the deposition transcript openly or from providing the entire transcript or the video and audio recording to the Court in an open record and do not in any way waive their right to do so by refraining from doing so here.  Rather, Plaintiffs make this Response without doing so to avoid any additional specious arguments by defendants, following their favored course of pursuing personal attacks, to raise no question on this issue.  Plaintiffs intend, however, to separately file a motion seeking to compel the production of the sequestered document and believe it appropriate under Rule 26(b)(5)(B) to present the document under seal to the Court for adjudication in that context.  6-26 Moore's Federal Practice - Civil Sec. 26.91 [2] (2012).

Clearly, by defendants' own description, the GIS Qalqilya Memorandum is directly responsive to Plaintiffs March 9, 2012 requests for documents relating to the February 16, 2002, bombing, etc.  Exhibit A at ¶¶ 1, 4.[4]

Since the GIS Qalqilya Memorandum is responsive to plaintiffs' document requests, under the Federal Rules the defendants had only two options: either (1) to produce the document to plaintiffs; or (2) if defendants believed that the document is privileged, as they now assert, to "expressly make the claim" of privilege, and serve plaintiffs with a privilege log "describ[ing] the nature of the document[] … in a manner that, without revealing information itself privileged or protected, w[ould] enable [the plaintiffs] to assess the claim." Fed.R.Civ.P. 26(b)(5)(A).

Indeed, defendants' counsel subsequently admitted that the GIS Qalqilya Memorandum "would appropriately be the subject of a privilege log." (DE 170-6 at 9; Dahbour Tr. 116)

However, defendants neither produced the GIS Qalqilya Memorandum, nor did they list it in any privilege log. Worse, defendants *intentionally omitted* the GIS Qalqilya Memorandum from the sole privilege log produced by them in this case. That privilege log, which was served by defendants on July 9, 2012, and purports to contain a "List of Documents Withheld on the Basis of Privilege and/or Protection," lists only a single document, and does not even hint at the existence of the GIS Qalqilya Memorandum. Exhibit B.

---

[4] Plaintiffs requested documents reflecting payment of benefits by defendants to Hafez's relatives by "virtue" of his commission of the bombing because they support the conclusion that defendants encourage suicide terrorism and that their provision of benefits to the families of suicide terrorists incentivized the bombing and/or constitutes approval and ratification of the bombing by defendants. *See e.g. Linde v. Arab Bank*, 384 F.Supp.2d 571, 584-5 (E.D.N.Y. 2005) (Allegation that bank administered program for payment of benefits to families of suicide terrorists and thereby incentivized attacks stated valid ATA claim against bank).

Thus, defendants did not merely fail to disclose the GIS Qalqilya Memorandum or list it in a privilege log, in blatant violation of Rule 26(b)(5)(A) – they actively attempted *to deceive plaintiffs* into believing that no such document existed, by intentionally excluding it from their sole privilege log, which was served on July 9, 2012, which was more than two months *after* defendants' counsel had received the GIS Qalqilya Memorandum on May 3, 2012.

Defendants' exclusion of the GIS Qalqilya Memorandum from their privilege log (which is captioned a "List of Documents Withheld on the Basis of Privilege and/or Protection"), amounts to an intentional fraud on the plaintiffs and, ultimately, on the Court itself.

Indeed, defendants would likely have succeeded in their duplicitous efforts to conceal from the plaintiffs this existence of this document if not for the unusual series of events that occurred at the September 12, 2012, deposition of Ibrahim Dahbour, the Deputy GIS Director in Qalqilya.

<u>SERIES OF EVENTS AT THE DEPOSITION OF IBRAHIM DAHBOUR, SEPT, 12, 2012,
DISCOVERY OF THE DOCUMENT AT ISSUE HEREIN</u>

On September 12, 2012, Plaintiffs' Counsel, David Schoen, took the 30(b)(6) videotaped deposition of Ibrahim Dahbour in Jerusalem Israel. Attorneys Hibey and O'Toole, both experienced partners in a large law firm attended for Defendants.  Two days before this deposition, creating significant stress and prejudice to Plaintiffs, Defendants untimely produced seventeen pages of documents relevant to Mr. Dahbour's deposition, all in Arabic.  Though a request to reschedule Mr. Dahbour's deposition would have been reasonable in light of this new 11th hour production, Plaintiffs' counsel chose, in the interests of efficiency and movement, to proceed with Mr. Dahbour's deposition.

On the morning of that deposition, after Plaintiffs' counsel complained that many of the documents were illegible, Defense Counsel produced a new set of the same documents to Mr.

Haller, (Plaintiffs' Israel Counsel), and represented them to be the original copies received by them.[5]  They were prepared by Mr. Eustice and delivered by Mr. O'Toole, according to Defense Counsel. (Dahbour Tr. at 128-129). Mr. Eustice had directed Mr. Haller to copy the documents and return them. Therefore, upon receipt, (unbeknownst to Mr. Schoen who was diligently, if not frantically, preparing for deposition with the brand new documents which he could not read because they were in Arabic ), Mr. Haller immediately copied the documents. And, in preparation for the deposition that was to take place imminently, *prior to Plaintiffs becoming aware of the new two-page document*, the documents were distributed to all of Plaintiffs consultants for review and translation.  Clearly, there was urgency in this, imposed by Defendants' late production of these documents.  (Tr. at 123-24, 135-36).

