## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, et al.,

                Plaintiffs,                Civ. No. 02-2280-RJL

       v.

THE SYRIAN ARAB REPUBLIC, et al.,

                Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL, FOR EXPANSION OF THE FACT AND EXPERT REPORT DEADLINE, AND FOR <u>RELATED RELIEF</u>

Per this Honorable Court's December 7, 2012 Order, plaintiffs submit this comprehensive motion to compel all pending fact discovery that plaintiffs require to complete meaningful discovery and effectively prepare this case for summary judgment and, if necessary, for trial. To the extent granting the relief herein requested requires an expansion of the discovery period, plaintiffs respectfully note that this is the first expansion plaintiffs have requested. Additionally, the case is not yet set for trial, defendants have already been granted an expansion to February 14 and March 18, the discovery listed above is critical to plaintiffs' case, and the reason it could not be obtained earlier is a result of defendants' transgressions, and despite plaintiffs' best efforts.

The reasons for this motion to compel are set forth in detail below. In sum, and by way of example only: Defendants produced hundreds of new Arabic documents on October 21 – *after the expert disclosure deadline,* including some of the most significant documents, concerning the mastermind of the bombing, Palestinian Authority ("PA") policeman, Raed Nazal. Defendants

have not yet produced, despite Plaintiffs cajoling, any documents about the bombing itself, other than a few documents relating to "martyr" payments to the families of the bomber and Nazal. Defendants did not produce any documents containing the crucial information in the Qalqilya GIS Memorandum (defined below), and have steadfastly refused to produce any of the information upon which it is based.  Contrary to their original representation that Ibrahim Dahbour was the author of that GIS Qalqilya Memorandum, defendants disclosed for the first time in their October 31 motion [DE 170] that Major Abu Hamid authored that allegedly privileged document and that defense counsel has had it at least since May 3, 2012.  Then defendants refused to produce Major Abu Hamid for deposition. Defendants delayed the 30(b)(6) depositions, which plaintiffs had noticed for August until September, and then defendants did not designate, and/or prepare the witnesses they did produce, on all topics. Defendants also produced Arabic documents relevant to the depositions on September 10, while the depositions were already under way. One week after those depositions concluded, in a response to a wholly unrelated interrogatory dated on the very last day of fact discovery, defendants untimely disclosed five new witnesses – some of which on their face appear to be relevant to the 30(b)(6) depositions that had just concluded – and then refused to produce them for deposition.

Plaintiffs must be permitted to complete their discovery in order to effectively prepare this case for summary judgment and, if necessary, for trial. Plaintiffs must also be afforded the opportunity to present all relevant evidence to their experts, including the evidence herein sought. Plaintiffs can accomplish both within the enlargement period already granted to defendants. There can be no justification for granting an enlargement to defendants, while denying a corresponding enlargement for plaintiffs, who have diligently pursued discovery

within the time-frame set by the Court but have been stymied by defendants' delays and gamesmanship.

All previous submissions in this case are hereby incorporated herein by reference.  Given the Court's expressed concern about the number of filings already in this case and in an effort to avoid burdening the record further, rather than attaching hereto relevant exhibits already submitted to the Court with previously filed submissions, plaintiffs endeavor herein, wherever possible, simply to refer the Court to those exhibits where they can be found on the docket in connection the previously filed submissions.

## RELEVANT CASE BACKGROUND

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, brought by U.S. citizens, and the family members and the estates of U.S. citizens – including two teenaged American girls – who were murdered or injured by a terrorist bombing carried out on Saturday night, February 16, 2002, in a packed pizzeria in the Israeli town of Karnei Shomron.  The bombing was carried out by a cell of the PFLP terrorist organization headquartered in the nearby Palestinian town of Qalqilya, located within the jurisdiction of defendant PA. The PFLP has been continuously designated by the United States government as a Foreign Terrorist Organization ("FTO") since 1997.[1]  It is well established that a defendant's provision of funding or other "material support or resources" [2] to an FTO, such as the PFLP, renders the defendant civilly liable under the ATA to American citizens killed or injured in terrorist attacks subsequently

---

[1] *See* 62 Fed.Reg. 52650 (Oct. 8, 1997).

[2] The phrase "material support or resources" is a term of art defined in 18 U.S.C. § 2339A which includes virtually every type of asset, goods or service imaginable, including financial support.

carried out by that FTO.[3]  Thus, a major factual issue in this case is the nature and extent of any "material support" which Defendants provided to the PFLP.

The suicide bomber himself was a young PFLP operative named Sadeq Hafez and, as plaintiffs subsequently discovered, the bombing was planned by Captain Raed Nazal who was both a salaried officer in the PA's security services and a leader of the PFLP cell in Qalqilya.  On April 26, 2002, Raed Nazal was killed by Israeli authorities while they were attempting to arrest him and he opened fire resisting the arrest.  Plaintiffs are in possession of documents from other sources showing that Raed Nazal continued his PFLP activities during the two plus months following the Karnei Shomron bombing and until his death.  In addition, as other 30(b)(6) testimony and documents establish, Raed Nazal was promoted to the rank of Major, posthumously, after the horrific suicide bombing at issue in this case and the PA made "martyr" payments to his family after his death.

## RELEVANT DISCOVERY BACKGROUND

### A. Plaintiffs' First RPD

On March 9, 2012, plaintiffs served defendants with a request for production ("First RPD") seeking, *inter alia*, documents "that relate to and/or reference the February 16, 2002, bombing," and documents evidencing "all payments made to and all benefits provided to Sadek

---

[3] *See, e.g. Owens v. Republic of Sudan*, 412 F. Supp.2d 99, 108 (D.D.C. 2006) (allowing or encouraging terrorist organization to operate by providing safe haven constitutes material support under the ATA); *Linde v. Arab Bank*, 384 F. Supp.2d 571 (E.D.N.Y. 2005) (provision of funds to an FTO renders the provider civilly liable under the ATA for terror attacks carried out by that FTO); *Weiss v. National Westminster Bank*, 453 F. Supp.2d 609 (E.D.N.Y. 2006) (same); *Strauss v. Credit Lyonnais*, 2006 WL 2862704 (E.D.N.Y. 2006) (same); *Goldberg v. UBS*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009) (same); *In re Chiquita Brands Intern., Inc. Alien Tort Statute and Shareholder Derivative Litigation*, 690 F.Supp.2d 1296 (S.D. Fla. 2010) (same); *Abecassis v. Wyatt*, 785 F.Supp.2d 614 (S.D. Tex. 2011).

Abdel Hafez's relatives by the PA and/or PLO at any time after February 16, 2002, in relation to, as a result of and/or due to Sadek Abdel Hafez's death." **DE 188-A** at ¶¶ 1, 4.

The sum total of defendants' document production on these topics is as follows: On June 8 and July 9, 2012 respectively, defendants produced Sadeq Hafez's 19 page martyr file from their Institute for the Care of Martyrs and Wounded and three additional pages reflecting martyr payments to Hafez's family, all in Arabic.  On September 10, 2012, defendants produced 4 pages of Arabic language documents from the PA's general intelligence ("GIS") file of Sadeq Hafez concerning a fist fight in which Hafez was involved while in vocational school. On October 21, 2012, defendants produced 5 pages of Arabic language documents from the Sadeq Hafez GIS file.  None of these GIS documents post-dated the bombing and none of the documents discussed the bombing itself. There simply must be more.

On July 9, 2012, defendants produced their sole privilege log in this case, which purports to contain a "List of Documents Withheld on the Basis of Privilege and/or Protection." **DE 188-B**. That privilege log lists only a single document – a letter dated May 8, 2001, which is described as a request for a legal opinion concerning the PA's payment of rent concerning the Qalqilya office of the PFLP.

### B.  The 30(b)(6) Depositions

Despite defendants' extremely limited document productions, cognizant of the September 19 deadline for fact discovery, on July 30, 2012 and August 2, 2012, Plaintiffs served their 30(b)(6) deposition notices (the "**Deposition Notices,**" **Exhibit A** hereto and **DE-181-A**) on the PLO and the PA.  Plaintiffs scheduled the depositions to commence on August 16, 2012 and designated a total of 19 topics for 30(b)(6) deposition testimony by the PA and 8 topics for 30(b)(6) testimony by the PLO. DE 181:6.

Unhappy with the noticed dates for the depositions, the PA sought and obtained a protective order, effectively postponing the depositions until early September, less than two weeks before the court set deadline for the close of fact discovery (September 19, 2012).[4] Defendants did not seek a protective order with respect to the substance of the 30(b)(6) notices. Instead, completely disregarding the proper procedure for handling deposition objections defendants served plaintiffs with general "objections" to Plaintiffs' 30(b)(6) Deposition Notices. DE 181-I; DE 181:6-7.

Plaintiffs were concerned that defendants might not produce a 30(b)(6) witness on all topics. Accordingly, they advised defendants of their intent to file a motion to compel. On or about August 21, 2012, before counsel traveled to Israel to take the 30(b)(6) depositions, counsel for the parties held a telephonic meet and confer with respect to plaintiffs' prospective motion to compel the depositions. At that conference, in order to stave off plaintiffs' prospective motion, defendants' counsel assured plaintiffs' counsel that defendants would present a witness on each of the designated topics. DE 181:7.

Defendants' counsel ultimately designated six witnesses for the topics included in the two 30(b)(6) notices, but did not identify these witnesses or the topics of their testimony until Plaintiffs' counsel was already in Israel. Notwithstanding their express representation on August 21, 2012, defendants did not designate any witness at all for several of the topics. In addition, after the depositions were already underway, defendants made changes to the topic designations and in some cases, modified the topics to their own formulation. While defendants' designated witnesses for many of the 30(b)(6) topics, as the depositions progressed, it became clear that they

---

[4] Defense counsel insisted unyieldingly that the Court's minute order granting their motion for protective order on scheduling meant that the depositions had to be scheduled on the schedule defense counsel unilaterally imposed.

were paying mere lip-service to counsel's pre-deposition commitment to designate a witness on every topic because even the designated witnesses were grossly unprepared.

