## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, *et al.*,

        Plaintiffs,

                              Civil Action No. 02-2280-RJL

v.

THE SYRIAN ARAB REPUBLIC, *et al.*,

        Defendants.

**PLAINTIFFS'MOTION FOR A STAY PENDING APPEAL OF ENFORCEMENT OF THE COURT'S JANUARY 2, 2013 MINUTE ORDER GRANTING DE 170 AND DENYING DE 189, 201, AND 202 (INSOFAR AS THEY RELATE TO THE DESTRUCTION OR RETURN OF THE GIS QALQILYA MEMORANDUM AND RELATED MATERIALS AND THE DESTRUCTION OF ALL RELATED NOTES AND OTHER MATERIALS)**

For the reasons set forth in the attached memorandum, the plaintiffs hereby respectfully move for an ORDER:

**STAYING** enforcement of the Court's January 2, 2013 Minute Order granting DE 170, and denying DE 189, 201, and 202 (insofar as they relate to the destruction or return of the GIS Qalqilya Memorandum and related materials and the destruction of all related notes and other materials) pending adjudication of plaintiffs' appeal of that order or, in the alternative, pending adjudication of plaintiffs' application for mandamus review of that order and the other related orders identified above.

Counsel for Plaintiffs hereby certify, pursuant to LCvR 7(m), that they have conferred by email with opposing counsel concerning the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

1

Plaintiffs, by their Attorneys,
/s/ David I. Schoen
David I. Schoen (DC Bar # 391408)
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
(334) 395-6611
DSchoen593@aol.com
Robert J. Tolchin (NY 0088)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rjt.berkman@gmail.com

Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, *et al.*,

        Plaintiffs,

                                      Civil Action No. 02-2280-RJL

v.

THE SYRIAN ARAB REPUBLIC, *et al.*,

        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY PENDING APPEAL OF ENFORCEMENT OF THE COURT'S JANUARY 2, 2013 MINUTE ORDER GRANTING DE 170 AND DENYING DE 189, 201, AND 202 (INSOFAR AS THEY RELATE TO THE DESTRUCTION OR RETURN OF THE GIS QALQILYA MEMORANDUM AND RELATED MATERIALS AND THE <u>DESTRUCTION OF ALL RELATED NOTES AND OTHER MATERIALS</u>)

### <u>Introduction</u>

By this motion, plaintiffs are seeking a stay of the Court's extraordinary January 2, 2013 order[1] granting DE 170 and denying DE 202 and the pleadings identified above that relate to the key materials in this case that the Court has ordered destroyed or returned to the defendants. Plaintiffs will first present herein the relevant facts and issues which attend this issue and which they wish to present to the Court of Appeals in the face of the impending order to destroy/return key documents. Then plaintiffs will demonstrate why the facts and legal issues presented here make a stay appropriate while plaintiffs pursue an appeal based on the collateral order doctrine or a writ of mandamus to seek relief from the irreparable harm that would flow from being forced to destroy or return these vitally important materials that are directly relevant to the defendant's material support for the horrific terrorist bombing at issue in this case which tragically took the lives of two teenaged American girls and wounded four other Americans.

---

[1] Since the order is a minute order with no explanation or analysis, it is assumed to be co-extensive with the relief sought by defendants in their motion.

In their motion, DE 170, defendants requested sweeping relief with respect to the GIS Qalqilya Memorandum, which they claim is privileged and was inadvertently disclosed at the deposition of Ibrahim Dahbour. Among other things, defendants requested that the document itself, relevant portions of the Dahbour deposition transcript and all notes and summaries thereof be returned or destroyed (as to one category of notes and summaries, the Order requires destruction, not the alternative of return). Although defendants never sought any relief with respect to the video recording of the deposition transcript, they have taken the position in a January 4, 2013 email (**Exhibit A**) that the video recording must also be returned or destroyed and are demanding that plaintiffs certify compliance with what they characterize as the Court's order by today, January 9, 2013.

At all times since defendants' inadvertent disclosure of the GIS Qalqilya Memorandum, plaintiffs have maintained the document and all of its facts in sequestration pursuant to the provisions of Federal Rule of Civil Procedure 26(b)(5)(B) and the parties' agreement on the record at the Dahbour deposition and have complied with the federal rules. Plaintiffs seek to maintain the status quo in this case and respectfully submit that this must be permitted for all of the reasons set forth below and to preserve the integrity of the document and the critically important facts contained therein, while preserving plaintiffs' full ability to seek review of the destruction/return order.

As the Court is aware, the GIS Qalqilya Memorandum is the key document in this case – the only document produced by defendants about the bombing – a heinous crime which resulted in the death of two young American girls, the injury of four other Americans and numerous others. As detailed in a January 2, 2013 email from plaintiffs' counsel to defendants' counsel (**Sealed Exhibit B**), the document contains at least 7 crucial facts concerning central issues of

liability and material support not found in any other documents and it establishes defendants' direct involvement in a terrorist bombing that brutally killed two teenaged American girls and wounded four other Americans on their night out in the local pizzeria.[2] Moreover, the GIS Qalqilya Memorandum is evidence of a crime which was investigated by the FBI without the benefit of that document. Plaintiffs believe that defendants' underhanded attempt, through material misrepresentations of fact intended corruptly to ensure the destruction of this evidence is also a crime under 18 U.S.C. §1512(c), as discussed below, and perhaps other obstruction statutes.

If plaintiffs were to return or destroy the document, deposition transcript, video tape and all notes and summaries thereon, they would effectively be deprived of any right to further litigate this issue on appeal. They would no longer have anything to submit for an appellate court's review. They would have no way to review the document to mount their arguments on appeal. They would not even have their own notes in support of the reasons why they should prevail on such an appeal – an unprecedented an unauthorized intrusion on plaintiffs' attorney-client relationship.

If defendants are permitted to go forward with their destruction demand, this critically important evidence of murder will likely be lost forever. Plaintiffs cannot rely on defendants to preserve the evidence. Defendants have already demonstrated their bad faith and criminal

---

[2] Plaintiffs note that these are not ordinary defendants, but defendants whose incitement to terror, and rewards for terror against American, Israeli, and other Western targets today are well documented. They daily reward terrorists as "martyrs," making payments to the families of terrorists killed in attacks against Israelis or by the Israeli army and glorifying them by naming streets and landmarks after them, among other things. Moreover, in the matter at hand, they have completely changed their stories as to why the document purportedly is privileged and without explanation have come up with two different versions of the same document. Returning the document to these defendants would be the equivalent of destroying it for all intents and purposes.

intentions by seeking the destruction of all traces of the document, attempting to conceal its existence from plaintiffs in the first place and continuously contradicting themselves and revising their story about the origin of the document, the basis for the privilege and their failure to take any steps to protect the privilege, as discussed below.

The destruction or return of these materials – described by defendants in the publicly filed documents as a report of what happened with respect to the terrorist murder at issue in this case after a full investigation - records of the defendants' own account of their direct participation in terrorism which has left two young American girls dead and four other Americans forever wounded, would not just impact on this case; it would deprive law enforcement authorities charged with investigating these murders and this act of terror with critically important evidence. It also would deprive Congress of the kind of evidence it must have to evaluate whether to continue funding these defendants, only to see the money go to support and reward terrorism against Americans.

While plaintiffs maintain that the Court's January 2, 2013 order was in error and represents a serious abuse of discretion, at this point plaintiffs are simply seeking to maintain the status quo. Rather than destroy all traces of the document, plaintiffs propose to continue to sequester it pursuant to Federal Rule 26(b)(5)(B) as they have done until now, a remedy which is one of three equally acceptable options for dealing with inadvertent disclosure under the Rules, with the materials at issue to be submitted under seal to the Court for a determination of the claim, pursuant to Rule 26(b)(5)(B).

