UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA


SHABTAI SCOTT SHATSKY,              CIVIL ACTION NO. 02-2280

ET AL

VERSUS                             WASHINGTON, D.C.


PALESTINIAN LIBERATION             FRIDAY, DECEMBER 7, 2012
OGRANIZATION, ET AL                3:23 P.M.

STATUS CONFERENCE

**BEFORE THE HONORABLE RICHARD J. LEON**

UNITED STATES DISTRICT COURT JUDGE



A P P E A R A N C E S:

FOR THE PLAINTIFFS,                David I. Schoen
                                   DAVID I. SCHOEN, ATTORNEY AT
                                   LAW
                                   2800 Zelda Road
                                   Suite 100-6
                                   Montgomery, AL 36106-3700
                                   (334) 395-6611


FOR THE DEFENDANTS,                Richard A. Hibey
                                   MILLER & CHEVALIER CHARTERED
                                   655 15th Street, NW
                                   Suite 900
                                   Washington, DC 20005
                                   (202) 626-5888

                                   Charles Francis Benedict
                                   McAleer, Jr.
                                   MILLER & CHEVALIER,
                                   CHARTERED
                                   655 15th Street, NW
                                   Suite 900
                                   Washington, DC 20005
                                   (202) 626-5963

Timothy O'Toole

REPORTED BY:                          WENDY C. RICARD, RPR, CCR
                                      OFFICIAL COURT REPORTER
                                      333 Constitution Avenue,NW
                                      Room #6718
                                      Washington, DC  20001
                                      202-354-3111

Proceedings recorded by mechanical stenography.

Transcript produced by computer-aided transcription.

# P R O C E E D I N G S

THE DEPUTY CLERK:  Calling civil case 02-2280;

Shabtai Scott Shatsky, et al, versus Palestinian Liberation

Organization, et al.  Would counsel please come forward and

identify yourself for the record?

MR. SCHOEN:  David Schoen from Montgomery, Alabama,

Your Honor, for the plaintiffs.

THE COURT:  Welcome.

MR. HIBEY:  Good to see you, Your Honor.  Richard

Hibey for the Palestinian Authority and PLO.

THE DEPUTY CLERK:  Would you come up to use the

microphone?

MR. MCALEER:  May it please the Court, Charles

McAleer for the defendants.

THE COURT:  Welcome.

MR. O'TOOLE:  Timothy O'Toole for the defendants.

THE COURT: Welcome.  Well, counsel, it's not every

day, thank God, that I have seven inches -- I want to repeat

that for the benefit of the Court of Appeals should it ever be

up there -- seven inches of motions filed in the last two

months.

This is a textbook example of how not to litigate a

case.  I expect parties to try their utmost and best to resolve

these matters; I'll rule on them.  But I'll give you fair

notice, I'm not happy with this way of doing business.  This is

1     not how you litigate in this Court.

2             Mr. Schoen, you're new to this Court. You've been a

3     party to all of this. You're going to hear it for the first

4     time, this is not how we do business in this courthouse. Make

5     sure you understand that. I don't know how they do things down

6     in Alabama.

7             Strachman has been in this spot for many, many, many

8     years. He knows this is not the way we do things, either. And

9     I'm not going to turn this into who struck John. All right?

10    And I'm not saying one side or the other is more guilty with

11    regard to unnecessarily clogging this court docket up with all

12    kinds of motions. I'm not going to ascribe blame, so to speak.

13            But it's pretty clear to me after reading most of

14    this -- I haven't read them all yet -- I've read most of them,

15    that what we have here is too little cooperation and

16    collaboration and too much obfuscation and fighting. It's

17    unnecessary.

18            I'm half tempted -- and it would be easy to do it --

19    you can sit down -- I'm half tempted to just say the -- and

20    just send it to a magistrate judge. But you know what? That

21    probably wouldn't be fair. So I'm going to be fair to my

22    magistrate judge colleagues, and I'm going to hang onto it.

23            Now, I gather from your correspondence, Mr. Schoen,

24    that you have some issue with regard to my being the judge in

25    this case after that issue was discussed on the record five

years ago, roughly.  You have copies of the transcript; you've

seen it.  And the counsel who preceded you represented on the

record in court and in writing they had no problem with me

being the judge in this case now that Mr.  Hibey is making his

appearance and entering into it.

And on top of that, in the pleadings you submitted

and the transcript you submitted, there is a description by me

on the record of the circumstances under which Mr. Hibey

represented them, and yet in your latter, you make it sound

like you don't know anything about the case.  To say the least,

that's confusing.

Do you want to take a shot at trying to explain to me

how you're so in the dark as a result of the description that's

in this record that you can't adequately assess and discuss

with your client whether or not this Court four years after the

fact should continue to be the judge in this case?  Do you want

to take a shot at it?  Come on up.

MR. SCHOEN:  Your Honor, I tried to lay out all of

the issues in my letter.

THE COURT:  It was a very lengthy letter, but the

letter didn't acknowledge your having read the transcript.

MR. SCHOEN:  Your Honor, I actually -- the letter

mentioned the steps that Your Honor took toward fully airing

this thing.  I referred to the transcript, and I referred to

what had happened there, and the waiver by Mr. --

THE COURT: I'm talking about the description in the
transcript that the Court gave of the circumstances under which
Mr. Hibey represented me.  That's -- I put that out on the
record.  I don't remember seeing that in your letter anywhere.
Do you recall that being in your letter?

MR. SCHOEN:  I'll get the letter if you'd like, Your
Honor.

THE COURT: Go ahead.  I know that your letter kept
saying Mr. Hibey wouldn't give you any details.

MR. SCHOEN:  Your Honor, with all due respect, in my
review of the law, the details that are relevant are things
like the nature of the action -- I didn't see that in the
transcript.  If I overlooked it, I overlooked it.  I saw that
Your Honor said there's a case in which Mr. Hibey represented
Your Honor and other attorneys in the firm, not just Your
Honor, and that the case was dismissed, and I believe I saw
reference it was in the Superior Court.  Beyond that, I didn't
see the facts, but there may be other facts that I overlooked
in there.

The case law, as I read it, requires simply just an
understanding of what the nature of the representation was;
whether there was an ongoing representation or relationship at
all.  I understood from that transcript, there's certainly no
ongoing relationship.  Your Honor, I tried to make clear in a
couple of places in the letter that I saw no basis for recusal

1    in this case on anything that I have seen.

2              But I have an independent duty as every player in the

3    system has, defense lawyer, plaintiff's lawyer, and the Court

4    all have independent duties to understand all of the relevant

5    facts to be able to make an evaluation so that I can advise my

6    clients.  So that when clients hear --

7              THE COURT: Who's counsel in this case; is it you or

8    Mr.  Tolchin?  Because he's listed on every pleading first, and

9    you're listed second.  Now, he's not here today.  I don't now

10   why he's not here today, but, obviously, he was counsel of

11   record before you were even involved in this case; is that not

12   correct?

13             MR. SCHOEN:  Yes, Your Honor.  I joined the case in

14   July of this year.

15             THE COURT: And he was counsel of record immediately

16   after Mr.  Strachman, or however he pronounces his name, was,

17   the gentleman who represented your clients for many, many years

18   and who in the transcript here not only represents that he

19   discussed it with his clients and they had no problem with it,

20   he had no problem with it.  So he was succeeded by Tolchin.

21             Are you telling me that Tolchin never had any

22   knowledge of this issue that you just sort of discovered this

23   letter, and upon discovering it that you went to your clients

24   and they were in the dark about this whole thing?  Is that what

25   you're telling this Court?

1          MR. SCHOEN:  Certainly, the latter part of that, Your

2     Honor.  The clients were in the dark about it, and I discovered

3     the letter.

4          THE COURT: Did you talk to Tolchin about it?

5          MR. SCHOEN:  Yes, I have, Your Honor.  I've talked to

6     Mr.  Tolchin.  I've talked to Mr. Strachman.  I've done --

7          THE COURT: What did Strachman say; did he keep the

8     clients in the dark?

9          MR. SCHOEN:  Mr. Strachman did not discuss it with

10    the clients, apparently.  Mr. Strachman doesn't know the facts

11    underlying the case to any further than what I've described in

12    the transcript.

