Exhibit 37

[Translation from the Hebrew by Riva Starr]

**1**
**[Emblem of the State of Israel]**
**Courts**

Stamped:      District Court in Jerusalem
                I affirm
                That this copy is accurate and conforms with the original
                /s/ Chief Secretary /dated/ June 2, 2013

**Before the District Court in Jerusalem**      **Serious Felony [Case] 7027/06**

**Before:**      **The Honorable Judges: Tzvi Segal – Deputy President – Presiding Judge, Yosef Shapira and Yoram Noam**

**In the matter of: State of Israel**      **The Prosecutor**

Through the Office of the Attorney General[,][1] District of Jerusalem

**Versus**

**Ahad Gholmeh (I[dentity] N[o.] 96060837)**      **The Defendant**

By his attorney, Advocate R. Anis

# Sentence

In a verdict, it has been determined, after hearing evidence, that the Defendant was one of the murderers of the Minister Rehavam Ze'evi, z"l [of blessed memory], who was murdered in cold blood on October 17, 2001 at the "Hyatt" Hotel in Jerusalem.

The Defendant was convicted of the offense of murder – pursuant to Section 300(a)(2) of the Penal Law, 5737-1977, as well as the offense of membership in a terrorist organization – pursuant to Section 3 of the Prevention of Terrorism Ordinance, 5708–1948, in conjunction with Sections 1 and 8 of such Ordinance.

The Defendant, who was one of the senior [members] of the military wing of the terrorist organization, the "Popular Front" [for the Liberation of Palestine, (hereinunder, the "PFLP" or the "Organization")] and who headed the hierarchy of those involved in the murderer, played a central part in planning the murder, dispatching the murderers to carry it out, and in their fleeing after the fact. The circumstances under which the offenses were perpetrated, and the active involvement of the Defendant in planning and executing the murder, were described extensively in the Court decision and there is no need to reiterate them.

SHATSKY - 007582-T

---

[1] Translator's Footnote: Additions by the translator are shown in [hard brackets].

[Translation from the Hebrew by Riva Starr]

**2**
**[Emblem of the State of Israel]**
**Courts**

<u>**Before the District Court in Jerusalem**</u>             **Serious Felony [Case] 7027/06**

**Before:**      **The Honorable Judges: Tzvi Segal – Deputy President – Presiding Judge, Yosef Shapira and Yoram Noam**

This Sentence, against the individual who headed the cell of murderers, and who was a proponent of the assassination and its execution, is the last in a series of legal proceedings which have been brought against all those involved in the murder who have been caught and brought to justice in Israel.

After hearing arguments by counsel for the parties for sentencing and the statements by the Defendant, we have come to the general conclusion that the Defendant should be sentenced as follows:

For the offense of murder – life imprisonment.

For the offense of membership is a terrorist organization – the maximum sentence determined by law, that is, 5 years of actual imprisonment.

Both terms of imprisonment shall run consecutively, commencing with the date of the arrest of the Defendant in Israel, [on] March 14, 2006.

**The Defendant is notified [of] his right to appeal to the Supreme Court within 45 days from today**.

Decided this 4th day of Kislev 5769 (December 1, 2008), in the presence of the parties.

Deputy President                    Judge                         Judge

Stamped:        District Court in Jerusalem
                I affirm
                That this copy is accurate and conforms with the original
                /s/ Chief Secretary /dated/ June 2, 2013

SHATSKY - 007583-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
1

Stamped:      District Court in Jerusalem
              I affirm
              That this copy is accurate and conforms with the original
              /s/ Chief Secretary /dated/ June 2, 2013

**Before the District Court in Jerusalem**          **Serious Felony [Case] 7027/06**
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
                   Judge, Y. Shapira and Y. Noam

In the matter of:      **The State of Israel**

                       By its attorney, Advocate G. Cohen

                       Of the Office of the Attorney General[,] District of Jerusalem

                                                                **The Prosecutor**

                                        **Versus**

                       **Ahad Gholmeh (I[dentity] N[o.] 960608370)**

                       By his attorney, Advocate R. Anis

                                                                **The Defendant**

# Verdict

**Judge Y. Noam:**

**Introduction**

1.      On the morning of October 17, 2001, the Minister of Tourism, Rehavam
Ze'evi, z"l [of blessed memory], was murdered at the "Hyatt" Hotel in Jerusalem. His life
was cut short by murderers, who fired three pistol bullets at him at close range, two of
which hit his head. The fatal shots to the late Minister were fired at approximately 6:50
a.m., when he was returning to his room from the dining room of the hotel where he had
eaten breakfast with his wife, and at the time he intended to leave for his work at the
Ministry of Tourism. The deceased was rushed to Hadassah Ein Kerem Hospital in
Jerusalem, where he was pronounced dead, after resuscitation efforts were unsuccessful .

2.      The Defendant, Ahad Gholmeh, born in 1968, from the village, Beit-
Fouriq, near Nablus, has been charged with serving as the head of the military wing of
the terrorist organization, The "Popular Front", and, by virtue of his position,

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
2

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

planned the murder of the late Minister and caused its execution, in retaliation for the killing of the Organization leader, Abu-Ali Mustafa, by Israeli security forces. The indictment charges the Defendant with the offense of murder – pursuant to Section 300 (a)(2) of the Penal Law, 5737-1977, as well as the offense of belonging to a terrorist organization – pursuant to Section 3, in conjunction with Sections 1 and 8, of the Prevention of Terrorism Ordinance, 5708-1948.

3.     This verdict is the final in a series of the indictments which were filed against those involved in the murder. The indictment against the Defendant, who pursuant to that alleged [herein] is the most senior individual behind the planning and execution of the murder, was filed on May 12, 2006, after the Defendant and additional [individuals] involved in the murder were brought to Israel by IDF forces from a prison compound of the Palestinian Authority in Jericho. The case was first adjudicated before a different panel [of judges] of this Court (**the Honorable Judges M. Ravid, O. Efal-Gabai and A. Farkash**), which also heard a parallel case in the matter of two additional Defendants. After such panel of judges rendered its ruling on February 21, 2007, regarding the denial of the preliminary claims in both cases, the instant case was transferred, on April 1, 2007, in the matter of the Defendant, and the matter of an additional Defendant, Majdi Rahima Rimawi (hereinunder[, "]**Majdi**["]), for adjudication before us. During the course of hearing the defense, the case of Majdi was separated and transferred for adjudication by another panel [of judges], due to Majdi's choice not to testify at his trial, but [rather] to give testimony at the trial of the Defendant. The trials of all the other defendants, including the trial of Majdi, have been concluded; and currently, there remains only to render a verdict in the matter of the Defendant.

SHATSKY – 007585-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**3**

<u>Before the District Court in Jerusalem</u>      **Serious Felony [Case] 7027/06**
**Before:**      The Honorable Judges: T. Segal – Deputy President – Presiding
              Judge, Y. Shapira and Y. Noam

### General Background Regarding Arrest of the Murder Suspects and their Trial in Israel

4.      Following is the factual background regarding the proceedings which preceded filing the indictment. This background was brought before the Court at the preliminary hearing stage and was undisputed.

Shortly after the murder, the Israeli security and investigative authorities began to accumulate information regarding its perpetrators. In light of this information, Mohamed Fahami Rimawi (hereinunder[, "]**Mohamed**["]) and Salah Alawi were quickly arrested as suspects involved in the murder, and information was also collected regarding suspicion of involvement of two others in the murder, Hamdi Quroan (hereinunder[, "]**Quroan**["]) and Basel Asmar (hereinunder[, "]**Asmar**["]). On October 19, 2001, two days after the murder, the Magistrate's Court in Jerusalem issued arrest warrants against the latter two.

At that time, an indictment was filed in this Court against Mohamed Rimawi and Salah Alawi in Serious Felony [Case] 4073/01– against the former for murder of the Minister, and against the latter, as an accomplice to the murder. The Court (the Honorable Judges Y. Hecht, M. Ravid and V. Tzaban) convicted the two on October 7, 2002 for the offenses with which they were charged. On that same date, Mohamed Rimawi received a life sentence, and Salah Alawi was sentenced on April 9, 2003 to twelve years of actual imprisonment.

Whereas the remaining suspects involved in the murder went into hiding in the area of Judea and Samaria, on February 3, 2002, the State of Israel presented the Palestinian Authority with requests to arrest Quroan and Asmar and transfer them to Israel. During February 2002, the Palestinian security forces arrested Hamdi Quroan, Basel Asmar and the Defendant in a safe house apartment in Nablus. The latter even broke his legs in attempting to flee unsuccessfully, while jumping from a window in the apartment. During the same period, the Palestinian Authority also arrested

SHATSKY - 007586-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
4

**Before the District Court in Jerusalem**            Serious Felony [Case] 7027/06

**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
            Judge, Y. Shapira and Y. Noam

Majdi Rimawi, a resident of the village Beit-Rima, which is north of Ramallah, who was also suspected in being involved in the murder. All those arrested were brought for interrogation by the investigating Palestinian authorities.  On March 3, 2002, after Israel had been notified of the arrest, an additional request was made of the Palestinian Authority to transfer Quroan and Asmar to Israel.

        5.        [no such number in the original Hebrew]

        6.        During Operation "Defensive Shield", which was conducted during April 2002, the Israeli security forces became aware that the murderers of the late Minister were hiding in the "Muqata'a" building in Ramallah. In light of the fact that the Palestinian Authority did not respond to the requests to turn over [the suspects], it was decided that IDF forces would encircle the structure, and so it was done. After a protracted siege, and negotiations brokered [by the] Americans and British, the parties reached a memorandum of understanding, the basis of which was an agreement that the suspects involved in the murder – Majdi Rimawi, Hamdi Quroan, Basal Asmar, the Defendant and Ahmad Sa'adat (who served as head of the PFLP), together with Fuad Shubaki (suspected of being responsible for bringing in the weapons ship, "Karin A"), would be transferred temporarily to the Jericho Prison compound, where they would be jailed under the supervision of British and American inspectors, twenty-four hours a day, and in return, Israel would lift the siege and undertake not to harm the six. The siege was indeed lifted, and the six were transferred to the Jericho Prison. In May 2002, the Magistrate's Court in Jerusalem issued arrest warrants for the Defendant and Majdi Rimawi, and a request was submitted to the Palestinian Authority to transfer them to Israel. After American officials warned the Palestinian Authority of [its] breach of the memorandum of understanding, and demanded that steps be taken to honor the agreement and ensure the security of the American and British inspectors, the inspectors left the prison facilities on March 14, 2006.  On that same day, the Israeli security forces arrested the six in the Jericho Prison compound, and transferred them to a detention facility. Initially, their detention was extended by the Military Court in Judea and Samaria, however, later on,

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
5

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06

**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y. Shapira and Y. Noam**

the Attorney General [in Israel] decided that Quroan, Asmar, Majdi and the Defendant would stand trial in Israel, and their detention was extended by the Magistrate's Court in Jerusalem.

7.      On May 12, 2006, indictments were filed against the Defendant and Majdi in the instant case (Serious Felony [Case] 7027/06), and against Quroan and Asmar in a separate case (Serious Felony [Case] 7028/06).

### The Indictment

8.      The indictment charges the Defendant with responsibility for planning and committing the murder, within the framework of his activity as head of the military wing of the PFLP. As aforesaid, the original indictment was filed initially against two defendants: Majdi and the Defendant. It included five different charges, of which Majdi alone was charged with four, and the fifth – for the murder of the late Minister Ze'evi – was charged to both. Whereas the trial of Majdi was separated as aforesaid, there remains before us only the fifth charge in the matter of the Defendant, with which [he] is accused of the offense of murder – pursuant to Section 300(a)(2) of the Penal Law, and the offense of membership in a terrorist organization – pursuant to Section 3 of the Prevention of Terrorism Ordinance.

9.      In the preamble to the indictment, it is alleged that, on the relevant dates, the Defendant served as the head of the military wing of the PFLP, while Majdi served as recruiter of activists in the Organization and as an architect of the commission of terrorist attacks. Following are the main facts of the indictment, as such pertains to the Defendant, after separating the charge[s] in the matter of the other defendant, Majdi.

Pursuant to that alleged in the indictment, in the wake of the death of the head of the PFLP, nicknamed Abu Ali Mustafa, on August 27, 2001 from fire by the Israeli security forces, it was decided

SHATSKY – 007588-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
6

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06

**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y. Shapira and Y. Noam

in the Organization to avenge his death by murdering a senior figure in Israel. In order to carry out the plan, Majdi approached Hamdi Quroan, who agreed to take part in the planned assassination. As part of the preparations for carrying out the murder, Quroan visited, at Majdi's directive, the "Hyatt" Hotel in Jerusalem and even received a false Israeli identity card from Majdi.  Majdi showed Quroan a picture of the late Minister, as the murder target, gave him information about his daily routine and the room in which he customarily stayed, and even gave him money in order to take a room at the same hotel. Quroan indeed took a room at the hotel on October 14, 2001, and tested the access and escape routes at the site. At this point, Quroan recruited another two participants to help him carry out the murder – Basel Asmar and Mohamed Rimawi – after Majdi approved their participation, and updated them that the plot being woven is to murder the Minister at the hotel in Jerusalem. Shortly thereafter, the three – Quroan, Asmar and Mohamed Rimawi – met with the Defendant and Majdi in Ramallah. At this meeting, the latter two prepared the three for carrying out the attack, completed its planning and determined the role of each for its perpetration.

It was further alleged in the indictment that, during the course of the meeting, that the Defendant encouraged the three, and blessed them before [they] left to commit the murder. When the three questioned what would happen if they were caught by the Palestinian Authority after carrying out the murder, the Defendant responded that the Palestinian Authority is "in his back pocket." Majdi directed Quroan to rent an additional car, gave him forged Israeli identification cards for Mohamed and Asmar, and also gave him, for purposes of the murder, two 7.65 mm pistols with silencers, and a "Scorpion" Sa'ar [storm] rifle. Quroan, through Mohamed, rented an additional car; purchased new clothes for himself and for Mohamed at Majdi's direction; and even received a Kia car, which the Defendant had rented.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
7

<u>Before the District Court in Jerusalem</u>                 Serious Felony [Case] 7027/06

**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y. Shapira and Y. Noam**

With regard to carrying out the murderous plan, it was alleged in the indictment that in the afternoon hours of October 16, 2001, Quroan and Asmar, armed with the pistols, arrived at the "Hyatt" Hotel in Jerusalem together with Mohamed, where they took a room under a false name through a forged identity card for Quroan and Asmar, whereas Mohamed slept in the house of a resident of Azriya in East Jerusalem.  The next day, on October 17, 2001, proximate to 6:00 am, Quroan went down from his room in the hotel to the dining room, to check that the late Minister was there. Thereafter, Quroan and Asmar armed themselves with the pistols, and positioned themselves close to the entrance to the emergency stairwell near the room in which the Minister was residing on the eighth floor. Close to 6:50, the deceased went up to his room, after eating breakfast in the dining room of the hotel. When he exited from the entrance of the elevator, and passed by the two, Quroan called to him. When the Minister turned to him, Quroan fired three pistol shots at close range. Two of the shots, which hit the head of the late Minister, were fatal, causing his death within a brief [period of] time. Quroan and Asmar fled quickly from the site, while leaving a pamphlet about Abu Ali Mustafa at the scene, as an indication and sign that the murder had been committed in revenge for the death of the latter.

The indictment attributes to the Defendant liability for the murder as a joint perpetrator – as [the] one who planned the murder, equipped the perpetrators with the means to execute it, and sent them to commit it.

## Review of Legal Proceedings

10.    As aforesaid, the indictment in this case (Serious Felony [Case] 7027/06) was filed against the Defendant and Majdi on May 12, 2006, and was initially heard before a different panel [of judges] (**the Honorable Judges M. Ravid, O. Efal-Gabai, A.**

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**8**

<u>Before the District Court in Jerusalem</u>          Serious Felony [Case] 7027/06

**Before:**     The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y.  Shapira and Y. Noam

**Farkash**), who were also hearing the parallel case (Serious Felony [Case] 7028/06) which was filed against Ahmad Quroan and Basel Asmar. When the trial opened, the defendants in the two cases raised preliminary claims: **The first** – regarding the lack of venue and subject matter jurisdiction, claiming that they view themselves as "**fighters against the Israeli occupation**," and therefore, they should be recognized as prisoners of war and the rules of war should be applied thereto; and **the second** – a claim of "double jeopardy," pursuant to which they had already been tried for murder of the late Minister by the courts of the Palestinian Authority, where the Defendant had been convicted, only for providing sanctuary for the murderers and [for] not reporting [them] to the Palestinian Authority. The hearing on the preliminary claims was held jointly for the two cases, and in its ruling dated February 21, 2007, the Court rejected the[ir] claims. Whereas in their Answer to the indictment, the four defendants denied the facts attributed to them in the two indictments, and whereas the two defendants in Serious Felony Case 7028/06 – Asmar and Quroan – were to serve as prosecution witnesses in Serious Felony Case 7028/06 [sic], the general prosecution moved for said panel [of judges] to hear only one of the cases, and to transfer the other case for adjudication before another panel. Accordingly, on March 26, 2007, the above-mentioned Court panel (**the Honorable Judges M. Ravid, O. Efal-Gabai, A. Farkash**) decided that it would hear Serious Felony Case 7028/06, and that the instant case – Serious Felony [Case] 7027/08, in the matters of the Defendant and Majdi, would be heard by a different panel. Pursuant to a decision by the **Honorable President, M. Arad,** dated April 1, 2007, the latter case was transferred to be heard before us.

11.     As the Defendant and Majdi denied the facts which were attributed to them in the indictment, prosecution evidence was heard to prove the[ir] guilt. During the defense, Majdi gave notice that he chose not to testify. As a result, the Defendant moved on January 17, 2008 to subpoena Majdi to testify as a defense witness on his behalf.  In light of the unusual and extraordinary situation which was created – where on the one hand – Majdi had sought to maintain his right to be silent at his trial, and where on the other hand – the Defendant insisted on his right to subpoena Majdi as a witness

SHATSKY - 007591-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
9

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06

**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
Judge, Y. Shapira and Y. Noam

on his behalf, the parties moved that the Court separate the proceedings for Majdi, so he would be able to testify on behalf of the Defendant. The Prosecutor even gave notice that it would not make use of the testimony Majdi would give as a witness on behalf of the Defendant against [Majdi]. Following agreement by the parties, the trial in the matter of Majdi was separated on February 13, 2008. After separation of the proceedings, Majdi testified as a defense witness, in which framework he took full responsibility for carrying out the murder, [and] asserted that the Defendant played no part therein, but [was] only an accomplice after-the-fact. After hearing the evidence, the Prosecutor believed that there was no bar to the separated case, in the matter of Majdi, continuing to be adjudicated before us; however, the attorney for Majdi objected thereto. In light of such objection, the parties agreed that adjudication of the separated case would be heard before a different panel, commencing with the summations stage. So we directed in our decision dated March 31, 2008, and a new case – Serious Felony [Case] 516/08 [-] was opened against Majdi, which was heard before a different panel of judges (**the Honorable Judges Y. Tzaban, G. Kanfei-Shteinitz and R. Carmel**). In the aforementioned case, on July 29, 2008, Majdi was convicted of murdering the late Minister Ze'evi, and of involvement in carrying out other terrorist attacks; and on September 22, 2008, he was given a life sentence and an additional eighty years in prison. The trial in the matters of Quroan and Asmar (before **the Honorable Judges M. Ravid, O. Efal-Gabai and A. Farkash**) had been concluded a number of months prior thereto. Hamdi Quroan was convicted of murdering the late Minister Ze'evi and other charges, pursuant to his admission of all the facts with which he had been charged in the amended indictment filed against him. Basel Asmar, who had admitted to the facts in the amended indictment, but [who] contended that he should only be charged with the offense of accomplice to murder, and not the charge of murder, was convicted of the offense of murder and other offenses with which he had been charged, after it had been determined in a verdict in his case that his role in the murder was that of a principal perpetrator. Therefore, a life sentence was imposed on each of the two (Quroan on December 3, 2007 and Asmar on February 5, 2008), and additionally – twenty years imprisonment [to be served] consecutively.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**10**

__Before the District Court in Jerusalem__          Serious Felony [Case] 7027/06

**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
Judge, Y. Shapira and Y. Noam

## Overview of the Evidentiary Grounds

12.      The evidentiary foundation brought by the Prosecution rests on four key bases:
**The first** – the confessions to the ISA and the police of Hamdi Quroan and Basel Asmar,
who were convicted of murdering the late Minister Ze'evi, and in which framework,
incriminated the Defendant as a central figure in planning of the murder, in dispatching
them to carry it out, and in assisting them during the escape stage; **the second** – the
confessions[2] to the police of Louai Oudeh, which describe the Defendant as one who
asked him to rent a car for him, [where] later, it became clear that it was used to carry out
the murder; **the third** – the confession[2] to the police of George Qourt, according to which,
a number of days prior to the murder, the Defendant asked him for his Israeli driver's
license to carry out a "big attack"; and **the fourth** – incriminating statements by
additional witnesses, pointing to membership of the Defendant in the PFLP and his senior
position in the military wing of the Organization.

13.      The following witnesses testified on behalf of the Prosecutor: **Hamdi Quroan
and Basel Asmar** – whose confessions to the ISA and police incriminated the Defendant
in involvement in the murder, although in Court, they refused to tell their story and sealed
their lips; **Louai Oudeh and George Qourt** -  with respect to the involvement of the
Defendant in renting the car and obtaining Israeli driver's licenses in order to carry out
the murder; **Abbas Mazahem, Khaled Khalabi and Ra'ed Zibar** – activists in the PFLP,
who related in their statements during the[ir] interrogation to the membership and role of
the Defendant in the Organization; Israel Security Agency **investigators**, who conducted
the interrogations of some of the witnesses; and **police investigators**, who took
confessions[2] from the witnesses, collected findings at the murder scene and seized
documents at the rental car agency. Additional witnesses on behalf of the Prosecutor
testified regarding the activit[ies] of Majdi. However, after his trial was separated, as
aforesaid, their testimony is no longer relevant.

SHATSKY – 007593-T

---

[2] Translator's Footnote: The spellings of the Hebrew words for announcement and confession are
homophones - they are spelled similarly (same spelling other than one (silent) letter), and pronounced the
same.  It appears that the author of the decision confused the spellings of these two words throughout the
decision. Therefore, the word for announcement is translated as "confession" throughout, based on the
sense of the context.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**11**

**Before the District Court in Jerusalem**                    Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
                  Judge, Y. Shapira and Y. Noam

14.    The **Defendant** himself testified on behalf of the defense, and the defense attorney also put on two additional witnesses: **Mohamed Rimawi**, who had been convicted in a separate proceeding for carrying out the murder, and who alleged that the Defendant did not play any part in planning or executing the murder, and was not even present at the meeting which preceded dispatching the perpetrators; and **Majdi**, the other defendant, whose trial had been separated as aforesaid, who testified as to the planning and execution of the murder, and alleged that the Defendant played no part therein. In the framework of the defense, the defense attorney moved, on behalf of the Defendant, to subpoena two witnesses holding an official position with the Palestinian Authority, in order for them to testify as to the investigative summaries recorded in the matters of Quroan and Asmar, at the time of their arrest by the Authority; however, in the end, the attorney for the Defendant was unsuccessful in bringing them to testify before us. The investigative summaries and their translations were submitted as evidence on behalf of the defense, with reservations by the Prosecution as to their weight.

**Answer by the Defendant to the Indictment and a Summary of his Version**

15.    In his Answer to the indictment, the Defendant did not dispute that the murder was actually committed however, [he] denied all the facts alleged with regard to the manner of its planning and commission, which were set forth in detail in the indictment, and in any case, denied that he played [any] part whatsoever therein. Moreover, the Defendant denied that he was a member of the PFLP, and noted that he served solely as an activist in an organization for human rights called "Damir." In his testimony and the summations, he admitted that he was involved with Quroan and Asmar fleeing after the murder, but claimed that all that he did consisted of organizing [for] the two to sleep over in a safe house apartment in Nablus, at the request of his acquaintance, Majdi. The Defendant explained his being found together with the murderers in the apartment in Nablus, at the time of their arrest by the Palestinian Authority, as well as his fleeing together with them, in that he came to visit them at that same time in the apartment and was concerned he would be arrested together with Quroan and Asmar, lest his name be associated with the murder. He denied that he had been present at the meeting in the coffee house in Ramallah, which preceded sending the murderers to Jerusalem, and in any case, denied that he instructed the members of the cell, and gave them his blessing to carry out the murder. The Defendant confirmed that, he had indeed rented

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
12

<u>Before the District Court in Jerusalem</u>                    Serious Felony [Case] 7027/06
Before:          The Honorable Judges: T. Segal – Deputy President – Presiding
                 Judge, Y. Shapira and Y. Noam

the ["]Kia["] car, however, he alleged that he did not know that it had been used by the perpetrators of the murder, and noted that he rented the car solely for the purpose of transporting the family members of those arrested, within the framework of his activit[ies] within the parameters of the organization, "Damir".

### Review of Evidence on Behalf of the Prosecutor

#### The Witness Hamdi Quroan

16.      Hamdi Quroan, who was convicted at his trial for the murder of the late Minister Ze'evi, as the one who pulled the trigger of the gun from which the fatal shots were fired, admitted committing the murder during his interrogation by the ISA and the police, and even incriminated the Defendant in being involved and planning it. When he was subpoenaed to give testimony by the Prosecutor, Quroan refused to answer questions directed at him and chose to be silent. In light thereof, his statements during the ISA and police interrogations were submitted, and the Prosecutor moved to rely on these findings, pursuant to Section 10A of the Evidence Ordinance [New Version], 5731-1971.

