

בתי המשפט
53

פ"ח 7027/06

בבית המשפט המחוזי בירושלים

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

ביצוע הרצח קיבל מהאחראי עליו, שבשמו לא נקב, מידע אודות סדר יומו של השר זאבי המנוח, כסף למימון הפיגוע וכן נשק. גרסתו של מג'די, לפיה דוקא את הרכב הביא בכוחות עצמו, נשמעה תמוהה ולא אמינה. בנסיבות אלו, ונוכח אי-אמינות עדותו, ניכר כי מג'די נטל על עצמו את האחריות להשגת הרכב, בכדי לחלק את הנאשם מסבך הראיות המפלילות אותו באשר לשכירת הרכב, ועל-מנת שלא לזהותו כאותו "אחראי" אלמוני, שסיפק למג'די ולחברי החוליה שהיו כפופים לו את כל האמצעים לביצוע הרצח.

53.    אשר-על-כן, החלטתי להעדיף את הודעותיהם בחקירה של עודה וקורט — בעניין שכירת מכונית ה"קאיה" על-ידי הנאשם והצטיידותו ברישיון נהיגה ישראלי — על-פני עדויותיהם של השניים בבית-המשפט, זאת על-יסוד סעיף 10א לפקודת הראיות. ההודעות, כאמור, תומכות זו בזו, מתארות פניה דומה של הנאשם אל העדים במהלך אותה עצרת בנושא דומה, ומשתלבות באמרותיו של אסמר בחקירה בדבר הבאת מכונית ה"קאיה" על-ידי הנאשם. את החיזוק הראייתי הנדרש, לפי סעיף 10א(ד) לפקודת הראיות, זוכה כל הודעה לקבל מרעותה.

מכלול הראיות שהובא לפנינו בסוגיית שכירת רכב ה"קאיה" ששימש את הרוצחים, מביא לכלל מסקנה כי הנאשם הוא זה ששכר את הרכב ביום העצרת, באמצעות לואי עודה, לקח אותו והעבירו לידי חולית הרצח. הוא מסר את הרכב לחברי החוליה בתום מפגש התדרוך שהתקיים בבית הקפה ברמאללה, זאת על-מנת שישמש אותם לביצוע הרצח, כפי שאכן אירע.

SHATSKY-007636



בתי המשפט
54

<u>בבית המשפט המחוזי בירושלים</u>                          פ"ח 7027/06

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

ההימלטות

54.    בעדותו הודה הנאשם, כי סייע לרוצחים, קורעאן ואסמר, בשלב הימלטותם
לאחר ההתנקשות. לדבריו, לאחר הרצח, בו לא היה מעורב כלל, נתבקש על-ידי מג'די,
אותו הכיר במסגרת הפעילות בארגון "דמיר", לאתר דירת מסתור בשכם עבור קורעאן
ואסמר, ולהלינם שם. על-פי גרסתו, הוא אכן מצא עבורם דירת מסתור, ואף היה
מבקרם שם מעת לעת, עד שנקלע לדירה באחד מביקוריו ונעצר בה יחד עם הרוצחים,
על-ידי כוחות הביטחון הפלסטיניים. המאשימה גורסת, כי חלקו של הנאשם בשלב
ההימלטות היה רחב יותר, וכי הלה נטל חלק פעיל בכל שלבי ההימלטות, כבר משלב
ההסתתרות ברמאללה, תוך שהתנהג כמבוקש ממש, ולא אך כמי שמגיע לבקר את
הנמלטים ולדאוג לצרכיהם. התשתית הראייתית המפלילה את הנאשם, בדבר התנהגותו
במהלך ההימלטות, נסמכת על אמרותיהם של קורעאן ואסמר בחקירתם בשב"כ
ובהודעותיהם במשטרה. טענתו של הנאשם, בדבר מעורבותו השולית והעקיפה בשלב
ההימלטות, נסמכה על עדותו שלו, ועל עדות מג'די.


55.    בהודעותיהם של קורעאן ואסמר במשטרה, כמו גם באמרותיהם בחקירת
השב"כ, אשר לגביהן כבר נקבע לעיל, כי יש להעדיפן על-פני שתיקתם בבית-המשפט,
וכי הן מהימנות ומשקפות את האירועים שהתרחשו, מספרים השניים, כל אחד בנפרד,
כי הנאשם הצטרף אליהם בהימלטותם כבר בהיותם בדירת מסתור ברמאללה. כך סיפר
קורעאן, כי הנאשם הגיע לבקרו עוד בדירת המסתור ברמאללה, ואף ביקש ממנו לרשום
דו"ח אודות ביצוע הרצח (ת/2, עמ' 11 ש' 18-19). דבריו אלה של קורעאן, מלמדים
על היותו של הנאשם שותף בכיר בסוד העניינים, אשר מתוקף מעמדו ותפקידו בתכנון
הרצח והוצאתו אל הפועל, אף ביקש לקבל דין וחשבון על ביצועו. בנוסף, הודעתו



בתי המשפט
55

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

האמורה של קורעאן סותרת את עדות הנאשם, לפיה מעורבותו בהימלטות החלה אך
בעיר שכם, מערערת את אמינותה, ומפריכה את טענתו כי לא היה מעורב ברצח, וכי לא
ביקש לדעת דבר אודותיו אלא אך לסייע לשניים בהימלטותם.

56.   הודעתו של קורעאן לגבי שלבי ההימלטות, נתמכת בהודעתו של אסמר, אשר
מסר בחקירתו כי לאחר הרצח הגיע הנאשם לדירת המסתור בעין אום-שראיט שבאזור
רמאללה, שם שהו השניים יחד עם מג'די, ברך אותם לרגל הצלחת הפיגוע, והורה להם
לעבור לדירת מסתור בשכם (ת/34, עמ' 3 ש' 28 - עמ' 4 ש' 2). עוד עולה מהודעותיהם
של קורעאן ואסמר, כי הנאשם נטל חלק פעיל בהימלטות, כאשר נסע עם קורעאן
ואסמר מרמאללה לדירת מסתור בשכם, ברכב הסעות, ואף שהה איתם בדירה, עד
שלפתע הגיעו כוחות הביטחון הפלסטיניים לעצרם, או-אז נמלט הנאשם, קפץ דרך
החלון, אך שבר את רגליו ונתפס.

57.   מעיון באמרות האמורות של קורעאן ואסמר, עולה המסקנה, כי תפקידו של
הנאשם לאחר הרצח לא הסתכם אך במתן סיוע לנמלטים, רוצחי השר המנוח, אלא הוא
עצמו נהג כנמלט, לאחר שהבין כי מתוקף תפקידו ומעורבותו ברצח הפך למבוקש.
קפיצתו מחלון דירת המסתור בעת ביצוע המעצר — שעל-פי תוצאותיה אינה עניין של
מה בכך — אף היא מעידה על כך שהנאשם ראה עצמו מבוקש, שותף למעגל הפנימי של
המבצעים ולא אך מסייע לבריחתם.

