UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SHABTAI SCOTT SHATSKY, *et al.*,

                                        Plaintiffs,

                        -against-

THE SYRIAN ARAB REPUBLIC, *et al.*,

                                        Defendants.

Civil Action No. 02-cv-02280 (RJL)

Oral Argument Requested

---

**PLAINTIFFS' REVISED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

Abbe David Lowell (#358651)
Joy L. Langford (#451728)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: 202-974-5605
Fax: 202-974-6705
adlowell@chadbourne.com
*Counsel for Plaintiffs*

Robert J. Tolchin (NY 0088)
The Berkman Law Office, LLC
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
Tel: 718-855-3627
rjtberkman@gmail.com
*Counsel for Plaintiffs*

January 21, 2014

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................ iii

**PRELIMINARY STATEMENT** ............................................................................1

**FACTUAL BACKGROUND** ..................................................................................3

A.  Plaintiffs Filed Their Complaint In 2002; Defendants Did Not Answer Until 2011 ..........3

    1.  Following The Entry of Default, Plaintiffs Immediately Prepared And Filed For Default Judgment ................................................................................3

    2.  Defendants Paid Lip Service To Discovery In The Default Action, Then Blindsided Plaintiffs With A Motion To Vacate In December 2007......................4

    3.  The Court Issued A Vacatur Order June 30, 2011, Requiring Defendants To Post A $1 Million Bond To Guarantee Their Commitment to Litigate .................5

    4.  Plaintiffs Had To File A Motion To Compel Defendants To Post The Court-Ordered $1 Million Bond Before Defendants Finally Did ....................................6

B.  Defendants' Claim That Plaintiffs' Rule 26(a)(1) Disclosures Were Served Late Is Untrue; Moreover, Defendants' Own Disclosures Were Lacking ......................................6

C.  Defendants' Allegation That Plaintiffs' Discovery Strategy Was Intended To Cause Delays Is Pure Fiction ..................................................................................7

    1.  Plaintiffs' Document Requests Were Well Within Fact Discovery, But Defendants' Productions Were Limited And Delayed ...........................................7

    2.  Defendants Did Not Make Their First Document Requests Until The Very End Of Fact Discovery ................................................................................12

    3.  Defendants' Claim That Plaintiffs' Interrogatory Responses Were Untimely Is Untrue; Defendants' Interrogatory Responses, On The Other Hand, Actually Are Unverified .............................................................................15

D.  Defendants' Deposition Strategy Was To Stall Plaintiffs From Taking Any Depositions For As Long As Possible, Including Forever ...............................................16

    1.  Defendants Noticed Plaintiffs' Depositions 46 Weeks Into Discovery.................16

    2.  Plaintiffs Noticed Their Depositions Timely, But Were Delayed Repeatedly By Defendants' Recalcitrance And Multiple Motions For Protective Orders.......17

E.   Defendants' Rely On Fully Litigated Claims As A Basis For Sanctions, Which Only Serves To Underscore The Frivolousness Of This Motion ...............................................21

**ARGUMENT** .........................................................................................................................23

I.   Neither The Facts Nor The Law Support Granting Sanctions Against Plaintiffs.............25

   A.   Plaintiffs Should Not Be Subject To Sanctions Under Rule 16(f)(1)(c) As They Have Not Disobeyed An Order............................................................................28

   B.   Plaintiffs Should Not Be Subject To Rule 37 Sanctions Because Defendants Have Suffered No Harm .......................................................................................30

   C.   To Warrant Sanctions Based On The Court's Inherent Authority, Plaintiffs Must Have Acted In Bad Faith, Vexatiously, Wantonly, Or For Oppressive Reasons, None Of Which Applies ........................................................................32

II.   Defendants' Motion For Sanctions Is Improper And Untimely ........................................33

III.   There Is No Basis To Strike Mr. Tolchin's Declaration Or Any Of Plaintiffs' Exhibits ..34

IV.   There Is No Basis To Strike Exhibits That Are Documents Produced By Defendants.....35

V.   Defendants' Unclean Hands Would Bar Relief Even If Defendants' Allegations Were Well-Founded (Which They Are Not)................................................................................37

VI.   Defendants' Motion For Sanctions Constitutes An Improper Attempt To Circumvent Court Rules ........................................................................................................................38

VII.   Defendants' Efforts To Malign Plaintiffs' Counsel Are Indecorous and Unseemly.........40

**CONCLUSION** ...................................................................................................................42

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

**CASES**

*Akers v. Beal Bank*,
  845 F. Supp. 2d 238, 243 (D.D.C. 2012) ................................................................. 34-35

*Am. Needle, Inc. v. New Orleans*,
  No. 04 c 7806,
  2012 WL 4327395 (N.D. Ill. Aug. 17, 2012) ..................................................................26

*Am. Prop. Constr. Co. v. Sprenger Lang Found.*,
  274 F.R.D. 1 (D.D.C. 2011).............................................................................................31

*Anand v. BP West Coast Prods., LLC*,
  484 F. Supp. 2d 1086, 1092 (C.D. Cal. 2007) ................................................................36

*Appalachian Power Co. v. EPA*,
  249 F.3d 1032 (D.C. Cir. 2001) ......................................................................................39

*Ass'n of Am. Med. Colleges v. Princeton Review, Inc.*,
  332 F. Supp. 2d 11, 18 (D.D.C. 2004)............................................................................38

*Averyt v. Wal-Mart Stores, Inc.*,
  265 P.3d 456 (Colo. 2011)..............................................................................................26

*Bonds v. District of Columbia*,
  93 F.3d 801 (D.C Cir. 1996)...........................................................................................31

*Brandt v. Vulcan, Inc.*,
  305 F.3d 752, 756 (7th Cir. 1994). .................................................................................33

*Bull v. UPS*,
  665 F.3d 68 (3d Cir. 2012)..........................................................................................1, 38

*Collectable Promotional Prods. v. Disney Enters.*,
  No. CIV-06-1187-D,
  2009 WL 1543449 (W.D. Okla. June 2, 2009) ...............................................................39

*Commercial Data-35 Servers, Inc. v. Int'l Bus. Mach., Corp.*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003) ..............................................................................36

*Convertino v. United States DOJ*,
  684 F.3d 93 (D.C. Cir. 2012) .........................................................................................35

iii

*DNT, LLC v. Sprint Spectrum, LP*,
 750 F. Supp. 2d 616, 630 (E.D. Va. 2010) .......................................................39

*Dushkin Publ'g Group, Inc. v. Kinko's Service Corp.*,
 136 F.R.D. 334 (D.D.C. 1991) .......................................................................26

*EEOC v. Burlington Northern & Santa Fe Ry. Co.*,
 No. 07-2450 Ma/P,
 2009 WL 1531019 (W.D. Tenn. May 26, 2009) ..........................................31

*Esposito v. Home Depot*,
 590 F.3d 72, 79 (1st Cir. 2009) .......................................................................25

*Fitts v. Unum Life Ins. Co.*,
 98-00617(HHK),
 2007 WL 1334974 (D.D.C. May 7, 2007) ....................................................26

*Hatch v. Reliance Ins. Co.*,
 758 F.2d 409 (9th Cir. 1985) .........................................................................28

*Hickman v. Taylor*,
 329 U.S. 495 (1947)........................................................................................28

*In re Miller*,
 No. 96-00431
 2009 WL 4730755 (Bankr. D.D.C. Dec. 3, 2009)........................................30

*ISP Chemicals LLC v. Dutchland, Inc.*,
 No. 5:08-CV-153, 2011 WL 2651241 (W.D. Ky. July 6, 2011) ....................26

*Kelley Foods of Alabama, Inc. v. Myers Nissi & Co., Inc.*,
 1:04cv1246-MHT,
 2006 WL 2290835 (M.D. Ala. Aug. 9, 2003) ...............................................33

*Krause v. Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.*,
 425 F. Supp. 2d 352 (W.D.N.Y. 2006) .........................................................26

*Revson v. Cinque & Cinque*,
 221 F.3d 71 (2d Cir. 2000)..............................................................................32

*Shareef v. Donahoe*,
 No. 3:11-CV-615-DCK,
 2013 WL4502174 (W.D.N.C. Aug. 22, 2013) ........................................34, n.18

*Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*,
 272 F.R.D. 350 (W.D.N.Y. 2011)....................................................................31

*Susquehanna Commercial Fin., Inc. v. Vascular Resources, Inc.*,
  No. 1:09-cv-2012,
  2010 WL 4973317 (M.D. Pa. Dec. 1, 2010) ....................................................................36

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*,
  242 F.R.D. 1 (D.D.C. 2007) ..........................................................................................25

*United States v. Philip Morris Inc.*,
  300 F. Supp. 2d 61 (D.D.C. 2004) ................................................................................38

*Vieiera v. Woodford*,
  258 Fed. App'x 924 (9th Cir. 2007) .............................................................................28

## STATUTES AND RULES

Anti-Terrorism Act, 18 U.S.C. § 2333................................................................................3

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 ...........................................4, n.2

Foreign Sovereign Immunities Act, 28 U.S.C. § 1608 ...........................................4, n.2

Title VIII of Public Law 101-246 (the PLO Commitments Compliance Act of 1989)................27

Fed. R. Civ. P. 6........................................................................................................6

Fed. R. Civ. P. 16 ....................................................................................................28

Fed. R. Civ. P. 26................................................6, 7, 10, 14, 21, 24, 25, 29, 30, 31, 35

Fed. R. Civ. P. 28..............................................................................................18, 19

Fed. R. Civ. P. 30(a) ...................................................................................................20

Fed. R. Civ. P. 30(b)(6)..........................................................................................19, 20, 21

Fed. R. Civ. P. 33 .............................................................................................11, 28, 30, 16

Fed. R. Civ. P. 34 .......................................................................................... *passim*

Fed. R. Civ. P. 37....................................................................................................29

Local Rule Civil Procedure 7(e) ...............................................................................38

**PRELIMINARY STATEMENT**

A slight variation on an old adage popular among lawyers is: "When the law is on your side, argue the law.  When the facts are on your side, argue the facts.  When neither the facts nor the law are on your side attack the lawyers," especially if the Court has raised issues about those lawyers in the past.[1]  This is what Defendants' motion for sanctions is—an untimely and ill-conceived attack directed at Plaintiffs (or, rather, since it would be unseemly for Defendants to attack directly the families of murdered children and other victims of the Karnei Shomron bombing, Plaintiffs' counsel).  To attempt this, Defendants dredge up issues that have already been decided by this Court and otherwise recast or outright rewrite the history of this litigation in an attempt to cast Plaintiffs in the worst possible light.  Defendants should not succeed in this endeavor.  Defense counsel has "crossed a line between effective advocacy and [their] duty as . . . officers of the court to accurately present the record."  *Bull v. UPS*, 665 F.3d 68, 83 (3d Cir. 2012).  Defendants not only brought this motion for sanctions with unclean hands, seeking to have the Court ignore their efforts to whitewash their own discovery misconduct, but they also brought the motion without being able to point to any actual harm suffered as a result of any allegation directed at Plaintiffs.

