UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, *et al.*,

                                    Plaintiff,

              -against-

THE SYRIAN ARAB REPUBLIC, *et al.*,

                                    Defendant.

Civil Action No. 02-cv-02280
(RJL)

Oral Argument Requested

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S
FEBRUARY 7, 2005 INTERLOCUTORY ORDER**

Abbe David Lowell (#358651)
Joy L. Langford (#451728)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: 202-974-5605
Fax: 202-974-6705
adlowell@chadbourne.com
*Counsel for Plaintiffs*

Robert J. Tolchin (NY 0088)
The Berkman Law Office, LLC
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
Tel: 718-855-3627
rjtberkman@gmail.com
*Counsel for Plaintiffs*

March 21, 2014

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................1

PROCEDURAL BACKGROUND .....................................................................1

ARGUMENT ...................................................................................................11

I.      Defendants Fail To Satisfy The Standard For Reconsideration.........................11

II.     Defendants Have Waived Personal Jurisdiction As A Defense.........................14

      A.     Defendants' Motion To Dismiss Asked The Court To Defer The Personal
           Jurisdiction Issue, Not To Decide It, And Defendants Have Since Waived
           The Defense .................................................................................15

      B.     Defendants Pledged To This Court That They Would Litigate Cooperatively
           And On The Merits—They Never Mentioned Jurisdiction .................................18

      C.     Defendants Definitively Waived Any Jurisdictional Defense  When They
           Moved for Summary Judgment  ...........................................................20

III.     *Daimler* Is Not Applicable To This Case .......................................................21

      A.     *Daimler* Is Not Applicable Because The PLO And PA Do Not Have Due
           Process Rights Under The United States Constitution .........................................22

           1.     Governmental and Foreign Political Entities Do Not Have Protections
                Under the Due Process Clause ...................................................23

           2.     The PLO and PA Exist Outside The Union ...............................................24

                a.     The PLO.........................................................25

                b.     The PA ...........................................................25

                 c.     Neither The PLO Nor The PA Falls Within The Protections
                     Of The Due Process Clause  .........................................26

           3.     The Rights Of Foreign Government And Political Entities Are
                The Prerogative Of The Executive—And Here The Executive
                Has Expressed Its Intent That Defendants Face Liability
                Under The ATA .................................................................27

IV.     Even If The Defendants Were Protected By The Due Process Clause, This Court's
      Assertion Of Personal Jurisdiction Over Defendants Would Not Violate Due Process....30

      A.     The Defendants Were On Notice That Their Conduct Was Proscribed ...............30

B.      Context Weighs In Favor Of The Court Asserting Jurisdiction ...........................31

C.      Alternatively, Physical Presence And Service Establish Jurisdiction ..................32

D.      The Court Has Specific Personal Jurisdiction Over Defendants .........................33

      1.      Defendants' Conduct Within The United States Relates To
The ATA Claim And Is Sufficient To Satisfy Minimum Contacts ..........34

      2.      Defendants' Extraterritorial Conduct Satisfies Minimum Contacts
Under The "Effects Test" ..........................................................................39

      3.      The Totality Of The Circumstances Supports Jurisdiction.......................43

V.      Defendants' Requested Relief Should Not Be Granted Without The Opportunity
To Conduct Jurisdictional Discovery.................................................................................44

CONCLUSION.................................................................................................................................45

CERTIFICATE OF SERVICE .......................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Action Network, Inc. v. Cater America, LLC*,
　Civ. No. 12-1972, 2013 WL 5428857 (D.D.C. Sept. 30, 2013) ..............................................33

*Arizona v. Shalala*,
　121 F. Supp. 2d 40 (D.D.C. 2000) .......................................................................................16

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
　486 U.S. 888 (1988)...........................................................................................................2

*Boim v. Holy Land Found. for Relief and Dev.*,
　549 F.3d 685 (7th Cir. 2008) ......................................................................................42, 43

*Bryson v. Gere*,
　268 F. Supp. 2d 46 (D.D.C. 2003) ................................................................................12, 13

*Burger King Corp. v. Rudzewicz*,
　471 U.S. 462 (1985)......................................................................................................33, 44

*Burlington Ins. Co. v. Okie Dokie, Inc.*,
　439 F. Supp. 2d 124 (D.D.C. 2006) ......................................................................................12

*Burnham v. Superior Court of Cal.*,
　495 U.S. 604 (1990) (plurality opinion) ..............................................................................32

*Burton v. N. Dutchess Hosp.*,
　106 F.R.D. 477 (S.D.N.Y. 1985.....................................................................................20, 21

*\*Calder v. Jones*,
　465 U.S. 783 (1984)...................................................................................................... 39-43

*Carney v. Beracha*,
　Civ. No. 3:12-cv-00180, 2014 WL 533727 (D. Conn. Feb. 10, 2014)....................................34

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
　148 F.3d 1080 (D.C. Cir. 1998) ...........................................................................................45

*Cent. States, Se. and Sw. Areas Pension Fund v. Wiseway Motor Freight, Inc.*,
　No. 99C4202, 2000 WL 1409825 (N.D. Ill. Sept. 26, 2000)..................................................21

*Citizens Cmty. Federal v. Silver, Freedman & Taff, L.L.P.*,
　No. 12–CV–648, 2014 WL 345261 (W.D. Wis. 2014) .................................................... 19-20

*City of E. St. Louis v. Circuit Court for Twentieth Judicial Circuit, St. Clair Co., Ill.*,
 986 F.2d 1142 (7th Cir. 1993) ...................................................................................24, 28

*City of Sault Ste. Marie, Mich. v. Andrus*,
 532 F. Supp. 157 (D.D.C. 1980) .............................................................................................28

*CML-NV Civic Ctr. v. Gowan*,
 No. 2:11–cv–00120, 2011 WL 6752406 (D. Nev. Dec. 23, 2011) ........................................13

*Daimler, A.G. v. Bauman*,
 134 S. Ct. 746 (2014 ................................................................................................. *passim*

*Daliberti v. Iraq*,
 97 F. Supp. 2d 38 (D.D.C. 2000) ...........................................................................................40

*Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc.*,
 275 F.R.D. 20 (D.D.C. 2011)..................................................................................................45

*\*Dem. Rep. Congo v. FG Hemisphere Assocs.*
 508 F.3d 1062, 1064 (D.C. Cir. 2007) .................................................................... 14-15, 19

*Diamond Chem. Co., Inc. v. Atofina Chems., Inc.*,
 268 F. Supp. 2d 1 (D.D.C. 2003) ...........................................................................................45

*\*e360 Insight v. The Spamhaus Project*,
 500 F.3d 594 (7th Cir. 2007) ..................................................................................... 17-18

*El Paso Co. Water Imp. Dist. No. 1 v. Int'l Boundary & Water Com'n*,
 701 F. Supp. 121 (W.D. Tex.1988)........................................................................... 27-28

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
 582 F.3d 393 (2nd Cir. 2009)...........................................................................................23, 25

*\*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
 131 S. Ct. 2846 (2011) ......................................................................................... 11, 13-14, 22

*Hamilton v. Atlas Turner, Inc.*,
 197 F.3d 58 (2d Cir. 1999)......................................................................................................19

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
 466 U.S. 408 (1984)................................................................................................................35

*Hertz Corp. v. Friend*,
 559 U.S. 77 (2010)..................................................................................................................31

*Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*,
 No. 99-4042, 2000 WL 147392 (10th Cir. Feb. 4, 2000) ......................................................19

iv

*In re Baan Company Securities Litigation,*
    245 F. Supp. 2d 117 (D.D.C. 2003) ................................................................34

*In re Magnetic Audiotape Antitrust Litig.,*
    334 F.3d 204 (2d Cir. 2003) ...........................................................................40

*In re Scott Cable Commc'ns, Inc.,*
    259 B.R. 536 (D. Conn. 2001) ........................................................................24

*\*Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982) ...............................................................................14, 15

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) .............................................................................. 33-34

*Int'l Technologies Integration, Inc. v. Palestine Liberation Org.,*
    66 F. Supp. 2d 3 (D.D.C. 1999) ......................................................................36

*J. McIntyre Mach., Ltd. v. Nicastro,*
    ___ U.S. ___, 131 S. Ct. 2780 (2011) ..............................................................35

*Kabbani v. Int'l Total Servs.,*
    Civ. A. No. 91–0391, 1991 WL 251863 (D.D.C. 1991) ........................................15

*Keeton v. Hustler Magazine, Inc.,*
    465 U.S. 770 (1984) ....................................................................................34

*Klinghoffer v. S.N.C. Achille, Lauro,*
    937 F.2d 44 (2d Cir. 1991) .................................................................3, 4, 29

*\*Knox v. Palestine Liberation Org.,*
    306 F. Supp. 2d 424 (S.D.N.Y. 2004) ................................................ 25-26, 28

*Licci ex. rel. Licci v. Lebanese Canadian Bank, SAL,*
    732 F.3d 161 (2d Cir. 2013) ..........................................................................40

*Livnat et al. v. Palestinian Authority,*
    No. 1:13cv498 (E.D. Va. 2013) .......................................................................14

*Lopes v. JetsetDC, LLC,*
    ___ F. Sup. 2d ___, No. 1:13-cv-01550, 2014 WL 793117 (D.D.C. Feb. 19, 2014) .............32

*Mann v. Castiel,*
681 F.3d 368 (D.C. Cir. 2012) .............................................................................33

*Marcial Ucin, S.A. v. SS Galicia,*
    723 F.2d 994 (1st Cir. 1983) ..........................................................................19

*Mendelsohn v. Meese,
   695 F. Supp. 1474 (S.D.N.Y. 1988)..................................................................... 26-27

Mohamed v. Rajoub,
   ___ U.S. ___, 132 S. Ct. 1702 (2012), No. 11-88, 2011 WL 3664462 (Aug. 19, 2011).........14

*Mwani v. bin Laden,
   417 F.3d 1 (D.C. Cir. 2005) .......................................................................33, 34, 35, 44

National Council of Resistance of Iran ("NCRI") v. Department of State,
   251 F.3d 192 (D.C. Cir. 2001) ..................................................................................27

O'Brien v. R.J. O'Brien & Assocs., Inc.,
   998 F.2d 1394 (7th Cir. 1998) ...................................................................................15

PaineWebber Inc. v. Chase Manhattan Private Bank (Switz.),
   260 F.3d 453 (5th Cir. 2001) .....................................................................................20

Palestine Info. Office v. Shultz,
   674 F. Supp. 910 (D.D.C. 1987), aff'd, 853 F.2d 932 (D.C. Cir. 1988) ........................... 26-27

*Price v. Socialist People's Libyan Arab Jamahiriya,
   294 F.3d 82 (D.C. Cir. 2002) ................................................................................ 23-24

Puerto Rico Public Housing Admin. v. U.S. Dep't of Housing & Urban Dev.,
   59 F. Supp. 2d 310 (D.P.R. 1999)....................................................................... 24-25, 27

*Pugh v. Socialist People's Libyan Arab Jamahiriya,
   290 F. Supp. 2d 54 (D.D.C. 2003),
   appeal dismissed, 112 Fed. App'x. 756 (D.C. Cir. 2004) ........................................... 23, 30-31

Pusey v. Dallas Corp.,
   938 F.2d 498 (4th Cir. 1991) ....................................................................................15

Rates Technology Inc. v. Nortel Networks, Corp.,
   399 F.3d 1302 (Fed. Cir. 2005).................................................................................20

Rundquist v. Vapiano,
   No. 09-2207, 2012 WL 5954706 (D.D.C. Nov. 9, 2012) ........................................................34

SEC v. Banner Fund Int'l,
   211 F.3d 602 (D.C. Cir. 2000) ..................................................................................16

SEC v. Bilzerian,
   378 F.3d 1100 (D.C. Cir. 2004) ............................................................................33, 34

SEC v. E-Smart Technologies, Inc.,
   926 F. Supp. 2d 231 (D.D.C. 2013) ...............................................................................33

*Shelby Co., Ala. v. Holder,*
    133 S. Ct. 2612 (2013) ..................................................................................................24

*\*Sisso v. Islamic Republic of Iran,*
    448 F. Supp. 2d 76 (D.D.C. 2006) ............................................................... 41-43