Sometime thereafter, Plaintiffs' counsel and their consultants discovered that within this new and slightly clearer copy was one additional document that had not been produced originally.  Plaintiffs assumed that the *non-production* of the document *originally* had been inadvertent since it was so clearly relevant and probative to the claims made by Plaintiffs, to the discovery requested by Plaintiffs over time, and to the witness, Mr. Dahbour, as described in detail above.[6]  During Mr. Dahbour's deposition, therefore, Mr. Schoen brought the document to

---

[5] Defendants complaint in their motion that they provided the new set of documents "as a courtesy, on a few hours' notice", (DE 170) is absolutely ridiculous in light of the fact that the original, illegible documents had been produced to Plaintiffs less than 48 hours before an important deposition and were responsive to discovery that had been propounded over 6 months prior, by Defendants' own admission. (DE 170-6).

[6] Defendants are absolutely incorrect that Plaintiffs took advantage of Defendants' inadvertent production or that the nature of the privileged document was apparent, as alleged in their Motion. (DE 170 at 5). The Memorandum  pertains to Saddek Abdel Hafez, the terrorist who committed the bombing in this case, a member of the PFLP, a Foreign Terrorist Organization under U.S. law, and as defendants' own submission reveals, it links him to Raed Nazal, a PFLP leader and paid officer in the employ of the PA. The document does not appear on its face to be a privileged document, but rather an intelligence *(continued next page)*

the attention of Defense Counsel for the purpose of asking that the document be Bates stamped so that he could inquire about it. Mr. Hibey asked to see the document and then asked for a recess and stepped outside, presumably to inquire of his co-counsel about this document. Mr. Hibey came back on the record shortly thereafter and made the representation that this was an "inadvertent turnover of two pages that were given to us. In other words, it was created for us, and **it would appropriately be the subject of a privilege log**…and…this should not have been turned over to you." (DE 170-6; Tr. at 115-16).

Mr. Schoen then suggested that the document be marked as an exhibit and sealed in light of the fact that the document (a) provides information directly relevant to the examination, (b) provides a great deal of information about the bomber, Mr. Hafez, and (c) appears to be, in the very least, from sources of information that should clearly have been produced. Mr. Schoen also offered, *based upon Mr. Hibey's representation that the hand-written notes in the margins belonged to his co-counsel*, (as Mr. Schoen had no way of knowing this prior), to block out those portions of the document. (*Id,* at p. 116-17).

In response to Mr. Schoen's inquiry as to what defense counsel claimed the document was, Mr. Hibey stated, "It's a document created by a client to report to attorney requests." (*Id,* at 117: 24-25). Mr. Hibey then asked if Plaintiffs had copied the document.

Defendants misrepresent Mr. Schoen's response in their motion, claiming he refused to answer. (DE 170:6). In fact, Mr. Schoen stated truthfully that he did not know the answer and asked for a recess. (*Id,* at 121-122). Mr. Schoen came back on the record, after conferring with

---

document or notes derived from an intelligence document, which should have been disclosed and, in the very least, must be based upon discoverable documents that should have been produced to the Plaintiffs. Moreover, if Plaintiffs intended any mischief, they would not have revealed the document to Defense Counsel in an innocent effort to obtain a Bates Stamp number. Defendants and their Counsel were caught with their hand in the cookie jar and are now trying to deflect blame.

co-counsel, and explained that circumstances of the production, discovery, copying and distribution of the documents produced that morning, as he learned from his co-counsel and as described above.[7]  (*Id,* at 122-24).

Mr. Schoen then proceeded to explain Plaintiffs' position on the document as follows:[8]

> After a review of the document, we believe, respectfully, that the document is not properly a privileged document and what occurred was the inadvertent disclosure of a non-privileged document, which we believe on its face -- perhaps with the exception of what you have described as the handwritten notes of Mr. Eustice…We believe it to be a pre-existing document that should have been disclosed to us and that contains important material information supportive of the plaintiffs' case that has been improperly withheld from us, both the document itself and the underlying information…And one reason that I say we believe the document to be a pre-existing document and a document of non-privileged character is that, in form and in content, to a great degree, it resembles other documents that have been disclosed in this case…It appears to be similar to or identical to the nature and character and form of other documents that we understand to be pre-existing documents taken from the files and produced to us from the defense.

Therefore, Mr. Schoen proposed that the document be marked and that he be permitted make inquiry of the witness. Mr. Schoen represented that Plaintiffs would, of course, maintain the

---

[7] Defendants also take quotes out of context in their last ditch effort to put the toothpaste back in the tube, after having accidentally disclosed a clearly discoverable and relevant document. (Plaintiffs have no doubt that Defendants are being truthful when they claim the production was "inadvertent," however Plaintiffs believe that not producing this document and/or the documents upon which it is based was misconduct). For example, Defendants juxtapose in their motion the fact that Plaintiffs' Counsel "was aware to some degree, in summary fashion, of what the document provides." and the fact that Plaintiffs' counsel conceded that he could "understand, of course, why the defense would consider that [document] to have a privileged nature," in an effort to confer wrongdoing onto Plaintiffs' Counsel. However, these two statements are completely unrelated, are taken out of context and out of order. The first explains that Mr. Schoen was somewhat aware of the contents of the document as it was translated before any claim of privilege was made, and the second deals with the ink in the margins *after he had been told* it was Mr. Eustice's handwriting. Defendants' efforts to relay falsities to this Court by misstating the record should not be countenanced.