### C.  Plaintiffs' Second RPD

Having received very few documents in response to their First RPD and no documents *at all* concerning the bombing itself (First RPD 1), on August 20, 2012, plaintiffs' served on defendants a second request for production of documents (the "Second RPD," attached hereto as **Exhibit B**) with many more detailed requests. This Second RPD contained RPD No. 104, essentially for all documents concerning Raed Nazal, the PFLP operative who masterminded the Karnei Shomron bombing while employed as a PA law enforcement officer.[5]

On September 10, 2012, in the midst of plaintiffs' 30(b)(6) depositions, defendants untimely produced additional Arabic language documents directly relevant to the depositions and some of which were responsive to plaintiffs' Second RPD, including one *8 page* Arabic language document concerning Raed Nazal, which defendants represented was relevant to the deposition of Nadime Barahme the following day.  Among other things, this document revealed that at the time of the bombing Nazal had a rank of Captain, he was promoted posthumously to Major and his family received "martyr" payments after his death due to his role in planning the Karnei Shomron bombing.  There was no lawful basis for withholding such a document until that late date. Again, it was one more document directly relevant to the whole theory of the case and to outstanding document requests, served many months earlier, back in March.  Now it was provided for the first time in the middle of depositions and only in Arabic.

Defendants did not produce any more documents until October 21, 2012, *two days after Plaintiffs' expert disclosure deadline.*  Among these late produced documents were *272 highly*

_____

[5] Of course, all documents concerning Raed Nazal were responsive to Plaintiffs' First RPD and should have been produced months earlier.

*relevant* documents, almost all from the PA's GIS files, all relating to Raed Nazal, Sadeq Hafez and other members of the PFLP cell that carried out the bombing. This untimely document production included *24 pages* of Arabic language documents on Raed Nazal.  Among other things, these documents (and others) show that the GIS maintained painstakingly detailed accounts of the PA's citizens concerning even the most insignificant events.[6] *Yet, none of the documents in the October 21 production concerns the bombing or even postdates it* (with the possible exception of a handful of documents showing "martyr" payments to Nazal's wife following his death).[7]

### D.  Defendants' Disclosure of the GIS Qaliqlya Memorandum

Since many of the documents in defendants' untimely September 10 production were illegible, plaintiffs requested clearer copies of those documents.  On September 12, 2012, at the 30(b)(6) deposition of Ibrahim Dahbour, defendants handed an envelope to plaintiffs' counsel containing the originals of the September 10 production for plaintiffs' counsel to copy.  During the course of the deposition, the parties realized that the envelope had contained a highly significant two-page document (the "GIS Qalqilya Memorandum") that had not been in the September 10 production.[8]  Defendants asserted a claim of privilege with respect to that

---

[6] For example, the Raed Nazal GIS documents contain seemingly irrelevant facts about his involvement in a family dispute concerning his sister's husband, information about his wife, including how they met and details about each of his siblings and their spouses.

[7] At the same time defendants produced 5 pages of Arabic language documents from the PA's GIS files on Sadeq Hafez.  None of these documents post-dated the bombing.  Previously, on September 10, 2012, defendants had produced 4 pages of Arabic language documents from the Sadeq Hafez GIS file, concerning a fist fight in which Hafez was involved while in vocational school.  On June 8 and July 9, 2012 respectively, defendants had produced Sadeq Hafez's 19 page martyr file from their Institute for the Care of Martyrs and Wounded and three pages reflecting martyr payments to Hafez's family, all in Arabic.  DE   at Exh. D, ¶¶ 4, 6, 10.

[8] **Exhibits C-1 and C-2** are the Arabic text of GIS Qalqilya Memorandum and an English translation thereof.  **Exhibit C-3** is the translator's certification.  Plaintiffs are filing these exhibits under

document, which is now before the Court in the context of their motion for the document's return or destruction, which plaintiffs vigorously oppose [DE 170, 188, 198].

The GIS Qalqilya Memorandum is a *purely factual account of the bomber and the bombing*, including events leading up to and following the bombing. It is the *only* document produced by defendants concerning the bombing and postdating it (with the exception of the documents concerning martyr payments referenced above) and is responsive to at least three of plaintiffs document production requests (First RPD 1 and 4 and Second RPD 104), which plaintiffs are seeking to compel herein. Among other things, the document references the close relationship between the bomber and the PA's Raed Nazal and the PFLP's Jamal al-Hindi. *See Dahbour Deposition Testimony 9/12/12* (DE 170-6) at 141:21-142:1.[9] And this is just the portion defendants chose to publicly disclose in DE 170, without explaining, of course, why a selective disclosure like those made in DE 170 and in Abu Hamid's declaration do not provide yet another basis for a waiver of their unsupportable privilege claim.

At the deposition, defendants' counsel represented that the GIS Qalqilya Memorandum had been prepared by Dahbour on or about September 10, 2012. *See* **DE 170-6** at 137:16-138:18;

---

seal in light of defendants' September 12, 2012, request under Rule 26(b)(5)(B) to sequester the document pending determination of defendants' privilege claim. Plaintiffs do not in any way concede that the document at issue is a privileged document.

[9] **DE 170-6** is a portion of the transcript of the September 12, 2012, deposition of Ibrahim Dahbour, the Deputy GIS Director in Qalqilya, who read the text of GIS Qalqilya Memorandum into the record with the agreement of defendants' counsel. Since defendants have neither asked plaintiffs to sequester the deposition transcript under Rule 26(b)(5)(B), nor even designated the transcript as "confidential" under the protective order in force in this case (and of course the 14 day window for doing so passed over 2 months ago), plaintiffs have no duty to file the deposition transcript, or the testimony therein cited in the instant memorandum, under seal. Indeed, the September 12, 2012, deposition was recorded audio-visually, and defendants have not sought any relief in respect to that recording, much less requested to sequester it. Nevertheless, out of an abundance of caution while these issues are being litigated, plaintiffs deem it advisable to and are filing the portion of the transcript with respect to which defendants' have claimed a privilege under seal as **Exhibit E**. There is no legitimate privilege claim.

139:25-140:9.  Defense counsel also conceded that the document "would appropriately be the subject of a privilege log." *Id*. at 115:20-116:18. In stark contrast to this representation, in their motion for the document's return [DE 170], defendants represent that the document was created by a Major Abu Hamid in April 2012 and came into defense counsel's possession on May 3, 2012.  *See* DE 170:3, Ex. 4 and 5.[10]  However, the GIS Qalqilya Memorandum was not listed on defendants' July 9 privilege log.[11]  Regardless of any claim of privilege with respect to the

---

[10] In his declaration filed in support of defendants' privilege motion, Major Abu Hamid states: "My final report consisted of two pages.  The Original Report included a GIS header at the top of the document and my signature on the last page.  I have reviewed another version of my report [presumably, the sequestered document] where the GIS header and my signature have been removed.  The text of both versions is the same."  DE 170-5 at ¶ 6. Plaintiffs cannot think of an innocent explanation for why there is a version of the GIS Qalqilya Memorandum lacking the GIS header and signature or for defense counsel's refusal to explain it.  Mr. Dahbour indicated, in the publicly disclosed portion of his deposition, that the so-called "privileged" document was like the other documents he had reviewed in the security files. Plaintiffs fully believe, based on its appearance, Mr. Dahbour's testimony, and all other relevant information that it is just one more improperly withheld document, just like so many others in the PA security files – withheld simply because they provide damning support for plaintiffs' case.  Defendants have used a variety of methods to unlawfully withhold such documents, including the claim, to which Mr. Dahbour put the lie unequivocally, that there are no relevant documents at all regarding Qalqilya, because the Israelis purportedly destroyed or seized them – a PA/PLO favorite, put forward by witnesses before Mr. Dahbour, but put to rest once and for all by his candor on the subject, acknowledging a fully intact archives with such files.

[11] Directly contrary to their statements on the record at the Dahbour deposition, in their reply on the privilege motion defense counsel attempts to justify the absence of the document from the July 9 privilege log by claiming that it was somehow included in a broad categorical listing of all communications and documents exchanged between defendants and their counsel after the filing of the complaint. *See* DE 198:7-8. *First*, it is well settled that a privilege log must contain sufficient detail to enable the receiving party to contest the claim of privilege.  Such a categorical listing of documents does not satisfy this requirement and, in and of itself, is grounds for waiver. *See, e.g., Zelaya v. Unicco Service Co*., 682 F. Supp.2d 28, 38-39 (D.D.C. 2010) (party failed to satisfy burden of establishing privilege where it did not provide sufficient details to support privilege claim on privilege log); *Safeco Ins. Co. of America v. M.E.S., Inc*., 2011 WL 6102014, *3-4 (E.D.N.Y. Dec. 7, 2011) (same). *Second*, according to that extremely broad language on their privilege log cited by defendants in their reply, any *document* (regardless of whether it is a communication or a source document created months or even years earlier) provided by defendants to their counsel at any time after November 18, 2002 could theoretically be the subject of a claim of privilege and *plaintiffs would never even know*.

document itself, plaintiffs certainly have a right to the underlying factual information on which the document based.

Therefore, on November 1, 2012, plaintiffs' counsel asked defense counsel to produce or identify all documents relied on by Major Hamid in preparing the GIS Qalqilya Memorandum (which were clearly responsive to plaintiffs' First RPD and should have been produced months earlier).  **Exhibit F**, email dated November 1, 2012, 8:36 am.  Outrageously, defense counsel, Charles McAleer, responded by implying that the *factual* information relied upon by Major Abu Hamid was also privileged:

> you assume without any stated basis that whatever documents or sources of information Major Hamid might have reviewed in preparing the inadvertently disclosed privileged memorandum **were non-privileged documents or sources of information**...