## RELEVANT BACKGROUND

### A. The Bombing

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, brought by U.S. citizens, and the family members and the estates of U.S. citizens – including two teenaged American girls – who were murdered or injured by a terrorist bombing carried out on Saturday night, February 16, 2002, in a packed pizzeria in the Israeli town of Karnei Shomron.  Because many of the victims of this horrific crime were United States citizens, the bombing was the subject of an FBI investigation which plaintiffs are advised is ongoing.

The bombing was carried out by a cell of the outlawed PFLP terrorist organization headquartered in the nearby Palestinian town of Qalqilya, located within the jurisdiction of defendant PA. The PFLP has been continuously designated by the United States government as a Foreign Terrorist Organization ("FTO") since 1997.[3]  It is well established that a defendant's provision of funding or other "material support or resources"[4] to an FTO, such as the PFLP, renders the defendant civilly liable under the ATA to American citizens killed or injured in terrorist attacks subsequently carried out by that FTO.[5]  Thus, a major factual issue in this case is the nature and extent of any "material support" which Defendants provided to the PFLP.

---

[3] *See* 62 Fed.Reg. 52650 (Oct. 8, 1997).

[4] The phrase "material support or resources" is a term of art defined in 18 U.S.C. § 2339A which includes virtually every type of asset, goods or service imaginable, including financial support.

[5] *See, e.g. Owens v. Republic of Sudan,* 412 F. Supp.2d 99, 108 (D.D.C. 2006) (allowing or encouraging terrorist organization to operate by providing safe haven constitutes material support under the ATA); *Linde v. Arab Bank,* 384 F. Supp.2d 571 (E.D.N.Y. 2005) (provision of funds to an FTO renders the provider civilly liable under the ATA for terror attacks carried out by that FTO); *Weiss v. National Westminster Bank,* 453 F. Supp.2d 609 (E.D.N.Y. 2006) (same); *Strauss v. Credit Lyonnais,* 2006 WL 2862704 (E.D.N.Y. 2006) (same); *Goldberg v. UBS,* 660 F. Supp. 2d 410 (E.D.N.Y. 2009) (same); *In re Chiquita Brands Intern., Inc. Alien Tort Statute and Shareholder Derivative Litigation,* 690 F.Supp.2d 1296 (S.D. Fla. 2010) (same); *Abecassis v. Wyatt,* 785 F.Supp.2d 614 (S.D. Tex. 2011).

The suicide bomber himself was a young PFLP operative named Sadeq Hafez and, as plaintiffs subsequently discovered and disclosed in the form in which they learned it, the bombing was planned by Captain Raed Nazal who was both a salaried officer in the PA's security services and a leader of the PFLP cell in Qalqilya (as well as a recently released terrorist who while in Israeli prisons brutally tortured and killed another man —the kind of accomplishment that led to his hire by the PA as a Captain).

On April 26, 2002, Raed Nazal was killed by Israeli authorities while they were attempting to arrest him and he opened fire resisting the arrest. Plaintiffs are in possession of documents from other sources showing that Raed Nazal continued his PFLP activities during the two plus months following the Karnei Shomron bombing and until his death. In addition, defendants have produced documents that show that Raed Nazal was promoted to the rank of Major in their official security forces, posthumously, after the horrific suicide bombing at issue in this case and the PA has been making "martyr" payments to his family after his death.

## B. Plaintiffs' Discovery Efforts and the Disclosure of the GIS Qalqilya Memorandum

Plaintiffs served defendants with document requests on March 9, 2012 and August 20, 2012 (the "First RPD" and the "Second RPD," respectively). In the First RPD, plaintiffs sought, *inter alia*, documents "that relate to and/or reference the February 16, 2002, bombing," and documents evidencing "all payments made to and all benefits provided to Sadek Abdel Hafez's relatives by the PA and/or PLO at any time after February 16, 2002, in relation to, as a result of and/or due to Sadek Abdel Hafez's death." DE 188-A at Nos. 1 and 4. In the Second RPD, plaintiffs sought, *inter alia*, all documents concerning Raed Nazal.[6] DE 202-B at No. 104.

---

[6] Of course, all documents concerning Raed Nazal were responsive to Plaintiffs' First RPD and should have been produced months earlier.

Defendants did not produce any documents at all in response to First RPD No. 1 (documents concerning the bombing) and produced only a limited number of documents concerning martyr's payments to the families of Sadeq Hafez and Raed Nazal. It is emphasized that the sum total of documents which defendants produced concerning these two major players consists of 28 pages of documents concerning Sadeq Hafez (his 19 page martyr file and 9 pages from his General Intelligence file, half of which relate to a high school fist fight [DE 202 at 5]) and 32 pages of documents concerning Raed Nazal (including 24 pages from his General Intelligence file [DE 202 at 8]), many of which were produced only after the close of fact and expert discovery.

Plaintiffs took 30(b)(6) depositions of defendants on several days in the first half of September 2012. At the September 12, 2012 30(b)(6) deposition of PA Security Services officer Ibrahim Dahbour, defendants inadvertently produced a two page Arabic language document referred to herein as the GIS Qalqilya Memorandum. At the deposition, defendants asserted a claim of privilege with respect to that document and only that document, based on a story which changed entirely six weeks later. Plaintiffs have at all times vigorously opposed this claim of purported privilege. DE 188, 201, 202, 205, 209.

The GIS Qalqilya Memorandum is a *purely factual account of the bomber and the bombing*, including events leading up to and following the bombing – a crime which caused the deaths of two young American girls and seriously injured 30 others, including several American citizens. It has appeared in two forms – one with an official GIS header and signature and one without. Defendants have refused to explain the existence of two different versions.

It is the *only* (i) document produced by defendants concerning the bombing and postdating it (with the exception of the documents concerning martyr payments referenced above) and was responsive to at least three of plaintiffs document production requests (First RPD

9

1 and 4 and Second RPD 104). DE 202 at 16-17. Yet it never was produced nor was it ever listed in a privilege log as required by law.

Among other things, the document is the only document produced by defendants referencing the close relationship between the bomber and the PA's Raed Nazal and at least 6 other critical facts. *See* DE 170-6 at 141:21-142:1;*see also* **Sealed Exhibit B.**[7] In this regard, by e-mail dated January 2, 2013, plaintiffs' counsel requested defense counsel to identify the documents upon which the GIS Qalqilya Memorandum is based, but have received no response.

In this regard, defense counsel's conduct has been particularly outrageous. First, notwithstanding the clear directive in Rule 26(b)(5)(B) expressly permitting submission under seal of a document a party claims to be privileged, specifically for determination of that claim, defendants vehemently have alleged misconduct by the plaintiffs for taking just such steps. (DE 206 at 9). Defendants badly mislead the Court about the Rule's provision.

Secondly and most offensive of all, defense counsel repeatedly asserts that it is impermissible to comment on the contents of the document at issue and then repeatedly accuses plaintiffs' counsel of improperly doing so. Yet, over and above the misrepresentations identified above and addressed in **Sealed Exhibit B**, defense counsel has the audacity to make such accusations, while representing to the Court the following:   " **Nor is there anything in the content of the memorandum that remotely helps Plaintiffs' case; ....**" **(DE 206 at 9,**

---

[7] **DE 170-6** is a portion of the transcript of the September 12, 2012, deposition of Ibrahim Dahbour, the Deputy GIS Director in Qalqilya, who read the text of GIS Qalqilya Memorandum into the record with the agreement of defendants' counsel. Plaintiffs are mindful of defendants' privilege claim and the Court's January 2, 2013 minute order. Therefore, plaintiffs will not reveal any information herein that has not already been publicly disclosed by defendants in their filings. For this reason, defendants are filing under seal an email from plaintiffs' counsel identifying key facts in the GIS Qalqilya Memorandum not in other documents produced by defendants – contrary to defendants' representations to the Court in order to persuade the Court to order the destruction of the document.