13         THE COURT: Are you telling this Court that Mr.

14    Strachman admitted never discussing it with the clients?

15         MR. SCHOEN:  That's my understanding, Your Honor.  As

16    I read the transcript, it's not clear to me that he answered

17    that part of the question, Your Honor, but to be perfectly

18    frank and fair to Mr. Strachman, that was a compound question.

19         Mr. Strachman certainly had no problem with Your

20    Honor appearing in this case.  I've tried to indicate in my

21    letter, Your Honor, that I see no basis for recusal in this

22    case.  I simply have to ascertain the facts.  If Your Honor

23    doesn't think that's appropriate, then that's Your Honor's

24    ruling.

25         I believe that there are a variety of factors that

1   the case law describes, Your Honor.  Frankly, there is a line

2   of cases from awhile ago which I think really predate the

3   change in Section 455 that found it mandatory if there were a

4   prior representation for disqualification, but that's clearly

5   not the law now and not the trend.  Certainly, no mandatory

6   disqualification --

7          THE COURT: Quote from the transcript -- the Court

8   speaking:  I gather -- speaking now to Mr. Strachman -- quote:

9   I gather you've had a chance to think about it and discuss it

10  with your counsel, Mr. Strachman -- excuse me, your client --

11  excuse me -- and from the written correspondence that I've

12  received, it is your position and your client's position that

13  you have no objection; is that correct?  Yes, Your Honor.

14         Several weeks ago Mr. Hibey mentioned very briefly

15  without expounding on the details that he had represented Your

16  Honor, and we immediately wrote to the Court as you indicated

17  indicating that we see no objection with Your Honor.  In fact,

18  we feel it would be appropriate and significant that Your Honor

19  continue on with this case, especially since we are sort of

20  rounding third, if you will, and through the nature and posture

21  of the case; close quote.

22         You think Mr. Strachman was not being candid with

23  this Court?

24         MR. SCHOEN:  No, Your Honor.  I think Mr. Strachman

25  was being candid.  I think Mr. Strachman explained that he

1   didn't have facts; he got a summary thumbnail sketch from Mr.

2   Hibey, and then Mr. Strachman immediately concluded from that

3   that there wouldn't be any basis for recusal, and one of the

4   factors being that the case he felt was coming around third

5   base, as he said.

6         Again, Your Honor, Mr. Strachman may have a very

7   different view of what his obligations were under the law than

8   I do.  As I mentioned in the letter, I'm very sensitive in the

9   area because I've litigated a number of conflict cases.  All I

10  asked for -- I didn't intend to bring this back before the

11  Court, Your Honor.

12        All I asked for in a discreet private e-mail to Mr.

13  Hibey, just one-on-one, was would you please just tell me the

14  facts of the representation.  I thought that was appropriate.

15  I thought it was required frankly, Your Honor.

16        THE COURT:  What did you need to know?

17        MR. SCHOEN:  The factors the Court talks about is,

18  again, Your Honor, I believe the nature of the representation;

19  how long that representation lasted; whether there's any kind

20  of not just representation, but ongoing relationship between

21  Mr. Hibey and the Court.

22        THE COURT: The answer to the last question is "no".

23  Mr. Hibey was retained by my law firm that I was in to

24  represent the law firm and six partners of which I was one.  It

25  was a malpractice case brought by a disgruntled client of the

1   firm.  The case went to trial in the Superior Court in either

2   '97 or '98 -- I can't remember the exact date.  The trial

3   lasted approximately eight weeks.

4           At the end of the case-in-chief for the plaintiff,

5   the Court granted the motion to dismiss as to me and to several

6   of my partners.  I can't recall how many others.

7           How much more do you need?

8           MR. SCHOEN:  I don't think I need any more, Your

9   Honor.

10          THE COURT: Very good.  You have no other questions?

11          MR. SCHOEN:  No, I don't, Your Honor.

12          THE COURT:  Very good.

13          MR. SCHOEN:  Your Honor, I'm very sorry that I've

14  caused this kind of reaction from the Court.  I honestly

15  believed --

16          THE COURT: I don't know what you're talking about,

17  this reaction.  You have more than enough information, Mr.

18  Schoen, in my judgment, but you want to litigate issues like

19  this and take the Court's time up with it --

20          MR. SCHOEN:  No, I don't, Your Honor.  That's what I

21  said in the letter.

22          THE COURT: It's your way of doing business.  Mr.

23  Hibey, it seems only fair to give you a chance to respond.

24          MR. SCHOEN:  Thank you, Your Honor.

25          MR.  HIBEY:  I have nothing to add to what Your Honor

has said regarding the description of the representation that I

undertook on behalf of the law firm of which you were one of

six partners who were called out in that particular case.  Any

other comment I might have would be merely that, comment, and I

don't think I want to dignify this aspect of the proceedings

with any statement on my part regarding my views concerning the

issue that I thought had been resolved many years ago with

counsel and with the Court on the record at my instigation

needs to be further addressed by me today.

THE COURT: Well, Mr.  Schoen, I'd be the first to

admit I've not done a lot of research whether or not -- you can

sit down -- whether or not in our circuit a issue of the kind

that you're raising requires, requires, any fact finding by

this Court.

It would be tempting to put Mr.  Strachman under

oath, but that seems to be the duty of bar counsel, not this

Court.  There's clearly, at least based on your representations

to me, there's clearly a miscommunication of some time being

alleged between Mr.  Strachman and your clients, but even if

that occurred -- and it may have and it may not have -- that

issue was raised and put to bed a long time ago.  Indeed, in

advance of any and many, I should say, rulings by this Court,

some of which your client and Mr.  Tolchin, whose team you

joined only recently, may not have liked.

But the purpose of relitigating, so to speak, this

issue is certainly not for the purpose of foreign shopping and whether or not there is any material need for this issue to be raised at all, I'm going to let you figure that out with the benefit of discussion with Mr. Strachman and bar counsel.

And I will go and look and see if our circuit has ever said that circumstances of this kind necessitate the Court to conduct its own fact inquiry as to whether or not the lawyer, in this case, Strachman, fell down on his job and misrepresented to this Court that he had discussed it with his clients. Based on his response to my question, there was no question in my mind whatsoever that he had discussed it with his clients and that they had no problem with it.

You can interpret it anyway you wish. You can say it was a compound question and it's unclear, Judge, but I can assure you, there was no unclarity in my mind, nor, I might add, in Mr. Hibey's mind or, apparently, Mr. Strachman's mind at the time, and that's a long, long time ago, long before you got involved in this case and long before I entered any rulings in this case.

But since then, I have entered rulings in this case, many rulings. Some of which were in favor of your clients and some of which were not, and as far as I can tell and absent my conclusion to the contrary, this is the status of the case for now, and it wouldn't be efficient and fair to my colleagues for me to recuse -- first of all, I have no basis to recuse myself,

but I said that at the time, and it's on the record in the
transcript.  I see no basis to recuse myself.

          As I mentioned just a moment ago, I have no
continuing ongoing relationship with Mr. Hibey.  Those events
took place 15 years ago.  I have no ongoing relationship with
him.  I have no ongoing relationship with the firm I served in.
In fact, I left that firm in 1999 -- before I became a judge 10
1/2 years ago.

          There is no continuing relationship; no continuing
connection between myself and my old firm or Mr.  Hibey for
that matter.  He has never since represented me under any
circumstances.  So I have no basis to recuse myself, and until
such time as I'm convinced that I have an obligation under
circuit rules and circuit precedent of which I am not aware of
any to conduct any kind of a fact finding inquiry, I'll leave
that up to the Bar.

          If Mr.  Strachman fell down on his job and
misrepresented to the Court, then he'll have to answer to the
Bar, and if his clients are concerned about it, then they can
file a Bar inquiry, too; but as far as I'm concerned, I'm not
doing anything more on this issue.

          And feel free if you find any D.C. Circuit case that
says I have to do a fact inquiry, let me know about it, too.
I'll be glad to receive it from you.