17.      The interrogation of Hamdi Quroan by the ISA was memorialized in approximately thirty protocol reports (Tet [Prosecution]/4 – Tet [Prosecution]/30). Initially, he denied that he took part in the murder of the late Minister Ze'evi, however, at a certain point, he began to admit his involvement in the murder, although he stated that he would not give [any] information thereabout. Finally, Quroan acceded and gave the ISA interrogators a detailed version regarding his involvement in the murder and [the] perpetration of many additional terrorist attacks, while incriminating his accomplices in the acts. He also divulged his version in full in a detailed confession in writing which was taken from him by the police on March 30, 2006 (Tet [Prosecution]/2).

18.      Following are the principle [points] of Hamdi Quroan's version, as memorialized in his detailed confession to the police, and which is consistent with the account he provided during his interrogation by the ISA:

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**13**

<u>**Before the District Court in Jerusalem**</u>　　　**Serious Felony [Case] 7027/06**
**Before:**　　**The Honorable Judges: T. Segal – Deputy President – Presiding**
　　　　　　**Judge, Y. Shapira and Y. Noam**

Following the death of the head of the PFLP, Abu Ali Mustafa, by shots by IDF forces, Majdi approached Quroan, and asked him to take part in a terrorist attack, to avenge the death of their leader. Quroan, who was amenable to participating in an attack, was sent by Rimawi to become familiar with the proposed terror site – the "Hyatt" Hotel in Jerusalem. Later, Majdi provided Quroan [with] a forged Israeli identity card, showed him a picture of the late Minister Ze'evi as the murder target, and gave him information about him – his daily schedule, his security format, and his routine [when] he stayed at the hotel. He rented a room at the "Hyatt" Hotel, and scouted around the hotel in order to prepare an assassination plan. Later, Quroan returned to Ramallah, and agreed with Majdi that he would recruit two of his friends who would participate with him in carrying out the murder - Basel Asmar and Mohamed Rimawi. The two acceded to Quroan's request to take part in the murder, and later, Quroan updated them at the meeting which was held in the coffee house in Ramallah regarding the main [points] of the assassination plan. During said meeting, Quroan left to meet alone with Majdi. In this meeting, Majdi gave him two additional forged identity cards – for Asmar and Mohamed, and asked him to rent a car with Israeli license plates. Quroan returned to Asmar and Mohamed, and gave them the forged identity cards. Shortly thereafter, Mohamed went to rent a car and returned to the meeting with a white "Polo" car, bearing Israeli license plates. The three wove the[ir] murder plot, according to which Quroan would shoot the late Minister; Asmar, who would stand at his side, would open fire at the security guard of the Minister, should he be accompanied by security; whereas Mohamed would wait outside the hotel in the "Kia" car, as an alternate "escape vehicle" to the "Polo" car of the two. Later, Majdi gave Quroan two pistols and a Sa'ar [storm] rifle with silencers, which the latter hid in the cars. Quroan and his two accomplices, Asmar and Mohamed, even purchased new clothes for the attack.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
14

**Before the District Court in Jerusalem**           **Serious Felony [Case] 7027/06**
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
              Judge, Y. Shapira and Y. Noam

In referring in his confession[2] to the police to the meeting which took place with the Defendant two days prior to the murder in the coffee house in Ramallah, Quroan noted as follows: "**Two days before the attack, we met as Majdi told me that I should bring Basel and Mohamed with me, in the café near Manara Square, Majdi was there too – he was not disguised, and Basel and Mohamed know him from the village; Ahad Gholmeh in his forties from Nablus was also there, is called Abu-Kayis, now in jail and he had a wig on his head. Then, I didn't know who he was, until we became wanted men, and only then I understood that this was Ahad Gholmeh. Majdi said that he was Rafik, and this means that he is a member of the PFLP, just like initially everybody calls each other brother, we in the PFLP call each other Rafik. And Majdi and Ahad spoke to us about the attack and encouraged us, and they said that after we would return from the attack to Ramallah they would make a big feast for us. And I was afraid then of the Palestinian Authority, and I asked Majdi and Ahad, what would happen when we return from the attack, and they said we should not be afraid. And before the attack, this was the only time that I saw Ahad Gholmeh. And I didn't know that Ahad was in charge at the PFLP. And I don't know if Ahad knew which attack we were going to do. And I think that everyone knew which attack we were going to do.**" (Tet [Prosecution]/2, page 7 lines 20-28).

Later on in his confession[2] to the police, Quroan described the preparations of the cell in anticipation of carrying out the murder, and their arrival at the ["]Hyatt["] Hotel. He and Asmar rented a room at the hotel, while Mohamed slept at a friend of Quroan's, by the name of Salah Alawi, in Azriya. On the morning of the murder, Quroan ensured that the car of the late Minister was parked in the parking lot of the hotel, and that the Minister was having breakfast in the dining room. Quroan took the pistols from his car with him and placed a pamphlet about Abu Ali Mustafa in the room where he had slept. He and Asmar approached the emergency stairwell, on the eighth floor, near the elevator and the room of the Minister, where they lay in ambush for him to come. When the deceased arrived at the threshold of his room and was about to open the door, Quroan called [out] to him and when the Minister turned to look at him, Quroan fired three shots.

SHATSKY – 007597-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**15**

<u>**Before the District Court in Jerusalem**</u>                    Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
            Judge, Y. Shapira and Y. Noam

Quroan described the getaway journey of the murderers from the scene in his confession[2]. Initially, they hid together in Azriya, later during their escape, they parted ways. Quroan arrived alone to the Ramallah area, where he met Majdi in a safe house apartment. The next day the Defendant arrived at the safe house apartment in order to interrogate Quroan, and Quroan described the circumstances of the meeting in his confession[2] thus: "**And the next day Ahad Gholmeh arrived at the apartment ... he came to see me, and asked to write a report for him about what happened at the attack. And I told Majdi what happened, and he wrote and gave the report to Ahad Gholmeh**" (Tet [Prosecution]/2, page 11 lines 17-19). A few nights later, Quroan and Majdi moved to a different safe house apartment in the Ramallah area, and at this stage Asmar joined them. Then, due to the concern that they would be caught by the Palestinian Authority, Quroan, Asmar and the Defendant moved to Nablus; there they resided in two safe house apartments. Quroan described the circumstances of the escape to Nablus in his confession[2] as follows: "**... Then we said we would go to Nablus to be there, and we travelled in a transport vehicle to Nablus, me Basel and Ahad Gholmeh, there we rented an apartment in Refidiya, and afterwards we moved to live in an apartment in Nablus. And afterwards they came from the Palestinian Authority to arrest us, and Ahad tried to escape from the window and broke both his legs and therefore they took him to the hospital. The Palestinian Authority arrested me and Basel, and took us to the Muqata'a in Ramallah to jail there**" (Tet [Prosecution]/2, page 11 lines 23-27).

**The Witness Basel Asmar**

19.    Basel Asmar was subpoenaed to testify on behalf of the Prosecutor, after he was convicted, as aforesaid in Serious Felony Case 7028/06, of the murder of the late Minister Ze'evi, and given a life sentence and twenty years imprisonment (to be served) consecutively. On the witness stand, Asmar sealed his lips and refused to answer questions. Accordingly, the Prosecutor submitted the protocol reports of the interrogations of the witness by the ISA, as well as his written confession to the police, and moved that the Court determine findings based upon his statements in the interrogation, pursuant to Section 10A of the Evidence Ordinance.

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**16**

<u>**Before the District Court in Jerusalem**</u>        **Serious Felony [Case] 7027/06**
**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding**
            **Judge, Y. Shapira and Y. Noam**

During the investigation, Asmar was first interrogated by ISA questioners, who documented the course of the investigation in protocol reports (Tet [Prosecution]/40 - Tet [Prosecution]/62). From a perusal of the reports it is clear that, even during his initial interrogations, Asmar showed signs that he intended to admit his part in the murder, and he soon gave his interrogators a detailed version about its commission, during which he incriminated others as well, including the Defendant. In parallel, Asmar gave detailed confessions in writing, which were taken by a police investigator on the following dates: March 17, 2006 (Tet [Prosecution]/34), March 22, 2006 (Tet [Prosecution]/35) and April 11, 2006 (Tet [Prosecution]/36). He even recorded a summary of his version in his own handwriting with regard to incrimination of the Defendant (Tet [Prosecution]/35A). Moreover, he reinacted committing the murder at the scene on March 23, 2006 (Tet [Prosecution]/39).

20.        Hereinunder are the main [points] of the account of Basel Asmar, as given during his confessions to the police, following the accounts that he articulated during the ISA interrogation:

In his confessions, Asmar related that he has supported the PFLP for many years, that in 2001, after the death of Abu Ali Mustafa, [he] was recruited, by his friend, Hamdi Quroan, to participate in an attack to avenge his death, and that together with him, Mohamed Rimawi was also recruited. Quroan advised him that they [could] expect to have a meeting with an anonymous [individual] who would give [them] details of the planned attack. Asmar noted that he arrived together with Quroan and Mohamed at the coffee house in Ramallah[.]  There they met Majdi, and that afterwards, said anonymous [individual], who arrived in a grey "Kia" vehicle, joined the meeting. Asmar described the anonymous [individual] as "**someone who did not tell us his name or nickname, he was about 40 years old, tall and full-bodied.  His hair was half white and half black. No beard. And this was the only time we met this anonymous [individual]**" (Tet [Prosecution]/34, page 1 lines 22-24). In another confession[2], taken five days later, Asmar noted that such anonymous [individual]

SHATSKY – 007599-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**17**

<u>Before the District Court in Jerusalem</u>                    Serious Felony [Case] 7027/06
Before:        The Honorable Judges: T. Segal – Deputy President – Presiding
               Judge, Y. Shapira and Y. Noam

was the Defendant: "**The unidentified [individual] with whom we met was Ahad Gholmeh. When we met with Ahad Gholmeh the first time in the coffee house in Ramallah, he, Ahad, wore a wig and I saw he has a scar on his forehead**" (Tet [Prosecution]/35, page 1 line 20). During the meeting, the Defendant stated that, " … **[there is a] need to do a revenge attack by the PFLP for the killing of a big man in the PFLP, and he said that the attack would be against Minister Ze'evi … and he spoke about the history of what had been with the Arabs**" (Tet [Prosecution]/34, page 1 lines 24-26); in response to Asmar's question, what they could anticipated from the Palestinian Authority when they would return from the attack, the Defendant answered: "**That the Palestinian Authority is in his back pocket**" (Tet [Prosecution]/35, [sic – no page] line 22). Asmar described that the Defendant gave them detailed information about the routine of the visits of the late Minister at the hotel and his daily agenda there, as well as going over the details of the murder plan with them, including the escape plan. At the end of the meeting, the three received a "Kia" car for purposes of carrying out the murder, which had been brought to the meeting by the Defendant.

       In his confessions, Asmar described how Quroan gave him a forged identity card, and how they rented the "Polo" car and purchased new clothing for carrying out the murder. He further described, similarly to Quroan's description, their preparations for carrying out the murder, their arrival in Jerusalem and their positioning themselves in the hotel. He also described in detail the commission of the murder, as one who had been a party thereto and present [and] armed at the scene. Asmar also described his escape journey, up to his arrival in the Ramallah area, where he met Majdi, who whisked him away to a safe house apartment in Ein Um-Shara'it, where Hamdi Quroan was already staying. Regarding the circumstances in which the Defendant joined them after the murder had been committed, Asmar relayed a version similar to that of Quroan, noting: "**Ahad Yusef Abu Gholmeh from Beit Fouriq arrived at the apartment in Nablus. About 35 … and he told us thank god we succeeded in the attack and that he was pleased, and he told us to travel to Nablus to the old city there, and we travelled to Nablus me Ahad and Hamdi**" (Tet [Prosecution]/34, page 3 lines 28 – page 4 line 2). In his confession[2] to the police on March 22, 2006 (Tet [Prosecution]/35), after his further interrogation at the ISA, Asmar admitted that,

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**18**

<u>**Before the District Court in Jerusalem**</u>          Serious Felony [Case] 7027/06
**Before:**         The Honorable Judges: T. Segal – Deputy President – Presiding
               Judge, Y. Shapira and Y.  Noam

after the murder, while they were hiding, it became apparent to him that the Defendant was the same anonymous [individual] who had met with him in the coffee house in Ramallah prior to the murder: "**I identified him by his voice, and I knew it was he who had had the wig in the coffee house. And I asked Ahad Gholmeh if he was the unidentified [individual] who had been with us in the meeting in the coffee house before the murder and had given us the information before the murder. And Ahad Gholmeh laughed and told me: Forget the matter. And I was even more sure that it was him**" (Tet [Prosecution]/35, page 1 lines 24-28).

According to Asmar's version, he stayed with Quroan and the Defendant in a safe house apartment in Nablus, together with a number of "wanted" [men] from the PFLP, and after about a month the three moved to another safe house apartment in Nablus. Asmar also described how the three were arrested by the Palestinian Authority, and what happened to them until their transfer to the Jericho Prison. He also noted that after they had been arrested, he flung at the Defendant: "**This is how you put the Palestinian Authority in your back pocket?**" with respect to the things the Defendant had told him in conversation at the coffee house in Ramallah prior to leaving to commit the murder (Tet [Prosecution]/35, page 2 lines 2-4); and that the Defendant responded to him, in this context: "**My connections with them turned out [to be] zero**" (Tet [Prosecution]/35, page 2 lines 4-5). Asmar also gave details in his confessions regarding planning and carrying out other attacks, and about the involvement and activit[ies] of the Defendant in this action, as head of the military wing of the PFLP (Tet [Prosecution]/36). When asked by the police investigator why initially he had noted that a masked man whom he did not know had sat with them, and later stated that the anonymous [individual] only wore a wig, and that only at a later stage did he identify him as Ahad Gholmeh (the Defendant) – Asmar evaded answering substantively (Tet [Prosecution]/37). Asmar further noted in his interrogation, that during the course of his stay in Nablus together with the Defendant, the latter taught him about the work of preparing explosive charges, and told him that in the past a charge had exploded in his face, while he was preparing it, and left a scar on his forehead (Tet [Prosecution]/57, paragraph 14.8.3; Tet [Prosecution]/36, page 4 line 17).

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
19

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06

**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y. Shapira and Y. Noam

## The Witness Louai Oudeh

21.     The witness Louai Oudeh was arrested in April 2001 as a suspect involved in committing many terrorist acts.  He was tried by a military court for the Judea and Samaria Region, and sentenced to twenty-eight years in prison. During his interrogation by the police on April 8, 2002 (Tet [Prosecution]/77), Oudeh provided a detailed confession regarding his involvement in terrorist activity and the involvement of others, including the Defendant, in such activity. He even recorded a summary of his confession in his own handwriting (Tet [Prosecution]/77A). When Oudeh was subpoenaed to testify on behalf of the Prosecution in the instant case, with regard to anything relating to the actions of the Defendant, he retracted his incriminating account that was in his confession to the police. Accordingly, he was declared a hostile witness, and the attorney for the Prosecution moved to prefer his statements in the interrogation over his testimony in Court, pursuant to Section 10A of the Evidence Ordinance.

In his confession[2] to the police on April 8, 2002, Oudeh related that he had been a member in the PFLP since his youth, and that he had already met the Defendant [back] in 1996, who was known to him as an activist in the Organization. Pursuant to his version, the Defendant offered him assistance and help with work or money, however he rejected the offer. Oudeh also noted in his confession[2] that in 2001, the Defendant met him in Ramallah, and sought to recruit him for a military action by the Organization, which would have included, *inter alia*, the transfer of cars to Jerusalem; where, in Oudeh's estimation, the intention was for car bombs. According to Oudeh, he refused the offer with the excuse that he was wanted in Jerusalem, and therefore he could not enter the city. According to his version, later on that year, during the course of a rally in memory of Abu Ali Mustafa held in Ramallah, the Defendant met him again, and asked for his help in renting a car: **"[He] asked me to rent a car in order to return people who had come to participate in the rally to their homes in the north. These people are the bereaved families**

SHATSKY – 007602-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**20**

<u>Before the District Court in Jerusalem</u>                Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
                Judge, Y. Shapira and Y. Noam

… I agreed and went with Ahad Gholmeh to the Orabi rental car company in Ramallah, and we rented a car in my name, we rented a "Kia" car" (Tet [Prosecution]/77, page 2 lines 24-28). According to him, the Defendant asked him to rent a car for one day, however, the rental company only rented cars for a minimum period of three days. He transferred the rental car to the Defendant who drove the car to the rally. After three days had passed, at the time the Defendant was to have returned the car to the rental company, the Defendant called him and asked him to pay the rental company for the rental of the car for an additional two days. Three days later, Oudeh was arrested for interrogation by the Palestinian Preventative Security [Force]. According to him, only later on did he become aware that the "Kia" car, which he had rented for the Defendant, was used to carry out the murder of the Minister Ze'evi in Jerusalem.

In his testimony in Court, Oudeh claimed that everything he had related in his statements during the interrogation with respect to the Defendant and the matter of renting the car for him – was not true, but rather was an attempt to hide the identity of the real individual who had received the rental car from him – an individual named Khaled Bakir from Ramallah. Oudeh testified that he avoided implicating such individual, since – in his words – "**He is elderly and he has children, an old man, sick**" (page 59); and as a result, he gave the name of the Defendant instead of such individual, as he heard on the news that [the Defendant] had been arrested, and in any case, had been ascribed liability for the murder of the late Minister Ze'evi. He further added that the ISA interrogators are the ones who pressured him to incriminate the Defendant.

**The Witness George Qourt**

22.        The witness George Qourt was arrested by the Israeli security forces prior to the commission of a suicide attack at the central bus station in Jerusalem, in which planning he had been involved. He was sentenced to nine years imprisonment for his membership and activit[ies] in the PFLP, and for planning said suicide attack.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**21**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**     The Honorable Judges: T. Segal – Deputy President – Presiding
              Judge, Y. Shapira and Y. Noam

In light of the contradictions between his statements during the interrogation and the content of his testimony before us, he was declared a hostile witness, and the Prosecution moved to prefer his statements during interrogation over his testimony in Court, pursuant to Section 10A of the Evidence Ordinance. The versions of Qourt were documented in two confessions[2] taken by the police (Tet [Prosecution]/78 - Tet [Prosecution]/79), as well as in the protocol reports from the ISA interrogation (Tet [Prosecution]/80 - Tet [Prosecution]/81).

In his confession[2] to the police on November 4, 2002 (Tet [Prosecution]/79), the summary of which he even recorded in his own handwriting (Tet [Prosecution]/79A), Qourt described that, a number of days prior to the murder of the late Minister Ze'evi, he participated in a demonstration of the PFLP in Ramallah, where calls for retaliation against Israel for the death of Abu-Ali Mustafa were heard. Qourt, who had an Israeli driver's license and identity card, relayed that at such rally the Defendant asked for his help for the purpose of preparing an attack: "**Ahad Gholmeh, an activist in the military PFLP, approached me and asked for my driver's license for a big attack**" (Tet [Prosecution]/79, page 1 lines 10-12). Initially Qourt refused the request, however, later he acceded, after the Defendant promised that he would change the details appearing on the license with a computer. According to Qourt, the Defendant took his license, and returned it within a short time, after copying it. Qourt also noted that two days thereafter the murder of the late Minister was carried out, and that since then he has not seen the Defendant. Qourt also described the activity of the Defendant in the framework of the military wing of the PFLP in his statements in the interrogation.

In his testimony before us, Qourt disavowed his statements in the interrogation with regard to everything he had attributed to the Defendant. He claimed that he did not ever give the Defendant his driver's license, explaining the contradiction between his statements in the interrogation and his testimony as follows: "... **I was subject to extremely harsh interrogation, and I said that I want to end this interrogation at any price. The ISA wanted any connection between me and Ahad,**

SHATSKY – 007604-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**22**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
                     Judge, Y. Shapira and Y. Noam

and as a result of the pressure this is what I said. I thought that Ahad is in prison in the Authority, and therefore I thought that anything I said against him would not cause him any real harm" (pages 79-80). Qourt also claimed that another individual, called Khaled Daleisheh, is the one who asked him for the license whereas the Defendant was only a witness to said conversation, and no more.

**The Witness Abbas Mazahem**

23.     The witness Abbas Mazahem, currently serving a sentence of sixteen years imprisonment for terror activities in the PFLP, testified on behalf of the Prosecutor regarding his association with the Defendant. In light of the contradictions which arose between his testimony in Court and his confessions[2] to the police, on October 30, 2002 and November 19, 2002 (Tet [Prosecution]/82 - Tet [Prosecution]/83), as well as his account in the ISA interrogations (Tet [Prosecution]/84 - Tet [Prosecution]/85), the Prosecutor moved to prefer his statements in the interrogation over his testimony, pursuant to Section 10A of the Evidence Ordinance.

In his confessions[2] to the police, as well as his interrogation by the ISA, Mazahem related that the Defendant is known to him from their jail stint together in the Israeli prison during the early 1990s. According to him, at the beginning of the second intifada, he renewed his activity with the PFLP, and was in charge of the village Avwin, north of Ramallah, on behalf of the Organization. Pursuant to his testimony, in 2001, he met with the Defendant in the PFLP offices in Ramallah, where the Defendant recruited him for the military wing of the Organization, for the purpose of carrying out terror attacks: "**In July 2001 it was, when I met with Ahad Gholmeh in Ramallah, he proposed military induction for me into the PFLP and I agreed. Afterwards Ahad Gholmeh told me to recruit people into a military cell of the PFLP and to commit attacks against Israeli targets and I agreed**" (Tet [Prosecution]/83, page 1 line 28 – page 2 line 3).  He further noted

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**23**

**Before the District Court in Jerusalem**            Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
                Judge, Y. Shapira and Y. Noam

that after about a week the Defendant gave him two Kalishnikov rifles, and in September gave him a lesson in dissembling and assembling weapons. He further described that later, after the death of Abu Ali Mustafa, he met the Defendant after a shooting attack that the cell had perpetrated against IDF soldiers, north of Ramallah, and the Defendant blessed him therefor. The witness even described a series of shooting attacks for which he was responsible in the framework of his activit[ies] in the Organization.

In his testimony in Court, Mazahem alleged that the sole connection between him and the Defendant was the one-time meeting with him in the street, following which he received a weapon from him for the purpose of his terrorist activity. Other than that, the witness denied that the Defendant was the one who recruited him into the PFLP, and that he trained him in weaponry. He claimed that it was not his concern, and therefore, [he] did not even investigate, to which organization the Defendant belonged. It should be noted that Mazahem did not deny in his testimony that the weapon he received from the Defendant was intended to carry out terrorist activity, and that indeed he carried out attacks with such weapon.

### The Witness Khaled Khalabi

24.    The witness Khaled Khalabi was active in the PFLP, and in the framework of the Organization, carried out terrorist activit[ies], for which he was sentenced to twenty-eight years in prison. In his statements during the ISA and police interrogations, he incriminated the Defendant as an activist with the PFLP, however, in his testimony in Court, he recanted such incrimination, and thus, the Prosecution moved to prefer his statements over his testimony, pursuant to Section 10A of the Evidence Ordinance.

In his confession[2] to the police on April 21, 2002 (Tet [Prosecution]/86), the main part of which he even recorded in his [own] hand-writing (Tet [Prosecution]/86A), and which he himself even raised in the ISA interrogation (Tet [Prosecution]/87 - (Tet [Prosecution]/88), Khalabi noted that

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**24**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**       The Honorable Judges: T. Segal – Deputy President – Presiding
              Judge, Y. Shapira and Y. Noam

the Defendant ensured his stay in a safe house apartment in Ramallah together with other wanted [men], during the period he was wanted but prior to his arrest. Furthermore, in his confession[2] he described the involvement of the Defendant in 2001 in a plan to bring a car with explosives into Jerusalem: "**In May 2001 Ahad Gholmeh sent me to meet with a PFPL activist in Ramallah ... that same person proposed that I bring in a car with explosives to Jerusalem, but I refused**" (Tet [Prosecution]/86, page 4 lines 9-12). Khalabi even noted that during the course of the funeral for Abu Ali Mustafa, he took the pistol of the Defendant and shot in the air.

In his testimony in Court, Khalabi denied that he had organizational contact with the Defendant, or that he had met him in the offices of the PFLP in Ramallah, and noted that he knew him solely from the time he had spent two years in Ramallah. He claimed that his incrimination of the Defendant in his confession[2] to the police was a false incrimination, and when demanded [that he give] a reason for the incrimination, he testified: "**He was under arrest by the Authority, and I wanted to evade the interrogator and therefore I mentioned his name because I knew he could not come**" (page 118).

**The Witness Ra'ed Zibar**

25.     The witness Ra'ed Zibar was involved in terrorist activity through the PFPL, for which he is currently serving a sentence of thirteen years in prison. As with the other witnesses, Zibar was also declared a hostile witness, and the Prosecutor moved to prefer his confession[2] to the police on April 18, 2002 ((Tet [Prosecution]/90), and his account in the ISA interrogation (Tet [Prosecution]/91), over his testimony before us, pursuant to Section 10A of the Evidence Ordinance.

In his confession[2] to the police, as in his interrogation by the ISA, Zibar noted that the Defendant served as head of the military wing of the PFPL. Zibar related in his confession[2] that he and his comrades

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
25

<u>Before the District Court in Jerusalem</u>          Serious Felony [Case] 7027/06
Before:      The Honorable Judges: T. Segal – Deputy President – Presiding
             Judge, Y. Shapira and Y. Noam

in the terror cell reported to the Defendant about their activit[ies] in the framework of the
cell, and their planned actions; that they sought his authorization to add additional people
to the cell; that they asked him for means, such as a "silencer"; and that they even
planned to ask him for explosive devices, for the purpose of carrying out an attack.

In his testimony in Court, Zibar claimed that the Defendant is not known to him at
all, other than the publication of the matter of his arrest in the media. He further claimed
that in his interrogation by the ISA, he gave in to the pressure which the interrogators put
on him, that part of his confession was [words] put into his mouth by the interrogators,
and that he gave the name of the Defendant because he knew that [the Defendant] was, in
any case, under arrest by the Palestinian Authority.