58.   בנוסף, דבריו של אסמר בהודעתו (ת/36), לפיהם כששהו בדירת מסתור בשכם
הגיעו לדירה שני אחיו של הנאשם בכדי לבקרו (ת/36, עמ' 7 ש' 5-7), מחזקים את

SHATSKY-007638



בתי המשפט
**56**

‎ב**בית המשפט המחוזי בירושלים**                                                  ‏פ"ח 7027/06

**לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם**

המסקנה כי שהותו של הנאשם בדירה לא הייתה מקרית ולביקורים קצרים, אלא שהות
ארוכה כמי שדר בה כמבוקש, ושבמהלכה אף הגיעו אחיו לבקרו. זאת ועוד: דבריו של
אסמר באמרותיו בחקירה (ת/57, סעיף 14.8.3; ת/36, עמ' 4 ש' 17), לפיהם לימד אותו
הנאשם כיצד להכין מטעני חבלה עת שהו בדירה בשכם, מאששת אף היא את המסקנה
כי הנאשם לא הגיע לדירת המסתור רק למטרת ביקורים ולדרוש בשלומם של
המבוקשים.

59.   הסבריו של הנאשם, לפיהם היה אך במקרה בדירת המסתור בשכם, כאשר בא
לבקר את קורעאן ואסמר, וכי החליט להימלט ממנה עת צבאו כוחות הביטחון
הפלסטיניים על דלתות הבית, כדי שלא יקשרו אותו לרוצחי השר ולא יראו בו כשותפם
– לא נשמעו אמינים וסבירים. כך גם לא נשמעה מהימנה עדותו של מג'די, לפיה
הנאשם רק סייע לרוצחים במציאת דירת מסתור בשכם. עדויותיהם של השניים ניגפות
אל מול הודעותיהם המפלילות של אסמר וקורעאן, ואינן מתיישבות עם התנהלותו של
הנאשם במהלך הימלטותו עם הרוצחים מאז הרצח ועד ללכידתם.

60.   ולסיכום שלב ההימלטות: מכלול הראיות מוביל לכלל מסקנה, כי הנאשם נמלט
יחד עם חברי חוליית הרצח והסתתר עמם, כמי שהיה שותף, ואף השותף הבכיר, לרצח.
מגרסאותיהם של קורעאן ואסמר ואסמר עולה, כאמור, כי הנאשם עצמו נמלט יחד עם
הרוצחים, עבר עמם מדירת מסתור אחת לשנייה, הגיע לדירת המסתור הראשונה כבר
ברמאללה שם ביקש לקבל דיווח על ביצוע הרצח, החליט לעבור עמם לעיר שכם, נסע
איתם ברכב ההסעות, ואף ניסה להימלט, ללא הצלחה, בקפיצה מחלון דירת המסתור
האחרונה שבה שהו, עת הגיעו אנשי הרשות הפלסטינית לעצרם. הודעותיהם של אסמר

SHATSKY-007639



בתי המשפט
57

פ"ח 7027/06

בבית המשפט המחוזי בירושלים

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

וקורעאן בעניין זה, שהיו כאמור מהימנות והשתלבו האחת ברעותה, בצירוף הראיות הנסיבתיות של עצם הימצאות הנאשם עם הנמלטים, בריחתו והתנהגותו, מביאות לכלל מסקנה, לפיה הנאשם, כמי שהיה שותף לרצח, נמלט יחד עם הרוצחים והסתתר עמם, וטופחות על-פני עדותו ועדותו של מג'די, לפיהן אך סייע לנמלטים לאחר מעשה, ותו לא.

חברותו של הנאשם בארגון החזית העממית

61.    כתב-האישום מייחס לנאשם עבירה של חברות בארגון טרור, ובפרק העובדות נטען כי הנאשם שימש כראש הזרוע הצבאית של ארגון החזית העממית. הנאשם טוען, כי כלל לא היה חבר בארגון, וכי כל עיסוקו התמצה בפעילות בארגון זכויות אדם בשם "דמיר". הנאשם הופלל בחברות בארגון טרור באמרותיהם בחקירה של באסל אסמר וג'ורג' קורט, וכן בהודעותיהם של שלושה עדים נוספים: עבאס מזאחם, חאלד חלבי וראאד זיבאר.

נפנה תחילה להודעותיהם של שלושת העדים האחרונים. השלושה תיארו את הנאשם כבעל תפקיד בכיר בזרוע הצבאית של ארגון החזית העממית; ואולם, בבית-המשפט חזרו בהם מהגרסה המפלילה את הנאשם. כל השלושה חזרו בהם מהודעותיהם, אך לא חלקו על עצם אמירת הדברים. הם טענו, כי הפלילו את הנאשם רק כדי לרצות את חוקריהם, שהפעילו עליהם לחץ, ומשום שסברו כי הדבר לא יפגע בנאשם, שממילא היה עצור בידי הרשות הפלסטינית. הסבריהם של העדים לא נשמעו אמינים. התרשמתי, כי הללו חששו להפליל את הנאשם, וביקשו לחלצו מהמיוחס לו בכתב-האישום. הם חזרו בהם מהודעותיהם בכל הנוגע למעורבותו של הנאשם

SHATSKY-007640



בתי המשפט
58

פ"ח 7027/06

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

בפעילות טרור, אך המשיכו לקחת אחריות על מעשי הטרור שביצעו בעצמם, בגינם כבר נשפטו והורשעו. בנסיבות האמורות, יש להעדיף את הודעותיהם במשטרה על-פני עדויותיהם, על-פי סעיף 10א לפקודת הראיות. מה גם, שהודעות אלה משתלבות זו בזו, וכן עם ראיות נוספות המצביעות על דפוסי פעולה דומים של הנאשם כפי שיפורט להלן.

62.     חאלד חלבי, שנידון, כאמור, לעשרים-ושמונה שנות מאסר בגין פעילותו בארגון החזית העממית, ציין בהודעתו כי הנאשם דאג להלינו בדירת מסתור ברמאללה, יחד עם מבוקשים אחרים (ת/86, עמ' 2 ש' 18-16). פרט זה בהודעתו מתיישב עם הודעותיהם של קורעאן ואסמר, שמסרו גם הם כי הנאשם דאג להלינם בדירות מסתור בשכם, ואף הגיע לדירת מסתור באזור רמאללה שבה שהו. פרט זה מצביע, אפוא, על דפוס פעולה זהה, לפיו הנאשם דאג למלט ולהסתיר את אנשי הארגון שהיו מבוקשים. עוד התברר בהודעתו של חלבי מעמדו של הנאשם בארגון, זאת כאשר ציין כי הנאשם שלח אותו להיפגש עם פעיל החזית העממית אשר הציע לו להכניס מכונית תופת לירושלים (ת/86 עמ' 4 ש' 12-9). דברים אלה טופחים על-פני גרסתו של הנאשם, שטען כי היה הוא אך פעיל זכויות אדם שסייע להלין את הרוצחים בשכם. גרסתו של חלבי, לפיה הנאשם הגיע להלוויתו של אבו עלי מוסטפא חמוש באקדח, אותו נטל חלבי על-מנת לירות באוויר (ת/86, עמ' 4 ש' 21-19), סותרת אף היא את טענת הנאשם, כי שימש אך כפעיל זכויות אדם.