Defendants claim Plaintiffs' "interject[ed], through the [Robert] Tolchin declaration, . . . documents that were not timely or properly disclosed to Defendants" (DE 270-1 at 5), and then opportunistically assert that the declaration should be stricken along with all of the exhibits referenced in the declaration—ironically including exhibits produced by Defendants themselves—as a sanction for purported "abuses."  Defendants must have considerable

---

[1]    At the last hearing in the case on November 13, 2013, the Court expressed concerns about actions taken or not taken by Plaintiffs' New York counsel, Robert Tolchin.  Sensing they now have a convenient whipping post, Defendants have constructed this motion as a "pile on" of Mr. Tolchin.

confidence that their own actions will not be scrutinized to now bring what is in effect a discovery motion to this Court at the eleventh hour, after dispositive motions have been filed.

The Court recently described Plaintiffs as having had a duty to raise any outstanding discovery issues during the December 7, 2012 and January 29, 2013 status conferences.  (DE 266 at 6-7.)  Defendants had the same duty and yet the transcripts from these status conferences as well as the November 13, 2013 motions hearing (DE 269) reveal no reference to any of the purported discovery-related concerns Defendants raise in this untimely motion.  Moreover, Defendants already moved for sanctions (DE 228) and obtained relief, but failed to mention in that motion many of the purported events Defendants now claim to be of such grave importance that the mere mention of them justifies striking Plaintiffs' summary judgment exhibits.  For Defendants intentionally to wait until now to bring this motion, which finds support not in facts but in inferences, is its own form of litigation abuse—and should be treated as such.

The Court already has given Defendants the opportunity to re-enter this case despite Defendants' willful default (DE 52, 126), after Defendants argued the case should be decided on the merits (DE 77 at 1).  Since then, on numerous occasions, Defendants have succeeded in blocking Plaintiffs' right to put their evidence forward, despite Defendants' own significant discovery deficiencies and efforts to avoid their own obligations.  Defendants' present motion is yet another attempt to cut-off Plaintiffs' right to fully and fairly litigate this case, while also unfairly disrupting and trying to influence the summary judgment process.  Defendants' motion should be denied and Defendants, so quick to ask for sanctions, should be subject to the same standard of review and scrutiny that they have urged should be applied to Plaintiffs.  This is true especially in light of Defendants' insistence that outstanding discovery issues should have been resolved before the parties brought a joint motion for a summary judgment briefing schedule.

## FACTUAL BACKGROUND

The Court is familiar with the facts of this case.  Briefly, this action arises out of the February 16, 2002 suicide bombing that took place in the Israeli town of Karnei Shomron, when a Popular Front for the Liberation of Palestine ("PFLP") terrorist detonated a large explosive device at a crowded pizzeria killing two American teenagers, Keren Shatsky and Rachel Thaler, and seriously injuring four other American citizens.  This action is brought by the estates and family members of the two individuals who died and the four other Americans who were gravely injured and their families, pursuant to the civil provisions of the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, against Defendants the Palestinian Authority ("PA") and the Palestinian Liberation Organization ("PLO"), of which the PFLP, a United States Department of State designated foreign terrorist organization, is a constituent faction.

### A.    Plaintiffs Filed Their Complaint In 2002; Defendants Did Not Answer Until 2011

Recently, the Court made clear its interest in this case reaching finality.  (Nov. 13, 2013 Hrg. Tr. 35:2-20.)  Indeed, it has been 11 years since Plaintiffs filed their Complaint (DE 3), yet only two-and-one-half years since Defendants deigned to answer (DE 128).  The Court is quite familiar with the procedural history of this case and normally Plaintiffs would not waste the Court's time revisiting that history at this point in the litigation.  Because, however, Defendants opted to try to reset the stage by rewriting the case history, Plaintiffs have no choice but to correct the record where the Defendants have misstated or misconstrued the facts or conveniently left out relevant facts as to their own behavior.

#### 1.    Following The Entry Of Default, Plaintiffs Immediately Prepared And Filed For Default Judgment

Defendants describe the "Initial Entry of Default," as having occurred on April 12, 2005 (DE 270-1 at 7 (citing DE 52)), but in fact that was the second Entry of Default.  The first Entry

3

of Default occurred on September 11, 2003.  (DE 18.)  Defendants moved to strike the first Entry

of Default on September 25, 2003, arguing that the Entry was premature and asking for an

enlargement of time to respond to the Complaint.  (DE 21.)[2]  Plaintiffs did not oppose

Defendants' motion.  (*See* DE 30.)  Rather than responding to the Complaint, however,

Defendants moved to dismiss on October 31, 2003.  (DE 26.)  The Court granted Defendants'

motion to strike on June 23, 2004 and then denied Defendants' motion to dismiss on February 7,

2005.  Defendants thereafter failed to answer, thus defaulting.  (DE 52.)

Defendants imply otherwise (DE 270-1 at 11), but Plaintiffs did not delay in preparing

for their motion for default judgment following the 2005 Entry of Default.  (DE 64.)[3]  Plaintiffs

immediately moved for an application to appoint a commissioner for taking depositions abroad

DE 54),[4] and spent the ensuing months gathering evidence and deposing witnesses regarding

Plaintiffs' damages.  On April 30, 2007, Plaintiffs filed their motion for default judgment, along

with extensive Proposed Findings of Fact and Conclusions of Law.  (DE 64; 64-2)

### 2.    Defendants Paid Lip Service To Discovery In The Default Action, Then Blindsided Plaintiffs With A Motion To Vacate In December 2007

Defendants let the clock run for eight months following the Plaintiffs' default judgment

motion, before moving to vacate the default, although they could have moved immediately.  On

---

[2]    Plaintiffs' Complaint also named the Syrian Arab Republic and certain other Syrian persons and entities.  (DE 3.)  The Syrian defendants were voluntarily dismissed from this action on May 2, 2005 (DE 55).  Thereafter, Plaintiffs and additional parties brought a separate action against the same Syrian defendants (No. 06-cv-0724 (RJL) and, when the Congress amended the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, a subsequent case was brought (No. 08-00496 (RJL); those two cases have been consolidated under No. 08-00496.  The clerk entered a default and all that remains to be done to conclude No. 08-00496 is a hearing pursuant to 28 U.S.C. § 1608(e).

[3]    The suggestion that Plaintiffs have delayed this litigation or parts of this litigation is part of Defendants' routine patter, although any such allegation continues to be "utterly false."  *See, e.g.*, DE 77 at 9 (accusing Plaintiffs of taking no further action for two years to secure a default judgment; *see also* DE 97 at 7 (plaintiffs' rebuttal describing Defendants' allegation as "utterly false").

[4]    Although already in default, the PA moved the Court to stay the proceedings for 90 days on January 31, 2006.  (DE 57.)  The motion was denied as moot by Minute Order on May 30, 2006.

May 17, 2007, Defendants' present counsel noticed an appearance (DE 66) and filed a response to Plaintiffs' default judgment motion (DE 67); two weeks later Defendants filed an "Opposition" (DE 69).  The Court ordered discovery in relation to the default action (DE 76), and the parties "spent the better part of five months" thereafter engaged in discovery, with Plaintiffs producing "thousands of pages of documents," and reports, including expert reports (DE 95, June 13, 2008 Hrg. Tr. 4:10-16).  Then, without warning, after five months of discovery, Defendants moved to vacate the Entry of Default on December 21, 2007.  (DE 77.)  Defendants now claim to have moved to vacate "pursuant to the Court's Scheduling Order (DE 72)" (*see* DE 270-1 at 11), but that Order is silent on vacatur.  Between Defendants' game-playing in the early stages of this litigation and the additional time spent on the default judgment motion, Defendants had eaten up five years.

3. **The Court Issued A Vacatur Order On June 30, 2011, Requiring Defendants To Post A $1 Million Bond To Guarantee Their Commitment to Litigate**

The Court heard argument on Defendants' motion to vacate on July 28, 2008  (DE 102) and, after long consideration, granted the vacatur motion almost three years later in an order dated June 30, 2011 (DE 125).  In its Memorandum Opinion, the Court stated that, despite finding it "overwhelmingly clear" that Defendants' default "was willful," the Court was "convinced that [Defendants were] *truly committed to litigating this matter*."  (DE 126 at 5-6 (emphasis added).)  The Court, however, noted that "waiting three years to attempt to vacate an entry of default may be egregious and subject to sanction."  (DE 126 at 11 n.5.)  Defendants finally filed their Verified Answer to Plaintiffs' 2002 Complaint on July 20, 2011, *more than nine years after the Complaint was filed*.  (DE 128.)

4.     **Plaintiffs Had To File A Motion To Compel Defendants To Post
The Court-Ordered $1 Million Bond Before Defendants Finally Did**

Defendants' claim that Mr. Tolchin "began threatening to file his first motion" in relation

to their failure to post a court ordered bond (DE 270-1 at 8) typifies the inflated language

Defendants rely on throughout this motion.  The facts tell a different story.  In their vacatur

motion, Defendants committed to (1) litigating in a "cooperative manner," if their default were

vacated; (2) posting a "$1 million penalty bond to ensure no future default [would] occur in the

event of vacatur," and (3) reimbursing "Plaintiffs for reasonable costs and expenses sustained as

a result of the default."  (DE 77 at  14-15.)  Defendants did not timely post bond after the Court's

June 30, 2011 Order.  (DE 127.)  Rather, it took prodding from Plaintiffs (*see, e.g*., DE 270-11)

and finally a motion to reinstate the default (DE 132) before Defendants would act.  In the end,

Defendants finally posted the bond on August 11, 2011 and August 16, 2011.

B.     **Defendants' Claim That Plaintiffs' Rule 26(a)(1) Disclosures Were Served Late Is
Untrue; Moreover, Defendants' Own Disclosures Were Lacking**

Plaintiffs timely served their initial Rule 26(a)(1) disclosures on October 31, 2011.  (Ex.

1.)  Once again, Defendants make an "utterly false" claim that Plaintiffs Rule 26(a)(1)

disclosures were untimely.  (DE 270-1 at 9.)  Plaintiffs' disclosures were served within the time

allowed under the Court's Scheduling Order (DE 136 ¶ 4) and Fed. R. Civ. P. 6(a)(1)(c).)  As

required by Rule 26(a)(1)(A)(i), Plaintiffs' initial disclosures named 29 individuals likely to have

discoverable information that Plaintiffs may use to support their claims and defenses.

Defendants deposed ten of the individuals identified in Plaintiffs' individual disclosures

(although they waited so long to notice the depositions, that the Court enlarged fact discovery

only so that Defendants could take the depositions out of time).

Defendants, on the other hand, served insufficient disclosures, as Defendants failed to identify individuals likely to have discoverable information as required by Rule 26(a)(1)(A)(i). Instead, Defendants disclosed  witness categories—"representatives" from various offices of the Palestinian Authority.  (Ex. 2 at 3-4.)  Defendants' initial disclosures did not identify anyone whom Plaintiffs could seek to depose, a deficiency that Defendants <u>never rectified</u> during discovery despite their obligation to do so under Rule 26(e).