*Sokolow v. Palestine Liberation Org.,*
    No. 04-cv-00397, 2011 WL 1345086 (S.D.N.Y. March 30, 2011) .................................35, 36

*South Carolina v. Katzenbach*
    383 U.S. 301 (1966) .................................................................................... 24

*Steinberg v. Int'l Criminal Police Org.,*
    672 F.2d 927 (D.C. Cir. 1981) ...............................................................................34

*Strauss v. Credit Lyonnais, S.A.,*
    249 F.R.D. 429 (E.D.N.Y. 2008) ...............................................................29, 32

*Tuckerbrook Alternative Invs., LP v. Banerjee,*
    754 F. Supp. 2d 177, 183 (D. Mass. 2010) ........................................................ 18-19

*Ungar v. Palestine Liberation Org.,*
    402 F.3d 274 (1st Cir. 2005) (ATA action filed against the PLO in March 2000).................31

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.,*
    153 F. Supp. 2d 76 (D.R.I. 2001) ...............................................................................33

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.,*
    325 F. Supp. 2d 15, 51 (D.R.I. 2004) ...............................................................................36

*United States v. Ali,*
    718 F.3d 929 (D.C. Cir. 2013) ...............................................................................30

*Virgin Islands v. Miller,*
    No. ST-08-CR-F-0348, 2010 WL 1790213 (V.I. Super. Ct. May 4, 2010)............................27

*Walden v. Fiore,*
    ___ U.S. ___, 134 S. Ct. 1115 (2014).......................................................... 43-44

*Wultz v. Islamic Republic of Iran,*
    755 F. Supp. 2d 1 (D.D.C. 2010) ...............................................................................33

*Xiangyuan Zhu v. United States,*
    No. 04-1216, 2006 U.S. Dist. LEXIS 660, at *5 (D.D.C. Jan. 3, 2006)..................................12

**Statutes**

18 U.S.C. § 2331-2339D, Antiterrorism Act of 1991 (1992) ....................................................4, 32

18 U.S.C. § 2334 ............................................................................................................4, 33

18 U.S.C. § 2337(2) ...............................................................................................................3

28 U.S.C. §§ 1330 and 1602-11, Foreign Sovereign Immunities Act (FSIA) ...............................3

**Constitutions**

U.S. Const. amend. V...............................................................................................25, 30, 35

U.S. Const. amend. XIV .......................................................................................23, 26, 29, 35

**Legislative Materials**

Hearing Before Subcomm. On Intellectual Prop. And Judicial Admin.
of the Comm. On the Judiciary, House of Reps., 102nd Congress,
Second Session on H.R. 2222, Antiterrorism Act of 1991 (1992) ................................................30

H.R. Rep. 102-1040 at 5 (Oct. 6, 1992)........................................................................ 28-29, 30

Hearing Before Subcomm. On Courts and Admin. Practice
of the Comm. On the Judiciary, U.S. Senate, 101st Congress,
Second Session on S. 2465, 3 (1990) (statement of Sen. Grassley) ..............................................29

**Other Authorities**

Fed. R. Civ. P. 4(k)(1)......................................................................................................4, 33, 34

Michael B. Kraft, *Evolution of U.S. Counterterrorism Laws, Policies,*
*and Programs in* 1 Evolution of U.S. Counter Terrorism Policy 1, 33
(Yonah Alexander and Michael B. Kraft eds., 2008) .................................................................29

## PRELIMINARY STATEMENT

Defendants, the Palestinian Liberation Organization ("PLO") and the Palestinian

Authority ("PA") (collectively, "Defendants") bring this motion to reconsider the Court's

February 7, 2005 Minute Order denying Defendants' motion to dismiss (DE 26, 28) in an attempt

to prevent a decision on the merits of Plaintiffs' claims.  The motion should be denied because:

(1) Defendants have waived their right to assert a personal jurisdiction defense in this case and

have consented to the Court's jurisdiction; (2) the case on which Defendants rely, *Daimler, A.G.*

*v. Bauman*, ___ U.S. ___, 134 S. Ct. 746 (2014), is not applicable to this case; and (3) this

Court's assertion of personal jurisdiction over Defendants nonetheless comports with the

Supreme Court's articulation of the requirements of Due Process.

## PROCEDURAL BACKGROUND

This case began in 2002, shortly after the bombing of a pizza parlor in the West Bank

settlement of Karnei Shomron that killed two American teenagers, Keren Shatsky, age 15, and

Rachel Thaler, age 16, and injured several of the Plaintiffs or their family members.  (DE 3.)

The bombing was masterminded by Raed Nazal, a now-deceased leader of the Popular Front for

the Liberation of Palestine ("PFLP"), the organization that claimed responsibility for the

bombing, and a constituent group of the PLO.  The bombing was carried out by Sadeq Hafez,

who was killed in the bombing.  Defendants have accorded Hafez martyr status.[1]

---

[1]     Exhibit 1 is an article dated Feb. 17, 2014 concerning a ceremony in Palestine's Qalqiya Governate commemorating the "martyrdom of its heroic son," suicide-bomber Sadeq Hafez, killed in the Karnei Shomron bombing.  The story and accompanying photo also are available at the PFLP website, http://pflp.ps/news.php?id=7517 (accessed March 16, 2014).  (As a courtesy, Plaintiffs have attached an English translation of the article.)  Exhibit 1 also includes a March 6, 2014 article from PMW, Palestinian Media Watch, *PA Honors terrorist who planned murder of Israeli minister Ze'evi for "heroic sacrifice,"* describing a ceremony honoring "Ahed Abu Gholmeh, who is serving a life sentence for planning the

(Cont'd on following page)

Before considering Defendants' motion, it is again necessary to review this case's procedural history to show the Court that Defendants long ago waived any alleged personal jurisdiction defense and consented to this Court's jurisdiction.  On July 27, 2003, Plaintiffs served Hassan Abdel Rahman, Defendants' then official representative in the United States, with the Summons and Complaint.  (DE 15.)  On September 11, 2003, Defendants sought a protective order seeking to strike or stay the notices of deposition that Plaintiffs had served on September 2, 2003 and noted an intent "to move for the dismissal of this action before answer under Rule 12(b) asserting sovereign and governmental immunity, and other defenses."  (DE 14 at 1-2.)  Defendants did not reference personal jurisdiction in their protective order motion.  (*See* DE 14.)

Defendants moved for a protective order on the same day the Clerk entered a default against Defendants.  (DE 18.)  In their response to Defendants' motion for a protective order, Plaintiffs explained to the Court that Plaintiffs sought to depose Hasan Abdul Raman and two other people who were "all employees of the PLO and/or the PA resident in the United States," "on factual issues related to personal jurisdiction."  (DE 23 at 4, 9; *see also* DE 20 3-8.)  Two weeks later, on September 25, 2003, Defendants moved to strike the default and sought an enlargement of time to October 31, 2003 to "respond to the complaint."  (DE 21 at 2.)  Instead of filing an answer, Defendants chose to file a motion to dismiss.  (DE 25, DE 26, revised November 15, 2003 as DE 28.)[2]

_____

(Cont'd from preceding page)

murder of Israeli Minister of Tourism Rehavam Ze'evi in 2001, and Ahmad Sa'adat, who is serving a 30-year sentence for heading the PFLP terror organization."  These articles show the PA's continuing support of the PFLP and its "martyrs."

[2]     For the convenience of the Court, Plaintiffs will reference DE 26 to conform to the brief cited by Defendants in their papers.  (DE 278.)

Defendants devoted more than half of their brief in support of their motion to dismiss (DE 26) to the Court's purported lack of subject matter jurisdiction "based on sovereign and governmental immunity under sec. 1604 of the Foreign Sovereign Immunities Act (FSIA) 28 U.S.C. 1330 and 1602-11, and 18 U.S.C. sec. 2337(2)."  (DE 26 at 3-16.)  Defendants also argued if the Court treated them as a foreign state  there was an issue with process (DE 26 at 16), and that the Complaint was a nonjusticiable political attack on the PLO and the PA.  (DE 26 at 18-30).  Just slightly more than one page of Defendants' 30-page brief involved any discussion of personal jurisdiction.  (DE 26 at 16-18.)  Even then, Defendants merely asserted that if they were "denied treatment as a foreign state," the case should be dismissed for lack of personal jurisdiction because they did not have "minimum contacts with the United States required by the Due Process Clause."  (DE 26 at 17.)  Arguing that their Washington, D.C. contacts fell within a "government contacts" exception recognized by the Second Circuit in *Klinghoffer v. S.N.C. Achille, Lauro*, 937 F.2d 44, 51-52 (2d Cir. 1991)*, Defendants claimed the exception in this instance should be given a "broad scope" in light of the "heightened significance the Israeli-Palestinian conflict has for U.S. and international foreign policy."  (DE 26 at 18.)  Defendants closed this "discussion" of personal jurisdiction with the suggestion that any discovery related to personal jurisdiction be deferred "until after subject matter jurisdiction is finally resolved," because "[i]ssues of personal jurisdiction are secondary to this Court's subject matter jurisdiction…."  (DE 26 at 18.)

Plaintiffs' robust response devoted 21 pages to a discussion as to why this Court has personal jurisdiction over Defendants, beginning with jurisdiction pursuant to domestic service of process under Federal Rule 4(k)(1), which gives a court jurisdiction over a defendant based on

domestic service of process when authorized by a statute of the United States, in this case 18 U.S.C. § 2334(a).  (DE 32-1 at 41-62.) [3]

Plaintiffs explained why Defendants' activities in Washington, D.C. were highly relevant to the personal jurisdiction question (DE 32-1 at 44-55) (this was before Defendants' personal jurisdiction defense was waived).  Although Defendants did not want to address their activities in Washington, D.C., Plaintiffs provided extensive detail, describing how Defendants had for many years maintained a "fully-staffed and well-funded office in Washington, D.C.," and engaged in "extensive public relations, educational, propaganda and other activities throughout the United States on behalf of the PLO and the PA."  (DE 32-1 at 34.)  Plaintiffs described Defendants' commercial activities in the U.S., and numerous other contacts in the U.S. generally and the District of Columbia specifically and argued that Defendants' contacts in the U.S. were sufficient to withstand a Fifth Amendment due process challenge.  (DE 32-1 at 49-61.)

After requesting and receiving two extensions, Defendants finally filed their reply on February 20, 2004, restating and expanding their arguments on sovereign immunity and nonjusticiability, and arguing that Defendants and any officials are exempt from liability under the ATA.  (DE 39.)  Defendants mentioned the issue of personal jurisdiction in passing only and did not even attempt to rebut Plaintiffs' overwhelming showing of Defendants' numerous contacts with the jurisdiction.

---

[3]     Before discussing personal jurisdiction, Plaintiffs showed the Court that Defendants cannot rely on the FSIA law, because "[n]either the PLO nor the PA is a 'foreign state.'"  (DE 32-1 at 2.)  The applicable law in this case is the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331, *et seq*., under which Congress created "a federal cause of action for 'international terrorism,'" and granted district courts "exclusive jurisdiction over such claims."  The ATA's "legislative history demonstrates clearly that § 2333 . . . [was] enacted as a specific response, and as a remedy, to jurisdictional and procedural hurdles raised by the PLO" in the *Klinghoffer* matter.  (DE 32-1 at 2-4.)

The Court granted Defendants' motion to strike their 2003 default (DE 21) on June 23, 2004, and on the same day granted Defendants' motion for a protective order (DE 18).  On November 3, 2004, Plaintiffs moved for partial summary judgment.  (DE 44.)  Defendants did not respond.

On February 7, 2005, the Court issued the following Order.  "MINUTE ORDER denying 26 MOTION to Dismiss by PALESTINE LIBERATION ORGANIZATION and PALESTINIAN AUTHORITY," and set a status conference for March 29, 2005.  During the status conference, Defendants informed the Court that they did know the bases for the Court's February 7, 2005 Minute Order, saying succinctly: "We don't know the grounds . . . ."  (DE 56, Mar. 29, 2005 Tr. 22:24-25.)  Defendants never sought further clarification from the Court concerning the Court's grounds for denying Defendants' motion to dismiss.