[8] It should be noted that the translator was concurrently translating Mr. Schoen's and Mr. Hibey's statements to the witness so that he was aware of their discussion.

document in a confidential manner, subject to the confidentiality order already in place and subject to the sequestration provisions of Federal Rule 26(b)(5)(B). (*Id,* at 122-27).

In response to this inquiry, Mr. Hibey asked to go off the record, once again, to consider the request and returned some time later, presumably after conferring with co-counsel and possibly clients, and stated:

> We think that there ought to be questioning regarding the nature of this document, not its content, put to the witness in aid of an ultimate determination as to whether these pages are privileged.  That being the case, I propose that questioning of the  witness at this time on that subject be made. In addition, since it is we who are asserting the privilege, I propose to be the first to ask the witness questions concerning the document. (*Id,* at 136-137).

Mr. Hibey's reasoning for going first was that it would be Defendants' burden to prove the privilege "if it comes to that." (*Id,* at 138). Mr. Schoen responded that he felt he should be permitted to question the witness first, but before getting to that asked a few questions. First, Mr. Schoen asked when Defense Counsel obtained the documents. Mr. Hibey responded that he believed the document came into their possession around September 10, 2012.[9] Second, Mr. Schoen asked who has had access to it and who translated it for Mr. Eustice, as Mr. Eustice does not read or understand Arabic and therefore would have needed someone to translate for him in order to have taken notes in the margins. Mr. Hibey did not know. (*Id,* at 137-38). Mr. Schoen also asked if the witness, Mr. Dahbour, generated the document and provided it to Defense

---

[9] Defendants have now taken the position in their motion that the document was created in April and produced to Defense Counsel in early May, 2012. This is especially noteworthy in light of Mr. Hibey's admission, (*Id*, at 116:14-15) that the document " ... would appropriately be the subject of a privilege log." Plaintiffs are left to wonder why, if the document was in produced to defense counsel in early May, it was not identified in the months leading up to September 12 in a privilege log, especially the one that was produced by Defendants in July. Plaintiffs can think of no other explanation than Defendants intended to conceal this document. What about all documents relied on or witnesses/information that were used in developing this report of "Hamid's investigation" (again if that is what they are claiming it to be)? What about the other 17 documents produced?  Why were they not produced earlier? Again, this document is pivotal to the whole story of the case and to Defendants' direct and respondeat superior liability at a bare minimum.

Counsel. Mr. Hibey answered, "*It is my understanding that the witness provided the information that is contained on this document*. MR. SCHOEN:  To someone else who then -- MR. HIBEY: To our investigator, yes, who is part of our –". (*Id*, at 140, emphasis added).

At all times during the deposition, after full consultation with his colleagues, Mr. Hibey represented that the source of information was the deponent, Mr. Dahbour, who provided the information in the Memorandum to a defense investigator, and in fact, Mr. Hibey took great exception to any suggestion that the matter was anything other than exactly that.  (Tr. 132-33) That story remained the story defendants were telling until October 31, 2012, when they filed DE 170 with a new and completely different story in terms of how, by whom, when, for whom, and why the Memorandum at issue was created.

Mr. Hibey, by his own demand then marked the documents as "Sealed Exhibit 1" and proceeded to question the witness first, as he insisted it was his burden. The very first question Mr. Hibey asked of Mr. Dahbour was whether he recognized this document, (for which he presumably provided the information). He answered "no…as a document, no" without hesitation.[10] (*Id*, at 140:20-25). Mr. Hibey then asked him, "Do you have any other information

---

[10] The new story Defendants are now telling, of course, is that some previously unmentioned person, a PA employee named Hamid, generated the document at issue, purportedly at the request of "the GIS Central Operations Center" (no person is named as having made this request), that the document he created had a header and his signature on it, while the one he has now reviewed differs in appearance (apparently the sequestered document), that he apparently only learned and understood that whoever asked him to generate the report apparently had been, in turn, asked by defense counsel to generate the report (Defendants do not even attempt to address the multiple impediments both to admissibility and to using this to support their absurd attorney-client privilege claim). (DE 170-5). This new story is absolutely irreconcilable with the representations of lead defense counsel and one of his partners, who also is a member of the defense team, at the Dahbour deposition, after multiple meetings off the record, when the claim of privilege was made orally on the deposition record on September 12, 2012. Moreover, at the end of the day, all we really know about this new critically important figure in the case, Abu Hamid, is that the PA has given him the rank of 'Major' - the very same rank the PA promoted Raed Nazal to posthumously, while paying his family "martyr" money commensurate with that rank, as a reward, following his role in recruiting, handling, training, and supplying the terrorist bomber in this case who

*(continued next page)*

to state regarding your understanding of the material contained in that document?" (Id, at 141:7-9). Mr. Schoen objected, Mr. Hibey twice directed Mr. Dahbour to answer nonetheless, and Mr. Dahbour answered as follows:

> **After I read these two pages in front of me, most of the information is available within our security files**.[11] There are maybe additional details about his brothers, his sisters. But he was being with Jamal Al-Hindi and Ra'ed Nazal, accompanied by. And Rafi Nasura -- he was like a picture by Rafi. His pictures were taken by Rafi Nasura before the operation was conducted. *(Id, at 141-142, emphasis added)*.