**Exhibit F**, email dated November 1, 2012, 7:03 pm. (emphasis added).  He categorically refused to respond to any of plaintiffs' counsel's discovery requests, *inter alia*, claiming that plaintiffs are not entitled to any of the requested information and that none of it is relevant.[12]  **Exhibit G**, email dated Nov. 1, 2012, 1:04 pm.

On November 1, 2012, plaintiffs also served defendants with a notice for Major Abu Hamid's deposition.  **Exhibit H**.  Defendants' counsel responded:

> We received the Notice of Deposition you issued to the Palestinian Authority on November 1, 2012, for the deposition of Major Abu Hamid on November 18, 2012, in the Middle East.  **Because fact discovery closed September 19, 2012**, and leaving aside whether you may even notice the PA for the individual deposition of Major Abu Hamid under the Rules, neither the Palestinian Authority nor Major Abu Hamid will be appearing for the deposition as noticed absent an order from the Court.

**Exhibit I**, email dated November 7, 2012 at 11:06 pm. (emphasis added).

### E.  Defendants' Deficient Initial Disclosures and Post-Discovery Cutoff Disclosure of 5 Directly Relevant Witnesses Known to Defendants Much Earlier

---

[12] Interestingly, one week later, defendants themselves filed the purported Arabic version of Major Hamid's declaration with the Court in a supplemental filing on November 7, 2012 [DE 174].

Defendants served their initial disclosures on October 28, 2011, but did not identify therein *any* individuals whom they "may use to support [their] claims or defenses" pursuant to Rule 26(a)(1)(A)(i). **DE 175-A**. DE 175:5. Nor did defendants supplement their initial disclosures by identifying potential witnesses at any time during the fact discovery period, which closed on September 19, 2012, pursuant to this Court's scheduling order.

On September 24, 2012, plaintiffs' counsel received by mail "Defendants' Objections and Answers to Plaintiffs' Second Set of Interrogatories (Nos. 2-12)" and "Defendants' Objections and Responses to Plaintiffs' Second Request for Production of Documents." Defendants' Responses and Answers were accompanied by a September 19, 2012 cover letter from defendants' counsel (also received by plaintiffs on September 24, 2012), which stated, *inter alia*, that the persons listed in their response to plaintiffs' fourth interrogatory were deemed supplemental disclosures pursuant to Rule 26(a)(1) and (e).  DE 175:6.  Defendants' response to plaintiffs' fourth interrogatory on a completely unrelated topic and not asking for the identification of any witnesses listed, *inter alia*, the names of five senior PA officers who had clearly been known to defendants from day one and whose names had not been disclosed in the entire one year discovery period. **DE 175-G** at 17. By defendants' own admission, some of these witnesses were directly relevant to plaintiffs' 30(b)(6) depositions, which had concluded approximately one week earlier.  DE 191:17-22.

Immediately upon receiving this disclosure, in an attempt to minimize any prejudice, plaintiffs served defendants with a notice for the depositions of these five individuals, but defendants responded that they would not comply with the notices on the grounds that fact discovery was already closed.  DE 191:9.  *See* deposition notice and email, **DE 175-I and DE 175-J**. It should not be lost on the Court that the position taken by defendants – that plaintiffs

cannot depose witnesses disclosed *after* the discovery deadline *because* the discovery deadline had passed – is unreasonable, unprofessional and an obstruction of justice and fairness.

Plaintiffs also note that Defendants' Objections and Answers to Plaintiffs' Second Set of Interrogatories (Nos. 2-12) (**DE 175-G**), as with their responses to plaintiffs first set of interrogatories (**Exhibit J**) were not signed and verified as required by the Federal Rules.

## ARGUMENT

### A.  The Overwhelming National Interests of Discovery in ATA Cases

When this Court set aside the defendants' default judgment, it did so stressing the importance of and the D.C. Circuit's "*clear* preference" for "resolution on the merits," and that "this case be resolved on the facts." (DE 126 at 4, 5, 11) (Emphasis in original).)[13] In a materially-similar case, Judge Gladys Kessler wrote the following:

> Given the far-reaching implications of a public airing of the evidence, the Court concludes that it will serve the interest of many segments of the public to reach the truth and set the record straight…. [T]he Court concludes that there is a strong public interest in permitting the parties' claims to see the light of day and face the oft-time harsh light of trial.

*Gilmore*, 675 F.Supp.2d at 113 (internal quotation marks omitted) (Quoting *Knox*, 248 F.R.D. 420 at 431-32).

The *Knox* Court outlined some of the public interests upon which Judge Kessler relied. They include the public interest in learning "[w]hether… high ranking PLO and PA officials harbored terrorism and murder as official policy"; and "whether [Defendants] personally issued

---

[13] This Court is joined by other federal courts that, writing under similar circumstances, expressed a strong interest in full and complete adjudication of the facts. *See, e.g., Gilmore v. Palestinian Interim Self-Government Authority*, 675 F.Supp.2d 104, 113 (D.D.C. 2009); *Knox v. The Palestine Liberation Organization*, 248 F.R.D. 420, 431-32 (S.D.N.Y. 2008); *Saperstein v. Palestinian Authority*, 2008 WL 4467535 at *12, *15 (S.D. Fla. Sept. 29, 2008).

the orders, knew of the plans or provided financing for the acts of murder they stand charged with having committed in this action and others like it." *Knox*, 248 F.R.D. at 431.

Plaintiffs emphasize that this action is brought under the civil provisions of the Antiterrorism Act. Resolution on the merits is critical in light of the "extremely strong [federal] interest" in using Congressional enactments in order to effectively prosecute the war on terror. *Estate of Ungar v. Palestinian Auth.*, 715 F.Supp.2d 253, 268 (D.R.I. 2010). As the courts of this Circuit and others have found – the prosecution of ATA cases serves not only Plaintiffs' personal interest, but the national interest of the United States:

> The legislative history of the ATA … reveal[s] this country's profound and compelling interest in combating terrorism at every level …
>
> Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism <u>vindicate the national and international public interest</u>.

*Weiss v. National Westminster Bank*, 242 F.R.D. 33, 46, 50 (E.D.N.Y. 2007) (emphasis added). *See also e.g. Ungar v. Palestinian Authority*, 715 F.Supp.2d 253, 268 (D.R.I. 2010) ("[T]here is an extremely strong interest in enforcing judgments … entered under the civil provisions of the Antiterrorism Act ("ATA")").

Said differently, "the United States has a profound and compelling interest in combating terrorism at every level." *Wultz v. Bank of China Ltd.*, 811 F.Supp.2d 841, 847 (S.D.N.Y. 2011) (reversed on other grounds). Therefore, courts have tended to take a liberal approach to allowing discovery in ATA actions.[14] In her recent October 29, 2012, Southern District of New York

---

[14] *See e.g. Linde v. Arab Bank*, 269 F.R.D. 186 (E.D.N.Y. 2010); *Weiss*, 242 F.R.D. at 55-56; *Strauss v. Credit Lyonnais*, 242 F.R.D. 199 (E.D.N.Y. 2007); *Strauss v. Credit Lyonnais*, 249 F.R.D. 429 (E.D.N.Y. 2008).

Judge Shira Scheindlin, in the matter of *Wultz, et. al. v. Bank of Chine Ltd., et. al.*, Case No.11 Civ. 1266 (SAS), at 15 ruled:

> But in light of the significant U.S. interest in eliminating sources of funding for international terrorism, and the other factors discussed below, the law governing discovery disputes in this case must ultimately be the broad discovery rules of the Federal Rules of Civil Procedure;

The national interest in ATA cases, and the corresponding liberal approach to allowing full discovery in these cases, demand that Plaintiffs be given the opportunity to fully and meaningfully complete discovery herein.

Defendants committed to cooperate in discovery in this case if the default, entered years before, were to be set aside. Instead, they have frustrated or obstructed discovery at every possible juncture and have withheld or delayed production of the most directly relevant and critically important information and documents that go right to the heart of the case – all contrary to their commitments in getting the default set aside and in contravention of the plaintiffs' lawful rights and our country's recognized national interests in full and broad discovery in actions like this arising from horrific acts of terrorism which brazenly target the lives of American citizens, in this case tragically killing two wonderful little girls and forever wounding others.

**B.  Plaintiffs Seek an Order Compelling the Following Depositions and Documents Based on Defendants Belated and Untimely Disclosures and Document Productions**

**1.  The Court Should Compel the Deposition of Major Abu Hamid**

Prior to defendants' October 31, 2012 motion [DE 170] for the return of the GIS Qalqilya Memorandum, plaintiffs did not even know of the existence of Major Abu Hamid, much less that he had knowledge of critical facts relevant to this case. In fact, defendants' story in their motion about the identity of that document's author and when it was created is completely different from (and irreconcilable with) the story they told on the record at the Dahbour deposition. The issues

relating to this document have been fully briefed and will only be summarized herein. Plaintiffs direct the Court to DE 188 and 201, which are incorporated herein be reference.[15]

According to defendants' current version of events, Major Abu Hamid is the author of the GIS Qalqilya Memorandum, which contains critical factual information responsive to at least three of plaintiffs' discovery requests, two of which have been outstanding since March 9, 2012.[16] The GIS Qalqilya Memorandum is an extremely important document for at least two reasons:

*First*, it is the only substantive document about the bombing, postdating the bombing, produced by defendants.  Aside from a limited number of documents concerning martyr payments, defendants did not produce a single document that postdates the bombing.  This is particularly troubling to plaintiffs because Dahbour testified that all of the facts in the GIS Qalqilya Memorandum were otherwise available in the PA's general intelligence ("GIS") files. **DE 170-6** at 141:18-20.