**n.4)(Emphasis added).** This representation by defense counsel is a blatant and outrageous lie intended corruptly to persuade this Court to order the destruction of this most material document (See 18 U.S.C. Sec. 1512(c)). But it is more than that in this context. It is beyond dispute an additional express waiver of any purported claim of privilege.

Defendants cannot on the one hand claim the document is privileged and its contents must never even be alluded to by plaintiffs, let alone exposed as a document which fully proves in no uncertain terms defendant's material support and its direct role in the murders at issue, while on the other hand giving itself license to affirmatively (and falsely) represent to the Court that its contents do not even "remotely" help Plaintiffs' case. That is by definition an express waiver of privilege. Perhaps more offensively it is the use of a lie to corruptly obstruct this process and that is inexcusable.

How dare defense counsel, under the guise of a most dubious claim of privilege (repeatedly waived, if it ever existed), demand that plaintiffs be prohibited from submitting the document to the Court under seal for determination of the claim as Rule 26(b)(5)(B) expressly permits, demand that plaintiffs not comment at all on the content of the document, even if it reflects evidence of a heinous crime, while then reserving to themselves the right to comment on it content and its purported lack of substantive significance to the case, as fully and falsely as they care to comment, while maintaining their attacks on defense counsel. Somehow, however, this Court has permitted and now rewarded just such conduct with the Minute Order at issue here.

The overwhelming significance of Major Abu Hamid and the facts underlying the GIS Qalqilya Memorandum cannot be gainsaid. It is a document from defendants' own files which, contrary to defendants' misrepresentations as to its nature, clearly establishes defendants'

material support and liability. According to the document's author – Major Abu Hamid – in a publicly filed Declaration, it is defendants' account of the bombing after a full investigation and it clearly reflects his reliance, ten years after the bombing, on documents and witnesses that were never identified to plaintiffs, as discussed below.

Clearly, this is **the** critical document for plaintiffs or for anyone who wishes to know what happened in this case (from the defendants' police officer's own findings, per his publicly filed Declaration – DE 170-5) and, whether or not the document itself is privileged (it is not), its underlying facts certainly are not privileged and should have been produced long ago. Moreover, the GIS Qaqilya Memorandum is evidence of a crime and is key for any federal investigation of the Karnei Shomron bombing. Plaintiffs believe that a copy must be provided to the Department of Justice and to the appropriate Congressional Committees and should be publicly disclosed. The order at issue here will forever prevent all of that and would work a grave miscarriage of justice.

On October 31, 2012, some six weeks after the disclosure and after the close of both fact and expert discovery in this case, defendants filed a motion seeking the return or destruction of the GIS Qalqilya Memorandum. DE 170. On December 14, 2012, plaintiffs filed a motion to compel, *inter alia*, the GIS Qalqilya Memorandum, its underlying information and its author (GIS Major Abu Hamid) for a deposition.[8] DE 202. Defendants' motion seeks, and the order now entered therefore grants, sweeping relief, including the destruction or return of the document and the relevant portion of the Dahbour deposition transcript and all notes or

---

[8] At the Court's direction pursuant to a minute entry dated December 7, 2012, plaintiffs filed DE 202 as a comprehensive motion for, *inter alia*, all additional fact discovery they deemed crucial and for which they were seeking an expansion of the fact and expert discovery deadlines.

summaries of the same. All of plaintiffs' arguments in DE 188, 201, 202 and 209 are incorporated herein by reference.

### C. The Record is Replete with Numerous Instances of Waiver, Which Defendants Have Tried to Avoid by Repeatedly Changing Their Story and Making Active Misrepresentations to the Court. The GIS Qalqilya Memorandum is In No Way Privileged and Any Even Arguable Privilege That Might Have Applied Has Been Waived in Multiple Ways.

Defendants' manufactured claim of privilege with respect to the GIS Qalqilya Memorandum was punctuated by numerous inconsistencies, changing stories and outright misrepresentations in a desperate attempt to convince plaintiffs and the Court that the purely factual document is in fact protected by some privilege which was never waived, and that the document and all notes and summaries of it should be destroyed. However, neither the facts nor the law support defendants' arguments.

It should be emphasized at the outset that the District of Columbia takes a strict approach to inadvertent waivers of privilege. *See, e.g., Bowles v. Nat'l Assoc. of Homebuilders*, 224 F.R.D. 246, 253 (D.D.C. 2004) ("A client wishing to preserve the privilege must treat the confidentiality of attorney-client communications like jewels-if not crown jewels.") *citing In re Sealed Case*, 877 F.2d 976, 979-980 (D.D.C. Cir. 1989) (internal quotation marks omitted). While this strict standard has been overridden to some degree by the enactment of FRE 502(b) which rejects an automatic waiver rule in favor of a three part test, parties still have a responsibility to act on conformity with the claim that a particular item is privileged. *See Amobi v. D.C. D.O.C.*, 262 F.R.D. 45, 53 (D.D.C. 2009)(Rejecting demand to destroy, return, or sequester materials claimed to be attorney-client privileged and work-product protected and inadvertently disclosed, based on finding of waiver).

Moreover, defendants' conduct, described below, strongly suggests that they are hiding behind the privilege in order to conceal evidence of a crime in violation of a criminal statute - 18 U.S.C. §1512(c). That statute provides, *inter alia*:

> Whoever corruptly—(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. §1512(c).

### 1. Defendants' Changing Story About the Origins of the Document

On the record at the Dahbour deposition, defendants presented one set of facts to support their privilege claim – that Dahbour had created the document for defendants' counsel's investigator on or about September 10, 2012. Indeed, those representations, which later proved to be false, provided the basis for plaintiffs' agreement to sequester the document pursuant to Federal Rule 26(b)(5)(B). Then, in their motion [DE 170], filed some six weeks later (and after both fact and expert discovery deadlines had passed so that plaintiffs had no ability to follow up), they told a completely different and irreconcilable story – that the document was created by a Major Abu Hamid in April 2012, at the request of the PA's GIS Central Operations Center – that he prepare a report of what happened with respect to the suicide bombing at issue in this case - with Abu Hamid only "now" "understand(ing)" (many months after preparing his report for his police official supervisor) that the request to the GIS Operations Center came from a defense lawyer. That report then was given to defense counsel on May 3, 2012. DE 170-5 at ¶ 5.

Clearly, defendants' counsel learned immediately that their representations on the record at the Dahbour deposition, upon which plaintiffs' relied in agreeing to sequester the document, had been incorrect. (DE 170-4 at 4) Yet, they waited some six weeks before correcting those

14

misrepresentations. Moreover, the misrepresentations related to a document defense counsel well knew they had in their possession many months before the Dahbour deposition. It never was produced to plaintiffs, nor was it ever listed on a privilege log.

The fact that defendants suddenly changed their story about how and when the document came into counsel's possession is suspicious in and of itself. To add to that, in his Declaration [DE 170-5], Major Abu Hamid admitted that there are also two versions of the document, one with the GIS header and his signature and another – the inadvertently disclosed version – without either. DE 188 at 24. Plaintiffs are unable to think of an innocent explanation for this. The apparent laundering of the document is further indication of defendants' bad faith effort to hide behind the privilege to conceal evidence of a crime.

2. Defendants' Contradictory Claims Concerning Whether the Document Should have been Listed on a Privilege Log

At the deposition, when defense counsel was claiming that Dahbour had created the document shortly before his deposition, **defense counsel admitted that the GIS Qalqilya Memorandum would "appropriately be the subject of a privilege log."** DE170-6 at 116:14-15. (Emphasis added) But of course defendants did not act "appropriately."