          Now, it's pretty obvious to me what's going on in

1  this matter.  I set a deadline for this case to have the fact

2  inquiries completed within a time frame, and for reasons that I

3  don't know, and, obviously, I don't have a crystal ball so I'll

4  never know, the parties got delayed and left it to the 11th

5  hour -- maybe not the 11th hour and 55th minute -- but late in

6  the game to actually conduct some of the most basic of the

7  discovery that needed to be done on the factual nature.

8        And then we have this flurry of activity in the last

9  two months, actually, the last month, leading up to the

10  deadline that has resulted in seven inches of pleadings; for

11  the benefit of the Court of Appeals seven inches of pleadings.

12  They don't get that very often up there.  This is not how we

13  litigate cases, Mr.  Schoen, in this district.

14        Now, what depositions do you need to take, Mr.

15  Schoen, that you haven't taken yet?

16        MR. SCHOEN:  Well, Your Honor, depositions would be

17  of a couple of varieties; one would be a deposition we just

18  filed a motion for the Hague deposition of a fellow named

19  Al-Hindi, whose name surfaced during the course of the

20  litigation over the purportedly privileged document related to

21  destroy or return document.  His name -- the only reason --

22        THE COURT: Is he a fact witness?

23        MR. SCHOEN:  What, Your Honor?  Yes, Your Honor.

24        THE COURT: Is he a fact witness?

25        MR. SCHOEN:  Yes, Your Honor.

1          THE COURT:  All right.  And his name surfaced prior

2     to the close of factual discovery?

3          MR. SCHOEN:  Yes, Your Honor.

4          THE COURT: And did it -- how was it disclosed?

5          MR. SCHOEN:  The name was disclosed -- again, I'm

6     speaking advisedly, Your Honor, not referring specifically to

7     the document that's at issue, but in the disclosure that was

8     made in the motion that accompanied the -- in a motion

9     regarding the destruction and return of the property, this

10    fellow's name was mentioned, again.

11         So I feel that I can mention it in the context of how

12    it's mentioned in the defendant's papers. He was a -- again, he

13    was a -- I hesitate to just go too far on the facts, Your

14    Honor, but he was associated with -- this is clear in their

15    papers that they filed -- he was associated with the bomber in

16    the case and the PA policeman who recruited and organized the

17    bomber.

18         THE COURT:  And you said he's at the Hague?

19         MR. SCHOEN:  No, Your Honor.  I said that word, the

20    "Hague", but I was referring to -- Hague depositions; meaning

21    we would have to get approval to take his deposition overseas.

22         THE COURT: So your pleading sets out all the reasons

23    why this is necessary?

24         MR. SCHOEN:  Yes, Your Honor.

25         THE COURT: Is that a fair statement?

1          MR. SCHOEN:  Yes, your Honor.

2          THE COURT:  That's one of the ones I have not read

3    yet.

4          MR. SCHOEN:  It was just filed, Your Honor.

5          THE COURT:  All right.  Well, I'll need to get to

6    that.  Who else do you need to depose?

7          MR. SCHOEN:  We believe, Your Honor, that we have

8    both the obligation and the right to pursue the deposition for

9    a person named Abu Hamid -- H-A-M-I-D.  Again, without getting

10   too much into the details here, Your Honor.  I know Your Honor

11   doesn't need to hear argument on motions, particularly ones not

12   ripe yet.

13         THE COURT: This is a separate motion?

14         MR. SCHOEN:  Well, Your Honor, this relates to the

15   motion for the destruction return of the property.  As we set

16   out in the papers, during the course of the deposition, we were

17   given one explanation as to why the document at issue was

18   purportedly privileged.  It was generated as a function of the

19   witness who was being deposed having met with the defense

20   investigator the night before or close in proximity to a

21   deposition.

22         When the defendants filed their motion for

23   destruction and return of the -- or return of the document on

24   October 31st, that position changed, and we were told that in

25   fact the document was a document drafted by this fellow, Abu

Hamid, who's a member of the PA security forces, and that if

I'm, again, recalling the argument or the assertion correctly

that he, Mr. Abu Hamid, came to find out that his supervisor

had been asked by someone on the defense team to -- something.

It's not clear from the --

But, in any event, he, Abu Hamid, was asked to

investigate the bombing, and according to the submission on

October 31st, Mr. Abu Hamid did an investigation and this

reflects -- this document reflects his report, a document which

the witness only described as similar to other documents in the

file itself, actually.

Again, not going into the merits of the argument,

Your Honor, I believe that given that there is a work product

privilege raised, we needed to seek the deposition of Mr. Abu

Hamid to try to some attorney source to get at the information

and the circumstances at which it was drawn, but the underlying

information, to be perfectly frank, Your Honor, we believe that

this information -- again, without going into the details, this

information clearly is at the heart of the case, and it's

information which should have been disclosed in response to our

March 2012 discovery requests.

This is all about material support by the PA for this

PFLP and this bombing, and so we certainly need -- we believe

are entitled to this document fully based on the waiver and all

sorts of other claims.  There's no excuse whatsoever if version

1     -- if the facts are as presented in the October 31st that this

2     document was received by the defense on May 3rd, there's

3     absolutely no reason and shouldn't have been disclosed in the

4     privilege log if the claim is privileged in response to the

5     March 2012 discovery request.  It goes to the heart of the

6     discovery request, Your Honor.

7           So we believe we're entitled to the underlying

8     information where did Mr. Abu Hamid find out this information.

9     Was it based on documents?  Was it based on witness interviews?

10    None of which we know anything about -- or none of whom, also,

11    Your Honor, potentially.

12          THE COURT: He's is a fact witness?

13          MR. SCHOEN:  Well he's a person after the fact who

14    says that he investigated what happened in the bombing, and we

15    believe that --

16          THE COURT: Why is that relevant?

17          MR. SCHOEN:  Because he's a security officer with the

18    PA, and we believe we're entitled to know what it is he relied

19    on in his investigation to come to conclusions that fully

20    support our case, Your Honor.

21          THE COURT: That's discussed at length in your

22    response to the defendant's motion for return or destruction of

23    -- inadvertent of produced document?

24          MR. SCHOEN:  It's discussed in there.  I don't know

25    about at length, Your Honor.  I believe so.  It's certainly in

1   papers that we have filed.  I could maybe more clearly identify

2   which other papers --

3            THE COURT: All right.  I'll look at it.  What else do

4   you have to --

5            MR. SCHOEN:  So Your Honor is clear, I believe it's

6   relevant for overcoming the work product privilege to the

7   extent that this one even applies to show that we're trying to

8   seek alternative means, Your Honor. We've asked the defendants

9   informally to permit the deposition, and they've declined and

10  said they would oppose a motion to take it.

11           Well, Your Honor, the motion that's also -- I'm

12  sorry, Your Honor.  I have my list of those motions that are

13  ripe and not ripe at my table that I could get, but I believe

14  I'm going to refer to one now that's not ripe; in fact, I'm

15  quite sure of it.

16           There's a motion pending -- if Your Honor would like

17  me to return to the table I can get the number -- the docket

18  entry number of the motion that I'm about to refer to, but I

19  can refer to it in general terms, and, perhaps, Your Honor will

20  know what I'm talking about.

21           It's a motion regarding what we contend to be the

22  failure by the defendants to produce witnesses, designated

23  witnesses, on certain specific topics in 30(b)6 depositions

24  that we took, and so because witnesses weren't produce --

25  again, as we lay out in the papers.  Before that -- before the

1    30(b)6 deposition were taken, which we had noticed in August,

2    and the defendants filed a protective order to get moved

3    September, basically, carving out one month from there for

4    Ramadan from the discovery schedule.  Those things then were

5    moved to September and before the 30(b)6 depositions,

6    defendants had filed certain objections to the topics that we

7    raised -- we took the position that they really needed to file

8    a productive order rather than objections if they were going to

9    address the merits.  They filed a protective order regarding

10   the timing, but not about the substance or the topics that we

11   mentioned.

12          We then had one of these meet and confers, and we

13   were assured -- we had suggested that we were going to file a

14   motion to address the issue because we felt we needed to

15   address it before we flew over to Israel -- before I flew over

16   to Israel to take the depositions.  We were assured during that

17   meet and confer that -- I believe the words used -- and I can

18   check my notes, they're at home, but it doesn't matter the

19   specific words -- that the defense would put a witness in the

20   chair for every topic.  While the defense might disagree with

21   us on the scope, meaning the number of years we're allowed to

22   inquire about and that sort of thing, the defense assured us

23   that they would present a witness for every topic.