**Testimony by the Interrogators**

26.    The defense attorney waived [his right] to cross-examination of the four ISA
investigators, and agreed to the admissibility of the protocol reports which they had
prepared, in which the accounts by the subjects had been documented. Nonetheless, the
defense attorney argued against the weight of the statements by the witnesses who
incriminated the Defendant; and with respect to Asmar – the reliance on the fact that his
version incriminating the Defendant had been given after he had requested ending his
interrogation quickly and to please his interrogators, who had put unfair pressure on him.

Accordingly, on behalf of the Prosecution, only the interrogators of Quroan,
Asmar and Qourt testified – nicknamed "Nurit", "Gur" and "Itzik" – who had
documented the investigation and the confessions by the subjects in the protocol reports
which had been submitted to the Court. The investigators testified as to the manner in
which the investigation had been run, its character and the developments which resulted
in the confessions of the subjects. They noted that the investigation was run fairly,
without putting words in the mouths of the subjects; they denied the claim that the
subjects were given excessive benefits only when they cooperated

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**26**

**Before the District Court in Jerusalem**        Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
        Judge, Y. Shapira and Y. Noam

with the investigators; and they asserted that the alleged benefits [were] not exceptional, and were [insufficient] to put unfair pressure on the subjects. Moreover, the police investigators, **Senior Staff Sergeant Major Ya'akov Barzani and Advanced Staff Sergeant Major David Mizrahi**, testified [and] described the manner in which the confessions[2] from the witnesses Quroan, Asmar, Mazahem and Qourt had been taken. The two testified that they took the confessions[2] from the subjects after they had given their versions during the ISA investigation. They confirmed that during the course of taking the confessions[2], the protocol reports from the ISA investigation were located in front of them; and they clarified that, at times, the investigator confronts the subject with the contents of his statements in the protocol, [where] significant discrepancies arise between the protocol and the confession[2].

## Evidence on Behalf of the Defendant

### Testimony by the Defendant

27.    The Defendant, who maintained his right [to remain] silent during his interrogations by the police, chose to testify in Court.

In his testimony, the Defendant denied everything attributed to him concerning the planning and perpetration of the murder. Included therein, [he] denied the allegation against him that [he] served as a member of the military wing of the PFLP. He claimed that he was active in a human rights organization called "Damir" and that he had no connection, direct or indirect, with terrorist activity. According to him, other than Majdi, whom he knew in the framework of activity for arranging family visits to prisoners, on behalf of the "Damir" organization, he did not know the perpetrators of the murder – Quroan and Asmar – but first met them after the murder, during their escape. He testified thus on this matter: "**Majdi called me, and asked me to find residences for two individuals in Nablus. I helped them find a home. Initially, they lived with me at [my] home for a certain period, a few days, until I found them a place to live, and they moved to live by themselves. This was the end of January or**

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**27**

**Before the District Court in Jerusalem**        Serious Felony [Case] 7027/06
**Before:**       The Honorable Judges: T. Segal – Deputy President – Presiding
                 Judge, Y. Shapira and Y. Noam

**February, I don't remember when it was. During my visit in their house, the Palestinian Authority placed a siege on the house in which we were. We tried to escape. My legs were broken and I was caught, and Majdi was also caught**" (page 216). The Defendant further testified that after he was caught by the Palestinian Authority, he was transferred to a hospital, and later was taken to the "Muqata'a" building in Ramallah, together with Hamdi Quroan, Basel Asmar, Majdi, Ahmed Sa'adat and Fuad Shubaki, which the IDF forces placed under siege. According to him, all the prisoners had been tried by the Palestinian Authority court and he was convicted, only for providing housing for the wanted [individuals] and providing them with assistance after the murder. Later, in the framework of the arrangement between the Palestinian Authority and the State of Israel, he and his friends were transferred to Jericho Prison, where they were held for approximately four years under the supervision of American and British inspectors, and finally, they were arrested by Israeli security forces.

In his testimony, the Defendant denied that he participated in an instructional meeting held in a coffee house in Ramallah prior to the murder, as alleged by Quroan and Asmar in their statements to the ISA and the police. He claimed that the incriminating statements were false, and they originated in the fact that his arrest by the Palestinian Authority was widely published and was known to prisoners in Israel. He assumed the prisoners, who were under pressure from the interrogation, preferred to set forth his name, and even to incriminate him, as they calculated that he would not be arrested by the Israeli security forces. The Defendant further commented that it was completely illogical for him to have worn a wig, as had been attributed to him, in a coffee house located in a neighborhood where he lives and, in any case, is [well-]known. He even denied that stated in the confessions[2] of Quroan and Asmar that they asked him, during their joint stay during the escape stage, whether he was the same anonymous wig-wearing [individual] who had been present at said meeting.

SHATSKY – 007610-T

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**28**

<u>**Before the District Court in Jerusalem**</u>　　　　**Serious Felony [Case] 7027/06**
**Before:**　　　The Honorable Judges: T. Segal – Deputy President – Presiding
　　　　　　Judge, Y. Shapira and Y. Noam

In his testimony, the Defendant also related to the incriminating confessions[2] of Louai Oudeh and George Qourt, which ascribe his approaching them during the demonstration in Ramallah, with a request of Oudeh – to rent a car for him, and of Qourt – to produce an Israeli driver's license for him. His version of this matter was that during the course of the rally he was sent by a man named Khaled Bakir, who was responsible for organizing the demonstration, to look for persons who held an Israeli driver's license, in order to rent a car to transport "**families of the martyrs and families of the prisoners**" (page 212). According to him, he approached George Qourt who responded that he was not available, but gave him his driver's license. He returned to Bakir, who directed him to return and look for someone who would rent a car. The Defendant returned the license to Qourt, and approached Louai Oudeh with a request that he rent a car for one day for the stated purpose. Oudeh agreed, received money from Bakir, and drove with the Defendant in Bakir's car to the offices of the rental car company, where they rented a car in his name. The Defendant claimed that Oudeh took the car, that he does not know what use was made of it, and that [he] did not see Oudeh afterwards.

In response to questions from the attorney for the Prosecutor, the Defendant denied that he blessed Quroan and Asmar for carrying out the murder, and that he asked them to prepare a report on their activit[ies]. He also denied that stated in the Asmar's confession[2], according to which he told Asmar that the scar which is on his forehead was caused as a result of faulty preparation of an explosive device. The Defendant also related to the accounts by Zivar, Ra'ed and Khalabi, in their statements during the interrogation, according to which he was the head of the military wing of the PFLP.  He denied this vehemently, and noted that he first saw said witnesses only in Court. With respect to his fleeing together with Quroan and Asmar at the time of their arrest by the Palestinian Authority, the Defendant explained that he fled from the safe house apartment because he was concerned that if he was arrested with the two, his name would be connected with the act of murder, when he had merely come to the apartment to visit them.

SHATSKY – 007611-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**29**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:      The Honorable Judges: T. Segal – Deputy President – Presiding
            Judge, Y. Shapira and Y. Noam**

**Testimony by Mohamed Fahami Rimawi**

28.    An additional witness who testified on behalf of the Defendant is **Mohamed Fahami Rimawi**, who was convicted in 2002 in this Court for involvement in the murder of the late Minister Ze'evi, in Serious Felony Case 4073/01, and given a life sentence.

      In his testimony, **Mohamed Rimawi** relayed that he was recruited for the purpose of carrying out the murder by Hamdi Quroan, and as part of the plans to carry it out, he was present at an instructional meeting which took place in a coffee house in Ramallah, a day prior to the murder. According to him, at such meeting, other than him, Hamdi, Asmar, and a man wearing a wig who wore glasses, by the name of Majdi were also present. During the course of his testimony, the witness asserted that the Defendant is not familiar to him, other than publication of his picture in the media; and when asked if he identifies Majdi Rimawi (who, at the time of the testimony, was an additional defendant in the instant proceeding), as the same man wearing a wig, he responded: "**He seems the same based on his build**". To an additional question – "**What about his face, you stated that he had no mustache or beard?**" he answered: "**Yes, if he would wear a wig, it would be the same person, however, I can't identify him like this**" (page 226).

**Testimony by Majdi Rimawi**

29.    As described hereinabove, the witness Majdi was an additional defendant in the proceedings before us, and at the defense stage elected not to testify. When the Defendant sought to have Majdi testify on his behalf, the proceedings were consensually separated, and the latter testified after the Prosecutor gave notice that it would not make use of his testimony at his trial.

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**30**

<u>**Before the District Court in Jerusalem**</u>            **Serious Felony [Case] 7027/06**
**Before:        The Honorable Judges: T. Segal – Deputy President – Presiding**
**Judge, Y. Shapira and Y. Noam**

This is the place to note, parenthetically, that the agreement by the parties regarding the separation of the trial of Majdi at the defense stage, in order to enable him to testify as a witness on behalf of the Defendant, as well as the declaration by the prosecution that it will not make use of his testimony against him, raise thorny questions with complex ramifications[,] having implications not only as to the instant case, but also as to other cases with multiple defendants. However, as this step was taken with the consent of the parties, the need to deliberate the issue and its consequences within the framework of a verdict is superfluous.

In his testimony, Majdi described how the murder of the late Minister was planned to avenge the death of Abu-Ali Mustafa. Majdi testified that he was the one who directed the members of the cell – Hamdi Quroan, Basel Asmar and Mohamed Rimawi – to carry out the assassination, giving them instructions, supplying them with money, providing a car for them [with which] to commit the murder, as well as receiving their reports after the fact. According to him, prior to the murder, on October 16, 2001, he met with the three supposed cell members in a coffee house in Ramallah, where he reviewed with them the details of the exact execution, he gave them instructions and handed them money and weapons; in his version, other than them, no other fifth person was present at the meeting. According to him, he gave Hamdi the "Kia" car in order to carry out the murder, after taking the car keys from a person named Louai. He alleged that he received the keys from Louai in the PFLP offices in Ramallah, when the latter sought to hand the keys to a clerk in the offices, and when he did not find a clerk, asked him – Majdi – to get them to their destination.

With regard to the  meeting in the coffee house in Ramallah, Majdi asserted that he arrived at the meeting with his face uncovered, that none of those present at the meeting wore a wig or sunglasses, and that he did not hide his identity and that the members of the cell knew his name was Majdi. He further noted that, in terms of hierarchy, he was under

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**31**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
          **Judge, Y. Shapira and Y. Noam**

a person who was responsible for him in the Organization; however, he claimed that he did not know him by name, but rather only by his nickname, as is customary in the PFLP. According to him, said "handler", the one who gave him the instructions to carry out the assassination, gave him the details about the late Minister Ze'evi, and provided him with the money and weapons for committing the murder. In response to a question by the attorney for the Prosecution, Majdi noted that he obtained the "Kia" car on his own, and did not get it from the "handler."

Majdi further claimed that the Defendant, who he knew by virtue of his activity in "Damir", had no connection with the murder, and in any case, was not involved in its planning, commission and receiving reports as to its perpetration. According to him, he called the Defendant only at the stage after the murder, at the time those involved in the assassination fled, when they were declared wanted [men] by the Palestinian Authority. He asked the Defendant to find them a safe house apartment in Nablus, the city in which the Defendant resided, after the searches for them intensified in Ramallah.  Moreover, he noted that after the murder, he did not report anything to his "handler", and that the details were, in any case, known to all through the media.

## Deliberations

## Summary of [Description of] Dispute

30.     As aforesaid, a summary of the account by the Defendant is that he was not involved in the planning and commission of the murder, he was not active in the PFLP, and that he only assisted the perpetrators of the murder after the fact to hide in an apartment in Nablus.

The key [points] of the defense attorney in his summations were that it would be incorrect to admit, pursuant to Section 10A of the Evidence Ordinance, the statements of the witnesses who incriminated the Defendant, both with regard to planning and executing

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**32**

<u>**Before the District Court in Jerusalem**</u>                 Serious Felony [Case] 7027/06
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
                 **Judge, Y. Shapira and Y. Noam**

the murder, and also with regard to his active involvement in terrorist actions in the military wing of the PFLP. According to the defense attorney, no weight or credibility should be ascribed to the incriminating statements by the witnesses during the ISA and police investigations. He opines, *inter alia*, that the ISA investigators did whatever they could to bring about the incrimination of the Defendant, and "locked onto" one investigative direction: they asserted heavy and unfair pressure on Hamdi Quroan, so that he would confess and incriminate the Defendant as that same anonymous [individual] who was present at the instructional meeting at the coffee house in Ramallah; and they conducted the investigation of Asmar while giving him benefits so he would incriminate the Defendant. The defense attorney further claimed that the witnesses who  incriminated the Defendant in their interrogation by the ISA and police, chose to implicate the Defendant as result of investigative pressure and a desire to please their interrogators; and that they incriminated the Defendant with the understanding that they would not cause him any harm as in any case he had been arrested by the Palestinian Authority, and his name had already been mentioned as someone who had been involved in one way or another with the murder. The defense attorney further alleged that, with respect to everything relating to the incriminating statements which were memorialized in the protocol reports of the ISA, the weight of the statements is negligible, because the protocol reports were recorded by those preparing the reports without the subjects signing the reports. The defense attorney also asserted that the versions of Quroan and Asmar [given] during the interrogation contradict each other with respect to everything related to the part of the Defendant in the meeting in the coffee house in Ramallah, and therefore, they should not be deemed credible. In his opinion, even if the statements of Quroan and Asmar are admitted, they require additional reinforcement, both because they are testimony by participants in the crime, and because they were admitted by virtue of Section 10A of the Evidence Ordinance. According to the defense attorney, in light of the contradictions which arose between the versions by the above-mentioned two witnesses, one external statement can not be used as evidentiary reinforcement for another. Moreover, his opinion is that the testimony of Majdi and Mohamed in Court should be admitted as credible, and that this testimony constitutes support for the version by the Defendant.

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**33**

<u>Before the District Court in Jerusalem</u>        Serious Felony [Case] 7027/06
**Before:        The Honorable Judges: T. Segal – Deputy President – Presiding**
**Judge, Y. Shapira and Y. Noam**

Alternatively, the defense attorney argued that even should the Court prefer the incriminating statements of the witnesses or their silence in Court, over their testimony, at best, [all] that may be based thereon is a conviction for the offense as an accomplice to murder, [but] not the offense of murder. In this context, the defense attorney opines that all that may be determined from the incriminating statements is that the Defendant was present at a meeting prior to sending off the murderers. Indeed, he alleges that such meeting took place after the plot had already taken shape and the operational tasks had already been distributed, and no evidence has been brought [showing that] the Defendant had [any] impact on the decision to carry out the murder or [had any] real contribution to its execution.

<u>Factual Determination[s]</u>

**Preliminary Comments**

31.     At the outset of the deliberations to determine the facts, I emphasize that the evidentiary foundation which incriminates the Defendant is grounded, in the main, on the accounts given by witnesses in the ISA and police interrogations. As aforesaid, seven of the prosecution witnesses – Quroan, Asmar, Qourt, Oudeh, Mazahem, Khalabi and Zibar – testified in a way that contradicted their statements [during] the interrogation, and were declared hostile witnesses. The first two did not open their mouths at all, whereas the other five each gave a similar explanation with a recurring theme in the testimony of each, with minor differences, according to which no weight should be attributed to their incrimination of the Defendant. They explained that they incriminated the Defendant solely in order to please the interrogators, who applied heavy pressure and "marked" the Defendant as a target. Moreover, they noted that since the Defendant had been arrested by the Palestinian Authority in connection with the murder incident, they were not concerned that as a result of their incriminating him, he would be brought to Israel, and as a result - they believed that no harm would befall him were they to make him responsible for the murder and other terrorist acts; furthermore, [they] would thus avoid providing information about, and implicating other terror activists– activists who were liable to be arrested or who had already been arrested by the Israel security forces.

SHATSKY – 007616-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**34**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

We can not accept these ineffectual explanations, upon which the Defendant in great part based his story, and are not to be trusted, *inter alia*, for the following reasons:

**First**, from a perusal of the incriminating statements by the witnesses who claim that they sought to "mitigate the damage" and incriminate the Defendant as involved in the murder, it is clear that they did not hesitate to volunteer considerable information about the involvement of the Defendant over the years in additional terrorist acts other than the murder, and with regard to his activities as a senior [individual] in the military wing of the PFLP. Moreover, in their confessions[2] in the investigation, the witnesses incriminated, with the same breath, many additional terror activists other than the Defendant without hesitation, and it is not clear that they were cautious in incriminating their comrades, as they have sought to portray to us.

**Second**, the recital of similar explanations by four out of the five hostile witnesses, in addition to the silence of the two additional witnesses, demonstrates that the repetitive version had been coordinated among the witnesses, as does the complete unwillingness of all seven to testify against the Defendant, and to reiterate the versions incriminating him, as had been given in their interrogations. It is utterly inconceivable, that four different witnesses, in separate interrogations, took an absolutely identical position in order to please their interrogators, and chose to incriminate precisely the same person out of all the activists in the Organization, in their belief that he would not be harmed thereby.

**Third**, there is not one incriminating statement [presented] before us which [demands] speculation and arouses suspicion, but rather a number of incriminating statements by prosecution witnesses which support each other. The great number of incriminating confessions[2] and statements [during] interrogation, by various subjects, on separate dates,

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**35**

<u>Before the District Court in Jerusalem</u>          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
                    Judge, Y. Shapira and Y. Noam

taken by a number of interrogators – all these refute the claim that both the witnesses and the defense attorney in his summations, have raised, pursuant to which the interrogators put words into the mouths of the subjects and did whatever they could, unfairly, in order to incriminate the Defendant; leading to the general conclusion that such claim is completely groundless, illogical and unreasonable.

### Outline of Deliberations in the Factual Determination

32.     As arises from a review of the aforementioned evidentiary base, the mass of evidence presented by the Prosecution rests on four principal foundations: **the first** – the statements [during] the interrogation by Hamdi Quroan and Basel Asmar, who incriminated the Defendant as a central figure in planning the murder, sending them to carry it out, and assisting them during the escape stage; **the second** – the statements by Louai Oudeh, according to which the Defendant asked him to rent the "Kia" car for him, which was used to commit the murder; **the third** – the statements by George Qourt, that a number of days prior to the murder, the Defendant asked him for his Israeli driver's license; and **the fourth** – incriminating statements by additional witnesses, indicating the senior position of the Defendant in the military wing of the PFLP.

        Against the such backdrop, the deliberations regarding the factual determination[s] will focus primarily on four main issues: the question of the participation of the Defendant in the meeting held in the coffee house in Ramallah just prior to sending the murderers to Jerusalem, and the role he played at such meeting; the role of the Defendant in renting the "Kia" car which was used by the assassins; involvement by the Defendant in the escape of the murderers, in receiving a report from them, as well as in fleeing with them after the murder; and membership as well as the position of the Defendant in the military wing of the PFPL.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**36**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**      The Honorable Judges: T. Segal – Deputy President – Presiding
         Judge, Y. Shapira and Y. Noam

Prior to discussing each of the above-mentioned issues in detail, I preface with a general evaluation of the accounts by the four witnesses, pursuant to which it is alleged that they [belonged to] the inner circle for planning and carrying out the assassination, and for which all have been convicted for perpetrating the murder in parallel proceedings conducted against them: Hamdi Quroan and Basel Asmar – who served as prosecution witnesses, and Majdi Quroan [sic] and Mohamed Rimawi – who testified on behalf of the defense.

### Evaluation of Versions by Witnesses from the Inner Circle

33.   **The weight of the confessions[2] of Hamdi Quroan and Basel Asmar**: The confessions of Quroan and Asmar in the police investigation, as well as their statements [during] the ISA investigation, were submitted by the Prosecution pursuant to Section 10A of the Evidence Ordinance, after the two were silent on the witness stand and were declared hostile witnesses. It was undisputed that the statements had been made by the witnesses, and the defense attorney did not claim that the versions that were recorded in their confessions[2] and protocol reports do not reflect that stated by the witnesses. Nonetheless, it was claimed that portions of the statements, which incriminated the Defendant, "were planted" in the mouths of the subjects by the ISA interrogators, and were given by them as a result of unfair pressure applied to them, and in an attempt to please their interrogators.

From the testimony of the ISA and police interrogators, and from a perusal of the protocol reports of the ISA interrogation, it arises that the claims of the defense attorney, regarding conducting an unfair investigation and extracting false confessions which were intended solely to incriminate the Defendant, are groundless. It is clear that the interrogation was run fairly and without the application of undue pressure. Documentation of the interrogation of the two witnesses points to a gradual process in which the subjects changed their stances, from a state of total denial and lack of cooperation, to giving their full incriminating confessions.

SHATSKY – 007619-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
37

**Before the District Court in Jerusalem**              Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
                  Judge, Y. Shapira and Y. Noam

With respect to the weight of the statements of each of the two, it is clear that these are detailed confessions which go into every detail of the events. Each of the two witnesses presented the events on an organized chronological continuum, providing most of the details coherently and clearly. From a perusal of the statements it is clear that they describe events which Quroan and Asmar experienced, and constitute authentic testimony regarding that which occurred. It should be further noted that the credibility of the statements, which include numerous details regarding commission of the murder, is bolstered in light of the fact that these details have been corroborated by physical evidence found at the scene, such as: fingerprints of the perpetrators, their DNA samples, the escape vehicle and other evidence, as shall be set forth hereinunder.

34.    **Testimony of Majdi Rimawi as Defense Witness:** From hearing the testimony of Majdi Rimawi before us, it was easy to form an impression that he took the witness stand free of [any] concern of self-incrimination, and that all he sought [to achieve] with his testimony was to help extricate the Defendant [from his predicament], and to distance him to the extent possible from involvement in the murder and terrorist activity. He attempted to aid the Defendant by taking full responsibility on himself for planning the assassination and dispatching the murder cell, knowing that everything he would say before us [could] not be used as evidence of his guilt at his trial, which had been separated as aforesaid.

Majdi noted in his testimony that he reported to a person who was responsible for him in the organizational hierarchy, however, [he] claimed not to know his name. It is clear from these words, that Majdi tried to evade exposing the identity of the one responsible – the Defendant; as logic directs that a veteran and key activist in the terror organization would know the identity of his supervisor, notwithstanding extreme compartmentalization; and as evidence, even the members of the cell who reported to Majdi – Quroan, Asmar and even the accomplice, Mohamed Rimawi –

SHATSKY – 007620-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**38**

<u>**Before the District Court in Jerusalem**</u>                 **Serious Felony [Case] 7027/06**
**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding**
                **Judge, Y. Shapira and Y. Noam**

knew their supervisor, Majdi himself, by name, and did not use any nickname for him whatsoever. It is also note-worthy that in his version, Majdi described the course of events identically to that given in the versions of Quroan and Asmar, and that his testimony diverged from their versions only in the descriptions relating to the Defendant himself and his involvement in, and planning of, the murder. It is clear that the lion's share of his testimony, which is in accord with the accounts by Quroan and Asmar, in fact reflects the events as they happened. Whereas the difference in the remaining parts of his account, which are the significant parts for our matters, stems from Majdi's desire to extricate the Defendant from the charges made against him.

The clear impression from the testimony by Majdi is that the witness – who when a defendant in this case chose to seal his lips and maintain his silence, changed his behavior and chose to testify only after his trial was separated and he became a witness protected against self-incrimination – did so only out of a motive to assist his friend, the Defendant, and not out of a desire to testify precisely as to the truth. It is incumbent on us to remember and emphasize, that his testimony, which began with a lecture on his ideological doctrine, and progressed to a cold and chilling account of the planning and execution stages of the murder, while taking full responsibility for dispatching the murder cell, without a scintilla of regret whatsoever, was uttered by a person who admitted that he was involved in the murder, who knows that everything he said would not be able to harm him, and who sought to assist his comrade who was on trial. Majdi's testimony was replete with peculiarities, particularly everything with regard to the Defendant, and was inconsistent with the incriminating versions of Quroan and Asmar in the interrogation. An evaluation of his testimony, as shall be detailed hereinunder regarding each issue separately, leads to the conclusion that his version, with respect to everything related to the Defendant is not credible whatsoever, and [any] findings should not rely thereon.

SHATSKY – 007621-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**39**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
                Judge, Y. Shapira and Y. Noam

35.    **Mohamed Rimawi**: the testimony of the defense witness, Mohamed Rimawi, left an impression of non-credibility. As shall be elucidated hereinunder, in the hearing on the matter of the instructional meeting in the coffee house in Ramallah the testimony of the witness was replete with inconsistencies and contradictions which the witness had difficulty explaining on cross-examination, and it was clear that it was not the truth which guided his testimony, but rather his desire to extricate the Defendant from his involvement in the murder.

At this point, we [begin] a detailed discussion regarding an evaluation of the evidence and determination of fact, with respect to each issue separately.

**The Meeting in the Coffee House in Ramallah**

36.    [This] key factual issue which is under dispute, the resolution of which is relevant in order to determine the involvement of the Defendant in planning and committing the murder, focuses on the question of the identity of those attending the meeting which took place in a coffee house in Ramallah, during which the murderers were given instructions just prior to their leaving to carry out the assassination. There is no dispute that such meeting took place and that, unfortunately, Majdi, Hamdi Quroan, Basel Asmar and Mohamed Rimawi were present thereat. Majdi and Mohamed so testified, so related Quroan and Asmar in their statements in the interrogation, and even the Defendant did not dispute this. The dispute, however, turns on the question of whether the Defendant was the fifth figure at such meeting, or not. An examination of the evidence brought before us, leads to the general conclusion that the accounts of Quroan and Asmar, which were documented in the ISA interrogations and in the witnesses' confessions[2] to the police, pursuant to which the Defendant was the fifth person participating in the instructional meeting, reflects the events as they happened.