63.     גם מהודעתו של ראאד זיבאר (ת/90) ניתן ללמוד, כי הנאשם היה דמות מרכזית בארגון החזית העממית, שעל פיה יישק דבר. זיבאר, המרצה כאמור עונש



בתי המשפט
59

<u>בבית המשפט המחוזי בירושלים</u>

פ"ח 7027/06

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

מאסר של שלוש-עשרה שנים בגין פעילות טרור שביצע, תיאר בהודעותיו בחקירה, את
פעילותו במסגרת ארגון החזית העממית, שכללה מספר פיגועי טרור, ומסר כי דיווח
לנאשם על אחד הפיגועים ואף ביקש ממנו נשק: "נפגשתי ברמאללה [עם] עאהד ע'ולמה
וסיפרתי לו על הפיגוע שעשינו. כמו כן ביקשתי מעאהד ע'ולמה משתיק קול עבור פיגוע
שאנחנו רוצים לעשות בגבעת זאב" (ת/90 עמ' 2 ש' 20-22). זיבאר הוסיף וציין
בהודעתו, כי ביקש את אישורו של הנאשם לצירוף פעילים צבאיים לחוליתו, דיווח לו
אודות פעילות החוליה והתכוון לבקש ממנו מטעני חבלה להכנת פיגוע. הוא תיאר את
הנאשם כ"אחראי על הזרוע הצבאית של החז"ע [החזית העממית]" (ת/90, עמ' 3 ש' 11).
בחקירתו בשב"כ תיאר זיבאר פיגוע ירי כנגד רכב ישראלי בו נטל חלק. הוא מסר, כי
לאחר הפיגוע נאספו הוא וחבריו אל רכב שבו היו הנאשם ושניים נוספים, וכי הלה לקח
אותו לדירה מסתור ברמאללה, שם שהה עמו מספר שעות (ת/90, סעיפים 15-16). עוד
ציין זיבאר בחקירתו, כי אחד מהפיגועים אותם תכנן לא יצא אל הפועל, בין-היתר
"לאור הניתוק שהיה עם עאהד אל ע'ולמה לאחר רציחתו של ח"כ רחבעם זאבי" (ת/91, 9,
סעיף 21).


64.      חיזוק להודעתו של זיבאר ניתן למצוא, בין-היתר, באמרותיו של אסמר לגבי
הנאשם, שבהן ציין הלה כי הנאשם שימש כראש הזרוע הצבאית של החזית העממית:
"ידוע שהוא ראש הזרוע הצבאית בחזית [ה]עממית" (הודעתו במשטרה ת/36, עמ' 9, ש'
4), וכן "...עאהד ע'ולמה הוא ראש הזרוע הצבאית של החז"ע" (זכ"ד מחקירת השב"כ –
ת/45 סעיף 8).



SHATSKY-007642



בתי המשפט
**60**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

.65   העד עבאס מזאהם לא הכחיש את הודאתו במשטרה, ואף הודה בעדותו לפנינו,
כי ביצע פעילות טרור במסגרת ארגון החזית העממית, וקיבל מהנאשם נשק לצורך
ביצוע פיגוע. עם זאת, הוא הכחיש, כאמור, את שטען בהודעתו, כי הנאשם גייס אותו
לארגון החזית העממית, וכי אימן אותו וברכו על ביצוע פיגוע טרור. על-פי הודעתו של
מזאהם (ת/83), הוא הכיר את הנאשם משנת 1992, מתקופת ישיבתם המשותפת בכלא
קציעות. הוא ציין, כי היה כלוא לסירוגין במתקן המעצר בקציעות בשנים 1989-1991,
וכי בשנת 1992 נידון לארבעה-עשר חודשי מאסר בגין פעילותו באינתיפאדה (עמ' 101
). מהמסמכים שהוגשו (ת/104) עולה, כי הנאשם שהה במשך עשרה חודשים, עד ליום
21.4.91, במעצר מינהלי בכלא קציעות, אך לא בשנת 1992 ; ועל-כן, טעה מזאהם
בכשנה, כאשר ציין כי המפגש היה בשנת 1992, במקום בשנת 1991. לדברי מזאהם,
הנאשם גייס אותו לארגון החזית העממית בשנת 2001, ואף הורה לו לגייס פעילים
לחולייה הצבאית ולבצע פיגועים. פרטים מפלילים אלה מאששים את שמסר העד חלבי
בהודעתו לעיל, כי הנאשם הפנה אותו לפגישה עם פעיל הארגון שהציע לו להכניס
מכונית תופת לירושלים ; וכן את הודעתו של זיבאר, שציין כי הנאשם הכווין את
הפעילות הטרוריסטית של חולייתו. מזאהם אף ציין, כי בשנת 2001 מסר לו הנאשם
נשק ואף העביר לו שיעור בנשק, עובדה הזוכה לתמיכה בהודעתו של זיבאר, אשר
ייחס לנאשם מעורבות באספקת כלי נשק לחולייתו. עוד הוסיף ומסר מזאהם, כי לאחר
פיגוע ירי שביצע עם חולייתו כנגד חיילי צה"ל, בירך אותו הנאשם על מעשיו. דפוס
התנהגות זה מחזק את דבריו של אסמר בהודעתו: "...הוא אמר לנו תודה לאל שהצלחנו
בפיגוע, והיה מבסוט ואמר לנו לנסוע לשכם לעיר העתיקה שם, ונסענו לשכם אני עאהד
וחמדי" (ת/34, עמ' 3 ש' 28 - עמ' 4 ש' 2).

SHATSKY-007643



בתי המשפט

**61**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב׳ השופטים: צ׳ סגל - סגן נשיא, י׳ שפירא וי׳ נועם

66.    ראיה נוספת, בדבר תפקידו של הנאשם בארגון החזית העממית, מצויה באמרותיו של העד ג׳ורג׳ קורט בחקירתו בשב״כ. בחקירתו מסר קורט, כי במהלך "אינתיפאדת אל אקצא" השתתף בהפגנות ועצרות שנערכו ברמאללה. הוא הוסיף ותיאר, כי "בעצרות והתהלוכות הנ״ל השתתפו בכירי מנהיגי החז״ע ביניהם אחמד סעדאת, עלי גראדאת, עאהד ע׳ולמה, חסן פטפטה ואחרים..." (ת/80, סעיפים 37-38). עוד ציין קורט בחקירתו, כי החל מחודש מאי 2001 החל ארגון החזית העממית לבצע פיגועים, ו"באותה תקופה ראה לטענתנו נייר התלוי על דלת משרד החז״ע ברמאללה הקורא לכל פעיל המעוניין להשתתף בפעילות צבאית או במאבק נגד כוחות הביטחון לפנות לעאהד ע׳ולמה" (ת/80, סעיף 41). קורט אף ציין את שמו של הנאשם כאחד מפעילי החזית העממית, אותם פגש בכנסים של הארגון במשרדים ברמאללה (ת/80, סעיף 50), ובהודעתו במשטרה מסר, כי "...כאשר הייתי הולך למשרדי החז״ע ברמאללה בתחילת האינתיפאדה נפגשתי שם עם עאהד ע׳ולמה פעיל חז״ע שהיה המתאם עם ארגונים אחרים הפעילות" (ת/78, עמ׳ 2 ש׳ 24-26).