**C.**     **Defendants' Allegation That Plaintiffs' Discovery Strategy Was Intended To Cause Delays Is Pure Fiction**

Throughout this litigation, Defendants have presented one face to Plaintiffs and another to the Court.  Once again, in Defendants' present motion, Defendants paint a very one-sided picture, ignoring how Defendants unilaterally reduced Plaintiffs' discovery period in this case to no more than three months and instead claiming Plaintiffs were dilatory.  Then, although Defendants produced more than <u>ninety percent</u> of their documents <u>after the close of fact discovery</u>, and served no document requests or interrogatories and noticed no depositions until August 3, 2012—<u>six weeks before the end of fact discovery</u>, Defendants have reiterated since September 2012 their sham mantra that it was Plaintiffs who artificially tried to extend fact and expert discovery.  (*See, e.g.*, DE 171 at 1, 13; DE 185 at 2.)  This motion is more of the same.

**1.    Plaintiffs' Document Requests Were Well Within Fact Discovery, But Defendants' Productions Were Limited And Delayed**

Plaintiffs' served their *First Request to Produce Documents and Things* on March 9, 2012, making 18 requests, through which Plaintiffs sought, among other things, documents related to (1) the Karnei Shomron bombing; (2) the PFLP bomber, Sadeq Abdel Hafez (including payments made to Hafez or his family members following Hafez's death); and (3) information about either Defendant's funding of the PFLP in the four years leading up to the bombing.  (Ex.

3 .)  Defendants served written objections and responses to Plaintiffs' *First Request* on April 12, 2012, but no documents.  (Ex. 4.)  In total, Defendants refused to produce documents in response to 10 out of 18 of Plaintiffs' requests unless Plaintiffs redrafted the request.  (*See* Ex. 4 at Defendants' responses to Requests No. 4, 5, 6, 7, 8, 9, 10, 11, 17, and 18.)  With respect to the other eight requests, Defendants produced nothing at all.  More than a month passed.

Finally, on May 31, 2012, Defendants supplemented their written responses (Ex. 5), and produced 11 pages of documents (07:000001-011), none of which are responsive to Plaintiffs' requests and instead relate to Defendants' defenses.  (*See* Ex. 6 at 6-7.)  For all of Defendants' finger pointing as to the timing of Plaintiffs' discovery requests (DE 270-1 at 13), almost three months after they were served, Defendants had only produced 11 non-responsive pages—all to Defendants' benefit.  Indeed, Defendants did not produce a single responsive document until Plaintiffs' counsel notified Defendants they were aware of the existence of certain categories of responsive documents, specifically martyrs files, which would be responsive to Plaintiffs Requests No. 1 and 3 and documents in which the PA initiated civil litigation in Israeli courts. (Ex. 7.)  Defendants claim credit for producing more documents "[w]hen Plaintiffs complained" without seeming to recognize the irony that Plaintiffs should not need to "complain" before Defendants will produce their responsive documents.  (DE 270-1 at 13.)

On June 8, 2012, three months after being served document requests and one month after being informed that Plaintiffs knew the documents existed, Defendants finally produced a single file (approximately 19 pages) from their "Institute for the Care of Martyrs' [i.e., suicide bombers] Families." (07:0000012-31.)  (*See* DE 172 at 7; *see also* Ex. 8, Letter from C. McAleer to R. Tolchin, May 31, 2012).)  The contents of this file were in Arabic, and the file was produced without translations, despite the fact that Defendants had made it known to Plaintiffs

that Defendants were having the documents translated.  (Ex. 8.)  Defendants now audaciously

declare Plaintiffs' production of certain "foreign-language documents were unaccompanied by

certified English translations" as if that alone should be sanctioned (DE 270-1 at 23), yet  it was

Defendants who set the "no translation" standard (Ex. 9).

On July 9, 2012, four months after Plaintiffs served Plaintiffs' first document requests,

Defendants moved for a protective order  (DE 157) and made another small production of

responsive documents (07:000031-07:00050).[5]  Plaintiffs have been hindered throughout this

litigation by Defendants' discovery shenanigans, including Defendants' failure to timely produce

the vast majority of their documents.

Having received just 50 pages of documents from Defendants (of which only 39 pages

were responsive to Plaintiffs' first document requests), Plaintiffs intensified their own

independent investigation.  After learning through an independent investigation of the

involvement of Raed Nazal, a Captain in the PA's security forces, in planning the Karnei

Shomron bombing and recruiting the bomber, Sadeq Hafez—and with the discovery window

rapidly closing—Plaintiffs served 111 supplemental document requests on August 20, 2012.

In their motion for sanctions (DE 270), Defendants' employ expressions of mock outrage

(and baseless inferences) that Plaintiffs served discovery on August 20, 2012 (at the "last minute,

. . . the last possible day to serve written discovery . . . .Plaintiffs deliberately chose this date for

---

[5]     Plaintiffs went into their depositions of Defendants' witnesses having only received 50 pages of
documents.  After the depositions were already underway, Defendants served 17 pages of documents
(entirely in Arabic and without translation), to supplement its prior 50 pages.  By serving so late,
Defendants were able to preclude Plaintiffs from obtaining any testimony relating to those documents
from the witnesses who had already been deposed, and by serving the Arabic documents without
translations, Defendants made it difficult for the Plaintiffs' English- and Hebrew-speaking counsel to
evaluate the importance of the documents to individual depositions.

serving . . .") (DE 270-1 at 19 and n.11),[6] notwithstanding the fact that Plaintiffs' supplemental

requests unquestionably were timely and necessary given Defendants' bare-bones "response" to

Plaintiffs' prior discovery requests.   Any suggestion Defendants were somehow prejudiced by

Plaintiffs' timely August 20, 2012 requests is belied by the fact that Defendants only agreed to

produce documents responsive to <u>seven</u> of Plaintiffs' supplemental requests.  (Ex. 10 at

Responses to Requests No. 7-8, 30-31, 33, 104, and 111.)  With respect to the remaining

requests, Defendants objected to producing responsive documents, said they would respond but

claimed there were no responsive documents, or both.  (Ex. 10 (*passim*).)  By October 19, 2012—

almost 10 years after this case was filed, thirteen months after the start of discovery, five weeks

<u>after</u> the only depositions Plaintiffs finally were able take in this case, and one month after the

close of fact discovery—Defendants still had produced <u>nothing</u> in response to Plaintiffs' second

document requests, despite having the documents in hand, and had produced a mere **67 pages**

purportedly in response to Plaintiffs' original document requests.   Defendants, moreover, had

reduced the number of Plaintiffs' second requests to which Defendants agreed to respond to just

<u>one</u>.  On October 21, 2012—more than one month after the close of fact discovery and two days

<u>after</u> Plaintiffs' deadline for identifying their experts—Defendants produced the bulk of the

documents they chose to allow Plaintiffs to see (07:000068-1080),[7] which included hundreds of

pages of documents in Arabic, without English translations.  In addition, on May 10, 2013, after

---

[6]   This is a familiar, albeit foundationless refrain from Defendants that they repeatedly have asserted to
the Court, but on which Defendants have never sought any related relief until now.  (*See, e.g.*, DE 173
at 1-3; DE 191.)  It goes without saying that had Defendants simply abided by their own obligations
to produce responsive documents in the first instance, any supplemental requests from Plaintiffs
would have been served earlier, if at all.

[7]   Ex. 11, Letter from C. McAleer to R. Tolchin, October 21, 2012, producing documents that "may be"
responsive to Plaintiffs' requests and "[t]o the extent applicable . . . shall also be deemed
supplemental disclosures of Defendants pursuant to Rule 26(a)(1) and 26(e)."

again being reminded of their obligations by Plaintiffs (Ex. 12), Defendants produced additional

documents (07:001081-1083).  In the cover correspondence, Defendants agreed to stipulate that

certain documents that Defendants produced in this litigation had come from Defendants' files,

but refused to stipulate to the authenticity of the documents.  (Ex. 13 at 2.)

Defendants to this day continue to withhold material to which Plaintiffs are entitled.

In a letter dated June 17, 2013, Plaintiffs politely made two inquires of Defendants in regard to:

(1) whether Defendants are withholding any documents from the PA General Intelligence

("GIS") Files on privilege grounds, and (2) whether orders related to the Karnei Shomron

mastermind Raed Nazal referenced in a document produced more than a month after discovery

was closed had been produced.  (Ex 14 at 2-3.)  Plaintiffs also asked Defendants to (1) update

their privilege log if Defendants were continuing to withhold documents from the GIS files as

privileged; (2) revisit their document production and comply with a Defendants' obligation to

produce documents in the manner "they are kept in the ordinary course of business," in

accordance with Rule 34; and (3) provide the factual basis for Defendants' contention that

certain records were business records within Rule 33, and to update their production accordingly.

(Ex. 14 at 1-2.)

Despite Defendants' acknowledgment of their continuing obligations under the Federal

Rules just two months earlier,[8] on June 24, 2013, Defendants responded to Plaintiffs' June 17

letter with a pithy, "We received your letter dated June 17, 2013, and respond as follows: Fact

discovery in this case closed over nine months ago, on September 19, 2012."  (DE 270-25.)

Defendants declined to "respond substantively" to Plaintiffs' questions.  *Id.*  If Defendants are

held to their own interpretation of discovery rules and deadlines, then the current motion for

---

[8]    Ex. 15, Letter from C. McAleer to A.D. Lowell, at 2, Apr. 17, 2013 (acknowledging that Defendants
        would comply with the Federal Rules' requirements for supplementation of discovery).

sanctions can be dismissed with a single sentence: "Fact discovery in this case closed over sixteen months ago, on September 19, 2012, and thus Defendants' Motion for Sanctions for alleged discovery violations is Denied."

### 2. Defendants Did Not Make Their First Document Requests Until The Very End Of Fact Discovery

Defendants finally served their first document requests on August 3, 2012.  (DE 270-32.) Not surprisingly, Plaintiffs, as victims of the Karnei Shomron bombing, have few documents in their possession, custody or control beyond material related to Plaintiffs' damages.  Rather, the majority of documents Plaintiffs produced are (1) government documents, including reports prepared by the United States Department of State,[9] (2) Israeli court records, Israeli police records, and records from the Passia Office in Jerusalem,[10] (3) other publicly available documents and material,[11] and (4) documents that were filed in other cases in which Defendants are parties.[12]  The majority of the material produced by Plaintiffs was equally available to Defendants and a good deal of it likely was known to Defendants, already in Defendants' files, or in some instances, under the PA's or PLO's control such that Defendants had an obligation to produce to Plaintiffs some of the very documents Defendants now seek to exclude.