Defendants at that point had not responded to Plaintiffs' motion for partial summary judgment; but rather than "treat[ing] it as conceded," the Court offered Defendants an opportunity to respond to Plaintiffs' motion.  (DE 56, Mar. 29, 2005 Tr. 28:7-21.)  In response, Defendants informed the Court that they may or may not respond because in these cases they tried to "take an interlocutory appeal" rather than be "confronted with the burdens of litigation." (DE 56, Mar. 29, 2005 Tr. 29:2-4.)  The Court told Defendants they should "feel free" to move for an interlocutory appeal.  (DE, 56 Mar. 29, 2005 Tr. 30:12-15.)  The Court then set a date by which Plaintiffs' motion for partial summary judgment had to be fully briefed, and said it would rule quickly on that motion and would then set a Scheduling Order if there was anything left to the case.  (DE 56, Mar. 29, 2005 Tr. 26:1-27:1, 32:1-6.)

Contrary to their prior suggestion to the Court, Defendants *did not* pursue an interlocutory appeal with respect to the Court's denial of Defendants' motion to dismiss.  Neither

did Defendants file an answer or respond to Plaintiffs' motion for partial summary judgment.
Defendants did nothing.  Consequently, on April 12, 2005, Plaintiffs obtained a second entry of
default against Defendants (DE 52) and began taking testimony and gathering evidence to  prove
their damages. Plaintiffs moved for entry of judgment by default on  April 30, 2007.  (DE 64.)
In their default judgment motion, Plaintiffs included a two-page discussion on why the Court
could find personal jurisdiction over Defendants by a preponderance of the evidence.  (DE 64 at
8-9.)

Defendants filed a response to Plaintiffs' default judgment motion on May 17, 2007 (DE
67), the same day that Defendants' present counsel entered a notice of appearance (DE 66).  In
their response, Defendants asked the Court for a second extension of time to "file a
comprehensive response to Plaintiffs' motion" and argued that Defendants were entitled "to an
opportunity to prepare for and attend an evidentiary hearing on the issue of appropriate
damages," including an opportunity to conduct discovery on the issue of damages.  (DE 67 at 2-
3.)  Defendants' response did not mention personal jurisdiction.  Two weeks later, Defendants
filed what they called their "Opposition" to Plaintiffs' motion for default judgment.  (DE 69.)  In
it, Defendants included a one-paragraph personal jurisdiction argument (DE 26), stating in a
conclusive manner that they "continue to contend that they have insufficient contacts with the
United States to warrant the Court's exercise of personal jurisdiction over them and reserve that
issue"  (DE 69 at 3).  Notably, Defendants continued to ignore and to refuse to respond
substantively to Plaintiffs' detailed factual presentation (*e.g.*, service, contacts with the U.S. and
this district) in this regard, even though Defendants' motion to dismiss had been denied and
Defendants admittedly did not know the grounds for the Court's denial.

The Court entered a Scheduling Order on June 25, 2007 (DE 72) directing the parties to confer about a discovery and briefing schedule.  On August 9, 2007, the parties filed their Joint Discovery and Hearing Plan (DE 75; 75-1), which the Court adopted and issued as a Scheduling Order on August 21, 2007.  (DE 76.)  Covering the period from August 20, 2007 to January 14, 2008, the Scheduling Order encompassed all of the parties' pre-hearing obligations (*i.e.*, written discovery, depositions, and identification of and objections to witnesses and exhibits).  The parties then "spent the better part of five months" engaged in discovery related to damages.  (DE 95, June 13, 2008 Tr. 4:10-16.)

It therefore was a shock to Plaintiffs, when—with no warning—on December 21, 2007, shortly before Defendants' deadline for designating witnesses pursuant to the agreed upon schedule, Defendants asked this court to set aside the default entirely and "*permit merits litigation*."  (DE 77 at 11, 51 (emphasis added).)  In support of their motion, Defendants attached as an exhibit the declaration of PA Prime Minister Fayad who, through his declaration, was "mak[ing] a firm, personal commitment to the litigation going forward."  (DE 77 at 13.)  Prime Minister Fayad's declaration, upon which Defendants relied heavily in their argument, establishes that Defendants re-entered this case with high level endorsement among their leadership that this litigation should proceed on the merits.  Mr. Fayad declared:

> I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process.  I have further instructed new counsel to transmit this commitment to the United States courts.  I personally commit to sustain this instruction throughout the effort to litigate these cases.  It is my belief that there are meritorious defenses to the claims brought in the United States and it is important to the PA to present those defenses.  Moreover, *it is important to the PA's role in the international community to participate in the legal process, even when it is process brought in the United States for actions that occurred far from the United States.*  The importance of this was not fully appreciated by the PA government, as a whole, until recently.  Now we can act on that understanding, and *we therefore seek to contest this litigation fully and responsively.*

(DE 77 at 23 (emphasis added).)

Defendants asserted that "special consideration" should be given to "Prime Minister Fayad's declaration…because of the trust and confidence the United States has placed in him…." (DE 77 at 13.)  The "strong meritorious defenses" that Defendants claimed in asking the Court to vacate their intentional default (DE 77 at 15, 43-50), which were endorsed by Mr. Fayad—and later referenced by the Court in granting Defendants' motion to vacate their intentional default (DE 126 at 9-10), related to Defendants' purported lack of liability, *not to jurisdiction*.  Instead, Defendants asserted they had "come to appreciate that they need to address these cases head on, rather than continuing to rely exclusively on jurisdictional defenses."  (DE 77 at 22.)

That there were political considerations extant in Defendants' desire to proceed on the merits is without question.  In his declaration, Prime Minister Fayad made clear that he had "been authorized by President Mahmoud Abbas to make decisions for both the PA and PLO" in connection with lawsuits that had been filed in the United States.  (DE 77-4 at 4.)  He noted that as part of his litigation review, he had "be[come] aware that President Abbas had corresponded with Secretary of State Rice with respect to the ongoing litigation of this and other similar suits filed in the United States.[4]  (DE 77-4 at 4.)  As a result of this correspondence, Secretary Rice instructed President Abbas to "'respond to U.S. legal proceedings in a good faith and a timely manner.'"[5]  (DE 77-4 at 4.)  He added that since then he had "endeavored to ensure that all

---

[4]    Secretary Rice's 2007 travel calendar reflects nine meetings with PA President Abbas in Ramallah, including four meetings in August, September, and October 2007.  Ex. 2.

litigation in the United States courts is conducted in accordance with Secretary Rice's instructions going forward."  (DE 77-4 at 4.)

Defendants' motion to vacate the default judgment (DE 77) mentioned personal jurisdiction only in passing, and then only as part of the procedural discussion of the case to date. (DE 77 at 18.)  It certainly reserved no rights with respect to personal jurisdiction; in fact, Defendants concluded their motion with a reminder to the Court of the "seriousness with which the Defendants take this litigation" and their "good faith desire to participate fully, in a cooperative and complete manner, including compliance with lawful discovery."  (DE 77 at 50.) Defendants encouraged the Court to give Prime Minister Fayad's declaration "great weight," and to vacate the default "in light of the declaration, the *law's strong preference for merits litigation*, and other tangible evidence of Defendants' desire to *litigate on the merits*."  (DE 77 at 50-51 (emphasis added).)  In their reply brief, Defendants did not mention personal jurisdiction at all, but merely asked the Court to "*permit full and fair merits litigation to go forward forthwith*." (DE 98 at 21 (emphasis added).)

Defendants' decision to move to dismiss in 2003, and then default if the motion was denied was strategic.  *See* DE 63, Jan. 11, 2007 Tr. 9:9-12 ("[T]he position of the Palestinian Defendants [was] that once the jurisdictional points had been asserted and overruled, the instructions [were] not to contest the merits of the case."; DE 56, March 29, 2005 Tr. 19:3-20:1 ("Palestine and Syria have come to the courts in the United States to protest that the courts have no jurisdiction over them.").  The Court did not disagree.  In its July 6, 2011 Memorandum

_____

(Cont'd from preceding page)

[5]     Four days before Defendants filed their motion to vacate the default (DE 77), it was announced that the United States had pledged $555 million dollars in aid to the Palestinian Territories at the Palestinian Donors' Conference, which took place in Paris in mid-December 2007.  Ex. 3.  Secretary Rice attended the Paris conference.

Opinion granting Defendants' motion to vacate, the Court acknowledged that it was "overwhelmingly clear" that Defendants' default "was willful."  (DE 126 at 5)  The Court granted Defendants' motion to vacate the default, however, because it was "convinced that [Defendants were] *truly committed to litigating this matter*."  (DE 126 at 6 (emphasis added).)

Defendants finally filed their Answer (DE 128) to Plaintiffs' Complaint (DE 3) on July 20, 2011.  Plaintiffs' third affirmative defense stated:  "This Court lacks personal jurisdiction over the Defendants with respect to this action."  (DE 128.)  Since then, Defendants have actively litigated this case, routinely seeking assistance from the Court and becoming a large consumer of judicial resources in relation to this case.  Until now, however, they have not expounded on any prior reference to (however brief), nor have they revisited, personal jurisdiction issues.

In September 2011, the parties met and conferred regarding a proposed Scheduling Order to govern the pretrial litigation of this case; which the Court adopted and issued on September 15, 2011.  (DE 136.)  Defendants repeatedly moved this Court for protective orders related to discovery (*see, e.g.*, DE 157, 159, 161, 163, 164) or otherwise opposed the depositions Plaintiffs sought to take (*see, e.g*., DE 207), thereby delaying and obstructing Plaintiffs' discovery efforts. Defendants made multiple discovery motions to this Court, including moving the Court to accept Defendants' expert report under seal, and, although Plaintiffs had served their damages expert reports timely, also moved for an indefinite extension of time to identify their damages experts. (DE 177, 178.)  Defendants participated in a joint motion for an order modifying the remaining expert discovery schedule—a revision that allowed Defendants to serve the expert reports they previously placed under seal plus "any additional Rule 26(a)(2)(B) written reports" they desired

(DE 226, 226-1)—then moved affirmatively for sanctions when Plaintiffs filed their liability

expert reports, believing they were permitted.  (DE 228.)

On June 17, 2013, Defendants entered into a joint motion for a briefing schedule for

summary judgment proceedings (DE 246) and, on August 12, 2013, filed their summary

judgment motion.  (DE 247, 247-1.)  In their summary judgment filing, Defendants sought

affirmative relief from this Court on the merits of the case and made only a passing reference to

personal jurisdiction, again raising it in reporting on the procedural history of the case.[6]  (DE

247-1 at 10.)  Defendants did not pause after filing their summary judgment motion.  Rather,

Defendants continued to actively participate in litigation and to seek affirmative relief from the

Court.  In October 2013, Defendants moved the Court to set aside a third party subpoena (DE

248), and on December 26, 2013, moved for sanctions (DE 270).  On January 31, 2014,

Defendants filed their 25-page summary judgment reply brief (DE 275) and their 170-page

sealed reply to Plaintiffs' statement of facts (DE 276).  A week later, on February 7, 2014,

Defendants filed this motion, asking the Court to reconsider its February 7, 2005 Minute Order

denying Defendants motion to dismiss, on the grounds that the Court has no personal jurisdiction

over Defendants.  (DE 278.)

**ARGUMENT**

I.    **Defendants Fail To Satisfy The Standard For Reconsideration**

Defendants' long-deferred motion for reconsideration, filed nine years after the Court's

denial of their motion to dismiss, must be denied.  The "reconsideration and amendment of a

---

[6]    In this regard, and as set out in Section I, *infra*, Plaintiffs note Defendants' main argument for
reconsideration, that the Court should apply the "at home" general personal jurisdiction standard, has been available
to Defendants since at least June 2011 when the Supreme Court decided *Goodyear Dunlop Tires Operations, S.A. v.
Brown*, 131 S. Ct. 2846 (2011).

previous order is an extraordinary measure." *Xiangyuan Zhu v. United States*, No. 04-1216, 2006 U.S. Dist. LEXIS 660, at *5 (D.D.C. Jan. 3, 2006) (citation omitted).  It may not be used to re-litigate already decided issues; rather, the movant must demonstrate some "intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or manifest injustice." *Bryson v. Gere*, 268 F. Supp. 2d 46, 53 (D.D.C. 2003).  A motion for reconsideration is not a "vehicle for presenting theories or arguments that could have been advanced earlier." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 439 F. Supp. 2d 124, 128 (D.D.C. 2006) (citation omitted).  "A court has the power to revisit prior decisions of its own. . ., although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice." *Id*. at 132 (citation omitted).  Such extraordinary circumstances do not exist here.