This information is disclosed in DE 170 (indeed, the defendants' selective disclosure of the contents and nature of the Memorandum in the body of its Motion and in the Declarations and deposition excerpt attached to it constitute a separate waiver, we respectfully submit and create an even more unfair circumstance for Plaintiffs in trying to respond). It is significant to note that the introduction by the witness of Nasura into this matter is new and important. As noted in this passage, Nasura took pictures of the PA's Nazal with the bomber before the bombing. Upon information and belief, Nasura was in Israeli custody after the bombing and until sometime in 2007. His testimony could have been compelled, therefore, while this case was in default, but Plaintiffs have no way to compel it since the default was vacated. This is further evidence of the unfair result and prejudice from vacating the default.

As a result of Mr. Dahbour's unequivocal testimony that he did not recognize the document and that the information contained within them is information contained within the PA's security

---

killed two little girls and irreversibly changed the lives of their families and of the other Plaintiffs wounded in this horrific act.

[11] Files that were specifically requested, that are discoverable, that are relevant and probative, and which should have been produced.

documents, Mr. Hibey agreed, appropriately, in a concession that privilege could not be

established, to allow the questioning regarding the documents to proceed.[12]  He stated:

> **We're not going to stand in the way of your questioning of the witness regarding this document.**  We -- we know, as lawyers, how it was created.  And I am telling you that it is a document that was created for us.  **But since the witness cannot identify the document per se as a document, then I am afraid we will go forward.**

Contrary to Defendants' contention, Mr. Hibey *did not* assert any privilege prior to allowing the

questioning of the witness on the document, nor did he limit the questioning to "provisional

questioning." (DE 170:10-11) and he never once interposed any objection during the witness's

testimony to having the testimony continue. In fact, to the contrary he said he was afraid he

would have to allow the questioning to go forward. At that point, Defense Counsel could have

refused to allow any questioning and to seek intervention from the Court.[13]  However, Defense

---

[12] It should be noted, of course, that with Mr. Dahbour right in front of them, defense counsel never asked him whether the facts Defense Counsel had represented were true – i.e. whether Mr. Dahbour had given the information in the document to a defense investigator – the very scenario on which defense counsel claimed to base their claim of privilege, and the circumstances under which they obtained Plaintiffs' counsel's consent to treat the document as sequestered under Rule 26(b)(5)(B).  Now, according to defense counsel, the facts on which they got the document to be sequestered were not true – and were not "corrected" until over six weeks later.  That hardly reflects appropriate conduct with respect to a claim of privilege and in an effort to conceal fully discoverable information, right from its files. It should also be noted that Mr. Eustice was only a phone call away in the same time zone awaiting another witnesses deposition in Ramallah – about 10 miles from Jerusalem. Mr. Hibey could have and should have called him for the required information. And, since Mr. O'Toole returned from recess with a detailed description of the "inadvertent" disclosure of the document, it is believed that Mr. Eustice was in fact contacted. If he was, then the new story about Mr. Hamid drafting the document, and not Mr. Dahbour, is even more suspect, as Mr. Eustice knew the truth. Plaintiffs respectfully suggest, therefore, that the new story appears to be a concoction 6 weeks after the fact.

[13] Defendants are correct that Plaintiffs represented they would seek sanctions for the cost of reconvening the deposition if they were not permitted to depose the witness on the document. See Tr. 126 (DE 170 at 10)  Plaintiffs were fully entitled to take this position and it was the correct one.  But it certainly had no impact on defense counsel as the next portion of the transcript makes abundantly clear and, indeed, it was defense counsel who insisted on examining the witness on the document and he insisted on doing so first, asserting that it was his "burden."  Tr. 136-37  If defendants felt so strongly that the document was privileged they could have, and should have, stood their ground. But, instead, defense counsel led the questioning and allowed the document to be read in its entirety and translated into the transcript, and allowed questions regarding it to be asked without objection, let alone a direction not to answer.

Counsel allowed Mr. Schoen, in a clear act of waiver of any privilege, to question the witness about the document, without limitation. The only thing Mr. Hibey clarified at the time was that everyone agrees that the marginalia is definitely work product,[14] and in fact Mr. Schoen instructed the witness (who did not understand English anyway) not to read the notes in the margins. (Id, at 142:16-17).

Mr. Dahbour read the entire document, which was translated by the official, certified translator, videoed and transcribed by the court reporter, without objection. Mr. Schoen also asked the witness numerous questions about the document and its contents – generally and specifically. At the end of the deposition, after all of this, Mr. Hibey made a statement reserving the right to continue to contest the use of the document and Mr. Schoen reiterated that Plaintiffs' respectfully disagreed. (*Id*, at 164-165). Defendants neither asked plaintiffs to sequester the deposition transcript under Rule 26(b)(5)(B), nor even designated the transcript as "confidential" under the protective order in force in this case. Defendants have also not requested the sequestration of the audio or video-tape of the deposition, not have they designated them as "confidential" under the protective order in force in this case.