---

[15] On the record at the deposition, with plenty of opportunities to verify the facts, defendants' lead counsel, Mr. Hibey, represented that Dahbour was the author of the GIS Qalqilya Memorandum and that the document had come into defense counsel's possession on or about September 10, 2012.  More than six weeks later, in their motion for the return of that document [DE 170], defendants asserted that the document was created by a Major Abu Hamid around April 2012 and that it came into defense counsel's possession around May 3, 2012.  On these facts, plaintiffs are at a complete loss as to why the document was not disclosed on defendants' July 9, 2012 privilege log and instead, defendants intentionally withheld from them not only the existence of the document itself, but its critical underlying facts.

[16] Specifically, requests no. 1 and 4 of Plaintiffs' First Request to Produce Documents and Things served on March 9, 2012 ("First RPD") seeking, *inter alia*, documents "that relate to and/or reference the February 16, 2002, bombing," and documents evidencing "all payments made to and all benefits provided to Sadek Abdel Hafez's relatives by the PA and/or PLO at any time after February 16, 2002, in relation to, as a result of and/or due to Sadek Abdel Hafez's death."; and request no. 104 of Plaintiffs' Second Request to Produce Documents and Things served on August 20, 2012 ("Second RPD") for all documents concerning Raed Nazal, the mastermind of the Karnei Shomron bombing.

*Second*, the GIS Qalqilya Memorandum contains crucial facts concerning the terrorist bomber during the time leading up to and after the bombing, that do not appear in any other document produced by defendants in this case.   These facts include how the bomber was recruited to the PFLP and his close association with the PA's Raed Nazal (who masterminded the bombing), the PFLP's Jamal al-Hindi, and the photographer Lafi Nasura, who documented their relationship before the bombing.  *Id.* at 141:21-142:1. In this regard, Dahbour testified that he had reviewed the entire GIS files for, *inter alia*, the bomber, Sadeq Hafez and Raed Nazal. According to Dahbour, the Raed Nazal file was three and a half to four centimeters thick. *Dahbour Deposition Testimony 9/12/12,* **Exhibit D** at 50:24-52:2. *See also* **Exhibit K**, still photograph extracted from the video recording of Dahbour indicating the size of Raed Mahdi's GIS file with his fingers. Yet, defendants produced only *24 pages* of documents from Raed Nazal's GIS file and only *9 pages* from the Sadeq Hafez GIS file, all of which were produced only on October 21, 2012 (two days after plaintiffs' expert disclosures deadline). Defendants did not produce *any* documents that post date the bombing (with the possible exception of some documents concerning martyr payments).[17]

Based on these developments, plaintiffs noticed the deposition of Major Abu Hamid, but ironically, defendants refused to produce him on the grounds that fact discovery was closed. [See **Exhibits F-I**]. Therefore, plaintiffs seek an order from the Court compelling that deposition.

2. **The Court Should Compel Defendants to Comply with Plaintiffs' Outstanding Discovery Requests**

---

[17] The only other document produced by defendants concerning Raed Nazal was an *8 page* Arabic language document from the files of PA's military finance department produced in the midst of the 30(b)(6) depositions, which revealed that at the time of the bombing Nazal had a rank of Captain, he was promoted posthumously to Major and his family received "martyr" payments after his death due to his role in planning the Karnei Shomron bombing.

Plaintiffs' requests for all documents concerning the Karnei Shomron bombing and all payments made by defendants to Sadeq Hafez's relatives due to his death have been outstanding since March 9, 2012.   **DE 188-A** at ¶¶ 1, 4.   Clearly, defendants have documents responsive to these requests that have not been produced, as evidenced by the existence of the GIS Qalqilya Memorandum.   Plaintiffs have already established the significance of the information in that memorandum for this case, which at bottom is about defendants' "material support" for the terrorists that carried out the Karnei Shomron bombing, including Sadeq Hafez and the PA's Raed Nazal.

Even if that memorandum itself were ultimately found to be privileged, defendants cannot credibly or in good faith argue that the information contained in it is privileged. *Dahbour, defendants own 30(b)(6) witness, testified that the facts reported in the memorandum could all be found in the GIS files*. **DE 170-6** at 141:18-20. Those files have been known to defendants and in their possession, custody and control at all times and certainly no later than April 2012, when the GIS Qalqilya Memorandum was prepared.   In addition, those files are not privileged and, indeed, defendants have already produced a limited number of documents from those files to plaintiffs in this case.   Significantly, however, none of the GIS documents produced by defendants to date concern the facts recounted in the GIS Qalqilya Memorandum.   To the extent defendants wanted to assert a privilege with respect to any such underlying files, they should have done so on a privilege log long ago.

The fact that -- (i) plaintiffs only learned of the GIS Qalqilya Memorandum at the very end of the fact discovery period due to defendants' unintentional (but fortuitous and appropriate) disclosure at the Dahbour deposition and (ii) defendants chose to identify Major Abu Hamid and the facts in his declaration only after the official close of fact and expert discovery -- do not

diminish in any way plaintiffs' basic rights to obtain the underlying factual information. Defendants' categorical refusal to cooperate with plaintiffs' good faith discovery efforts in this regard, as reflected in the November 1-7 email correspondence (**Exhibits F-I**), is cynical and unprofessional at best and a flagrant abuse of discovery at worst.  In addition, plaintiffs have the right to obtain the original non-laundered version of the GIS Qalqilya Memorandum with the GIS header and signature for use as evidence in this case.  It bears emphasizing that *compliance by defendants with plaintiffs' discovery requests, assuming defendants provide the underlying facts contained in the GIS Qalqilya Memorandum, would moot the need for the Court to make a determination as to whether either of the versions of the GIS Qalqilya Memorandum are, in fact, privileged*.

Likewise, the complete GIS files for Raed Nazal and Sadeq Hafez are *relevant, responsive to plaintiffs' document requests and must be produced*.  Quite simply, it is not believable that the GIS file for Raed Mahdi, a known PFLP activist who had served time in Israeli prison, contains only 24 pages, particularly when Dahbour testified that he had personally reviewed that GIS file in preparation for his September 12 deposition and that it was "three and a half to four centimeters thick."  Defendants' belated, self-serving e-mail claim that Dahbour was referring to the "standard-issue box" in which the file is kept (whatever that means) and not the file itself is nothing more than a thinly veiled attempt to justify their willful nonproduction of documents. **Exhibit L.**  Moreover, it defies logic that the PA's GIS files, which contain detailed accounts of Raed Mahdi's involvement in a family dispute and Sadeq Hafez's vocational school fist fight, contain no documents concerning a major terrorist bombing!

Therefore, Plaintiffs ask the Court to order defendants comply with all of the discovery sought herein forthwith, including all documents concerning the Karnei Shomron bombing and all payments made by defendants to Sadeq Hafez's relatives due to his death.

### 3.   The Court Should Compel the Deposition of Jamal al-Hindi

Prior to plaintiffs' receipt of the GIS Qalqilya Memorandum, plaintiffs were completely unaware of the close relationship between the bomber and the PFLP's Jamal al-Hindi.  Although defendants have maintained their claim of privilege with respect to that document, they freely disclosed the close relationship between Sadeq Hafez and al-Hindi in their October 31 submission, filed on ECF.  *See* DE 170-6 at 141:22-24.  Subsequently, plaintiffs confirmed that al-Hindi is serving time in Israeli prison with ten years left on his sentence.   DE 197:4. Therefore, they have filed a motion to take his deposition pursuant to the Hague Convention [DE 197].   It is clear from the GIS Qalqilya Memorandum that Hindi possesses highly relevant knowledge concerning the bomber and the bombing.  Hindi's deposition is crucial, particularly because of defendants' refusal to provide any of the highly probative facts underlying the GIS Qalqilya Memorandum.  The need for Al-Hindi's depositions and legal arguments are made fully in DE 197, which is incorporated herein by reference.

Based on past experience, and the recent experience of the plaintiffs in *Klieman v. Palestinian Authority*, Civ. No. 04-01173(PLF)(JMF)(D.D.C.), in which they were able to schedule Hague depositions in less than two months [DE 197:3], plaintiffs are confident they will be able to schedule Hindi's deposition by January 31, 2013 if the Court grants permission imminently, and certainly within the enlargement period already granted to defendants. However, plaintiffs commit that if they are allowed to start the process forthwith and are not able

to schedule al-Hindi's deposition within the expansion time frame granted to plaintiffs, they will

not seek an enlargement of the deadlines to do so.

### C. **Plaintiffs Seek Sanctions, or in the Alternative, an Order Compelling Defendants to Produce a 30(b)(6) Designee on Topics for Which Either no Witness was Designated or the Designee was not Prepared**

#### 1. Defendants Were Required to Designate a Knowledgeable and Fully Prepared Witness For Each 30(b)(b)(6) Topic

Having failed to seek, much less obtain a protective order with respect to any of the

30(b)(6) topics, defendants have waived any objections thereto.   Plaintiffs refer to and

incorporate all of their arguments in this regard in their Motion to Compel and for Sanctions at

DE 181:12-15.  Plaintiffs have fully briefed the issues in this section, which are summarized

herein, in DE 181, which is incorporated in its entirety herein by reference.

Corporate bodies may be subpoenaed pursuant to Rule 30(b)(6), which sets forth the

duties of the party deposed, in relevant part, as follows:

> The named organization ***must then designate one or more*** officers, directors or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify…   The persons designated ***must testify about information known or reasonably available to the organization***.