According to defendants' new story, defense counsel has been in possession of the GIS Qaqliya Memorandum since at least May 3, 2012. At all times thereafter the document itself and all of the underlying facts and people reflected in it were concealed from plaintiffs, notwithstanding plaintiffs' discovery demands, outstanding since March of 2012, directed exactly toward such information. If we are to believe defendants' new story, then such privilege was clearly waived long ago when defense counsel did not include the document on their privilege log dated July 9, 2012, two months after they supposedly received the document.

15

The failure to serve a privilege log waives any claim of privilege. "[P]laintiff's failure to comply with Fed.R.Civ.P. 26(b)(5), requiring him to file a privilege log, bars in itself any claim of privilege, whatever its basis. ... Plaintiff once again asserts the attorney client and work product privileges. Once again, however, his failure to provide the privilege log required by Fed.R.Civ.P. 26(b)(5) bars any claim of privilege." *Bregman v. District of Columbia*, 182 F.R.D. 352, 363 (D.D.C. 1998).*See also e.g.Banks v. Office of Senate Sergeant-at-Arms*, 241 F.R.D. 376, 386 (D.D.C. 2007) ("[W]here a party fails to assert a privilege on its privilege log or in any of its pleadings, the privilege is waived.").

Directly contrary to their statements on the record at the deposition, months later defense counsel attempted to justify the absence of the document from the July 9 privilege log by claiming in their reply [DE 198 at 7-8] that it was somehow included in a broad categorical listing of all communications and documents exchanged between defendants and their counsel after the filing of the complaint. However, it is well settled that a privilege log must contain sufficient detail to enable the receiving party to contest the claim of privilege. Defendants' categorical listing of documents does not satisfy this requirement and, in and of itself, is grounds for waiver. *See, e.g., Zelaya v. Unicco Service Co.*, 682 F. Supp.2d 28, 38-39 (D.D.C. 2010) (party failed to satisfy burden of establishing privilege where it did not provide sufficient details to support privilege claim on privilege log); *Safeco Ins. Co. of America v. M.E.S., Inc.*, 2011 WL 6102014, *3-4 (E.D.N.Y. Dec. 7, 2011) (same). In addition, according to that extremely broad language cited by defendants in their reply [DE 198], any *document* (regardless of whether it is a communication or a source document created months or years earlier) provided by defendants to their counsel at any time after November 18, 2002 could theoretically be the subject of a claim of privilege and *plaintiffs would never even know.*

**Indeed, the evidence clearly shows that defendants planned to improperly conceal the existence of this evidence of their crime from plaintiffs (and the world) forever, and would have succeeded in doing so, but for the extraordinary events at the Dahbour deposition.**

3.  Defendants Belatedly Claimed that the Confidentiality Order Applied Even Though They Never Took any Steps to Protect the Document, the Deposition Transcript or the Audio-Visual Recording Pursuant Thereto or to Otherwise Comply with the Strict Directives in the Confidentiality Order – Which Defendants Drafted.

Defendants never suggested that the Confidentiality Order, DE 157, applied until several months after the fact. In fact, plaintiffs' counsel raised the Confidentiality Order at Dahbour's deposition; but defendants chose to ignore and implicitly reject its application, and instead exclusively referred to and relied on Federal Rule 26(b)(5)(B) and continued to do so at all times thereafter in very clear and explicit terms. *See* DE 170-6 at 126:5-132:20. *See also* DE 208-1. As plaintiffs noted in DE 201 and 209 and the exhibits thereto, incorporated herein by reference, the very first time defendants decided, in their great facility at changing arguments mid-stream, to even suggest that the Confidentiality Order might apply, was in their Reply [DE 198] in support of their motion seeking the document's destruction.[9]

Moreover, even if the Confidentiality Order did apply, defendants clearly waived its protections with respect to both the deposition transcript and the audio-video recording by *inviting Dahbour's testimony on the record and then failing to take any steps to designate that material confidential pursuant to the terms of the Confidentiality Order*. Indeed, defense counsel allowed Dahbour to read the entire document into the record and to testify at length about it

---

[9]Pursuant to the parties express agreement at the deposition and in email correspondence over a month later, plaintiffs have sequestered the document pursuant to Federal Rule 26(b)(5)(B) and will continue to do so.

without a single objection or instruction not to answer. At various points, defense counsel actively engaged in dialogue with the official translator to clarify the translation of words from the Arabic. DE 170-6 at 143:12-149:19.

The Confidentiality Order – which, of course, defendants drafted and asked the Court to impose – sets out clear mandatory directives that any party must follow if it seeks to have any portion of a deposition deemed confidential or kept under seal. Defendants never took a single such step at any time with respect to the deposition transcript and the video arising from it, which have been in the public domain at all times since, with the court reporter under no restriction whatsoever as to who may have access to it. The first time defendants sought any relief with respect to the deposition transcript was in their motion filed some six weeks after the disclosure and defendants never sought any relief from the Court with respect to the video tape. *See e.g., United States v. Ary*, 518 F.3d 775, 783-785 (10 Cir. 2008)(six-week delay in asserting attorney-client privilege and work-product protection was sufficient to constitute waiver); *United States v. White*, 970 F.2d 328, 334-335 (7th Cir. 1992)(failure to timely assert attorney-client privilege for each specific communication or document constitutes waiver); *Compare* defendants' conduct with *Heriot v. Byrne*, 257 F.R.D. 645, 662 (N. D. Ill. 2009) (no waiver of privilege where steps were taken within 24 hours of inadvertent disclosure to correct problem). *See also, United States v. Neill*, 952 F. Supp. 834, 842 (D.D.C. 1997)(failure to specifically identify computer files seized by government as protected by attorney-client privilege constituted waiver); *see generally, 3-511 Weinstein's Federal Evidence* Sec. 511.04[6] on a finding of waiver for failing to specifically and timely identify each item claimed to be privileged. Defendants' actions have not been in any way consistent with a party's legitimate maintenance of a claim of privilege with respect to the deposition or the video.

18

Defendants' conduct in inviting Dahbour's testimony about the document and failing to take any steps to protect the deposition transcript or the audio-visual recording is not consistent with Rule of Evidence 502(b), which provides that disclosure of privileged material is not a waiver only if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." Fed.R.Evid. 502. *See Williams v. District of Columbia*, 806 F. Supp. 2d 44 (D.D.C. 2011); *Amobi v. District of Columbia D.O.C.*, 262 F.R.D. 45 (D.D.C. 2009); *Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*, 2010 WL 275083 (S.D. Cal. January 13, 2010).

Thus, to the extent such inadvertent disclosure was the result of defendants' own sloppiness and failure to take proper precautions with respect to the document, defendants waived the privilege under F.R.E. 502. *See, e.g., Mt. Hawley Ins. Co. v. Feldman Products*, 271 F.R.D. 125, 136 (S.D.W. Va. 2010) (where precautions taken to prevent disclosure were not reasonable and number of inadvertent disclosures were large); *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480, 520 (Ct. Fed. Cl. 2009) (failure to take reasonable precautions to protect document waived privilege); *see also William v. District of Columbia*, 806 F. Supp. 2d 44, 49-50 (D.D.C. 2011) (District of Columbia failed to provide sufficient information for Court to evaluate reasonableness of precautions taken and did not take reasonable precautions to correct error once discovered).

Defendants effected a further subject matter waiver with respect to the document by voluntarily *and selectively* disclosing in their motion [DE 170] some of the critical facts in the GIS Qalqilya Memorandum, including the close relationship between the bomber and PA's RaedNazal and the PFLP's Jamal Hindi. Specifically, defendants disclosed the following

testimony from Dahbour concerning the GIS Qalqilya Memorandum, while asserting privilege with respect to the remainder of Dahbour's testimony on that subject:

> After I read these two pages in front of me, most of the information is available within our security files. There are maybe additional details about his brothers, his sisters. But he was being with Jamal Al-Hindi and Ra'edNazzal, accompanied by. And Rafi Nasura -- he was like a picture by Rafi. His pictures were taken by Rafi Nasura before the operation was conducted.