24          When we got over there, that wasn't the case, Your

25   Honor, and some of the topics are more important than other,

1    but we mention -- we designated all of them -- we identified

2    all of the topics because we thought all of them were

3    important, and so it would be the witnesses who we believe --

4    not we believe -- the witnesses who were not produced on the

5    topics set out in our motion regarding the failure to produce

6    witnesses, which, again, is not ripe, Your Honor.

7              THE COURT: How many deposition is that?

8              MR. SCHOEN:  I don't know the answer off the top of

9    my head, Your Honor, but I think something like -- again, may I

10   get the motion, Your Honor?

11             THE COURT: Sure.

12             MR. SCHOEN:  I have a quandary, and I'm not sure --

13   it's certainly not the Court's problem, and I don't mean to

14   interject my problems in this at all.  I'm Sabbath observant,

15   and once the Sabbath begins, I'm not allowed to speak with a

16   microphone like this.  It doesn't happen for awhile; yet I've

17   never had a hearing on a Friday afternoon.  I'm sorry to say,

18   but I've been very nervous about the situation, but I don't

19   know how to approach it.  I certainly still have some time.

20             THE COURT:  How much time you've got?

21             MR. SCHOEN:  4:28 would be the absolute cutoff as I

22   understand it from when I could continue speaking into a

23   microphone.  I've made other preparations; I'm going to leave

24   any money I had in my pocket here in the courtroom.  I'm going

25   to leave my pen here because I can't carry those things, but --

1          THE COURT:  She doesn't need the microphone does she?

2          MR. SCHOEN:  I'm fine with it now, Your Honor.  It

3     wouldn't be for another half hour, Your Honor.

4          THE COURT REPORTER:  It does record for the digital.

5     I could get my external microphone out.

6          THE COURT: Okay.

7          MR. SCHOEN:  Thank you very much.

8          THE COURT:  We'll see how we're doing.

9          MR. SCHOEN:  Yes, Your Honor.

10          THE COURT:  If need be, we'll go without the

11     microphone.

12          MR. SCHOEN:  Thank you, Your Honor.  Your Honor, we

13     identified topics 13, 14, and 15 in the notice to the PA, and

14     17 is four -- five.  I believe it would be five to six

15     depositions, Your Honor.

16          THE COURT:  Well, give me the names of the people.

17          MR. SCHOEN:  I don't the names of the people, Your

18     Honor.  They would be designees by the PA that weren't

19     designated for the topics that we sought the depositions on

20     this time.

21          THE COURT:  Did you indicate in advance that you

22     needed people for those particular topics?

23          MR. SCHOEN:  Yes, Your Honor.

24          THE COURT:  And what was the response?

25          MR. SCHOEN:  The response, Your Honor, was in our

1    meet and confer, the defense assured us that the would be

2    producing a witness for every topic that we designated.

3           Again, it's laid out in the motion, Your Honor. It's

4    not ripe yet, so I don't mean to --

5           THE COURT: What were the topics?

6           MR. SCHOEN:  I don't have the exhibits to the motion

7    with me, Your Honor, but I'm reading from docket entry 181.

8    Topic 13 dealt with communications between the PA and the PFLP

9    concerning this case.  Topic 14 was communications between the

10   PA -- I'm referring by the initials, Your Honor, but I mean, of

11   course, Palestine Authority.  Communications between the PA,

12   and it's Mr.  Saadat -- S-A-A-D-A-T -- the PFLP's secretary

13   general.  And then between the PA and Mr. Malouh; that's topic

14   15, who is the PFLP's deputy secretary general.

15          Just to give a little background, Your Honor, on

16   those two topics, again, as we lay out in the motion papers

17   Mr.  Saadat took the position at his deposition that he

18   wouldn't testify that -- I believe he said:  I have the blood

19   of Rachel Curry(Phonetic) on my hands -- Rachel Corey(Phonetic)

20   -- and he doesn't recognize the jurisdiction of the Court; that

21   sort of thing.

22          I explained that I was coming from the United States'

23   case, not an Israeli case, and he, essentially, said the same

24   thing and wouldn't speak.  Based on discussion our Israeli

25   counsel had with Mr. Saadat's local counsel over there -- let's

1    call it -- he understood that there were discussions between PA

2    lawyers and defense lawyers and this fellow who's a lawyer for

3    Mr. Saadat that may have procured Mr. Saadat's not speaking

4    -- we don't know.  I can't tell the Court that is what lead him

5    not to speak, but I will say this about the next subject, Your

6    Honor, Mr. Malouh -- that's M-A-L-O-U-H.

7             One of the things in this case that took some time

8    litigating was litigation over whether Mr. Malouh's deposition

9    would be bifurcated or not.  The defense took the position that

10   we should only be able to inquire of him in his capacity as a

11   member of their executive committee first, and only after in

12   his capacity as the PFLP leader, and Your Honor ruled that way,

13   and that was based -- I don't specifically what led Your Honor

14   to the conclusion, but I know that in the papers presented to

15   Your Honor, Your Honor was clearly given the impression that

16   there would be a dichotomy between those two roles.

17            And during the course of the deposition as it

18   proceeded, I would be interrupted periodically, not frequently,

19   with the objection or question as to whether my question was in

20   one capacity or the other, and so, finally, I put it to Mr.

21   Malouh whether he operates in two different capacities in his

22   mind or otherwise, and he said, absolutely not, that it's all

23   the same.  He wears the same hat all the time.

24            And so that was a frustrating experience after having

25   litigated that issue before Your Honor -- I didn't litigate it,

1       but after having seen the papers that were litigated

2       that were at issue, and we had to bifurcate that deposition,

3       but, in my event, we have asked in this topic 15 for

4       communications between the PA and the Mr. Malouh, who normally

5       sits on the executive committee, has a driver, chauffeur, and a

6       Mercedes provided by them; his utility bills, I believe, paid

7       for by them, and he's the top guy on the street, let's call it

8       -- he's the deputy secretary general of the PFLP, the outlawed

9       terrorist organization, Your Honor.  So those are those topics.

10              I'm sorry, Your Honor.  I'm just looking to see.

11      Again, I don't have the exhibits.  I'm just looking to see the

12      description of what the next topics are.

13              The topic number 17 was an effort to understand the

14      nature and the extent of loss or destruction of documents --

15      there's been a claim in this case that -- again, this was

16      highlighted in the depositions, Your Honor, to an exceedingly

17      frustrating point.

18              A couple of witnesses testified as has been the

19      defense position that they're unable to produce or consult or

20      rely on documents -- and let's be specific -- specifically,

21      regarding the town of Qalqalia(Phonetic) -- Q-A-L -- Qalqalia

22      -- specifically about this because either the Israelis seized

23      them in incursions or the Israelis destroyed them -- something

24      like that -- witness after witness gave that testimony, and

25      that's been the defense until Mr. Dahbour -- D-A-H-B-O-U-R --

1    testified the following day, and, again, preceding his

2    deposition, we were given 17 documents in Arabic that related

3    to this matter in part.

4            When Mr. Dahbour was examined, he testified that he

5    was able to review the files from California and in archives

6    keep all files from Qalqalia, and so it was very frustrating to

7    learn that after hearing other witnesses purportedly unable to

8    answer questions because there were no documents from Qalqalia.

9            And so here, we were seeking a witness who could

10   testify about the loss or destruction -- purported loss or

11   destruction of the documents that has handcuffed defendants in

12   responding.

13           Topic 18, Your Honor, is one that -- another one that

14   we find we felt particularly -- was particularly important.

15   This is particularly important in a case like this where the

16   defendants and their records and appropriate personnel, outside

17   of our subpoena power.

18           So this was a witness we had hoped we'd provide

19   foundational basis for documents and evidence that we wish to

20   offer into evidence in all likelihood at the trial, and, of

21   course, at the summary judgment motion.  So this was a

22   custodian of records type witness for documents that had been

23   produced by the defendants in the case, which appear to be from

24   the PA's own files.