SHATSKY – 007622-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**40**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

37.      Quroan, as aforesaid, in his confession[2] to the police, depicted a fifth person present at the meeting: "**Ahad Gholmeh in his forties from Nablus was also there, is called Abu-Kayis, now in jail, and he had a wig on his head.**" (Tet [Prosecution]/2, page 7 lines 21-22). He explained that he understood that the Defendant was th[at] same person only after he met him when [he] fled and hid together with him. This was reinforced by the confession[2] of Basel Asmar, who also described the presence of a fifth anonymous person at the meeting held prior to the murder, who "**wore a wig (baruka) and I saw that he had a scar (jareh) on his forehead (gabin)**" (Tet [Prosecution]/35, page 1 line 20); and [he] added that his identity became clear to him only at a later stage, when they met in the safe house apartment; "**I identified him by his voice, and I knew it was he who had had the wig in the coffee house. And I asked Ahad Gholmeh if he was the unidentified [individual] (unidentified – Y.N.) who had been with us in the meeting in the coffee house before the murder and had given us the information before the murder. And Ahad Gholmeh laughed and told me: Forget the matter. And I was even more sure that it was him**" (Tet [Prosecution]/35, page 1 lines 24-28). In his ISA interrogation, Asmar related similar things, and noted that "**[he] identified the voice of Ahad and the features of his face**" (Tet [Prosecution]/46, paragraph 17). Asmar's evaluation was reinforced when he asked the Defendant how he had been caught by the Palestinian Authority, while prior to the murder they had been promised by the anonymous [individual] that his connections with the Authority were strong and would prevent their arrest, and [the Defendant] responded as aforesaid that, "**his connections turned out [to be] zero**". These responses by the Defendant to questions by Asmar, where he did not deny that he was the anonymous speaker at the meeting, and in a manner which demonstrates that he knew what was being spoken about, and in particular, his relating to the question about his connections with the Palestinian Authority, constitute additional reinforcement for the conclusion that the Defendant was indeed the same fifth person who was present at the meeting in the coffee house in Ramallah.

38.      The scar on the forehead of the Defendant also reinforces the weight [given] the identification by Asmar of the anonymous [individual] as the Defendant. The actual existence of the scar on the forehead of the Defendant is not under dispute (page

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**41**

<u>**Before the District Court in Jerusalem**</u>                    **Serious Felony [Case] 7027/06**
**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding**
                        **Judge, Y. Shapira and Y. Noam**

336). Asmar relayed in his statements in the interrogation how the Defendant taught him to prepare explosive devices, when they were staying in the safe house apartment in Nablus, at a stage when the identity of the Defendant was revealed and known to him. In the ISA interrogation, Asmar noted that the Defendant told him that the scar on his forehead resulted from the detonation of an explosive device which he had assembled, in the framework of a "work accident" (Tet [Prosecution]/57, paragraph 14.8.3). A similar description of the scar on the forehead appeared in the confession[2] by Asmar to the police, when he referred to said anonymous [individual] wearing a wig and bearing a scar on his forehead, who was present at the meeting held in the coffee house in Ramallah (Tet [Prosecution]/35, page 1 line 20).

39.        With everything regarding the identification of the Defendant by Quroan and Asmar, as the one who participated in the instructional meeting in the coffee house in Ramallah just prior to sending out the murder cell, great weight should be accorded to very fact that the three stayed together for a long period of a number of years, beginning with their fleeing after the murder, and up to and including their arrest by the Israeli security forces in 2006 in Jericho. A logical and obvious conclusion is that after such a long period of time of living together, where the three had already been captured and imprisoned, the question of the identity of the anonymous [individual] did not remain hazy and unresolved amongst them, whether it had been the Defendant, or not. Therefore, considerable weight should be attributed to the incriminating statements by Quroan and Asmar, who were decisive in identifying the anonymous [individual] who participated in the meeting in the coffee house in Ramallah – as the Defendant. It should be further noted that also during the reenactment of the murder by Asmar, he was asked with respect to the identity of the person who gave them the information for purposes of carrying out the murder, and Asmar repeated his version incriminating the Defendant, as set forth hereinabove in the reenactment script:

> "Asmar:        With respect to the information, I told you that it was at the beginning, in the meeting, that is, Ahad told it to me, Ahad Abu Gholmi (Gholmeh – Y.N.),

SHATSKY – 007624-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**42**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y. Shapira and Y. Noam**

Investigator:   Again, who?

Asmar:          Ahad Abu Gholmi,

Investigator:   What information did he give you?

Asmar:          The details of the attack that was, going out, ah, when he is to be [found], and when he eats breakfast and when he is up[stairs]" (Tet [Prosecution]/39A, pages 4-5).

40.     The defense attorney raised a host of arguments against the weight of the incriminating statements by Quroan and Asmar in his summations.

We did not find [anything of] substance in the arguments by the defense attorney, pursuant to which the section incriminating the Defendant in the statements by Quroan and Asmar was the fruit of an unfair interrogation. From hearing the testimony of the interrogators before us, and from a comprehensive perusal of the confessions[2] of the witnesses to the police and the protocol reports of the ISA investigation, we have formed an impression that the interrogations of Quroan and Asmar were conducted fairly, without undue or improper pressure being applied to them, which would have impaired the weight of their statements, and that the two related their accounts incriminating the Defendant without the interrogators putting details into their mouths regarding such incrimination.

Arguments by the defense attorney, that the investigation should have been handled solely by the Israel Police, and not by the ISA, which is a preventive force, should be rejected. I am comfortable opining that an interrogation of those involved in the murder, even though several years had passed since the date it occurred, was still in the main of a preventive nature, and in particular when the subjects were suspected of belonging to a murderous terrorist organization, and where the Defendant was interrogated

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**43**

**Before the District Court in Jerusalem**          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
**Judge, Y. Shapira and Y. Noam**

on suspicion of holding a senior position in a terror organization which is still active. As a preventive interrogation, it falls within the purview of the Israel Security Agency, as different rules apply thereto than those which apply to police investigations, including all the documentation thereof (see: Criminal Appeal 6613/99 **Samirak v. State of Israel**, PD 56(3) 529).

41.      Regarding the substance of the statements incriminating the Defendant, the defense attorney further argues that Asmar, during the course of his interrogations, did not initially reveal the identity of the anonymous [individual] as the Defendant, but rather added these details only later, so as to please his investigators, in contrast to other details which he admitted from the outset. The defense attorney further asserted that Asmar first described the Defendant as having white hair and a "French haircut", and finally noted that he wore a wig; thus, his version should not be viewed as credible. These arguments, as well, are rejected. First, it should be noted that Asmar's description of the appearance of that same anonymous [individual] has been memorialized in the ISA report as follows: "**In his 40s, his hair whitened a bit (the subject notes that some of the hair is white and some is black), the subject noted that his hair was in a "French haircut", a little long on the sides, a body build that is a bit full, his height is approximately 1.75 ...**" (Tet [Prosecution]/42, paragraph 24.2.5). This is not, therefore, a man "with white hair" as asserted in the summations by the defense attorney; in any event, there is no contradiction between the versions of Asmar over the stages of his interrogations regarding his description of such person, but best, a natural development of making an admission, where each time the subject revealed a bit more. An interrogation of a suspect is by nature is an ongoing and developing process, where in many instances, the thanks [sic – translator's note: should be "confession"], as well as most of the details are given only after a gradual, continual process, at times lengthy, during the course of which the suspect reveals additional details at every stage, until a complete account is given. From a perusal of the reports regarding the interrogation of Asmar by the ISA and his confessions taken by the police, it is clear that a process of this type also occurred with Asmar, who initially sought, it would seem,

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**44**

<u>**Before the District Court in Jerusalem**</u>      **Serious Felony [Case] 7027/06**
**Before:**     **The Honorable Judges: T. Segal – Deputy President – Presiding**
               **Judge, Y. Shapira and Y. Noam**

to avoid incriminating the Defendant, and only attributed help with escaping to him, when it was clear to all that the Defendant was captured with the wanted [individuals]; however, later on, he already began to give details about the Defendant's involvement in the instructional meeting prior to sending out the cell, which took place in the coffee house in Ramallah.

42.    With regard to the argument by the defense attorney concerning the contradiction between the version of Quroan and that of Asmsar, with everything related to the actions of the Defendant at the meeting and the extent of his involvement in planning the murder, even if there is a certain discrepancy between the versions, where Quroan describes the role of the Defendant at the meeting as less dominant, while Asmar grants him a more central role, this is not a substantial and significant discrepancy between the versions. Asmar related in his version that the Defendant went over the plan in detail with the members of the cell and gave them his blessing for success. Quroan, indeed, did not set forth in detail in his statements the role of the Defendant in [giving] the instructions, however, from his confession[2] as well it can definitely be learned that the Defendant took an active part in the meeting, as one who conversed with the perpetrators, and encouraged them prior to their going on their way: "**Majdi and Ahad spoke with us about the attack and encouraged us, and they said that after we would return from the attack to Ramallah, they would make a big feast for us. And I was afraid then of the Palestinian Authority and I asked Majdi and Ahad what would happen when we return from the attack, and they said we should not be afraid**" (Tet [Prosecution]/2, page 7 lines 20-28).

It may be further noted that attorney for the Defendant, in his summations on this matter (page 14, paragraph 31(g) of the summations), bases his arguments regarding the contradiction between the versions, *inter alia*, on the fact he alleges, according to which Quroan in his confession related that two days prior to the murder a four-way meeting took place attended by Quroan, Asmar, Mohamed and Majdi, during which Majdi gave comprehensive instructions to the three regarding the details of the attack which they were to carry out, whereas the meeting at which a fifth man was present, was only to receive a blessing for success and to raise the spirits of the three. The attorney for the Defendant even referred to paragraphs 11.2.1 – 11.2.27

SHATSKY – 007627-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**45**
**Before the District Court in Jerusalem**                **Serious Felony [Case] 7027/06**
**Before:        The Honorable Judges: T. Segal – Deputy President – Presiding**
**Judge, Y. Shapira and Y.  Noam**

in Quroan's confession (Tet [Prosecution]/20).  A perusal of the confession of Quroan reveals that the factual grounds for this allegation by the Defendant's attorney are erroneous, as Quroan, in his confession, describes his meeting with Mohamed Rimawi and Asmar, separately from his parallel meeting with Majdi. According to him, the four – way meeting never happened, but rather only his one meeting with his two accomplices from the cell, a second meeting with Majdi, and an additional and final meeting in which the five were present, including also the Defendant as said anonymous [individual.

43.    The defense attorney further argues in his summations that the credibility of the confessions[2] by Quroan and Asmar is also hurt in light of their statements taken by the Palestinian Authority investigators. He asserts that, in the investigation by the Authority (Nun [Defense]/4), the two gave a detailed version, [and] there is no reference to the meeting which [they] held prior to the murder in the presence of the Defendant, nor any detail connecting the Defendant to [any] involvement in, or planning of, the murder, to be found upon its perusal. According to the defense attorney, the details incriminating the Defendant appeared only in the interrogations of Quroan and Asmar in Israel, thus hurting the credibility of their versions. From a perusal of the reports summarizing the investigations which were prepared by the investigators of the Palestinian Authority, it arises that, other than the subject of Quroan and Asmar being put up to stay by the Defendant after the murder, there is no reference by the two to the involvement by the Defendant in planning the murder, and nothing is even mentioned regarding the existence of a meeting in his presence. Indeed, the two did not even note anything at all about [any] meeting whatsoever, not even a four-way meeting, which according to Majdi and Mohamed Rimawi, did indeed take place. The obvious conclusion, therefore, is that the two, in their confessions[2] to the Palestinian Authority, sought to avoid incriminating others, and therefore, did not note the very existence of the preliminary meetings, omitting [mention of] many details to their investigators. The fact that in their interrogations in Israel Quroan and Asmar relayed additional details, and, *inter alia*, details incriminating the Defendant, should not raise [any] suspicions about their statements, or indicate that they are peculiar. In any event, being that the investigative material

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**46**

<u>**Before the District Court in Jerusalem**</u>           **Serious Felony [Case] 7027/06**
**Before:       The Honorable Judges: T. Segal – Deputy President – Presiding**
**              Judge, Y. Shapira and Y. Noam**

collected by the Palestinian Authority is partial and deficient, we find it difficult to evaluate the nature and quality of the interrogation of the two by Authority personnel, and as a result – one should not derive any findings therefrom which would detract from the weight of the statements incriminating the Defendant.

44.     The defense attorney further noted that the allegation by the Prosecution – relying on the confessions[2] by Quroan and Asmar – that the Defendant appeared at the meeting with the cell members at the coffee house while wearing a wig, is peculiar and illogical, particularly in light of the account of the prosecution witness George Qourt – who related in his confession[2] that the Defendant met him on the day of the demonstration and asked for his driver's license in order to carry out an attack, while his face was uncovered and [he was] without a wig. The defense attorney believes that this peculiarity impinges upon the credibility of the confessions[2] of Quroan and Asmar.

        Prior to delving into the details of this argument, I preface [with the] comment that, as a rule, it is not always possible to find logic in the behavior and methods of operation of a person committing this act or another, particularly when committing a criminal offense, and to fully understand his state of mind. Thus, too, with the matter [before] us[.] The fact that the Defendant chose to wear a wig at one meeting in particular, and at another meeting – not to do so, does not hurt the credibility of the statements of Quroan and Asmar. Moreover: specifically in the instant case it is possible to conceive of a number of logical explanations for this: the Defendant approached Qourt during the mass rally marking the death of Abu-Ali Mustafa, during which the Defendant was surrounded by people who knew him. So, for example, Louai Oudeh, who participated in the demonstration, testified that he had known the Defendant since 1996 as an activist in the PFLP, and that the latter approached him during the rally, and this was, of course, with his face uncovered. Logic dictates that an individual fulfilling a senior role in a terror organization, who participates in a mass rally of the Organization in the full light of day, and is apparently

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**47**

**Before the District Court in Jerusalem**          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
                    **Judge, Y. Shapira and Y. Noam**

known to many of the participants in such demonstration, would not succeed and would not even attempt to hide his face and identity; furthermore, in the very nature of a demonstration of this type, which is a protest event, there is a certain logic in having senior Organization [members] appear without disguising their identity. Additionally, approaching Qourt and Oudeh during the demonstration was in general, [and] did not include [any] specific indication that the driver's license and rental car were needed for the purpose of murdering a minister in Israel, but rather for purposes of a "big attack", and thus, the Defendant did not need to hide his identity, as in any case, he did not associate himself with the specific murder, while at the instructional meeting in the coffee house prior to the murder, the participants spoke specifically about the planned murder and the details of the operational plan, where the majority of the participants did not know the Defendant previously.

45.      The defense attorney further argued in his summations in the above context that the prosecution's version, according to which the Defendant, who never revealed himself to Quroan, who had already carried out numerous attacks in the past in the framework of the Organization, decided this time to deviate from his habit and caution and meet with him prior to the murder, is illogical. This argument, too, is rejected for two reasons: **First**, murder of the late Minister Ze'evi was an exceptional and atypical terror attack in its symbolism, by any measure, and it is possible to understand why, just prior to carrying out this specific attack, a personal blessing for success from a senior [member] of the Organization was required. **Secondly**, the appearance of the Defendant at the meeting, wearing a wig, specifically demonstrates his caution, from which he never deviated even this time, and therefore he appeared before Quroan and the others with his identity concealed.

46.      As aforesaid, while Quroan and Asmar confirmed in their confessions in the ISA and police interrogations that the Defendant participated in the instructional meeting in the coffee house in Ramallah, and took an active role, the witnesses on behalf of the Defendant – Majdi Rimawi and Mohamed Rimawi – in their testimony before us, denied that the Defendant

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**48**

<u>Before the District Court in Jerusalem</u>            Serious Felony [Case] 7027/06
**Before:**        The Honorable Judges: T. Segal – Deputy President – Presiding
            Judge, Y. Shapira and Y. Noam

participated in the meeting and even claimed that no fifth person whomsoever participated. An examination of the testimony of the latter two witnesses reveals, as aforesaid, that they are not at all credible. First, Mohamed testified [as to information he had previously] withheld, as in his confessions[2] to the police, he did not give the same details regarding those attending the meeting. In his first interrogation by the police, dated October 20, 2001 (Nun [Defense]/1), Mohamed did not relate at all to the very existence of such a significant meeting; in his interrogation dated November 13, 2001 (Nun [Defense]/2) he depicted the meeting while explicitly noting that Majdi was the fourth individual to participate, and did not mention anything about his wearing a wig or glasses. Only in his testimony in Court [did he] note, surprisingly, that the fourth individual at the meeting was an anonymous individual introduced by the name Majdi, and that he wore a wig and glasses. When he was asked to identify him in the courtroom, he said that he identifies Majdi Rimawi as the same Majdi who was present at the meeting, however based solely on his body build. This testimony was substantively inconsistent with his confession[2] to the police, where he explicitly noted that the fourth individual was Majdi Rimawi, approximately 35 years old, who had appeared before them without attempting to hide his identity. When Mohamed was asked during his cross-examination to explain the aforesaid contradictions, he responded evasively: "**I said it, and it is not my fault if I didn't say it at the interrogation**" (page 226), and later on**: "I did not say the whole truth? First of all, I do not think that I am required to state the whole truth ...**" (page 227).

Another serious discrepancy arises between the version of Majdi and the version of Mohamed. Indeed, Majdi himself stated that only four were present at the meeting; however, in contrast to Mohamed's version, he noted that he arrived at the meeting with his face uncovered, that he did not hide his identity, and that none of the participants in the meeting wore a wig or sunglasses. Accordingly, other than the fact that the testimonies of Mohamed and Majdi], are overridden by the matching confessions[2] of Quroan and Asmar,

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**49**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

they even contradict each other, and the testimony of Mohamed is even inconsistent with his confession[2] to the police.

The contradictions and inconsistencies in the testimonies by Mohamed and Majdi, as well as their [leaving an] impression of lack of credibility lead [us] to the conclusion that the two have attempted to extricate the Defendant from [his] involvement in planning the murder by "erasing" his very presence from the meeting at the coffee house in Ramallah. As has already been noted, Mohamed did this after already being convicted for murder, and Majdi took this path only after hearing the prosecution's declaration that it would not make use of his testimony against him. The version of the Defendant, who sought to rely on the testimony of his two comrades, also sounds inconsistent and not credible.

47.    Therefore, the conditions of Section 10A of the Evidence Ordinance for determining findings against the Defendant, based on the incriminating statements of Hamdi Quroan and Basel Asmar, both in the ISA interrogations and in their confessions[2] to the police, have been met. As arises from a perusal of the evidence and from the deliberations regarding their determination – the statements of each witness support the statements of the other, both with regard to the "core" of the accounts and as to the "peripheral" details. The statements carry considerable internal weight and are in accord with one another. With regard to the evidentiary reinforcement required for each of the incriminating statements of Quroan and Asmar separately, pursuant to Section 10A (d) of the Evidence Ordinance, such reinforcement may be found in great abundance in the evidentiary foundation. First, as has been determined in case law, statements requiring evidentiary reinforcement may constitute reinforcement for each other (see and compare: Additional Hearing 25/80 **Katashvili v. State of Israel**, PD 35(2) 457). Thus in our matter, details of the version of Quroan, as given in his interrogations, constitute reinforcement for the details of the version of Asmar in the interrogation, and vice versa. Additional support for the versions of Quroan and Asmar in the investigation may be found in the evidence incriminating the Defendant

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**50**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
          **Judge, Y. Shapira and Y. Noam**

in renting the car which was used by the murderers, and in obtaining an Israeli driver's license for this purpose, as set forth in detail in the following sections of th[is] verdict. As aforesaid, Asmar noted in his statements that, at the conclusion of the instructional meeting in the coffee house in Ramallah, the Defendant gave them a grey "Kia" vehicle in order to commit the murder – the car with which, in Asmar's opinion, the Defendant arrived at the meeting and had even been rented by him (Tet [Prosecution]/46, paragraph 20). As shall be clarified hereinunder, it has been proven – according to the confessions[2] of George Qourt – that a number of days prior to the murder, the Defendant asked him for his Israeli driver's license for the purpose of carrying out a "big attack"; it has also been proven – according to the confessions[2] of Louai Oudeh – that the Defendant rented a ["]Kia["] car through him, which served later as the escape vehicle for the murderers. Additional reinforcement for the incriminating versions of Quroan and Asmar, regarding the participation by the Defendant in the instructional meeting in the coffee house, may be found – as shall be clarified hereinunder in the verdict – also in the behavior of the Defendant after the fact, when he joined those who perpetrated the murder in the safe house apartment, requested a report on their activities from them, and fled together with them to safe house apartments in Nablus.

48.    **In summary**: Based on said evidentiary foundation, relying in the main on the statements made by Quroan and Asmar in the investigation, it arises that five participated in the instructional meeting in the coffee house in Ramallah, just prior sending the cell out to commit the murder: the Defendant, Majdi, Quroan, Asmar and Mohamed. At this meeting, the Defendant played an active role, as someone with authority. He instructed the cell members in preparation for the murder, encouraged them and raised their spirits, and even gave them his blessing prior to their leaving to carry out the assassination. During the meeting, the Defendant did not identify himself by name, and even concealed his identity by wearing a wig. Indeed, his identification by Asmar and Quroan after the murder, when

SHATSKY – 007633-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**51**

<u>**Before the District Court in Jerusalem**</u>                 **Serious Felony [Case] 7027/06**
**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding**
                **Judge, Y. Shapira and Y. Noam**

they met him during the[ir] escape together and stayed with him over a prolonged period in prison, was [well-]grounded and carried weight, made a credible impression and was supported by the entirety of the evidence as set forth in detail hereinabove.

### Rental of the Car

49.    An additional factual issue requiring determination is the question of the involvement of the Defendant in renting the "Kia" car, which served the murder cell as an escape vehicle. The Defendant did not deny that he indeed took care of renting said vehicle prior to the date of the murder, however, he explained that he did this at the direction of an individual named Bakir, and [that] this was in order to transport "families of prisoners and martyrs", unrelated to the murder plan, and without his knowing that the vehicle was later passed on for this purpose. The fact that the "Kia" car served as the escape vehicle at the time of committing the murder and was driven by Mohamed Rimawi, is not under dispute among the parties, [nor] the fact that Louai Oudeh is the one who was registered as renting the vehicle on the rental company documents (Tet [Prosecution]/103). The relevant evidence for determining the instant issue are the confessions[2] to the police by Louai Oudeh, according to which he rented the car for the Defendant; the statements by George Qourt during the ISA and police interrogations, in which he noted that he gave the Defendant the driver's license which belonged to him, for purposes of using it in the framework of a "big attack"; the confessions[2] of Asmar, according to which the car was brought to the cell members by the Defendant; the testimony of Majdi Rimawi, who claimed that he was the one who brought the car; and the testimony of the Defendant.

50.    As aforesaid, during the testimony of Oudeh in Court, he was declared a hostile witness, and the attorney for the Prosecution moved to prefer his confessions[2] to the police over his testimony. Oudeh did not dispute actually giving the account which incriminated the Defendant in his confession[2] (Tet [Prosecution]/77), as well as in [the] recording of a summary of his confession[2] in his hand-writing (Tet [Prosecution]/77A). He claimed in his testimony that he said [those] things in order not

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**52**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
                 **Judge, Y. Shapira and Y. Noam**

to incriminate a person called Bakir, for whom he had rented the vehicle, and therefore, he used the name of the Defendant, who had already been arrested by the Palestinian Authority. As a result, it remains to be examined whether to prefer the statements by Oudeh to the police over his testimony. The testimony of Oudeh in Court, pursuant to which he incriminated the Defendant merely to please his interrogators, does not sound credible at all. In contrast, the account raised during his confession[2] to the police leaves an impression of credibility of an authentic account reflecting what actually happened, particularly when this is integrated into the entirety of the evidence.

51.     The version of Oudeh in the police investigation is supported by the confession[2] of George Qourt, which the Prosecution also moved to prefer over the testimony in Court. As aforesaid, in his statement which is in this confession[2] to the police (Tet [Prosecution]/79), where Qourt did not dispute the actual statements, but rather only the accuracy of their contents, Qourt related that the Defendant asked him, during the rally which was held prior to the murder, for his driver's license "**for a big attack**" (Tet [Prosecution]/79, page 1 line 12). The confessions[2] of Oudeh and Qourt reinforce each other; and in his confession[2], Qourt points to the real purpose for which the Defendant asked to rent the car – carrying out a "**big attack**" – the murder. The confession[2] by Oudeh to the police also enjoys support, as aforesaid, from the statements by Asmar in the investigation, in which he noted that the "Kia" car was brought by the Defendant at the end of the instructional meeting in the coffee house in Ramallah (Tet [Prosecution]/46, paragraph 20).

52.     The testimony of Majdi, pursuant to which he took the keys to the vehicle from Louai Oudeh in the offices of the PFLP without reporting such to anyone and gave it to the cell [members] (page 245), does not leave a credible impression at all. The statements of Asmar and Oudeh in the investigation prevail over his testimony [which] was replete with peculiarities and inconsistencies with regard to the responsibility for renting the vehicle. Majdi testified that, in order

SHATSKY – 007635-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
53

**Before the District Court in Jerusalem**          **Serious Felony [Case] 7027/06**
**Before:**     **The Honorable Judges: T. Segal – Deputy President – Presiding**
           **Judge, Y. Shapira and Y. Noam**

to carry out the murder, he received from his handler, whose name he did not indicate, information about the daily routine of the late Minister Ze'evi, money for financing the attack as well as weapons. Majdi's version, according to which he himself brought the car on his own, sounds astonishing and not credible. Under these circumstances, and in light of the non-credibility of his testimony, it is clear that Majdi took responsibility for obtaining the car, in order to extricate the Defendant from the complex of evidence incriminating him with respect to renting the vehicle, and so as not to identify him as said anonymous "handler," who supplied Majdi, and the cell members who reported to him, with all the means with which to perpetrate the murder.

53.     Therefore, I have decided to prefer the interrogation confessions[2] of Oudeh and Qourt – regarding the rental of the "Kia" car by the Defendant and his being equipped with an Israeli driver's license – over the testimony of the two in Court, in reliance on Section 10A of the Evidence Ordinance. The confessions[2] as aforesaid, support each other, describe similar contact by the Defendant with the witnesses during the same rally on a similar topic, and are in accord with the statements by Asmar during the investigation regarding the Defendant bringing the "Kia" car. Each confession[2] receives the required evidentiary support from the other, pursuant to Section 10A (d) of the Evidence Ordinance.