67.    בנוסף להודעות האמורות, ניתן ללמוד על חברותו של הנאשם בארגון ועל בכירותו בו, גם מראיות נוספות בתיק. התיאורים בדבר התנהלותו של הנאשם ותפקידו במהלך המפגש בדירת המסתתור ברמאללה, לגביו כבר נקבע לעיל כי נטל בו חלק פעיל, מצביעים על כך כי הלה לא היה אך עוד משתתף במפגש, אלא דמות בכירה ביותר בארגון, שהגיעה בסמוך לפני מועד הרצח על-מנת לעבור עם חברי החוליה על תוכנית הביצוע, לחזק את רוחם ולהעניק להם את ברכת הדרך, וכל זאת כאשר הוא שומר על מסתורין לגבי זהותו. כך גם הגעתו לאחר הרצח לפגישה עם חברי החוליה, בכדי



בתי המשפט
**62**

פ"ח 7027/06                              <u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

לברכם ולבקש כי יערכו עבורו דו"ח אודות הרצח. ראיות אלו מצביעות על חברותו של
הנאשם בארגון, תפקידו הבכיר ושותפותו בתכנון הרצח והוצאתו לפועל.


68.    מכלול ההודעות האמורות — המשתלבות זו עם זו, התומכות ומאששות האחת
את רעותה, והנתמכות בראיות אחרות — מובילות למסקנה, כי הנאשם מילא תפקיד
בכיר בזרוע הצבאית של ארגון החזית העממית, ואף עמד בראש הזרוע הצבאית. בגדר
תפקידו הוא גייס חוליות, סיפק להן נשק, הכוונן פעולות טרור ואף ברך על ביצוען.
במסגרת זו אף תכנן את רצח השר המנוח, שילח את החוליה לביצוע ההתנקשות וסייע
למרצחים בהימלטותם יחד עמו.


סיכום מארג הראיות וההכרעה העובדתית

69.    מארג הראיות שהובא לפני בית-המשפט, ושתואר בהרחבה לעיל, מתייחס
לשלושה מישורים עובדתיים: הראשון — שלבי תכנון הרצח, ההכנות לביצועו ותדרוך
חברי החוליה על-ידי הנאשם בפגישה שקדמה לשילוחם לביצוע ההתנקשות; השני —
ביצוע הרצח, והימלטות הרוצחים וחברי החוליה, ביניהם הנאשם, עד ללכידתם;
והשלישי — חברותו ופעילותו של הנאשם בארגון החזית העממית, כבעל תפקיד בכיר
בזרוע הצבאית של הארגון.


לאחר בחינה מוקפדת של ראיות המאשימה, מהימנותן ומשקלן, וזאת אל מול
גרסת הנאשם, העדים והראיות שהביא לתמיכתה ולביסוסה, עולה כי הראיות
המפלילות את הנאשם מצטרפות לכדי מארג שלם הפורש לפנינו תמונה ברורה של
מהלך האירועים, החל משלבי תכנון הרצח ועד ללכידת מבצעיו. מארג זה כולל עדויות,

SHATSKY-007645



בתי המשפט
**63**

פ"ח 7027/06                                   <u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

ראיות חפציות, הודעות שנגבו במשטרה ואמרות שנמסרו בחקירת השב"כ. עיקרן של
הראיות המפלילות את המשיב ברצח ובפעילות בארגון הטרור, מצויות באמרותיהם של
העדים בחקירה, שהועדפו — לפי סעיף 10א לפקודת הראיות — על-פני שתיקתם (של
שניים מהם) או עדויותיהם (של היתר) בבית-המשפט. האמרות הרבות — המתייחסות
למעורבותו של הנאשם ברצח החל משלב התכנון ועד לשלב המעצר — הנן מהימנות
ובעלות משקל רב. הן משתלבות זו בזו, תומכות האחת בשנייה, ולא עלה בידי הנאשם
והעדים מטעמו לערער את משקלן ואמינותן.


70.   נסכם להלן את התשתית העובדתית, המצביעה על מעורבותו של הנאשם
בתכנון הרצח ובהוצאתו אל הפועל.


כאמור, במרכזו של מארג הראיות עמדו הודעותיהם במשטרה ואמרותיהם
בחקירת השב"כ של קורעאן ואסמר, אשר הפלילו, כל אחת בנפרד, את הנאשם
במעורבות בתכנון הרצח ובביצועו מטעם ארגון החזית העממית. השניים מסרו גרסאות
מפורטות, קוהרנטיות, בעלות הגיון ומשקל, לפיהן הנאשם, אשר זהותו הוסוותה, נכח
במפגש שנערך בבית-הקפה ברמאללה בסמוך לפני הרצח, תדרך את חברי חוליית
הרצח, עודד את רוחם והעניק להם את ברכת הדרך, כבכיר בארגון. זיהוויים של השניים
את הנאשם כאותו אדם שהשתתף בפגישת התדרוך, היה בעל משקל רב, והותיר רושם
מהימן ; ובפרט נוכח שהייתם המשותפת עמו בשלבי ההימלטות והמעצר.


נדבך ראייתי נוסף המפליל את הנאשם בשלב ההכנות לרצח, מתייחס לעדויות
בעניין מעורבותו של הנאשם בשכירת המכונית ששימשה את הרוצחים. נדבך זה נסמך



בתי המשפט
64

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

על הודעתו במשטרה של לואי עודה, לפיה במהלך העצרת ברמאללה פנה אליו הנאשם
בבקשה שישכור עבורו רכב, וכי שכר עבורו את רכב ה"קאיה" והעבירו לידיו – רכב
ששימש את הרוצחים בנסיעתם לזירת הרצח. גרסתו של עודה אף נתמכה בהודעתו
של ג'ורג' קורט, אודות פניית הנאשם אליו במהלך העצרת, ומסירת רישיון הנהיגה שלו
לנאשם, לצורך ביצוע "פיגוע גדול"; וכן בהודעתו של אסמר, שמסר כי הנאשם הוא זה
שהביא את רכב ה"קאיה" לאותה פגישה בבית הקפה ברמאללה, שבסיומה נמסר הרכב
לידי הרוצחים.

בהמשך השתלשלות האירועים, כפי שעולה מהודעותיהם של קורעאן ואסמר,
לאחר שבוצע הרצח בהתאם לתוכנית שהותוותה, היה זה הנאשם אשר הופיע עד מהרה
בדירת המסתור שבאזור רמאללה, בה שהו קורעאן, אסמר ומג'די, בירך את הרוצחים על
הצלחת המזימה, ואף ביקש שיערכו עבורו דו"ח על ביצועה. מאותו הרגע נטל הנאשם
חלק פעיל בהימלטות הרוצחים, עת דאג לדירות מסתור עבורם ואף החליט על מעברם
יחד עמו לשכם, כאשר הם נוסעים חמושים ברכב הסעות. הוא נמלט והסתתר עמם
בדירות המסתור, עד למעצרו על-ידי כוחות הביטחון הפלסטינים לאחר ניסיון הבריחה
הכושל מהדירה האחרונה בשכם.