Plaintiffs produced and disclosed third-party documents within a reasonable period of time after they came into their possession and, when applicable, after Plaintiffs recognized such documents might be relied upon during litigation of this matter.  As an initial matter, it should be

---

[9]     *See, e.g.*, Exhibits 50, 51, 52, 53, 54, 55, 56, 57, and 64 to *Plaintiffs' Summary Judgment Opposition.*

[10]    *See, e.g.*, Exhibit 15, 16, 19, 20, 26, 27, 37, 45, 55, 59, 62, 63, 64, 65, 114, 115, 116, 117, 118, 119, 132, and 133 to *Plaintiffs' Summary Judgment Opposition.*

[11]    *See, e.g.*, Exhibit, 91, 120, 121, 122, 123, 124, 125, 135, 136, 137, 138, 139, 140, 141, 142, 143, 142, 144, 145, 146, 150, 167, 168, and 169 to *Plaintiffs' Summary Judgment Opposition.*

[12]    *See, e.g.*, Exhibit, 42, 43, 113, and 131 to *Plaintiffs' Summary Judgment Opposition.*

noted that many of the documents Defendants now seek to strike were produced anew with Bates

numbers after present DC counsel were admitted into the case.  The re-produced documents, now

Bates-numbered Shatsky000001 to Shatsky007227, were provided to Defendants as a courtesy to

them and as a convenience to all parties because the documents earlier had been produced

without Bates numbers.  Ex. 14 at 3; 270-26.  Plaintiffs made an effort to keep Defendants

informed of exactly what they were doing (Ex. 14), but even so, Defendants vehemently noted

their opposition in a June 24, 2013 response to Plaintiffs' letter:  "We . . . reject this late

production . . . whenever it may occur, and we will not treat it as operative or effective in any

respect in this case."  (DE 270-25.)  Having apparently arrogated to themselves the role of

deciding what documents have operative effect in this matter, Defendants did not bother seeking

guidance from the Court or indeed call the Court's attention to their position, either in a separate

motion or in their summary judgment papers.  In fact, they never raised the issue with the Court

at all until this motion.  (DE 270.)

When Plaintiffs re-produced their 7,227 pages of documents on June 17, 2013, they also

produced additional documents pursuant to their ongoing duty to disclose, which included Bates-

stamped copies of documents "that were recently disclosed in the Sokolow case"—another case

involving the same Defendants.  (Ex. 14 at 3.)  Again as a courtesy to Defendants, and although

under no obligation to do so, when Plaintiffs made their July 2, 2013 supplementary disclosures

(Ex. 16), Plaintiffs also provided Defendants a chart detailing exactly what had been produced to

date.

Plaintiffs subsequently made additional disclosures pursuant to their obligations to

supplement.  In each instance, Plaintiffs updated the chart.  (DE 270-27; 270-28.)  On four

occasions October 28, October 29, November 12, and November 19, 2013, Defendants

sometimes wrote lengthy missives to Plaintiffs in regard to Plaintiffs' supplemental productions, asserting that Plaintiffs had an obligation to "indicate the source of documents" and "the date on which the documents came into Plaintiffs' possession, custody or control." (DE 270-29 at 2; *see also* DE 270-29 at 8; DE 270-29 at 10-11; DE 270-29 at 13.)  In each of these letters, Defendants unilaterally proclaimed, "Plaintiffs' purported Rule 26(a)(1) disclosures . . . lack any force or effect in this case."  (DE 270-29 at 5; DE 270-29 at 8; DE 270-29 at 10; *see also* DE 270-29 at 13 ("Plaintiffs' purported disclosures").)  The attitude mimicked that of earlier e-mail communications, in which Defendants unilaterally declared Plaintiffs' disclosures to be of no effect.  (*See, e.g.*, Ex. 17, March 19, 2013 E-mail from C. McAleer to R. Tolchin ("By timing, form and substance, this purported Rule 26(a)(1) disclosure and document production by Plaintiffs is defective and lacks any force or effect in this case. We intend to treat it as such.")  However, despite Plaintiffs' inquiries as to what Defendants meant in the earlier emails when Defendants declared the supplemental disclosures deficient "by timing, form and substance," Defendants did not apprise Plaintiffs that Defendants believed they were entitled to know the source from which Plaintiffs obtained the documents or when Plaintiffs came into possession of the documents, as Defendants began to assert in the letter campaign they embarked upon more than two months after filing their pending Motion for Summary Judgment.

Although Plaintiffs did not, and to this day, do not believe they owed Defendants a lengthy response to Defendants belated complaints (and certainly Defendants had never extended a similar courtesy), Plaintiffs responded on December 12, 2013.  In an effort to pour oil over Defendants' troubled waters, Plaintiffs prepared and provided Defendants with an extensive chart describing Plaintiffs' disclosures in detail.  (DE 270-4.)  The chart, prepared as a courtesy, was meant to assist Defendants in understanding why Plaintiffs disclosures were timely under

the Federal Rules.  That Defendants choose to use it now to argue that Plaintiffs should be

sanctioned shows where the true litigation abuses lie.

### 3. Defendants Claim That Plaintiffs' Interrogatory Responses Were Untimely Is Untrue; Defendants' Interrogatory Responses, On The Other Hand, Actually Are Unverified

Defendants each served interrogatories on August 3, 2012, with the PA serving 17

interrogatories (DE 270-14 at 24-35) and the PLO serving 20 interrogatories (DE 270-14 at 2-

22).  The record reflects Plaintiffs timely serving their objections and answers to Defendants'

respective interrogatories on September 4, 2012.  (Ex. 18, 19.)  Of the total 37 interrogatories

served by Defendants, Plaintiffs objected to eight interrogatories outright for multiple reasons

including that the information sought was protected by attorney/client privilege or sought

information relating only to the Syrian defendants, which had long ago been dismissed from this

case.  Where the interrogatory and corresponding objection involved materials related to the

Syrian entities and persons that are no longer defendants in this case, the objection noted "as a

matter of law, the conduct of the Syrian Defendants is not relevant to, and cannot derogate, from

the conduct and liability of the instant Defendants . . . ."  (*See, e.g.,* Ex. 18 at No. 11.)  With the

exception of the eight interrogatories to which Plaintiffs outright objected, including on the basis

of attorney-client privilege, Plaintiffs' remaining objections included a caveat (which Defendants

themselves had employed in responding to Plaintiffs' discovery requests) that the interrogatory

would be answered "if it were modified to address" Plaintiffs' objections. (*See* Ex. 18, Ex. 19.)

Defendants never modified their interrogatories in response to Plaintiffs' objections.

Plaintiffs served interrogatories on Defendants on March 26, 2012.  (Ex. 20.)  Defendants

responded on April 30, 2012.  (Ex. 21.)  Defendants served supplemental objections and answers

to Plaintiffs' first interrogatories on May 31, 2012.  (Ex. 22.)  Plaintiffs served supplemental

interrogatories on August 20, 2012, the answers to which were again signed by Defendants'

counsel.  (Ex. 23.)  In each instance, Defendants' answers were unverified in violation of Federal

Rule 33(b)(3).

**D.** **Defendants' Deposition Strategy Was To Prevent Plaintiffs From Taking Any Depositions For As Long As Possible, Including Forever**

      **1.** **Defendants Noticed Plaintiffs' Depositions 46 Weeks Into Discovery**

In Defendants' motion for sanctions (DE 270-1), Defendants make a number of

unfounded allegations against Plaintiffs, but are remarkably silent as to their own behavior.  Yet,

in keeping with their recalcitrance in taking part in discovery, Defendants did nothing with

respect to serving their own document requests, interrogatories, or deposition notices until

August 3, 2012, just six weeks before the close of fact discovery.  (Ex. 24.)  It was not until that

date that Defendants noticed the depositions of all ten Plaintiffs, with the notice calling for them

to appear in Washington D.C. between the dates of August 27 and 31, 2012.  (Ex. 24.)

Defendants had known of Plaintiffs for ten years, and easily could have noticed these depositions

in a timely manner that would have allowed Plaintiffs the time needed to make arrangements to

travel from Israel to DC.  More importantly, Defendants could have been accommodating.  Their

own brief shows that they noticed the Plaintiffs' depositions for August 27-31 in Washington,

D.C. but Defendants were going to be in the Middle East "to prepare for and defend numerous

depositions. . . during the first two weeks of September 2012."  (DE 270-1 at 19.)  Had

Defendants noticed the Plaintiffs' depositions sooner, as they had ample time to do, or tried to

work out an arrangement with Plaintiffs, those depositions could have been taken before the

close of fact discovery.

      On August 24, 2012, Plaintiffs moved for an order directing that depositions of Plaintiffs

would take place in Israel because five of the ten Plaintiffs to be deposed could not travel to the

United States for medical and/or family reasons (DE 164), which was denied by Minute Order on December 8, 2012.  Despite intentionally noticing Plaintiffs' depositions at the last moment, Defendants were granted an enlargement of fact discovery to February 14, 2013 to take the depositions of Plaintiffs in Washington, D.C.  (DE 236,  Dec. 7, 2012 Hrg. Tr. at 44:22-45:2.)

> **2.     Plaintiffs Noticed Defendants' Depositions Timely, But Were Delayed Repeatedly By Defendants' Recalcitrance And Multiple Motions For Protective Orders.**

While there are many egregious statements in Defendants' motion papers (DE 270-1), one that particularly requires the Court's attention is Defendants' false assertion that Defendants had "repeatedly offered to provide witness testimony," which Defendants follow with a number of citations to the record.  (DE 270-1 at 14 (citing DE 141,142, 151, 159, 160, 161, 163.) Remarkably, none of the proffered citations supports Defendants' assertion that they were generous with their witnesses.  DE 141, for example, is Plaintiffs' response to Defendants' motion for a protective order; DE 142 is Defendants' withdrawal of a protective order motion as moot; DE 151 is Defendants' motion for a protective order; DE 159, 160, and 161 are motions to quash Plaintiffs' deposition notices; and DE 163 is a motion seeking to reschedule the elusive Mr. Malouh.  Defendants use this faux authority to support Defendants' spin on Plaintiffs' efforts to schedule depositions (i.e., that Plaintiffs had taken *zero* depositions), which, as with much of the rest of Defendants' allegations, bears little resemblance to reality.[13]

---

[13]    Defendants' opposition to Plaintiffs' November 2, 2012 motion to compel documents (DE 171) also beats a steady refrain of claiming that Plaintiffs had manufactured discovery disputes in order to prolong discovery (apparently notwithstanding Defendants' utter failure to make any meaningful production that would have permitted Plaintiffs to proceed.)  Despite it being illogical and nonsensical given Plaintiffs' desire to resolve this case, this same refrain is heard in each of Defendants' oppositions to Plaintiffs' motions to compel.

Once a discovery schedule was set, Plaintiffs wasted no time in preparing to take depositions. Despite Defendants' efforts to stonewall, Defendants claim now (with zero evidence) that Plaintiffs' "strategy seemed designed to ensure no depositions would occur during the fact discovery period." (De 270-1 at 13.) The devil is in the details, however, and the details show that Defendants did everything possible to keep Plaintiffs from taking depositions.

Shortly after discovery began, Plaintiffs went through the necessary procedures to obtain Letters of Request pursuant to the Hague Convention, and to obtain an order appointing certain individuals as commissioners authorized to take oaths and record deposition testimony outside the United States pursuant to Fed. R. Civ. P. 28(b)(1)(D), in order to take the deposition of Ahmed Sa'adat Yousuf Abdel Rasoul ("Ahmed Sa'adat"), the terrorist leader of the PFLP who was serving a lengthy prison term in Israel (DE 137). These motions were referred to Magistrate Judge Kay, who granted the motion for Issuance of Letters of Request on January 10, 2012. (DE 145.) The Letter of Request for the taking of the Sa'adat deposition was issued on January 12, 2012. (DE 147.)