Defendants latch on to the Supreme Court's recent decision in *Daimler AG v. Bauman,* __ U.S. __, 134 S. Ct. 746 (2014), discussing a corporation's "at home" status for jurisdictional purposes, which was decided a month before Defendants filed this motion, to support their argument that there has been a change in the law.  Defendants' position is without merit.

First, *Daimler* does not contain a change in "controlling law" as applicable to this case. *Daimler* involved the exercise of jurisdiction by the States over corporations and was largely based on concerns about interfering with international commerce; *Daimler* did not consider the very different public policy issues involving the exercise by the United States of jurisdiction over terror organizations and entities supporting terror organizations.  Therefore, *Daimler*'s discussion about personal jurisdiction is inapplicable here.  *See* Sections III & IV, *infra*.

Second, the principle in *Daimler* on which Defendants rely was previously stated more than two years ago in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, 131 S.

Ct. 2846 (2011).  Defendants acknowledge as much at page 8 of their motion, in which they

quote the *Goodyear* court directly:

> Elaborating on the "at home" standard for the exercise of general jurisdiction, the
> Supreme Court explained: "For an individual, the paradigm forum for the exercise
> of general jurisdiction is the individual's domicile; for a corporation, it is an
> equivalent place, one in which the corporation is fairly regarded as at home.". . .
> The *Goodyear* Court further identified place of incorporation and principal place
> of business as paradigm bases for the exercise of general jurisdiction over non-
> natural persons.

(DE 278 at 8 (citing *Goodyear Dunlop Tires Operations, S.A.*, 131 S. Ct. at 2853-54).)

      As soon as the *Goodyear* Court announced the "at home" standard, it was recognized that

*Goodyear* represented a "noticeable shift" in the law:  "The Supreme Court significantly altered

its viewpoint regarding the importance of where a corporation is 'at home,' referencing domicile,

state of incorporation, and principal place of business, in holding that general jurisdiction for

actions against a corporation could not be based on continuous activity in a state unrelated to the

claim alleged that did not reflect the corporation being 'at home' in that state."  *CML-NV Civic

Ctr. v. Gowan*, No. 2:11–cv–00120, 2011 WL 6752406, at *6 (D. Nev. Dec. 23, 2011).

      Defendants were well aware of *Goodyear* long before now.  In fact, Defendants relied on

*Goodyear* in a brief filed in the Supreme Court in August 2011, just weeks after *Goodyear* was

decided for the very proposition Defendants cite to here.  In their brief to the Supreme Court in

opposition to a petition for a writ of *certiorari*, Defendants quoted the following from *Goodyear*:

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's

domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly

regarded as at home."  *See* Brief in Opposition On Petition for a Writ of Certiorari at 17,

*Mohamed v. Rajoub*, ___ U.S. ___, 132 S. Ct. 1702 (2012) (No. 11-88, 2011 WL 3664462, at

*17 (Aug. 19, 2011).  Plaintiffs also included a discussion of *Goodyear* in their motion to

dismiss filed June 5, 2013 in *Livnat v. Palestinian Authority,* more than two months before Defendants filed their summary judgment papers in this case.  Memorandum of Law in Support of the Palestinian Authority's Motion to Dismiss, *Livnat et al. v. Palestinian Authority*, No. 1:13cv498 (E.D. Va. 2013) (Docket Entry 6) ("Applying the *Goodyear* standard here, Plaintiffs must allege that the PA has sufficient contacts with the United States so that the PA is "fairly regarded as at home.'")

It would be manifestly unjust to Plaintiffs were the Court to reconsider its 2005 denial of Defendants' motion to dismiss (DE 26), given that Defendants could have brought this motion more than two years ago, but instead moved for summary judgment without referencing *Goodyear* or making a substantive personal jurisdiction argument.  (DE 247.)  *Goodyear* was decided on June 27, 2011, while the Court's decision as to Defendants' motion to vacate their 2005 default (DE 77) was pending and three weeks before Defendants filed their Answer (DE 128).  Since then, Defendants have vigorously litigated this case, using considerable judicial resources in the process, and have asked the Court to make a decision on the merits of the case. This motion, which rests on an improper foundation, must be denied.

## II.     Defendants Have Waived Personal Jurisdiction As A Defense

No matter how Defendants try, they cannot unwind the clock now and reclaim a defense that has long since been waived.  The "requirement of personal jurisdiction represents first of all an individual right," as such, "it can, like other such rights, be waived." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).  This Circuit specifically recognizes waiver "where a defendant has engaged in extensive post-default litigation without suggesting an infirmity in personal jurisdiction." *Dem. Rep. Congo v. FG Hemisphere Assocs., LLC*, 508 F.3d 1062, 1064 (D.C. Cir. 2007).  Defendants also can waive jurisdiction through

their actions, which "may amount to a legal submission to the jurisdiction of the court." *Ins. Corp. of Ir.*, 456 U.S. at 704-705.

Once personal jurisdiction is waived, the defendant has submitted to the jurisdiction of the court, and the defense can neither be reclaimed by a defendant nor restored by the court. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1399 (7th Cir. 1998); *see also Pusey v. Dallas Corp.*, 938 F.2d 498, 501 n.4 (4th Cir. 1991) ("[A] party's waiver operates not only to cut off his right to raise the defense, but the court's power to invoke it." (citation and quotations omitted)); *Kabbani v. Int'l Total Servs.*, Civ. A. No. 91–0391, 1991 WL 251863, at *1 (D.D.C. 1991) (noting that even if the court thought that the defendants' objection had merit, the court could not grant relief once the defense was waived).

Defendants waived their personal jurisdiction defense by failing to timely assert it. Moreover, Defendants' actions leave little doubt that this belated request for relief comes seven years too late – as that was when Defendants consented to the jurisdiction of this Court when it asked to be given a chance to litigate this case on the merits.

A.     **Defendants' Motion To Dismiss Asked The Court To Defer The Personal Jurisdiction Issue, Not Decide It, And Defendants Have Since Waived The Defense**

Defendants included very little by way of personal jurisdiction arguments in their 2003 motion to dismiss (DE 26), but now ask the Court to revisit the issue based on what they describe as an intervening change in law.  Even if there were an intervening change in law, it has no impact on this matter because the Defendants long since waived any personal jurisdiction defense.  What Defendants neglect to mention in their motion to reconsider (DE 278) is that Defendants' motion to dismiss was based almost entirely on subject matter jurisdiction (DE 26 at 3-16) and nonjusticiability (DE 26 at 18-30).  Tucked in the middle of the motion to dismiss

were brief references to personal jurisdiction, lack of process, and service of process.  (DE 26 at 16-18.)  Defendants' reply brief was silent with respect to all three issues, other than a passing reference to personal jurisdiction in a wholly different context, even though Plaintiffs had addressed these points in detail in their opposition.  (DE 39.)  That is the sum and substance of Defendants' written personal jurisdiction argument that Defendants want this Court to revisit.

This Court has held that an unanalyzed argument need not be addressed by the Court. *Arizona v. Shalala*, 121 F. Supp. 2d 40, 46 n.4 (D.D.C. 2000); *see also SEC v. Banner Fund Int'l*, 211 F.3d 602, 613-14 (D.C. Cir. 2000) (declining to address the defendant's "half-hearted" personal jurisdiction argument).  Defendants' choice to offer only a "half-hearted" personal jurisdiction argument likely was because Defendants did not want the Court to decide personal jurisdiction at that time.  Rather, Defendants told the Court the following:

> Issues of personal jurisdiction are secondary to this Court's subject matter jurisdiction and their resolution, and any discovery that may be appropriate with respect to them, should be deferred as "burdens of litigation" until after subject matter jurisdiction is finally resolved.

(DE 26 at 18.)

In effect, Defendants touched on a personal jurisdiction defense, but did not invest any effort in arguing the issue in their papers, and they specifically did not ask the Court to decide the issue.  The substance of their motion makes clear that Defendants made a tactical choice to put subject matter jurisdiction and their sovereign immunity argument front and center— everything else was "secondary."

The Court said no more than that it was denying Defendants' motion to dismiss in its February 7, 2005 Minute Order, yet Defendants—who already have informed the Court they do not know the grounds for the Court's decision (DE 56, Mar. 29, 2005 Tr. 22:24-25)—now attempt to divine what was in the Court's mind when it issued the Order.  Defendants assert that

(a) the Court has exercised "general jurisdiction over the PA and PLO, based principally on" Plaintiffs' arguments in the motion to dismiss; (b) the "Court presumably adopted" a now-rejected test for personal jurisdiction "in denying the Defendants' motion to dismiss"; and (c) the "Court's attribution of activities of the D.C. office of the PLO Mission to the Palestinian Authority also conflicts with *Daimler.*"  (DE 278 at 2, 10, 12.)  The Court, of course, said and did none of these things.  It simply said it was denying the motion.

Defendants have never been shy about moving the Court when they want something and could have formally moved the Court for a clarification as to the basis for its denial of Defendants' motion to dismiss.  Moreover, during the status conference on March 29, 2005 (or in any other pleading or status conference over the past nine years), Defendants could simply have asked the Court for a clarification.  But Defendants did not.  Nor did Defendants follow up on their assertion that they intended to seek an appeal of the jurisdictional issues.

Instead, Defendants defaulted and then came back to the Court seeking relief, not once but twice—first to participate in the damages portion of the post-default proceeding in relation to Plaintiffs' motion for default judgment (DE 64) and then to set aside the default entirely in order to litigate on the *merits* (DE 77).  The Seventh Circuit considered a similar case, where a defendant represented by counsel asserted a personal jurisdiction defense, among others, but then informed the Court that it would not defend the action.  *See e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 599-600 (7th Cir. 2007).  The Seventh Circuit deemed the personal jurisdiction defense waived because the defendant had "affirmatively elected to abandon those defenses before the district court" when it told the court in oral argument that it would not defend the action.  *Id.* at 600.

Defendants here are no different from the defendant in *Spamhaus*.  As with *Spamhaus*, Defendants' decision to default after the motion to dismiss was denied was strategic and planned. Here, too, the Court was cognizant of the willfulness of Defendants' default:

> Indeed, it seems overwhelmingly clear that defendants' default in this case was willful.  I am not persuaded in the least bit by defendants' arguments that their default was the result of regional turmoil, the lack of an institutional decision-making mechanism, or defendants' inability to understand the Court's jurisdiction.

(DE 126 at 5).

It has been seven years since Defendants asked the Court to vacate their intentional default and allow them to litigate on the merits, and almost three years since Defendants filed their Answer (DE 128) and began actively litigating this case.  Defendants should not now be allowed to revive a stale defense from which they intentionally walked way.

### B.    Defendants Pledged To This Court That They Would Litigate Cooperatively And On The Merits—They Never Mentioned Jurisdiction

It is ironic that Defendants argued vociferously to be allowed to litigate this case on the merits following their second default (DE 77) but now ask the Court to reconsider its February 7, 2005 Minute Order.[7]  Defendants' plea comes too late.  Lack of personal jurisdiction is a defense that can be "waived by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct."  *Tuckerbrook Alternative Invs., LP v. Banerjee*, 754 F. Supp. 2d 177, 183 (D. Mass. 2010) (finding waiver where the defendant defaulted, moved to vacate, filed and withdrew a suit against the plaintiff in the same court on the same facts, and defaulted a second time in the first case) (citing *Marcial Ucin, S.A. v. SS Galicia*, 723 F.2d 994, 996 (1st Cir.

---

[7]    Defendants' presentation of a meritorious defense was integral to the Court's decision to grant Defendants' motion to vacate:  "Specifically, defendants contend that the suicide bombing was, in fact, carried out by a militant wing of the PFLP . . . . I find defendants' assertions are sufficient to constitute a defense against plaintiffs allegations that the PA and PLO were responsible for the attacks . . . ."  (DE 126 at 10.)