Should Defendants make such requests, they would be improper - just like their request made in the instant motion filed as DE 170 – as the document is clearly not privileged, and/or

---

[14] There is little more relevant to the merits of this case than the information Defendants seek to conceal through their Motion for the return or destruction of the document at issue – an effort which Defendants have expanded to include portions of the deposition transcript, comprised of testimony from their own witness which they not only failed to object to, but affirmatively invited and effectively licensed at the time – testimony neither sequestered nor sealed, and which puts the lie to their entire defense in this case and to express and indisputably false representations defense counsel have made to this Court. For example, on September 1, 2012, defense counsel unequivocally represented to this Court that "… there has been no undermining of the fact that the deplorable bombing in this case was the act of an outlawed group, not supported in any way by the PA or the PLO." (DE 166 at 3)  This was demonstrably false then, See DE 167 at 11-12, and the events of September 12, 2012 it clear that this was false in even stronger terms.

reflects underlying documents that are clearly not privileged and have not been produced, *and because* Defendants waived any privilege argument when they failed to mention the Memorandum in their privilege log, allowed the document to be fully used at deposition and did not seek to seal the deposition transcript, audio or video-tape. It should also be noted again that Defendants waited six weeks to seek relief regarding the document.[15]

Now Defendants seek even to have that transcript destroyed.  (See DE 170 at 2, para. 3). They cannot be permitted to succeed in their attempts to conceal the true facts of the events underlying this case and their full liability for those events, reflected in their own files and known by their own agents and employees and concealed virtually in their entirety prior to September 12, 2012.  The rules of our system and the great public interest underlying the Anti-Terrorism Act cannot permit such misconduct and misguided efforts to prevail.

Those efforts manifest themselves in Defendants' mischaracterization to this Court regarding Plaintiffs' actions and statements as discussed above. By way of further example, Defendants mischaracterize Plaintiffs' use of the sequestered document after the deposition, claiming that Plaintiffs improperly referenced the document in an effort to obtain actions on other discovery issues. In fact, Plaintiffs' counsel was referencing the document in direct response to Defense Counsel's claim that the document was privileged. In an effort to avoid motion practice, Plaintiffs sought discovery *on the privileged nature of the document itself*, which is apparent from the emails, attached to DE 170 as Exhibit B. It is Defendants who refused to cooperate with Plaintiffs' efforts, and instead filed this motion six weeks late and after already

---

[15] It seems apparent to Plaintiffs that Defendants' mistake was getting caught not having produced clearly relevant and discoverable information and there was a lot of shuffling going on, on the part of defense counsel, in order to seek this Court's assistance without inculpating themselves.  Their efforts were unsuccessful. This is a mistake that cannot be covered up. And, it certainly calls into question the genuineness of Defendants' other searches and productions in this matter.

waiving any possible privilege. And, again, Plaintiffs strongly contest that the document was ever privileged in the first place.[16]

Moreover, even if *arguendo*, the document were privileged, clearly the underlying documents are not and must be produced.  By their own account, the Memorandum is an account of the bombing, it is about the bomber, his association with PA police officer Nazal and others and, as Mr. Dahbour testified, it is fully consistent with what is "available within (the PA's) security files."  (170-6 at 34; Tr. 141)  (Of course this followed false testimony by other 30(b)(6) designees that there were no files at all).

Defendants fail to even address this abundantly obvious point in their motion. Where are the underlying documents used to prepare this "summary," as they suggest it is? Where are the witnesses who provided the information to Hamid for his investigation into the bombing for purposes of this "investigation" for the Memorandum? Perhaps most significant to all of this briefing, therefore, is that Defendants still have never explained why the underlying information never was produced to Plaintiffs or how, in light of what was sitting right in their own files all along, when at the same time they made the representation to this Court just 11 days earlier, in

---

[16]  Defendants also mischaracterize why they filed their supplement to their motion. (DE 174). Defendants' original Motion, DE 170, was supported by a signed sworn statement in English by a person, Mr. Abu Hamid, who claimed to be directly involved in the generation of the document at issue, but who acknowledged that he did not speak English.  In other words, as to the sworn statement submitted to this Court over his signature, in support of Defendants' Motion, Mr. Hamid, by definition, could not even have read it, let alone understood it or known whether it comported with the information he had provided in Arabic.  Plaintiffs' counsel immediately requested a copy of any Arabic version of the statement which Mr. Hamid might actually have reviewed before his signature was placed on a sworn statement in English that he could not even read. Defendants rejected Plaintiffs' request out of hand.  Instead, a week after filing their Motion, Defendants filed a Supplemental Memorandum in further support of DE 170, (DE174), and, along with additional argument/accusations (but no translator's certification, as one might reasonably expect), finally provided the Court with the purported Arabic version which the affiant is said to have reviewed, and which Defendants had refused to give to Plaintiffs. Rather than simply responding to Defendants' legitimate and logical inquiry, Defendants felt the need to file a motion with the Court and then to blame the need on Defendants.

DE 166, that their claim that the bombing in this case was "not supported in any way by the PA or the PLO" has never been undermined.  Their own witness, a representative put forward by the Defendants under Rule 30(b)(6) far more than "undermined" that demonstrably false representation.  (DE 170-6 at 34; Tr. 141 – (Mr. Dahbour  (Referring to the document at issue): "After I read these two pages in front of me, most of the information is available within our security files.").

There is little more relevant to the merits of this case than the information Defendants seek to conceal through their Motion for the return or destruction of the document at issue – an effort which Defendants have expanded to include portions of a deposition transcript, comprised of testimony from their own witness which they not only failed to object to, but affirmatively invited and effectively licensed at the time – testimony neither sequestered nor sealed, and which puts the lie to their entire defense in this case and to express and indisputably false representations defense counsel have made to this Court.[17]  (See DE 180 at 2, Para. 3).