Fed. R. Civ. P. 30(b)(6) (emphasis added).  Thus, according to this Rule and as discussed below,

the subpoenaed party has a duty to designate a witness for each noticed topic.  Moreover, such

designee must be fully prepared to give complete and binding answers on behalf of the

corporation with respect to his/her topics, including information not within his/her personal

knowledge. *See e.g.*, *Great American Ins. Co. of New York v. Vegas Construction Company*, 251

F.R.D. 534, 538-40 (D. Nev. 2008); *Spicer v. Universal Forest Prods.*, 2008 U.S. Dist. LEXIS 1254, *10-11 (D.W.V. Oct. 1, 2008). [18]

This duty to prepare includes requiring the "designated representative to review all matters known or reasonably available to the corporation in preparation for the 30(b)(6) deposition." *Ace USA v. Union Pacific Railroad Co*., 2011 U.S. Dist. LEXIS 80793 (D. Kan. July 25, 2011); *Spicer,* 2008 U.S. Dist. LEXIS 1254 at *11.  In discussing the duties of the corporation pursuant to Rule 30(b)(6), the *Myrdal* court (Lamberth, J.) explained:

> The underlying purpose of *Rule 30(b)(6)* is to prevent bandying, the practice in which people are deposed in turn but each disclaims knowledge of the facts that are clearly known to persons in the organization and thereby to the organization itself.

*Myrdal*, 248 F.R.D. at 317 (citing *Fed. R. Civ. P. 30(b)(6)* Advisory Committee Notes, 1970 Amendment) (quotation marks omitted).

Though Plaintiffs are not seeking monetary sanctions, it is important to note that the failure to produce a fully prepared 30(b)(6) witness is grounds for sanctions under Rule 37(d), particularly monetary sanctions, which are mandated in the rule itself.[19] Other types of sanctions

---

[18] *See also, e.g., Myrdal v. District of* Columbia, 248 F.R.D. 315, 317 (D.D.C. 2008) (discussing obligations of corporation pursuant to Rule 30(b)(6), *inter alia*, to produce knowledgeable witnesses and to prepare them); In *re Vitamins Antitrust Litig.,* 216 F.R.D. 168, 172 (D.D.C. 2003) ("Bioproducts is obligated to produce one or more *30(b)(6)* witnesses who were thoroughly educated about the noticed deposition topics with respect to any and all facts known to Bioproducts or its counsel"); *Coryn Group II, LLC v. O.C. Seacrets, Inc.*, 265 F.R.D. 235, 238 (D.Md. 2010) ("[T]he corporation is expected to *create* a witness or witnesses with responsive knowledge, and in doing so must make a good faith effort to find out the relevant facts – to collect information, review documents, and interview employees with personal knowledge.") (quotation marks omitted); *Function Media, L.L.C. v. Google, Inc.*, 2010 WL 276093 at *3 (E.D.Tex. 2010) (noting the "obligation to educate a witness on the noticed 30(b)(6) topic.") (emphasis added).

[19] *See, e.g., Vitamins*, 216 F.R.D. at 174 (awarding reasonable fees associated with preparing sanctions motion pursuant to Rule 37(d)); *Great American*, 251 F.R.D. at 542 (awarding reasonable attorney's fees and costs associated with taking deposition and filing sanctions motion); *Coryn Group II*, 265 F.R.D. at 240 (awarding costs associated with reconvening depositions, including travel and accommodation);

may also be warranted where a 30(b)(6) witness lacks knowledge and/or is unprepared with respect to his designated subject areas.  See, e.g., *Aldridge v. Lake County Sheriff's Office*, 2012 U.S. Dist. LEXIS 102514, *16 (N.D. Ill. July 24, 2012) (sanctions included, *inter alia*, limiting defendant to answers testified at 30(b)(6) depositions and precluding defendant from taking position at trial or from calling other witnesses on issues where no testimony was provided); *Spicer*, 2008 U.S. Dist. LEXIS 1254 at *23 (striking defense where 30(b)(6) witness had no information on that topic and plaintiff was thus unable to probe that defense).

### 2. Plaintiffs Seek to Compel the Following 30(b)(6) Depositions

#### (a) PA 30(b)(6) Topic 10 (Raed Nazal)

Since Raed Nazzal, the mastermind of the Karnei Shomron attack on behalf of the PFLP, was a PA law enforcement officer <u>at the very same time that he was planning the Karnei Shomron attack</u> and subsequent to it, Plaintiffs noticed a 30(b)(6) topic to the PA for all details concerning his employment by the PA.

> **PA Notice Topic 10**: The full details of Raed Nazal's employment by the PA at any time between September 13, 1994 and the date of his death, including without limitation: (i) the nature and title of all jobs and/or positions held by Nazal in the PA; (ii) Nazal's responsibilities, duties, authorities and/or privileges in filling such jobs and/or positions; and (iii) Nazal's remuneration and/or compensation for filling such jobs and/or positions.

Defendants designated Nadime Barahme to testify on this topic and on September 10, 2012, the night before Barahme's deposition, Defendants produced an 8 page Arabic language document concerning Nazal about which they claimed Barahme would be able to testify.  However, Barahme had never seen that document before:

> Q.   You believe this is all Mr. Nazzal's file, all
> of these documents relate to Mr. Ra'ed Nazzal; correct?
> A.   As is written in it.

---

*Spicer*, 2008 U.S. Dist. LEXIS 1254 at *22-23 (awarding fees associated with, inter alia, taking depositions of unprepared witnesses and filing and arguing sanctions motion).

> Q.  Okay.  Have you ever seen documents that look
> like these before?
> A.  No.

*Barahme Deposition Testimony 9/11/12,* attached hereto as **Exhibit M** at *109:14-19.*  All Barahme was able to do was confirm the contents of the document.  *Id. at 107:1-125:16.*

In addition, Barahme's testimony concerning that document directly contradicts defendants' response to plaintiffs' third interrogatory.  Barahme testified that Nazal was posted for a short period at the command in Jericho and then at the general headquarters for the Northern Governorates.  **Exhibit M** at 112:6-20.  According to Barahme, while at the general headquarters, Nazal reported to work but he was not assigned any tasks. *Id.* at 112, 113-113:5.  By contrast, in their response to plaintiffs' third interrogatory, defendants claim that Nazal was employed by the PA but never even reported to work. **DE 175-G** at 15.  Plaintiffs are entitled to test this contradiction.

Defendants also purported to designate Raed Taha Amayra (legal advisor to the PSS in the West Bank and supervisor of interrogation in the West Bank) and Ibrahim Dahbour on limited aspects of topic 10 related to security.  **Exhibit 170-6** at 9:17-10:8*; Amayra Deposition Testimony 9/10/12,* attached hereto as **Exhibit N,** at 6:15-20.  While Amayra and Dahbour testified generally about the PA's policy of hiring former detainees in its security apparatus purportedly to "rehabilitate" them, neither were able to provide any details concerning Nazzal's employment with the PA.  **Exhibit D** at *53:6-16;* **Exhibit N** at *80:16-81:15.*[20]

---

[20]  In this regard, plaintiffs note that in their ham handed supplementation of their Initial Disclosures in a response to an unrelated interrogatory dated September 19, 2010 (the very last day of fact discovery), defendants identified another witness - Iyad al-Aqra - a PSS employee in Qalqilya during the relevant time period with knowledge concerning Raed Nazal.

According to this testimony by Dahbour and Amayra and defendants' response to plaintiffs' third interrogatory, it appears that defendants contend that hiring Raed Nazal, a known PFLP terrorist, into its law enforcement services, was part of a plan purportedly (and misguidedly) aimed at rehabilitating unrepentant terrorists, who maintained their terrorist ties and associations.   This is developed and supported in greater detail in plaintiffs sealed submission, filed as DE 187-7; but since it is sealed, based on a "confidentiality" designation used broadly by defendants on document they finally produce, no further details will be publicly provided here.   Plaintiffs commend the Court's attention to DE 187-7, the Declaration describing these matters and specifically Nazal's known history and activities.

Clearly, Raed Nazal is a crucial figure in this case.   The fact that he was a PA law enforcement officer at the same time that he planned the Karnei Shomron bombing on behalf of the PFLP is extremely damaging to the defendants.   He is also referred to as one of the bomber's close associates in a publicly disclosed portion of the GIS Qalqilya Memorandum with respect to which defendants are asserting a privilege. As discussed above, defendants have produced very few documents concerning Raed Nazal – only 32 pages all together and only 24 of those pages from the PA's GIS file, which Dahbour testified was three and a half to four centimeters thick. Significantly, none of the GIS documents on Raed Nazal concerns the bombing.

Particularly since plaintiffs noticed a 30(b)(6) topic on Raed Nazal, the PA did not prepare its designee on this topic, its own interrogatory response contradicts that designee's testimony, the PA produced very few documents concerning Raed Nazal – none of which even mentions the bombing or postdates it – and the PA is claiming privilege with respect to the only document mentioning Raed Nazal in connection with the bomber and the bombing, plaintiffs ask

the Court to direct defendants to produce a knowledgeable and fully prepared witness to testify in their 30(b)(6) topic 10.

### (b) PA/PLO 30(b)(6) Notice Topics 1 and 2

Since Plaintiffs' claims for damages based on the provision of material support and resources by the PA and the PLO to the PFLP - a designated FTO since 1997 - are at the heart of this lawsuit, Plaintiffs designated 30(b)(6) topics in that regard both for the PA and the PLO.

> **PA/PLO Notice Topic 1**: The full details of all provision of material support or resources by the PA/PLO (including without limitation the PNF) to the Popular Front for the Liberation of Palestine ("**PFLP**") between September 13, 1994 and February 16, 2002.

> **PA/PLO Notice Topic 2**: The full details of all provision of material support or resources by the PA/PLO (including without limitation the PNF)  to the PFLP between February 16, 2002 and today.