DE 170-6 at 141:18-142:1. Defendants *could have* filed that portion of the Dahbour transcript under seal.

They further waived the privilege by representing to the Court what they claim the document does and does not show and what Abu Hamid did and did not do – all while demanding that plaintiffs be barred from commenting on the document's contents and without giving plaintiffs any way to challenge defendants' account of how the document actually was generated. (DE 206 at 9) *Cf. Bowles* at 224 F.R.D. 257-260 (discussing rule on subject matter waiver).

### 4. Defendants Made Blatant Misrepresentations to the Court in an Effort to Completely Deprive Plaintiffs of the Document and its Underlying Facts and Information

Defendants have made numerous misrepresentations to the Court in a misguided (and criminal) effort to get the Court to sanction the wholesale destruction of evidence of a crime – the horrific Karnei Shomron bombing in which two young girls were killed – in clear violation of the criminal provisions of 18 U.S.C. §1512(c).

*First*, defendants blatantly misrepresented to the Court the nature and value of the GIS Qalqilya Memorandum, claiming that it does not help plaintiffs' case. DE 206 at 9, n. 4. That statement is demonstrably false. Clearly, the memorandum is extremely helpful to plaintiffs' case – as the only document from defendants' files concerning the bombing and with at least seven

crucial facts not in any other document produced by defendants. Indeed, this is not the first such misrepresentation defendants have made to the Court.

On September 1, 2012, knowing they had in their possession for months by then the Qalqilya GIS Memorandum, containing many key facts about the bombing and its perpetrators, and knowing from other sources that defendant's own police officer, Raed Nazal, had recruited the PFLP terrorist bomber and had masterminded the bombing, defense counsel outrageously misrepresented to the Court that "there has been no undermining of the fact that the deplorable bombing in this case was the act of an outlawed group, not supported in any way by the PA or the PLO." [DE 166 at 3]. This statement was demonstrably false then [see DE 167 at 11-12], and the events at the Dahbour deposition make this falsehood all the more clear from defendant's own records.

*Second*, in their reply [DE 206] to plaintiffs' motion to compel, defendants' falsely represented to the Court that the underlying factual information contained in the GIS Qalqilya Memorandum had either already been produced or could be found in publicly available documents:

> He [Major Abu Hamid] knows nothing about this matter apart from the applicable GIS files (the responsive, relevant and non-privileged contents of which have been produced to plaintiffs (DE 198 at 6)) and a search of publicly available documents he conducted ten years after the incident...

DE 206 at 9. However, as explained above, the GIS Qalqilya Memorandum is the only document produced by defendants concerning the bombing. It contains at least seven key facts that are not found in any other source. By email dated January 2, 2013, **(Sealed Exhibit B)**, plaintiffs asked defendants to specifically identify the documents on which the GIS Qalqilya Memorandum is based, but defendants did not respond.

*Third*, Dahbour testified at his deposition that he had reviewed the complete GIS files for, *inter alia*, Raed Nazal and Sadeq Hafez and that those files contained most of the crucial facts in the purportedly privileged GIS Qalqilya Memorandum. DE 202-D at 50:24-52:2; DE 170-6 at 141:18-20. Yet defendants have produced no other documents containing the key facts in the GIS Qalqilya Memorandum. Dahbour also testified that Raed Nazal's GIS file was three and a half to four centimeters thick. DE 202 at 17; DE 202-D and DE 202-K. Yet defendants produced only a handful of documents from that file. According to defendants, Dahbour's clear deposition testimony about the size of the Raed Nazal GIS file must be ignored in favor of an after the fact, self-serving email statement by defendants' counsel that Dahbour was not referring to the paper contents of the file, but to the size of the "standard-issue box" in which the file was kept. DE 206 at 7. Defendants' after the fact attempt to extricate themselves from Dahbour's clear testimony does not explain away Dahbour's further statements as to why Raed Nazal's GIS file was so "much bigger" than Sadeq Hafez's – because "[h]e [Raed Nazal] has much more activities." DE 202-D at 50:13-51:2. The 24 pages defendants produced from the Raed Nazal GIS file, which they now claim is all plaintiffs are "entitled to"[1] from that file, hardly qualifies as "much bigger" than the 9 pages defendants produced from the Sadeq Hafez GIS file. DE 202 at 5 and 8; DE 206 at 7, 10.

### D. Defendants Failed to Establish that the GIS Qalqilya Memorandum or its Underlying Facts Were Privileged in the First Place

#### 1. Defendants' Have not Satisfied Their Burden with Respect to the GIS Qalqilya Memorandum

Even defendants recognized that the burden was on them to establish any claim of privilege. **DE 170-6** at 139:12-13. *See also, e.g., Zelaya*, 682 F, Supp. 2d at 38 (burden is on party asserting privilege); *Safeco*, 2011 WL 6102014 at *3 ("[T]he party asserting either the

attorney-client privilege or attorney work product protection has the 'heavy burden' of proving that privilege or protection applies to the documents or communications at issue.") (citations omitted). Yet, they utterly failed to make such a showing.

As plaintiffs discussed in their opposition [DE 188 at 23-24] to defendants' privilege motion, Major Abu Hamid's declaration itself establishes that the GIS Qalqilya Memorandum is not, and never was, privileged. According to Major Abu Hamid, he prepared the GIS Qalqilya Memorandum in the ordinary course of his duties as a GIS agent, at the request of his GIS supervisor and only learned that the document had been requested by defendants' lawyers some six months after the fact when defendants needed to get his declaration to support their misguided motion. DE 170-5. Certainly, these facts do not satisfy defendants' burden as the proponent of the privilege.

Moreover, even if the document was created as part of an investigation into the bombing ten years after the fact, this alone does not make the document privileged. Defendants have been under a duty to investigate the facts of this case since it was commenced and to produce any documents found during the course of such investigation. Contrary to defendants' claim, such an investigation is not by itself privileged. Major Abu Hamid managed to create a report about the bombing ten years after the fact. That report was based on documents or witnesses or both and that underlying information must be produced.

## 2. In any Event, the Facts Underlying the GIS Qalqilya Memorandum are not Privileged

Moreover, it is manifest that the facts underlying the GIS Qalqilya Memorandum (which contrary to defendants' misrepresentations have never been produced) are in no way privileged. Well-established work product jurisprudence permits discovery of the facts underlying material subject to work product protection and, if the party seeking discovery satisfies the substantial

need and undue hardship standard, even the purported work product itself. *See, e.g., In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5-7 (D.D.C. 2002) (discussing standard for overcoming work product where (i) much of the underlying evidence had been destroyed, (ii) most of the witnesses were refusing to testify and (iii) 30(b)(6) statements contained numerous inconsistencies); *Murphy v. Kmart Corp.*, 259 F.R.D. 421, 427 (D.S.D. 2009) (discussing same where witnesses are no longer available for purposes of impeachment or corroboration); *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 164 (D. Minn. 1986) (work product was overcome in connection with claims investigation materials from investigation conducted at request and under supervision of attorneys); *Xerox Corp. v. Int'l Bus. Machine Corp.*, 64 F.R.D. 367, 381 (S.D.N.Y. 1974) ("A party should not be allowed to conceal critical, non-privileged, discoverable information, which is uniquely within the knowledge of the party and which is not obtainable from any other source, simply by imparting the information to its attorney and then attempting to hide behind the work product doctrine after the party fails to remember the information.") (citations omitted). *See also* Charles Alan Wright, Arthur B. Miller, Mary Kay Kane, Richard L. Marcus, 8 Fed. Prac.& Proc. Civ. Sec. 2025 (West 3d ed. 2012).