25           Now, again, if there would be a stipulation that

these were business records or something that would help with
the -- or be relevant to the admissibility of these documents,
that kind of thing wouldn't be necessary, but that has not been
forthcoming.

Thirteen, 14, 15, 17 and 18 -- I think I've
identified, Your Honor, and that's what I see in our motion
papers with respect to that, with respect to the failure to
produce --

THE COURT:  So it could be that the witness -- if the
Court were to require a witness to be produced for such a
deposition could cover all four or five topics.

MR. SCHOEN:  It's certainly possible, Your Honor.

THE COURT: We'll have to see what they have to say.

MR. SCHOEN:  Yes, Your Honor.  I just want to --

THE COURT:  Any other deposition you need?

MR. SCHOEN:  I say this, Your Honor, cautiously, but
there is another motion being prepared to be filed on this
issue.

THE COURT: Well, you better wait before you submit
that.

MR. SCHOEN:  I'll just explain one, Your Honor.  And
then this motion goes to the failure to produce witnesses on
the topics, the one I just addressed, DE-181.  The forthcoming
motion is a little different variety, and, that is, the failure
to meet the defendant's obligations under Rule 30(b)6 to

eloquently prepare witnesses to testify on the topics for which they were designated, and the resounding example of that I suppose -- I don't say resounding because it's a peculiar situation, but one example of that would be, for example, we had a topic listed attempting to address -- you asked a witness who could -- we asked for a witness who could address the affirmative defense the defendants have raised that they are -- they lack the capacity to be sued and that they are an unincorporated association, which has certain criteria's, membership and that sort of thing that the law sets out.

We asked for a witness to be able to testify about that; a witness was designated on that topic and had no familiarity whatsoever I think it would be fair to say with those concepts.  We believe that Rule 30(b)6 has an affirmative obligation on counsel producing a witness to prepare the witness to explain the topic that witness is going to be designated for and to prepare the witness to testify on that topic; that's one example, and that's a peculiar one, Your Honor, that doesn't go to the facts of the case, but, again, if we were to file the motion, we would lay out all of those bases.

I understand Your Honor said I'm not doing anything wrong to direct that it not be filed?

THE COURT: I would wait before he files petitions or motions.

1          MR. SCHOEN:  Yes, Your Honor.  Thank you, Your Honor.

2          THE COURT: Mr.  Hibey, do you have any depositions

3     you need to do?

4          MR. HIBEY:  Your Honor, may I ask Mr. McAleer to

5     respond to the --

6          THE COURT:  That's fine.  Whoever.  I had the

7     distinct impression there were five defendants -- five

8     plaintiffs that you wanted to depose you didn't get to depose.

9          MR. MCALEER:   Your Honor, yes, we noticed 10

10    plaintiffs actually for deposition, and we noticed them in

11    August, and the plaintiffs filed a motion for a protective

12    order as to all 10.

13          With respect to certain of the plaintiffs, the

14    plaintiffs' counsel had indicated that there were some specific

15    health issues in the case of a couple of those plaintiffs,

16    issues over the birth of I believe a grandchild.

17          We have indicated to the plaintiffs that we were

18    willing to reach an accommodation regarding those specifically

19    identified plaintiffs, and the record is very clear on that,

20    but there were five of the plaintiffs as to whom the

21    plaintiffs' counsel never indicated any impediment for then to

22    travel to the District of Columbia where they chose to file

23    this lawsuit.

24          THE COURT: So you need to do those five?

25          MR. MCALEER:  Yes, Your Honor.

```
1              THE COURT: You want to do them?

2              MR. MCALEER:  We want to do those five.  Obviously if

3    --

4              THE COURT: You want to do them here in DC, right?

5              MR. MCALEER:  Yes, Your Honor.

6              THE COURT: Okay.

7              MR. MCALEER:  And we don't know whether the

8    circumstances have changed with respect to the plaintiffs who

9    were anticipating a birth of a grandchild or with respect to

10   the plaintiff who was undergoing I believe some mental health

11   treatment and his parents who felt they needed to be near him.

12   Those were the five plaintiffs that had indicated were not able

13   to as of August to travel to DC, but the circumstances may have

14   changed as to them.

15             One of issues that the plaintiffs recently raised

16   with the Court, which we addressed yesterday in a consolidated

17   reply filing the issue of Rule 35 exams.  The plaintiffs had

18   indicated to the Court that we had not scheduled Rule 35 exams,

19   but the record we submitted to the Court yesterday very clearly

20   indicates that back in August, I had indicated to plaintiffs'

21   counsel that an association with the depositions here that we

22   wanted to schedule Rule 35 exams.

23             It's exactly the same procedure that was followed

24   with respect to, I believe, 42 plaintiffs in the

25   Sokolow(Phonetic) case up in New York, without objection or
```

impediment to getting those scheduled.  When I raised that

issue with the plaintiffs in August, they acknowledged that

that was -- I think their phrase was a "good plan".

Unfortunately, they took the position that none of their

clients would travel from Israel for the deposition, and,

hence, were not going to be available for the Rule 35 exams.

Obviously, the health care professionals who'd be

conducting those Rule 35 exams are located here, and the

examinations would need to be conducted here, but it's most

certainly an issue that I raised with plaintiffs that didn't

register an objection at the time.  The only reason that the

Rule 35 examinations did not occur was because of the position

that the plaintiffs took on the location of the depositions as

reflected in my motion for a protective order.

THE COURT: Now, are these the same plaintiffs who the

plaintiffs' counsel represented were not healthy enough to

travel to Washington, DC?

MR. MCALEER:  There was only one plaintiff who was

indicated by plaintiffs' counsel to be not healthy at the time

of August 2012 to travel here, and that gentleman was named

"Leo(Phonetic) Thaler".  His parents who are also plaintiffs in

this case were, according to plaintiffs' counsel, concerned

about his treatment, and I certainly credit that, and they

wanted to be with him.

The indication at the time in August was that Mr.

1    Leo Thaler was going to be released after a couple of weeks --

2    we're now almost three months later.  I don't know what his

3    circumstance is, but his parents were able to travel as far as

4    I know at the time, they simply didn't want to travel because

5    they wanted to attend to the healthcare interest of their

6    child.

7            THE COURT: He hasn't been deposed?

8            MR. MCALEER:  He's not been deposed; his parents have

9    not.  And then of the group of five that the plaintiffs said

10   could not travel to the U.S., the other two were plaintiffs

11   whose children were expecting a new baby.  So at the time in

12   August, the plaintiffs said that they preferred not to travel

13   out of the country while awaiting the birth of their

14   grandchild.

15           Obviously, we're now three months later, and I'm not

16   sure that that same concern pertains --

17           THE COURT: Well, how many of the 10 plaintiffs have

18   been deposed?

19           MR. MCALEER:  None, Your Honor.  They all -- they're

20   governed by the plaintiffs' motion for a protective order,

21   which sought to preclude depositions of all 10 here; even the

22   five as to who may never have asserted any health, travel or

23   other impediment to appearing here in the jurisdiction in which

24   they filed the action.

25           THE COURT:  Well, it wasn't ruled on.

1          MR. MCALEER:  It was not ruled on, Your Honor.

2          THE COURT: If it's not ruled on, the status quo

3     exists.

4          MR. MCALEER:  Yes, Your Honor.

5          THE COURT: So it should have been done.

6          MR. MCALEER:  Well, it had been our desire to do the

7     depositions, however, there were just no plaintiffs willing to

8     appear in this jurisdiction to convene the depositions or to

9     conduct the Rule 35 examinations.  And, of course, the fact --

10          THE COURT: How many of the plaintiffs based on your

11     understanding of their condition do you believe you are willing

12     to accommodate deposing in Israel?  You said five a minute ago;

13     it's still five or is it less than five?

14          MR. MCALEER:  Well, that was at the time -- the only

15     plaintiff whose health condition we were told prevented was

16     one; so one of the 10.

17          THE COURT: You believe the other nine should have to

18     come here?

19          MR. MCALEER:  I do, Your Honor.

20          THE COURT: All right.  We'll see what he's got to say

21     about that in a second.  Who else needs to be deposed?  You've

22     got nine plaintiffs you need to depose?