       The entirety of the evidence presented before us in the matter of the rented "Kia" car used by the murderers brings [us] to the general conclusion that the Defendant is the one who rented the car on the day of the demonstration, through Louai Oudeh, took it and transferred it to the murder cell. He gave the vehicle to the cell members at the end of the instructional meeting which was held in the coffee house in Ramallah for them to use to perpetrate the murder, as indeed happened.

SHATSKY – 007636-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
54

Before the District Court in Jerusalem          Serious Felony [Case] 7027/06
Before:        The Honorable Judges: T. Segal – Deputy President – Presiding
               Judge, Y. Shapira and Y. Noam

## The Escape

54.     In his testimony, the Defendant admitted that he assisted the murderers, Quroan and Asmar, in the escape stage after the assassination. According to him, after the murder, in which he was not involved at all, he was asked by Majdi, whom he knew in the framework of his activity with the "Damir" organization, to locate a safe house apartment in Nablus for Quroan and Asmar, and to put them up there. Pursuant to his version, he indeed found a safe house apartment for them, and even visited them there from time to time, until he was trapped in the apartment during one of his visits and was arrested there, together with the murderers, by the Palestinian security forces. The Prosecution believes that the Defendant's part in the escape stage was more extensive, and that he took an active part in all the stages of the escape, [starting] from hiding in Ramallah, where he truly behaved as a wanted [man], and not just as one who arrived to visit those fleeing and see to their needs. The evidentiary grounds incriminating the Defendant regarding his conduct during the escape rely on the statements by Quroan and Asmar in their ISA interrogations and their confessions[2] to the police. The argument [made] by the Defendant, regarding his marginal and indirect involvement at the escape stage, relies on his testimony and that of Majdi.

55.     In the confessions[2] by Quroan and Asmar to the police, as well as in their statements during the ISA interrogation, with regard to which a ruling has already been set forth hereinabove that such should be preferred over their silence in the courtroom because they are credible and reflect the events that happened, the two relate, each individually, that the Defendant joined them in hiding back when they were in the safe house apartment in Ramallah. Thus, Quroan related that the Defendant arrived to visit back in the safe house apartment in Ramallah, and even asked him to record a report about committing the murder (Tet [Prosecution]/2, page 11 lines 18-19). These statements by Quroan demonstrate that the Defendant was a senior participant in the secret goings-on, who, by virtue of his position and role in planning and executing the murder, even asked for a report on its commission. Moreover, said confession[2]

SHATSKY – 007637-T

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**55**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:      The Honorable Judges: T. Segal – Deputy President – Presiding**
                      **Judge, Y. Shapira and Y. Noam**

by Quroan contradicts the testimony by the Defendant, pursuant to which his involvement in the escape commenced only in the city of Nablus, is not credible, and is inconsistent with his claim that he was not involved in the murder, and that he did not seek to learn anything about it, but rather merely aid the two in their escape.

56.    The confession[2] by Quroan regarding the escape stages is supported by the confession[2] by Asmar, who relayed in his interrogation that after the murder the Defendant arrived at the safe house apartment in Ein Um-Shara'it in the Ramallah area, where the two, together with Majdi, were staying, blessed them for their success in the attack, and directed them to move to a safe house apartment in Nablus (Tet [Prosecution]/34, page 3 line 28 –page 4 line 2). It further arises from the confessions[2] by Quroan and Asmar, that the Defendant assumed an active role in the escape, when he travelled with Quroan and Asmar from Ramallah to the safe house apartment in Nablus, in a transport vehicle, and even stayed with them in the apartment, until suddenly, the Palestinian security forces arrived to arrest them[;] then the Defendant fled, jumped from the window, but broke his legs and was caught.

57.    From a perusal of such statements by Quroan and Asmar, the conclusion may be drawn that the role of the Defendant after the murder was not limited solely to providing assistance to those fleeing, the murderers of the late Minister, but rather he himself acted as one fleeing, after he understood that, by virtue of his position and involvement in the murder, he had become a wanted man. His jumping from the window of the safe house apartment while the arrest was occurring – which, based on the consequences, was not a minor matter – also demonstrates that the Defendant viewed himself as a wanted [individual], a party to the inner circle of perpetrators, and was not merely aiding in their escape.

58.    Furthermore, Asmar's statement in his confession[2] (Tet [Prosecution]/36), that when they stayed in the safe house apartment in Nablus, two brothers of the Defendant came to the apartment to visit him (Tet [Prosecution]/36, page 7 lines 5-7), reinforces

SHATSKY – 007638-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
56
<u>Before the District Court in Jerusalem</u>            Serious Felony [Case] 7027/06
**Before:        The Honorable Judges: T. Segal – Deputy President – Presiding
Judge, Y. Shapira and Y. Noam**

conclusion that the stay of the Defendant in the apartment was not incidental and for short visits, but rather an extended stay of one who resided there as a wanted [man], and during which his brothers even came to visit him. Moreover: according to Asmar in his statements in the interrogation (Tet [Prosecution]/57, paragraph 14.8.3; Tet [Prosecution]/36, page 4 line 17), pursuant to which the Defendant taught him how to prepare explosive devices while they stayed in the apartment in Nablus, also reinforces the conclusion that the Defendant did not come to the safe house apartment solely for the purpose of a visit and to inquire as to the well-being of the wanted [men].

59.    The explanations of the Defendant, pursuant to which he was just in the safe house apartment in Nablus incidentally, when he had come to visit Quroan and Asmar, and that he decided to flee it when the Palestinian security forces amassed at the doors to the house, so they would not connect him with the murderers of the Minister and would not deem him to be their accomplice – do not sound credible or reasonable. So, too, Majdi's testimony, according to which the Defendant merely assisted the murderers in finding a safe house apartment in Nablus, does not sound credible. The incriminating confessions[2] by Asmar and Quroan prevail over the testimony of [Majdi and the Defendant], which is not in accord with the behavior of the Defendant during his flight with the murderers, from [the time of] the murder until their capture.

60.    **Summary of the Escape Stage**: The entirety of the evidence leads [us] to the general conclusion that the Defendant fled, together with the members of the murder cell and hid with them, as one who was a participant, even the senior participant, to the murder. From the versions of Quroan and Asmar, it arises, as aforesaid, that the Defendant himself fled together with the murderers, moved with them from one safe house apartment to another, arrived at the first safe house apartment [even back] in Ramallah where he requested a report on the commission of the murder, decided to move with them to the city of Nablus, travelled with them in a transport vehicle, and even tried unsuccessfully to escape, by jumping from a window of the last safe house apartment in which they stayed, when the Palestinian Authority personnel arrived to arrest them. The confessions[2] by Asmar

SHATSKY – 007639-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
57

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
            Judge, Y. Shapira and Y. Noam

and Quroan on this matter, which were, as aforesaid, credible and in accord with one another, with the addition of the circumstantial evidence of actually finding the Defendant with the escapees, his fleeing and his conduct, bring [us] to the general conclusion, pursuant to which, the Defendant, as one who was a participant in the murder, fled together with the murderers and hid with them, and refute his testimony and the testimony of Majdi, according to which he only assisted the escapees after the fact, and nothing more.

### Membership of the Defendant in the PFLP

61.     The indictment charges the Defendant with the offense of membership in a terror organization, and in the facts section [herein], it is alleged that the Defendant served as head of the military wing of the PFLP. The Defendant contends that he has never been a member of the Organization and that all of his dealings have been limited to activity in a human rights organization called "Damir". The Defendant was incriminated with membership in a terror organization in the interrogation statements by Basel Asmar and George Qourt, as well as in the confessions[2] by three additional witnesses: Abbas Mazahem, Khaled Khalabi and Ra'ed Zibar.

        We first examine the confessions[2] of the latter three witnesses. The three described the Defendant as holding a senior position in the military wing of the PFPL; however, in Court, they recanted their account incriminating the Defendant. All three recanted their confessions[2], however, they did not dispute actually making the statements. They claimed that they incriminated the Defendant solely to please their interrogators, who put pressure on them, and because they believed that this would not harm the Defendant, who in any case was under arrest by the Palestinian Authority. The[se] explanations by the witnesses do not sound credible. My impression is that they were concerned about incriminating the Defendant, and sought to extricate him from that charged against him in the indictment. They recanted their confessions[2] with respect to everything related to the involvement of the Defendant

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**58**

<u>**Before the District Court in Jerusalem**</u>                **Serious Felony [Case] 7027/06**
**Before:**       **The Honorable Judges: T. Segal – Deputy President – Presiding**
              **Judge, Y. Shapira and Y. Noam**

in terror activity, however, they continued to take responsibility for the terror acts which they themselves perpetrated, for which they had already been tried and convicted. Under such circumstances, their confessions[2] to the police should be preferred over their testimony, pursuant to Section 10A of the Evidence Ordinance; moreover, such confessions[2] are in accord with one another, as well as with additional evidence indicating similar patterns of action by the Defendant as shall be set forth hereinunder.

62.     Khaled Khalabi, who has been sentenced, as aforesaid, to twenty-eight years imprisonment for his activity in the PFLP, noted in his confession[2] that the Defendant took care of his staying in a safe house apartment in Ramallah, together with other wanted [individuals] (Tet [Prosecution]/86, page 2 lines 16-18). This detail in his confession[2] is in accord with the confessions by Quroan and Asmar, who also relayed that the Defendant ensured their stay in safe house apartments in Nablus, and even came to the safe house apartment in the Ramallah area in which they were staying. This detail therefore, points to an identical pattern of action, according to which the Defendant ensured the escape and concealment of Organization members who were wanted. The role of the Defendant in the Organization was further clarified when Khalabi noted in his confession[2] that the Defendant sent him to meet with a PFLP activist who proposed that he bring a car bomb into Jerusalem (Tet [Prosecution]/86, page 4 lines 9-12). This refutes the account of the Defendant, who claimed that he was merely a human rights activist who assisted in putting up the murderers in Nablus. Khalabi's version, according to which the Defendant came to the funeral of Abu Ali Mustafa armed with a pistol, which he gave to Khalabi in order to shoot in the air (Tet [Prosecution]/86, page 4 lines 19-21), also contradicts the Defendant's contention that he served solely as a human rights activist.

63.     The confession[2] by Ra'ed Zibar (Tet [Prosecution]/90) also demonstrates that the Defendant was a central figure in the PFLP, whose orders were followed implicitly. Zibar, serving as aforesaid a prison sentence

SHATSKY – 007641-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**59**

<u>**Before the District Court in Jerusalem**</u>          Serious Felony [Case] 7027/06
**Before:**      **The Honorable Judges: T. Segal – Deputy President – Presiding**
              **Judge, Y. Shapira and Y. Noam**

of thirteen years for terror activity which he carried out, described, in his confession[2] in the investigation, his activity in the framework of the PFLP, which included a number of terror attacks, and relayed that he reported to the Defendant about one of the attacks, and even asked for a weapon from him: "**I met [with] Ahad Gholmeh in Ramallah and I told him about the attack which we did. I also asked Ahad Gholmeh for a silencer for an attack which we want to do in Givat Ze'ev**" (Tet [Prosecution]/90, page 2 lines 20-22). Zibar further noted in his confession[2] that he asked for approval from the Defendant to add military activists to his cell, reported to him about activity of the cell, and intended to ask him for explosive devices for planning an attack. He described the Defendant as "**responsible for the military wing of the PFLP**" (Tet [Prosecution]/90, page 3 line 11). In his ISA interrogation, Zibar described a shooting attack of an Israeli vehicle in which he took part. He relayed that, after the attack, he and his comrades were collected in a vehicle containing the Defendant and two others, and that [the Defendant] took him to a safe house apartment in Ramallah, where he stayed with him for several hours (Tet [Prosecution]/90, paragraphs 15-16). Zibar further noted in his interrogation that one of the attacks which he planned was not carried out, *inter alia*, "**in light of the lack of contact with Ahad al Gholmeh after the murder of Knesset member Rehavam Ze'evi**" ((Tet [Prosecution]/91, paragraph 21).

64.      Reinforcement for the confession[2] by Zibar may be found, *inter alia*, in the statements by Asmar regarding the Defendant, in which [Asmar] noted that the Defendant served as head of the military wing of the PFLP: "**It is known that he is the head of the military wing of the PFLP**" (his confession[2] to the police (Tet [Prosecution]/36, page 9 line 4), as well as "**Ahad Gholmeh is the head of the military wing of the PFLP**" (protocol of the ISA interrogation - Tet [Prosecution]/45, paragraph 8).

SHATSKY – 007642-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**60**

<u>**Before the District Court in Jerusalem**</u>          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

65.       The witness Abbas Mazahem did not deny his confession to the police, and even admitted in his testimony before us that he had committed acts of terror in the framework of the PFLP, and had received a weapon from the Defendant in order to carry out the attack. Nonetheless, he denied, as aforesaid, that which [he] had asserted in his confession[2] that the Defendant had recruited him to the PFLP, and that he trained him and blessed him for carrying out the terrorist attack. According to Mazahem's confession[2] (Tet [Prosecution]/83), he had known the Defendant since 1992 from the period they sat together in Kitzi'ot Prison. He noted that he was intermittently imprisoned in the Kitzi'ot Prison facility from 1989-1991, and that in 1992 he was sentenced to fourteen months imprisonment for his activity during the intifada (page 101). From the documents submitted (Tet [Prosecution]/104) it arises that the Defendant stayed for a period of ten months, until April 21, 1991, under administrative detention at Kitzi'ot Prison, but not in 1992; thus, Mazahem erred by about a year, when he noted that the meeting was in 1992 instead of 1991. According to Mazahem, the Defendant recruited him to the PFLP in 2001, and also instructed him to recruit activists to the military cell and to carry out attacks. These incriminating details reinforce what the witness Khalabi related in his confession[2] hereinabove, that the Defendant directed him to a meeting with an Organization activist who proposed that he bring a car bomb into Jerusalem; as well as the confession[2] by Zibar, who noted that the Defendant directed the terrorist activity of his cell. Mazahem also noted that, in 2001, the Defendant gave him a weapon and even gave him a lesson in weaponry, a fact which is supported by the confession[2] by Zibar, who credited the Defendant with involvement in procuring weapons for his cell. Mazahem further added and related that, after the shooting attack which he perpetrated with his cell against IDF soldiers, the Defendant blessed him for his actions. This behavioral pattern reinforces the words of Asmar in his confession[2]: **".... he told us thank god we have succeeded in the attack, and was pleased and told us to travel to Nablus to the old city there, and we travelled to Nablus me Ahad and Hamdi"** (Tet [Prosecution]/34, page 3 line 28 – page 4 line 2).

SHATSKY – 007643-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**61**

**Before the District Court in Jerusalem**          **Serious Felony [Case] 7027/06**
**Before:          The Honorable Judges: T. Segal – Deputy President – Presiding**
**Judge, Y. Shapira and Y. Noam**

66.      An additional [piece of] evidence regarding the position of the Defendant within the PFLP may be found in the statements by the witness George Qourt in his ISA interrogation. In his interrogation, Qourt related that during the "Al Aksa Intifada", he had participated in protests and demonstrations held in Ramallah. He further described that "**at the above-mentioned demonstrations and marches the senior leaders of the PFLP participated, amongst whom [were] Ahmad Sa'adat, Ali Gradat, Ahad Gholmeh, Hassan Fatfata and others ...**" (Tet [Prosecution]/80, paragraphs 37-38). Qourt further noted in his interrogation that, commencing in May 2001, the PFLP began to perpetrate attacks, and "**during the same period [he] saw he claimed a paper hung on an office door of the PFLP in Ramallah calling for any activist interested in participating in a military action or in the struggle against the security forces to contact Ahad Gholmeh**" (Tet [Prosecution]/80, paragraph 41). Qourt even noted the name of the Defendant as one of the PFLP activists with whom he met at conferences of the Organization in the offices in Ramallah (Tet [Prosecution]/80, paragraph 50), and in his confession[2] to the police, he related that "**... when I would go to the offices of the PFLP in Ramallah at the beginning of the intifada I met there with Ahad Gholmeh an activist in the PFLP who was the coordinator of activity with other organizations**" (Tet [Prosecution]/78, page 2 lines 24-26).

67.      In addition to said confessions[2], membership of the Defendant in the Organization and his seniority may be demonstrated by additional evidence in th[is] case. The descriptions regarding the conduct of the Defendant and his role during the meeting in the safe house apartment [sic – translator's note: should be coffee house] in Ramallah, at which it has already been determined hereinabove he took an active role, indicate that he was not just another participant in the meeting, but a most senior figure in the Organization, who arrived just prior to the date of the murder in order to review the operational plan with the cell members, lift their spirits and give them his blessing for success, all while maintaining [an air of] mystery [concerning] his identity. So, too, his arrival after the murder to the meeting with the cell members in order

SHATSKY – 007644-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**62**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

to bless them and request that they prepare a report for him about the murder. This evidence indicates membership by the Defendant in the Organization, his senior position therein, and his participation in planning and executing the murder.

68.    The entirety of the aforesaid confessions[2] – which are in accord with one another, support and reinforce each other, and which are supported by other evidence – lead [us] to the conclusion that the Defendant played a senior role in the military wing of the PFLP, and even headed the military wing. Within the parameters of his position, he recruited cells, supplied them with weapons, directed acts of terror, and even blessed their perpetration. In such framework, he also planned the murder of the late Minister, sent the cell to carry out the assassination and assisted the murderers in escaping together with him.

**Summary of the Body of Evidence and the Factual Determination**

69.    The body of evidence brought before the Court, which has been described extensively hereinabove, has three factual facets: **the first** – planning stages for the murder, preparations for its commission, and instruction of the cell members by the Defendant at the meeting which preceded sending them off to carry out the assassination; **the second** – perpetration of the murder, and escape by the murderers and cell members, amongst [whom was] the Defendant, until their capture; **and the third** – membership and activity by the Defendant in the PFLP, holding a senior position in the military wing of the Organization.

After a meticulous examination of the Prosecutor's evidence, its credibility and weight, vis-à-vis the account by the Defendant, [and] the witnesses and the evidence [he] brought in support and foundation thereof, it becomes apparent that the evidence incriminating the Defendant coalesces into an entire compilation [of evidence], laying out before us a clear picture of the course of events, commencing with the planning stages of the murder and [continuing] up until the capture of the perpetrators. This body [of evidence] includes testimony,

SHATSKY – 007645-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**63**

**Before the District Court in Jerusalem**            Serious Felony [Case] 7027/06
**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding**
                **Judge, Y. Shapira and Y. Noam**

physical evidence, confessions[2] taken by the police and statements given during ISA interrogations. The main portion of the evidence incriminating the Respondent [sic – translator's note: Defendant] with murder and with activities in a terror organization, are to be found in the statements of the witnesses during the investigation, which were preferred – pursuant to Section 10A of the Evidence Ordinance – over the silence (of two of them) or their testimony (of the others) in Court. The multitude of statements – relating to the involvement of the Defendant in the murder starting at the planning stage and up until the arrest stage – are credible and carry great weight. They are in accord with one another, support each other, and the Defendant and the witnesses on his behalf have been unable to erode their weight or credibility.

70.     Following is our summary of the factual grounds demonstrating the involvement of the Defendant in the planning and commission of the murder.

As aforesaid, in the center of the body of evidence stand the confessions[2] to the police and the statements in the ISA interrogations of Quroan and Asmar, each of whom incriminated the Defendant independently in involvement in planning and executing the murder on behalf of the PFLP. The two related detailed, coherent accounts having logic and weight, pursuant to which the Defendant, whose identity was disguised, was present at a meeting held in a coffee house in Ramallah immediately prior to the murder, instructed the members of the murder cell, raised their spirits and conferred his blessing for their success, as a senior [member] in the Organization. Identification by the two of the Defendant as the same individual who had participated in the instructional meeting carried great weight, and left an impression of credibility; particularly in light of their staying together with him during the flight and arrest stages.

An additional evidentiary layer incriminating the Defendant at the planning stage of the murder relates to the testimony regarding the involvement by the Defendant in renting the car which was used by the murderers. This layer relies

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**64**

**Before the District Court in Jerusalem**          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
          **Judge, Y. Shapira and Y. Noam**

on the confession[2] to the police by Louai Oudeh, according to which the Defendant approached him with a request that he rent a vehicle for [the Defendant] during the rally in Ramallah, and that [Oudeh] rented the "Kia" car for [the Defendant] and transferred it to him – a vehicle which was used by the murderers to drive to the murder scene. Oudeh's account was also supported by the confession[2] by George Qourt, regarding the Defendant's approaching him during the rally, and [Qourt's] giving his driver's license to the Defendant, for the purpose of carrying out a "big attack"' as well as the confession[2] by Asmar who related that the Defendant was the one who brought the "Kia" car to the same meeting in the coffee house in Ramallah, at the conclusion of which the vehicle was given to the murderers.

Later in the chain of events, as arises from the confessions[2] by Quroan and Asmar, after perpetrating the murder in accordance with the plan which had been drawn up, it was the Defendant who quickly appeared in the safe house apartment in the Ramallah area, in which Quroan, Asmar and Majdi were staying, blessed the murderers on the success of their plot, and even requested that they prepare a report on its commission for him. From such moment, the Defendant took an active role in the flight of the murderers, when he saw to safe house apartments for them and even decided on their move together with him to Nablus, where they travelled armed in a transport vehicle. He fled and hid with them in the safe house apartments, until his arrest by the Palestinian security forces after a failed attempt to flee from the last apartment in Nablus.

Finally, from this extensive collection of evidence, including the confessions[2] to the police by Mazahem, Khalabi and Zibar, as well as the statements by Asmar and Qourt, it arises that the Defendant was an active member of the terror organization called PFLP, and held a senior position in the military wing of the Organization. In this framework, he recruited activists, supplied them with money and weapons, directed terrorist activities and blessed their commission; and this was for a considerable number of incidents and over a significant period of time.

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**65**

<u>Before the District Court in Jerusalem</u>                Serious Felony [Case] 7027/06
**Before:**        **The Honorable Judges: T. Segal – Deputy President – Presiding**
            **Judge, Y. Shapira and Y. Noam**

The senior status of the Defendant in the military wing of the Organization may also be demonstrated by his active involvement in the murder of the late Minister Ze'evi, in that he arrived at the meeting in the coffee house in Ramallah prior to carrying out the murder and gave the cell members final instructions and his blessing for their success; and in that immediately after the murder, he joined the murderers, requested a report from them on its commission, and arranged for [his] joint escape with them.

71.    **In summary**: Said body of evidence leads [us] to the general conclusion that, beyond a reasonable doubt, the Defendant who served in a senior position in the military wing of the PFLP terror organization, was actively and centrally involved in planning the murder of the late Minister Rehavam Ze'evi, z"l, [of blessed memory], in the preparations therefor, in instructing the murderers and dispatching them to perpetrate the murder. Shortly after the murder, he joined them, asked them for a detailed report on its commission, and ensured their escape, together with him, to safe house apartments, until their capture.

<u>The Offenses</u>

**Offense of Murder – the Normative Framework**

72.    The offense of murder – pursuant to Section 300(a)(2) of the Penal Law – with which the Defendant has been charged in the indictment sheet, is defined as follows: "**One [who] did any of the following, shall be charged with murder and is liable for life imprisonment, and only to that penalty: . . . (2) One [who] caused the death of any person with premeditation**".

The *Mens rea* – "**premeditation**" – is defined in Section 301(a) as follows: "**For purposes of Section 300, one who killed a person shall be deemed to have killed him with premeditation, if he resolved to kill him and killed him in cold blood without**

SHATSKY – 007648-T

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**66**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**

**Before:**      **The Honorable Judges: T. Segal – Deputy President – Presiding**
      **Judge, Y. Shapira and Y. Noam**

any provocation immediately prior to the act, under circumstances in which he was able to think and to understand the results of his actions, and after he prepared himself to kill him or prepared the instrument with which he killed him."

There are three cumulative elements required to prove a *mens rea* of "premeditation": **the element of resolving to kill**, requiring the existence of intent on two levels: on the intellectual level – envisioning or anticipating the fatal consequence, and on the emotional level – desiring or aspiring to carry it out; **the element of preparation**, characterized as a purely physical element consisting of preparing for the act to kill; and **the element of lack of provocation**, which is a negative element, meaning the absence of an external-provocative event, occurring proximate to the act to kill and causing the Defendant to lose self-control and commit the fatal act without careful consideration (see: Criminal Appeal 11578/05 **Taleh v. State of Israel**, decided June 18, 2007, paragraphs 15-18 of the judgment; see also: Criminal Appeal 9604/04 **Karikhali v. State of Israel**, decided on September 4, 2007, paragraph 11).

In our case, the defense attorney has not disputed that the death of the late Minister Ze'evi was caused with premeditation, and that the one who caused his death has met all the elements for the offense of murder. The argument by the defense attorney is that the Defendant had no link to the murder, whether as a principal perpetrator or an accomplice. Once it has been determined hereinabove that the Defendant was involved in planning the murder, in instructing those committing [the murder] and dispatching them on their way, it remains to examine whether he should be deemed a principal perpetrator of the offense of murder, or whether, under the alternative argument by the defense attorney, he was merely an accomplice.

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**67**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:          The Honorable Judges: T. Segal – Deputy President – Presiding**
**Judge, Y. Shapira and Y. Noam**

**Joint Perpetration of the Offense – The Legal Framework**

73.    The offense of murder with which the Defendant is charged comes within the
purview of a multi-participant offense, as in planning and perpetrating the murder of the
Minister, many individuals were involved, including: the murderers, Quroan and Asmar,
the driver of the escape vehicle, Mohamed Rimawi, the director of cell activity, Majdi
Rimawi, and the other accomplices, members of the Organization and its senior staff,
who were involved in carrying out th[is] murderous act of terror.