לבסוף, ממקבץ רחב של ראיות, הכוללות את הודעותיהם במשטרה של מזאחם,
חלבי וזיבאר, כמו גם אמרותיהם של אסמר וקורט, עולה כי הנאשם היה חבר פעיל
בארגון הטרור המכונה "החזית העממית", ונשא בתפקיד בכיר בזרוע הצבאית של
הארגון. במסגרת זו הוא גייס פעילים, סיפק להם כסף ונשק, הכווין פעילויות
טרוריסטיות ובירך על ביצוען; וזאת במספר רב של מקרים ולאורך תקופה משמעותית.

SHATSKY-007647



**בבית המשפט המחוזי בירושלים**                                    פ"ח 7027/06

**לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם**

מעמדו הבכיר של הנאשם בזרוע הצבאית של הארגון אף נלמדת ממעורבותו הפעילה ברצח השר זאבי המנוח, בכך שהגיע לפגישה בבית הקפה ברמאללה עובר לביצוע הרצח, ונתן לחברי החוליה את התדריך האחרון ואת ברכת הדרך; ובכך שחבר למרצחים מיד לאחר הרצח, ביקש לקבל מהם דו"ח על הביצוע, והסדיר את ההימלטות המשותפת עמם.

71.    סיכומם של דברים: מארג הראיות האמור מוביל לכלל מסקנה, שמעבר לכל ספק סביר, כי הנאשם, ששימש כבעל תפקיד בכיר בזרוע הצבאית של ארגון הטרור החזית העממית, היה מעורב פעיל ומרכזי בתכנון רצח השר המנוח רחבעם זאבי ז"ל, בהכנות לקראתו, בתדריך הרוצחים ובשילוחם לביצוע הרצח. בסמוך לאחר הרצח, חבר אליהם, ביקש לקבל דו"ח מפורט על הביצוע, ודאג למילוטם, יחד עמו, לדירות מסתור, עד למעצרם.

<u>העבירות</u>

עבירת הרצח – המסגרת הנורמטיבית

72.    עבירת הרצח – לפי סעיף 300(א)(2) לחוק העונשין – אשר יוחסה לנאשם בכתב-האישום, מוגדרת כלהלן: "העושה אחת מאלה, יואשם ברצח ודינו – מאסר עולם ועונש זה בלבד: . . . 2) גורם בכוונה תחילה למותו של אדם".

היסוד הנפשי – "כוונה תחילה" – הוגדר בסעיף 301(א) כדלהלן: "לעניין סעיף 300, יראו ממית אדם כמי שהמית בכוונה תחילה אם החליט להמיתו, והמיתו בדם קר, בלי

SHATSKY-007648



בתי המשפט
66

**בבית המשפט המחוזי בירושלים**

פ"ח 7027/06

**לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם**

שקדמה התגרות בתכוף למעשה, בנסיבות שבהן יכול לחשוב ולהבין את תוצאות מעשיו,

ולאחר שהכין עצמו להמית אותו או שהכין מכשיר שבו המית אותו".

שלושה הם הרכיבים המצטברים הנדרשים לשם הוכחת היסוד הנפשי של

ה"כוונה תחילה": יסוד ההחלטה להמית, הדרוש קיומה של כוונה על שני רבדיה:

במישור השכלי — חזות או צפיית התוצאה הקטלנית, ובמישור הרגשי — רצון או

שאיפה להתגשמותה; יסוד ההכנה, שמאפיין כיסוד פיזי מובהק שעניינו ההכנה

למעשה ההמתה; ויסוד היעדר הקינטור, שהנו יסוד שלילי, אשר משמעו היעדר אירוע

חיצוני-פרובוקטיבי, המתרחש בסמוך למעשה ההמתה וגורם לנאשם לאבד את

השליטה העצמית ולבצע את המעשה הקטלני ללא יישוב הדעת (ראו: ע"פ 11578/05

טלה נ' מדינת ישראל, ניתן ביום 18.6.07, בפיסקאות 15-18 לפסק-הדין; וכן ראו: ע"פ

9604/04 כריכלי נ' מדינת ישראל, ניתן ביום 4.9.07, בפיסקה 11).

בענייננו, לא חלקה הסניגוריה על כך של מותו של השר זאבי המנוח נגרם

בכוונה תחילה, וכי במי שגרם למותו נתגבשו כל יסודות עבירת הרצח. טענת

הסניגוריה הייתה, כי לנאשם לא הייתה כל זיקה לרצח, בין כמבצע עיקרי ובין כמסייע.

משנקבע לעיל, כי הנאשם היה מעורב בתכנון הרצח, בתדרוך המבצעים ובשילוחם

לדרכם, נותר לבחון אם יש לראותו כמבצע עיקרי של עבירת הרצח, או שמא, כטענתה

החלופית של הסניגוריה, כמסייע בלבד.

SHATSKY-007649



בתי המשפט
67

<u>בבית המשפט המחוזי בירושלים</u>

פ"ח 7027/06

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

ביצוע בצוותא של העבירה – המסגרת המשפטית

73.    עבירת הרצח המיוחסת לנאשם באה בגדרה של עבירה רבת-משתתפים, שכן בתכנון רצח השר ובהוצאתו אל הפועל היו מעורבים גורמים רבים, וביניהם: הרוצחים קורעאן ואסמר, נהג רכב המילוט מחמד רימאווי, מתווה פעילותה של החולייה מג'די רימאווי, ויתר המסייעים, חברי הארגון ובכיריו, אשר היו מעורבים בביצוע פעולת הטרור הרצחנית.


הסניגוריה טענה בסיכומיה, כי אף אם תתקבל המסכת העובדתית שנטענה על-ידי המאשימה בכתב-האישום, הרי שלכל היותר יש לראות בנאשם כמסייע, שכן תפקידו, על-פי עובדות כתב-האישום, היה מינורי, ואין לראותו כחלק מהמעגל הפנימי של המבצעים שבלעדיו לא הייתה יוצאת התוכנית אל הפועל. בטרם נכריע באשר למשמעות המשפטית של מעשי הנאשם, נסקור את הדין ונעמוד על ההבחנה שבין המבצע העיקרי של עבירה פלילית לבין המסייע.


74.    אחריותם של הצדדים השותפים לעבירה רבת-משתתפים, מוסדרת בסעיפים 29-31 לחוק העונשין. ההבחנה העיקרית הנה בין שותפים ישירים לבין שותפים עקיפים. השותפים הישירים נוטלים חלק בביצוע העיקרי של העבירה, ואלו הם המבצעים בצוותא או המבצעים באמצעות אחר (סעיף 29 לחוק); ואילו השותפים העקיפים נוטלים חלק עקיף בביצוע העבירה, ואלו הם המסייעים והמשדלים (סעיפים 30 ו-31 לחוק). ההבחנה בין צורות השותפות – הישירה והעקיפה – היא פונקציונאלית, ונעשית על-פי התפקיד השונה שיש לשותפים השונים בהגשמת המזימה העבריינית (ע"פ 2769/95 פלונים נ' מדינת ישראל, פ"ד נא(3) 388, בעמ' 401; וכן ראו על



בתי המשפט
**68**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

ההבחנות שבין השותפים הישירים לשותפים העקיפים: ש"ז פלר, יסודות בדיני עונשין,

כרך ב', בעמ' 179 ו- 186 (תשמ"ז)).