On October 6, 2011, Plaintiffs noticed the deposition of Abdel Rahim Malouh, a member of the PLO's executive committee and then Deputy Secretary-General of the PFLP. Defendants moved to quash the notice and for a protective order on October 26, 2011, averring that Mr. Malouh would be unavailable at the time and place noticed. (DE 139.) Defendants also argued that were the deposition to proceed, it should be limited in scope to Mr. Malouh's knowledge in his official capacity as a member of the PLO. (DE 139.) Plaintiffs served an amended notice on November 18, 2011, setting the date for Mr. Malouh's deposition as December 12, 2011, at a location to be selected by the PLO. Defendants immediately refused to accommodate Plaintiffs' amended notice, arguing, in part, that it did not fit their schedule. (Ex. 25.) In light of

18

Defendants refusal to produce Mr. Malouh, Plaintiffs withdrew their amended notice, and

Defendants subsequently withdrew their motion for a protective order.  (DE 142.)

On February 1, 2012, Plaintiffs notified Defendants that the "Hague Convention request

for the deposition of the [imprisoned] Ahmed Sa'adat" had "been delivered to the Israeli

Directorate of Courts," and that Plaintiffs hoped it would be executed shortly."  (Ex. 26.)  The

same e-mail went on to say:

> In the meanwhile there are a number topics on which we would
> like to conduct Rule 30(b)(6) depositions of the PA and PLO. I
> believe it would be useful for me to send you the list of topics, and
> for us to then confer about the timing and locations of the
> depositions, to see whether we can reach full or at least partial
> agreement on those issues, before I serve deposition notices.
> Would that method of proceeding be agreeable to you?

*Id.*  Plaintiffs subsequently confirmed the list of topics on which Plaintiffs intended to depose

Defendants' Rule 30(b)(6) witnesses.  (Ex. 27.)  On March 9, 2012, Plaintiffs served *Plaintiffs'*

*First Notice of Taking Depositions pursuant to Fed.R.Civ.P. 30(b)(6)*, which Plaintiffs amended

on March 27, 2012.

On April 2, 2012, Plaintiffs renewed their notice of the taking of the deposition of Mr.

Malouh.  (Ex. 28.)  Defendants moved for a protective order, asking that the deposition of Mr.

Malouh be bifurcated with the examination regarding Mr. Malouh's knowledge or actions in his

capacity as a member of the PLO Executive Committee occurring separately from the

examination regarding his knowledge or actions in any other relevant capacities, including his

capacity as Deputy Secretary-General of the PFLP.  (DE 151 at 2.)  The Court granted

Defendants' motion on July 30, 2012.  (DE 162.)

Because Plaintiffs were going to take their depositions overseas, it became important to

resolve a dispute between the parties as to whether U.S. rules would apply.  On April 6, 2012,

Plaintiffs filed a motion seeking the Court's assistance in ensuring depositions conducted under the Hague Convention would apply United States-rules for attorney conduct at depositions in order to preclude speaking objections, signaling, etc. and that the Rule 30(a)(2)(A)(ii) limitation would not apply as to Defendants in this action.  (DE 148.)  In their response papers, Defendants posited that (1) the procedural rules of the state executing the Letters Rogatory under the Hague Convention (in this case, Israel) govern the taking of depositions.  (DE 150 at 2.)  Defendants also sought to establish that Plaintiffs were limited to serving a single Rule 30(b)(6) notice to the PLO pursuant to Rule 30(a)(2)(A)(ii), and a single Rule 30(b)(6) notice to the PA without further leave of Court.  (DE 150 at 4.)  The Court denied Plaintiffs' motion on May 7, 2012 by Minute Order.

Given the questions that had been put before the Court, Plaintiffs read the Court's Minute Order to mean that they could issue only one deposition notice to the PA and one notice to the PLO without further leave of Court.  Plaintiffs therefore withdrew their existing notices, which had been served on the assumption that Plaintiffs would be able to serve supplemental notices as the facts developed, and prepared to serve their sole and final Rule 30(b)(6) deposition notice to each Defendant.  Plaintiffs subsequently noticed the depositions of Sami Ramlawi, Tayseer Qaba and Shaher Ali Al-Rai, which Defendants quickly moved to quash on the grounds that the individuals noticed were not employees of the PA or PLO.  (DE 159, 161, 160.)  The Court granted Defendants motions by Minute Order on August 28, 2012.

Plaintiffs again noticed the deposition of Mr. Malouh, setting the deposition for August 15, 2012, and, on August 2, 2012, Plaintiffs served an amended notice, setting the Rule 30(b)(6) depositions for August 16, 2012 in Jerusalem.  On August 7, 2012, Defendants moved to reschedule the depositions of Mr. Malouh and of Defendants' 30(b)(6) designees  so as to

exclude Ramadan, which ran from July 19, 2012 to August 19, 2012.  (DE 163.)  The Court

granted Defendants motion by Minute Order on August 28, 2012.

The depositions of Mr. Malouh, Mr. Sa'adat, and Defendants' Rule 30(b)(6) designees

finally took place between September 5 and September 12, 2012.[14]  Yet even then, Defendants

hampered Plaintiffs in their ability to prepare their case.  First, Defendants did not present a

30(b)(6) witness on many of the noticed topics.  Second, by September 2012, Defendants still

only had produced a mere 50 pages of documents in "response" to Plaintiffs' document requests

and Defendants' own Rule 26 obligations.  Third, because Defendants had fought Plaintiffs at

every turn, and excluded both the month of March 2012 and Ramadan from the period during

which depositions could occur, Plaintiffs depositions were not allowed to take place until very

late in the discovery period.  As a result, Plaintiffs were blocked from conducting any follow-up

discovery based on the depositions prior to the close of fact discovery.  And because Defendants

waited until the very last day of fact discovery to disclose five witnesses who had information

that Defendants may use to support their defense—Major General Majed Faraj, Hisham Jarrar,

Mahmoud Noful, Iyad al-Aqra, and Brigadier General Azzam Zakarneh—Plaintiffs were unable

to depose them, or to seek document discovery relating to these potential witnesses.[15]

### E.  **Defendants Rely On Fully Litigated Claims As A Basis For Sanctions, Which Only Serves To Underscore The Frivolousness Of This Motion**

In addition to the frivolous allegations set out above, Defendants request sanctions

against Plaintiffs based on allegations or events that have already been before the Court:

---

[14]   Abdel Rahim Malouh finally was deposed on September 5, 2012; Jawad Amawi was deposed on September 6, 2012; Ahmed Sa'adat was deposed on September 9, 2012; Raed Taha Mahmud Amayra was deposed on September 10, 2012; Nadime Al-Barahme was deposed on September 11, 2012; and Yasser Shaqbu' and Ibrahim Dahbour were deposed on September 12, 2012.

[15]   Ex. 23, Defendants' Objections and Answers to Plaintiffs' Second Set of Interrogatories (Nos. 2-12) at 18-19.  Defendants served their Objections and Responses to Plaintiffs' Second Request to Produce Documents and Things (Nos. 1 to 111) on the same day.  Ex. 10.

(1) Plaintiffs' expert report submissions; (2) Plaintiffs' timely-served subpoena to the Arab Bank seeking documents relevant to this case; (3) Plaintiffs' discovery motions; and (4) Defendants demand for the return of a responsive document that they never logged as privileged.

Having already successfully moved to have the testimony of Plaintiffs' experts struck due to Plaintiffs' untimely expert disclosures, Defendants now ask the Court to impose further sanctions on Plaintiffs, including a new order prohibiting Plaintiffs from relying upon any third-party material referenced by the excluded liability experts in their reports. The Court already imposed what it believed to be an appropriate sanction. If Defendants believed sanctions were warranted beyond the striking of Plaintiffs' expert testimony, they should have made that argument in their February 2013 motion for sanctions.

Similarly, Defendants apparently seek sanctions based on Plaintiffs' attempt to obtain discovery from the Arab Bank through a timely-served subpoena. Defendants have, however, already raised this issue before the Court and obtained the requested relief – Plaintiffs were prohibited from obtaining the third-party documents. Defendants should not now be permitted to go back to the Court for further relief.

As for Plaintiffs' various discovery motions, those motions were filed during the time surrounding Defendants' October 19, 2012 production. The impetus for Plaintiffs' motions was Defendants' dilatory behavior, which is detailed at length in the preceding pages. Plaintiffs' individual (and omnibus) motions sought the Court's assistance in obtaining documents Defendants had failed to produce (and which testimony of Defendants' designated 30(b)(6) deponents and Defendants' sparse document production indicated existed) and in reaching (or precluding) witnesses that Defendants had not identified until the very end of discovery, among other issues. (DE 168, 169, 172, 175, 181, 197, 202.) Although the Court ultimately denied

Plaintiffs' discovery motions, each had a sound basis.  Plaintiffs also had a sound basis to dispute Defendants' assertion of privilege over a document that had never been logged as such, and which was favorable to Plaintiffs.  While Defendants have chosen inflammatory language to describe Plaintiffs' positions in these disputes, Plaintiffs did not act improperly or with vexatious intent.

The majority of Plaintiff's motions for which Defendants now seek sanctions were filed and decided before Defendants' February 2013 motion for sanctions, and any concerns Defendants had with Plaintiffs' efforts as respects the Arab Bank would have already been known to Defendants.  (DE 228.)  Yet, other than a passing (inaccurate) reference to Defendants' supposed (and unfounded) concern about Plaintiffs' interrogatory responses being untimely, Defendants did not reference any of the purported "concerns" raised here in their February 2013 sanctions motion.  They should not be permitted to do so now.

## ARGUMENT

As this Court noted last year: "[W]hat we have here is too little cooperation and collaboration and too much obfuscation and fighting."  (DE 236, Dec. 7, 2012 Hrg. Tr. 4:15-16.) It is plain from a review of the full record in this case that Defendants, in filing the instant motion for sanctions, have not taken the Court's admonition to heart.

Nothing Plaintiffs or their prior or current counsel are alleged to have done rises to the level warranting the sanctions sought by Defendants—sanctions that effectively would result in a dismissal of Plaintiffs' claims.  Indeed, most of the "concerns" raised by Defendants either have been fully litigated or are well-past their expiration dates as they were not brought to the Court's attention in anything close to a timely manner.  Moreover, even taking Defendants' allegations as true, Defendants show no pattern of discovery violations or abuses by Plaintiffs.  Most

significantly, when the many layers of aspersions against Plaintiffs' past and current counsel and the misplaced innuendo and untimely complaints about Plaintiffs' responses to Defendants' written requests are peeled away, the Court will find that Defendants have not cited a single violation of any Court order or rule much less a violation that has in any way prejudiced Defendants.  If  Plaintiffs are guilty of anything, it is of  having exceeded the disclosure obligations mandated by the discovery rules.

A mere cursory glance at the list of documents that are the subject of Plaintiffs' supplemental disclosures will reveal that the material disclosed was not created by or in Plaintiffs' control but instead came from the public domain and was equally accessible to Defendants (and in several cases more accessible or even already in Defendants' possession).  As such, it is not clear that Plaintiffs had any duty to produce the documents at all.  However, out of an abundance of caution, when Plaintiffs identified documents they would likely rely upon in presenting their case or in defending against affirmative defenses asserted by Defendants, Plaintiffs made supplemental disclosures.  In so doing, Plaintiffs faithfully honored the spirit of Rule 26(a) and the duty to supplement initial disclosures even though the letter of the rule does not necessarily dictate such disclosure for material outside of Plaintiffs' control.