1983)) (quotations omitted)).  "Defendants should raise such preliminary matters before the court's and parties' time is consumed in struggle over the substance of the suit." *Dem. Rep. Congo, LLC*, 508 F.3d at 1064 (finding waiver where defendant engaged in extensive post-default litigation without suggesting an infirmity in personal jurisdiction).  Long delays in raising jurisdictional concerns are "subversive of orderly procedure and make for harmful delay and confusion." *Marcial Ucin, S.A.*, 723 F.2d at 997 (finding waiver where a defendant waited four years to move for dismissal on jurisdictional grounds); *see also Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 62 (2d Cir. 1999) (same).

Not only have Defendants been dilatory in raising this defense, they repeatedly have manifested their consent to the Court's jurisdiction through their conduct.  When a defendant has participated in litigation for a lengthy period of time and has sought affirmative relief from the Court, it may not "pull its personal jurisdiction defense out of the hat like a rabbit." *Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*, No. 99-4042, 2000 WL 147392, at *3 (10th Cir. Feb. 4, 2000) (quotations omitted).  Rather, defendants "waive the defense" of personal jurisdiction "when their conduct might lead the plaintiff to believe that defendants have given up the defense and submitted to jurisdiction, when they allow or encourage the court to expend resources that would go to waste if the case is dismissed." *Citizens Cmty. Federal v. Silver, Freedman & Taff, L.L.P.*  No. 12–CV–648, 2014 WL 345261, at *3-4 (W.D. Wis. 2014) (finding waiver where the defendants did not raise their personal jurisdiction defense until more than a year into the case) (internal citations omitted).

Defendants returned to this Court and repeatedly pledged to litigate on the merits, informing the Court that they had "strong meritorious defenses," and advising the Court of their "seriousness" and "good faith" in asking the Court to vacate their intentional default.  (DE 77 at

5, 40.)  Although Defendants' Answer (DE 128) included personal jurisdiction as an affirmative

defense, this was clearly *pro forma* as Defendants made no subsequent motion, until now, to

have personal jurisdiction heard as a dispositive issue.  As discussed *supra*, Defendants' motion

to dismiss (DE 26) did not affirmatively ask the Court to decide personal jurisdiction, but rather

to defer jurisdictional discovery.  (DE 26 at 17-18.)  That Defendants did not believe it was a

decided issue is apparent from their inclusion of a reference to a desire to "reserve that issue" in

their response to Plaintiffs' motion for default judgment (DE 69 at 3), and their incorporation of

the defense in their Answer (DE 128).  "[R]esponsive pleadings, however, do not preserve the

defense in perpetuity."  *Burton v. N. Dutchess Hosp.*  106 F.R.D. 477, 481 (S.D.N.Y. 1985); *see

also Rates Technology Inc. v. Nortel Networks, Corp*., 399 F.3d 1302, 1309 (Fed. Cir. 2005)

(noting that "a party may consent to personal jurisdiction by extensively participating in the

litigation without timely seeking dismissal"); *PaineWebber Inc. v. Chase Manhattan Private

Bank (Switz.)*, 260 F.3d 453, 459 (5th Cir. 2001) (acknowledging the "well-established rule that

parties who choose to litigate actively on the merits thereby surrender any jurisdictional

objections").  There is good reason to require defendants to move quickly with respect to

jurisdictional defenses.  Plaintiffs would otherwise be placed in the untenable position of having

their causes become time-barred while Defendants proceed on the merits.  It, moreover, would

be costly in terms of both the Courts' and Plaintiffs' expenditure of resources were Defendants

permitted to wait until the eleventh hour to raise a jurisdictional defense.

## C.   Defendants Definitively Waived Any Jurisdictional Defense When They Moved for Summary Judgment

Since the Court granted Defendants' motion to vacate the 2005 default, Defendants have

vigorously litigated this case.  It is particularly appropriate to find a waiver of a personal

jurisdiction defense when a defendant moves for summary judgment without including a

challenge to personal jurisdiction in their motion.  *Cent. States, Se. and Sw. Areas Pension Fund v. Wiseway Motor Freight, Inc.*, No. 99C4202, 2000 WL 1409825, at *4 n.3 (N.D. Ill. Sept. 26, 2000) (finding waiver of personal jurisdiction where defendants spent two years participating in discovery, status conferences, responding to plaintiffs motions, and moved the court for summary judgment); *Burton*, 106 F.R.D. at 481-82 (failing to argue personal jurisdiction in a summary judgment motion waives the defense).

Defendants moved for summary judgment in August 2013 (DE 247), two years (and 119 docket entries) after filing their Answer (DE 128).  Summary judgment came at the conclusion of two very busy years in this case, beginning with the Court's decision to vacate Defendants' default so that they could litigate on the merits.  In their motion papers, that is exactly what Defendants argued—the merits.  Defendants made no argument regarding personal jurisdiction, and only referenced the defense in passing as part of the procedural history of the case.  This is no different from *Central States* where the court found a waiver of the jurisdictional defense under the same circumstances.  Defendants committed to this Court that they intended to litigate this case on the merits as described in their motion to vacate; they should be held to their commitment.

III.    ***Daimler* Is Not Applicable To This Case**

Even were the Court to ignore the untimeliness of Defendants' motion for reconsideration and Defendants' waiver of the personal jurisdiction defense, Defendants' motion still should be denied because the Supreme Court's decision in *Daimler* is not applicable here.

In *Daimler, A.G. v. Bauman*, 134 S. Ct. 746 (2014), non-U.S. plaintiffs brought claims arising in Argentina in the U.S. District Court for the Northern District of California against DaimlerChrysler Aktiengesellschaft ("Daimler"), a German public company headquartered in Stuttgart, Germany.  The Supreme Court granted *certiorari* to determine "whether, consistent

with the Due Process Clause of the Fourteenth Amendment, Daimler [wa]s amenable to suit in

California courts for claims involving only foreign plaintiffs and conduct occurring entirely

abroad."  *Id*. at 753.  (The Daimler plaintiffs argued only general personal jurisdiction.)  In

holding the Fourteenth Amendment Due Process Clause did not permit the exercise of personal

jurisdiction over Daimler, the Court reasoned:

> *Goodyear* made clear that only a limited set of affiliations with a forum will
> render a defendant amenable to all-purpose jurisdiction there.  "For an individual,
> the paradigm forum for the exercise of general jurisdiction is the individual's
> domicile; for a corporation, it is an equivalent place, one in which the corporation
> is fairly regarded as at home." 564 U.S. at ___, 131 S. Ct. at 2853-2854…With
> respect to a corporation, the place of incorporation and principal place of business
> are "paradig[m]… bases for general jurisdiction"…Those affiliations have the
> virtue of being unique—that is, each ordinarily indicates only one place—as well
> as easily ascertainable…These bases afford plaintiffs recourse to at least one clear
> and certain forum in which a corporate defendant may be sued on any and all
> claims.

*Id*. at 760 (citations omitted).  The Supreme Court noted neither Daimler nor MBUSA were

incorporated or had their principal place of business in California and stated Daimler was not

subject to general personal jurisdiction in every State in which its subsidiary's sales are sizable.

The Supreme Court did not, however, "foreclose the possibility that in an exceptional case…a

corporation's operations in a forum other than its formal place of incorporation or principal place

of business may be so substantial and of such a nature as to render the corporation at home in

that State."  *Id.* at 761 n. 19.

A.      ***Daimler* Is Not Applicable Because The PLO And PA Do Not Have Due
        Process Rights Under The United States Constitution**

Defendants are foreign governmental and political bodies; such entities do not have due

process rights.  The decision in *Daimler* turned on the due process rights of a foreign corporate

defendant and, as such, is inapplicable to the position of the parties in this case.

1.      **Governmental and Foreign Political Entities Do Not Have Protections Under the Due Process Clause**

Foreign states do not have due process rights under the Constitution that would protect them from a federal court's assertion of personal jurisdiction.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002) ("[F]oreign states are not 'persons' protected by the Fifth Amendment."); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 57 (D.D.C. 2003) (same), *appeal dismissed*, 112 F. App'x. 756 (D.C. Cir. 2004); *see also Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399 (2d Cir. 2009) (describing a foreign State as lying "outside the structure of the Union;" therefore foreign states and their instrumentalities are not entitled to due process jurisdictional protections).

In *Price*, American citizen plaintiffs sued Libya for torture and hostage taking.  294 F.3d at 82.  With respect to Libya's claim that the court did not have personal jurisdiction over it, the D.C. Circuit stated: "[W]e hold that Libya, as a foreign state, is not a 'person' within the meaning of the Due Process Clause.  We therefore conclude that the Constitution imposes no limitation on the exercise of personal jurisdiction by the federal courts over Libya."  *Id*. at 85-86.  The court added:

> Never has the Supreme Court suggested that foreign nations enjoy rights derived from the Constitution, or that they can use such rights to shield themselves from adverse actions taken by the United States.  This is not surprising.  Relations between nations in the international community are seldom governed by the domestic law of one state or the other…Rather, the federal judiciary has relied on principles of comity and international law to protect foreign governments in the American legal system.  This approach recognizes the reality that foreign nations are external to the constitutional compact, and it preserves the flexibility and discretion of the political branches in conducting this country's relations with other nations.

*Id*. at 97 (citations omitted).  The court concluded that if a foreign state believes it has "suffered harm by virtue of being haled into court in the United States, foreign states have available to

them a panoply of mechanisms in the international arena through which to seek vindication or redress." *Id*. at 98.

Similarly, States, municipalities, political subdivisions and other government entities have no rights under the Due Process Clause. *See South Carolina v. Katzenbach*,[8] 383 U.S. 301 (1966) (States of the Union are not persons protected by the Due Process Clause); *City of E. St. Louis v. Circuit Court for Twentieth Judicial Circuit, St. Clair Co., Ill*., 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause."); *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under the Fifth Amendment's due process clause.").  Notably, this rule applies as well to governmental entities—like the PA—that are neither foreign sovereign states, nor States of the Union or parts thereof.  *See, e.g.*, *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (finding agencies were "intrinsically part of the Commonwealth of Puerto Rico," and thus "non-persons" under the Fourteenth Amendment).

### 2.    The PLO And PA Exist Outside the Union

Defendants are not foreign sovereigns.  Nonetheless, they are the types of government and political entities that exist "outside the structure of the Union." *Frontera*, 582 F.3d at 399 (citation omitted).  In their filings with this Court, Defendants have asserted they are government entities (exactly the type of entity the courts have ruled are outside the Due Process Clause):  the "PLO and PA must be treated as part of Palestine" (DE 28 at 3); the "PA and PLO are parts of

---

[8] In *Shelby Co., Ala. v. Holder*, 133 S. Ct. 2612 (2013), the Supreme Court abrogated *Katzenbach* on other grounds.

the functioning government of Palestine," (DE 28 at 9); and the "PA and PLO are core elements and perform core functions of the Palestinian government…." (D.E. 39 at 2).

a.      **The PLO**

The PLO Constitution ratified by the Palestine National Assembly in 1968 provides for an elected National Assembly (Art. 5), an Executive Committee headquartered in Jerusalem (Art. 17), a Palestine National Army (Art. 22), and various Departments.  *See* Exhibit 4.  In 1974, the "United Nations General Assembly recognized the PLO as 'the principal party to the question of Palestine,' and the PLO has since participated in the United Nations General Assembly as a permanent observer."  *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 432 (S.D.N.Y. 2004) (quotations and citation omitted).  Then-PLO Chairman Yasser Arafat addressed the General Assembly in 1974, describing the PLO as "a national liberation movement, comprising all the Palestinian factions, organizations and capabilities."  U.N. Doc. A/PV.2282 ¶ 60 (1974). In September 1993, at the White House, the PLO and Israel agreed to a Declaration of Principles on Interim Self-Government Arrangements recognizing the "mutual legitimate and political rights" of Palestinians and Israelis.  *Knox*, 306 F. Supp. 2d at 433 (citation omitted).

b.      **The PA**

Under the May 1994 Agreement on the Gaza Strip and the Jericho Area between the PLO and Israel, the interim governmental authority—the PA—was established "with 'all the legislative and executive powers and responsibilities' specified in that agreement."  *Knox*, 306 F. Supp. 2d at 433.  "In September 1995 [the PLO and Israel] completed the Interim Agreement," which "overhauled the structure of the PA and delineated its powers in much more detail."  *Id.* The Interim Agreement established governmental functions for the PA and transferred specified "powers and responsibilities" from the Israeli military government to the PA.  36 I.L.M. 551, 558.  Among its powers and responsibilities, the PA can "sue and be sued," *id.* at 561 (Art. IX.2),

and provides many government services, including local policing and civil authority over traditional matters such as water rights, utilities, financial development and banking, transportation and telecommunications, roads and railways, trade and commerce, industrial development, employment, social welfare, environmental protection, and trade.  36 I.L.M. at 603 (Annex III).

c.   **Neither The PLO Nor The PA Falls Within The Protections Of The Due Process Clause**

The PLO is "dedicated to ends involving territorial and political rights, and thus inevitably has the characteristics of a 'political entity'" existing outside the bounds of the Constitution.  The PLO does not fall within the protections of the Due Process Clause.  *Palestine Info. Office v. Shultz*, 674 F. Supp. 910, 916-17 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (D.C. Cir. 1988);[9] *see also Mendelsohn v. Meese*, 695 F. Supp. 1474, 1481 (S.D.N.Y. 1988) ("A 'foreign state lies outside the structure of the Union'…The same is true of the PLO, an organization whose status, while uncertain, lies outside the constitutional system.  It has never undertaken to abide by United States law or to 'accept the constitutional plan.'"  (citations omitted)).