## ARGUMENT

For the reasons set forth below, the instant motion should be granted.

### I.  DEFENDANTS HAVE REPEATEDLY WAIVED ANY CLAIMS OF PRIVILEGE

Defendants' motion should be denied because, as shown below, they have waived any claim of privilege in respect to the GIS Qalqilya Memorandum in numerous ways, and on numerous occasions, as set forth in chronological sequence below.

---

[17] On September 1, 2012, defense counsel unequivocally represented to this Court that œ˜ there has been no undermining of the fact that the deplorable bombing in this case was the act of an outlawed group, not supported in any way by the PA or the PLO."  (DE 166 at 3)  On September 3, 2012, Plaintiffs advised the Court that this representation was absolutely false and demonstrably so – and that was without knowing that Defendants had the information contained in the document Defendants wish to conceal and have destroyed.  (DE 167 at 11-12)

### A.  Failure to Include the GIS Qalqilya Memorandum in a Privilege Log

As discussed above, the GIS Qalqilya Memorandum is unquestionably responsive to plaintiffs' March 9, 2012, requests for production of documents "that relate to and/or reference the February 16, 2002, bombing," among other things.  Exhibit A at ¶¶ 1, 4.

Rule 26(b)(5)(A) provides that: "When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party *must*:

    (i)    expressly make the claim; and

    (ii)    describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

Fed.R.Civ.P. 26(b)(5)(A) (emphasis added).

This "obligation [in Rule 26(b)(5)(A)] is met through the provision of a privilege log." *DL v. District of Columbia*, 251 F.R.D. 38, 45 (D.D.C. 2008). And as defendants' counsel belatedly admitted at the September 12, 2012, deposition, the GIS Qalqilya Memorandum "would appropriately be the subject of a privilege log." Tr.  at 115:14-15.

But defendants did not serve *any* privilege log listing the GIS Qalqilya Memorandum. To the contrary, defendants *intentionally omitted* the GIS Qalqilya Memorandum from their sole privilege log in this case, and which was served on July 9, 2012, more than two months after defendants' counsel received the GIS Qalqilya Memorandum from defendants. Exhibit B.

Thus, defendants have *blatantly and willfully* violated Rule 26(b)(5)(A).

As a rule, a failure to serve a privilege log waives any claim of privilege. "[P]laintiff's failure to comply with Fed.R.Civ.P. 26(b)(5), requiring him to file a privilege log, bars in itself any claim of privilege, whatever its basis. … Plaintiff once again asserts the attorney client and work product privileges. Once again, however, his failure to provide the privilege log required by Fed.R.Civ.P. 26(b)(5) bars any claim of privilege." *Bregman v. District of Columbia*, 182 F.R.D. 352, 363 (D.D.C. 1998). *See also e.g. Banks v. Office of Senate Sergeant-at-Arms*, 241 F.R.D. 376, 386 (D.D.C. 2007) ("[W]here a party fails to assert a privilege on its privilege log or in any of its pleadings, the privilege is waived.").

While courts sometimes excuse a failure to serve a privilege log, they will not do so where there has been "unjustified delay, inexcusable conduct, or bad faith." *See e.g. Trustees of Elec. Workers Local No. 26 v. Trust Fund Advisors*, 266 F.R.D. 1, 9 n.8 (D.D.C. 2010) (noting that a finding of waiver is appropriate in the event of "unjustified delay, inexcusable conduct, or bad faith" and declining to find that claims of privilege had been waived because "[t]here is no assertion that the mistakes in plaintiffs' privilege log were due to bad faith.").

Defendants' behavior here clearly evinces "unjustified delay, inexcusable conduct [and] bad faith." Defendants intentionally omitted the GIS Qalqilya Memorandum from their privilege log (Exhibit B) even though, as they have admitted, they knew full well that it should have been "the subject of a privilege log." Tr. 115:14-15.

**Indeed, the evidence clearly shows that defendants planned to improperly conceal the existence of this document from plaintiffs forever, and would have succeeded in doing so, but for the extraordinary events at the Dahbour deposition**. Defendants should not be rewarded for being caught red-handed concealing this responsive document, which has been in

their counsel's hands since at least May 3, 2012, by being permitted to now assert privileges that should have been included in a privilege log six months ago.

Therefore, the Court should find that defendants have waived any claims of privilege.

## B.  Marking the Document As a Deposition Exhibit

Defendants' counsel marked the GIS Qalqilya Memorandum as a sealed exhibit at the September 12, 2012, deposition of Ibrahim Dahbour. Tr. at 139:16-20. ("MR. HIBEY:  All right. Let's mark this as Sealed Exhibit Number 1.").

As defendants are well aware, under Rule 32(a)(3), plaintiffs are entitled to use Dahbour's deposition as evidence on summary judgment or at trial. Fed.R.Civ.P. 32(a)(3) ("An adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6).").

Accordingly, by making the GIS Qalqilya Memorandum an exhibit to a deposition transcript that plaintiffs are entitled to use on summary judgment or at trial, defendants waived any claim of privilege in respect thereto. *See U.S. ex rel. Schweizer v. Oce*, 577 F.Supp.2d 169, 176 (D.D.C. 2008) (filing of exhibit under seal absent judicial compulsion waived all privileges).