The PA designee for these topics was Nadime Barahme (PA topics 1 and 2), a lawyer who is currently head of the PA Lands Authority and previously served as legal counsel for the Ministry of Finance.  The PLO's designee for these topics was Yasser Shaqbu'a (PLO topics 1 and 2), Manager of Public Accounts at the Palestine National Fund ("**PNF**").   Neither witness was adequately prepared with respect to either of these topics.

At the outset, Barahme testified that he had not even been informed in advance of the subjects of his testimony.  **Exhibit M** *at 19:11-16*.  He further testified that his preparation for the deposition consisted of two meetings with attorneys, review of <u>one</u> document – the rent contract for the PFLP's Qalqilya office (the "**PFLP Office Lease**") – and one telephone conversation with the controller of accounts at the Ministry of Finance concerning that one document.  *Id. at 20:5-18; 21:25-23:12; 24:14-25:2*.

Barahme then admitted that any steps he had taken to verify whether the PA had made actual payments to the PFLP could not possibly have been sufficient because the computer only

lists payments by the recipient's name, *e.g.*, the name of the landlord on the rent contract as opposed to the name of the organization for whose benefit the payment was made.  *Id. at 28:7-18; 48:5-49:8*.  Thus, to the extent the controller conducted a computer search for PFLP transfers, as Barahme claimed she had done (*Id. at 47:18-48:4*), such a search simply could not produce responsive results.  Moreover, Barahme expressly testified that he did not know about the PA's funding of other PFLP offices in other towns.  *Id. at  28:14-18; 48:5-14.*  Tellingly, on September 19, one week after the last 30(b)(6) deposition, Defendants belatedly identified a witness - Mahmoud Noful - who purportedly "possesses knowledge concerning certain properties used by the PFLP in the West Bank at certain periods of time", but they refused to allow his deposition on the grounds that fact discovery was already closed.

In addition, the testimony of Barahme and Sahqbu'a concerning payments to the PFLP was contradictory.  While Barahme admitted that the PA pays expenses and salaries for PLO factions, including the PFLP, and their members, he was unable to respond more specifically to questions on that subject, claiming that such payments are within the realm of the PNF, not the PA Ministry of Finance.  *Id. at 52:19-54:18.*  In contrast, Shaqbu'a claimed that the PNF does not pay and has never paid salaries or expenses to PLO executive committee members (with the exception of the late Tawfik Ahud) and that his search for such payments yielded only some limited expenses the PNF had paid for Abdel Rahim Malouh, the PFLP representative on the PLO Executive Committee, while Malouh was living in Jordan.  *Shaqbu'a Deposition Testimony 9/12/12,* attached hereto as **Exhibit O,** *at 38:15-40:9.*  Going around in circles, Shaqbu'a also testified that except for small offices for each PLO executive committee member which the PNF has funded since 2009, PLO expenses within the PA are paid for by the PA Ministry of Finance, not the PNF.  *Id. at 36:18-37:21.*

Shaqbu'a admitted that the PLO has around 100 bank accounts all around the world, in each country where it has a diplomatic mission. *Id. at 28:21-29:19*. He was unable to answer questions about the total amount of money the PNF received from the PA in any particular year, stating that the only information he had with him at the deposition related to the PNF's account in Amman. *Id. at 47:12-51:8; 54:10-23*.

According to Shaqbu'a, the only steps he took to prepare for the deposition were:

A: I received the names of two institutions and nine persons and I checked the records of the PNF on any -- about financial payments – about financial payments carried to out to these two institutions and these nine individuals.

*Id. at 57:17-23*. Other than Ahmad Saadat, Abdel Rahim Malouh and Abu Ali Mustafa he was unable to readily recall the names of the individuals. *Id. at 58:7-12*. Not surprisingly, he testified that he found no transfers from the PNF to any of those institutions or individuals other than some expense payments for Malouh. *Id. at 71:8-73:7; 74:6-10*. However, he later admitted that his searches did not cover even all PNF files because he did not have access to PNF records located in other countries:

Q.  BY MR. SCHOEN:  Do you have access to conduct a search for all of the PLO accounts all around the world?
A.  Yes.
Q.  How do you conduct a search of the PLO bank accounts –
A.  I'm sorry.  What do you mean, having access into a bank account?
Q.  The PLO has a bank account in Indonesia, for example?
A.  Of course not.
Q.  Oh.  The PLO doesn't have a bank account in Indonesia?
A.  Yes, it has.  But I have no ability to access it.
Q.  And that would be the same answer for PLO bank accounts in all of the other countries in which the PL maintains a bank account?
A.  Yes.
*Id. at 79:1-20*.

Moreover, Plaintiffs have no way of knowing whether the list of names searched by Shaqbu'a was comprehensive, particularly in light of Barahme's testimony that transfers are not listed according to the ultimate beneficiary, but according to the actual transferee.

Far from avoiding the bandying that Rule 30(b)(6) is supposed to prevent, the PA's designation of Barahme and Shaqbu'a accomplished just the opposite. Neither was able to provide coherent testimony concerning transfers of funds or other "material support" by either the PA or the PLO to the PFLP.

Therefore, Defendants did not produce witnesses with knowledge of Topics 1 and 2, as required by Rule 30(b)(6). The topics are critical to Plaintiffs' case and Plaintiffs must be permitted a meaningful deposition or depositions in their regard.

### (c) PA 30(b)(6) Topics 17 and 19 and PLO Notice Topic 8

In response to defendants' extremely limited document productions in this case and their claim raised as early as October 28, 2011 in their Rule 26 Initial Disclosures [DE 175-A] that relevant documents had been destroyed (a theme falsely repeated at the 30(b)(6) depositions), plaintiffs noticed the following related topics.

> **PA Notice Topic 17**: If the PA contends that any documents or information responsive to any discovery request served by plaintiffs in this action have been lost, destroyed, or removed from the PA's possession, custody, or control since the date of the filing of this action, the full identifying details of any and all such documents or information, and the full details of when and how such documents or information were lost, destroyed, or removed from the possession, custody, or control of the PA.

> **PA Notice Topic 19**: The full details of any and all searches conducted by the PA for documents and information responsive to each of the discovery requests served by plaintiffs on the PA in this action (including, without limitation, and all searches conducted by the PA for information responsive to the topics listed in the instant notice of deposition).

> **PLO Notice Topic 8**: The full details of any and all searches conducted by the PLO for documents and information responsive to each of the discovery requests served by plaintiffs on the PLO in this action (including, without limitation, and all searches

conducted by the PLO for information responsive to the topics listed in the instant notice of deposition).

In their Initial Disclosures, Defendants listed as the subject areas for those individuals likely to have discoverable information, information concerning the "removal and/or destruction" of records by the IDF.[21]  This claim concerning the loss of documents has been raised repeatedly by Defendants as an excuse for their paltry document productions.  Indeed, some of the 30(b)(6) witnesses relied on this claim to excuse their utter lack of knowledge about their designated topics.[22]  This claim, however, has been proven false both by Dahbour's testimony concerning the GIS files, discussed *supra*, and in other contexts where Defendants have managed to locate PA files from the same time period that support their arguments.[23]  In addition, defendants' claim of privilege with respect to the GIS Qalqilya Memorandum and their refusal to provide any of its underlying facts magnifies the significance of these topics.  If defendants are going to take the position that they have no documents concerning the bombing itself or postdating it, Plaintiffs are entitled to know what searches they have conducted and the

---

[21] Plaintiffs also note that Defendants did not identify any individuals likely to have discoverable information by name, but instead listed generally "representative" of four different PA government offices and the designated subject area for each of those "representatives" was identical.  Indeed, the first time defendants identified any witnesses pursuant to Rule 26(a)(1) was in response to a wholly unrelated topic dated the very last day of fact discovery.

[22] However, this claim that all documents from the relevant time period were destroyed has been proven false in multiple contexts, most recently at the 30(b)(6) deposition of Ibrahim Dahbour who admitted to the existence of PA General Intelligence files on all of the individuals relevant to this case.  *Dahbour Deposition Testimony 9/12/12 at 56:21-58:1,* attached hereto as **Exhibit D**.

[23] Several months ago, Plaintiffs' counsel learned that in a civil suit arising from a different terrorist attack during the same time period as the Karnei Shomron attack, currently pending against the PA and PLO in an Israeli court, *Goldman et al. v. PA et al.,* Civ. No. 1137/05 (Tel-Aviv District Court), the PA and PLO submitted a copy of an official August 2001 request to the PA from the Israeli government to arrest a number of terrorists. Defendants PA and PLO submitted that Israeli request to the *Goldman* court because it purportedly contains a handwritten notation from Yasser Arafat to arrest the terrorists listed therein (which Defendants present as evidence that they opposed terrorism).

details of their claim that documents were destroyed by the Israelis. Defendants did not designate any witness with respect to PA topic 17.[24]

The witnesses designated by defendants for PA topic 19 (Nadime Barahme) and PLO topic 8 (Yasser Shaqbua) were not prepared. Barahme testified that he had no knowledge of such discovery requests (**Exhibit M** at *55:5-57:6; 102:11-103:3*) and, as noted above, Shaqbu'a conducted only limited searches of PLO records. Defendants' failure to produce a knowledgeable witness on these topics is prejudicial to Plaintiffs, particularly because they have produced only small numbers of documents while maintaining that relevant documents were destroyed by the Israelis. Nevertheless, plaintiffs are willing to forgo the 30(b)(6) depositions on these topics if the Court grants plaintiffs' request for a deposition of Major Abu Hamid, provided that he discloses his sources for the GIS Qalqilya Memorandum.

### (d) PA 30(b)(6) Topic 18

PA 30(b)(6) topic 18 is a critically important topic designed to require the production of custodians to provide necessary foundational testimony for many of Plaintiffs' evidentiary submissions in connection with a motion for summary judgment and trial, if necessary.