Of course, defendants have refused to produce any of the underlying factual information upon which Major Abu Hamid relied and refused to produce Major Abu Hamid for deposition citing the close of fact discovery. DE 188 at 24; DE 202 at 11; DE 202-F-I. Moreover, in order to prevent plaintiffs from accessing the information in the GIS Qalqilya Memorandum, defendants falsely represented to the Court that such information was in other documents already produced by defendants in this case. Since the key facts underlying the GIS Qalqilya Memorandum are not in any other document produced by defendants, the Court has simply exacerbated plaintiffs' undue hardship by denying Plaintiffs' motion to compel in this regard.

## E. The Court's January 2, 2013 Order and Defendants' Demand for Certification of Compliance

Notwithstanding these clear legal authorities and defendants' failure to present any facts to support their claim, by minute order dated January 2, 2013, the Court granted defendants' motion [DE 170] and denied plaintiffs' motion [DE 202] without any explanation or analysis. By granting the relief in a minute order, the Court appears to have endorsed all of the sweeping relief sought by defendants, including their request that plaintiffs destroy all notes and summaries of the document. The Court could have maintained the status quo and avoided irreversible harm to plaintiffs by granting defendants' motion, but ordering plaintiffs to continue to sequester the document rather than requiring them to return or destroy it and all notes– one of the options expressly provided by Rule 26(b)(5)(B). This at least would have ensured the right to a meaningful appeal, if necessary, on this vitally important issue. Now, even if a copy remains under seal (subject also to be returned to the defendants at the Court's discretion, it would appear, with plaintiffs powerless to prevent the same) for the duration of the case, plaintiffs still would have no right to consult or refer to it for the appeal and would have no notes from the relevant events or from their research on the subject and would be barred by this Order even from referring to it.  This renders the appeal a nullity.  Such an Order is unprecedented and without lawful authority. Plaintiffs respectfully submit that a minute order is not adequate in a situation such as this involving a hotly contested claim of privilege where defendants have a heavy burden which plaintiffs claim was not satisfied.

According to defendants, plaintiffs are prohibited from even relying on the underlying (and clearly not privileged) facts contained in the document for any purpose. DE 206 at 6-9. This is extremely problematic as the GIS Qalqilya Memorandum is the only source for at least seven key facts. In another case where a court ordered destruction of an inadvertently produced

document, the court expressly declined to make any rulings with respect to the collateral consequences of the document having been in the opposing party's possession for 22 months and having been used by them in developing their theories of the case. *See TFT-LCD (Flat Panel) Antitrust Litig.*, 2009 U.S. Dist. LEXIS 86351 (N.D. Cal. Sept. 10, 2009).

In addition, under this order, defendants will be able to testify in a manner completely contradictory to the GIS Qalqilya Memorandum and to continue to falsely represent that there is no evidence of any material support. This result is inequitable, particularly when defendants' own document unequivocally establishes the existence of such evidence. At most, the document should be subject to some type of exclusionary rule where its use is prohibited except for the purposes of impeachment if it is contradicted.

Emboldened by the Court's wholesale adoption of virtually their every filing and rejection of virtually all of plaintiffs' filings on every issue, Defendants now demand action by plaintiffs in relation to this order beyond even what they requested in their motion [DE 170] and they claim the minute order requires the same.

By email dated January 4, 2013, 7:17 pm (**Exhibit A**), defendants demanded that plaintiffs' provide a certification of compliance with the Court's minute order by January 9, 2013. Specifically, defendants claim that plaintiffs are required to:

1. Destroy, or return to counsel for Defendants, all copies, notes, translations and summaries of the documents marked as Sealed Exhibits 1 and 1A from the September 12, 2012, deposition of Ibrahim Dahbour ("Dahbour Deposition");

2. Destroy the portions of any documents, computer files, or other materials containing notes, translations, summaries of, or quotations from, the documents marked as Sealed Exhibits 1 and/or 1A at the Dahbour Deposition;

3. Destroy, or return to counsel for Defendants, the portion of the Dahbour Deposition transcript, from page 143, line 19 through page 163, line 8, and all other materials

containing notes, translations or summaries, that discuss or reference the contents of the documents marked as Sealed Exhibits 1 and 1A, including the corresponding portions of the videotape recording[10] of the Dahbour Deposition;

4.      Provide counsel for Defendants with a list of all persons to whom Plaintiffs' counsel distributed or communicated any portion, copies, notes, translations or summaries of the documents marked as Sealed Exhibits 1 and/or 1A at the Dahbour Deposition, including the portion of the Dahbour Deposition transcript and corresponding portion of the Dahbour Deposition videotape recording that discusses the contents of Sealed Exhibits 1 and/or 1A.

Thus, defendants are demanding that plaintiffs divest themselves of all copies of and notes concerning the GIS Qalqilya Memorandum – the only document produced by them concerning the murderous bombing, a crime against United States citizens. If plaintiffs comply with this demand, they will arguably be forced by this Court's Order into being complicit in defendants' crime of destroying evidence of a crime in violation of 18 U.S.C. 1512(c) and they will be deprived of any opportunity to litigate this privilege issue on appeal.

Aside from the potentially devastating consequences compliance with the Court's order could have on plaintiffs' case, compliance would also be harmful to the interests of the United States because it would lead to the destruction of evidence of a crime or crimes being investigated by the FBI without the benefit of the facts in the GIS Qaqilya Memorandum – the heart of the case and, by defendants' own account, their report of what actually happened in connection with the murder of these American teens and the wounding of the other Americans.

---

[10] As is typical of defendants' underhanded approach, they prefaced their email stating that all of the referenced steps were specifically requested in their motion. However, defendants never requested any relief with respect to the videotape recording of the Dahbour deposition transcript. Even this Court's minute order cannot be construed to grant relief for something that was never requested. It is plaintiffs' position that the videotape of the Dahbour deposition is not covered by the January 2, 2013 Order. The existence of the videotape and defendants' persistent failure to seek relief with respect thereto is an independent grounds for a waiver of any privilege that may have existed, as discussed above.

If nothing is done, no review permitted here, defendants will get away with their illegitimate and illegal cover up efforts with impunity. Through this motion, plaintiffs are simply seeking to preserve the status quo.

## ARGUMENT

### A. The Overwhelming National Interests of Discovery in ATA Cases

When this Court set aside the defendants' default judgment in this case, it did so stressing the importance of and the D.C. Circuit's *"clear* preference" for "resolution on the merits," and that "this case be resolved on the facts." (DE 126 at 4, 5, 11) (Emphasis in original).)[11] In a materially-similar case, Judge Gladys Kessler wrote the following:

> Given the far-reaching implications of a public airing of the evidence, the Court concludes that it will serve the interest of many segments of the public to reach the truth and set the record straight.... [T]he Court concludes that there is a strong public interest in permitting the parties' claims to see the light of day and face the oft-time harsh light of trial.

*Gilmore,* 675 F.Supp.2d at 113 (internal quotation marks omitted) (Quoting *Knox,* 248 F.R.D. 420 at 431-32).

The *Knox* Court outlined some of the public interests upon which Judge Kessler relied. They include the public interest in learning "[w]hether... high ranking PLO and PA officials harbored terrorism and murder as official policy"; and "whether [Defendants] personally issued the orders, knew of the plans or provided financing for the acts of murder they stand charged with having committed in this action and others like it." *Knox,* 248 F.R.D. at 431.

---

[11] This Court is joined by other federal courts that, writing under similar circumstances, expressed a strong interest in full and complete adjudication of the facts. *See, e.g., Gilmore v. Palestinian Interim Self-Government Authority,* 675 F.Supp.2d 104, 113 (D.D.C. 2009); *Knox v. The Palestine Liberation Organization,* 248 F.R.D. 420, 431-32 (S.D.N.Y. 2008); *Saperstein v. Palestinian Authority,* 2008 WL 4467535 at *12, *15 (S.D. Fla. Sept. 29, 2008).