23          MR. MCALEER:  Yes, Your Honor.

24          THE COURT: Well, 10, actually; nine here.  Nine in

25     the U.S., one in Israel.  All right.  How many others you got

1  to depose?

2          MR. MCALEER:  We did not notice the depositions

3  beyond that, Your Honor.

4          THE COURT:  Okay.  How long is it going to take you

5  to do it?

6          MR. MCALEER:  Well, based on the experience in the

7  Sokolow case, they can be done in a rather efficient fashion.

8          THE COURT: Two days each?

9          MR. MCALEER:  Yes.  At most, yes.  So I think you're

10  looking at the ability to be able to do this over the course of

11  a week-and-a-half, two weeks.  In fact, when we issued the

12  notice of deposition, it was with that in mind.

13          THE COURT: Now, the guy -- the plaintiff that you say

14  that has got the health problem that would probably prohibit

15  him from traveling to the U.S., could he have a Rule 35 exam in

16  Israel?

17          MR. MCALEER:  We would undertake to make that happen

18  if we could --

19          THE COURT: Doctors in Israel -- you could maybe

20  arrange to have a doctor retained for that purpose.

21          MR. MCALEER:  If Mr. Leo Thaler is still unable to

22  travel because of his health, we would do both the deposition

23  and the Rule 35 exam in Israel.

24          THE COURT: It would seem as to the other plaintiffs,

25  then, if they're coming to the United States for a deposition,

1    they should have their Rule 35 examination while they're here.

2              MR. MCALEER:  Yes, Your Honor.  That would be our

3    request to the Court and was our request to the plaintiffs.

4              THE COURT: You've got some doctors lined up for this

5    purpose?

6              MR. MCALEER:  Yes, Your Honor.  In fact, with respect

7    to our November 19, 2012 expert disclosure deadline, defendants

8    did identify damages—related experts, and we have the ability

9    here to have those examinations done by professionals in the

10   United States.

11             THE COURT: All right.  Anything else?  Any other

12   depositions you need to do?

13             MR. MCALEER:  No.  In terms of depositions we are

14   seeking, those are the ones that we were seeking.

15             THE COURT:  You think realistically you can get all

16   that done by the end of January?

17             MR. MCALEER:  Yes, Your Honor.

18             THE COURT: About two months.  A little less than two

19   months with the holidays in there and kind of —— maybe

20   Valentine's Day.  You can get it done by Valentine's Day?

21             MR. MCALEER:  Yes, Your Honor.

22             THE COURT: Mr.  Schoen, how many of your plaintiffs'

23   clients ——— how many of your clients are too ill to travel to

24   the United States?

25             MR. SCHOEN:  I don't the answer to that, Your Honor.

1    I want about it when Your Honor asked -- I want to be clear,

2    Judge, these plaintiffs have not declined the deposition.

3    These depositions were noticed 11 months -- almost 11 months

4    into the 12-month period.  This was a matter of timing that we

5    addressed in our motion papers, and we offered to have the

6    depositions take place in October, frankly.

7              I want to be clear.  It's not a matter of --

8              THE COURT: You indicated that they'd come to the

9    United States in October?

10             MR. SCHOEN:  We said -- I'm not sure about the United

11   States.  We offered to have the depositions taken; some in

12   Israel; some in the United States, Your Honor.

13             THE COURT:  All right.

14             MR. SCHOEN:  There were those health problems.  There

15   was a Visa problem.  I had one person who did not have a Visa.

16   We had a school teacher who wasn't able to come at the

17   beginning of school.  We have people with childcare

18   obligations; they made a time to be able to resolve.

19             THE COURT: All right.  So if I understand you

20   correctly, you are not going to be seeking relief from the

21   Court to have all of those 10 plaintiffs deposed in Israel?

22             MR. SCHOEN:  No, Your Honor.  Certainly not all of

23   them, Your Honor.  I'm just not in a position to say today what

24   particular people's problems are in terms of health problems,

25   Visa problems or otherwise, so that I couldn't give the Court a

fair description today of when they could be here, whether they
could travel here.  I have no reason to believe that the
numbers would be any worse in terms of who could come to the
United States; in other words, if there were five could come
before and five couldn't, I have no reason whatsoever to
believe they would be worse, and it may be that all of them
could come.  It may be that they can't.  I just don't know.

THE COURT: Well, I'll tell you what:  The only ground
that I'll accept for someone not coming is a medical reason
documented in writing from a doctor in Israel indicating that
this person's health would be adversely affected or impacted by
his traveling to the United States.  That's the only reason;
not that someone's  grandchildren are being born -- no; not
that someone's teaching at a school -- no.

They chose to be plaintiffs in this court, in this
district.  They are to get here and be deposed here, and when
they're here, those that need to be subjected to a Rule 35 exam
will have their exam, and I'm not going to extend this
discovery period certainly any longer than Valentine's Day, so
you've got a window -- if someone's got a medical reason, they
better start getting that letter in fast; you'll have to file a
motion.  Because as of now, they're all going to have to come
unless and until I see a letter from a doctor that satisfies me
that the person's not in good health to come.

Now, I would expect -- expect -- defense counsel to

1    work with you on that issue, and I would only have to see it

2    only if they could not be satisfied.  I have reason to believe

3    that they are willing to try to accommodate anybody -- he

4    mentioned a particular Mr. Thelon -- I think his name was or

5    something like that.

6          MR. SCHOEN:  Thaler, Your Honor.

7          THE COURT: Thaler.  So there's one person who might

8    have a medical condition that would be adverse to his

9    traveling; okay.  Fine.  And there may be others.  I don't know

10   if there are others, but I expect them to work with you on

11   that, and if when they see whatever medical information there

12   is that would warrant it, then, I expect them to be reasonable,

13   and if they're not, then, you can seek relief of the Court.

14         MR. SCHOEN:  Your Honor -- I'm sorry -- if I may, I

15   understood the Court to say certainly not extending discovery

16   beyond Valentine's Day -- I want to be clear with the Court

17   that the depositions that we seek of people who just surfaced

18   now with this document and one just surfaced October 31st --

19   this Al-Hindi and Abu Hamid -- does it require an order from

20   the Court for the depositions to be taken?  Their most recent

21   experience with this is from another court in this district --

22         THE COURT: We haven't gotten to them yet.

23         MR. SCHOEN:  Oh, I see, Your Honor.  I thought --

24         THE COURT:  I'm only talking about now the

25   plaintiffs.

1            MR. SCHOEN:  Oh, I understand, Your Honor.  I

2   thought Your Honor said that certainly discovery wouldn't go

3   out any further than February 14th, but if Your Honor meant for

4   the plaintiffs' depositions, then, I understand.

5            THE COURT: No.  No.  No.  All discovery.  They're

6   next -- I haven't gotten to them yet.  I'm just focusing on

7   those 10 plaintiffs.

8            MR. SCHOEN:  Yes, Your Honor.  I just wanted to make

9   the point that the most recent experience is from another court

10  in this district in the Klieman -- K-L-I-E-M-A-N -- case in

11  which when a deposition was ordered -- it's another case

12  against these defendants -- when a deposition was ordered to be

13  taken in Israel by the Court here under the Hague convention,

14  the turnaround time was approximately three months rather than

15  two months.

16            THE COURT: What judge was that?

17            MR. SCHOEN:  They're in the case.  I'm not sure of

18  the judge, Judge. You could certainly inquire of defense

19  counsel.  I don't know the answer to it.

20            We submitted with our papers, I believe, a reference

21  to the Klieman case and the time that it took.  I think that's

22  in the recent Al-Hindi motion that we filed.

23            THE COURT:  Well, like you said a minute ago, the

24  motion is not ripe yet with regard to Al-Hindi and Hamid.  I'm

25  going to wait to see what happens when they're ripe.

1          MR. SCHOEN:  Yes, Your Honor.  Thank you, Your Honor.

2          THE COURT:  Now, how about these five topics that you

3     mention, Mr. McAleer?

4          MR. MCALEER:  Yes, Your Honor.  May I just briefly

5     note to the Court, there isn't -- as far as I know -- there is

6     no motion pending with respect to a deposition of Mr.

7     Abu Hamid, and --

8          THE COURT: I thought he said there was.  Maybe I

9     misunderstood it.