    The defense attorney argued in his summation that, even were the factual thesis
alleged by the Prosecution in the indictment to be accepted, at the most the Defendant
could be deemed an accomplice, as his role pursuant to the facts in the indictment was
minor, and he should not be viewed as belonging to the inner circle of perpetrators,
without whom the plan would never have come to fruition. Prior to ruling with regard to
the legal significance of the Defendant's actions, we shall review the law and grapple
with the distinction between the principal perpetrator of a criminal offense and an
accomplice.

74.    The liability of the parties participating in a multi-participant offense is set forth
in Sections 29-31 of the Penal Law. The primary distinction is between direct
perpetrators and indirect perpetrators. The direct perpetrators take part in committing the
main [elements] of the offense, and they are the joint perpetrators or those who commit it
through [the agent of] another (Section 29 of the Law); whereas the indirect perpetrators
take an indirect part in committing the offense, and they are the accomplices and
accessories (Sections 30 and 31 of the Law). The distinction between the types of
participation – direct and indirect – is functional, and made according to the different
role[s played by] the various perpetrators in carrying out the criminal plot (Criminal
Appeal 2769/95 **John Doe(s) v. State of Israel**, PD 51(3) 388, at 401;

SHATSKY – 007650-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
68

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          The Honorable Judges: T. Segal – Deputy President – Presiding
          Judge, Y. Shapira and Y. Noam

regarding the distinction between direct and indirect perpetrators, see also: S. Z. Feller,
**Foundations of Penal Law**, Vol. 2, at 179 and 186 (5747)).

Section 29 of the Penal Law determines that the "**perpetrator of the offense [–]
includes a perpetrator together with others**"; and that perpetrators together with others
are: "**Participants in the commission of an offense, while performing acts for its
commission, [are] joint perpetrators, and it is immaterial whether all acts were
performed jointly, or some were performed by one person and some by another**."

The joint perpetrators are to be found at the top [of the scale] ranking the
participants of a multi-participant offense. They act as one entity in committing a
criminal operation, together constituting a single hand which in charge of carrying it out,
where each of them is part of the criminal mission itself (Criminal Appeal 4389/93
**Mordechai v. State of Israel**, PD 50(3) 239, at 250). Under [that] ruling, "**the law deems
joint perpetrators as one body, acting through various arms. The act of each arm is
attributed to the entire body, to each one of the participants**" (Criminal Appeal
2796/95 **John Doe[s] v. State of Israel**, PD 51(3) 388, 402).

The *mens rea* for a joint perpetrator is the mental element required to commit the
completed offense, including [any] special intent, to the extent such is required. The *actus
rea* is characterized by the "control test." Under this test, the joint perpetrator is an
internal force in [its] perpetration, the [one] controlling – together with others – the entire
criminal activity. Concerning the substance of the functional control test in the above-
mentioned **John Doe** case, in Criminal Appeal 2796/96, the Honorable President Barak
explained: "**The joint perpetrator is characterized in that he is the master of the
criminal activity. He holds functional-substantive control together with the other joint
perpetrators over the criminal act. He is part of the joint decision to commit the
offense. He is part**

SHATSKY – 007651-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**69**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
          **Judge, Y. Shapira and Y. Noam**

of the overall plan to carry out the prohibited criminal act. He acts with the other joint perpetrators, so that each of them controls – together with the others – the entire activity. His role with respect to the decision to commit the offense is that of an "inside" man. His contribution is "internal" [and] his role is substantive in carrying out the joint plan" (id., at 403; and see: the judgment by **the Honorable President Barak** in Criminal Appeal 3353/03 **Amar Abdel Hadi Saliman v. State of Israel** (decided on September 5, 2005)).

Prof. Kramnitzer in his article, "The Perpetrator in Penal Law – A Profile," **Pelilim A**, 65 (5750), also [understood] the characterization of joint perpetration to be an activity in common with a single hand controlling the action: "**Each of the perpetrators together has control together with the others over the development of the matters ... each of them acts with his friend and through his friend. Therefore, each of them should be viewed as though he himself, with his own hands, committed everything that he himself did with his own hands or [that] others did with their hands ...**" (page 73).

Case law proposes yet an additional test, termed the "**integrated test**," which may assist in situations in which a determination under the "**control test**" is not clear-cut (Criminal Additional Hearing 1294/96 **Meshulam v. State of Israel**, PD 52(5) 1). The integrated test may be incorporated, as an additional criterion, in the array of considerations guiding the Court in examining the circumstances of each specific case. Under the integrated test, a principal perpetrator is one whose contribution to the multi-participant criminal event is manifested by behavior – active or passive – and a mental relationship (*mens rea*), which transfer to him, alone or together with others, the status of the commission. The integration between the actual behavior (*actus rea*) and the mental relationship (*mens rea*) for the offense is what gives expression to the functional substance of the direct primary contribution of an individual to the multi-participant criminal event. Pursuant to th[is] model, the greater the *mens rea* of the perpetrator of the offense, and the greater his degree of interest in its commission, the lower the level of *actus rea* required, and vice versa (see the **Meshulam** case, *id.*, at 25-6). One of the derivatives of this rule

SHATSKY – 007652-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**70**

<u>**Before the District Court in Jerusalem**</u>          **Serious Felony [Case] 7027/06**
**Before:**      The Honorable Judges: T. Segal – Deputy President – Presiding
         Judge, Y. Shapira and Y. Noam

is that where no doubt arises with respect to the perpetrator having the requisite *mens rea* for the completion of the planned offense, he bears liability as a joint perpetrator, even if his physical contribution towards its commission is no greater than that of an accomplice (cf. Criminal Appeal 3390/98 **Rosh v. State of Israel**, PD 53(5), 871; Criminal Appeal 3596/93 **Abu Saror v. State of Israel**, PD 52(2) 481).

Participation in committing the offense, as a principal joint perpetrator, does not require taking part in the physical commission of the actual *actus rea* itself, and it may even be manifested in planning [its] commission and directing the criminal activity (Criminal Appeal 2801/95 **Korakin v. State of Israel**, PD 52(1) 791, at 802; Criminal Appeal 4503/99 **Ephraim v. State of Israel**, PD 55(3) 604, at 618-619). For this reason, the rule is that being present at the crime scene does not constitute a condition for imposing liability on a principal perpetrator, who may control the criminal plan by "remote control", even absent a presence at the scene of the incident or its environs (Criminal Additional Hearing 1294/96, **Meshulam**, *op. cit*, at 30).

75.    And now [we turn to] the accomplice. The accomplice is defined in Section 31 of the Criminal Law as follows: "**One whom, prior to the commission of an offense or during its commission – performs an act to enable, facilitate, or ensure its commission, or prevent the capture of the perpetrator, discovery of the offense or its spoils, or to contribute in any other manner towards generating conditions which enable commission of the offense, is an accomplice**."

The accomplice is an external factor, an indirect participant, ranked lower [on the scale of] the criminal participants. The accomplice is to be found outside the inner circle of perpetrators of the offense, he does not take part in the decisions connected with committing the crime and does not control it (Criminal Appeal 4389/93, **Mordechai**, *op. cit*, at 251). His contribution to the criminal endeavor is external to commission of the offense, and solely secondary. It is manifest in acts of

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**71**

**Before the District Court in Jerusalem**  **Serious Felony [Case] 7027/06**
**Before:**  **The Honorable Judges: T. Segal – Deputy President – Presiding**
    **Judge, Y. Shapira and Y. Noam**

assistance, as distinguished from the acts by the principal offenders perpetrating the offense, and which assist in that they create, in one fashion or another, conditions [enabling] commission [of] the offense by the principal perpetrators (Criminal Appeal 2976/95, **John Doe[s]**, op. cit, at 405; M. Gur Arye, "Penal Law Bill (Preliminary Section and General Section) 5752- 1992", **Mishpatim** 24, 9, at 42 (1994)).

  The distinction between direct participation and indirect participation is not intended to be easy in borderline cases, that is – the greater the distance from the "**core**" of the definition beyond its "**relatively grey area**" (Criminal Appeal 2976/95, **John Doe[s]**, *op. cit*, at 406) or "**into the grey area**" between the principal perpetrator and assistance (Criminal Appeal 4188/93 **Levi v. State of Israel**, PD 49(1) 539, at 559). The distinction in difficult cases such as these is determined according to the circumstances of each and every instance (With regard to distinguishing among various participants, see: Criminal Appeal 3353/03, **Saliman**, *op. cit*; M. Gur Arye, "Forms of Perpetrating a Criminal Offense," **Pelilim** A, 29 (5750).

76.  This distinction, regarding the classification of principal perpetrators**,** vis-à-vis accomplices, is manifest, *inter alia*, in many offenses [*sic* - translator's note: also written "participants" – possible typo] committed in the framework of crime organizations, or terror organizations. These organizations base their operations on a "work arrangement," pursuant to which the roles of each of the members of the associations are defined so that one's position and its importance are not necessarily contingent upon a presence at the scene of the incident and at its location on the date on which the offense is committed. This is patent in terror organizations, which are characterized by a hierarchical structure and division of roles among the organization's members. Terror organizations, in the main, carry out their terrorist activities through a "military wing" of the Organization. The military wing has a clear hierarchical structure, generally compartmentalized, which includes the members of the cell, the terrorists themselves, the dispatchers, the recruiters, regional activity coordinators, heads of the military wings and senior [members] of the Organization. Each member of the Organization, pursuant to his position and role,

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
**72**

**Before the District Court in Jerusalem**          Serious Felony [Case] 7027/06
**Before:**          **The Honorable Judges: T. Segal – Deputy President – Presiding**
          **Judge, Y. Shapira and Y. Noam**

is responsible for carrying out his part in the chain, culminating in the perpetration of murderous terror attacks, whether as a principal perpetrator or as an accomplice. Thus, there are those responsible for recruiting operatives, others deal with raising funds, procuring weapons, vehicles, explosives and their production. Delineating the manner of action, determining policy for the attacks and selecting targets for the attacks are the province of the most senior in the Organization, who, together with those under them, rehearse the operational plan, relay it to the cell members, while raising their spirits, instilling in them a feeling of confidence prior to leaving to commit their murderous deeds, and convincing them of the righteousness of their villainous ways. By integrating all the factors in their various tasks, carrying out each act of terror and attack becomes feasible. Each link in the chain has an essential role in the success of each terrorist attack. There those whose roles are central, and they belong to the internal operational circle – these are the principal perpetrators of the offense. There are those whose roles are secondary, [who] end up only in providing indirect assistance in one way or another. The distinction between the principal perpetrator and the accomplice in activities of crime organizations or terrorist organizations shall be made pursuant to such tests as have been reviewed hereinabove, each case – according to its [own] circumstances.

### Liability of the Defendant as Principal Perpetrator of the Offense of Murder

77.     Applying such tests to the circumstances of the instant case leads [us] to the clear [and] unambiguous conclusion, beyond any reasonable doubt, that the Defendant should be deemed a principal perpetrator of the offense of murder.

In order to commit the murder, a limited group of PFLP activists organized themselves as a squad with a clear hierarchical structure acting as one entity, and where each one of its members had a specific and defined task in the murder plot. Quroan was to pull the trigger, while Asmar was with him at the scene and safeguarding him; Mohamed Rimawi had the task of driving the get-away car which waited outside the hotel; Majdi was the one to recruit the members of the cell, give [them] weapons, money, false documents, and provided them with information and details about

SHATSKY – 007655-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
Courts
73

**Before the District Court in Jerusalem**        Serious Felony [Case] 7027/06
**Before:**       The Honorable Judges: T. Segal – Deputy President – Presiding
           Judge, Y. Shapira and Y. Noam

their assignment; and the Defendant – was the one who stood at the head of the murder pyramid, directing the plan. He provided Majdi, who was subordinate to him, with the target for the attack and the date for carrying it out, directed him to recruit the cell, and was involved in preparing the details of the murder plan. Moreover, he also took an active part in organizing the means for committing the murder, when he acted to obtain the driver's licenses, and was even the one to take care of renting the "Kia" car and bringing it to the cell. In the framework of his position, the Defendant also took an active role in instructing the cell at such meeting which took place prior to the murder, encouraged it prior to dispatching it to commit the assassination and bestowed a blessing for success on its members, as a senior [member] of the Organization. After the murder, he joined them to receive a report, and ensured their escape, together with him, to safe house apartments. These acts, characteristic of the Defendant, in planning and delineating methods of action, in physically committing the actions connected with the murder, and in joining the perpetrators after the fact, demonstrate that [he] was a dominant figure and a central spoke in the [wheel comprising the] squad which had been organized for the attack, and as a senior [individual] in the Organization had clear and full control over the course of events culminating in perpetration of the murder. It is clear that the instructional meeting conducted at the coffee house in Ramallah prior to the murder, outlines, more than anything [else], the parameters of the inner circle of perpetrators of the murder – the murderers, the driver of the escape vehicle, the recruiter of the cell [members] and the one who directed its activities, and the senior person who was in charge – the Defendant, who [all] acted as one entity in order to carry out the murder plot. This entire group, and in particular, the Defendant, who headed the pyramid for planning and perpetrating the murder, are to be considered principal perpetrators of the murder, both according to the control test and the functional test as described hereinabove, and according to the integrated test. As a result, the Defendant should be deemed a joint perpetrator of the offense of murder [based on] his aforesaid actions.

### Offense of Membership in a Terror Organization

78.      Section 3 of the Prevention of Terrorism Ordinance, 5708–1948 provides that: "An individual who is a member of a terrorist organization, shall be charged with an offense, and upon his being found guilty, shall be liable for a prison sentence of up to five years."

SHATSKY – 007656-T

[Translation from the Hebrew by Riva Starr]

[Emblem of the State of Israel]
**Courts**
74

<u>**Before the District Court in Jerusalem**</u>　　　　　**Serious Felony [Case] 7027/06**
**Before:**　　　**The Honorable Judges: T. Segal – Deputy President – Presiding Judge, Y. Shapira and Y. Noam**

The term "**terrorist organization**" is defined in Section 1 of the Ordinance as follows: "'**A terrorist organization' means a group of individuals using in its activities acts of violence which are liable to cause the death or injury of a person, or to threats of such violent acts.**" The term "**member in a terrorist organization,**" is defined in th[at] same section as: "**An individual belonging thereto, including an individual participating in its activities, publishing propaganda on behalf of a terrorist organization or its activities.**"

Section 8 of the Ordinance determines that the government of Israel is the one which has the authority to declare that a certain group of individuals is a terror organization.

In our matter, no dispute has arisen with regard to the PFLP being a terror organization as defined in the Ordinance. Whereas it has been determined that the Defendant was an active member in the PFLP terror organization, and a senior [individual] in the military wing of the Organization, therefore, the elements of the offense of membership in a terrorist organization, pursuant to Section 3 of the Ordinance, in conjunction with Sections 1 and 8 of the Ordinance have been more than met.

## Outcome

79.　　Based on that stated hereinabove, it has been duly proven, and beyond any reasonable doubt, that the Defendant, in the framework of his activity in the terror organization, PFLP, and by holding a senior position in the military wing of the Organization, was liable, as a joint perpetrator, for the murder of Minister Rehavam Ze'evi, z"l [of blessed memory], on October 17, 2001.

SHATSKY – 007657-T

[Translation from the Hebrew by Riva Starr]

**[Emblem of the State of Israel]**
**Courts**
**75**

<u>Before the District Court in Jerusalem</u>          Serious Felony [Case] 7027/06
**Before:          The Honorable Judges: T. Segal – Deputy President – Presiding
Judge, Y. Shapira and Y. Noam**

   Wherefore, it is proper to convict the Defendant for the offense of murder – pursuant to Section 300(a)(2) of the Penal Law, 5737-1977; and for the offense of membership in a terrorist organization – pursuant to Section 3 of the Prevention of Terrorism Ordinance, 5708–1948, in conjunction with Sections 1 and 8 of such Ordinance.

          **Judge**

                              Deputy President T. Segel

                              I concur.

     **Deputy President**

                              Justice Y. Shapira

                              I concur.

          **Judge**

   It has been decided as aforesaid in the verdict by Judge Y. Noam, to convict the Defendant of the offense of murder - pursuant to Section 300(a)(2) of the Penal Law, 5737-1977; and of the offense of membership in a terrorist organization – pursuant to Section 3 of the Prevention of Terrorism Ordinance, 5708–1948, in conjunction with Sections 1 and 8 of such Ordinance.

   **Given this day, 4th of Kislev 5769 (December 1, 2008) in the presence of attorneys for the Prosecutor, the defense attorney and the Defendant**.

          **Deputy President**          **Judge**                    **Judge**

Stamped:          District Court in Jerusalem
                 I affirm
                 That this copy is accurate and conforms with the original
                 /s/ Chief Secretary /dated/ June 2, 2013

SHATSKY – 007658-T

Original





1

בתי המשפט

פ"ח 7027/06

בבית המשפט המחוזי בירושלים

לפני:    כב' השופטים: צבי סגל - סגן נשיא - אב"ד, יוסף שפירא ויורם נועם

בעניין:    מדינת ישראל    המאשימה

באמצעות פרקליטות מחוז ירושלים

נ ג ד

עאהד ע'ולמה (ת"ז 960608370)    הנאשם

ע"י ב"כ עו"ד ר' אניס

## גזר דין

בהכרעת הדין נקבע, לאחר שמיעת ראיות, כי הנאשם היה אחד מרוצחיו של השר רחבעם זאבי ז"ל, שנרצח בדם קר ביום 17.10.01 במלון "הייאט" בירושלים.

הנאשם הורשע בעבירת רצח – לפי סעיף 300(א)(2) לחוק העונשין, התשל"ז – 1977, וכן בעבירה של חברות בארגון טרוריסטי – לפי סעיף 3 לפקודה למניעת טרור, התש"ח – 1948, בצירוף סעיפים 1 ו-8 לפקודה זו.

הנאשם, שהיה מבכירי הזרוע הצבאית של ארגון הטרור "החזית העממית", ואשר עמד בראש ההיררכיה של המעורבים ברצח, נטל חלק מרכזי בתכנון הרצח, בשילוח המרצחים לביצועו, ובמילוטם לאחר מעשה. נסיבות ביצוע העבירות, ומעורבותו הפעילה של הנאשם בתכנון הרצח ובהוצאתו לפועל, תוארו בהרחבה בהכרעת הדין ואין צורך לחזור עליהן.

SHATSKY-007582

2

בתי המשפט

בבית המשפט המחוזי בירושלים                                    פ"ח 7027/06

לפני:   כב' השופטים: צבי סגל - סגן נשיא - אב"ד, יוסף שפירא ויורם נועם

גזר-דין זה, כנגד מי שעמד בראש קבוצת המרצחים והיה מהוגי תוכנית ההתנקשות ומוציאיה אל הפועל, חותם את שורת ההליכים המשפטיים אשר ננקטו כנגד כלל המעורבים ברצח, שנתפסו והובאו לדין בישראל.

לאחר ששמענו את טענות ב"כ הצדדים לעונש ואת דברי הנאשם, באנו לכלל מסקנה, כי יש לדון את הנאשם לעונשים כדלקמן:

בגין עבירת הרצח – מאסר עולם.

בגין העבירה של חברות בארגון טרוריסטי – המאסר המרבי הקבוע בחוק, היינו, 5 שנות מאסר בפועל.

שתי תקופות המאסר תרוצנה במצטבר, החל מיום מעצרו של הנאשם בישראל, 14.3.06.

הודעה לנאשם זכותו לערער לבית המשפט העליון תוך 45 יום מהיום.

ניתנה היום, ד' בכסלו תשס"ט (1 בדצמבר 2008), במעמד הצדדים.

ס ג ן   נ ש י א                    ש ו פ ט                    ש ו פ ט

בית המשפט המחוזי בירושלים
אני מאשר
שהעתק זה נכון ומתאים למקור
תאריך _____ (8) _____ מזכיר ראשי

SHATSKY-007583





בתי המשפט

1

<u>בבית המשפט המחוזי בירושלים</u>

<u>לפני כב' השופטים : צ' סגל - סגן נשיא, י' שפירא וי' נועם</u>

בעניין :         מדינת ישראל

ע"י ב"כ עו"ד ג' כהן

מפרקליטות מחוז ירושלים

<u>המאשימה</u>

נ ג ד

עאהד ע'ולמה  (ת"ז 960608370)

ע"י ב"כ עו"ד ר' אניס

<u>הנאשם</u>

<u>הכרעת-דין</u>

השופט י' נועם:

פתח דבר

1.    בבוקרו של יום 17.10.01 נרצח שר התיירות, רחבעם זאבי ז"ל, במלון "היאט"
בירושלים. חייו קופדו בידי מרצחים, שירו לעברו מטווח קצר שלושה כדורי אקדח,
אשר שניים מהם פגעו בראשו. היריות הקטלניות לעבר השר המנוח נורו בסמוך לשעה
6:50 בבוקר, עת חזר לחדרו מחדר האוכל שבמלון, שם סעד את ארוחת הבוקר יחד עם
רעייתו, ושעה שהשתעתד לצאת לעבודתו במשרד התיירות. המנוח הובהל לבית-החולים
הדסה עין-כרם בירושלים, שם נקבע מותו, לאחר מאמצי החייאה שלא צלחו.

2.    הנאשם, עאהד ע'ולמה, יליד 1968, מהכפר בית-פוריק שליד שכם, הואשם כי
שימש כראש הזרוע הצבאית של ארגון הטרור "החזית העממית", וכי מתוקף תפקידו



בתי המשפט
2

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים : צ' סגל - סגן נשיא, י' שפירא וי' נועם

תכנן את רצח השר המנוח והביא להוצאתו אל הפועל, זאת כנקמה על הריגתו בידי כוחות הביטחון הישראליים של מנהיג הארגון, אבו-עלי מוסטפא. כתב-האישום מייחס לנאשם עבירת רצח – לפי סעיף 300(א)(2) לחוק העונשין, התשל"ז-1977, וכן עבירה של חברות בארגון טרוריסטי – לפי סעיף 3 בשילוב עם סעיפים 1 ו-8 לפקודה למניעת טרור, התש"ח-1948.

3.      הכרעת-הדין זו הנה האחרונה בשורת כתבי-האישום שהוגשו נגד המעורבים ברצח. כתב-האישום נגד הנאשם, שעל-פי הנטען הנו הגורם הבכיר ביותר שעמד מאחורי תכנון הרצח והוצאתו אל הפועל, הוגש ביום 12.5.06, לאחר שהנאשם ומעורבים נוספים ברצח הובאו לישראל על-ידי כוחות צה"ל ממתקן מעצר של הרשות הפלסטינית ביריחו. התיק החל להישמע לפני הרכב אחר של בית-משפט זה (כב' השופטים מ' רביד, א' אפעל-גבאי וא' פרקש), שדן גם בתיק מקביל בעניינים של שני נאשמים נוספים. לאחר מתן החלטתו של אותו מותב ביום 21.2.07, בדבר דחיית הטענות המקדמיות בשני התיקים, הועבר התיק הנדון ביום 1.4.07, בעניינו של הנאשם ובעניינו של נאשם נוסף, מג'די רחמה רימאווי (להלן – מג'די), לשמיעה לפנינו. במהלך שמיעת פרשת ההגנה הופרד משפטו של מג'די והועבר לשמיעה לפני הרכב אחר, זאת נוכח בחירתו של מג'די שלא להעיד במשפטו שלו, אך למסור עדות במשפטו של הנאשם. משפטיהם של כל הנאשמים האחרים, לרבות משפטו של מג'די, נסתיימו; וכיום נותר אך להכריע את הדין בעניינו של הנאשם.

SHATSKY-007585



בתי המשפט
3

פ"ח 7027/06          <u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

רקע כללי אודות מעצרם של החשודים ברצח והעמדתם לדין בישראל

4.      להלן הרקע העובדתי בדבר ההליכים שקדמו להגשת כתב-האישום. רקע זה
הובא לפני בית-המשפט בשלב הדיון בטענות המקדמיות, ולא היה שנוי במחלוקת.

בסמוך לאחר הרצח החל להצטבר בידי רשויות הביטחון והחקירה הישראליות
מידע אודות מבצעיו. בעקבות מידע זה נעצרו עד מהרה מחמד פהמי רימאווי (להלן –
מחמד) וצלאח עלווי, כחשודים במעורבות ברצח, וכן נאסף מידע בדבר חשד
למעורבותם של שניים נוספים ברצח – חמדי קורעאן (להלן – קורעאן) ובאסל אסמר
(להלן – אסמר). ביום 19.10.01, יומיים לאחר הרצח, הוצאו בבית-משפט השלום
בירושלים צווי מעצר מעצר כנגד השניים האחרונים.

כנגד מחמד רימאווי וצלאח עלווי הוגש בשעתו כתב-אישום בבית-אישום זה
בתיק פ"ח 4073/01 – כנגד הראשון בגין רצח השר, וכנגד השני בגין סיוע לרצח. בית-
המשפט (כב' השופטים י' הכט, מ' רביד וי' צבן) הרשיע את השניים ביום 7.10.02
בעבירות שיוחסו להם. מחמד רימאווי נשפט באותו יום למאסר עולם, וצלאח עלווי
נידון ביום 9.4.03 לשתים-עשרה שנות מאסר בפועל.

הואיל ויתר החשודים במעורבות ברצח הסתתרו באזור יהודה ושומרון, הגישה
מדינת ישראל ביום 3.2.02 לרשות הפלסטינית בקשות למעצר והעברה לישראל של
קורעאן ואסמר. במהלך חודש פברואר 2002 עצרו כוחות הביטחון הפלסטיניים, בדירת
מסתור בשכם, את חמדי קורעאן, באסל אסמר והנאשם. האחרון אף שבר את רגליו בעת
ניסיון הימלטות שלא צלח, במהלכו קפץ מחלון הדירה. באותה תקופה גם נעצר על-ידי

SHATSKY-007586



בתי המשפט
4

בבית המשפט המחוזי בירושלים

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

הרשות הפלסטינית מג'די רימאווי, תושב הכפר בית-רימא שמצפון לרמאללה, אשר
נחשד אף הוא במעורבות ברצח. כל העצורים הובאו לחקירה לפני רשויות החקירה
הפלסטיניות. ביום 3.3.02, לאחר שנודע לישראל דבר המעצר, הועברה לרשות
הפלסטינית פנייה נוספת להעברת קורעאן ואסמר לישראל.