סעיף 29 לחוק העונשין קובע כי "מבצע עבירה" הוא "לרבות מבצעה בצוותא";

וכי מבצעים בצוותא הם: המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה, הם

מבצעים בצוותא, ואין נפקה מינה אם כל המעשים נעשו ביחד, או אם נעשו מקצתם בידי

אחד ומקצתם בידי אחר".

המבצעים בצוותא מצויים בראש מדרג השותפים בעבירה רבת-משתתפים. הם פועלים

כגוף אחד לביצוע המשימה העבריינית, מהווים יחדיו יד אחת השולטת על הביצוע וכל אחד

מהם הוא חלק מהמשימה העבריינית עצמה (ע"פ 4389/93 מרדכי נ' מדינת ישראל, פ"ד נג(3)

239, בעמ' 250). כפי שנפסק, "החוק רואה במבצעים בצוותא גוף אחד, הפועל באמצעות

זרועות שונות. פעולתה של כל זרוע משויכת לגוף כולו, לכל אחד ממשתתפיו" (ע"פ

2796/95 פלוני נ' מדינת ישראל, פ"ד נא(3) 388, 402).

היסוד הנפשי של המבצע בצוותא, הנו היסוד הנפשי הנדרש לביצוע העבירה

המושלמת, לרבות כוונה מיוחדת, ככל שזו נדרשת. היסוד העובדתי מתאפיין ב"מבחן

השליטה". על-פי מבחן זה, המבצע בצוותא הוא גורם פנימי לביצוע, השולט – יחד עם אחרים

– על הפעילות העבריינית כולה. על מהותו של מבחן השליטה הפונקציונאלי עמד כב' הנשיא

ברק בע"פ 2796/96 בעניין פלונים, לעיל: "המאפיין את המבצע בצוותא שהוא אדון

לפעילות העבריינית. בידיו השליטה הפונקציונלית-מהותית ביחד עם המבצעים בצוותא

האחרים, על העשייה העבריינית. הוא חלק מההחלטה המשותפת לביצוע העבירה. הוא חלק

SHATSKY-007651



בתי המשפט
69

פ"ח 7027/06

לפני כב' השופטים : צ' סגל - סגן נשיא, י' שפירא וי' נועם

מהתוכנית הכוללת להגשמת הפעולה העבריינית האסורה. הוא פועל עם המבצעים בצוותא
האחרים, כך שכל אחד מהם שולט - יחד עם האחרים - על הפעילות כולה. מעמדו ביחס
להחלטה לביצוע העבירה הוא של איש 'פנים'. תרומתו היא 'פנימית' חלקו הוא מהותי
להגשמת התוכנית המשותפת" (לעיל, בעמ' 403 ; וכן ראו : פסק-דינו של כב' הנשיא ברק
בע"פ 3353/03 עמר עבדל האדי סלימאן נ' מדינת ישראל (ניתן ביום 5.9.05)).

על המאפיין את הביצוע בצוותא כפעילות יחדיו, ביד אחת, השולטת על הביצוע, עמד
גם פרופ' קרמניצר במאמרו, "המבצע בדיני עונשין - קווים לדמותו", פלילים א', 65
(תש"ן): "לכל אחד מן המבצעים ביחד יש שליטה יחד עם האחרים על התפתחות העניינים
... כל אחד מהם פועל עם חברו ובאמצעות חברו. לכן, גם יש לראות כל אחד מהם כאילו
ביצע במו ידיו את כל מה שבוצע במו ידיו או בידי האחרים..." (עמ' 73).

בפסיקה אף הוצע מבחן נוסף, שכונה "המבחן המשולב", שניתן להיעזר בו במצבים
שבהם הכרעה על-פי "מבחן השליטה" אינה ברורה (דנ"פ 1294/96 משולם נ' מדינת ישראל,
פ"ד נב(5) 1). את המבחן המשולב ניתן לשלב, כאבן-בוחן נוספת, במערכת השיקולים שינחו
את בית-המשפט בבדיקת נסיבותיו של כל מקרה נדון. על-פי המבחן המשולב, מבצע עיקרי הוא
זה אשר תרומתו לאירוע עברייני רב-משתתפים מתבטאת בהתנהגות — אקטיבית או פאסיבית —
וביחס נפשי, שמקנים לו, בלבד או ביחד עם האחרים, את המעמד של העשייה. השילוב בין
ההתנהגות בפועל והיחס הנפשי לעבירה הוא שיית ביטוי למהות הפונקציונאלית של תרומתו
העיקרית הישירה של אדם לאירוע העברייני רב-המשתתפים. על-פי המודל, ככל שהיסוד הנפשי
של עושה העבירה ניכר יותר, ומידת העניין שלו בביצועה רב יותר, ניתן להסתפק בדרגה נמוכה
יותר של היסוד העובדתי, ולהיפך (ראו פרשת משולם, שם, עמ' 6-25). אחת ההגדרות של הכלל



בתי המשפט
70

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

**לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם**

הָאָמוּר הִנֵּה, כִּי מָקוֹם בּוֹ לֹא מִתְעוֹרֵר כָּל סָפֵק בְּיַחַס לִהְיוֹת הָעַבַרְיָן בַּעַל מַחֲשָׁבָה פְּלִילִית
הַנִּדְרֶשֶׁת לְשִׁכְלוּלָהּ שֶׁל הָעֲבֵירָה הַמְתוּכְנֶנֶת, נוֹשֵׂא הוּא בְּאַחְרָיוּת כִּמְבַצֵּעַ בְּצַוְתָּא, אַף אִם תְּרוּמָתוֹ
הַפִיזִית לְבִיצוּעָהּ אֵינָהּ גְּדוֹלָה מִזּוֹ שֶׁל מְסַיֵּעַ (הֶשְׁווּ: ע"פ 3390/98 רוש נ' מ"י, פ"ד נג(5), 871;
ע"פ 3596/93 אבו סְרוּר נ' מ"י, פ"ד נב(2) 481).

הִשְׁתַּתְּפוּת בְּבִיצוּעָהּ שֶׁל עֲבֵירָה, כִּבְיצוּעַ עִיקָרִי בְּצַוְתָּא, אֵינָהּ מְחַיֶּיבֶת נְטִילַת חֵלֶק
בַּעֲשִׂיָּיה הַפִיזִית שֶׁל מַעֲשֶׂה הָעֲבֵירָה גוּפוֹ, וִיכוֹלָה הִיא לָבוֹא לִכְלָל בִּיטּוּי בְּתִכְנוּן הַבִּיצוּעַ וּבְנִיהוּל
הַפְּעִילוּת הָעַבַרְיָינִית (ע"פ 2801/95 קוּרְקִין נ' מְדִינַת יִשְׂרָאֵל, פ"ד נב(1) 791, עַמ' 802; ע"פ
4503/99 אֶפְרַיִם נ' מְדִינַת יִשְׂרָאֵל, פ"ד נה(3) 604, עַמ' 618-619). מִטַּעַם זֶה נִפְסַק, כִּי נוֹכְחוּת
בִּזִירַת עֲבֵירָה אֵינָהּ מֵהַוָּוה תְּנַאי לְהַטָּלַת אַחְרָיוּת עַל מְבַצֵּעַ עִיקָרִי, הַיָּכוֹל לִשְׁלוֹט בַּתִּכְנִית
הָעַבַרְיָינִית בְּ"שֶׁלֶט רָחוֹק" גַּם לְלֹא נוֹכְחוּת בִּזִירַת הָאֵירוּעַ אוֹ בְּקִרְבָתָהּ (דנ"פ 1294/96 בְּעִנְיַין
מְשׁוּלָם, לְעֵיל, בְּעַמ' 30).