That Defendants have invested so much time and expense in an attempt to convince the Court that Plaintiffs' "over-compliance" with discovery obligations should be sanctioned exposes Defendants' complete lack of confidence in the pending Motion for Summary Judgment and reveals the extraordinary lengths Defendants are willing to go to prevent the hearing on the merits Defendants so vigorously sought when Defendants' goal was to convince this Court to vacate the earlier entry of default.

## I.     Neither The Facts Nor The Law Support Granting Sanctions Against Plaintiffs

No basis exists for granting Defendants' motion for sanctions.  Moreover, where, as here, a requested sanction effectively would result in a dismissal or judgment against the sanctioned party, the "justification for [the sanction] must be comparatively more robust" than what is required for other sanctions.  *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 79 (1st Cir. 2009).  There is no justification, robust or otherwise, for the sanctions Defendants request.

Defendants allege Plaintiffs "violated" the Court's Scheduling Order (DE 136) and subsequent orders by supplementing Plaintiffs' document production and disclosures (DE 270-1 at 29.)  Defendants, however, fail to reference that (1) before Plaintiffs' obligation to produce a document arises, Plaintiffs must have control over the document, and (2) Plaintiffs have an on-going Rule 26(e) supplementation obligation that does not end when fact discovery ends.  These discovery maxims reflect the reality that Plaintiffs' supplemental productions violated no Orders of this Court.

As a factual matter, Plaintiffs did not have in their possession, custody or control extensive documents relating to Defendants' liability.  Nor did Plaintiffs generate or create *any* documents relating to Defendants' liability.  Rather, the documents in this case relevant to Defendants' liability came from Defendants' modest productions (a most generous characterization) or were gathered by Plaintiffs from third-party sources or archives and databases as the case progressed and as the issues in the case developed.  Because Defendants could have pursued documents from these same third-party sources, Plaintiffs were not obligated to disclose such material in response to Rule 34 document requests.  A party should not be compelled to produce documents or information that are a matter of public record to the extent that the party seeking the discovery may obtain the information themselves.  *See Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd*., 242 F.R.D. 1, 5 (D.D.C. 2007) ("Typically, courts

25

do not order discovery of public records which are equally accessible to all parties.") (citation omitted); *see also Fitts v. Unum Life Ins. Co.,* 98-00617(HHK), 2007 WL 1334974, at *19 (D.D.C. May 7, 2007) ("It is 'well-established that discovery need not be required of documents of public record which are equally accessible to all parties.'") (citing *Dushkin Publ'g Group, Inc. v. Kinko's Service Corp.,* 136 F.R.D. 334, 335 (D.D.C. 1991)); *ISP Chemicals LLC v. Dutchland, Inc.,* No. 5:08-CV-153, 2011 WL 2651241, at *4-5 (W.D. Ky. July 6, 2011) (where defendants argued plaintiff failed to disclose at all a document in its possession, the court concluded plaintiff had no obligation to disclose the document because it was "public record and was available to both parties" and "[d]iscovery need not be required of documents of public record which are equally accessible to all parties") (citations omitted); *Am. Needle, Inc. v. New Orleans,* No. 04 c 7806, 2012 WL 4327395, at *8 (N.D. Ill. Aug. 17, 2012) ("Defendants need not produce documents that are a matter of public record."); *Krause v. Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.,* 425 F. Supp. 2d 352, 374-75 (W.D.N.Y. 2006) (affirming a Magistrate Judge's decision, which stated: "It is well established that discovery need not be required of documents of public record which are equally accessible to all parties.") (citation omitted); *Averyt v. Wal-Mart Stores, Inc.,* 265 P.3d 456, 460 (Colo. 2011) ("discovery not required for public documents that are publicly available to all parties") (citation omitted).

Not only do Defendants fail to establish that the material disclosed by Plaintiffs in their supplemental disclosures qualified as material in Plaintiffs possession, custody and control so as to make the material properly the subject of a Rule 34 request and a Court's order to compel production, but Defendants also neglect to acknowledge that many of Plaintiffs' allegedly untimely disclosures were of documents well known to Defendant.  Moreover, a review of the supplemental disclosures suggest that many of the documents should have been produced by

Defendants themselves as the material would have been responsive to Plaintiffs' discovery requests and Defendants clearly were in possession of such material or had the means of asserting control over the material in a manner that Plaintiffs could not despite the public nature of the information.  For example, the PLO Commitment Compliance Act ("PLOCCA") Reports attached as exhibits 50, 53, and 54 to Plaintiffs' summary judgment opposition are reports issued by the United States Department of State in accordance with Title VIII of Public Law 101-246 (the PLO Commitments Compliance Act of 1989 - PLOCCA), as amended.  These documents are key to Defendants' status *vis-à-vis* the United States.  The documents therefore are ones of which Defendants would have been painfully aware since the time the documents were released, and are ones Defendants likely had in their possession when Plaintiffs made their document requests.  To the extent that the PLOCCA reports issued during the Second Intifada (or material discussing these PLOCCA reports) were in Defendants' possession, it is difficult to understand how such material was not responsive to Plaintiffs' document requests.  Similarly, a number of Plaintiffs' supplemental disclosures are video clips of Mohammed Dahlan, former head of the PA Preventive Security Forces, commenting on the number of martyrs that were members of the Preventive Security Forces and on Arafat's duplicitous positions meant to hide the fact that the PA continued to support terrorist activity.  Again, it is difficult to understand how Defendants' failure to produce such material in response to Plaintiffs' document requests is not a discovery violation.  Faced with Defendants' refusal to produce the material, Plaintiffs gathered the material and disclosed it themselves.

Exhibits 31, 42, 43, 113 and 131 to Plaintiffs' summary judgment opposition filing are testimony given and documents exchanged in other cases (the *Gilmore* and *Goldman* cases)—cases to which Defendants are parties but Plaintiffs are not.  Exhibits 42 and 43 are transcripts of

testimony of Palestinian Authority witnesses in the *Goldman* case.  Additionally Exhibits 31 and 113 were produced *to* Defendants in *Gilmore* and Exhibit 131 is a document produced *by* Defendants in *Gilmore*.  The testimony and documents comprising these exhibits plainly were in the hands of Defendants well before Plaintiffs even had access to them.  Moreover, Exhibit 31 is a May 2004 decision handed down by the Tel Aviv District Court and therefore was publicly available.  In sum, Defendants simply cannot be said to have been prejudiced by the timing of Plaintiffs' disclosure of these exhibits.

Because certain of Plaintiffs' counsel are also counsel for parties adverse to Defendants in these other actions, Defendants make the disingenuous argument that the material was in possession of Plaintiffs' counsel and therefore in possession of Plaintiffs.  To argue such is to suggest that Plaintiffs' are obligated to rifle the files of Plaintiffs' attorneys' *other* clients in order to find documents that might be relevant to Plaintiffs' case.  That certainly has never been the rule.  *See Hickman v. Taylor*, 329 U.S. 495, 504 (1947) (noting that an "order could not have been entered as to [attorney] since Rule 34, like Rule 33, is limited to parties to the proceeding, thereby *excluding* their counsel or agents") (emphasis added); *see also Vieiera v. Woodford*, 258 Fed. App'x 924 (9th Cir. 2007) (recognizing that Rule 34 permits discovery from a party only); *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 416 (9th Cir. 1985) (same).  Such conduct, moreover, would constitute a violation of counsel's duty of confidentiality owed to counsel's other clients and might result in the breach of the attorney-client privilege.

## A.  Plaintiffs Should Not Be Subject To Sanctions Under Rule 16(f)(1)(c) As They Have Not Disobeyed An Order

Rule 16(f)(1)(c) allows for sanctions where a party or an attorney "fails to obey a scheduling or other pretrial order."  Contrary to Defendants' assertions, Plaintiffs have not failed to obey the Court's orders.  The first Court order Defendants suggest Plaintiffs have failed to

obey by making supplemental disclosures is the Scheduling Order cutting off fact discovery on

September 19, 2012.  For all the reasons discussed above, this contention has no merit.

Defendants also appear to be arguing that Plaintiffs have violated this Court's Order (DE

242) excluding the testimony of Plaintiffs' liability experts by using independent material

referenced in or attached to the liability expert reports (DE 270-1 at 40-41).  In granting

Defendants' motion for sanctions based on the timing of Plaintiffs' expert reports, the Court

ordered that Plaintiffs' expert "*testimony*" be excluded.  (DE 242.)  The Court's Order did not

address or effect the exclusion of the independently admissible documents the experts referenced

in and/or appended to their reports. Therefore, the issue with respect to these documents is not

whether they should be stricken as being offered in violation of the Court's order excluding

testimony by Plaintiffs' experts, but rather whether Plaintiffs disclosed the documents to

Defendants in a timely manner.

Rule 26(a) only requires supplementation if the document "has not otherwise been made

known to the other part[y]."  At the latest,[16] Defendants were given notice of the potential

relevance of the material upon receipt of the expert reports on February 14, 2013.  Having been

made aware of the documents by the documents references in or attached to the reports prepared

by the liability experts, Plaintiffs had no further disclosure obligation.  Nonetheless, for the ease

of reference and out of an abundance of caution, Plaintiffs assembled the documents, Bates-

labeled them, and provided them to Defendants.  Once again, Defendants seek to have Plaintiffs

---

[16]   Much of the material referenced in the expert reports and made the subject of later supplemental
disclosures not only came into Defendants' possession during the course of other ATA litigation, but
again falls within the category of material that while publicly available to one who ensues an
appropriate investigation, is more easily attained by Defendants themselves because, for example, the
material relates to statements made by leaders within the PA or PLO.  As such, Defendants should
have produced the material in response to Plaintiffs document requests.

sanctioned for Plaintiffs' good faith efforts to make sure the parties were operating with a clearly labeled set of material.

### B.  Plaintiffs Should Not Be Subject To Rule 37 Sanctions Because Defendants Have Suffered No Harm

Defendants' argument that sanctions are warranted under Fed. R. Civ. P. 37 similarly is without merit.  Rule 37 allows for sanctions where a party has failed "to provide information or identify a witness as required by Rule 26(a) or (e), . . . unless the failure was substantially justified or is harmless," Fed. R. Civ. P. 37(c)(1), or  has "fail[ed] to serve answers, objections or written response" to Rule 33 interrogatories or Rule 34 requests for production.  Fed. R. Civ. P. 37(d)(1)(a)(ii).

Plaintiffs did not fail to respond to interrogatories or Rule 34 requests.  *See In re Miller,* No. 96-00431, 2009 WL 4730755, at *5 (Bankr. D.D.C. Dec. 3, 2009) (Rule 37(d) applies where a party "utterly fails" to serve answers, objections or written responses, not when a party's answers fail to satisfy the opposing party), *appeal dismissed by*, 891 F. Supp. 2d 8 (D.D.C. 2012), *aff'd*, No. 12-7113, 2013 WL 1187408 (D.C. Cir. Mar. 12, 2013).  Plaintiffs objected to the Defendants interrogatories as improper and invited Defendants to modify the interrogatories to make it possible for Plaintiffs to respond.  To grant sanctions in such a situation would in effect reward Defendants for propounding a blatantly improper and overly broad discovery request and then refusing to amend that request when Plaintiffs offered to respond to a properly modified request.