The PA, moreover, is a government entity and therefore, like the PLO, falls outside the framework and protections of the Constitution.[10]  *See Puerto Rico Pub. Hous. Admin.*, 59 F.

---

[9]      The district court in *Shultz* reasoned that the Palestine Information Office ("PIO") was the Mission for the PLO and stated:  "If the States of the Union have no due process rights, then a 'foreign mission' *qua* 'foreign mission' surely can have none."  674 F. Supp. at  919.  On appeal, the D.C. Circuit did not question the district court's view that the PLO would not be entitled to due process rights, but stated as to the PIO that it could not "be held to have forfeited its due process rights because it is a foreign mission when that is the very determination it wishes to challenge."  *Shultz*, 853 F.2d at 942.  Here, it is actually the PLO and PA who are the named defendants; there is no issue as to identity or, therefore, as to entitlement to due process protections.

[10]     As the D.C. Circuit has recognized, an entity need not be a sovereign state to fall outside the framework and protections of the Constitution.  In *National Council of Resistance of Iran ("NCRI") v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), the D.C. Circuit rejected the government's argument that two Iranian dissident organizations were not entitled to protection under the Due Process Clause, reasoning that neither the People's

(Cont'd on following page)

Supp. 2d at 325 (agencies were "intrinsically part of the Commonwealth of Puerto Rico," and thus "non-persons" under the Fourteenth Amendment); *cf. Virgin Islands v. Miller*, No. ST-08-CR-F-0348, 2010 WL 1790213, at *5 (V.I. Super. Ct. May 4, 2010) (Government of the Virgin Islands "is not a person for purposes of due process"(citation omitted)); *El Paso Co. Water Imp. Dist. No. 1 v. Int'l Boundary & Water Com'n*, 701 F. Supp. 121, 123-24 (W.D. Tex.1988) (political subdivision does not have due process rights); *City of E. St. Louis*, 986 F.2d at 1144 ("Municipalities…are not 'persons' within the meaning of the Due Process Clause.")[11]; *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167-68 (D.D.C. 1980) (city is not a person within the meaning of the Fifth Amendment).

> 3.   **The Rights Of Foreign Government And Political Entities Are The Prerogative Of The Executive—And Here The Executive Has Expressed Its Intent That Defendants Face Liability Under The ATA**

The scope of whatever effect federal courts give to the state actions or privileges and immunities of a foreign government or political body "is a matter ultimately determined not by juridical right or rule of law, but by whether, by application of the doctrine of comity or as a matter of public policy, it is warranted for a court, under the circumstances of a particular case,

---

(Cont'd from preceding page)

Mojahedin of Iran nor the NCRI was a government; the "closest the Secretary [could] come [was] to assert that the Council ha[d] described itself as a 'government in exile'…[t]hat untested claim [was] not sufficient *by itself* to bring the Council within the ambit of authorities governing the interrelationship of two sovereigns." *Id.* at 202-03 (emphasis added). Importantly, the court went on to state: "*If*," however, the United States were to *recognize* the Council as a government, or even perhaps to *deal* with it as if it were a government, then the result might be different." *Id.* at 203 (emphasis added).

Whereas neither petitioner in *NCRI* was actually a government, the PLO and PA are the representatives of the Palestinian people and the governing body for designated geographic areas. Moreover, although the PLO and PA are not foreign states, the United States "deal[s]" with the PLO and the PA as if they are a government. The U.S. negotiates with the PLO as part of the Middle East peace process and provides foreign aid to the PA. Exs. 5-7.

[11]    In their Memorandum of Points and Authorities in support of their summary judgment motion, Defendants suggest the PA is akin to a municipality. (DE 247-1 at 28-29.)

to accord any measure of respect to the asserted acts or protections of the foreign entity or government in question."  *Knox*, 306 F. Supp. 2d at 439.  It is the "executive branch, not the judiciary, [that] is uniquely empowered to delineate the bounds of international comity."  *Id.* at 447.  A review of the legislative history of the ATA makes clear the Executive Branch participated in the enactment of the civil remedy provisions and that those provisions were enacted with the goal of obtaining jurisdiction over terrorists and terrorist organizations in general, and the PLO in particular.

In 1986, Congress enacted legislation providing for criminal jurisdiction over international terrorist acts against United States nationals.  Congress subsequently determined "there [wa]s a need for a companion civil legal cause of action for American victims of terrorism."  H.R. Rep. 102-1040, at 5 (1992).  The civil remedies of the ATA initially were introduced and enacted in 1990; the ATA subsequently was repealed on technical grounds and then was re-enacted in 1992.  *See Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 444 (E.D.N.Y. 2008).

The State Department and the Department of Justice played a role in the drafting of the ATA civil remedy provisions; both Departments supported the legislation.[12]  As for the ATA being aimed at the PLO in particular, the legislative history is replete with references to the *Klinghoffer* case, which arose from the murder of Leon Klinghoffer, an elderly, wheelchair-bound American passenger aboard the hijacked Achille Lauro cruise ship, who was shot by the

---

[12]      *See* Hrg. Before the Subcomm. on Courts and Admin. Practice of the Comm. on the Judiciary, United States Senate, 101st Congress, Second Session on S. 2465, 3 (1990) (statement of Sen. Grassley);  *id.* at 18-20, 35-38 (State Dep't and Dep't of Justice officials' statements suggesting revisions which were incorporated in the final legislation); *id.*at 25 (Dep't of Justice "strongly supports the fundamental objectives of Senate bill 2465."); Michael B. Kraft, *Evolution of U.S. Counterterrorism Laws, Policies, and Programs* in Evolution of U.S. Counter Terrorism Policy 1, 33 (Yonah Alexander and Michael B. Kraft eds., 2008).

PLO hijackers and thrown into the Mediterranean. [13]  *See* H.R. Rep. 102-1040 at 5.  It was "[o]nly by virtue of the fact that the attack violated certain Admiralty laws and that the organization involved—the Palestinian Liberation Organization—had assets and carried on activities in New York, [that] the [*Klinghoffer*] court [was] able to establish jurisdiction over the case."  H.R. Rep. 102-1040 at 5.

The ATA was designed to "remove the jurisdictional hurdles in the courts confronting victims and [] empower[] victims with all the weapons available in civil litigation."[14]  Indeed, two of the "major features" of the ATA are (1) "[t]he extension of civil jurisdiction to accommodate the reach of international terrorism—i.e., *American civil law would be granted the same extra-territorial reach as American criminal law*," and (2) "[t]he facilitation of filing suits against international terrorists, through a provision allowing a suit to be filed in any district in which the defendant has a representative."  H.R. Rep. 102-1040 at 5 (emphasis added).

Considering the legislative history of the ATA, one can be left with no doubt that (1) the civil remedy provisions were aimed at providing jurisdiction over terrorist organizations in general and the PLO in particular, and (2) the Executive Branch of the government supported that aim.

---

[13]    *See also* Hrg. Before the Subcomm. on Courts and Admin. Practice of the Comm. on the Judiciary, United States Senate, 101st Congress, Second Session on S. 2465 at 12-13, 16-17 (July 25, 1990) (State Department official's statement on the proposed legislation discussing the *Klinghoffer* case against the PLO and stating "we support this legislation as a useful addition to the arsenal of legal tools for the fight against terrorism"); *id*. at 25, 30-31 (Dep't of Justice official discussing the *Klinghoffer* case).

[14]    Hrg. Before the Subcomm. on Intellectual Prop. and Judicial Admin. of the Comm. on the Judiciary, House of Representatives, 102d Congress, Second Session on H.R. 2222, Antiterrorism Act of 1991, 10 (1992) (letter from Sen. Chuck Grassley).

IV.     **Even If The Defendants Were Protected By The Due Process Clause, This Court's Assertion Of Personal Jurisdiction Over Defendants Would Not Violate Due Process**

A.      **The Defendants Were On Notice That Their Conduct Was Proscribed**

In the criminal context, due process requires only that the defendant have been on notice that his conduct was proscribed. *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013).  It would be incongruous to require more in a case like this where individuals injured by criminal conduct assert a civil cause of action for damages caused by the criminal conduct.  *See Pugh*, 290 F. Supp. 2d at 59 (noting  it "logically follows that if federal courts may constitutionally exercise criminal jurisdiction over individuals, the Constitution should be no bar to those same federal courts, in a civil action for such damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.").  Indeed, a defendant typically has greater protections in the criminal context than in the civil context.

Here, the PLO and PA certainly were on notice that their conduct was proscribed.  "The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years."  *Id.* at 59.  Moreover, prior to the suicide bombing at issue in this case, the PLO and PA had in fact been named in at least one ATA suit.  *See Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 276 (1st Cir. 2005) (ATA action filed against the PLO in March 2000).

B.      **Context Weighs In Favor Of The Court Asserting Jurisdiction**

In *Daimler*, the Supreme Court emphasized the predictability of having a corporation generally subject to general personal jurisdiction only in its place of incorporation and principal place of business:  "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable."  *Id.* at 760 (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Simple jurisdictional rules…promote greater predictability.")).

The Court stated its decision was reinforced by the international rapport and comity concerns brought to its attention by the Attorney General.  *Id.* at 763.

The instant case, however, involves a very different context.  Here, the PLO and PA purposefully have set up offices in Washington, D.C. and New York and have regularly sought out an audience not only with our government, but also with institutions of higher learning, U.S. businesses and U.S. citizens.  *See* Ex. 8; *see also* Ex. 9 ("Message from the Ambassador, stating: "In our efforts we seek to better relations with the U.S. government, establish commercial contacts with the business community, and encourage cultural exchange through public outreach and educational efforts to foster a better understanding of Palestine and Palestinians in the United States.").  Defendants have sought support both in the U.S. and specifically in this district.  The national security concerns at issue in this case weigh in the opposite direction from the international rapport concerns expressed in *Daimler.  See Strauss*, 249 F.R.D. at 443-44 ("The legislative history of the ATA, Executive Orders signed by two United States Presidents, and…international treaties and an international task force, establish this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks.").

The Supreme Court in *Daimler* expressly stated it did "not foreclose the possibility that in an exceptional case…a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State."  134 S. Ct. at 761 n. 19.  To adopt Defendants' personal jurisdiction arguments would be to contravene one of the main purposes of the ATA – to enable American Plaintiffs injured by acts of international terrorism to hale Defendants like the PLO and PA into a U.S. court to answer to the American victims of their crimes.

C.      **Alternatively, Physical Presence And Service Establish Jurisdiction**

The Court also has jurisdiction based on Defendants' physical presence in the United States.  Physical presence of a defendant and service on the defendant in the forum has long been held sufficient to subject the defendant to general jurisdiction when the forum's otherwise tenuous relation would not extend to the claims at issue.  *Bendix Autolite Corp. v. Midwesco Enters., Inc.* 486 U.S. 888, 892-93 (1988); *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 611-12 , 616, 619, 628 (1990) (plurality opinion); *Lopes v. JetsetDC, LLC*, ___ F. Supp. 2d ___, No. 1:13-cv-01550, 2014 WL 793117, at *6 (D.D.C. Feb. 19, 2014).  *Daimler* does not address the question of whether service on a defendant in the forum remains sufficient to subject the defendant to general personal jurisdiction.