## C.  Permitting Dahbour to Testify About and Read the Document Into the Record

Rule 502(b) of the Federal Rules of Evidence provides that "disclosure of a communication or information covered by the attorney-client privilege or work-product protection … does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." Fed.R.Evid. 502.  *See Williams v. District of Columbia*, 806 F. Supp. 2d 44 (D.D.C. 2011); *Amobi v. District of*

*Columbia D.O.C.*, 262 F.R.D. 45 (D.D.C. 2009); *Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*, 2010 WL 275083 (S.D. Cal. January 13, 2010).

### D.  Failure to Sequester or Seek Relief in Respect to the Audiovisual Recording

The September 12, 2012, deposition of Ibrahim Dahbour, who read the GIS Qalqilya Memorandum into the record, was recorded audio-visually on videotape. DE 170-6 at 1-2. Defendants have never requested that plaintiffs "return, sequester, or destroy" the videotape of the deposition, pursuant to Rule 26(b)(5)(B), nor does their motion seek any relief in respect to that videotape. Defendants have taken no actions whatsoever regarding the videotape.

Rule 502(b) of the Federal Rules of Evidence provides that "disclosure of a communication or information covered by the attorney-client privilege or work-product protection … does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." Fed.R.Evid. 502.

Even assuming that defendants' agreement to allow Mr. Dahbour to read the GIS Qalqilya Memorandum into the record while being videotaped was "inadvertent" (which it clearly was not) and could somehow be squared with the notion that defendants "took reasonable steps to prevent disclosure" of the GIS Qalqilya Memorandum (which it clearly cannot), in the more than two months that have passed since the deposition, defendants have utterly failed to take *any* "steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)," in respect to the videotape.

Thus, defendants have unquestionably waived any claims of putative privilege in respect to the videotape of the Dahbour deposition.

It is black-letter law that the failure to treat one copy of a purportedly privileged document as privileged, extinguishes the privilege for all copies. "Stewart's June 23 e-mail to Nussbaum was clearly protected by her attorney-client privilege, until she waived that privilege by forwarding a copy of the e-mail to her daughter." *U.S. v. Stewart*, 287 F.Supp.2d 461, 464 (S.D.N.Y. 2003) (citation omitted). Needless to say, the videotape of the Dahbour deposition is in essence a copy of the transcript prepared by the court reporter; indeed, the videotape is even more inclusive than the transcript, because it contains both the English-language dialogue (as reflected in the transcript) and the original Arabic-language questions and answers from the witness, as well as the video images and audio of the deposition. *See e.g. U.S. Fidelity & Guar. Co. v. Braspetro Oil*, 2002 WL 15652 at *5 (S.D.N.Y. 2002) (waiver of privilege for information stored on electronic medium constituted waiver for hard copies). And, like the transcript, the videotape obviously features Dahbour reading the GIS Qalqilya Memorandum into the record.

Therefore, because defendants have waived any claims of privilege in respect to the videotape – by failing to take any steps to have it sequestered, returned or destroyed, as required by Fed.R.Evid. 502(b) – they have also waived any claims of privilege regarding the deposition transcript and the GIS Qalqilya Memorandum, which are encompassed by the videotape.

### E.  Failure to Timely Sequester or Seek Relief in Respect to the Transcript

As noted above, under Rule 502(b), if defendants wanted to avoid waiver of privilege claims regarding the deposition transcript, they were required to "promptly t[ake] reasonable steps" to ensure that it be treated as privileged including "following Federal Rule of Civil Procedure 26(b)(5)(B)." Rule 502(b). But defendants have never asked plaintiffs "return, sequester, or destroy" the videotape of the deposition, pursuant to Rule 26(b)(5)(B). Indeed, until they filed their motion, defendants *never* took any steps to protect the deposition transcript.

Therefore, defendants have waived any claims of privilege regarding the transcript. *See e.g. Williams v. District of Columbia*, 806 F.Supp.2d 44, 52-53 (D.D.C. 2011) (privilege waived under Rule 502(b) where party did nothing but request sequestration under Rule 26(b)(5)(B)). And because the GIS Qalqilya Memorandum was read into the transcript, defendants' waiver regarding the transcript constitutes a waiver regarding the GIS Qalqilya Memorandum as well. *See also* cases cited under Section C. above.

## II. DEFENDANTS' CLAIM OF ATTORNEY-CLIENT PRIVILEGE MUST FAIL

Defendants make no showing whatsoever to support their manufactured claim that the document is an attorney-client privileged document.  It has even less basis for claiming any such privilege for the deposition transcript or the audio-video of the deposition.

Mr. Hamid's Declaration perhaps makes the point with sufficient clarity.  The strongest Mr. Hamid's Declaration gets in showing any link whatsoever between defendants' attorneys and his Memorandum (assuming for these purposes that the document was created by Mr. Hamid), according to his Declaration, he is a PA GIS employee.