> **PA Notice Topic 18**: In respect of all documents produced or disclosed by the PA in this action prior to the deposition: (i) when and how the document produced or disclosed came into the possession, custody or control of the PA, the locations in which the document was kept and/or located since it came into the possession, custody or control of the PA, and the identities, titles and positions of all custodians of the document since it came into the possession, custody, or control of the PA; (ii) whether the document produced or disclosed is an authentic copy of an original document; (iii) when and how such original document came into the possession, custody or control of the PA; (iv) the date and place that such original document was created and/or generated; (v) the circumstances in which and reasons that such original document was created and/or

---

[24] Please note DE 181: 17-21, where plaintiffs make the related argument that defendants had an obligation to preserve all of the documents plaintiffs seek as of the date of the February, 2002 bombing. Their inability to produce a witness to explain and the nature and extent of any allegedly destroyed documents presents a clear case of spoliation, which allows the court to make an adverse evidentiary inference that the destroyed (or withheld) documents are not favorable to the spoliator. See, e.g., *D'Onforio* at *15; see also *Zhi Chen* at 12.

generated; (vi) the identities, titles and positions of all persons who took part in creating and/or generating such original document, and the role or part of each such person in creating and/or generating such original document; (vii) the locations in which such original document was kept and/or located since its creation and/or generation; (viii) the identities, titles and positions of all custodians of such original document since its creation and/or generation.

This topic also specifically addresses the position taken by Defendants that they will not concede the admissibility of any of the documents produced by them.  In Defendants' responses to Plaintiffs' Requests for Production of Documents (dated April 12, 2012 and September 19, 2012, relevant portions attached hereto as **DE 181-D; DE 181-E**), Defendants included the following boilerplate statement: "In making a document production, Defendants are not conceding that particular documents are those of the PA or PLO."  *See Preliminary Statement of each response*, ¶ 4.  Likewise, in their responses to Plaintiffs' Interrogatories (dated May 31, 2012 and September 19, 2012, relevant portions attached hereto as **Exhibit J hereto and DE 175-G**), Defendants refused to concede that any information or documents referenced therein are admissible for trial.  *See Preliminary Statement of each response*, ¶ 4.  Defendants did not designate any witness for this topic.

In an effort to keep the list of depositions plaintiffs need to take as short as possible and mindful of the Court's reminder at the December 7th Conference that the parties should try to work together more, before filing this motion plaintiffs' counsel sent an email to defense counsel to try to ascertain whether defense counsel would be willing to stipulate to the authenticity and admissibility of documents produced from defendants' own files, pursuant to discovery demands or through disclosures.

This would largely, if not completely obviate the need for a custodian of records type of deponent, whose deposition otherwise would be absolutely essential since such witnesses are

outside the Court's subpoena power and such testimony is required for the admission of such documents (e.g. business records), absent such a stipulation.

The email exchange on this subject, attached hereto as **Exhibit P**, makes clear that a deposition on this topic absolutely is required.  Plaintiffs are entitled to establish an evidentiary foundation for all documents they wish to adduce into evidence for purposes of summary judgment or, if necessary, at trial – not just some "selected" documents, as defense counsel proposes and our right to do so is not dependent on defense counsel's good will or view of which documents we should wish to have authenticated and otherwise established as admissible against the defendants for any given purpose.  It is worth noting that, in contrast to defendants' position, plaintiffs are fully willing to stipulate to the authenticity (and likely to the admissibility, depending on the intended evidentiary purpose) of all documents they have produced form their records in discovery or by way of disclosures in this case.

Since defendants failed to appear for their deposition on this topic and have indicated that they will not satisfactorily cooperate with plaintiffs on this issue, the most appropriate remedy here would be a Court order relieving the plaintiffs of any obligation to establish the authenticity, admissibility, or the truth of any matters set forth in the documents produced and/or disclosed by the PA in this matter and precluding defendants from challenging the authenticity, admissibility, or the truth of any matters set forth in such documents.  In this regard, plaintiffs refer to and incorporate by reference all of their arguments in their Motion to Compel and for Sanctions For Defendants Failure to Produce a 30(b)(6) Witness on all Noticed Topics and for Related Relief. *See* DE 181:21-22.

Solely in the alternative, if the Court declines to sanction defendants, plaintiffs request the Court to direct defendants to designate a witness on this topic and permit the noticed deposition to go forward.

### D. Plaintiffs Seek to Exclude the Five Witnesses Defendants' Untimely Disclosed in Their Answer to Plaintiffs' Fourth Interrogatory, or in the Alternative, to Depose Those Witnesses

On the last day of fact discovery, after failing to identify a single witness pursuant to Rule 26(a) during the entire fact discovery period, defendants purported to supplement their initial disclosures, first served on October 28, 2011 with five new witnesses, all senior PA officials who clearly had been known to the PA all along. DE 175:4-9. As explained in plaintiffs' motion for sanctions pursuant to Rule 37(c) and reply with respect to that motion [DE 175, 200], which are incorporated herein by reference, plaintiffs seek an order precluding these witnesses in the first instance.  Indeed, in circumstances such as these, such preclusion is mandated unless the party to be sanctioned can show that its violation was justified or harmless by pointing to "unusual or extenuating circumstances." *Elion v. Jackson*, 2006 WL 2583694, at *1 (D.D.C., 2006) ("the overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some unusual or extenuating circumstances") (citations omitted); *Walls v. Paulson*, 250 F.R.D. 48, 53-55 (D.D.C. 2008) (same).  DE 175:13-14.

Defendants have simply not satisfied their burden to show that intentionally waiting until the very last day of fact discovery to make these disclosures in an interrogatory response on a wholly unrelated topic that did not even ask for identification of witnesses, knowing that plaintiffs would have no opportunity to depose the witness, was either justified or harmless. *Elion v. Jackson*, 544 F.Supp.2d 1, 6 (D.D.C. 2008); *Jackson v. American Family Mut. Ins. Co.*, 2012 WL 845646 at *3 (D.Nev. 2012); *Caribbean I Owners v. Great American Ins.*, 2009 WL

857439 at *2 (S.D.Ala. 2009).   DE 175:14-15.   Plaintiffs have fully addressed defendants' arguments in this regard in their motion and reply [DE 175 & 200] to defendants' opposition filed on December 13, 2012, which is incorporated herein by reference.

Solely, in the alternative, if the Court declines to preclude the untimely disclosed witnesses, in order to avoid the obvious prejudice to plaintiffs from defendants' belated disclosures, plaintiffs respectfully request that the Court issue an order compelling defendants to produce the witnesses for deposition.

### E.  The Court Should Compel Defendants to Produce for a Deposition The Person or Persons Who Prepared Their Interrogatory Responses.

As noted above, the answers served by defendants to plaintiffs' first and second set of interrogatories were not signed or verified as required by the Federal Rules.  *See* **DE 175-G; Exhibit J**.  The requirement that responses to interrogatories must be signed and verified is clear in the Federal Rules.  *See* Rule 33 (b) provides.  The signature and oath requirements are viewed with gravity by the courts, particularly because interrogatories are a discovery tool intended to enable the parties to adduce potentially admissible evidence for trial.  See e.g., Steptoe v. City of Syracuse, Civil Action No. 5:09-CV-1132 (NPM/DEP), 2011 U.S. Dist. LEXIS 139061, *15-16 (N.D.N.Y. Nov. 29, 2011) (noting importance of signature and oath requirements for obtaining admissible trial evidence); Walls v. Paulson, 250 F.R.D. 48, 52-55 (D.D.C. 2008) (same and noting that compliance with Federal Rules is not optional); Saria v. Mass. Mutual Life Ins. Co., 228 F.R.D. 536, 539 (S.D. West Virginia) (same).

Accordingly, plaintiffs are entitled to know who prepared defendants' interrogatory responses and to depose such person or persons.  Plaintiffs insisted that such information (and signature/verification) be provided before discovery closed so that the signatory/verifier could be

deposed.   Defendants repeatedly assured that plaintiffs that the signature/verification would be forthcoming; but it still has never been provided to date.

### F.  The Court Should Extend the Fact and Expert Discovery Deadlines

There is no question that plaintiffs have satisfied the "good cause" standard set forth in Rule 16 for amending scheduling orders (and could satisfy any more stringent standard on the record here).  The "good cause" standard primarily considers the diligence of the moving party, i.e., whether the moving party acted in good faith and had a reasonable basis for not meeting the deadline.[25] Plaintiffs here have diligently pursued discovery, but defendants have chosen to withhold relevant information until the very last minute and beyond. Plaintiffs should not be penalized for defendants' failures by having to submit their expert report by the current deadline when the information that should have been available through the discovery process for use in the expert report has not been disclosed in full.  The Court should also consider that since the dates for dispositive motions and trial have not yet been set, any extension of time will not have significant impact on these proceedings.

Under the scheduling order in force in this case, plaintiffs' expert disclosures were due on October 19, 2012. *See* DE 136 at ¶¶ 5-6. However, plaintiffs' liability experts are unable to fully and accurately assess plaintiffs' claims, and plaintiffs are therefore unable to complete and make

---

[25] *See, e.g., Livingston v. Sodexo, Inc*., 2012 U.S. Dist. LEXIS 78108, *4 (D. Kan. 2012); *Reese* at *2; *Kinetic Concepts* at *14.  As a general rule, this standard is satisfied where the request for an extension is based on information obtained through discovery.  *Id*. at *3 (granting leave to amend answer after court deadline where defendant's proposed amendment was based on information it learned at plaintiff's deposition and extending discovery deadline, *inter alia*, to enable plaintiff to obtain discovery related thereto); *Kinetic Concepts* at *15-16 (where good cause existed to extend fact discovery deadline, expert discovery deadline would also be extended); *Mays v. Stobie*, 2010 U.S. Dist. LEXIS 129263, *15 (Idaho 2010) (allowing late amendment of pleading where amendment was based on information learned in discovery).

their expert disclosures.  Indeed, until plaintiffs complete all required depositions, it is unclear which testifying experts plaintiffs will need in this action.