Plaintiffs emphasize that this action is brought under the civil provisions of the Antiterrorism Act. Resolution on the merits is critical in light of the "extremely strong [federal] interest" in using Congressional enactments in order to effectively prosecute the war on terror. *Estate of Ungar v. Palestinian Auth.*, 715 F.Supp.2d 253, 268 (D.R.I. 2010). As the courts of this Circuit and others have found – the prosecution of ATA cases serves not only Plaintiffs' personal interest, but the national interest of the United States:

> The legislative history of the ATA ... reveal[s] this country's profound and compelling interest in combating terrorism at every level ...

> Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism <u>vindicate the national and international public interest</u>.

*Weiss v. National Westminster Bank*, 242 F.R.D. 33, 46, 50 (E.D.N.Y. 2007) (emphasis added). *See also e.g. Ungar v. Palestinian Authority*, 715 F.Supp.2d 253, 268 (D.R.I. 2010) ("[T]here is an extremely strong interest in enforcing judgments ... entered under the civil provisions of the Antiterrorism Act ("ATA")").

Said differently, "the United States has a profound and compelling interest in combating terrorism at every level." *Wultz v. Bank of China Ltd.*, 811 F.Supp.2d 841, 847 (S.D.N.Y. 2011) (reversed on other grounds). Therefore, courts have tended to take a liberal approach to allowing discovery in ATA actions.[12] In her recent October 29, 2012, Southern District of New York Judge Shira Scheindlin, in the matter of *Wultz, et. al. v. Bank of Chine Ltd., et. al.*, Case No.11 Civ. 1266 (SAS), at 15 ruled:

---

[12]*See e.g. Linde v. Arab Bank*, 269 F.R.D. 186 (E.D.N.Y. 2010); *Weiss*, 242 F.R.D. at 55-56; *Strauss v. Credit Lyonnais*, 242 F.R.D. 199 (E.D.N.Y. 2007); *Strauss v. Credit Lyonnais*, 249 F.R.D. 429 (E.D.N.Y. 2008).

But in light of the significant U.S. interest in eliminating sources of funding for international terrorism, and the other factors discussed below, the lawgoverning discovery disputes in this case must ultimately be the broad discovery rules of the Federal Rules of Civil Procedure;

The national interest in ATA cases, and the corresponding liberal approach to allowing full discovery in these cases, demand that Plaintiffs be given the opportunity to fully and meaningfully complete discovery herein.

### B. Standard for Granting a Stay

In deciding whether to grant a stay, the court must consider: (1) the applicant's likelihood of succeeding on appeal, (2) whether the applicant will be irreparably harmed if a stay is not granted, (3) whether the issuance of a stay would cause substantial injury to other parties interested in the lawsuit, and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418 (2009); *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *United States v. Philip Morris, Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003).

### 1. Likelihood of Succeeding on Appeal

Based on all of the foregoing facts and developments in this case, plaintiffs have established a great likelihood of succeeding on appeal. Plaintiffs are appealing the January 2, 2013 order under the collateral order doctrine, and in the alternative are seeking mandamus review. With all due respect, the Court's order requiring the destruction or return of the materials at issue represents a broad and alarming abuse of discretion – requiring the wholesale destruction of evidence of a crime based on a mere assertion of privilege where defendants have not made even a minimal showing and plaintiffs have established numerous grounds for waiver and substantial need under well-established work product jurisprudence. Thus, both as a legal and a factual matter, the order is not supportable. The order also has the effect of aiding defendants in

30

the commission of the crime of destruction of evidence under 18 U.S.C. §1512(c). Defendants should not be permitted to evade the law with such impunity.

The materials at issue simply are not privileged. If ever they were somehow privileged (and defendants certainly have never met their burden on this), any such privilege has been waived expressly and repeatedly, all as described above.

However, even if the Court feels such a showing has not been made, a stay is still appropriate. Failure to meet the likelihood of success factor may be excused where the applicant has made a particularly strong showing on the other factors. The traditional factors are "typically evaluated on a 'sliding scale,'" such that a strong showing on one factor may excuse a relatively weaker showing on another. *EEOC v. Quad/Graphics, Inc.*, 875 F. Supp. 558, 559 (E.D. Wisc. 1995) ("Despite my belief that the respondent is not likely to succeed on its appeal, I believe that the other four factors, primarily the irreparable harm that the respondent will suffer if a stay is not granted, weigh heavily in favor of granting the stay. Failure to grant the respondent a stay in this case would make its right to appeal of little value."); *Friendship Edison Public Charter School Collegiate Campus v. Nesbitt*, 704 F. Supp. 2d 50, 51 (D.D.C. 2010)(quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009); *Thomas v. City of Evanston*, 636 F.Supp. 587, 591 (N.D.Ill.1986).

### 2. Irreparable Harm

Courts have found irreparable harm if an appeal would effectively be rendered moot in the absence of a stay. *See e.g., EEOC v. Quad/Graphics, Inc.,* 875 F. Supp 558, 559 (E.D. Wisc. 1995) ("requiring the respondent to turn over the requested information, where its appeal is seeking to avoid such requirement would make the appeal academic"); *EEOC v. St. Regis Paper Co.-Kraft Div.,* 717 F.2d 1302, 1303 (9th Cir.1983). Clearly, this is acutely applicable herein

31

where defendants are demanding that plaintiffs destroy crucial evidence of their liability and complicity in the murder of United States citizens in violation of the ATA. Once this evidence is destroyed, plaintiffs will have no way to retrieve it and, thus, will be deprived of any ability to use this evidence in the future, either in an appeal or a retrial.

Returning the document to these defendants, who have had changing stories, different versions of the document and whose very raison d'etre is a dedication to attacking American, Jewish, and other Western assets, citizens, interests and values, and which, as a core principle provides material support for terrorists and treats them as martyrs and national heroes, would be no better than destruction.

### 3. Substantial Injuries to Other Parties

There would be no harm to other parties of interest. In *EEOC v. Quad/Graphics, Inc.*, at 559, the Court found if respondent did not succeed on appeal, the only harm incurred would be a delay in the EEOC's receipt of the information that was the subject of the order. Here, even that delay would not occur. Plaintiffs are simply seeking to maintain the status quo. The only delay would be a delay in the criminal destruction of evidence of a crime.

These defendants waited six weeks before they even raised these issues that have now led the Court to enter its destruction Order. They secured a sequestration agreement on false pretenses, never corrected during that six week period; and still plaintiffs complied with their end of the agreement in every regard. The status quo must be preserved and causes no injury to anyone.

### 4. Harm to Public Interest

A stay of enforcement of the January 2 order and the maintenance of the status quo will not cause any harm to the public interest. To the contrary, such a stay will preserve the public

interest. The courts consistently have recognized that the ATA reflects Congress's view that there is a compelling national interest in discovery in ATA cases, given the insight such discovery provides into the agenda and methodology of terrorists and of those, like these defendants, who provide material support for terrorists who kill innocent Americans. DE 202 at 13-15. Defendants' illegitimate cover-up efforts must not be permitted with impunity.

In addition, the order itself has an adverse and indeed illegal impact on the public interest. The public interest is particularly at risk here because the relief was granted in a minute order without any explanation or analysis. Thus, plaintiffs have no way of knowing the intended parameters of the order. Under defendants' iteration, the order is all encompassing and goes even beyond what defendants originally requested in their motion – requiring the destruction of the video recording of the Dahbour deposition in addition to the transcript and the document and all notes and summaries thereof.

The ATA itself reflects a great public national interest in full disclosure of the facts, circumstances, methodology, and participants in acts of terror that target, murder, and maim Americans. This Order is directly contrary to this compelling public interest.