10          MR. MCALEER:  I don't believe there is such a

11     deposition pending.  I am -- I would like to -- if the Court is

12     interested, I'd be happy to address very briefly the issue of

13     Mr. Abu Hamid, but there isn't a motion pending.

14          THE COURT: If he wants a deposition of that fellow

15     and that other -- Al-Hindi -- the burden's on him to convince

16     the Court, discovery's closed.  I'm considering opening it up

17     until February 14th for limited purpose, i.e., you get the

18     plaintiffs that you haven't been able to depose, and they get

19     these topic you all didn't have people who could address.

20          I'll give you a chance to talk about that, but --

21          MR. MCALEER:  Yes, Your Honor.

22          THE COURT: But the point is that they went there, and

23     they didn't have people who are knowledgeable with 30(b)6

24     deposition on certain topics that he believes -- he's

25     represented to this Court that are critical to their ability to

1          prosecute their case.

2                    Now, if you disagree with that, obviously, I'll be

3          glad to hear what you have to say, but --

4                    MR. MCALEER:  I do disagree, Your Honor.  I'll be

5          glad to address those issues.  And let me note for the Court

6          that our opposition to the motion on deposition topic coming

7          Monday, and we'll be filing on time and addressing these issues

8          in more detail, but in the meantime, Your Honor --

9                    THE COURT: Just give me a succinct response.

10                    MR. MCALEER:  Absolutely, Your Honor.

11                    THE COURT: Be mindful of his time.

12                    MR. MCALEER:  I will.  And let me address that real

13          quickly; five topics.  We had objected on the basis of case law

14          in this jurisdiction, a Judge Lamberth decision, that says as

15          to certain subjects an interrogatory answer is preferred,

16          particularly, when it can involve circumstances about which a

17          30(b)6 witness would not necessarily be knowledgeable,

18          including searches conducted by counsel.

19                    Now, in this instance as to these five topics, there

20          were interrogatories that the plaintiffs served on August 20th

21          that called for answers on the last day of discovery, September

22          19th.  We answered those -- and let me address, in particular,

23          the first topic, topic 13:  Communications with the PFLP.

24                    If I recall correctly, I don't have the answers to

25          interrogatories here.  We answered the interrogatory on that,

1    and we indicated that there were no responsive communications

2    of which we were aware.  We answered that in the interrogatory.

3    We thought it inappropriate for the purposes of the Rule 30(b)6

4    examination.

5          What they were trying to get at were these kind of

6    counsel-to-counsel communications about which a lay 30(b)6

7    witness would not have knowledge.  We would demonstrate that in

8    our opposition.  Secondly, communications with Achman Saadat --

9    similarly, we answered an interrogatory to that effect on

10   September 19th and indicated again, based on my recollection,

11   that there were no known identified responsive communication

12   that there were no known responsive communications with Mr.

13   Saadat.

14         What counsel is referring to is that there was a

15   gentleman, an attorney, Palestinian attorney, Mr.

16   McMoud(Phonetic) Hasaan, who as it happened, represented both

17   Mr.  Saadat who is in jail in an Israeli prison, who was a --

18   had a leadership position in the PFLP and Mr. Abdel Rahim

19   Malouh(Phonetic) who is a member of the PLO executive committee

20   who also happens to be a deputy secretary general of the PFLP.

21         It was as to that deposition that Mr. McMoud Hasaan

22   represented Mr.  Malouh in his PFLP capacity, and we

23   represented Mr.  Malouh in his capacity as member of PLO

24   executive committee.

25         We, obviously, had communications,

1    counsel-to-counsel, with Mr.  McMoud Hasaan to coordinate the

2    issue of Mr.  Malouh's deposition.  We -- not then, not ever,

3    would instruct a witness not to answer or testify at a

4    deposition.

5            The notion that Mr.  Schoen seems to suggest that

6    somehow we brought about Mr.  Saadat's refusal to testify --

7    his testimony was given in court in Israel -- is absolutely

8    baseless.

9            THE COURT: All right.

10           MR. MCALEER:  We take our responsibility to the Court

11   seriously in that regard.

12           THE COURT: Okay.

13           MR. MCALEER:  Now, the --

14           THE COURT:  As I said a minute ago, fact discovery is

15   closed.

16           MR. MCALEER:  Yes, Your Honor.

17           THE COURT: The burden is on the moving parties who

18   want to extend it for specific limited purposes to convince the

19   Court to extend it.  He's going to have to convince me on those

20   points, and you'll get your chance to oppose in writing to the

21   extent that that hasn't already been done.

22           On the issue of the plaintiffs' depositions, that's a

23   closed issue now.  You're going to get to depose all of them

24   between now and Valentine's Day, and he's going to be able to

25   give a Rule 35 exam to whichever ones you believe it's

1           necessary to do.

2                   All right.  Now, with regard to Al-Hindi and Hamid,

3           he's got to convince me that that's appropriate; the burden's

4           on him, not on you.  Fact discovery is done.  He has to

5           affirmatively convince the Court -- you'll get to oppose it,

6           obviously.

7                   So there are some motions here that are not ripe yet.

8           I'm going to wait and see what those all look like.  Okay.  For

9           now, I know enough to deny the motion for protective order,

10          which is 167; 186 -- plaintiffs' motion to compel production of

11          withheld documents -- provisional funding -- I've reviewed all

12          those pleadings; 173 and 187 -- plaintiffs motion to compel

13          production of documents -- the defendants have agreed but

14          failed to produce and to adjourn deadlines for expert

15          disclosures -- I'm going to deny all three of those.

16                  I'm going to continue to look at the motion for

17          return or destruction of inadvertently produced documents, and,

18          then, of course, the remaining ones.  So those motions remain

19          extant and get your responses in as soon as possible.

20                  MR. MCALEER:  Yes, Your Honor.  We will.

21                  THE COURT: Now, do you have any experts you need to

22          depose or you're all set?

23                  MR. MCALEER:  We haven't deposed any of their

24          experts.  The only experts they disclosed by their October 19th

25          deadline were damages related experts, and, as to those,

1    obviously, to understand the bases for their opinions, we would

2    --

3                THE COURT: If they don't have any other experts than

4    that, then that's a problem for them, right?

5                MR. MCALEER:  That is our position, Your Honor, and

6    we opposed any attempt by them to hold open their right to

7    designate other experts.

8                THE COURT: That period is closed, too.  So the burden

9    is on them to convince the Court to allow any more experts --

10   on behalf of the plaintiffs.  Now, how about your experts?

11               MR. MCALEER:  Your Honor, we designate -- we served

12   plaintiffs with two damages related experts on our deadline

13   date of November 19th.  As to our liability experts, we filed

14   those with a motion for the Court to file them under seal and

15   in camera because we thought it not fair while they were trying

16   to get additional time for their -- after the fact -- for their

17   expert disclosures, we thought it not fair at that point to --

18   that they should be served with our liability experts, but we

19   complied with our disclosure deadlines.

20               And if the Court has ruled that they are not able to

21   identify -- to designate or disclose any additional expert

22   witnesses beyond those that they designated on October 19,

23   their deadline, then their -- the process may well be that our

24   expert liability expert reports can be unsealed by the Court.

25               THE COURT: Well, I'm going to give him a chance to

 1    tell me if he has any experts that he needs to be deposed.  Are

 2    your people ready to be deposed?

 3              MR. MCALEER:  Well, we can certainly have them ready

 4    to be deposed -- some may be traveling -- need to travel, but

 5    we could certainly have them ready to be deposed.

 6              THE COURT: All right.  I'll give you to -- I'll give

 7    you to March 18th -- that's a Monday -- to depose any experts

 8    that need to be deposed -- I'll give each side until March 18th

 9    -- that's roughly a month after the close of this extended fact

10    discovery period -- to have their experts deposed.

11              You have two; now, let's see if he's got any.

12              MR. MCALEER:  We have two damages.  We have our

13    liability experts, all whose reports are before -- with the

14    Court.

15              THE COURT:  All right.  So you have three?

16              MR. MCALEER:  We have several liability experts.  I

17    believe the total is about four or five. So we have a total of

18    eight experts who we have disclosed; two of them are damages'

19    related, and the remainder are issue of non-damages or

20    liability-related experts.