6.      במהלך מבצע "חומת מגן", שנערך בחודש אפריל 2002, נודע לכוחות
הביטחון הישראליים כי רוצחי השר המנוח מסתתרים בבניין ה"מוקטעה" ברמאללה.
נוכח העובדה, כי הרשות הפלסטינית לא הגיבה לבקשות ההסגרה, הוחלט כי כוחות
צה"ל יכתרו את המבנה, וכך נעשה. לאחר מצור ממושך ומשא ומתן בתיווך אמריקאי
ובריטי, הגיעו הצדדים למסמך הבנות, שבבסיסו הסכמה כי החשודים במעורבות ברצח
– מג'די רימאווי, חמדי קורעאן, באסל אסמר, הנאשם ואחמד סעדאת (שכיהן כראש
ארגון החזית העממית), יחד עם פואד שובכי (שנחשד כאחראי על הבאת ספינת הנשק
"קארין איי"), יועברו זמנית למתחם כלא יריחו, שם יכלאו תחת השגחתם של פקחים
בריטים ואמריקאים, עשרים וארבע שעות ביממה, ומנגד, מדינת ישראל תסיר את
המצור ותתחייב שלא לפגוע בשישה. המצור אכן הוסר והשישה הועברו לכלא יריחו.
בחודש מאי 2002 הוצאו צווי מעצר מבית-משפט השלום בירושלים כנגד הנאשם
ומג'די רימאווי, וכן הועברה לרשות הפלסטינית בקשה להעברתם לישראל. לאחר
שגורמים אמריקאים התריעו לפני הרשות הפלסטינית על הפרת מסמך ההבנות מצדה,
ודרשו כי יינקטו צעדים לכיבוד ההסכם ולהבטחת ביטחונם של הפקחים האמריקאים
והבריטים, עזבו הפקחים ביום 14.3.06 את מתקן הכליאה. עוד באותו היום עצרו
כוחות הביטחון הישראליים את השישה במתחם כלא יריחו, והעבירו אותם למתקן
מעצר. בתחילה הוארך מעצרם בבית-המשפט הצבאי ביהודה ושומרון, אך בהמשך



SHATSKY-007587



בתי המשפט
5

<u>בבית המשפט המחוזי בירושלים</u>

<b>לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם</b>

הוחלט על-ידי היועץ המשפטי לממשלה כי קורעאן, אסמר, מג'די והנאשם יועמדו לדין בישראל, ומעצרם הוארך בבית-משפט השלום בירושלים.


7.   ביום 12.5.06 הוגשו כתבי-אישום נגד הנאשם ומג'די בתיק הנדון (פ"ח 7027/06), ונגד קורעאן ואסמר בתיק נפרד (פ"ח 7028/06).


האישום

8.   כתב-האישום מייחס לנאשם אחריות לתכנון הרצח וביצועו, זאת במסגרת פעילותו כראש הזרוע הצבאית של ארגון החזית העממית. כאמור, כתב-האישום המקורי הוגש תחילה כנגד שני נאשמים: מג'די והנאשם. הוא כלל חמישה אישומים שונים, אשר ארבעה מתוכם יוחסו אך למג'די, והחמישי – בגין רצח השר זאבי המנוח – יוחס לשניהם. הואיל ומשפטו של מג'די הופרד כאמור, נותר לפנינו בעניינו של הנאשם רק האישום החמישי, שבו הואשם בעבירת רצח – לפי סעיף 300(א)(2) לחוק העונשין, ובעבירה של חברות בארגון טרוריסטי – לפי סעיף 3 לפקודה למניעת טרור.


9.   בפתח כתב-האישום נטען, כי הנאשם שימש במועדים הרלבנטיים כראש הזרוע הצבאית של ארגון החזית העממית, בעוד מג'די שימש כמגייס פעילים בארגון וכמתווה ביצועם של פיגועי טרור. להלן עיקר עובדות כתב-האישום, כפי שהוא מיוחס לנאשם, לאחר הפרדת האישום בעניינו של הנאשם הנוסף, מג'די.


על-פי הנטען בכתב-האישום, בעקבות מותו ביום 27.8.01 של ראש ארגון החזית העממית, המכונה אבו עלי מוסטפא, מאש כוחות הביטחון הישראליים, הוחלט



בתי המשפט
**6**

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

בארגון לנקום את מותו על-ידי רצח של אישיות בכירה בישראל. כדי להוציא את התוכנית אל הפועל, פנה מג'די לחמדי קורעאן, שהסכים ליטול חלק בהתנקשות המתוכננת. כחלק מן ההכנות לביצוע הרצח, ביקר קורעאן, בהוראת מג'די, במלון "היאט" בירושלים, והוא אף קיבל ממג'די תעודת זהות ישראלית מזויפת. מג'די הציג לקורעאן את תמונתו של השר המנוח, כיעד לרצח, מסר לו פרטים אודות שגרת יומו והחדר שבו הוא נוהג להתאכסן, ואף נתן לו כסף על-מנת שישכור חדר באותו מלון. קורעאן אכן שכר חדר במלון ביום 14.10.01, ובחן את דרכי הגישה והמילוט במקום. בשלב זה גייס קורעאן עוד שני שותפים שיסייעו לו בביצוע הרצח – באסל אסמר ומוחמד רימאווי – לאחר שמג'די אישר את הצטרפותם, ועדכן אותם כי התכנית הנרקמת היא לרצוח את השר במלון בירושלים. בסמוך לאחר מכן, נפגשו השלושה – קורעאן, אסמר ומוחמד רימאווי – עם הנאשם ועם מג'די ברמאללה. בפגישה זו הכינו השניים האחרונים את השלושה לביצוע הפיגוע, השלימו את תכנונו ועמדו על תפקידו של כל אחד בהוצאתו אל הפועל.

כן נטען בכתב-האישום, כי במהלך הפגישה חיזק הנאשם את ידי השלושה, ובירך אותם לקראת היציאה לביצוע הרצח. לשאלתם של השלושה, מה יקרה אם ייתפסו על-ידי הרשות הפלסטינית לאחר ביצוע הרצח, השיב הנאשם כי הרשות הפלסטינית "בכיס הקטן" שלו. מג'די הורה לקורעאן לשכור רכב נוסף, העביר לו תעודות זהות ישראליות מזויפות עבור מחמד ואסמר, וכן מסר לו, לצורך הרצח, שני אקדחים בקוטר 7.65 מ"מ עם משתיקי קול, ורובה סער מסוג "סקורפיון". קורעאן, באמצעות מחמד, שכר רכב נוסף; רכש, בהוראת מג'די, בגדים חדשים עבורו ועבור מחמד; ואף קיבל לידיו רכב מסוג "קאיה", אותו שכר הנאשם.



בתי המשפט

7

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

בעניין הוצאתה אל הפועל של התכנית הרצחנית, נטען בכתב-האישום כי בשעות אחר הצהריים של יום 16.10.01 הגיעו קורעאן ואסמר, חמושים באקדחים, יחד עם מחמד למלון "היאט" בירושלים, שם שכרו חדר תחת שם בדוי, באמצעות תעודת זהות מזויפת, עבור קורעאן ואסמר, ואילו מחמד לן בביתו של תושב עזרייה שבמזרחה ירושלים. למחרת, ביום 17.10.01 בסמוך לשעה 6:00 בבוקר, ירד קורעאן מחדרו במלון לחדר האוכל, כדי לוודא שהשר המנוח נמצא במקום. לאחר מכן, הצטיידו קורעאן ואסמר באקדחים, והתמקמו בסמוך לכניסה למדרגות החירום שליד החדר שבו השתכן השר בקומה השמינית. בסמוך לשעה 6:50 עלה המנוח לחדרו, לאחר שסעד את ארוחת הבוקר בחדר האוכל של המלון. כאשר יצא מפתח המעלית וחלף על פניהם של השניים, קרא קורעאן לעברו. משנפנה אליו השר, ירה לעברו קורעאן שלוש יריות אקדח מטווח קצר. שתיים מהיריות, שפגעו בראשו של השר המנוח, היו קטלניות והביאו למותו תוך זמן קצר. קורעאן ואסמר נמלטו במהרה מהמקום, תוך שהותירו בזירה חוברת אודות אבו עלי מוסטפא, כאות וסימן לכך שהרצח בוצע כנקמה על מותו של האחרון.

כתב-האישום מייחס לנאשם אחריות לרצח כמבצע בצוותא — כמי שתכנן את הרצח, צייד את המבצעים באמצעים להוצאתו אל הפועל ושילח אותם לביצועו.

סקירת ההליכים המשפטיים

10. כאמור, כתב-האישום בתיק זה (פ"ח 7027/06) הוגש נגד הנאשם ונגד מג'די ביום 12.5.06, ונידון תחילה לפני הרכב אחר (כב' השופטים מ' רביד, א' אפעל-גבאי, א'



SHATSKY-007590



פ"ח 7027/06                                              בבית המשפט המחוזי בירושלים

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

פרקש), שדן אף בתיק המקביל (פ"ח 7028/06), אשר הוגש נגד אחמד קורעאן ובאסל
אסמר. עם פתיחת המשפט, העלו הנאשמים בשני התיקים טענות מקדמיות: האחת –
בדבר היעדר סמכות שיפוט מקומית ועניינית, וזאת בטענה, כי הם רואים עצמם
"לוחמים נגד הכיבוש הישראלי", ועל-כן יש להכיר בהם כשבויי מלחמה ולהחיל עליהם
את דיני המלחמה; והשנייה – טענת "סיכון כפול", לפיה כבר נשפטו בגין רצח השר
המנוח, זאת על-ידי בית-דין של הרשות הפלסטינית, כאשר הנאשם הורשע אך בגין
מתן מקלט לרוצחים ואי-דיווח לרשות הפלסטינית. הדיון בטענות המקדמיות התקיים
במאוחד בשני התיקים, ובהחלטתו מיום 21.2.07 דחה בית-המשפט את הטענות. הואיל
ובתשובתם לאישום כפרו ארבעת הנאשמים בעובדות שיוחסו להם בשני כתבי-האישום,
והיות ששני הנאשמים בתיק פ"ח 7028/06 – אסמר וקורעאן – היו אמורים לשמש
כעדי תביעה בתיק פ"ח 7028/06, ביקשה התביעה הכללית מהרכב השופטים האמור
לדון אך באחד מהתיקים, ולהעביר את התיק השני לשמיעה לפני הרכב אחר. לפיכך,
ביום 26.3.07 החליט הרכב בית-המשפט הנ"ל (כב' השופטים מ' רביד, א' אפעל-גבאי,
א' פרקש) כי יישמע לפניהם תיק פ"ח 7028/06, וכי התיק הנדון – פ"ח 7027/08,
בעניינם של הנאשם ומג'די, יישמע לפני הרכב אחר. על-פי החלטת כב' הנשיאה מ' ארד
מיום 1.4.07, הועבר התיק האחרון לשמיעה לפנינו.


11.   משכפרו הנאשם ומג'די בעובדות שיוחסו להם בכתב-האישום, נשמעו ראיות
התביעה להוכחת האשמה. בפרשת ההגנה הודיע מג'די, כי הוא בוחר שלא להעיד. או-
אז, ביקש הנאשם, ביום 17.1.08, להזמין את מג'די למתן עדות כעד הגנה מטעמו. נוכח
הסיטואציה החריגה ויוצאת הדופן שנוצרה, כאשר מחד – ביקש מג'די לשמור על זכות
השתיקה במשפט, וכאשר מאידך – עמד הנאשם על דרישתו להזמין את מג'די כעד



פ"ח 7027/06        בבית המשפט המחוזי בירושלים

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

מטעמו, ביקשו הצדדים מבית-המשפט להפריד את הדיון בעניינו של מג'די, על-מנת שיוכל להעיד מטעם הנאשם. המאשימה אף הודיעה, כי לא תעשה שימוש לחובתו של מג'די בעדות שימסור כעד מטעם הנאשם. בעקבות הסכמת הצדדים הופרד הדיון בעניינו של מג'די ביום 13.2.08. לאחר הפרדת הדיון, מסר מג'די עדות כעד הגנה, במסגרתה נטל אחריות מלאה לביצוע הרצח, אך טען כי לנאשם לא היה בו כל חלק, אלא אך כמסייע לאחר מעשה. בתום שמיעת עדותו סברה המאשימה, כי אין מניעה לכך שגם התיק המופרד, בעניינו של מג'די, ימשיך להישמע לפנינו; ואולם, בא-כוחה של מג'די התנגד לכך. נוכח ההתנגדות האמורה, הסכימו הצדדים כי הדיון בתיק המופרד יישמע לפני הרכב אחר, החל משלב הסיכומים. כך הורינו בהחלטתנו מיום 31.3.08, ונגד מג'די נפתח תיק חדש – פ"ח 516/08, שנשמע לפני מותב אחר (כב' השופטים י' צבן, ג' כנפי-שטייניץ ור' כרמל). בתיק האמור הורשע מג'די ביום 29.7.08 ברצח השר זאבי המנוח, ובמעורבות בביצוע של פיגועי טרור נוספים; וביום 22.9.08 נגזר דינו למאסר עולם ולשמונים שנות מאסר נוספות. הדיון בעניינים של קורעאן ואסמר (לפני כב' השופטים מ' רביד, א' אפעל-גבאי וא' פרקש) הסתיים מספר חודשים לפני-כן. חמדי קורעאן הורשע ברצח השר זאבי המנוח ובאישומים נוספים, זאת על-פי הודאתו בכל העובדות שיוחסו לו בכתב-אישום המתוקן שהוגש נגדו. באסל אסמר, שהודה בעובדות כתב-האישום המתוקן, אך טען כי יש לייחס לו אך עבירת סיוע לרצח, ולא עבירת רצח, הורשע בעבירת הרצח ובעבירות הנוספות שהואשם בהן, זאת לאחר שנקבע בהכרעת-הדין בעניינו כי חלקו ברצח היה של מבצע עיקרי. על כל אחד מהשניים (על קורעאן ביום 3.12.07 ועל אסמר ביום 5.2.08) הוטל עונש מאסר עולם, ובנוסף – עשרים שנות מאסר במצטבר.





בתי המשפט

**10**

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

התשתית הראייתית במבט-על

12. המסד הראייתי שהובא על-ידי המאשימה, מתבסס על ארבעה אדנים מרכזיים: הראשון – הודאותיהם בשב"כ ובמשטרה של חמדי קורעאן ובאסל אסמר, שהורשעו ברצח השר זאבי המנוח, ואשר בגדרן הפלילו את הנאשם כדמות מרכזית בתכנון הרצח, בשילוחם לביצועו ובסיוע להם בשלב ההימלטות; השני – הודעותיו במשטרה של לוّאי עודה, המתארות את הנאשם כמי שביקש ממנו לשכור עבורו רכב, שבהמשך נתחוור כי שימש לביצוע הרצח; השלישי – הודעתו במשטרה של ג'ורג' קורט, לפיה מספר ימים לפני הרצח ביקש ממנו הנאשם את רישיון הנהיגה הישראלי שלו, לביצוע "פיגוע גדול"; והרביעי – אמרות מפלילות של עדים נוספים, המצביעות על חברותו של הנאשם בארגון החזית העממית ועל מעמדו הבכיר בזרוע הצבאית של הארגון.

13. מטעם המאשימה העידו העדים שלהלן: חמדי קורעאן ובאסל אסמר – אשר בהודאותיהם בשב"כ ובמשטרה הפלילו את הנאשם במעורבות ברצח, אך בבית-המשפט סרבו למסור גרסה וסכרו פיהם; לוّאי עודה וג'ורג' קורט – בקשר למעורבות הנאשם בשכירת הרכב ובהשגת רישיונות נהיגה ישראלים לצורך ביצוע הרצח; עבّאס מזّאחם, חّאלד חלבי וראאד זיבאר – פעילים בארגון החזית העממית, שהתייחסו באמרותיהם בחקירה לחברותו של הנאשם בארגון ותפקידו; חוקרי שירות הביטחון הכללי, אשר ניהלו את חקירתם של חלק מהעדים; וחוקרי משטרה, אשר גבו הודעות מהעדים, אספו ממצאים בזירת הרצח ותפסו מסמכים בחברת השכרת הרכב. עדים נוספים מטעם המאשימה העידו אודות פעילותו של מג'די. ואולם, לאחר שהופרד משפטו, כאמור, עדויותיהם אינן רלבנטיות עוד.

SHATSKY-007593



בתי המשפט

**11**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב׳ השופטים: צ׳ סגל - סגן נשיא, י׳ שפירא וי׳ נועם

14.   מטעם ההגנה העיד הנאשם עצמו, וכן השמיעה הסניגוריה שני עדים נוספים:
מחמד רימאווי, שהורשע בהליך נפרד בביצוע הרצח, ואשר טען כי הנאשם לא נטל כל
חלק בתכנון הרצח ובביצועו, ואף לא נכח בפגישה שקדמה לשילוח המבצעים; ומג׳די,
הנאשם השני שמשפטו הופרד כאמור, אשר העיד על תכנון הרצח וביצועו, וטען כי
לנאשם לא היה כל חלק בו. במסגרת פרשת ההגנה ביקש הסניגור להזמין לעדות מטעם
הנאשם שני עדים הנושאים תפקיד רשמי ברשות הפלסטינית, על-מנת שיעידו על
סיכומי החקירה שערכו בעניינם של קורעאן ואסמר, עת נעצרו על ידי הרשות; ואולם,
בסופו של יום לא עלה בידי ב״כ הנאשם להביאם להעדות לפנינו. סיכומי החקירה
ותרגומיהם הוגשו כראיות מטעם ההגנה, בהסתייגויות של המאשימה לעניין משקלם.

תשובת הנאשם לאישום ותמצית גרסתו

15.   בתשובתו לאישום לא חלק הנאשם על עצם ביצוע הרצח, אך כפר בכל העובדות
הנטענות בדבר אופן תכנונו וביצועו, אשר פורטו בכתב-האישום, וממילא כפר בכך
שנטל בו חלק כלשהו. כן הכחיש הנאשם, כי היה חבר בארגון החזית העממית, וציין כי
שימש אך כפעיל בארגון לזכויות אדם בשם ״דמיר״. בעדותו ובסיכומיו הודה, כי היה
מעורב בהימלטותם של קורעאן ואסמר בעקבות הרצח, אך טען כי כל שעשה התמצה
בארגון הלנתם של השניים בדירה מסתור בשכם, זאת לבקשתו של מכרו, מג׳די. הנאשם
הסביר את הימצאותו יחד עם הרוצחים בדירה בשכם, בשעה מעצרם על-ידי הרשות
הפלסטינית, וכן את בריחתו יחד עמם, בכך שבא אותם עת לבקר בדירה וחשש להיעצר
עם קורעאן ואסמר, פן ייקשר שמו לרצח. הוא הכחיש, כי היה נוכח במפגש בבית
הקפה ברמאללה, שקדם לשילוחם של הרוצחים לירושלים, וממילא הכחיש, כי תדרך
את חברי החוליה ונתן להם את ברכתו לביצוע הרצח. הנאשם אישר, כי אמנם שכר את

SHATSKY-007594



בתי המשפט

**12**

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

מכונית הקאיה, אך טען כי לא ידע שזו שימשה את מבצעי הרצח, וציין כי שכר את
המכונית רק לצורך הסעת בני משפחותיהם של עצורים, זאת במסגרת פעילותו במסגרת
ארגון "דמיר".

<u>סקירת הראיות מטעם המאשימה</u>

העד חמדי קורעאן

16. חמדי קורעאן, שהורשע במשפטו ברצח השר זאבי המנוח, כמי שלחץ על הדק
האקדח ממנו נורו היריות הקטלניות, הודה בחקירותיו בשב"כ ובמשטרה בביצוע הרצח
ואף הפליל את הנאשם במעורבות בו ובתכנונו. משהוזמן למתן עדות מטעם המאשימה,
סירב קורעאן להשיב לשאלות שהופנו אליו, ובחר בשתיקה. לאור זאת, הוגשו אמרותיו
בחקירותיו בשב"כ ובמשטרה, והמאשימה ביקשה לסמוך עליהן ממצאים, לפי סעיף
10א לפקודת הראיות [נוסח חדש], התשל"א-1971.

17. חקירתו של חמדי קורעאן בשב"כ הונצחה בכשלושים דו"חות זיכרון דברים
(ת/4-ת/30). תחילה הכחיש כי נטל חלק ברצח השר זאבי המנוח, אך בשלב מסוים
החל להודות במעורבותו ברצח, אם כי הודיע שלא ימסור פרטים על כך. לבסוף, נתרצה
קורעאן ומסר לחוקרי השב"כ גרסה מפורטת אודות מעורבותו ברצח, וביצוע פיגועי
טרור רבים נוספים, תוך שהפליל את שותפיו למעשים. הוא אף גולל את גרסתו בהודאה
מפורטת בכתב שנגבתה ממנו במשטרה ביום 30.3.06 (ת/2).

18. להלן עיקרי גרסתו של חמדי קורעאן, כפי שהונצחה בהודאתו המפורטת
במשטרה, ואשר תואמת גם את הגרסה שמסר בחקירותיו בשב"כ:



SHATSKY-007595



בתי המשפט
13

בבית המשפט המחוזי בירושלים

לפני כב׳ השופטים: צ׳ סגל - סגן נשיא, י׳ שפירא וי׳ נועם

לאחר מותו של ראש ארגון החזית העממית, אבו עלי מוסטפא, מירי של כוחות צה״ל, פנה מג׳די אל קורעאן, וביקש ממנו ליטול חלק בפיגוע טרור, כנקמה על מות מנהיגם. קורעאן, שנאות להשתתף בפיגוע, נשלח על-ידי רימאווי להכיר את זירת הפיגוע המתוכנן – מלון ״היאט״ בירושלים. בהמשך, המציא מג׳די לקורעאן תעודת זהות ישראלית מזויפת, הציג לו תמונה של השר זאבי המנוח, כיעד הרצח, ומסר לו פרטים אודותיו – על סדר יומו, אופן אבטחתו והרגלי שהייתו במלון. הוא שכר חדר במלון ״היאט״, וסייר במלון לצורך הכנת תכנית ההתנקשות. בהמשך, חזר קורעאן לרמאללה, וסיכם עם מג׳די כי יגייס שניים מחבריו שישתתפו עמו בביצוע הרצח – באסל ומחמד רימאווי. השניים הסכימו לבקשתו של קורעאן ליטול חלק ברצח, ובהמשך עדכן אותם קורעאן, בפגישה שקיימו בבית-קפה ברמאללה, על עיקרי תוכנית ההתנקשות. במהלך אותה פגישה, יצא קורעאן להיפגש ביחידות עם מג׳די. בפגישה זו נתן לו מג׳די שתי תעודות זהות מזויפות נוספות – עבור אסמר ומחמד, וביקש ממנו לשכור רכב עם לוחיות רישוי ישראליות. קורעאן חזר לאסמר ולמחמד, ומסר לידיהם את תעודות הזהות המזויפות. בתכוף לכך, ניגש מחמד לשכור רכב, וחזר למפגש עם מכונית ״פולו״ בצבע לבן, נושאת לוחיות רישוי ישראליות. השלושה רקמו את מתווה הרצח, לפיו קורעאן יירה לעבר השר המנוח; אסמר, שיעמוד לצדו, יפתח באש לעבר המאבטח של השר, אם ילווה במאבטח; ואילו מחמד ימתין מחוץ למלון במכונית ה״קאיה״, כ״רכב מילוט״ חלופי למכונית ה״פולו״ של השניים. בהמשך, מסר מג׳די לקורעאן שני אקדחים ורובה-סער עם משתיקי קול, אותם הסליק האחרון בכלי הרכב. קורעאן ושני שותפיו, אסמר ומוחמד, אף רכשו בגדים חדשים לצורך הפיגוע.

SHATSKY-007596



פ"ח 7027/06 <u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

בהתייחסו בהודעתו במשטרה למפגש שהתקיים עם הנאשם יומיים לפני הרצח
בבית קפה ברמאללה, ציין קורעאן כדלהלן: "לפני הפיגוע ביומיים, נפגשנו כמו שאמר לי
מג'די שאביא איתי את באסל ומחמד, בקפה ליד כיכר מנארה, שם היה גם מג'די – שהיה
גלוי, ובאסל ומחמד מכירים אותו מהכפר, והיה גם עאהד ע'ולאמה בשנות ה-40 משכם,
נקרא אבו-קייס כיום בכלא והיה לו לראשו פאה. אני אז לא ידעתי מיהו עד שנעשינו
מבוקשים, ורק אז הבנתי שזה עאהד ע'ולאמה. מג'די אמר שהוא רפיק, וזה אומר שהוא חבר
בחזית עממית, כמו שבפתח כל אחד קורא לשני אח, אנחנו בחזית עממית קוראים אחד לשני
רפיק. ומג'די ועאהד דיברו איתנו על הפיגוע ועודדו אותנו, והם אמרו שלאחר שנחזור
מהפיגוע לרמאללה יעשו לנו חפלה גדולה. ואני פחדתי אז מהרש"פ, ושאלתי את מג'די
ועאהד, מה יקרה כשנחזור מהפיגוע, והם אמרו שלא נפחד. ולפני הפיגוע, זו פעם יחידה
שראיתי את עאהד ע'ולאמה. ואני לא ידעתי שעאהד היה אחראי בחזית עממית. ואני לא
יודע אם עאהד ידע איזה פיגוע אנחנו הולכים לעשות. ואני חושב שכולם ידעו איזה פיגוע
אנחנו הולכים לעשות" (ת/2, עמ' 7 ש' 20-28).