75.    וּמִכָּאן לִמְסַיֵּעַ. הַמְסַיֵּעַ הוּגְדַּר בְּסָעִיף 31 לְחוֹק הָעוֹנְשִׁין כְּדִלְהַלָּן: "מִי אֲשֶׁר, לִפְנֵי
עֲשִׂיַּית הָעֲבֵירָה אוֹ בִּשְׁעַת עֲשִׂיָּיתָהּ, עָשָׂה מַעֲשֶׂה כְּדֵי לְאַפְשֵׁר אֶת הַבִּיצוּעַ, לְהָקֵל עָלָיו אוֹ
לְאַבְטֵחַ אוֹתוֹ, אוֹ לִמְנוֹעַ אֶת תְּפִיסַת הַמְבַצֵּעַ, גִּילּוּי הָעֲבֵירָה אוֹ שְׁלָלָהּ, אוֹ כְּדֵי לִתְרוֹם בְּדֶרֶךְ
אַחֶרֶת לִיצִירַת תְּנַאִים לְשֵׁם עֲשִׂיַּית הָעֲבֵירָה, הוּא מְסַיֵּעַ".

הַמְסַיֵּעַ הִנּוֹ גּוֹרֵם חִיצוֹנִי, שׁוּתָּף עָקִיף, הַמְדוֹרָג נָמוּךְ יוֹתֵר בַּמִּדְרָג שׁוּתָּפֵי הָעֲבֵירָה.
הַמְסַיֵּעַ מָצוּי מִחוּץ מֵחוּץ לְמַעֲגָל הַפְּנִימִי שֶׁל מְבַצְעֵי הָעֲבֵירָה, הוּא אֵינוֹ נוֹטֵל חֵלֶק בַּהַחְלָטוֹת הַקְּשׁוּרוֹת
לְבִיצוּעַ הָעֲבֵירָה וְאֵין הוּא שׁוֹלֵט בָּהּ (ע"פ 4389/93 בְּעִנְיַין מָרְדְּכַי, לְעֵיל, בְּעַמ' 251). תְּרוּמָתוֹ
לְמִשִׂימָה הָעַבַרְיָינִית הִנָּהּ חִיצוֹנִית לְבִיצוּעַ הָעֲבֵירָה, וּמִשְׁנִית בִּלְבַד. הִיא בָּאָה לִידֵי בִּיטּוּי בְּמַעֲשֵׂי

SHATSKY-007653



בתי המשפט

**71**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

עזר, הנפרדים ממעשיהם של העבריינים העיקריים המבצעים את העבירה, ואשר מסייעים בכך
שיוצרים, בדרך זו או אחרת, תנאים לביצוע העבירה על ידי המבצעים העיקריים (ע"פ 2976/95
בעניין פלונים, לעיל, עמ' 405; מ' גור אריה, "הצעת חוק העונשין (חלק מקדמי וחלק
כללי) התשנ"ב-1992", משפטים כ"ד, 9, בעמ' 42 (1994)).


האבחנה בין השותפות הישירה לבין השותפות העקיפה אמורה להיות לא קלה במקרים
הגבוליים, דהיינו – ככל שמתרחקים מ"גרעין" ההגדרה אל עבר "אזור האפלולית היחסית"
שלה (ע"פ 2796/95 בעניין פלונים, לעיל, בעמ' 406) או "לתחום האפור" שבין הביצוע
העיקרי לסיוע (ע"פ 4188/93 לוי נ' מדינת ישראל, פ"ד מט(1) 539, בעמ' 559). האבחנה
במקרים קשים שכאלו תוכרע על-פי נסיבותיו של כל מקרה ומקרה (על האבחנה בין השותפים
השונים, ראו: ע"פ 3353/03 בעניין סלימאן, לעיל; מ' גור אריה, "צורות של ביצוע עבירה
פלילית", פלילים א, 29 (תש"ן).


76.    אבחנה זו, בעניין סיווגם של המבצעים העיקריים, אל מול המסייעים, באה לידי ביטוי,
בין-השאר, בעבירות רבות משתתפים המבוצעות במסגרת ארגוני פשיעה, או ארגוני טרור.
ארגונים אלה פועלים באופן המושתת על "סידור עבודה", לפיו מוגדרים תפקידיו של כל אחד
מחברי ההתארגנות, כאשר תפקידו של כל אחד מהם וחשיבותו אינם מותנים בהכרה בנוכחותו
בזירת האירוע ובמיקומו במועד ביצוע העבירה. בולט הדבר בארגוני הטרור, המתאפיינים
במבנה היררכי ובחלוקת תפקידים בין חברי הארגון. ארגוני הטרור, לרוב, מוציאים לפועל את
פעילותם הטרוריסטית באמצעות "זרוע צבאית" של הארגון. לזרוע הצבאית מבנה היררכי ברור,
לרוב ממודר, הכולל את חברי החוליה, המפגעים עצמם, המשלחים, המגייסים, מרכזי הפעילות
האזוריים, ראשי הזרוע הצבאית ובכירי הארגון. לכל חבר בארגון, על-פי מעמדו ותפקידו,

SHATSKY-007654



בתי המשפט
72

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

אחריות לביצוע חלקו בשרשרת שסופה בהוצאתה אל הפועל של פיגועי טרור רצחניים, בין אם
כמבצע עיקרי בין אם כמסייע. כך, יש האחראים לגיוס הפעילים, אחרים עוסקים בגיוס
הכספים, באספקת אמצעי הלחימה, כלי הרכב, חומרי הנפץ ויצורם. התווייה דרכי הפעולה,
קביעת מדיניות הפיגועים ובחירת יעדי הפיגוע, נתונים לבכירים יותר בארגון, אשר יחד עם
הכפופים להם אמונים על התכנית המבצעית, מוסרים אותה לחברי החוליה, תוך שמעודדדים את
רוחם, נוסכים בהם תחושת ביטחון בטרם יציאתם לביצוע מעשיהם הרצחניים, ומשכנעים אותם
בצדקת דרכם הנפשעת. בשילובם של כל הגורמים על משימותיהם השונות, תתאפשר הוצאתו
אל הפועל של כל מעשה טרור ופיגוע. לכל פרט בשרשרת חלק חיוני להצלחתו של כל פיגוע
טרוריסטי. יש שתפקידם מרכזי, והם שייכים למעגל המבצעים הפנימי — אלה הם המבצעים
העיקריים של העבירה. יש שתפקידם משני, ומסתכם אך במתן סיוע עקיף באופן זה או אחר.
האבחנה בין המבצע העיקרי לבין המסייע בפעילותם של ארגוני פשיעה או ארגונים
טרוריסטיים, תעשה על-פי המבחנים האמורים שנסקרו לעיל, כל מקרה — על-פי נסיבותיו.