Additionally, Defendants' argument that Plaintiffs' supplemental disclosures were untimely is without merit.  (DE 270-1 at 30-32.)  Rule 26(e)(1) "requires supplementation if information later acquired would have been subject to the disclosure requirement.  As case preparation continues, a party must supplement its disclosures when it determines that it may use

30

a witness or document that it did not previously intend to use."  Fed. R. Civ. P. 26(a) advisory committee's note on Subdivision (a)(1) to 2000 Amendment.  "The duty to supplement continues even after the discovery period has closed."  *Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011) (emphasis added).  Supplementation "need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness as the trial date approaches."  Fed. R. Civ. P. 26(e) advisory committee's note to 1993 Amendments.  Accordingly, documents produced by a party after the close of discovery and after the opposing party has filed a motion for summary judgment are timely disclosed where the disclosing party "sought out and produced the records as soon as it learned that those records were at issue."  *EEOC v. Burlington Northern & Santa Fe Ry. Co.*, No. 07-2450 Ma/P, 2009 WL 1531019, at *2 (W.D. Tenn. May 26, 2009).

Defendants cannot, moreover, show that the timing of Plaintiffs' disclosures was unjustified or that Defendants suffered harm as a result thereof.  In determining whether to impose a discovery sanction, a court considers prejudice to the other party.  *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996).  If, as here, a party "fail[s] to specifically identify any prejudice emanating from the timing of [the opposing party's] disclosure[s]," then it leads to the conclusion that the timing of the productions was "harmless."  *Am. Prop. Constr. Co. v. Sprenger Lang Found.*, 274 F.R.D. 1, 6 (D.D.C. 2011) (denying sanctions because the movant failed to show it was harmed by its opponents' late disclosures).  Plaintiffs rely on no "surprise" documents in this matter.  Plaintiffs noticed no "surprise" witnesses.  Furthermore, Defendants' complaint about the proffer of Israeli policeman Jamal Shaquor is disingenuous.  Officer Shaquor has been designated solely to authenticate documents and explain why they qualify as business records.  He has not been designated to provide any substantive testimony.

31

Furthermore, neither Mr. Tolchin's Declaration nor any of Plaintiffs' exhibits could have caused even the slightest hiccup in Defendants' litigation strategy.  As set out above, many of the documents Defendants now seek to strike are documents that were in fact produced by Defendants in other cases or *should have been produced by Defendants* in response to Plaintiffs' discovery requests.

Defendants have tried to package everything they perceive as an issue, no matter how stale, into one neat bundle for the Court in the hopes of winning the Court's favor with respect to this motion.  Even after collecting every purported late production or perceived slight for the purposes of this motion, however, Defendants cannot show that anything Plaintiffs are alleged to have done (or not done) prejudiced Defendants or harmed Defendants in any way.

### C.   To Warrant Sanctions Based On The Court's Inherent Authority Plaintiffs Must Have Acted In Bad Faith, Vexatiously, Wantonly, Or For Oppressive Reasons, None Of Which Applies

The Court has inherent authority to sanction a party where there is evidence that the "party or attorney has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Revson v. Cinque & Cinque*, 221 F.3d 71, 78 (2d Cir. 2000) (citation and quotation marks omitted).  "An award of sanctions under the court's inherent power, requires <u>clear evidence</u> that the challenged actions are *entirely without color*" and that the actions were taken "for reasons of harassment or delay or for other improper purposes." *Id*. (emphasis added).  In this case mistakes have been made on both sides.  But it is plain from a review of the full record in this case that neither Plaintiffs nor their counsel have acted in bad faith, vexatiously, wantonly, for oppressive reasons or for any improper purpose.  Plaintiffs' counsel have done nothing but vigorously represent their clients within the bounds of the law.[17]  If anyone is guilty of bad faith

---

[17]   Plaintiffs were not employing litigation tactics meant to harass or be vexatious when it filed its series of motions to compel.  Rather, Plaintiffs were responding to legitimate questions raised by testimony

or vexatious or wanton misconduct, it is Defendants and their counsel.  Defendants began this

action by flouting the jurisdiction of the Court and purposefully defaulting.  Since Defendants

succeeded in obtaining vacatur of the default, Defendants have focused all their efforts on

avoiding discovery obligations, repeatedly delaying depositions noticed by Plaintiffs, refusing to

produce 90% of Defendants' document discovery until two days *after* Plaintiffs' expert reports

were due, identifying crucial witnesses on the last day of fact discovery and providing crucial

witness documents *in Arabic without English translations* the day before depositions.  The Court

should deny Defendants' motion and instead take notice of Defendants' hypocrisy in bringing

the motion in light of Defendants' massive misconduct and discovery deficiencies.

## II.   **Defendants' Motion For Sanctions Is Improper And Untimely**

If Defendants' allegations were true—which they are not—Defendants' motion would

nevertheless fail as untimely because Defendants did not seek relief without "unreasonable

delay."  *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994).  The timeliness of a motion for

sanctions depends on factors such as when the moving party learned of the discovery violation,

how long the moving party waited before bringing the issue to the court's attention, and

prejudice to the moving party.  *Kelley Foods of Alabama*, *Inc. v. Myers Nissi & Co.*, *Inc.*,

1:04cv1246-MHT, 2006 WL 2290835, at *3 (M.D. Ala. Aug. 9, 2003) (waiting over a year to

object to a plaintiffs' tardiness makes the "objection . . . itself untimely").  Defendants easily

could and, if warranted, should have brought their motion a long time ago.  An example of

Defendants' unwarranted delay is found in the three full pages Defendants spend arguing "there

---

of Defense witnesses or documents produced by Defendants.  For example, witness Ibrahim Dahbour testified to having reviewed complete (and in the case of Ra'ed Nazaal, voluminous) files on Ra'ed Nazaal and Hafez the day before he was deposed.  Material fitting such a description was neither produced nor logged by Defendants, and thus Plaintiffs made a motion to compel.  Similarly, Defendants logged as privileged a document that was later described by the Defense witness as not being privileged at all.  Under such circumstances, Plaintiffs decision to pursue production of such a document cannot be said to have been made in bad faith.

is no evidence that Plaintiffs served any objections or responses [to Defendants' interrogatory requests] on or before September 4, 2012." (DE 270-1 at 15-18.) If Defendants believed this allegation, and thought it somehow warranted the exclusion of any supplemental disclosure, they could and should have brought such to the Court's attention during the fact discovery period. Defendants also have had numerous other opportunities to seek relief since the close of discovery and, based on Defendants' own arguments, Defendants should have identified any purported issue on which it wanted relief when the Court addressed, *inter alia*, discovery issues during the December 7, 2012 status conference. (DE 236.) That Defendants did not move within the discovery period alone should bar Defendants from arguing now that Plaintiffs objections were insufficient.[18]

### III. There Is No Basis To Strike Mr. Tolchin's Declaration Or Any Of Plaintiffs' Exhibits

Defendants have no basis for asking this Court to strike Robert Tolchin's declaration or any of the accompanying exhibits. Mr. Tolchin's declaration serves a limited purpose, which is to inform the Court that, as counsel, Mr. Tolchin can affirm that certain documents written in Hebrew have been accurately translated. The declaration also sets forth the manner in which certain evidence identified in the declaration will be admissible at trial, in some instances through an individual whose sole purpose will be to authenticate the document, which is permitted.[19] *Cf. Akers v. Beal Bank*, 845 F. Supp. 2d 238, 243 (D.D.C.) (party must "show that

---

[18] Defendants did not precede its motion for alleged discovery violations with a motion to compel. That fact alone justifies denying a motion for sanctions. *Shareef v. Donahoe*, No. 3:11-CV-615-DCK, 2013 WL 4502174, at *7 (W.D.N.C. Aug. 22, 2013) (finding that plaintiff's allegations of discovery-based misconduct were untimely and noting that plaintiff "ha[d] essentially short-circuited the usual procedure by moving for sanctions without properly objecting and/or first moving to compel") (*appeal dismissed by*, 2013 WL 5647844 (4th Cir. Oct. 17, 2013)).

[19] Mr. Tolchin's declaration is not the first time Defendants were made aware that Plaintiffs intended to enlist an authenticating witness from the Israeli Police Department. Plaintiffs alerted Defendants to

the material is admissible as presented or [] explain the admissible form that is anticipated"),

*aff'd*, No. 12-7045, 2012 WL 4774676 (D.C. Cir. Oct. 2, 2012). An attorney may serve in this

role and make a declaration regarding the case on which he is counsel of record without such

action rendering him a witness on the case. *See*, *e.g.*, *Convertino v. U.S. Dept. of Justice*, 684

F.3d 93, 100 (D.C. Cir. 2012) (allowing a declaration where counsel "outlined the particular

facts [plaintiff] hoped to discover and why those facts were necessary to his claim," and

described why the plaintiff "could not produce the facts in opposition to" the defendant's

summary judgment motion) (punctuation and citation omitted).

　　Defendants move to strike Mr. Tolchin's declaration based on Defendants' assertions as

to the timeliness of Plaintiffs' responses to Defendants' interrogatories and document requests

and of Plaintiffs' Rule 26 disclosures. As set out above, Defendants' assertions that Plaintiffs

responses to interrogatories and document requests were untimely is unsupported by the record.

Had this been a true issue, Defendants had ample time between September 4, 2012 and the close

of fact discovery to seek the Court's aid. But Defendants did not. To the extent Defendants now

contend Plaintiffs' interrogatory and document responses were inadequate, that complaint is

something that should have been raised at a much earlier date than the present.

　　Plaintiffs also timely served their Rule 26 disclosures and timely produced and disclosed

documents. There is no basis on which Mr. Tolchin's declaration should be stricken.

## IV. There Is No Basis To Strike Exhibits That Are Documents Produced By Defendants

　　The frivolity of Defendants' motion for sanctions is highlighted by the fact that

Defendants ask the Court to strike exhibits that are documents produced by Defendants

themselves. These documents are Exhibits 151-166 to Plaintiffs' opposition to Defendants'

---

the likelihood that they would have a policeman used to authentic business documents in December
2012. (Ex. 30.)

motion for summary judgment.  Defendants fail to acknowledge that "[d]ocuments produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent."  *Anand v. BP West Coast Prods., LLC*, 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007) (citations omitted); *see also Commercial Data Servers, Inc. v. Int'l Bus. Mach., Corp.*, 262 F. Supp. 2d 50, 60 (S.D.N.Y. 2003) ("It is disingenuous and wasteful for [a party] to object that its own documents are not authenticated, and thus inadmissible … on summary judgment.").