Given that jurisdiction is predicated on Fed. R. Civ. P. 4(k)(1)(C) and the ATA "authorizes nationwide service of process to establish personal jurisdiction over a defendant," *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 31 (D.D.C. 2010) (citing 18 U.S.C. § 2334), the due process analysis in this case is under the Fifth Amendment (not the Fourteenth Amendment as was at issue in *Daimler*).  Under the Fifth Amendment, the forum to be considered is the United States in its entirety.  *See SEC v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004); *SEC v. E-Smart Tech., Inc*., 926 F. Supp. 2d 231, 236 (D.D.C. 2013) (same); *see also Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001) (personal jurisdiction is proper under the ATA when defendants have minimum contacts with United States as a whole, and have been served in any district where they reside, are found, or have an agent).  As Defendants are present in the United States, and as Defendants were served in the United States (DE15), general personal jurisdiction is proper.

D.    **The Court Has Specific Personal Jurisdiction Over Defendants**

Three requirements must be met for a court to exercise specific personal jurisdiction over a defendant:  (1) a long-arm statute or rule must authorize service of process on the defendant; (2) service of process must be valid and effective; and (3) the exercise of personal jurisdiction must comport with the dictates of the Constitution and in particular the Due Process Clause of either the Fifth or the Fourteenth Amendments.  *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012); *Mwani v. bin Laden*, 417 F.3d 1, 8-9 (D.C. Cir. 2005); *American Action Network, Inc. v. Cater America, LLC*, Civ. No. 12-1972, 2013 WL 5428857, at *3 (D.D.C. Sept. 30, 2013). Only the last of these requirements is contested by Defendants.

Due Process requires that the Court's exercise of personal jurisdiction (1) be based on the existence of minimum contacts between the defendants and the forum, which is typically satisfied where the defendants have fair warning that a particular activity could subject them to the jurisdiction of a foreign sovereign; and (2) comport with "traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945); *Burger King*, 471 U.S. at 472; *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 774 (1984); *Mwani*, 417 F.3d at 11. As set out above, where service of process is authorized by Federal Rule 4(k)(1)(C) in connection with the ATA, as it is here, the proper forum for the consideration of contacts is the United States as a whole, and it is the requirements of the Fifth Amendment, and not the Fourteenth, that govern.  *Bilzerian*, 378 F.3d at 1106 n.8; *Steinberg v. Int'l Criminal Police Org*., 672 F.2d 927, 930 (D.C. Cir. 1981).[15]

---

[15]    Note that pursuant to amendments made to the Federal Rules in 2007, what was previously referred to as Rule 4(k)(1)(D) is now Rule 4(k)(1)(C).  *See Carney v. Beracha,* Civ. No. 3:12-cv-00180, 2014 WL 533727, at *14 n.6 (D. Conn. Feb. 10, 2014).

Defendants have waived and consented to this Court's exercise of personal jurisdiction over them.  Were the Court to revisit the personal jurisdiction issue, however, the applicable standard favors Plaintiffs.  Where an evidentiary hearing on personal jurisdiction has not taken place, any type of factual evidence may be submitted to and considered by the court, without regard to its admissibility, and factual discrepancies are to be resolved in favor of the plaintiff at the motion to dismiss stage.  *In re Baan Company Securities Litigation*, 245 F. Supp. 2d 117, 125 (D.D.C. 2003); *see also Rundquist v. Vapiano,* No. 09-2207, 2012 WL 5954706, at *3 (D.D.C. Nov. 9, 2012) (where an evidentiary hearing has not been held, to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make a *prima facie* showing based on any evidence that is relevant).

### 1. Defendants' Conduct Within The United States Relates To The ATA Claim And Is Sufficient To Satisfy Minimum Contacts

"The question [to be addressed in the specific jurisdiction analysis] is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has power to subject the defendant to judgment concerning that conduct."  *J. McIntyre Mach., Ltd. v. Nicastro*, ___ U.S. ___, 131 S. Ct. 2780, 2789 (2011).  Where a defendant's contacts with the jurisdiction are substantial, a defendant may be subject to specific personal jurisdiction even if its claim is merely "related to" its conduct within the forum.  *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *see also Mwani*, 417 F.3d at 13 (court could exercise personal jurisdiction over defendants who allegedly orchestrated a terrorist bombing that took place entirely in Kenya, because the bombing was one component of an ongoing conspiracy to attack the United States; plaintiffs' injuries arose out of or related to the defendants' overall campaign of terror (citation omitted)).

Defendants' contacts with the United States are substantial.  In addition to the jurisdictional contacts set out in Plaintiffs' opposition (DE 32-1 with exhibits) to Defendants' motion to dismiss, Defendants had numerous additional contacts with the United States, all relating to Defendants' overall joint objective of operating and supporting a campaign that used acts of public relations in tandem with acts of terror to influence American policy with respect to the Middle East.  Indeed, the PLO operates a fully functional office in Washington, D.C., with employees.  *See* DE 32-1 and exhibits; *Sokolow v. Palestine Liberation Org.*, No. 04-cv-00397, 2011 WL 1345086, at *3 (S.D.N.Y. March 30, 2011); PLO Delegation website, http://plodelegation.us (last accessed March 17, 2014).  The PLO office represents the PLO and the PA in the United States, and both the PLO and the PA have paid the expenses of the office and the salaries of the employees.  *See* Ex. 10 at Ex. B.

Further, the PLO has maintained bank accounts and account balances in Washington, D.C.  *See* Ex. 11 at Sched. 2; Ex. 12 at Sched. 2.  It also appears that as of July 2002, the PA had millions of dollars on deposit in the New York branches of Citibank and Arab Bank and a brokerage account at Salomon Smith Barney.  *See Ungar ex. rel. Strachman v. Palestinian Auth.*, 325 F. Supp. 2d 15, 51 (D.R.I. 2004).

The PA and PLO also have given numerous lectures and interviews at high schools, colleges, and clubs in the U.S., and to U.S. media outlets, in order to further their agenda.  *See id.* at 51; Ex. 13 at Sched. 3; Ex. 14 at Sched. 1.  The PA and PLO have reported spending as much as $500,000 a year on these and other lobbying related appearances.  *See* Ex. 15 at 238; Ex. 16 at 235; Ex. 17 at 225-26; Ex. 18 at 216; Ex. 19 at 219; Ex. 20 at 216; Ex. 21 at 217; Ex. 22 at 213.

Defendants have entered into numerous commercial contracts with U.S. companies.  *See, e.g., Int'l Technologies Integration, Inc. v. Palestine Liberation Org.*, 66 F. Supp. 2d 3 (D.D.C.

1999) (dispute involving the PLO and PNA's contract with a Virginia company to develop domestic and international communications and telecommunications in the West Bank, Jericho and the Gaza Strip); *Sokolow*, 2011 WL 1345086, at \*4 (cataloging the PLO and PA's commercial contracts).  In addition, the PA entered into a multi-year contract with a consulting and lobbying firm, paying a very substantial retainer, which gave rise to a substantial promotional presence in the United States.  *See Sokolow*, 2011 WL 1345086, at \*4; Exs. 23-27.

   The numerous public statements the PA and PLO have made to the U.S. audience are designed to destabilize Israel and pressure the United States into advocating for an end to the so-called occupation of the West Bank.  *See generally*, http://plodelegation.us (displaying numerous articles protesting Israeli activities, Settlements).

   At all times relevant to this litigation, Defendants acted in concert to engage in a dual-pronged campaign that sought to employ public relations-type propaganda and to provide support for acts of terrorism to further Defendants' goal of terminating the so-called Israeli occupation, which ultimately gave rise to the Karnei Shomron bombing.  As part of the public relations component of the campaign, between 2000 and 2002, Hasan Abdel Rahman, the Chief Representative of the PA and the PLO in the U.S. at the time, repeatedly argued to U.S. leaders and the American public that the only way the terrorist attacks on Israel would end is if the U.S. pressured Israel to withdraw from the contested territories.  *See* Ex. 28 (CNN, February 3, 2002: "The Jewish settlements…have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel."); Ex. 29 (CNN, April 12, 2002:  "[W]hat takes Palestinians to the situation we are in is 36 years of one of the most brutal occupations in modern history. That's what turns people into suicide bombers.");  Ex. 30 (PBS, March 29, 2002:  "Mr. Colin Powell is missing the point…He should point fingers to Mr. Sharon to move his soldiers,

his army, his settlers, from the Palestinian territories…Peace can be achieved only when those guys leave us alone and leave us as a free people…If the situation continues, if the occupation continues…no one can stop the Palestinians."); Ex. 31 (CNN, April 14, 2002:  "I think the involvement of the United States on the site would be very, very helpful because obviously the two parties trust the United States and they want the United States to be involved…. We feel that 35 years of foreign, illegal occupation is more than enough."); *see also* Ex. 32 (CNN, October 17, 2000:  "I tell you how we end all of this. The Palestinian people have been living under Israeli military occupation for 33 years.…As long as Israel continues to occupy them…I don't think that peace the [sic] possible.").

During this same time period, Defendants reinforced the message of the public relations component of its campaign by providing material support to terrorist groups, including Raed Nazal and the PFLP, the individual and group directly responsible for the Karnei Shomron bombing.  The evidence shows Defendants gave material support to the PFLP in the form of paying a salary to Nazal without demanding any concomitant job responsibilities or even issuing him a uniform, paying rent for the Qalqilya PFLP office, publicly celebrating Nazal as a martyr after his death, making significant payments to the families of all prisoners held in Israeli prisons, and lobbying for the prisoners' release.  *See* Ex. 33 at 80:13-81:15; DE 254-9 (Ex. 43 to Plaintiffs' opposition to summary judgment); DE 261-2 (Ex. 123 to Plaintiffs' opposition to summary judgment); DE 258-7 (Ex. 67 to Plaintiffs' opposition to summary judgment); DE 258-10 (Ex. 71 to Plaintiffs' opposition to summary judgment); DE 258-8 (Ex. 68 to Plaintiffs' opposition to summary judgment); 258-9 (Ex. 69 to Plaintiffs' opposition to summary judgment); DE 262-3-4 (Ex. 169 to Plaintiffs' opposition to summary judgment); DE 258-6 (Ex. 66 to Plaintiffs' opposition to summary judgment).

When Defendants provided the PFLP with material support, they had ample knowledge that the PFLP was a terrorist organization and that they had recruited militant members of the PFLP into PA security operations.[16]  Ex. 33 at 33-35, 42.  In a 2007 broadcast, Mohammed Dahlan, a key PA security official who was chief of the Palestinian Preventive Security Service from the mid-1990s until 2002 and Palestinian Minister of State for Security beginning in 2003, boasted that "forty percent of the Martyrs in th[e] [Second] Intifada belonged to the Palestinian security forces."  *See* DE 261-20 (Ex. 142 to Plaintiffs' opposition to summary judgment).  He also intimated that the PA used its security forces to shield known terrorists:  "The Palestinian security forces were those who protected and hid half of the Hamas [military] leadership and the Hamas military force during the Intifada.  *See id.*  Moreover, the Karnei Shomron attack was not the first act of violence committed by the PFLP; indeed, the PFLP has a history of engaging in terrorist attacks that target Americans.  *See* Exhibit 35 at 3 (in June 1975, the PFLP kidnapped the U.S. military attaché to Lebanon and released him only after ransom was paid); *id.* at 4 (in June 1976, in Beirut, Lebanon, the PFLP kidnapped the U.S. ambassador to Lebanon and the U.S. economic counselor, and ultimately shot and killed both of them); *id.* at 7 (in October 1985, a PFLP squad took over an Italian cruise ship sailing to Israel, held the passengers hostage, and murdered an American).

Although the violence at issue in this case took place in Karnei Shomron and not in the United States, the litigation arises from and relates to injuries sustained by Plaintiffs in connection with Defendants' joint and dual pronged campaigns of public relations and terrorism

---

[16]      The U.S. State Department documented in PLO Commitments Compliance Reports ("PLOCCA Reports") for the period Dec. 16, 2001 to June 15, 2002 that the PA and PLO had not divorced themselves from terrorist activities and indeed support them.  *See* DE 256-5 (Ex. 54 to Plaintiffs' opposition to summary judgment).

to attain the PLO and PA's goal of ending the occupation.  That this litigation arises from injuries sustained by Plaintiffs relating to Defendants' overall campaign, of which the Karnei Shomron bombing was merely one component, is clear.  Because Defendants' substantial contacts with the United States relate to the claim at issue here, minimum contacts are satisfied.