He claims that some unspecified time, "earlier this year" he was told by "GIS Control Operations Center" (no person is named as having given the instructions or as having made the request) – and one assumes this is the source for all of his orders in the course of his work as a GIS officer (as opposed to the agent of an attorney) – "to prepare a report pertaining to Sadek Abdel Hafez (the terrorist bomber in this case)."   (DE 170-5 at Para. 3)   He impliedly acknowledges that no one at any time contemporaneous with the event in any way indicated to him that this was at the request of or for the use of any attorney, let alone defense counsel in this case.  Indeed, he admits that he only "now" "understand(s)" that the report was "requested by and for" the lawyers in this case.  (*Id*.).  He doesn't say how he "now" has come to that

conclusion, who told him so, how he knows it to be true, etc. – and he certainly did not believe in any way that he was acting as their agent or on their behalf at the time in question or that he was drafting any such report of memorandum for an attorney's use.   He simply followed his "supervisor('s)" "instructions" and prepared the report.  (*Id.*)  Moreover, there is no showing as to with whom the document was shared or whether it was kept in any kind of confidential manner, such that even if it had some indicia of attorney-client privilege, it may well have been waived.  We certainly do not have any facts presented on this at all.

Since receiving DE 170 and learning for the first time about this claim that a Mr. Hamid generated the document which six weeks earlier Mr. Hibey had represented was the product of information Mr. Dahbour gave to a defense investigator, Plaintiffs repeatedly have sought defense counsel's consent to a deposition of Mr. Hamid and, on November 1, 2012, Plaintiffs served a formal notice of deposition on defense counsel, seeking Mr. Hamid's production for a deposition.  Defense counsel have steadfastly refused to produce Mr. Hamid for a deposition, citing, cynically enough, the close of fact discovery (weeks before they first disclosed his existence, contrary to their previous claim about the document's source) as a primary reason they would not consent to a deposition or adhere to a notice of deposition.

Similarly, Plaintiffs have asked defense counsel to explain why the document at issue appears in two different versions:  One with an official GIS header and Mr. Hamid's signature and one with both of those things removed.  (DE 170-5 at Para. 6).  Defense counsel have categorically refused to explain the difference in appearance or who removed the header and signature from the document and why.

Putting aside admissibility issues regarding this representation, defendants submission does not even come close to supporting a claim that the document in question is an attorney-

client privileged document and defendants have in no way satisfied their burden. *See generally*, 6-26 Moore's Federal Practice Civil Sec. 26.49.

### III. THERE IS NO WORK-PRODUCT PRIVILEGE AND ANY CLAIM OF WORK-PRODUCT PRIVILEGE SHOULD BE OVERRIDDEN

Defendants' also have failed to satisfy their burden of showing that the document in question is work-product privileged. And again, there is no basis whatsoever for such a claim of privilege for the deposition transcript or the audio-video of the deposition.

While the concept of "work-product" often is spoken of as a "privilege," it is standard hornbook law that it is, at best, a qualified privilege. Charles Alan Wright, Arthur B. Miller, Mary Kay Kane, Richard L. Marcus, 8 Fed. Prac. & Proc. Civ. Sec. 2025 (West 3d ed. 2012).

In order to override a claim of work-product "privilege," a party seeking discovery of the material at issue must show only that he has a "substantial need" for the it, and that he would suffer "undue" hardship to obtain the "substantial equivalent." *Id*.

There can be no question that Plaintiffs have a "substantial need" for a document which purports to reflect all of the facts surrounding the terrorist bomber who victimized, the story of the bombing, and a report on the bombers associates, including the PA's Nazal, Mr. al-Hindi, and the photographer Nasura who documented their relationship before the bombing. Tr. 141-142. That is especially so in the context of this case where both the facts of the bombing and information on who helped the bomber and any ties such person(s) has (have) with these Defendants is directly at issue.

As noted above, Plaintiffs have tried repeatedly to obtain the "substantial equivalent" of getting the report (although Plaintiffs do not concede that it would be a fully satisfactory alternative) by requesting and even noticing the deposition of Mr. Hamid; but defense counsel

has categorically rejected each such request.   Additionally, Plaintiffs have no way to compel Nasura to sit for a deposition, although they did before the default was vacated.

In short, defendants have not made out their work-product claim in any way and even if *arguendo* they had, any such qualified privilege has been overcome by Plaintiffs indisputable substantial need for the document and the information contained therein and their inability to obtain a substantial equivalent without undue hardship.   Defendants' claim of privilege must be rejected in every regard.

## The Court Should Require an *in camera* Review of the Material

At the bare minimum, as a preliminary step, the Court must review the document at issue and the full deposition transcript *in camera* in order to fully evaluate the privilege claim, as well as the claim that the privilege has been waived or that the work product privilege claim has been overcome on the grounds discussed herein.   *See U.S. v. Hsia*, 81 F. Supp. 2d 7, 9 (D.D.C. 2000), *quoting*, *Halkin v. Helms*, 598 F.2d 1, 5 (D.C. Cir. 1978); *See also, Huthnance v. District of Columbia*, 268 F.R.D. 120, 124 (D.D.C. 2010)(ordering *in camera* review to determine privilege); *Ascom Hasler Mailing Systems, Inc. v. United States Postal Service*, 267 F.R.D. 1, 6 (D.D.C. 2010)(Same).

**WHEREFORE**, based on all of the foregoing and the failure of defendants to meet their burden in keeping a document and material of great public interest sequestered or destroyed, Defendants' Motion must be Denied.

Plaintiffs, by their Attorneys,

/s/ David I. Schoen
David I. Schoen (DC Bar# 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama  36106
(334) 395-6611
DSchoen593@aol.com

Robert J. Tolchin (NY0088)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rjt.berkman@gmail.com

Counsel for Plaintiffs