It is defendants' actions, as set forth in detail above, and summarized below, that caused the need for this expansion.  By way of example, and most significantly, as earlier discussed, on October 21, 2012, <u>two days after plaintiffs' expert disclosure deadline</u>, defendants produced critical Arabic language documents from the PA GIS of a number of significant PFLP operatives in Qalqilya at the time of the bombing, including Raed Nazzal.  Plaintiffs had to get these documents translated before they could even begin to consider and analyze them. The things these documents disclosed about Nazal that are directly relevant to the argument made here are set out in the sealed submission docketed as DE 187-7, the Schoen Declaration and especially at Paragraphs 10-13 of that Declaration (referring to the untimely produced documents – designated by defendants as "confidential" in finally producing them - and their significance in detail).  Again, plaintiffs commend the Court's attention, respectfully to DE 187-7 and the essential nature of such untimely disclosed information for expert witnesses on liability for material support under the ATA to consider in developing his or her expert opinion.[26]

These late produced documents are relevant to several areas for expert testimony, including, *inter alia*: (i) the PA's knowledge of the PFLP's terrorist activities against Israel; (ii) the PA's policy of support for such terrorist; (iii) the Qalqilya PFLP cell that carried out the bombing and whose headquarters the defendants funded; (iv) the PA's policy of employing

---

[26] The Raed Nazal documents represent only a sampling of the documents produced by defendants untimely on October 21, 2012 -- two days after plaintiffs' expert disclosure deadline.  The other documents contain further substantive information which require expert review and consideration on many of the same potential topics.  In this regard, plaintiffs also reiterate that many of their document requests remain outstanding with defendants refusing either to state that they have no responsive documents or to identify a date certain for production of the responsive documents

former Israeli detainees and known terrorists in its security services; (v) the PA's knowledge of the terrorist activities of its security employees; (vi) the PA's general attitude towards the PFLP and its lack of concern about PFLP activities, unless negatively impacting the PA itself; (vii) the PA's policy of rewarding terrorist activities against Israel, by making "martyr" payments to family members of terrorists killed in action; (viii) Plaintiffs' respondeat superior theory of liability in general;  and (ix) the PA's material support of a known terrorists and terrorist organizations in violation of the ATA in general.  This is stated in only general terms here due to defendants' "confidentiality" designation which prevents plaintiffs from publicly discussing the documents.  Plaintiffs refer the Court to the sealed portion of the submission docketed as DE 187.

In addition, by way of example:

- Defendants did not disclose the true identity of the author of the critical GIS Qalqilya Memorandum until October 31, 2012, almost two weeks after plaintiffs' expert disclosures deadline.

- Plaintiffs had no knowledge of any relationship between the bomber, Sadeq Hafez, and the PFLP's Jamal Hindi, until defendants' disclosure of the GIS Qalqilya Memorandum. And because plaintiffs were restricted from using that information – due to defendants' sequestration demand – until defendants themselves recently disclosed the relationship publicly in their motion (DE 170), plaintiffs were not able to seek Hindi's deposition prior to the expert deadline.

- Defendants failed to designate any witness with respect to certain 30(b)(6) topics or to designate knowledgeable witnesses with respect to others – all critical to plaintiffs' expert disclosures.

Thus, the additional depositions and documents plaintiffs seek to compel herein are also relevant to many of the same expert topics referred to above.

It is well established that an opposing party's failure or refusal to cooperate with discovery constitutes grounds to enlarge the deadline for expert disclosures. *See e.g. Cedar Rapids Lodge & Suites, LLC v. JFS Development, Inc.*, 2010 WL 5070484 at *3-4 (N.D.Iowa

Dec. 6, 2010) (Agreeing that "until [fact] discovery is obtained from all Defendants, it is not possible for an expert to opine regarding whether [defendant] breached its obligations" and adjourning plaintiffs' expert disclosure deadline because "[a]s a consequence of Defendants' failure to provide discovery, Plaintiffs were unable to disclose their expert witnesses, complete with the experts' opinions, by the … deadline."). *See also Kinetic Concepts, Inc. v. Convatec Inc.*, 2010 WL 1418312 at *4 (M.D.N.C. April 2, 2010) ("Delays as to fact discovery likely caused a cascading effect on the completion of expert discovery (which often cannot go forward in a productive way when fact discovery remains outstanding).").

As noted above, defendants' consistent failure and refusal to cooperate in discovery by properly complying with appropriate requests, by responding to simple and directly relevant requests with pages of inapplicable objections, by failing to produce promised witnesses and otherwise, is in direct contravention of the commitment they made in convincing the Court to vacate the long-standing default defendants previously intended to have entered against them. Such refusal to cooperate now has direct implications on expert discovery as well and it simply would not be fair to allow defendants to profit yet again from their broken commitments and obstruction of the discovery process.

The mutually agreed case schedule in this action, which was adopted by the Court, provides for expert disclosures 30 days after the "completion of fact discovery." DE 136 at ¶6. The fact and expert discovery deadlines were tied together out of necessity- the purpose of that 30-day period after *completion* of fact discovery was to enable plaintiffs to gather all fact evidence and present it to their experts so the latter can include it in their analyses.

That purpose has been thwarted by Defendants' egregious conduct with respect to their withholding of critical evidence and witnesses relating to the bomber in this matter and his

associates, their failure to produce and prepare witnesses for the 30(b)(6) depositions, and their late production of critical documents in this case. Plaintiffs must be permitted the opportunity to, for example, depose Major Abu Hamid and Jamal al-Hindi, who clearly have relevant and compelling knowledge relating to the Defendants' material support of the bomber. Moreover, the 30(b)(6) depositions, which were delayed until close to the end of the fact discovery by defendants' actions, and regarding which defendants willfully and intentionally did not produce and/or prepare a witness for each noticed topic, must be completed before expert reports can be produced. Plaintiffs also must be afforded the opportunity to include in their expert reports the critical documents produced by defendants *after* plaintiffs' expert report deadline. All of this discovery is directly relevant to the liability expert reports in this matter. Defendants' actions made it impossible for plaintiffs to gather and analyze all relevant facts for their experts.

There is also an important equitable argument for an expansion of the expert deadline. The Court has recognized -- with respect to defendants -- that the expert deadline should be modified to allow defendants' experts to consider information timely sought by the defendants but received by them only after the expert deadline. The same principle should apply to plaintiffs. Defendants sought plaintiffs' depositions only at the very end of the discovery period. As a result, plaintiffs' motion for protective order was only resolved <u>after</u> the discovery period was over. Yet, despite the late date on which defendants sought the depositions, and the fact that the dispute between the parties resolved long after the discovery and expert deadlines passed, the Court is allowing defendants to depose, and take Rule 35 exams of, the plaintiffs. And, the Court modified the discovery deadline and defendants' expert disclosure deadline, without requiring Defendants to make any showing of need, so that defendants' experts will be able to opine on the information gleaned from the depositions and Rule 35 exams.

Similarly, but all the more so, with plaintiffs: the responsive documents from the GIS files on Raed, Sadeq and the other members of the PFLP cell which defendants produced on October 21 were sought by plaintiffs in their March and August requests for production, and should have been produced at the very latest by September 19, which would have given plaintiffs' experts a full month to incorporate them in their analyses. Since defendants ultimately produced the documents, albeit at least a month late, there can be no debate that plaintiffs were entitled to these documents (as opposed to defendants' requests for plaintiffs' depositions, where there was a reasonable dispute and a motion that had to be resolved by the court). Applying the rule that was applied to the defendants – that where discovery is timely sought, but obtained only after the deadlines have passed, the deadlines should be modified to allow the experts to make use of the missing material – Plaintiffs' deadlines should also be enlarged.

The same is true for the missing Rule 30(b)(6) witnesses: plaintiffs moved for a protective order for their depositions, which is the proper procedure, and when the court denied that protective order it also modified defendants' disclosure deadline. By contrast, defendants did not follow the proper procedure: they failed to seek a protective order on the 30(b)(6) depositions, and instead just failed to produce witnesses (after promising to do so), thereby waiving any objections. Those depositions should be ordered and plaintiffs' expert deadline enlarged. However, even if the court denies plaintiffs the 30(b)(6) depositions, plaintiffs should still be allowed to file expert reports because plaintiffs reasonably relied upon the explicit case law regarding waiver of objections to depositions, which is itself "good cause" to modify the disclosure deadline to allow plaintiffs to file reports.

Plaintiffs have acted in good faith in seeking the relief requested herein and in seeking to enlarge the time for their expert disclosures, and should not be penalized for doing so. This is the

first request for enlargement. A trial date has not yet been set. In the event that Court declines to compel further depositions, it should adjourn Plaintiffs' expert disclosure deadline until 30 days after the disposition of this motion.

**WHEREFOR**E, the instant motion to compel should be granted.


Dated: December 14, 2012                              Plaintiffs, by their Attorneys,

                                                      /s/ David I. Schoen
                                                      David I. Schoen (DC Bar # 391408)
                                                      David I. Schoen, Attorney at Law
                                                      2800 Zelda Road, Suite 100-6
                                                      Montgomery, Alabama  36106
                                                      (334) 395-6611
                                                      DSchoen593@aol.com

                                                      Robert J. Tolchin (NY0088)
                                                      111 Livingston Street, Suite 1928
                                                      Brooklyn, New York 11201
                                                      (718) 855-3627
                                                      rjt.berkman@gmail.com

                                                      Counsel for Plaintiffs