There is a great public interest in having law enforcement and Congress fully informed on all of the facts in this field, especially where, as here, there is a heinous crime at issue and defendants are the direct beneficiaries of the largesse of American taxpayers.   This Order frustrates these important public interests as well.

In the very least, a limited stay should be granted in order to allow plaintiffs to seek a stay from the court of appeals, which is their right pursuant to Fed. R. App. P. 8. *See, U.S. v. Nat. State Bank of N.J.*, 469 F.Supp 612 (D.N.J. 1979).

### C. The January 4, 2013 Minute Order is the Subject of an Appeal, or in the Alternative an Application for Mandamus Review

1.  Plaintiffs Meet the Standard for Collateral Order Review

The review of a district court's orders pursuant to the collateral order doctrine are limited to asmall class of decisions where order (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment. *Cohen v. Beneficial Industrial Loan Corp*, 337 U.S. 541 (1949).

The Court's January 2, 2013 minute order is an extraordinary order that falls within these parameters. This order conclusively determines the privilege issues raised by the GIS Qalqilya Memorandum. Plaintiffs have established that as a matter of law the document (and by extension the deposition transcript and the video tape) is not privileged and its underlying facts certainly must be produced. The issues relating to whether the defendants have satisfied their burden with respect to privilege are separate and apart from the merits of the case. The order is effectively unreviewable on appeal for all of the reasons discussed herein.  It is a reviewable final order within the ambit of the Supreme Court's decision in *Cohen*, 337 U.S. at 546-547.

2.  Alternatively, Plaintiffs Meet the Standard for Mandamus Review

Mandamus is generally reserved for "questions of unusual importance necessary to the economical and efficient administration of justice" or "important issues of first impression." *Id. EEOC v. K-Mart Corp.,* 694 F.2d 1055, 1061 (6th Cir.1982). In determining whether an issue is subject to mandamus, the 6th Circuit Court of Appeals has utilized a balancing test of five factors:

> We examine whether: (1) the party seeking the writ has no other adequate means, such as
> direct appeal, to attain the relief desired; (2) the petitioner will be damaged or prejudiced
> in a way not correctable on appeal; (3) the district court's order is clearly erroneous as a
> matter of law; (4) the district court's order is an oft-repeated error, or manifests a

34

persistent disregard of the federal rules; and (5) the district court's order raises new and important problems, or issues of law of first impression. *In re Perrigo Co.,* 128 F.3d at 435 (citing *In re Chimenti,* 79 F.3d 534, 540 (6th Cir.1996)). These factors need not all be met, and some factors will often be balanced in opposition to each other.

*John B. v. Goetz,* 531 F.3d 448, 457 (6th Cir. 2008). In *John B,* the Court found that the first, second, third, and fifth factors all weighed in favor of granting a writ, so that the case presented the type of extraordinary circumstance that warranted mandamus relief. *Id.*

All of the *John B* factors weigh in plaintiffs' favor here. With regard to the first factor, in the event the Court rejects plaintiffs' collateral appeal, plaintiffs will have no adequate means to attain relief. With regard to the second factor, it is clear that if the wholesale destruction defendants are demanding is permitted to go forward, critical evidence of defendants' liability in this case and their involvement in a crime will be forever lost. Plaintiffs will have no redress to any court of appeals at the end of the case because by that time the evidence will be already lost.

With regard to the third and fourth factors, plaintiffs can demonstrate a "clear abuse of discretion" on the part of the district court. *Mallard v. U.S. Dist. Court,* 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *In re King World Prods., Inc.,* 898 F.2d 56, 58 (6th Cir.1990). Indeed, the facts and legal authorities set out above demonstrate beyond doubt that defendants never satisfied their burden of establishing any privilege. Moreover, even if they had, their conduct from May 3, 2012, the date the document supposedly came into their possession, until today, reflects numerous instances of waiver. Thus, there is no basis in law or fact for the Court's grant of the extraordinary relief in its January 2 order. In addition, the order appears to require the absolute divestment by plaintiffs of all materials related to the GIS Qalqilya Memorandum, a result which will lead to the destruction of evidence of a crime in violation of 18 U.S.C. §1512(c), and defendants have interpreted the order to go beyond even what they originally requested. Plaintiffs find it hard to believe that any court would issue such sweeping

and irreversible relief in a minute order without any explanation or analysis.

With regard to the fifth factor, the instant matter poses a question of unusual importance related to the potential destruction of evidence of a crime and one of seemingly first impression. There is a significant amount of case law providing for mandamus action when a court orders privileged information to be disclosed, but not the reverse, *i.e.*, when a court orders destruction of inadvertently disclosed privileged information and such information is the sole evidence produced by defendants inculpating them in a crime.[13] The possible permanent loss of evidence is at least as important as the preservation of a privilege, perhaps even more so since the destruction of evidence is a crime in and of itself and once done, plaintiffs will not be able to turn back the clock.

While Mandamus is considered extraordinary relief, courts have granted mandamus review in analogous circumstances involving the threat of permanent loss of evidence. In *In re Newman*, 782 F.2d 971 (Fed. Cir. 1986), the court of appeals found mandamus to be appropriate where the lower court exceeded its discretionary authority when it ordered possibly destructive testing of a device for which the applicant sought a patent. The Court also found that no subsequent appeal would necessarily redress any damage resulting from the district court's authorization that the applicant's machine could be destroyed. *See also Texaco, Inc. v. Borda*, 383 F.2d 607 (3rd Cir. 1967) (mandamus issued where trial court abused its discretion in putting off deposition of witness pending the outcome of a correlating criminal case where there was a possibility that the delay would lead to loss of evidence due to the advanced age of the witness). In the instant case the chance of loss of evidence is a certainty. Mandamus is acutely appropriate.

---

[13] *See, e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 444 F.3d 462, 472 (6th Cir.2006) (quoting *In re Perrigo Co.*, 128 F.3d at 436); *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir.2003)

*cf. See Schlagenhauf v. Holder*, 379 U.S. 104, 85 S. Ct. 234, 13 L. Ed. 2d 152 (1964) (addressing mandamus where a discovery question raised a novel issue of law); *Bowman v. U.S.*, 412 A.2d 10 (D.C. Cir. 1980) (D.C. Circuit invoked mandamus jurisdiction where trial court had usurped powers compelling defense disclosures under threat of a sanction to limit defense testimony for failure to comply). Other decisions go even further, granting a writ to correct discovery orders that are found to involve an abuse of discretion,[14] or simply to be wrong.[15] Certainly mandamus should be found appropriate here for all of the reasons above.

Based on the foregoing, mandamus review of the January 3 order is warranted.

**WHEREFORE**, the instant motion should be granted, a stay of the Court's Order granting DE 170 should be entered and the status quo should be preserved.

Dated: January 9, 2013

Plaintiffs, by their Attorneys,
/s/ David I. Schoen
David I. Schoen (DC Bar # 391408)
2800 Zelda Road, Suite 100-6
Montgomery, Alabama  36106
(334) 395-6611
DSchoen593@aol.com

Robert J. Tolchin (NY 0088)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rjt.berkman@gmail.com
Counsel for Plaintiffs

---

[14] *See, e.g., In re Wilkinson*, 137 F.3d 911, 914 (6th Cir. 1998); *In re Terra Intern., Inc.*, 134 F.3d 302, 306 (5th Cir. 1998); *In re Collins*, 73 F.3d 614, 614–615 (6th Cir. 1995); *In Winters v. Travia*, 495 F.2d 839 (2d Cir. 1974).

[15] *In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 187–188 (2d Cir. 2004), *University of Texas at Austin v. Vratil*, 96 F.3d 1337, 1340–1341 (10th Cir. 1996), In re Newman, 782 F.2d 971 (Fed. Cir. 1986); *In re Halkin*, 598 F.2d 176, 197–200 (D.C. Cir. 1979).