21              THE COURT:  Well, if they want to depose them, they

22    get to March 18th to do it.

23              MR. MCALEER:  Your Honor, one final issue, and I'll

24    be very quick on this:  We would want to have the Court make

25    clear that if they are barred from further disclosures of

1      expert witnesses other than those that they disclosed on

2      October 19th that they have no right to -- if you will -- back

3      door it through a rebuttal expert process that they are --

4      they're barred from further expert disclosures in the case.

5              THE COURT: Well, I said a minute ago, the burden is

6      on plaintiff now to convince the Court that they should be able

7      to add additional experts than the ones they've already

8      noticed.

9              All right.

10             MR. MCALEER:  Yes, sir.  Thank you, Your Honor.

11             THE COURT: And by the way, the expert opinion reports

12     need to be in to them no later than February 14th.

13             All right.  Mr.  Schoen, turn that mike off.

14             MR. SCHOEN:  Your Honor, I have 15 minutes -- before

15     4:48.

16             THE COURT:  Oh, all right.  Well, go ahead, then. You

17     can do it in less than 18 minutes I'm sure.

18             MR. SCHOEN:  Well, what time is it now, Your Honor?

19             THE COURT:  It's about 4:30.

20             MR. SCHOEN:  4:30 -- 18 minutes would be 4:48.  Very

21     briefly, Your Honor.

22             THE COURT:  You probably don't need 18 minutes.

23             MR. SCHOEN:  I probably need two minutes, Your Honor.

24             THE COURT: How many experts more do you need?

25             MR. SCHOEN:  We would need all of our liability

experts, Your Honor, and we've addressed this in our papers.
The defendants withheld all of the information about their
policemen, Nazal, who organized, recruited, provided handling
and training and food and supplies for this bomber until after
the fact discovery deadline.

They disclosed only this Al-Hindi in his document
that they had withheld; Hamid we never heard about until
October 31st, a month-and-a-half after the close of fact
discovery and after the expert deadline.

Your Honor, we must be able to produce -- disclose
liability experts in this case, and we need the information
from their witnesses to show to our experts.  Our experts need
to know how is it that a PL(sic) policeman was able to recruit,
organize, et cetera, this kind of bombing and then -- given a
promotion from the rank of captain to major after he did all of
those thing; how it is he gets mortar money; his family gets
mortar money, his family gets mortar money, so-called "mortar
money" after his death; these are all things the expert needs
to be able to consider; the liability experts needs to be able
to consider; what's the interaction --

THE COURT: Fact discovery is closed.

MR. SCHOEN:  They withheld the information.  That's
what our motion papers are about.  They withheld the documents
about Nazal -- N-A-Z-A-L -- and they withheld -- again, these
documents they had that describes what I'm not supposed to go

1    into because it's a so-called "privilege" document, which we

2    don't believe it is at all -- it's something that should have

3    been disclosed in response to our March request about any

4    material support provided by the defendants.  It goes exactly

5    to all of those things.

6              THE COURT: How many people have you deposed to date?

7              MR. SCHOEN:  I don't know how to answer that, Your

8    Honor.  The 30(b) -- I don't know how many 30(b)6 witnesses

9    there were.

10             THE COURT: How many fact witnesses have you deposed;

11   not you personally, your team?

12             MR. SCHOEN:  I understand.  Those 30(b)6 witnesses

13   are fact witnesses in the context of this case, Your Honor.

14   Al-Hindi is one person we now know was a participant;

15   apparently, an associate; a person who is seen with, associated

16   with and so on, that's a fact witness.

17             THE COURT: You've told me that you've got a pleading

18   filed with the Court.

19             MR. SCHOEN:  Yes, Your Honor.

20             THE COURT:  Setting forth why you believe Al-Hindi

21   should be able to --

22             MR. SCHOEN:  As to Hamid.  Yes, Your Honor.  As to

23   Hamid, we served a notice of  notice of deposition.  Mr.

24   McAleer said correctly, I believe, there's no motion pending.

25   We served a notice of deposition, and the defendant's position

1    was, among other things, discovery closed, we're not producing

2    him as a witness.

3            THE COURT:  Okay.  So you have one week to file a

4    motion to compel production of the witnesses that you believe

5    they need to produce or for a fact -- for additional fact

6    discovery; you have one week.  They have one week to respond.

7            And I'll rule on that before Christmas, but if I

8    grant it, you'll get to February 14th for that fact discovery

9    to be conducted, and if they're experts, you've got to a month

10   window to March 18th to get those done.

11           Now, how many liability experts you say you've got?

12           MR. SCHOEN:  I don't know the answer; two or three I

13   believe.

14           THE COURT:  Okay.  You better get them in the ready

15   position, and you have to convince me that you have to call

16   them, as well, so you better set forth in your pleading why you

17   should be able to add these experts that you haven't previously

18   noticed on liability.  Did they do reports?

19           MR. SCHOEN:  No, Your Honor.

20           THE COURT: Are they going to do reports?

21           MR. SCHOEN:  Yes, Your Honor.  Of course.

22           THE COURT:  All right.  Well, they have to have their

23   reports completed and done, too, by February 14th just like

24   their experts have to if they do have expert reports.

25           MR. SCHOEN:  Understood, Your Honor.

1          THE COURT: You've got a week.  Are there any other

2     depositions you need to get done?

3          MR. SCHOEN:  I'm not aware of them, Your Honor.

4     We'll address that in the motion that's in a week, Your Honor.

5          THE COURT: Get it in, counsel.

6          MR. SCHOEN:  Yes, Your Honor.

7          MR. SCHOEN:  May I be excused, Your Honor?

8          THE COURT: You're excused.

9          MR. SCHOEN:  Thank you, Your Honor.

10          THE COURT: Let me ask one more question of defense

11    counsel:  These documents that are under seal, do they need to

12    stay under seal?

13          MR. MCALEER:  We would ask that they stay under seal

14    unless and until there's been a final determination that the

15    plaintiffs have no right to identify additional experts because

16    they are liability experts whose opinions under the Court's

17    prior scheduling order would only have been necessary after we

18    had reviewed the plaintiffs.  That's the problem because they

19    haven't -- they didn't meet their deadline; we met ours.

20          And so we would ask unless -- until the Court rules

21    on what may be their motion regarding additional expert

22    disclosures that they remain under seal, Your Honor.  We

23    apologize for the inconvenience to the Court on that.

24          THE COURT:  They have it.  They have all this

25    information.

1          MR. HIBEY:  No.  They have whatever information they

2     have.  What we're saying is that we have met our deadline

3     obligation to file expert witnesses.  That comes one month

4     after they should have filed theirs, but they blew through that

5     deadline on their own.  Okay.

6          So we don't think they should have the benefit of

7     reviewing our materials before they meet their obligation.

8     Now, they have failed to meet it, and the Court may determine

9     that because they have failed to meet it as they did in one

10    other case that I can think of, then, that's it, they don't

11    have any experts in their case-in-chief.

12          THE COURT:  All right. So you want to keep this under

13    seal until I rule on it.

14          MR. HIBEY:  Yes.  If you please, Your Honor.

15          THE COURT:  That's agreeable.  Counsel, do your best

16    to work these things out.  I don't want seven more inches of

17    pleadings here.  This is really beyond the pale.

18          I have over 200 cases I have to concern myself with;

19    this is only one of them -- MDL of mammoth proportions.  So,

20    please, let's be practical.

21          MR. HIBEY:  Yes, Your Honor.

22          MR. SCHOEN:  Yes, Your Honor.

23          THE COURT: Stand at recess.

24          (Whereupon, this hearing concluded at 4:39 p.m.)

25

1
**C E R T I F I C A T E**

2
        I, Wendy C. Ricard, Official United States Court

3
Reporter in and for the District of Columbia, do hereby

4
certify that the foregoing proceedings were taken down by

5
me in shorthand at the time and place aforesaid,

6
transcribed under my personal direction and supervision,

7
and that the preceding pages represent a true and correct

8
transcription, to the best of my ability and understanding.

9

10

11

12                                    _____

13                                    Wendy C. Ricard, RPR, CCR

14                                    Official U.S. Court Reporter

15

16

17

18

19

20

21

22

23

24

25