בהמשך הודעתו במשטרה תיאר קורעאן את הכנות החוליה לקראת ביצוע
הרצח, ואת הגעתם למלון היאט. הוא ואסמר שכרו חדר במלון, בעוד מחמד לן אצל
חברו של קורעאן, בשם צלאח עלאווי, בעזרייה. בבוקר הרצח וידא קורעאן, כי רכבו
של השר המנוח חונה בחניית המלון, וכי השר סועד את ארוחת הבוקר בחדר האוכל.
קורעאן נטל עמו את האקדחים מרכבו, והניח עליון אודות אבו עלי מוסטפא בחדר שבו
לן. הוא ואסמר ניגשו לגרם מדרגות החירום, בקומה השמינית, בסמוך למעלית ולחדרו
של השר, שם ארבו לבואו. כאשר הגיע המנוח למפתן חדרו ועמד לפתוח את הדלת,
קרא לעברו קורעאן, ומשהפנה השר את מבטו לעברו, ירה בו קורעאן שלוש יריות.



בתי המשפט
15

פ"ח 7027/06

**בבית המשפט המחוזי בירושלים**

**לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם**

קורעאן תיאר בהודעתו את מסע הימלטותם של המרצחים מהזירה. תחילה
הסתתרו יחד בעזרייה, ובהמשך הימלטותם התפצלו דרכיהם. קורעאן הגיע לאזור
רמאללה, שם פגש בדירת מסתור את מג'די. למחרת היום הנאשם הגיע לדירת המסתור
על-מנת לחקור את קורעאן, וכך תיאר קורעאן את נסיבות המפגש בהודעתו: "ולמחרת
היום הגיע לדירה עאהד ע'ולמה... הגיע לראות אותי, וביקש לכתוב לו דו"ח על מה שהיה
בפיגוע. ואני סיפרתי למג'די מה שהיה, והוא כתב ונתן את הדו"ח לעאהד ע'ולמה" (ת/2,
עמ' 11 ש' 17-19). כעבור מספר לילות עברו קורעאן ומג'די לדירת מסתור נוספת
באזור רמאללה, ובשלב זה הצטרף אליהם אסמר. בהמשך, מחמת החשש כי ייתפסו
על-ידי הרשות הפלסטינית, עברו קורעאן, אסמר והנאשם, לשכם; שם השתכנו בשתי
דירות מסתור. את נסיבות ההימלטות לשכם תיאר קורעאן בהודעתו כדלהלן: "...אז
אמרנו שנלך לשכם להיות שם, ונסענו ברכב הסעות לשכם, אני באסל ועאהד ע'ולמה, שם
שכרנו דירה ברפידיה, ואחר כך עברנו לגור בדירה בשכם. ואחרי כן הגיעו מהרש"פ לעצור
אותנו, ועאהד ניסה לברוח מהחלון ושבר את שתי רגליו ולכן לקחו אותו לבית-חולים. אותי
ואת באסל עצרו הרש"פ, ולקחו אותנו למוקטעה ברמאללה לכלא שם" (ת/2, עמ' 11 ש'
23-27).


העד באסל אסמר

19.   באסל אסמר הוזמן למתן עדות מטעם המאשימה, זאת לאחר שהורשע, כאמור,
בתיק פ"ח 7028/06, ברצח השר זאבי המנוח, ודינו נגזר למאסר עולם ולעשרים שנות
מאסר במצטבר. בעומדו על דוכן העדים, סכר אסמר את פיו וסירב להשיב לשאלות.
לפיכך, הגישה המאשימה את דו"חות זיכרון הדברים על חקירותיו של העד בשב"כ,
וכן את הודעתו בכתב במשטרה, וביקשה מבית-המשפט לקבוע ממצאים על-יסוד
אמרותיו בחקירה, לפי סעיף 10א לפקודת הראיות.



SHATSKY-007598



בתי המשפט
**16**

**בבית המשפט המחוזי בירושלים**

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

בחקירתו נחקר אסמר תחילה על-ידי חוקרי השב"כ, שתיעדו את מהלך החקירה
בדו"חות זכרון דברים (ת/40-ת/62). מעיון בדו"חות ניכר, כי כבר בחקירותיו
הראשונות הראה אסמר סימנים לפיהם הוא מתכוון להודות בחלקו ברצח, ועד מהרה
מסר לחוקריו גרסה מפורטת אודות ביצועו, במסגרתה הפליל גם אחרים, לרבות
הנאשם. במקביל, מסר אסמר הודאות מפורטות בכתב, שנגבו על-ידי חוקר משטרה,
במועדים הבאים: 17.3.06 (ת/34), 22.3.06 (ת/35) ו-11.4.06 (ת/36). את תמצית
גרסתו בדבר הפללת הנאשם, אף רשם בכתב ידו (ת/35א). כמו כן, שיחזר את ביצוע
הרצח בזירה ביום 23.3.06 (ת/39).


20.    להלן עיקרי גרסתו של באסל אסמר, כפי שנמסרה בהודאותיו במשטרה, בהמשך
לגרסאות שהשמיע בחקירת השב"כ:


בהודאותיו מסר אסמר, כי מזה שנים הוא תומך בארגון החזית העממית, כי
בשנת 2001, לאחר מותו של אבו עלי מוסטפא, גויס, על-ידי חברו חמדי קורעאן,
להשתתף בפיגוע נקמה על מותו, וכי עמו גויס גם מחמד רימאוי. קורעאן הודיע לו, כי
צפויה להם פגישה עם אלמוני שימסור פרטים על הפיגוע המתוכנן. אסמר ציין, כי הגיע
יחד עם קורעאן ומחמד לבית-קפה ברמאללה, שם פגשו את מג'די, וכי לאחר מכן
הצטרף למפגש אותו אלמוני, שהגיע ברכב מסוג "קאיה" בצבע אפור. אסמר תיאר את
האלמוני כ"מישהו שלא אמר לנו את שמו או כינויו, הוא כבן 40 גבוה ומלא גוף. שיערו
חצי לבן וחצי שחור. ללא זקן. וזו פעם יחידה שפגשנו את האלמוני הזה" (ת/34, עמ' 1, ש'
22-24). בהודעה נוספת, שנגבתה חמישה ימים לאחר מכן, ציין אסמר כי אותו אלמוני

SHATSKY-007599



בתי המשפט
17

<u>בבית המשפט המחוזי בירושלים</u>                    פ"ח 7027/06

לפני כב' השופטים : צ' סגל - סגן נשיא, י' שפירא וי' נועם

היה הנאשם: "הבלמ"ז איתו נפגשנו זה עאהד ע'ולמה. כאשר נפגשנו עם עאהד ע'ולמה
בפעם הראשונה  בבית הקפה ברמאללה, הוא, עאהד, חבש פאה ואני ראיתי שיש לו צלקת
על המצח" (ת/35, עמ' 1 ש' 20). במהלך המפגש אמר הנאשם, כי "...צריך לעשות פיגוע
נקמה של חזית עממית על הריגת איש גדול בחזית עממית, והוא אמר שהפיגוע יהיה נגד
השר זאבי... ודיבר על ההיסטוריה של מה שהיה עם הערבים" (ת/34, עמ' 1 ש' 24-26);
ולשאלתו של אסמר, מה צפוי להם מצד הרשות הפלסטינית לכשישובו מהפיגוע, השיב
הנאשם: "שהרש"פ אצלו בכיס הקטן" (ת/35, ש' 22). אסמר תיאר, כי הנאשם מסר להם
מידע מפורט אודות שגרת ביקוריו של השר המנוח במלון וסדר יומו שם, וכן עבר איתם
על תכנית הרצח לפרטיה, לרבות תכנית המילוט. בתום המפגש קיבלו השלושה רכב
מסוג "קאיה" לצורך ביצוע הרצח, אשר הובא למפגש על-ידי הנאשם.


אסמר תיאר בהודאותיו, כיצד מסר לו קורעאן תעודת זהות מזויפת, וכיצד שכרו
את מכונית ה"פולו" ורכשו בגדים חדשים לצורך ביצוע הרצח. הוא הוסיף ותיאר,
באופן דומה לתיאורו של קורעאן, את הכנותיהם לביצוע הרצח, ואת הגעתם לירושלים
והתמקמותם במלון. כן תיאר לפרטים את ביצוע הרצח, כמי שהיה שותף לו ונכח חמוש
בזירה. אסמר הוסיף ותיאר את מסע הימלטותו, עד להגיעתו לאזור רמאללה, שם פגש
במג'די, שמילט אותו לדירה מסתתור בעין אום-שראיט, שבה שהה כבר חמדי קורעאן.
על נסיבות הצטרפותו של הנאשם אליהם לאחר ביצוע הרצח, מסר אסמר גרסה דומה
לזו של קורעאן, בציינו: "...הגיע לדירה עאהד יוסף אבו ע'ולמה מבית פוריק בשכם, כבן
35... והוא אמר לנו תודה לאל שהצלחנו בפיגוע והיה מבסוט, ואמר לנו לנסוע לשכם לעיר
העתיקה שם, ונסענו לשכם אני עאהד וחמדי" (ת/34, עמ' 3 ש' 28 - עמ' 4 ש' 2).
בהודעתו במשטרה מיום 22.3.06 (ת/35), לאחר המשך חקירתו בשב"כ, הודה אסמר כי

SHATSKY-007600



בתי המשפט
**18**

**בבית המשפט המחוזי בירושלים**

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

לאחר הרצח, במהלך הסתתרותם, נתחוור לו כי הנאשם, הנו אותו אלמוני שנפגש עמם בבית הקפה ברמאללה עובר לרצח: "אני זיהיתי אותו לפי הקול שלו, וידעתי שזה הוא שהיה עם הפאה בבית הקפה. ואני שאלתי את עאהד ע'ולמה, אם זה הוא הבלמ"ז שהייה איתנו בפגישה בבית הקפה לפני הרצח ונתן לנו את המידע לפני הרצח, ועאהד ע'ולמה צחק ואמר לי תשכח מהעניין. ואני עוד יותר הייתי בטוח שזה הוא" (ת/35, עמ' 1 ש' 28-24).

על-פי גרסת אסמר, הוא שהה עם קורעאן והנאשם בדירת מסתור בשכם, יחד עם מספר "מבוקשים" מהחזית העממית, ולאחר כחודש עברו השלושה לדירת מסתור אחרת בשכם. כן תיאר אסמר כיצד נעצרו השלושה על-ידי הרשות הפלסטינית, ואת קורותיהם עד להעברתם לכלא יריחו. הוא הוסיף וציין, כי לאחר שנעצרו הטיח בנאשם: "ככה אתה שם את הרש"פ בכיס הקטן?", בהתייחסו לדברים שאמר לו הנאשם בשיחה בבית הקפה ברמאללה לפני היציאה לביצוע הרצח (ת/35, עמ' 2, ש' 2-4) ; וכי הנאשם השיב לו, בהקשר זה: "הקשרים שלי איתם יצאו אפס" (ת/35, עמ' 2 ש' 4-5). אסמר הוסיף ומסר פרטים בהודעותיו, אודות תכנון וביצוע של פיגועים נוספים, ועל מעורבותו ופעילותו של הנאשם בפעילות זו, כראש הזרוע הצבאית של ארגון החזית העממית. (ת/36). כשנשאל על-ידי חוקר המשטרה, מדוע בתחילה ציין שישב עם אדם רעול פנים אותו לא הכיר, ובהמשך מסר כי האלמוני חבש פאה בלבד, וכי רק בשלב מאוחר יותר זיהה אותו כעאהד ע'ולמה (הנאשם) – התחמק אסמר מתשובה עניינית (ת/37). עוד ציין אסמר בחקירתו, כי במהלך שהותו בשכם יחד עם הנאשם, לימד אותו הלה את מלאכת הכנת מטעני החבלה, וסיפר לו כי בעבר התפוצץ מטען בפניו, עת עסק בהכנתו, והותיר צלקת על מצחו (ת/57, סעיף 14.8.3 ; ת/36, עמ' 4 ש' 17).



בתי המשפט
19

פ"ח 7027/06

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

העד לואי עודה

21.    העד לואי עודה נעצר בחודש אפריל 2001, כחשוד במעורבות בביצוע פעולות
טרור רבות. הוא נשפט בבית-משפט צבאי באזור יהודה ושומרון ונידון לעשרים
ושמונה שנות מאסר. בחקירתו במשטרה מיום 8.4.02 (ת/77), מסר עודה הודאה
מפורטת על מעורבותו בפעילות טרוריסטית ועל מעורבותם של אחרים, לרבות הנאשם,
בפעילות זו. הוא אף העלה את תמצית הודאתו ברישום בכתב-ידו (ת/77א). משהוזמן
עודה למתן עדות מטעם המאשימה בתיק הנדון, בכל הנוגע למעשיו של הנאשם, חזר
בו מגרסתו המפלילה שבהודעתו במשטרה. לפיכך, הוכרז כעד עוין, וב"כ המאשימה
ביקשה להעדיף את אמרותיו בחקירה על-פני עדותו בבית-המשפט, לפי סעיף 10א
לפקודת הראיות.


בהודעתו במשטרה, מיום 8.4.02, מסר עודה, כי מאז היותו נער היה חבר
בארגון החזית העממית, וכי כבר בשנת 1996 פגש בנאשם, שהיה מוכר לו כפעיל
בארגון. על-פי גרסתו, הציע לו הנאשם עזרה וסיוע בעבודה או בכסף, אך הוא דחה את
ההצעה. עודה הוסיף וציין בהודעתו, כי בשנת 2001 פגש בו הנאשם ברמאללה, וביקש
לגייסו לפעילות צבאית מטעם הארגון, שתכלול, בין-היתר, העברת מכוניות לירושלים;
כאשר להערכתו של עודה הכוונה הייתה למכוניות תופת. לדברי עודה, סירב להצעה
בנימוק שהוא מבוקש בירושלים, ועל-כן אינו יכול להיכנס לעיר. על-פי גרסתו,
בהמשך אותה שנה, במהלך עצרת לזכרו של אבו עלי מוצטפא, שנערכה ברמאללה,
פגש בו שוב הנאשם, שביקש את סיועו בשכירת רכב: "ביקש ממני לשכור רכב כדי
להחזיר אנשים שהגיעו להשתתף בעצרת לבתיהם בצפון. האנשים האלה הם המשפחות

SHATSKY-007602



בתי המשפט
**20**

**בבית המשפט המחוזי בירושלים**

**לפני כב׳ השופטים: צ׳ סגל - סגן נשיא, י׳ שפירא וי׳ נועם**

השכולות... אני הסכמתי והלכתי עם מאהד ע׳ולמה לחברה להשכרת רכב ׳עורבי׳
ברמאללה, ואנחנו שכרנו רכב על שמי, שכרנו רכב מסוג ״KIA״ (ת/77, עמ׳ 2 ש׳ 24-28).
לדבריו, הנאשם ביקש ממנו לשכור רכב ליום אחד, אך בחברת ההשכרה ניתן היה
לשכור רכב רק לתקופה מינימאלית של שלושה ימים. הוא מסר את הרכב השכור
לנאשם, והלה נסע ברכב לעצרת. בחלוף כשלושה ימים, עת אמור היה הנאשם להחזיר
את הרכב לחברת ההשכרה, התקשר אליו הנאשם וביקש ממנו לשלם לחברת ההשכרה
עבור שכירת הרכב ליומיים נוספים. כעבור שלושה ימים נעצר עודה לחקירה על-ידי
הביטחון המסכל הפלסטיני. לדבריו, רק בהמשך נודע לו כי רכב ה״קאיה״, אותו שכר
עבור הנאשם, שימש לביצוע רצח השר זאבי בירושלים.


בעדותו בבית-המשפט טען עודה, כי כל שמסר באמרותיו בחקירה באשר
לנאשם ולנושא שכירת הרכב עבורו – אינו אמת, אלא היה בגדרו של ניסיון להסתיר
את זהות האדם האמיתי שקיבל ממנו את הרכב המושכר – אדם בשם חאלד באכיר
מרמאללה. עודה העיד, כי נמנע מלסבך את אותו אדם, הואיל – וכלשונו – ״הוא מבוגר
ויש לו ילדים, איש זקן, חולה״ (עמ׳ 59); ומשכך, מסר את שמו של הנאשם חלף אותו
אדם, שכן שמע בחדשות כי הלה נעצר, וכי ממילא מיוחסת לו האחריות לרצח השר
המנוח. עוד הוסיף, כי חוקרי השב״כ הם שלחצו עליו להפליל את הנאשם.


*העד ג׳ורג קורט*

22.    העד ג׳ורג׳ קורט נעצר על-ידי כוחות הביטחון הישראליים בטרם יצא אל
הפועל פיגוע התאבדות בתחנה המרכזית בירושלים, שבתכנונו היה מעורב. הוא נשפט
לתשע שנות מאסר בגין חברותו ופעילותו בארגון החזית העממית, ובשל תכנון פיגוע



בתי המשפט

**21**

<u>בבית המשפט המחוזי בירושלים</u>                                    פ"ח 7027/06

**לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם**

ההתאבדות האמור. לאור הסתירות בין אמרותיו בחקירה לבין תוכן עדותו לפנינו, הוכרז הלה כעד עוין, והמאשימה ביקשה להעדיף את אמרותיו בחקירה על-פני עדותו בבית-המשפט, לפי סעיף 10א לפקודת הראיות. גרסאותיו של קורט תועדו בשתי הודעות שנגבו במשטרה (ת/78-ת/79), וכן בדו"חות זיכרון דברים מחקירת השב"כ (ת/80-ת/81).

בהודעתו במשטרה מיום 4.11.02 (ת/79), שאת תמציתה אף רשם בכתב-ידו (ת/79א), תיאר קורט כי מספר ימים עובר לרצח השר זאבי המנוח, השתתף בעצרת של ארגון החזית העממית ברמאללה, שם נשמעו קריאות לנקמה בישראל על מותו של אבו-עלי מוסטפא. קורט, אשר לו רישיון נהיגה ותעודת זהות ישראליים, מסר, כי באותה עצרת ביקש הנאשם את סיועו לצורך הכנת פיגוע: "עאהד ע'ולמה, פעיל חז"ע צבאי, פנה אליי וביקש את רישיון הנהיגה שלי לפיגוע גדול" (ת/79, עמ' 1 ש' 12-10). בתחילה סירב קורט לבקשה, אך בהמשך נעתר לה, לאחר שהנאשם הבטיח כי יישנה את פרטיו המופיעים ברישיון, באמצעות מחשב. לדברי קורט, נטל הנאשם את רישיונו, והחזירו תוך זמן קצר, לאחר שצילם אותו. קורט הוסיף וציין, כי יומיים לאחר מכן בוצע רצח השר המנוח, וכי מאז לא ראה את הנאשם. כן תיאר קורט באמרותיו בחקירה, את פעילותו של הנאשם במסגרת הזרוע הצבאית של ארגון החזית העממית.

בעדותו לפנינו חזר בו קורט מאמרותיו בחקירה, בכל הנוגע לדברים שייחס לנאשם. הוא טען, כי כלל לא מסר לנאשם את רישיון הנהיגה שלו, ואת הסתירה בין אמרותיו בחקירה לבין עדותו תירץ כלהלן: "... הייתי תחת חקירה מאוד קשה, ואמרתי שאני רוצה לסיים את החקירה הזו בכל מחיר. השב"כ רצה כל קשר ביני לבין עאהד,



פ"ח 7027/06        <u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

וכתוצאה מהלחץ זה מה שאמרתי. חשבתי שעאהד נמצא בכלא ברשות, ולכן סברתי שכל מה שאגיד נגדו לא יגרום לו נזק באופן מעשי" (עמ' 79-80). קורט הוסיף וטען, כי אדם אחר, בשם חאלד דליישה, הוא שביקש ממנו את הרישיון, ואילו הנאשם היה אך עד לאותה שיחה, ותו לו.

העד עבאס מזאחם

23.   העד עבאס מזאחם, המרצה כיום עונש של שש-עשרה שנות מאסר בגין פעילות טרור בארגון החזית העממית, העיד מטעם המאשימה בעניין קשריו עם הנאשם. נוכח הסתירות שנתגלו בין עדותו לבית-המשפט לבין הודעותיו במשטרה, מיום 30.10.02 ומיום 19.11.02 (ת/82, ת/83), כמו גם גרסתו בחקירות השב"כ (ת/84 ו-ת/85), ביקשה המאשימה להעדיף את אמרותיו בחקירה על-פני עדותו, לפי סעיף 10א לפקודת הראיות.

בהודעותיו במשטרה, וכן בחקירתו בשב"כ, מסר מזאחם כי הנאשם מוכר לו מישיבתם המשותפת בכלא הישראלי בתחילת שנות התשעים. לדבריו, בראשית האינתיפאדה השנייה חידש את פעילותו בארגון החזית העממית, והיה האחראי מטעם הארגון על הכפר עבוין, שמצפון לרמאללה. על-פי עדותו, בשנת 2001 נפגש עם הנאשם במשרדי ארגון החזית העממית ברמאללה, שם גייס אותו הנאשם לזרוע הצבאית של הארגון, לשם ביצוע פיגועי טרור: "בחודש יולי 2001 זה היה, כאשר נפגשתי עם עאהד ע'ולמה ברמאללה, הוא הציע לי גיום צבאי לחזית העממית, ואני הסכמתי. ואחר כך עאהד ע'ולמה אמר לי לגייס אנשים לחולייה צבאית של החז"ע ולעשות פיגועים נגד מטרות ישראליות ואני הסכמתי" (ת/83, עמ' 1 ש' 28 — עמ' 2 ש' 3). הוא הוסיף וציין,

SHATSKY-007605



בתי המשפט
23

פ"ח 7027/06

בבית המשפט המחוזי בירושלים

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

כי לאחר כשבוע מסר לו הנאשם שני רובי קלאצ'ניקוב, ובחודש ספטמבר העביר לו שיעור בפירוק והרכבת נשק. עוד תיאר, כי בהמשך, לאחר מותו של אבו עלי מוסטפא, פגש את הנאשם לאחר פיגוע ירי שביצעה החוליה כנגד חיילי צה"ל, צפונית לרמאללה, והנאשם בירך אותו על כך. העד אף תיאר שורה של פיגועי ירי היה להם אחראי במסגרת פעילותו בארגון.

בעדותו בבית-המשפט טען מזאחם, כי הקשר היחיד בינו לבין הנאשם היה במפגש חד-פעמי עמו ברחוב, שבעקבותיו קיבל ממנו נשק לצורך פעילותו הטרוריסטית. מעבר לכך, הכחיש העד כי הנאשם הוא זה שגייסו לארגון החזית העממית, וכי הלה אימן אותו בנשק. הוא טען, כי אין זה מעניינו, ועל-כן אף לא בירר, לאיזה ארגון שייך הנאשם. יצוין, כי מזאחם לא הכחיש בעדותו כי הנשק שקיבל מהנאשם נועד לביצוע פעילות טרוריסטית, וכי אכן ביצע פיגועים באמצעות נשק זה.

העד חאלד חלבי

24.    העד חאלד חלבי היה פעיל בארגון החזית העממית, וביצע במסגרת הארגון פעילות טרוריסטית, שבגינה נידון לעשרים-ושמונה שנות מאסר. באמרותיו בחקירות השב"כ והמשטרה הפליל את הנאשם, כפעיל בארגון החזית העממית, אך בעדותו בבית-המשפט חזר בו מהההפללה האמורה, ועל-כן ביקשה המאשימה להעדיף את אמרותיו על-פני עדותו, לפי סעיף 10א לפקודת הראיות.

בהודעתו במשטרה מיום 21.4.02 (ת/86), שאת עיקרה אף רשם בכתב-ידו (ת/86א), ואשר אף הועלתה על-ידו בחקירת השב"כ (ת/87-ת/88), ציין חלבי כי

SHATSKY-007606



בתי המשפט

**24**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

הנאשם דאג להלינו בדירת מסתור ברמאללה יחד עם מבוקשים אחרים, במהלך התקופה שבה היה מבוקש אך טרם נעצר. כן תיאר בהודעתו את מעורבותו של הנאשם בשנת 2001 בתוכנית להכניס מכונית תופת לירושלים: "בחודש מאי 2001 עאהד ע'ולמה שלח אותי להיפגש עם פעיל חז"ע ברמאללה... אותו אדם הציע לי להכניס מכונית תופת לירושלים, אבל אני סרבתי" (ת/86, עמ' 4 ש' 9-12). חלבי אף ציין, כי במהלך הלווייתו של אבו עלי מוסטפא, נטל את אקדחו של הנאשם וירה באוויר.


בעדותו בבית-המשפט, הכחיש חלבי כי היה לו קשר ארגוני עם הנאשם, או כי פגש אותו במשרדי ארגון החזית העממית ברמאללה, וציין כי הכירו רק מתקופה שהותו בת השנתיים ברמאללה. הוא טען, כי הפללתו את הנאשם בהודעתו במשטרה, היתה הפללת כזב, ובהידרשו לסיבת ההפללה העיד: "הוא היה עצור ברשות, ורציתי להתחמק מהחוקר לכן הזכרתי את שמו כי ידעתי שהוא לא יכול לבוא" (עמ' 118).


העד ראאד זיבאר

25.   העד ראאד זיבאר היה מעורב בפעילות טרוריסטית במסגרת ארגון החזית העממית, שבגינה הוא מרצה כיום עונש של שלוש-עשרה שנות מאסר. כשאר העדים, גם זיבאר הוכרז כעד עוין, והמאשימה ביקשה להעדיף את הודעתו במשטרה מיום 18.4.02 (ת/90), ואת גרסתו בחקירת השב"כ (ת/91), על-פני עדותו לפנינו, זאת לפי סעיף 10א לפקודת הראיות.


בהודעתו במשטרה, כמו גם בחקירתו בשב"כ, ציין זיבאר כי הנאשם שימש כראש הזרוע הצבאית של ארגון החזית העממית. זיבאר מסר בהודעתו, כי הוא וחבריו

SHATSKY-007607