אחריותו של הנאשם כמבצע עיקרי בעבירת הרצח

77.     יישום המבחנים האמורים על נסיבות המקרה שלפנינו, מוביל למסקנה ברורה, חד-
משמעית, ושמעבר לכל ספק סביר, כי יש לראות את הנאשם כמבצע עיקרי של עבירת הרצח.


לצורך ביצוע הרצח התארגנה קבוצה מצומצמת של פעילי החזית העממית, כחבורה
בעלת מבנה היררכי ברור שפעלה כגוף אחד, ואשר לכל אחד מחבריה היה תפקיד מסים ומוגדר
במזימת הרצח. קורעאן נועד ללחוץ על ההדק, כאשר אסמר עמו בזירה ומאבטח אותו; על
מחמד רימאווי הוטל תפקיד נהג רכב המילוט שהמתין מחוץ למלון; מג'די היה זה שגייס את
חברי החוליה, העביר לה אמצעי לחימה, כסף, תעודות מזויפות, ומסר להם מידע ופרטים על



בתי המשפט
**73**

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב׳ השופטים: צ׳ סגל - סגן נשיא, י׳ שפירא וי׳ נועם

משימתם; והנאשם – היה זה שעמד בראש פירמידת הרצח, הוגה התכנית. הוא מסר למג׳די, שהיה כפוף לו, את יעד הפיגוע ומועד ביצועו, הורה לו לגייס את החוליה, והיה מעורב בהכנת פרטי תכנית הרצח. יתרה מכך, הוא אף נטל חלק פעיל בארגון האמצעים לקראת ביצוע הרצח, כאשר פעל להשגת רישיונות הנהיגה, והיה אף זה שדאג לשכירתו של רכב ה״קאיה״ והביאו לחוליה. במסגרת תפקידו אף נטל הנאשם חלק פעיל בתדרוך החוליה באותו מפגש שנערך עובר לרצח, עודד אותה לקראת ביצוע ההתנקשות והעניק לחבריה את ברכת הדרך, כבכיר בארגון. לאחר הרצח, הוא חבר אליהם לקבלת דיווח, והוא דאג למילוטם, יחד עמו, לדירות מסתור. מעשיו אלה של הנאשם, שהתאפיינו הן בתכנון ובהתוויית דרכי הפעולה, הן בביצוע פיזי של פעולות הקשורות ברצח והן בחבירה אל המבצעים לאחר המעשה, מעידים כי היה דמות דומיננטית וזרוע מרכזית בקרב החבורה שהתאגדה לצורך הפיגוע, וכבכיר בארגון הייתה לו שליטה ברורה ומלאה על מהלך האירועים, שהביא בסופו של יום לביצוע הרצח. ניכר, כי מפגש התדרוך שנערך בבית הקפה ברמאללה עובר לרצח, שרטט יותר מכל את גבולות המעגל הפנימי של מבצעי הרצח – הרוצחים, נהג רכב המילוט, מגייס החוליה ומי שהכוונו את פעילותה, והאחראי הבכיר – הנאשם, שפעלו כגוף אחד על-מנת להוציא אל הפועל את מזימת הרצח. כל הקבוצה האמורה, ובפרט הנאשם, שעמד בראש פירמידת תכנון הרצח והוצאתה אל הפועל, הנם בגדר מבצעים עיקריים של הרצח, הן על-פי מבחן השליטה והמבחן הפונקציונאלי שתוארו לעיל, והן על-פי המבחן המשולב. משכך, במעשיו האמורים יש לראות את הנאשם, כמבצע בצוותא של עבירת הרצח.


עבירת חברות בארגון טרור

78.     סעיף 3 לפקודת מניעת טרור, התש״ח-1948, קובע: ״אדם שהוא חבר בארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין, יהא צפוי לעונש מאסר עד חמש שנים״.

SHATSKY-007656



בתי המשפט
74

פ"ח 7027/06

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

המונח "ארגון טרוריסטי" מוגדר בסעיף 1 לפקודה כדלהלן: "'ארגון טרוריסטי' פירושו חבר אנשים המשתמש בפעולותיו במעשי אלימות העלולים לגרום למותו של אדם או לחבלתו, או באיומים במעשי אלימות כאלה". המונח "חבר בארגון טרוריסטי", הוגדר באותו סעיף: כ"אדם הנמנה עליו, וכולל אדם המשתתף בפעולותיו, המפרסם דברי תעמולה לטובת ארגון טרוריסטי או פעולותיו".

סעיף 8 לפקודה קובע כי ממשלת ישראל היא שבסמכותה להכריז על חבר אנשים מסוים כארגון טרור.

בענייננו, לא נתעוררה מחלוקת באשר להיותו של ארגון החזית העממית ארגון טרור כהגדרתו בפקודה. הואיל ונקבע, כי הנאשם היה חבר פעיל בארגון הטרור החזית העממית, ובכיר בזרוע הצבאית של הארגון, הרי שמתקיימים מאליהם יסודות העבירה של החברות בארגון טרוריסטי, לפי סעיף 3 לפקודה, בצירוף סעיפים 1 ו-8 לפקודה.

התוצאה

79.   על-יסוד האמור לעיל, הוכח כדבעי, ומעבר לכל ספק סביר, כי הנאשם, במסגרת פעילותו בארגון הטרור "החזית העממית", וכבעל תפקיד בכיר בזרוע הצבאית של הארגון, היה אחראי, כמבצע בצוותא, לרציחתו של השר רחבעם זאבי ז"ל, ביום 17.10.01.

SHATSKY-007657



בתי המשפט
75

פ"ח 06/7027

<u>בבית המשפט המחוזי בירושלים</u>

לפני כב' השופטים: צ' סגל - סגן נשיא, י' שפירא וי' נועם

אשר-על-כן, מן הדין להרשיע את הנאשם בעבירת רצח – לפי סעיף 300(א)(2) לחוק

העונשין, התשל"ז-1977 ; ובעבירה של חברות בארגון טרוריסטי – לפי סעיף 3 לפקודה למניעת

טרור, התש"ח-1948, בצירוף סעיפים 1 ו-8 לפקודה זו.

שופט

סגן הנשיא צ' סגל:

אני מסכים.

סגן נשיא

השופט י' שפירא:

אני מסכים.

שופט

הוחלט כאמור בפסק-דינו של השופט י' נועם, להרשיע את הנאשם בעבירת רצח – לפי

סעיף 300(א)(2) לחוק העונשין, התשל"ז-1977 ; ובעבירה של חברות בארגון טרוריסטי – לפי

סעיף 3 לפקודה למניעת טרור, התש"ח-1948, בצירוף סעיפים 1 ו-8 לפקודה זו.

ניתנה היום, ד' כסלו התשס"ט (1 בדצמבר 2008), בנוכחות ב"כ המאשימה, הסניגור והנאשם.

בית המשפט המחוזי בירושלים
שהעתק זה **אני מאשר**
נכון ומתאים למקור

שופט

התאריך    (8) מזכיר ראשי

סגן נשיא

SHATSKY-007658