Defendants contend Plaintiffs should be sanctioned with the exclusion of Defendants' own documents because Plaintiffs did not identify Defendants' documents as admissions and as statements against interest upon which Plaintiffs intend to rely at trial in response to a contention interrogatory propounded by Defendants (before Defendants made their late productions of the documents they now seek to exclude).  Plaintiffs objected to Defendants' interrogatory as overbroad.  In *Susquehanna Commercial Fin., Inc. v. Vascular Resources, Inc*., No. 1:09-cv-2012, 2010 WL 4973317, at * 8 (M.D. Pa. Dec. 1, 2010), the court considered a motion to compel as respects a contention interrogatory nearly identical to the one in question here.  In that case, the contention interrogatory demanded that the party identify "any 'statement' or 'admission' that [the opposing party] made at any time regarding 'the subject matter of this lawsuit."  The *Susquehanna* Court concluded the interrogatory was over broad and denied the motion to compel.  2010 WL 4973317, at *8.  So, too, Defendants' interrogatory here is impermissibly overbroad and cannot serve as the basis for a sanction award.

There simply is no reasonable basis on which Defendants may ask the Court to exclude their own documents.  The fact that Defendants have done so signals that Defendants understand these documents necessarily defeat Defendants' Motion for Summary Judgment as these

documents confirm not only that Defendants provided material support to the PFLP, but also that there are grounds to hold Defendants vicariously liable for the actions of their employee, Ra'ed Nazal.

## V.      Defendants' Unclean Hands Would Bar Relief Even If Defendants' Allegations Were Well-Founded (Which They Are Not)

    Defendants *assert*, *allege*, *aver*, and *argue*, but mostly Defendants *affect* the role of victim, complaining or making allegations against Plaintiffs about the very things *Defendants did* in this litigation, such as untimely document production, extensive periods where they refused to participate in discovery, and a refusal to provide translations for Arabic documents, among other "injustices."  Having engaged in the very behavior Defendants' so vociferously argue warrant sanctions against Plaintiffs, Defendants come to this Court with unclean hands and thus should be barred from seeking sanctions.  For example, Defendants aver:  "There is simply no good faith excuse for Plaintiffs to have produced sixty-nine [sic] (69%) of their total document disclosure in this case after the close of fact discovery on September 19, 2012."  (DE 270-1 at 39.)  Defendants neglect, however, to acknowledge the fact that Defendants produced a mere 67 pages of documents during fact discovery and made more than 90% of their document production and disclosures after the close of fact discovery in this case (and successfully avoided sanctions for doing so).  Similarly, Defendants characterize Plaintiffs' "deposition discovery strategy," as being "designed to ensure that no depositions would occur during the fact discovery period," (DE 270-1 at 10) but neglect to acknowledge their own recalcitrance in providing witnesses for deposition.  Defendants have had four attorneys in attendance at status conferences (*see, e.g.*, DE 269 (Nov. 13, 2013 Hrg. Tr.) and had enough attorney resources to appear at status conferences held by the United States District Court for the Eastern District of New York when enforcement of Plaintiffs' third party subpoena was pending before that court, but somehow

came up short when it came time to prepare witnesses and defend depositions, so they

unilaterally struck the entire month of March 2012 from the calendar, when depositions could

have been taken:

> As you prepare to issue [deposition] notices, please be aware that there is
> absolutely no way in which I would be available for and able to appear at
> such depositions before April 2012 at the earliest.  Unless you wish to
> create an issue for disagreement, you should not notice those depositions
> for any date in March 2012.

(Ex. 29 at 3.)  Defendants further carved out Ramadan (which fell in July 19 to August

19, 2012), resulting in the deferral of properly-noticed depositions until September 2012

(DE 270-1 at 3).

Defendants similarly complain that Plaintiffs did not serve their discovery requests until

March 2012 (DE 270-1 at 10) but bury in a footnote the fact that Defendants served their first

discovery requests in August 2012, a mere six weeks before the close of discovery.  (DE 270-1

at 12, n.10.)  "[A]ll sanctions originate from the realm of equity."  *Bull* v. *United Parcel Serv.,

Inc.*, 665 F.3d 68, 83 (3d Cir. 2012).  "The unclean hands defense closes the doors of a court of

equity to a party tainted with inequitableness or bad faith relative to the matter in which she

seeks relief and derives from the equitable maxim that one who comes into equity must come

with clean hands."  *Ass'n of Am. Med. Colleges v. Princeton Review, Inc*., 332 F. Supp. 2d 11, 17

n.2 (D.D.C. 2004) (citation and quotations omitted); *United States v. Philip Morris Inc*., 300 F.

Supp. 2d 61, 74 (D.D.C. 2004) (same).  Whatever Defendants have alleged Plaintiffs have done

in this litigation, Defendants also have done – in spades.  As such, the doctrine of unclean hands

bars Defendants efforts to have sanctions imposed upon Plaintiffs.

## VI.   <u>Defendants' Motion Is An Improper Attempt To Circumvent Court Rules</u>

Local Rule 7(e) provides: "A memorandum of points and authorities in support of or in

opposition to a motion shall not exceed 45 pages . . . without prior approval of the [C]ourt.

Documents that fail to comply with this provision shall not be filed by the Clerk."  Defendants'
current filing should be deemed to be a violation of the page limits for both Defendants'
summary judgment motion and for Defendants' motion for sanctions.  Defendants' devote a
significant portion of their memorandum in support of sanctions to a discussion of Plaintiffs'
summary judgment opposition.  Additionally, Defendants attach as Exhibit 28 to their
memorandum in support of sanctions a two page, single-spaced "exhibit" which Defendants
describe as "summarizing, by category of exhibits, the various evidentiary assertions that Mr.
Tolchin makes in his declaration."  (DE 270-1 at 39.)  Exhibit 28 is no exhibit at all.  It is pure
analysis and, if properly formatted and integrated into Defendants' sanctions memorandum,
would bring the memorandum to at least four pages over the limit.  The motion itself, of course,
is an obvious ploy to expand Defendants' summary judgment argument – but the crafty use of an
exhibit to expand the page limits is a flat-out rules violation that warrants its own sanction, in the
very least to the extent of striking or declining to consider the exhibit.  *See e.g.*, *Collectable
Promotional Prods. v. Disney Enters.*, No. CIV-06-1187-D, 2009 WL 1543449, at *1 n.1 (W.D.
Okla. June 2, 2009) (declining to consider an exhibit that was attached to a brief and that
contained argument, stating: "The Court regards the inclusion of this exhibit as an inappropriate
means of avoiding the page limit for [the brief].").

Defendants' motion for sanctions is, moreover, an attempt to make an end-run around
jurisprudence prohibiting a party from injecting a new issue into summary judgment proceedings
at the reply stage.  *See DNT, LLC v. Sprint Spectrum, LP*, 750 F. Supp. 2d 616, 630 (E.D. Va.
2010) (stating that the court would not consider any new issues raised in the reply brief); *cf.
Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1064 (D.C. Cir. 2001) ("[B]ecause of
petitioners' failure to raise the issue in their opening brief, we do not address it on the merits.")

(citation omitted).  The sole basis for Defendants' Motion for Summary Judgment was that Plaintiffs could point to no admissible evidence to support their claims.  Hence, to the extent Defendants' claim that Plaintiffs could point to no admissible evidence was based on the assumption that Defendants would be successful in having documents previously disclosed by Plaintiffs excluded due to alleged discovery violations.  Nevertheless, that basis for exclusion should have been addressed in Defendants' summary judgment papers.

## VII.  Defendants' Efforts To Malign Plaintiffs' Counsel Are Indecorous and Unseemly

This motion for sanctions is not about Plaintiffs or their conduct.  Rather, it is about Defendants' animosity toward Plaintiffs' counsel.  The attorneys in this matter, whether in the United States or in Israel, are not the parties in this matter, yet the Defendants' ire is aimed directly at Plaintiffs' counsel.

Defendants' animosity towards certain of Plaintiffs' counsel is made obvious by Defendants' request that the Court strike Mr. Tolchin's declaration (DE 270-1 at 36), and in Defendants' gratuitous and inappropriate comments, such as references to "the ever shifting cast of attorneys" in relation to Plaintiffs' counsel (DE 270-1 at 5).  Of course, Defendants' comments belie the fact that Plaintiffs *and Defendants* have had multiple attorneys involved in these proceedings, as well as the fact that Mr. Tolchin has remained a counsel of record in this case, with other attorneys joining as necessary due to Mr. Tolchin's inability to fully staff the case within his office.  Also of note is the fact that Defendants devote several pages of their brief to complaints that Plaintiffs are receiving litigation support from an anti-terrorism NGO in Israel, the Shurat HaDin Israel Law Center.  (DE 270-1 at 5-9.)  Defendants and the Court have long known of Shurat HaDin's involvement in this case.  Israeli counsel's involvement in this matter is unsurprising given that much of the evidence is located in Israel and numerous depositions took place in Israel.  Indeed, Defendants' have their own Israeli counsel working on this case.

40

Defendants fail to explain even now how Shurat HaDin's involvement could possibly be the basis for sanctions. Plaintiffs trust the Court will treat Defendants' aspersions and half-truths as harassing litigation tactics, and proceed accordingly.

One of the advantages of joining a case in progress is that it gives new counsel an opportunity to review the record with fresh eyes. Defendants make a number of remarks about what it describes as the "abusive behavior of plaintiffs' counsel." (DE 270-1 at 31.) The lack of graciousness—or "abusive behavior"—about which Defendants complain could just as easily be complained of by Plaintiffs. Any lack of graciousness that may have occurred in this case may find its roots in the long history among some of the counsel, who have been on opposite sides in several of the cases listed in footnote 3 of Defendants' brief. (DE 270-1 at 6, n.3.) It is not surprising that Plaintiffs' counsel have sent their share of sharp-toned e-mails to Defendants' counsel over the years. Plaintiffs could sort through hundreds (if not thousands) of e-mails generated over the years and make the same argument about Defendants' counsel; such an effort would, however, be a needless distraction. Plaintiffs retained new D.C. counsel in 2013 (DE 229), and that counsel brings a clean slate. There is no reason to dredge up past slights on either side as such "evidence" proves nothing more than that opposing counsel sometimes argue during the course of a dispute. In keeping with the rest of Defendants' motion, that is hardly sanctionable.

As the Court said recently, this case is ready . . . .

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion for Sanctions, and provide any other relief to Plaintiffs as the Court deems fit.   A

proposed order is attached.


Dated:   January 21, 2013

Respectfully submitted,



By        /s/ Abbe David Lowell

Abbe David Lowell (#358651)
Joy L. Langford (#451728)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: 202-974-5605
Fax: 202-974-6705
adlowell@chadbourne.com
*Counsel for Plaintiffs*

Robert J. Tolchin (NY 0088)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
Tel: 718-855-3627
rjtberkman@gmail.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of January 2014, I caused a true and correct copy of the foregoing *Memorandum Of Points And Authorities In Opposition To Defendants' Motion For Sanctions* and accompanying exhibits to be filed and served electronically via CM/ECF to:

Charles F. G. McAleer, Jr.
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5799
cmcaleer@milchev.com

Richard A. Hibey
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5799
rhibey@milchev.com

Mark J. Rochon
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5799
mrochon@milchev.com

*Counsel for Defendants, the PA and the PLO*

and all Counsel of Record.

/s/ Abbe David Lowell
Abbe David Lowell