> 2.  **Defendants' Extraterritorial Conduct Satisfies Minimum Contacts Under The "Effects Test"**

Minimum contacts sufficient to satisfy due process also may be established where the effects of a defendant's entirely extraterritorial conduct are nevertheless felt within the forum.  *See Calder v. Jones*, 465 U.S. 783, 790 (1984).  Known as the effects test, this theory of personal jurisdiction is "typically invoked where…the conduct that forms the basis for the controversy occurs entirely out-of-forum."  *Licci ex. rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).

In accordance with this doctrine, the Supreme Court and numerous courts within the D.C. and Second Circuits, among others, have upheld the exercise of personal jurisdiction in the face of Fifth Amendment challenges in cases where defendants have expressly aimed their conduct at United States citizens or United States policy.  *See, e.g., Calder v. Jones*, 465 U.S. at 789; *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (defendant's presence at a Seoul, Korea meeting during which price-fixing activities that would affect the U.S. market were conducted "satisf[ies] the 'effects' test frequently used in the analysis of specific personal jurisdiction"); *Daliberti v. Iraq*, 97 F. Supp. 2d 38, 54 (D.D.C. 2000) (finding personal jurisdiction over Iraqi defendants who kidnapped three Americans in Iraq in order to prompt certain actions by the U.S. government, including the lifting of economic sanctions); *Mwani*, 417 F.3d at 13 (engaging in multiple previous plots against the U.S. contributed to a finding that the

attack at issue, although committed in Lebanon, was directed at the U.S., with the intent that the effects would be felt in the U.S.).

In *Calder v. Jones*, the petitioners, two newspaper employees based in Florida, wrote an allegedly libelous article about an entertainer who lived and worked in California, for publication in a nationwide newspaper with its largest base of circulation in California. 465 U.S. at 785-86. Even though the petitioners were Florida residents with negligible direct contacts with California, the Supreme Court concluded that, under the effects test, personal jurisdiction existed over the petitioners with respect to plaintiff's libel claim. *Id.* at 789-90. Even though the petitioners did not control the marketing of the newspaper or directly profit from its sales in California, they intentionally wrote a potentially defamatory article knowing that the respondent lived and worked in California, where the newspaper had its largest readership base. *Id.* The Supreme Court held the *Calder* petitioners should have "reasonably anticipate[d] being haled into court [in California] to answer for the truth of the statements made in their article;" jurisdiction was "proper based on the effects of [petitioners'] Florida conduct in California." *Calder*, 465 U.S. at 789-790 (citations and quotations omitted).

Similarly, in *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 79 (D.D.C. 2006), the family of a woman killed in a terrorist bombing in Tel Aviv filed suit against Hamas in this district court pursuant to the FSIA, alleging that Hamas was complicit in the bombing. The attack was committed on Israeli soil, the woman and her husband were Israeli citizens (albeit with permanent residency status in the U.S.), two of their three children were Israeli citizens, and only their third child was a U.S. citizen. *Id.* Nevertheless, the court concluded that under the effects test it had "no difficulty concluding that the conduct plaintiffs attribute to Hamas, if proven, was calculated to cause injury to U.S. citizens (among others) and, predictably, did just

that…Terrorism cases provide textbook examples of 'unabashedly malignant actions' aimed at the United States whose effects are directed at and felt here." *Id.* at 89-90 (quoting *Mwani*, 417 F.3d at 13).

> It is…entirely foreseeable that an indiscriminate attack on civilians in a crowded metropolitan center such as Tel Aviv will cause injury to persons who reside in distant locales—including tourists and other visitors to the city, as well as relatives who live in the area.  The ripples of harm that flow from such barbarous acts rarely stop at the banks of the Mediterranean Sea or the Jordan River, and those who engage in this kind of terrorism should hardly be surprised to find that they are called to account for it in the courts of the United States….

*Id.*  Thus, the Court found that where injury to Americans was a foreseeable result of a broader attack, even if Americans were not the primary goal of the attack, personal jurisdiction could be exercised pursuant to the effects doctrine.  *Id.*

Here, much as in *Calder* and *Sisso*, Defendants have engaged in intentional and/or reckless misconduct outside of the forum that is nevertheless directed at the forum and its citizens, by launching, or alternatively by providing material support to, a campaign of terror designed to harm both Israelis and Americans in an effort to influence U.S. and Israeli policy in the Middle East.  Defendants supported the PFLP by providing direct financial support and by hiring the mastermind of the attack that caused Plaintiffs' injuries, Raed Nazal, knowing that Nazal was a PFLP leader who would carry out terrorist attacks.  *See* Ex. 33 at 80:18-25; Ex. 34 at 35:2-13; 52:3-12; 85:9-17; 87:4-6.  The fact that the PFLP engaged in multiple other attacks against the U.S., including the kidnapping of U.S. ambassadors, prior to the Karnei Shomron bombing, further demonstrates it was likely to target the United States.  *See* Exhibit 35 at 3; *see also Mwani,* 417 F.3d at 13.

In fact, through Defendants' support, Nazal was able to orchestrate a bombing that targeted a pizzeria in a shopping mall located in the Neve Aliza neighborhood of Karnei Shomron, a neighborhood and town notable for their high density of American citizens.  *See*

Exs. 36 & 37.  Indeed, Neve Aliza was founded by American families, was initially inhabited

exclusively by Americans in the 1980s, and today, along with Karnei Shomron as a whole, has

successfully become known as a community highly conducive to American emigrants and

visitors.  *See id.*  While the population of Israel as a whole is approximately 3% American,

Karnei Shomron may be as high as 10-13% American, and Neve Aliza's American population is

known to be significantly higher.  *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d

685, 694 (7th Cir. 2008) (observing that approximately 3.1% of Israel's population is comprised

of American citizens); Exs. 36 & 37.

      Defendants cannot avoid jurisdiction in the U.S. based on a theory that the suicide

bomber only targeted the Israeli citizens at the Karnei Shomron pizzeria any more than the

*Calder* petitioners could avoid jurisdiction in California for the effect of their actions aimed at

California from their base in Florida.  *See Calder*, 465 U.S. at 789-90.  Nor can Defendants be

permitted to ignore the foreseeable consequences of providing material support to entities within

their ranks that plan and carry out indiscriminate attacks against Israelis, as the *Sisso* court

concluded.  *See Sisso,* 448 F. Supp. 2d at 90; *see also Boim*, 549 F.3d at 694 (noting that because

3.1 percent of Israel's population is American, injury to Americans is a foreseeable consequence

of any attack in Israel).  Defendants at least recklessly supported terrorist activities such as the

targeting of the pizzeria in Karnei Shomron in order to kill both Israelis and Americans and

cause pain and suffering in both Israel and the U.S.  Much as the *Calder* and *Sisso* courts

concluded, Defendants directed their intentional and/or reckless misconduct at Americans by

providing material support to entities within the PLO who targeted Americans or at a minimum

knew or should have known that their indiscriminate attacks would injure Americans.  Indeed, if

the *Boim* court could conclude that injury to Americans is a foreseeable consequence of an attack

anywhere in Israel, where the population is 3% American, this rationale applies even more strongly in a neighborhood and town like Neve Aliza and Karnei Shomron, where the population is 10-20% American.  A constitutionally sufficient nexus thus exists between Defendants and this forum, such that the exercise of personal jurisdiction is proper.

Plaintiffs' claims arise out of a terrorism campaign that not only killed and injured United States citizens, but also appeared designed to influence United States policy.  In the context of the Fourteenth Amendment, the Supreme Court has held that "the plaintiff cannot be the only link between the defendant and the forum" to satisfy the effects test.  *Walden v. Fiore*, ___ U.S. ___, 134 S. Ct. 1115, 1122 (2014).  *Walden* does not apply here.  By supporting terrorists who attack in a neighborhood, town, and country known to be densely populated with Americans, where harming Americans was a foreseeable and likely consequence, and where that attack was part of a broader campaign to influence American policy,  Defendants should have reasonably anticipated being haled into court in the U.S.  It is eminently fair to ask them to answer for that conduct in a United States court of law.

### 3.  The Totality Of The Circumstances Supports Jurisdiction

Even after concluding that minimum contacts exist between the defendant and the forum, a court may also consider "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  *Mwani*, 417 F.3d at 14 (quoting *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320)).  "Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King*, 471 U.S. at 477; *see also Mwani*, 417 F.3d at 14 (finding the exercise of personal jurisdiction to be reasonable and fair, by virtue of the fact that defendants who committed a terrorist bombing outside of the United States had sought to harm Americans).

43

By engaging in a campaign of terror or, alternatively, by providing material support to a campaign of terror, in Israel that, in connection with a sophisticated public relations campaign within the U.S., was designed to influence U.S. foreign policy, Defendants purposefully directed their activities at the United States and its citizens.  Much as in *Mwani*, where the defendants bombed a U.S. embassy overseas to cause fear within the United States and ultimately influence U.S. policy in the United States, the exercise of jurisdiction over Defendants here comports with fair play and substantial justice.  *See Mwani*, 417 F.3d at 14.  The fact that the Karnei Shomron bombing did not take place within the borders of the U.S. is not a consideration that would render the assertion of this Court's jurisdiction incompatible with substantial justice.  *See id.*

## V. Defendants' Requested Relief Should Not Be Granted Without The Opportunity To Conduct Jurisdictional Discovery

"[J]urisdictional discovery is available when a party has 'at least a good faith belief' that the court has personal jurisdiction.  *Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc.*, 275 F.R.D. 20, 30 (D.D.C. 2011) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)).  The D.C. "Circuit's standard for permitting jurisdictional discovery is quite liberal." *Id.* (citation omitted); *see also Diamond Chem. Co., Inc. v. Atofina Chems., Inc.,* 268 F. Supp. 2d 1, 15 (D.D.C. 2003) (jurisdictional discovery is permitted even where a plaintiff "has not made out a *prima facie* case of jurisdiction" and even if it is not clear discovery will resolve "the jurisdictional questions in the case." (citations and quotations omitted)).  As Plaintiffs have a good faith belief that this Court has personal jurisdiction over Defendants and have more than made out a *prima facie* case of jurisdiction, if the Court is inclined to revisit personal jurisdiction and grant Defendants' motion, the Court should refrain from doing so until the parties conduct jurisdictional discovery.

44

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Reconsideration, and provide any other relief to Plaintiffs as the Court deems fit. A proposed order is attached.

Dated:    March 21, 2014

Respectfully submitted,

By    _____ /s/ Abbe David Lowell_____

Abbe David Lowell (#358651)
Joy L. Langford (#451728)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: 202-974-5605
Fax: 202-974-6705
adlowell@chadbourne.com
*Counsel for Plaintiffs*

Robert J. Tolchin (NY 0088)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
Tel: 718-855-3627
rjtberkman@gmail.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of March 2014, I caused a true and correct copy of

the foregoing *Memorandum Of Points And Authorities In Opposition To Defendants' Motion for*

*Reconsideration of the Court's February 7, 2005 Interlocutory Order on Personal Jurisdiction In*

*Light of Recent Supreme Court Decision* and accompanying exhibits to be filed and served

electronically via CM/ECF to:

> Charles F. G. McAleer, Jr.
> MILLER & CHEVALIER CHARTERED
> 655 Fifteenth Street, N.W.
> Suite 900
> Washington, D.C. 20005-5799
> cmcaleer@milchev.com
>
> Richard A. Hibey
> MILLER & CHEVALIER CHARTERED
> 655 Fifteenth Street, N.W.
> Suite 900
> Washington, D.C. 20005-5799
> rhibey@milchev.com
>
> Mark J. Rochon
> MILLER & CHEVALIER CHARTERED
> 655 Fifteenth Street, N.W.
> Suite 900
> Washington, D.C. 20005-5799
> mrochon@milchev.com
>
> *Counsel for Defendants, the PA and the PLO*

and all Counsel of Record.

> /s/ Abbe David Lowell
> Abbe David Lowell