IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
SHABTAI SCOTT SHATSKY, ET AL.,    )
                                  )
             Plaintiffs,          )    CA No. 02-2280
                                  )
                                  )    Washington, D.C.
        vs.                       )    July 8, 2015
                                  )    3:15 p.m.
PALESTINE LIBERATION ORGANIZATION, )
                                  )
             Defendant.           )
_____ )
```

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          Abbe David Lowell
                             Joy L. Langford
                             CHADBOURNE & PARKE LLP
                             1200 New Hampshire Avenue, NW
                             Suite 300
                             Washington, D.C. 20036
                             (202)974-5605
                             adlowell@chadbourne.com
                             langford@chadbournet.com


For the Defendant:           Richard A. Hibey
                             MILLER & CHEVALIER, CHARTERED
                             655 15th Street, NW
                             Suite 900
                             Washington, D.C. 20005-5701
                             (202)626-5888
                             rhibey@milchev.com

APPEARANCES CONTINUED:

For the Defendant:          Mitchell R. Berger
                            Alexander Chopin
                            Amy Brown
                            SQUIRE PATTON BOGGS (US) LLP
                            2550 M Street, NW
                            Washington, D.C. 20037
                            (202)457-5601
                            mitchell.berger@squirepb.com
                            alexandra.chopin@squirepb.com
                            amy.brown@squirepb.com


Court Reporter:             William P. Zaremba, RMR, CRR
                            U.S. Courthouse
                            333 Constitution Avenue, NW
                            Room 6511
                            Washington, D.C. 20001
                            (202)354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
1                    P R O C E E D I N G S

2            DEPUTY CLERK:  All rise.  This Honorable Court is

3   now in session.  The Honorable Judge Richard J. Leon

4   presiding.  God save the United States and this Honorable

5   Court.  Please come to order.

6            Your Honor, we have Civil Action 02-2280,

7   Shabtai Shatsky, et al., versus the Palestinian Liberation

8   Organization.

9            Counsel, please approach the lectern and identify

10  yourselves for the record.

11           MR. LOWELL:  Good morning, Your Honor.

12  Abbe Lowell and Joy Langford from Chadbourne & Parke on

13  behalf of the plaintiffs.

14           THE COURT:  Welcome back.

15           MR. BERGER:  Good afternoon, Your Honor.

16  Mitchell Berger from Squire Patton Boggs for the Palestinian

17  Authority and the PLO, along with my partners,

18  Alexandra Chopin and Amy Brown.

19           THE COURT:  Welcome.

20           MR. HIBEY:  Good afternoon, Your Honor.

21  Richard Hibey.  Also for the PA and PLO defendants with me,

22  my partners from the law firm of Miller Chevalier,

23  Charles McAleer and John Eustice.

24           THE COURT:  Welcome.

25           All right, counsel.  We're here to hear argument
```

1  on the issues raised previously by the Court.  There doesn't

2  seem to be much issue with regard to the Court's authority.

3  The issue is whether sanctions are appropriate,

4  and, if so, what the sanction should be.  So I assume that's

5  what the counsel will address.

6  And I'll give each side 15 minutes.  You can

7  reserve part of your time for rebuttal, if you'd like.

8  MR. HIBEY:  Your Honor, I understand that this is

9  usable, this ELMO, with the Court's permission.

10  THE COURT:  Well, yeah.  I mean, if you can figure

11  out how to use it.

12  MR. HIBEY:  Well, I've been oriented to it a

13  little bit.

14  THE COURT:  There you go.

15  MR. HIBEY:  With that, I appreciate the

16  opportunity to do that.

17  (Pause)

18  MR. HIBEY:  The question before the Court is

19  whether in a lawsuit marked by persistent bad faith and

20  discovery abuse on the part of the plaintiffs, the Court

21  should strike from use in the plaintiffs' opposition to our

22  defendants' motion for summary judgment 73 exhibits that

23  were untimely submitted in the Tolchin Declaration and first

24  disclosed after the passage of the discovery deadline in

25  this case, all in violation of the Rules of Procedure and of

1   the inherent authority of the Court to protect its integrity

2   and the judicial process.

3           The Court has granted me permission to use this

4   ELMO.  I just want to, if I'm doing this correctly, somebody

5   will have to tell me if it's showing up.

6           Your Honor, briefly, I want to --

7           THE COURT:  It needs to be -- it's a little fuzzy.

8   I don't know if you can dial it or something.

9           Tim, see if you can help him with the dial there.

10          MR. HIBEY:  Is this the dial?

11          THE COURT:  Maybe that's what you need.  I don't

12  know.

13          MR. HIBEY:  It's not a zoom issue, is it?

14          THE COURT:  That's better.  Whatever you just did

15  works better.

16          MR. HIBEY:  Hopefully, it will work well enough to

17  orient you to the fact that we're dealing with 73 exhibits

18  to the plaintiffs' opposition to the defendants' motion for

19  summary judgment that was --

20          THE COURT:  66 of the 73 were submitted in --

21  after January 2nd, when the Court denied request for

22  discovery extension.

23          MR. HIBEY:  Yes.  And with this second document, a

24  distillation of this first document, what we've done is

25  simply taken the numbers out --

1          THE COURT:  Okay.

2          MR. HIBEY:  -- and given you in broad stroke the

3    history of the submission of these 73 exhibits, all of which

4    came after the September 19, 2012, discovery deadline, which

5    was established by order of the Court.

6          And there is no question about that certainly in

7    the minds of the plaintiffs' counsel, because one month

8    before the discovery deadline had occurred, in August of

9    2012, in Exhibit 20 of the submission that we've made in our

10   motion for sanctions, counsel, Robert Tolchin, specifically

11   inquired of us seeking confirmation that the discovery

12   cutoff date was, in fact, September 19th, 2012.  So that was

13   very much etched in the case.

14         And notwithstanding the clear and unmistakable

15   knowledge that that was the deadline for the discovery, fact

16   discovery to be submitted, they went ahead and did what they

17   did as revealed in this summary.

18         Sixty-six of the 73 exhibits were first disclosed

19   after the January 2nd, 2013, omnibus minute order that

20   denied a whole bunch of discovery motions that the

21   plaintiffs had filed in the last couple of months of the

22   year 2012.

23         Twenty-nine of those 66 exhibits were first

24   disclosed after the January 26th minute order, the year

25   2013, setting a summary judgment briefing schedule.

1          And one of those 29 was first disclosed between

2     that particular minute order and when we, the defendants,

3     filed our motion for summary judgment on August 12th, 2013.

4          THE COURT:  So none of these documents were able

5     to be tested through the discovery process?

6          MR. HIBEY:  Oh, no.  No.  These were, as we say,

7     first disclosed to us in this time frame, which was well

8     after the discovery deadline in this case had passed.

9          THE COURT:  Now, some of the documents, I believe

10    it's 16, were documents that the defendants themselves had

11    produced?

12         MR. HIBEY:  Yes.

13         THE COURT:  So roughly, 16 of the total.

14         Why should documents that the defendant produced

15    also be stricken from the usage of the plaintiffs in their

16    opposition to summary judgment since they're ones that you

17    produced?

18         MR. HIBEY:  Well, there are two factors and

19    reasons, if you will, that I think enter into that.

20         The first is that the disclosure of those

21    documents occurred upon a mutually agreed upon date of

22    exchange as follows:  What Tolchin did in August by seeking

23    to confirm the discovery deadline was to take that

24    opportunity to serve upon us Rule 34 request for production

25    of documents, which were then due in a certain date

1    around -- oh, the close, September 19th.

2              THE COURT:  Right.

3              MR. HIBEY:  There were in that request 250

4    discrete requests, which meant that we had to scramble to

5    find documents responsive to them, get them translated,

6    analyze them to see if, indeed, they were responsive, and to

7    get them to them.

8              We timely complied with our Rule 34 obligations to

9    indicate what we were going to do with respect to any

10   documents that were responsive to a proper inquiry under

11   Rule 34.

12             Thereupon, with that timely indication, the

13   parties then agreed that there would be an exchange of the

14   discovery documents in Jerusalem on or about the 21st of

15   October.  It was on the 21st of October, 2012, that we

16   submitted material responsive to the Rule 34 demand.  That

17   was after the discovery deadline.

18             But as you can see, it was a ministerial act of

19   getting them physically to these people, but our response

20   was timely made.

21             THE COURT:  Okay.

22             MR. HIBEY:  Secondly, I'll seek confirmation from

23   my colleagues who --

24             THE COURT:  Sure.

25             MR. HIBEY:  -- lived this in even more detailed

1  fashion than I did.  I don't believe any of those particular

2  documents were used by us or them in the summary judgment

3  pleadings.

4          THE COURT:  Oh.

5          MR. HIBEY:  So if I'm correct in that regard, then

6  I'll stand by that statement.  Now --

7          THE COURT:  You can always verify it with a

8  follow-up letter to the Court.

9          MR. HIBEY:  I may be able to do it while we're

10  here.

11          THE COURT:  Okay.  That's fine.

12          MR. HIBEY:  I appreciate that, Your Honor.

13          Now, it's not a pleasant task to predicate a

14  motion for sanctions on the conduct and the abusive conduct

15  of an opponent, no matter how hotly contested a litigation

16  might be.

17          THE COURT:  Well, Mr. Lowell wasn't involved in

18  the case at that point in time.

19          MR. HIBEY:  He was not.

20          THE COURT:  Was not involved.

21          MR. HIBEY:  But let me jump forward in response to

22  that particular observation on your part.

23          It's a good question as to who the lawyers were,

24  and that has been the case all along.

25          THE COURT:  I've often wondered that myself.

1      MR. HIBEY:  Well, I think, Your Honor, you're

2  going to have to come to grips with it, if I may

3  respectfully suggest, because what you have here are people

4  who appear in court sometimes, but a whole shadow litigation

5  team that you're aware of by virtue of the contempt

6  proceedings that were almost initiated against the

7  plaintiffs when they refused to turn over a document that we

8  had inadvertently disclosed.

9      THE COURT:  Well, I can remember some heated

10  discussions with counsel from Alabama, I believe it was,

11  about what was really going on and what his colleagues in

12  Brooklyn were actually doing that he wasn't aware of,

13  et cetera, et cetera.  I remember that.

14      MR. HIBEY:  Well, it's more than that.  It's not

15  only his colleagues in Brooklyn but his colleagues in the

16  Middle East in Israel where an outfit called Shurat HaDin is

17  behind this whole litigation strategy that they call

18  "lawfare," a take on warfare.

19      THE COURT:  Uh-huh.

20      MR. HIBEY:  And for various and sundry ideological

21  reasons, they pressed these points through the use of

22  litigation everywhere they can, but especially here in the

23  United States.

24      And the conduct of those lawyers is absolutely

25  integral to what's happened here.  These deadlines were just

1  not met; and yet this organization, which Mr. Tolchin is a

2  representative of here in the United States, who actually is

3  a reception point for contributions to support the work of

4  Shurat HaDin, this dynamic is at work to such a point that

5  they have agreed to control over the documents that -- and

6  timing of when they were used than perhaps even counsel in

7  the courtroom.

8          We pressed very hard in 2012 during the period in

9  which on numerous occasions plaintiffs' counsel would,

10  quote, supplement the record purportedly under Rule 26,

11  making these disclosures from time to time.  And on each

12  occasion, Mr. McAleer was very careful to document his

13  opposition, his rejection of this whole notion for a number

14  of reasons, not the least of which was, "We've never seen

15  these documents.  What are you talking about?"  And this is

16  just not right because discovery is closed.

17          Finally, in or about November of 2012, December of

18  2012, December 11th, we received a letter from counsel with

19  an attachment.  It's in the exhibits here -- the exhibit

20  number escapes me right now -- but it's in the high 20s.

21  I said 2012, and I meant 2013.

22          THE COURT:  All right.

23          MR. HIBEY:  Exhibit No. 4, which was a letter from

24  plaintiffs' counsel, who are here in the courtroom, to

25  Mr. McAleer, explain at least two things that I can think

1    of; one, their view of what they could do that they had a

2    right to supplement all along and that that right of

3    supplementation simply carried forward.  And they submitted

4    a multi-page document identifying the various exhibits and

5    with a footnote.

6            And if Your Honor will indulge me a moment,

7    because I don't have a lot of room here, I'll go back and

8    get the --

9            THE COURT:  Go ahead.

10            MR. HIBEY:  Get the letter and the attachment.

11            (Pause)

12            MR. HIBEY:  Exhibit 4, a letter dated December

13    12th, 2013, from Ms. Langford of the plaintiffs' in-court

14    counsel, explains that under Rule 26, they only have an

15    obligation to submit anything that they ultimately decide

16    they're going to use.  And, therefore, they -- it's only

17    when it becomes a decision to use a document that they have

18    an obligation under Rule 26 to use it and produce it.

19            Well, there's no mention here of another operative

20    set of rules, namely, 33 and 34, interrogatories and

21    requests for production of documents, where there is no such

22    limitation; there is only the obligation to produce with

23    respect to what is asked for.

24            And I can assure you without fear of contradiction

25    that our interrogatories and requests for documents covered

1   entirely the subject matter of these 73 exhibits.  Had they

2   been responded to, there would have been an obligation

3   notwithstanding Rule 26 to have turned them over to us when

4   we asked for them.

5           THE COURT:  Uh-huh.

6           MR. HIBEY:  That just did not happen.

7           Now, we were always concerned about where did

8   these documents come from.  How did they -- what makes them

9   a document for use in a case like this?

10          And ultimately, in this same letter, the

11  plaintiffs submitted to us an index of what they have

12  disclosed, purportedly under Rule 26, that are cited as

13  exhibits in the opposition to our motion for summary

14  judgment.  In that respect, they had numbered about 169 of

15  them.

16          And the appendix at the end, at the very end, on

17  page 21 of the attachment to our Exhibit 4, the following

18  footnote:  Unless otherwise noted in all instances, the

19  material provided as a Rule 26 disclosure was originally

20  obtained by Shurat HaDin and subsequently provided to

21  Counsel of Record; hence, Counsel of Record is relying upon

22  the records and/or representations of Shurat HaDin for

23  purposes of compiling this index.

24          This throws it right back, as far as I'm

25  concerned, to the harsh reality that we are dealing with

```
 1   lawyers who are not here in the courtroom but who are

 2   absolutely joined at the hip, if you will, with what goes on

 3   here in the courtroom.

 4              THE COURT:  Is Mr. Tolchin here in the courtroom

 5   today?

 6              MR. HIBEY:  I do not see him.

 7              THE COURT:  Mr. Lowell, is he here?

 8              MR. LOWELL:  He's not, Your Honor.

 9              THE COURT:  Is there a reason why he's not?

10   Counsel of Record in the case still, isn't he?

11              MR. LOWELL:  Yes.  But not all counsel of record

12   are here all the time, Your Honor, which was the case.

13   On one particular occasion, you asked that he attend and he

14   did.  You didn't ask him to attend on any other occasions

15   you've been here, so we've been following your lead.

16              THE COURT:  Okay.

17              MR. HIBEY:  On something as critical as this where

18   we are asking -- and there's no mistake about it in our

19   papers -- that the Tolchin Declaration be stricken, it would

20   seem to me that he should be here.  His absence speaks

21   volumes.  I think it's right to infer that he has nothing

22   good to say.

23              I'll give you an example.

24              THE COURT:  Well, at least I think at best it's

25   curious that he's not here.  That's at best.
```

```
1              MR. HIBEY:  If you take, for example, Exhibit 1 --
2    indulge me a moment, Your Honor.
3              THE COURT:  Uh-huh.
4              MR. HIBEY:  Here's a perfect example of why an
5    index like this is not only unreliable -- it should be
6    rejected -- but let's work with it for a second.
7              Exhibit 31.  Exhibit 31 is referenced in the chart
8    that is part of our Exhibit 4.  Now, Exhibit 31 is, again,
9    what they're using in the opposition.  It's the verdict in
10   the State of Israel against Marwan Barghouti, May 20th,
11   2004.
12             Date received by plaintiffs' counsel.  Plaintiffs'
13   counsel do not recall the date on which they received this
14   document.
15             There was a case --
16             THE COURT:  So that would include Mr. Tolchin?
17             MR. HIBEY:  Oh, absolutely.
18             THE COURT:  Since he's plaintiffs' counsel.
19             MR. HIBEY:  Absolutely.
20             There's a case that was brought by Surat HaDin in
21   the Southern District of Florida called Saperstein.
22   In Saperstein, this very document was produced in the year
23   2009.  But here, they're not sure.
24             Now, this is, I mean, this is a gross
25   inconsistency that suggests to me that they're just not
```

1  reliable in what they've submitted here.

2          And that unreliability persists.  I'm trying to

3  find another example of that, but perhaps --

4          THE COURT:  Well, I think you've got plenty of

5  examples.

6          Where's the bottom line here in terms of what's

7  the appropriate sanction?

8          MR. HIBEY:  Well, the appropriate sanction is to

9  preclude the use of these documents under the Federal Rules

10  of Civil Procedure.  There's ample provision.  And Rule 16,

11  it says you can't use things if you violate the scheduling

12  order.

13          THE COURT:  There's plenty --

14          MR. HIBEY:  We did that.

15          THE COURT:  There's plenty of authority on that.

16          MR. HIBEY:  Yeah.

17          And the same under Rule 37, the sanctions are

18  clear.  These folks haven't even come close to complying

19  with the rules.  And then they act as if the orders of the

20  Court, the rulings that you made at the end of December --

21  I'm getting my years mixed up --

22          THE COURT:  '12.

23          MR. HIBEY:  -- '12 did not occur at all, and that

24  they had an entitlement to shovel into this case any

25  document that Shurat HaDin happened to have that could be

1   used in their opposition or purport to be used in their

2   opposition to our motion for summary judgment.  That's not

3   right.  Indeed, it is gravely wrong.

4             THE COURT:  So effectively, the Declaration of

5   Tolchin should be out.

6             MR. HIBEY:  I'm sorry?

7             THE COURT:  Effectively, the Tolchin Declaration

8   itself would be out.

9             MR. HIBEY:  Well, the declaration.

10            But what we understand to be were also all of the

11  exhibits that he references.

12            THE COURT:  Right.

13            MR. HIBEY:  Because if the Tolchin Declaration is

14  out, those exhibits should be out for the reasons that are

15  very clear here --

16            THE COURT:  Okay.

17            MR. HIBEY:  -- with respect to the total

18  noncompliance of these people with the rules.

19            I think, Your Honor, if there are any specific

20  questions --

21            THE COURT:  Your colleague --

22            MR. HIBEY:  -- I could truncate my presentation,

23  I'm sure.

24            THE COURT:  Your colleague might have something.

25            MR. HIBEY:  If you'll indulge me, I'll find out.

1          (Pause)

2          MR. HIBEY:  Your Honor, would you take a comment

3     from Mr. McAleer about the 16 documents?

4          THE COURT:  Sure.

5          MR. HIBEY:  Thank you.

6          MR. McLEER:  May it please the Court, I'm always

7     honored to follow Mr. Hibey to the podium, but I'll be

8     brief.  I just wanted to address the Court on one issue the

9     Court had raised and clarify the record.

10          Specifically, the Court had focused on certain

11     exhibits that the plaintiffs used as summary judgment

12     exhibits, which were from among those produced by the

13     defendants in discovery.

14          THE COURT:  Right.

15          MR. McLEER:  Specifically, that's an argument that

16     the plaintiffs had raised on page 35 of their opposition to

17     our motion for sanctions, which is docket entry 2272.

18     And specifically, those are Exhibits 151 to 166.

19          THE COURT:  Right.

20          MR. McLEER:  Now, one point of clarification for

21     the Court.  Those exhibits are not among the 73 referenced

22     in the chart that Mr. Hibey showed the Court at the

23     beginning of this hearing.

24          THE COURT:  Okay.

25          MR. McLEER:  That chart was meant to focus on the

1   documents that were late disclosed by plaintiffs.  So that's

2   point one on clarification.

3         Point two is that we had separately moved for

4   exclusion of Exhibits 151 to 166 as reflected in our motion

5   for sanctions and our proposed order for several reasons,

6   including the fact that during the discovery period, we had

7   served written discovery upon Mr. Tolchin and his colleagues

8   that sought, among other things, identification of any

9   statements that they were going to contend in the case

10  constituted admissions by the Palestinian Authority, or the

11  PLO.

12        And we had also propounded document requests that

13  sought -- or that accompanied the interrogatories.

14        As the record makes clear, we contend there was no

15  timely objection to the interrogatories, and there was never

16  any substantive response to any of the interrogatories.

17        Indeed, the first documents that we got from the

18  plaintiffs were facsimiled to us on September 16 after the

19  September 4th deadline and for the plaintiffs' benefit after

20  the depositions that they were taking of our witnesses had

21  occurred in the Middle East.  And that was the first

22  document we had gotten.  And they were just simply a set of

23  don't-bother-us objections, and they reflected utter disdain

24  for the discovery process.

25        Why is it important for purposes of this motion

1    for sanctions that we would move to exclude documents we had

2    produced?

3            Well, certainly, we produced a number of documents

4    in response to plaintiffs' request, even though the

5    plaintiffs had not articulated in written discovery, nor had

6    they, through their obligations, under 26(a)(1), which are

7    self-effectuating, essentially disclosed what it was that

8    they were going to use against us by way of admissions or

9    other evidence.

10           And, obviously, I need not explain to the Court

11   that there is substantial due diligence that counsel does in

12   evaluating evidence and assessing the effectiveness of it or

13   the weakness of it or the strength of it and to take actions

14   to address it, whether they raise hearsay issues or other

15   things that one could attack.

16           But in this instance, the plaintiffs never

17   responded to discovery at all to the utter disdain of the

18   process, despite repeated requests from me, and then

19   purported to send us a document which was dated September

20   4th but which we didn't receive at all until a facsimile on

21   September 16th.

22           And so our position, which I won't belabor further

23   for the Court, is that that is an additional ground for

24   striking those documents which the plaintiffs over a year

25   later and after refusing to answer our discovery tendered to

1    the Court as a basis for not awarding summary judgment to

2    the Palestinian Authority and the PLO.

3          We are entitled to know that information during

4    the discovery period.  Mr. Tolchin refused to provide it to

5    us knowingly, intentionally, willfully.  And it's on that

6    independent basis that we move to strike those documents,

7    even though they were ones that we produced during the

8    discovery process.

9          I appreciate the Court's willingness to hear that

10   clarification.

11         THE COURT:  Thank you.

12         Mr. Hibey, are you finished then?

13         MR. HIBEY:  Well, I am, unless Your Honor has a

14   other questions.

15         THE COURT:  You can have a few minutes in

16   rebuttal, if you like.

17         MR. HIBEY:  I'll hold on to that.  Thank you,

18   Your Honor.

19         THE COURT:  Okay.  Mr. Lowell.

20         MR. LOWELL:  Let me start, Your Honor, by at least

21   addressing the issue of counsel, because you raised it to me

22   as well.  I don't fault defendants for changing counsel in

23   the last 4 weeks or 8 weeks or 12 weeks, whatever it was.

24   It happens in cases.

25         The fact that plaintiffs have counsel in the

 1  United States and in Israel as they have counsel in the

 2  Middle East is of no moment.  The law firm in Israel that

 3  does, in fact, help coordinate plaintiffs' actions is a

 4  courageous and much threatened law firm for their actions

 5  and, among other things, with U.S. counsel.

 6          THE COURT:  What's their name, for the record?

 7          MR. LOWELL:  Shurat HaDin is the same law firm.

 8          THE COURT:  Spell that for the reporter, please.

 9          MR. LOWELL:  S-h-a-u-r-a-t-d-i-n.

10          THE COURT:  Thank you.

11          MR. LOWELL:  And that organization, that law firm

12  that works with U.S. counsel, has been the adversaries of

13  Mr. Hibey's law firm in many of these cases.  Indeed, they

14  are the consistent defense counsel, including in the

15  New York Sokolow case, which ended a few months ago, with a

16  $238 million verdict for plaintiffs.  There's a history of

17  this battle that pre-dates and postdates the Shatsky case.

18          Let me try to refocus on what I think you asked at

19  the last hearing when you asked to what extent, if any,

20  should the evidence produced after the close of discovery be

21  usable to oppose summary judgment in this case.

22          Mr. McAleer just talked about a whole other issue

23  of whether or not their own documents did or did not comply

24  with hearsay or other rules, but that's not what you asked

25  for, so I'm going to zoom in on what you said.

1          There are, Your Honor, four groups of material or

2     documents that we have cited to in opposition to the

3     defendants' motion for summary judgment.

4          Of those, they are as follows:  They are

5     defendants' depositions.  They are defendants' own

6     documents.  They are plaintiffs' documents for which there's

7     no issue as to whether they were produced before or after

8     the discovery.  And then there are what are the, I think,

9     the ones in dispute, the ones that defendants allege to have

10    been disclosed after the close of discovery about which the

11    Court made the inquiry which brings us here today.

12         Of that, there aren't actually 73 documents or 67

13    documents.  There are probably 14 or 15 documents cited by

14    us in particular opposition to the motion for summary

15    judgment.

16         In some cases, one or more of those documents are

17    cumulative to another point in our opposition for summary

18    judgment.  In other words, the defendants' own deponent may

19    have said something that's reflected in a document, both are

20    designated as an opposition material, even though one may

21    confirm the other.

22         THE COURT:  So the 67 documents they say were

23    produced after the deadline in September of 2012 you say are

24    not actually 67 at all.  There's 14?

25         MR. LOWELL:  Well, I can give you the exact

1  number.

2          THE COURT:  We're going to go very slow here.

3          MR. LOWELL:  Okay.

4          THE COURT:  I want this specifically addressed

5  now.

6          Have you gone over the 67 they claim were produced

7  after discovery closed?

8          MR. LOWELL:  I understand that they have opposed

9  every document that was --

10          THE COURT:  I'm going to re-ask the question.

11          MR. LOWELL:  Yes.

12          THE COURT:  Have you reviewed the list of 67?

13          MR. LOWELL:  Yes.

14          THE COURT:  How many of those 67 were produced by

15  your team, Mr. Tolchin in your office or whoever, after

16  discovery closed?  How many of the 67?

17          MR. LOWELL:  I think all of them.

18          But I think that begs the issue, Your Honor.

19  And you have to at least let me address it for the record,

20  even if you've made your decision.

21          THE COURT:  I haven't made a decision yet.

22          MR. LOWELL:  Then let me address those --

23          THE COURT:  But you just told me about two minutes

24  ago, Mr. Lowell, that it was only 14.

25          MR. LOWELL:  No, no.

1          THE COURT:  Now you're telling me it's all 67.

2          MR. LOWELL:  Then I misspoke.

3          THE COURT:  You either are misspeaking or not

4     speaking clearly.  I don't know which of the two it is, but

5     I can assure you neither one is helpful in this courtroom.

6          MR. LOWELL:  May --

7          THE COURT:  So speak clearly.  Speak clearly.

8          MR. LOWELL:  Of the 67 documents or however many,

9     all of which were produced after the September 2012 close,

10    there are fewer than that number that are being addressed in

11    our opposition for summary judgment.

12          In other words, there are 70, 100 documents that

13    are listed in the statement of material facts.  However, in

14    our briefing, against summary judgment, we referred to a

15    subset of those as those that are only necessary to defeat

16    summary judgment.

17          So I can focus the Court's attention on that

18    category of documents, all of which were produced in your or

19    the plaintiffs' --

20          THE COURT:  I'm only asking you to focus on the

21    ones produced after summary judgment.

22          MR. LOWELL:  So all of the ones on their list --

23          THE COURT:  Let me finish.  Let me finish.

24          Mr. Hibey's team has indicated to this Court in

25    writing and orally in court that there were 73 exhibits that

1  were produced after the discovery closed.  That's what

2  they've represented.

3           There's a subgroup of those 16 that were documents

4  that have previously been produced by the defendants.

5           MR. LOWELL:  Just let me interrupt to tell you

6  I think he says that that number does not include the 16

7  produced by the defendants.

8           THE COURT:  Okay.  Well, we're going to get

9  clarification of that one way or the other before we're done

10 here.

11          Let's assume for the sake of discussion it doesn't

12 include it.  Okay.  They're claiming there are 73 that were

13 produced after discovery closed.  If I understood what you

14 just said a minute ago, you've reviewed all 73 and you agree

15 they were produced after discovery was closed.  That's all

16 I'm concerned about.

17          MR. LOWELL:  Okay.

18          THE COURT:  Now, if I were to conclude that all 73

19 to be stricken from the record, obviously, you would have to

20 rewrite your opposition to summary judgment without any

21 reference to any of them.  And I'll give you time to do

22 that.

23          The only issue on the table is a very narrow

24 issue.  What sanction, if any, is appropriate for the

25 failure to produce those documents during the discovery

1  process?  That's the only issue.

2          MR. LOWELL:  May I at least state something that

3  I'd like the Court to consider?

4          THE COURT:  As to what the appropriate sanction

5  is?

6          MR. LOWELL:  Yes.

7          THE COURT:  Absolutely.  Absolutely.  Go ahead.

8          MR. LOWELL:  In order to sanction the plaintiffs

9  for what is the post-close of discovery disclosure of

10  documents, there has to be an obligation of the plaintiffs

11  to provide those documents prior to the close of discovery.

12          THE COURT:  Uh-huh.

13          MR. LOWELL:  Each and every one of the items in

14  the defendants' list is a document that was not in the

15  possession and control of the plaintiffs.  They were all

16  over the world.  Many, many, Your Honor, were in the

17  defendants' possession.  Many, the defendants got in the

18  other discovery.

19          Mr. Hibey explained Exhibit 31 to you.

20          And Mr. Hibey was candid that Mr. Hibey and his

21  team knew about Exhibit 31 because of a lawsuit called

22  Saperstein that had occurred.  That lawsuit and his

23  receiving that document occurred prior to the close of

24  discovery in this case.

25          When the Court turns, if it does, to the issue of

1    sanctions, sanctions occur if there's, one, not any

2    reasonable explanation for a failure to disclose -- and I'll

3    come back to that very briefly; and, second of all, if

4    there's prejudice to a defendant.

5           So imagine that there are 15 documents that we

6    mention in our opposition to the motion for summary judgment

7    in the actual argument section.  And imagine that all 15

8    were produced after the close of discovery.  And imagine

9    that of those 15, 12 of them were already in the possession

10   of the defendant, who comes into court and asks that you

11   strike them, even though they've had them in their

12   possession, in some cases, for two or three years.

13          It would not be an appropriate sanction to strike

14   them in this case if defendants, who are exactly the same,

15   the PLO and the PA, and counsel, who are exactly the same,

16   Miller and Chevalier, have had those in their files for

17   years before they moved to sanction by way of striking in

18   December of this year of 2014.  I'm sorry.

19          Now, as to that grouping, Your Honor, all I wanted

20   to say -- and I've said it, but I want to give you or have

21   the opportunity to submit the case cites -- is that none of

22   those documents, not one, the ones that were produced after

23   discovery fit into the category of Rule 33 or 34 documents,

24   because they reside in the possession of third parties.

25          And case after case indicate that one party in

1  litigation is not obligated to get in the discovery context

2  that which is equally available to both parties, because

3  they, for example, are public records, court documents in

4  Israel, statements by people in the PA or the PLO in the

5  Middle East that have been in those court documents or in

6  other litigation.

7         I want the Court to know that of the 73 documents

8  that the defendants are complaining about, all 73 are not in

9  the category of which sanctions occur.  By that I mean,

10  these are not plaintiffs' documents.  They're medical

11  records, their own investigators' files as to what happened

12  right after the bombings occurred.

13         These are either court documents, PA or PLO

14  testimony from other cases, PA or PLO statements in

15  newspaper articles, a Department of State report.

16  And things that are in the public record either of court

17  documents or available to both parties, not one of those

18  documents was in the possession of --

19         THE COURT:  If they're so readily available, why

20  weren't they produced before the deadline for discovery

21  closed in September of '12?

22         MR. LOWELL:  Well, in some cases, they didn't even

23  exist until after the close of discovery.  There are court

24  judgments in Israel that were on their list that did not

25  occur until after the close of discovery in this case.

1   They literally didn't exist.

2           THE COURT:  So they requested documents that

3   didn't exist.  Is that what you're --

4           MR. LOWELL:  No.  They didn't -- they requested

5   general category.  Give me all documents that blah, blah,

6   blah, blah, blah.

7           So you provide that which is in plaintiffs'

8   possession and control that match that.  Then discovery

9   closes.

10          For that which a plaintiff or defendant is

11  obligated to produce by the end of discovery, of course, we

12  cite, as Mr. Hibey says, to Rule 26, which requires both

13  parties to supplement discovery properly requested even

14  after the close of discovery.

15          One of the things that neither the defendants'

16  counsel told this Court moments ago was that of the 16

17  documents that they say are from their own files that we do,

18  in fact, rely on to oppose summary judgment, more than half

19  of them were disclosed to us.  Guess what?  After the close

20  of discovery.

21          And when that happened, it prompted investigations

22  to find out more about the items that they chose to withhold

23  and disclose only after the close of discovery.

24          So how could it be gainsaid that a party receiving

25  a document from another party after the close of discovery

1    and then seeks to investigate for the very reasons

2    Your Honor asked them, how do you test the document?  How do

3    you find out its validity?  How do you translate it?

4          How can it be said that if we didn't know to go

5    into those matters until after the close of discovery, we

6    can be held responsible for not doing so before we get the

7    very document that required that?

8          So they are quick to talk about how many documents

9    were produced after the close of discovery.  They do not

10   tell the Court, as we do in our papers, that they don't come

11   to court with clean hands on that issue, because they

12   produced so much of their discovery after the close of

13   discovery themselves.

14         As to the third-party documents, Israeli court

15   documents, Palestinian, the PNA security counsel documents,

16   and other such documents that we call third parties, one or

17   two or three didn't even exist then.

18         As to those that did exist, they were found when

19   they were found after the parts of discovery.

20         And I'll give you, for example, another reason

21   why.

22         It was only in their motion for summary judgment

23   the very first time, not in their answer, not in a

24   supplemental answer, nowhere until they filed their motion

25   for summary judgment did they put forward a defense -- it's

1   an affirmative defense.  Maybe it's not even an affirmative

2   defense, because it wasn't listed as such.

3          But the defense under one of the legs of

4   liability, the respondeat superior leg, that we could not

5   pass muster under what's called the Monell Decision, that

6   says when a government authority is the defendant and is

7   defending against respondeat superior, the plaintiff has to

8   show that it's a pattern and practice of that government

9   authority to conduct the behavior of which they're trying to

10  hold an individual employee responsible.  They put that in

11  their motion for summary judgment, not before.

12         So some of the material that was provided after

13  the motion for summary judgment is addressed to their Monell

14  argument and could not have been produced before because it

15  had not been raised before.

16         And it's, again, an explanation that it's not as

17  simple as defendants would like to say that X percent of all

18  the materials that have been produced were produced after

19  the close of discovery.  As a matter of calendar, that is

20  correct.  As a matter of legal consequence, that is not

21  correct.  And that's what we're trying to put forward in our

22  opposition to their sanctions.

23         So if you went document by document through those

24  that are either listed in our opposition or that which is in

25  the long list, which is every document -- and that's why I

1    said it's a subset -- you would find that there are, for

2    example, the categories I've said.

3           And I think that was important to get into the

4    record, because, otherwise, it would seem, if you were

5    sitting in the back and observing this proceeding today,

6    you'd get the impression that plaintiffs had in their files

7    documents that were properly requested by the defendants

8    sometime in the discovery period.  September 2012 came and

9    went.  And then all of a sudden, that which should have been

10   produced before September 2012, all of a sudden appears out

11   of thin air as if it was an intentional violation of the

12   discovery rules, and nothing of that sort happened.

13          I can assure the Court if you look at those

14   documents one by one, you will see that in those categories

15   I've said, they belong not in the possession and control of

16   the plaintiffs but perhaps in categories including work

17   product of attorneys, and not the attorneys that are

18   representing the plaintiffs in this case.

19          One of the ironies of the back and forth over

20   sanctions is the fact that the plaintiffs' counsel, among

21   all the plaintiffs in Saperstein, in Shatsky, and in

22   Gilmore, they're not always the same in the United States.

23          They may have local counsel the same, but each and

24   every one of them was represented by the same defense

25   counsel who complain about the lack of discovery here when

1   they had in their possession a good number of the documents

2   from those other cases.

3          And, again, we could submit to you an item-by-item

4   detailed account as to which of those would be that would

5   have been in the Saperstein case, the Gilmore case, the

6   Gordon case, the Sokolow case.

7          Indeed, there are later testimony -- one of the

8   documents that we put forward in our opposition is even

9   testimony from a defendants' representative from one of the

10  those other cases of which they complain is being designated

11  after the close of discovery.  So it's a question of when it

12  was required to be disclosed, if it was ever required to be

13  disclosed, when did lawyers for the plaintiff find those

14  documents?  Why did they find those documents, i.e., it was

15  raised in a defense by them, and then whether it was

16  promptly provided.

17         And here is the second irony.  I think the rules

18  are a little bit vague.  I think they are.

19         But nevertheless, what we're being punished for,

20  at least what defendants would like to punish for, is doing

21  more than the rules required.  Each and every one of the

22  supplements that my law firm did, because when we got into

23  the case and Your Honor points out it was late in the game,

24  we wanted to, out of abundance of caution --

25         THE COURT:  What month and year did you enter the

1   case?

2          MR. LOWELL:  I think it was the spring.  I think

3   it's like April of 2013.

4          And it was after the quarrel that you were going

5   over with Mr. Hibey and the expert issue as well.  It was

6   right after that.

7          The second irony, therefore, is that by us using

8   or invoking the continued obligation to provide discovery

9   after initial disclosures under 26(a), by saying to them,

10  guess what?  We now have come across an Israeli court

11  document which is the conviction of somebody in the

12  Palestinian Authority for setting a bomb identical to the

13  bomb that was set off in the Shatsky case or by a person in

14  police custody who says that he was with the bomber here who

15  confessed that he did it.

16          Or when we put forward a document, a statement by

17  a representative of the PA or the PLO, who says that

18  Chairman Arafat inspired and initiated the intifada, which

19  is one of the issues that would be in litigation.  And we

20  tell them that because we find that material after the close

21  of discovery from third parties, court cases, documents,

22  speeches, videotape, Al Jazeera, or whatever and we give it

23  to them and we say to them, this is not our requirement, but

24  we're giving it to you out of some form of making sure.

25          Could you imagine if we had come to court at trial

1  or at the pretrial conference and I produced to you

2  loose-leafs full of exhibits marked 1 through 150, and 40 of

3  them were never produced to them, even though I did have

4  them in my possession at that point, after the close of

5  discovery but before the pretrial, they would be right to

6  squawk.

7         What makes them wrong to squawk today is because

8  they have had them for so much time before they moved for

9  sanctions, as an example.

10        They moved for sanctions, Your Honor, at the end

11 of 2014 and as part of their motion for summary judgment in

12 the beginning of 2015.

13        Some of the documents about which they complain,

14 they've had, even from us as part of this supplemental

15 response, for over a year.

16        And there's case law that we cited that indicates

17 that if you're going to move for sanctions and then have an

18 argument as to whether you were prejudiced by what you're

19 seeking to have sanctioned, then you should do it promptly,

20 because the Court cases we also have pointed to say that the

21 sanction of striking evidence from a case that would have

22 the effect of a dismissal is the resort -- is the sanction

23 of last resort, not the sanction of first.

24        And when courts go through that, they ask, what

25 would the alternatives have been, and what is the real

1   prejudice?  And I'll give you, again, an example from what

2   Mr. Hibey said.  He said that some of these documents he

3   couldn't test.  He's never seen them.

4         And I've already pointed out that in a good many

5   of them, not only has he seen them, he's had them in their

6   possession.

7         I'll go a step further.  Plaintiffs made Rule 33

8   and Rule 34 discovery requests.  Plaintiffs asked for

9   statements by the PA and the PLO representatives having to

10  do with issues in contention.  Plaintiffs asked for

11  statements that would bear on any of the issues that would

12  be relevant in discovery.

13        Defendants had some of the exact documents that we

14  have now found in third-party situations in their

15  possession, and they never provided it in discovery to us.

16  And, again, if you do document by document, I will be able

17  to show the Court that there are documents that they're

18  complaining about that should be stricken from the record

19  that were those that they should have been providing to us,

20  not us to them, in supplemental discovery that was not

21  required of them.

22        Why them?  Because it's their spokesman in the

23  Middle East, because they know about the PLOCCA report by

24  the Department of State, because they're participating in

25  that process, because they're the ones that have their

1    individuals in police custody.

2            For them to argue that they are surprised, for

3    them to argue that they're prejudiced, for them to argue

4    that the sanction should be to strike, when you look at

5    those documents specifically is taking advantage of a

6    situation they neither have the law for or the equity for.

7    And that is something that we've put forward in our papers

8    too.

9            So if you simply state, Your Honor, are there

10   documents that were, quote, produced after the close of

11   discovery?  If I hadn't been clear, let me be clear.

12   They were.  And they may be all of the 73 about which they

13   complain, although that's a subset of that which we really

14   refer to in our opposition for summary judgment.

15           But if you ask why were they produced after

16   discovery, where did they exist in the world, who knew about

17   them, when were they produced, even if it was after

18   discovery, do they exist in other cases of which the

19   defendants are parties, do they exist in cases in which

20   defense counsel are the same defense counsel, you take a

21   list of that many documents and you turn them into maybe

22   two, four, five, and that's what a document-by-document

23   review would indicate.

24           And so consequently, I want the Court to

25   understand that I am prepared, if the Court wants, on that,

1  using one of their 73 documents, one by one -- I wasn't

2  going to do it orally -- to show you what I've said to be

3  the case, as to where they are, why they were produced,

4  whether they had notice, whether they were prejudiced, so

5  that you can get to the issue of sanctions, if any, that

6  should apply.

7        Let me just look at my notes and respond to --

8  confer with my co-counsel and see if I have forgotten

9  anything.

10       I'm happy, but I know Your Honor doesn't need it,

11  partially because we have pleadings, and partially, even if

12  we don't, to give the Court citations, even of cases of this

13  Court -- I mean, the D.C. District Court -- on the issues of

14  what I've just said; that is, no need to respond when both

15  parties have equal access to the documents, sanction of

16  striking when it would be the -- tantamount to dismissal,

17  being the sanction of last resort, et cetera.

18       But I want to make --

19       THE COURT:  That wouldn't be the case here.

20       MR. LOWELL:  Say that again.

21       THE COURT:  That wouldn't be the case here.

22       MR. LOWELL:  I don't know.  Let me give you an

23  example.

24       I did say to you that on some propositions of

25  summary judgment, let's say the proposition that the

1   defendants knowingly and intentionally provided material

2   support to a terrorist organization, that we have, let's

3   say, five bases.

4         So let's say two of those bases were in the

5   category that they, say, were late produced and you were to

6   strike those two.  Then there might be three left.

7   And summary judgment should still fail as it did when they

8   made that same motion in front of Judge Daniels in the

9   Sokolow case.

10         But there might be another proposition, and

11   I'm not here ready to tell you what that one might be, in

12   which I only had one or two, for a proposition necessary to

13   defeat summary judgment, and consequently striking that

14   might actually eliminate a claim.  So it might and it might

15   not.

16         We went out of our way, Your Honor, because we

17   were counsel coming into the case later, to oppose summary

18   judgment wherever possible so that there was no mistake, by

19   relying on defendants' own statements in their depositions,

20   defendants' statements to the public, and the documents that

21   were produced from defendants' files, 16.

22         So the counsel that addressed you from defense

23   counsel are correct -- well, Mr. Hibey wasn't sure and

24   Mr. McAleer made it clear.  We do rely on their documents to

25   oppose summary judgment, because they weren't late produced

 1   at all.  They were produced by defendants.  Well, I take

 2   that back.  They actually were late produced, but they

 3   weren't late produced by plaintiffs.  They were late

 4   produced by defendants.  And they are very much part of our

 5   opposition for summary judgment.

 6        So with that, Your Honor, if you'll indulge me a

 7   minute, and then we can give the defendants an opportunity

 8   to rebut.

 9        THE COURT:  Go ahead.

10        (Pause)

11        MR. LOWELL:  My co-counsel reminds me that we

12   have -- we all have a tendency in long litigation to confuse

13   dates.

14        What I've said was that they waited to move for

15   sanctions until December of '14.  It was December, the end

16   of December of '13; their motion for summary judgment,

17   January of '14.

18        But what I said about the length of time that they

19   had our responses prior to the time that they sought such

20   sanctions is the right amount of time.  I just had the

21   calendar dates incorrect.

22        THE COURT:  Okay.

23        MR. LOWELL:  I appreciate Your Honor's ability.

24        THE COURT:  All right.  Thank you.

25        Mr. McAleer.

 1          MR. McLEER:  May it please the Court, I'm happy to

 2   address any questions the Court may have.

 3          But I can be rather specific, and I wish to be

 4   specific in responding to what Mr. Lowell argued, because he

 5   was not -- I will say to the Court the written record

 6   disproves what Mr. Lowell just argued.  To the extent he was

 7   specific at all, let me give an example.  Let's be specific.

 8          Mr. Lowell talks about documents that they relied

 9   on for opposing summary judgment.  He says there's not that

10   many.  Well, okay, let's pick one that they do rely on, do

11   rely on heavily.  It's Exhibit 115.

12          Now, we would contend, Your Honor, that they had

13   many obligations to produce the document that they

14   ultimately used as Exhibit 115.

15          Let's start with 26(a)(1), which is

16   self-operative.  It's been in existence for the full

17   discovery period.  Up through September 19th, they had that

18   obligation.

19          Rule 33 and 34, they had that obligation.

20   Mr. Tolchin didn't like it, so he just decided not to -- not

21   to respond.

22          THE COURT:  And what is Exhibit 115?

23          MR. McLEER:  Okay.  Well, Exhibit 115 is a

24   document that the plaintiffs first disclosed on August 26,

25   2013, after we had filed our motion for summary judgment and

1    after they knew from me from countless exchanges that I

2    objected to their late production in an attempt to fix a

3    record that they knew was broken because of their own

4    co-counsel's conduct.

5            So they produced a document on August 26th.

6    What is it?  Well, their description is that it's an Israeli

7    police document.  It's a statement of Mohammed Shawqi Nazal.

8            And by description, when did this statement of

9    Mr. Mohammed shocking nods also apparently get made to the

10   Israeli police?  Well, that would be June 5th of 2002.  That

11   would be 11 years before they produced the document in this

12   case.

13           Now, so we're not talking about documents that

14   came into existence late or just came into existence, which,

15   by the way, pertains to the documents of ours they were

16   referring to, but I can get to that later.

17           So this document is dated November -- it was

18   produced in August of 2013, but it was dated June 5th of

19   2002.

20           THE COURT:  Now, maybe they're arguing it wasn't

21   in the possession of the plaintiffs.

22           MR. McLEER:  Well, and that can be simply and

23   easily disposed of.

24           As Mr. Hibey said, I had been pushing them and

25   pushing them.  They were dumping these documents on us, not

1    indicating what the source of the documents were, when they

2    came into their possession.

3            And plaintiffs, at one point, they, in their

4    letters, they're saying, Oh, well, these are in the

5    possession of the third parties.

6            Well, guess what?  When they finally responded to

7    my inquiry, which was our motion for sanctions, Exhibit 4,

8    the December 12, 2013, chart that explains where they got

9    them from.

10           Guess where they came from?  Chadbourne & Parke

11   tells us, we don't have any docs.  We got -- we're dependent

12   on Shurat HaDin to provide us everything that we have.

13           And, in fact, they tell me that the information on

14   when Shurat HaDin got the documents is information provided

15   exclusively by Shurat HaDin that they can't verify from

16   firsthand or personal knowledge.

17           So in this chart, when do they say --

18           THE COURT:  Let me have you stop there a second.

19           I believe it's your impression -- and correct me

20   if I'm wrong -- and I believe it's Mr. Lowell's

21   representation to the Court -- and he'll correct me if I'm

22   wrong -- that Shurat HaDin is working together with

23   plaintiffs' counsel; it's basically their Israeli local

24   counsel.

25           MR. McLEER:  Even more --

1           THE COURT:  Is that your impression?

2           MR. McLEER:  That is indeed, Your Honor.  But it's

3  even more so.

4           Do you remember when Mr. Strachman --

5           THE COURT:  Yeah.

6           MR. McLEER:  -- asked for leave to get out of

7  those other two Syrian cases that are pending before the

8  Court?  You know, the allegations against the Syrian

9  defendants that are the same ones here that Mr. Tolchin said

10  were irrelevant to my discovery request or to discovery in

11  this case?

12          Well, in that case, Mr. Strachman came before the

13  Court when he was moved for leave to get out of that case

14  when Mr. Tolchin was coming into that.

15          And Mr. Strachman said that, in fact, he hadn't

16  been doing things for much at all in the case; that it was

17  Ms. Darshan Leitner who had the power of attorney for the

18  plaintiffs who was making the decisions, who was controlling

19  the litigation.

20          THE COURT:  Who is she?

21          MR. McLEER:  She is the head of Shurat HaDin.

22  She is an Israeli lawyer who is active in all of these

23  cases.

24          And Mr. Tolchin affiliates with Shurat HaDin.

25          And a person -- you remember from one of the

1  exhibits when I actually asked while the depositions were

2  going on for -- where were the discovery responses?  And who

3  responded to that?  That was Mr. Mordecai Heller of

4  Shurat HaDin, who told me, gee, catch your -- take a breath.

5  Maybe go complain to the postmaster general.  I'm not going

6  to send you anything by e-mail.

7          And Mr. Tolchin is the one that's responsible for

8  those discovery responses.  He's a Shurat HaDin fellow as

9  well.

10          And many of the supplemental 26(a)(1), purported

11  26(a)(1) disclosures that were made to us were transmitted

12  by members of Shurat HaDin.  The names I recall are

13  Ms. Dina Rovner or Ms. Rachel Weiser coming from the Middle

14  East and sending e-mails.

15          THE COURT:  Let me ask you this:  Mr. Lowell has

16  pointed out on a number of occasions that you, your firm,

17  has been representing or had been representing for quite a

18  while a number, the same clients in a number of different

19  cases around the United States.  Saperstein is one that's

20  been mentioned down in Florida.  He mentioned a case in New

21  York City that recently, I think, went to trial.

22          MR. McLEER:  The Gilmore case here in this court.

23  This case.

24          THE COURT:  Right.

25          MR. McLEER:  In every one of those cases,

1    Mr. Tolchin and Shurat HaDin are involved.

2            THE COURT:  Which is exactly where I'm headed with

3    this question.

4            In those other -- in any of those other cases, did

5    you have similar situations as this that the judges in the

6    other cases had to deal with, where the Shurat HaDin folks

7    had documents in their possession, but for reasons known,

8    I guess, principally to them, they didn't produce them

9    during discovery, they held onto them.  And then at a later

10   time, they produced them at the point of opposing summary

11   judgment.  Did you have that type of situation?

12           MR. McLEER:  Well, we certainly had any number of

13   discovery problems down in Florida in the Saperstein case

14   that were presided over by Magistrate Judge O'Sullivan,

15   where hearing after hearing I was having to deal with this

16   same hide-the-ball situation from Mr. Tolchin and his

17   co-counsel.

18           We ended up getting relief from Magistrate

19   Judge O'Sullivan repeatedly on these document issues, to the

20   point where the plaintiffs down there, Mr. Tolchin had to

21   declare that he was unable to go forward to prove his case

22   down there by virtue of the limitations that the Court had

23   imposed on him because of the discovery conduct that had

24   occurred there.

25           THE COURT:  That was in Saperstein?

1          MR. McLEER:  That was in Saperstein.

2          THE COURT:  Did Magistrate Judge O'Sullivan issue

3    any opinions with regard to these discovery problems?

4          MR. McLEER:  Most of them were oral rulings from

5    the bench.  There may have been some written opinions.

6          There were certainly -- I think there was an

7    appeal to District Judge Seitz that may have been appeals

8    from the rulings of Magistrate Judge O'Sullivan.

9    We certainly -- there are hearing transcripts that --

10          THE COURT:  Southern District of Florida?

11          MR. McLEER:  Yes, Your Honor.

12          THE COURT:  Uh-huh.

13          MR. McLEER:  Now, on Exhibit 115, okay, they tell

14    us in December of 2013, in this chart, that the document --

15    indeed, all the documents, but including 115, came from

16    Shurat HaDin.

17          Now, when do they represent that Shurat HaDin had

18    Exhibit 115 in their possession?  November 30th, 2012.

19    And that's referenced on page 14 of the December 12th, 2013,

20    chart, which is Exhibit 4 to our motion for sanctions.

21          So even if you credit what they're representing,

22    what Shurat HaDin is representing, that Chadbourne & Parke

23    is simply channeling, even if you credit that, then it shows

24    that nine months before they first disclosed it to us and

25    only after we had filed motion for summary judgment did they

1    first disclose their -- that document to us in their -- on

2    August 26th of 2013.

3              THE COURT:  And that document is a statement given

4    to the --

5              MR. McLEER:  It is purporting to be a police

6    statement --

7              THE COURT:  A police statement.

8              MR. McLEER:  -- given by Mr. Mohammad

9    Shawqi Nazal.

10             Here's what Mr. Tolchin does in his declaration,

11   which is why Mr. Tolchin's declaration certainly needs to be

12   stricken.

13             Because in the Tolchin Declaration, Mr. Tolchin

14   describes Exhibit 115 as a true and correct copy of a record

15   kept by the Israeli police in the ordinary course of

16   regularly conducted investigations that -- that -- it was

17   obtained from a police station in Ariel, Israel, or from the

18   Israeli military court files at my direction -- that's

19   Mr. Tolchin speaking -- and that plaintiffs intend to submit

20   an affidavit, a business record affidavit, from the police

21   interrogators.

22             In fact, he goes on to say that a request of the

23   Israeli police is pending.

24             Now, having been down this road so many times with

25   Mr. Tolchin, I had discovery requests pending that said

1    I want the identification; interrogatories requesting

2    identification of all communications that they had with the

3    Israeli government at whatever level.  And I wanted every

4    document that they had sent to or received from the Israeli

5    government.  And I'd want every document that they had

6    obtained through any informal or formal request.  That's an

7    obligation in addition to their self-effectuating 26(a)(1)

8    obligation.  That's an obligation that they had before the

9    close of discovery.

10            Now, the fact of the matter is that Mr. Tolchin,

11   who apparently didn't have the time, interest, or

12   inclination or, I think, more actually, wanted to

13   specifically inhibit our ability to prepare for and defend

14   the depositions that occurred before the fact discovery

15   period of our witnesses, couldn't bother to get around to

16   answering that discovery, but apparently had enough time to

17   go to, if these representations are correct, to troll around

18   for documents and obtain them through Shurat HaDin.

     And what ended up happening was only after we filed motion

20   for summary judgment do they disclose this document.

21            So I would submit, Your Honor -- and I can go

22   through an example as an example.

23            Exhibit 31 is another one that Mr. Hibey had

24   mentioned that Mr. Lowell scoffs at.  Well, it's saying, oh,

25   well, Your Honor, this is preposterous because they had it

1   in 2009 in the Saperstein case.

2          Well, let's investigate that just a little bit.

3   The document purports to be, by the plaintiffs' description

4   in the December 2013 chart, a verdict of Marwan Barghouti.

5   And when was that verdict dated?  May 20th, 2004.

6          Now, when did they disclose it for use in this

7   case?  November 6th, 2013.  Again, after we had filed

8   summary judgment and just before they were going to file

9   their opposition to our summary judgment.

10         THE COURT:  When did it come into their

11  possession?

12         MR. McLEER:  Well, they --

13         THE COURT:  Supposedly.

14         MR. McLEER:  And this is wonderful.  I just loved

15  this when I saw it in the chart.

16         In the column that says, when did you get this,

17  meaning when did Shurat HaDin, because this -- the chart

18  apparently conveys Shurat HaDin, quote, Plaintiffs' counsel

19  do not recall the date on which they received this document,

20  close quote.  That appears on page 2 of the December 12th,

21  2013, chart.

22         Now, do you think the plaintiffs and specifically

23  Shurat HaDin and Mr. Tolchin and his colleagues didn't know

24  when they got that?  Because they knew they had gotten it at

25  least as early as 2009, because they produced it in the

1  Saperstein case in 2009, July 21st, 2009, to be specific.

2          THE COURT:  They produced that very document?

3          MR. McLEER:  That very document.

4          And in Gilmore on June 18th of 2013.

5          Now, Mr. Lowell says, well, gee, Judge, that's

6  really, you know, that's no problem.  That's no prejudice to

7  the defendants.

8          That is absolutely not true.

9          Let's look at their 26(a)(1) disclosures.

10 Did they disclose Marwan Barghouti in their 26(a)(1)

11 disclosures as a witness or a person of knowledge?  No.

12         Did they identify Mr. Marwan Barghouti or anything

13 having to do with Mr. Marwan Barghouti in response to any of

14 our written discovery?  No.

15         Does the verdict of Marwan Barghouti that's dated

16 in 2004 reference the bombing at issue in this case?  No.

17         Does it relate to any of the allegations relating

18 to the Shatsky bombing in the incidents?  No.

19         And then they dumped this on us on November 6th of

20 2013, having had it clearly in their possession.

21         And by their possession, I mean Shurat HaDin,

22 Bob Tolchin, Mordecai Heller, Nitsana Darshan-Leitner, and

23 David Schoen.  And everyone else who's been associated with

24 the representation of the plaintiffs in this case.  They had

25 it in their files at least as early as 2009 when they

1   produced it in Saperstein.

2          But there was no sense in which we were put on

3   notice, either by their 26(a)(1) disclosures or their

4   nonexistent Rule 33 interrogatory answers or, I would

5   submit, their failure to make any Rule 34 production of

6   documents in this case to us.

7          And to suggest that we had the obligation to

8   intuit that in this case, after we had gotten through

9   discovery, after we had had to put up with every conceivable

10  motion targeted against us and prevailed on those motions

11  and months later and after having filed summary judgment

12  that we were supposed to intuit that the Marwan Barghouti

13  verdict, in the minds of the plaintiffs, somehow has a

14  relationship to this case.

15         So I would submit to Your Honor that Mr. Lowell's

16  protestations that -- regarding Exhibit 31 are just flat out

17  not right.  Now, he may be trying to make the best of a bad

18  situation.  But the bottom line is it's a bad situation

19  which we have fully documented to this Court.

20         Now, Mr. Lowell says that we delayed in filing the

21  motion for sanctions.  That is flat out not true.  Every

22  single time I informed plaintiffs, whether it was before the

23  Chadbourne Parke firm was involved or afterwards, I informed

24  the plaintiffs that we objected to the late disclosure of

25  documents, and I sent e-mails to them; I sent letters to

1  them.

2        On the very day that the parties filed a joint

3  motion with this Court to set a summary judgment schedule,

4  Ms. Langford sends me a letter saying that -- and I'm not

5  trying to be sarcastic with this -- but essentially saying,

6  we realize none of the documents that prior counsel have

7  produced have been Bates-numbered, so we're going to send a

8  new Bates-numbered set.  And, oh, we're going to start

9  producing some more documents.

10        Well, what ended up happening was months of

11  supplemental disclosures that ran into the thousands of

12  pages of documents -- and right away, I informed -- I sent a

13  letter to Ms. Langford on June 24th indicating that we

14  objected to such late disclosures.  It was untimely.

15  Certainly, having survived all of the various motions before

16  this Court and having gone through that process --

17        THE COURT:  When she produced them, did she

18  indicate in any organized way on the document-by-document

19  basis as to the reason why this particular document was

20  being disclosed at this particular time, i.e., we didn't

21  know it existed until now; it just came into existence.

22  You know, reasons like that.

23        Was there any effort on the part of the Chadbourne

24  firm to indicate on a document-by-document basis the reason,

25  why the document was being produced months and months and

 1    months after discovery closed?  Did they attempt even to do

 2    that?

 3            MR. McLEER:  Let me say no with an explanation, if

 4    I can.

 5            What they did was they provided certain

 6    description when giving the disclosures --

 7            THE COURT:  Uh-huh.

 8            MR. McLEER:  -- and attached to that a chart that

 9    they were using as a running chart to supplement.

10            And in their disclosures, they would provide some

11    information.  But it was not informative on the issues that

12    the Court addressed, which is why the Court will see in the

13    records, letters from me in October and November of 2013

14    where I essentially try to unpackage what I understand these

15    disclosures to have been, which I had long ago rejected but

16    just trying to -- so if needed by the Court or anyone, we

17    could be on the same page on what they were doing.

18            And in those letters and the exchanges with

19    Chadbourne & Parke, I saw the curious use of the phrase

20    "Counsel of Record," to refer to when they obtained

21    documents.  And that piqued my interest because that just

22    seemed like parsing, frankly.

23            And I've been down this road so many times before.

24    That's why I was pushing and pushing for the source

25    information and when the documents came into their

1    possession.  That ultimately became the December 12, 2013,

2    chart that Ms. Langford sent me.  And it was finally then

3    that we got the critical information, which is that, for

4    example, again, if you were to credit what Shurat HaDin has

5    said, that they came into possession of Exhibit 115 in

6    November of 2012 and didn't disclose it until August of 2013

7    and that it came from the Shurat HaDin files.

8         So there was substantial back and forth.

9    It wasn't clear from what they were sending me; however,

10   they might try to describe their efforts.

11        And I have no ill feelings towards Ms. Langford or

12   Mr. Lowell.  They came into a really, a mess created by

13   plaintiffs' counsel.

14        But when I was asking for information, I knew what

15   I needed, they knew what I needed.  They were using phrases

16   like "Counsel of Record" and -- and when it ultimately

17   became revealed in December of 2013 what the situation was,

18   we -- I engaged in a meet-and-confer communications with

19   Chadbourne & Parke, which ultimately led to the filing of

20   the motion for sanctions on December 26th of 2013.

21        So, frankly, for anyone to say that having finally

22   gotten the chart revealing the Shurat HaDin information on

23   December 12th of 2013 and filing a motion for sanctions on

24   December 26th of 2013, that we somehow sat on our rights is

25   just flat out wrong.

1          And what is the ultimate retort on that issue,

2     Your Honor?  It's one thing to have late disclosed the

3     documents.  And repeatedly, we had indicated to them that we

4     were -- that we were objecting to the late disclosure and

5     rejecting the late disclosure.

6          But I, as I indicated repeatedly to Chadbourne &

7     Park, we were going to object to any attempt by them to use

8     these late disclosed materials in -- on any motions or on

9     summary judgment or at trial.

10          The operative event that occurred was

11     November 12th of 2013 when they filed their summary judgment

12     opposition, knowing full well what our position was on that

13     issue.  Boy, did they know it, because I had repeatedly

14     indicated it to them.

15          And they went ahead and they used the

16     late-disclosed documents.  As the information Mr. Hibey

17     provided to you indicated, that, for example, 28 of the

18     exhibits on their summary judgment were first disclosed

19     after we had filed our summary judgment motion.

20          And it was their use of the documents -- and there

21     are other examples.  Exhibit 116 is another example of a

22     document that purports to relate another one of these police

23     or tribunal documents that relates to somebody not named in

24     the 26(a)(1) disclosure, not identified in an answer to an

25     interrogatory.

1          And that reveals that that document was in

2     Shurat HaDin's possession, if you credit the chart, as early

3     as December of 2012, again, many, many months before they

4     disclosed it to us, and I believe they disclosed that in

5     October of 2013.

6          Your Honor, if I may just very quickly touch on a

7     couple points, because I don't want to overstay my welcome

8     before the Court.

9          The fact of the matter is, we didn't have the duty

10    to scour the Internet for documents.  We've cited case law

11    to the Court on that.  And that would be the Nightlight

12    case.  We didn't have that obligation.  They had the

13    obligation to disclose that which they were going to use.

14    That's 26(a)(1).

15         But as importantly, they had the duty to disclose

16    the information, responsive information in answers to

17    interrogatories, which they never did, and in their document

18    productions.

19         They contend, Mr. Lowell says that many of the

20    documents they relied on were ones we produced after the

21    close of discovery.  The record's clear in terms of the

22    production we did in October of 2012, which only occurred

23    because plaintiffs, trying to jam us in the deposition

24    period, scheduled their discovery responses to be -- our

25    discovery responses to be due the last day of the discovery

1    period.  But we produced over a thousand pages of documents

2    on that -- in Israel in response to their request.

3              THE COURT:  Remind me.  Are any of the documents

4    that were produced after discovery closed, are any of those

5    documents, documents that were either expert reports or

6    transcripts of depositions that occurred after discovery?

7              MR. McLEER:  Well, that's interesting, Your Honor.

8    In terms of the documents that were exhibits to the expert

9    reports, 28, I believe, of those documents are ones that

10   plaintiffs purported to reproduce or redisclose here.

11             And I think -- and I believe, yes, 20 of those --

12   I'm sorry -- 28 of the 66 were disclosed after January 2nd,

13   and they were exhibits to the expert reports.

14             And you remember, if I might briefly remind the

15   Court of that, the plaintiffs' disclosure date for experts

16   was on October 19th.  And the -- and Mr. Tolchin absolutely

17   aggregated to -- aggregated to himself an extension by just

18   not doing the -- his liability expert disclosures on October

19   19th of 2012, and then filed a series of motions asking for

20   an extension of the expert period.  Your Honor ruled on

21   every one of those motions, denied the relief to extend the

22   expert disclosure deadline.

23             So then what does Mr. Tolchin do?  Well, just as

24   he had ignored the Court's ruling to return the protected

25   document that the Court had ordered returned and that led to

1    a scheduled contempt hearing, he goes ahead and files or

2    serves expert disclosures on February 14th.

3           We filed the next day to strike those expert

4    reports because he had been denied leave.  His extension was

5    back in October 19th of 2012.  The Court granted our motion,

6    struck those reports which had been accompanied by all of

7    the exhibits.

8           Then he serves rebuttal expert reports in April;

9    and ultimately, by virtue of an agreement, those are

10   withdrawn.  So there's no operative expert reports that

11   contained all of these exhibits.

12          And then what happens is that having deliberately

13   blown their expert disclosure deadline, they proceed to try

14   to backdoor it as they have tried with everything in this

15   case, and they just purport to redisclose them as 26(a)(1)

16   disclosures.  And we feel and believe that that is a

17   violation of the rulings of the Court, and it's an end run.

18          But let us even think in terms of a timing issue.

19   I had propounded discovery requests that asked for any

20   documents that they had sent to or received from any expert

21   witness or anybody providing opinion testimony in this case.

22   And that was an obligation from back in September of 2012.

23          So even if under plaintiffs' theory, it's a no

24   harm, no foul, gee, Judge, you excluded the expert reports

25   but you didn't say anything specifically about the exhibits

1   that the experts relied upon.  The fact of the matter is,

2   these are experts who show up in all of these cases and have

3   for the better part of a decade.

4         And they work hand in glove with Shurat HaDin.

5   They work hand in glove with the Israeli government.

6   These are documents and materials that Shurat HaDin and

7   plaintiffs' counsel in this case knew about, could have

8   accessed, probably did access.

9         And the notion that even if the Court didn't, in

10  striking the February 2013 disclosures, didn't parse it

11  enough to be able to say, and, oh, by the way, the exhibits

12  that the experts are now trying to use are also governed by

13  this, the fact of the matter is, those are documents and

14  materials that could have been and should have been

15  disclosed under 26(a)(1), self-operatively, and in response

16  to our Rule 34 request months earlier.

17        THE COURT:  All right.

18        MR. McLEER:  And, Your Honor, with respect to

19  these documents that Mr. Lowell says that he -- that they're

20  relying on that we produced later so we come to the Court

21  with unclean hands, first off, unclean hands is not a

22  defense.  The "he did it too" is not a defense to the issues

23  that are before this Court.

24        But from our quick reckoning, the exhibits to the

25  plaintiffs' -- or to the plaintiffs' opposition that were

1    produced by defendants after September 2012 that he is

2    referring to, I believe, are Exhibit No. 45, 68, 71, and

3    150, which were documents that came into existence after

4    September 19th of 2012, for example, supplemental payment

5    records relating to ongoing payments that may have occurred

6    to certain persons after September 19th of 2012.

7            In terms of his argument that suddenly, you know,

8    in our motion for summary judgment, we were asserting new

9    defenses and that only then did they understand and realize

10   that some of these documents were relevant, so then they

11   hurried to disclose them, the fact of the matter is, the

12   points that Mr. Lowell has raised, they are issues of legal

13   standards.  They are of -- they are not issues of new

14   defenses.

15           Finally, Your Honor, although, again, I'll be

16   happy to address any questions the Court may have, when

17   Mr. Lowell says to Your Honor, as he did back on, at the

18   June 17th hearing, Your Honor, I'm prepared to do an

19   exhibit-by-exhibit analysis.

20           THE COURT:  Uh-huh.

21           MR. McLEER:  The fact of the matter is, Your Honor

22   denied that opportunity at that time.  But more importantly,

23   Mr. Lowell had that opportunity when he filed his response

24   to our motion for sanctions.

25           And I believe the Court will hopefully agree that

 1    when we filed our motion for sanctions, which is something

 2    that we do not do lightly -- and I can count on one hand the

 3    sanctions motions that I filed -- I was going to make sure

 4    that it was fully documented, and we didn't hide the ball in

 5    any respect and we laid it out there.  And we did.

 6         Whatever he had to say, whatever explanation he

 7    had, he had -- he should have put it in his opposition.

 8    And I don't believe that they're -- with all due respect to

 9    the Court, although the Court can receive whatever the Court

10    wishes, I don't think that would be appropriate under these

11    circumstances.

12         With that, Your Honor, we would rest on our

13    papers, unless the Court has any further questions for us.

14         THE COURT:  No.  What I do usually in cases of

15    this kind where there's issues of this complexity and

16    magnitude raised, I give the parties a chance to review the

17    transcript; and if they want to submit a supplemental, not

18    responses back and forth but just a supplemental pleading

19    based on their review of the transcript, they're welcome to

20    do that.

21         It's been my experience that oftentimes you walk

22    out of the courtroom, you say, gee, I wish I'd said this or

23    I wish I responded to that.  And certainly, after you've had

24    a chance to review the transcript, you might say, I wish

25    I had said this or said that.

1          So it would be limited, of course, to anything

2    that was discussed or raised here in the Court.  It's not a

3    license to go off into other areas.  But if you want to

4    submit a supplemental pleading based upon your review of the

5    transcript as to things that were represented in court or

6    things that you either didn't respond to or you want to

7    clarify or whatever, each side is welcome to do that.

8          But we're not going to do replies and rounds of

9    briefing.  You're welcome to submit whatever you want to

10   submit in that regard.

11         MR. HIBEY:  Is there a page limit, Your Honor?

12         THE COURT:  Well, it certainly shouldn't be more

13   than -- I mean, I can't imagine it being more than 15 pages.

14   It just really shouldn't be more than that.  It really

15   shouldn't.

16         This has already been briefed pretty extensively.

17   And, you know, there's a lot of ink that's been spilled over

18   this issue.

19         I'm not doing more responses, Mr. Lowell.

20   That was the rebuttal.

21         MR. LOWELL:  I was just going to ask if I could,

22   and you've denied me.  I just wanted to go to the podium and

23   ask.

24         MR. BERGER:  I have a separate point, Your Honor,

25   if I could.

1        Mitchell Berger from Squire Patton Boggs.

2        Your Honor correctly warned me when we were here

3   last time that today was going to be full with the sanctions

4   issue and, therefore, we wouldn't be able to get to other

5   issues.  Just curious whether the Court envisions after

6   you've received the supplemental submission on sanctions

7   whether we will be addressing any of the other pending

8   motions, including our reconsideration.

9        THE COURT:  I think where we are, Mr. Berger, as

10  you can obviously observe yourself, I doubt -- I doubt

11  completely -- and I wouldn't expect your team to be as

12  intimately familiar with what happened in discovery as the

13  team that conducted discovery in this case.  And because

14  that's true, I am not letting them out of this case until

15  I've resolved these issues.  Once I've resolved these issues

16  to my satisfaction, I will permit them to withdraw from the

17  case, but not until then.

18        Now, as far as summary judgment goes, if the Court

19  decides ultimately to grant the motion for sanctions in

20  some -- either in whole or in part and does strike certain

21  exhibits from use by the plaintiffs in their opposition to

22  summary judgment, then it would seem to me appropriate to

23  give both sides a chance to revise their motion for summary

24  judgment and their opposition to motion for summary

25  judgment, because those would have to be written with those

1    documents excised from the table, off the table, if the

2    Court were to rule accordingly.

3            So to use that example that was just argued about

4    by Mr. McAleer, 115, I think it was.  If the Court were to

5    rule hypothetically, 115 is off the table.

6            Well, you represented to me that this was relied

7    upon rather heavily in the opposition to the motion for

8    summary judgment by plaintiffs' counsel.  Okay, fine.

9            Well, obviously, he's got to have a chance to

10   rewrite his opposition, a, without using 115, and then

11   figure out what other arguments he would craft absent 115 to

12   oppose summary judgment.

13           And, obviously, I want to give -- if I rule

14   accordingly, I would have to give, in fairness to plaintiff,

15   a chance to revise the opposition to summary judgment.

16           And, of course, your reply would no longer be

17   applicable, because your reply probably addresses 115 at

18   length.  So...

19           MR. BERGER:  Indeed, Your Honor, I would think,

20   hypothetically, if the Court were to make that ruling,

21   we would have to re-brief in its entirety because of the

22   disparity in the page limits, where, if they have a new shot

23   at it for 45 pages and we're limited to a reply of 25, that

24   really would create an imbalance that in many ways would

25   reward them for sanctionable conduct.

1        THE COURT:  Right.

2        MR. BERGER:  I take all of that, Your Honor.

3  Of course, we have other issues besides summary judgment.

4  I understand.  I mentioned it last time.

5        THE COURT:  I think the practical reality is that

6  once this issue is resolved, however it's resolved, we're

7  going to have to regroup and hear from both sides as to how

8  it changes the landscape for the purposes of either a motion

9  for summary judgment or certainly an opposition to a motion

10  for summary judgment.

11        MR. BERGER:  Right.

12        And then with respect to the other pending

13  motions, Your Honor, I understand we would take them up at

14  that subsequent status conference.

15        THE COURT:  There's no time for that right now.

16  The priority is, clearly, this is first, then the motions

17  for summary judgment are second.

18        MR. BERGER:  Thank you very much, Your Honor.

19  I appreciate your indulging me.

20        MR. LOWELL:  Can I respond to his point?

21        THE COURT:  I'm not sure what you're responding

22  to, but go ahead.

23        MR. LOWELL:  I just want the record, again, to be

24  clear, Judge.  What he's not talking about is the sanctions

25  or summary judgment.  He's talking about his third attempt

1    to have the case dismissed on personal jurisdiction grounds.

2    After that has been visited and revisited by this Court,

3    he'd like to raise it another time.  That's not the motion

4    for summary judgment or the sanctions.  It's the

5    motion to dismiss on personal jurisdiction grounds.

6              THE COURT:  Well, he didn't say that, but...

7              MR. LOWELL:  That's what he's meaning.

8              THE COURT:  But that's, you know.

9              MR. BERGER:  Indeed, Your Honor, I'd be happy --

10             THE COURT:  Not likely the Court is going to go in

11   that direction.

12             MR. BERGER:  Well, whether --

13             MR. LOWELL:  That's what he would like you to do.

14             MR. BERGER:  Well, whether the Court would or not,

15   the point that I had made in the motion for reconsideration,

16   which I mentioned expressly last time, Your Honor -- and

17   I'm not trying to hide the ball on anything -- that issue,

18   of course, is now up in the D.C. Circuit and will be briefed

19   now.

20             And so all I'm asking, Your Honor -- I'm not

21   asking you to address it today -- is the opportunity to

22   explain why, given that the Circuit is sinking its teeth

23   into this issue and is going to resolve it substantively --

24             THE COURT:  Have they heard argument?

25             MR. BERGER:  No, Your Honor.  The appellants'

1    brief on that issue is due July 13th.

2            But what they've done, interestingly -- there are

3    four of these cases, all of which have been dismissed --

4    they have grouped them all for a consolidated disposition,

5    indicating that they intend to resolve the jurisdictional

6    issue in those cases.  And so that has some bearing on

7    future proceedings there.

8            THE COURT:  Have they held the arguments?

9            MR. BERGER:  They have not set a date, Your Honor.

10   They have set all cases for argument on the same day before

11   the same panel in the D.C. Circuit, indicating they plan a

12   coordinated disposition of all four of these other cases,

13   all of which, of course, were dismissed.

14           This is the last case standing against the PA and

15   the PLO.  The others have been dismissed either for lack of

16   jurisdiction, three of them by Judge Friedman and

17   Judge Kollar-Kotelly, or on summary judgment by --

18   I'm sorry -- Judge Kessler.  Right.

19           So with those four being out, Your Honor, what

20   I had wanted to do -- I know Mr. Lowell likes to

21   characterize this as a third or fourth or fifth attempt,

22   it seems to me in candor to the Court, it's worth the Court

23   knowing in managing this case that the D.C. Circuit is going

24   to address substantively the issue of jurisdiction; and it

25   seems to me that that's worthy of a discussion item when we

```
 1   do reconvene.

 2            THE COURT:  The appellants' brief was due when?

 3            MR. BERGER:  It is due July 13th.

 4            And then because there are so many cases that are

 5   consolidated, the Circuit has given us until September 13th,

 6   I believe it is, for the response briefs.  And then there's

 7   a short reply period.  So this case will be heard in the

 8   D.C. Circuit on the jurisdictional issue this year.

 9            THE COURT:  Well, the practical reality is, if you

10   want to get practical -- Mr. Lowell, you can have a seat.

11            MR. LOWELL:  Thank you, sir.

12            THE COURT:  The practical reality is this:

13   It's going to take weeks, if not months, to resolve the

14   issue that's in front of me right now.

15            MR. BERGER:  And, again, I appreciate it,

16   Your Honor.  And that's why I thought in fairness, I'd let

17   the Court know.

18            THE COURT:  And in September, I'm starting a

19   three-month trial, criminal case.  So there is no, no

20   possibility that a summary judgment motion will be resolved

21   between now and December.  There's just no way.

22   I don't know when I'd even have the summary judgment

23   argument.

24            MR. BERGER:  Yeah.

25            THE COURT:  So the practical reality is that the
```

1   D.C. Circuit will hear the arguments in whatever those

2   consolidated cases are before my three-month trial starting

3   in September ends.

4           Now, of course, the big question mark is, as you

5   well know, is how long will it take them to issue an

6   opinion?  Now, see my NSA case was argued last November.

7   Is that eight months, nine months?  No opinion.

8           Who knows when the opinion will come out.

9   It might not come out till next June.  I mean, I don't know.

10  I mean, I don't know what's going on.

11          MR. BERGER:  Right.  And, indeed, Your Honor,

12  I appreciate that.

13          All I'm saying, Your Honor, is, hypothetically,

14  were they to decide it promptly and were they to uphold the

15  decisions of Judge Friedman and Judge Kollar-Kotelly that

16  there is no jurisdiction, I would think simply that's a

17  factor Your Honor would want to take into account in

18  planning future events in this case.

19          THE COURT:  And then there's another issue that

20  could occur; and that is that if I ruled in favor of the

21  motion by the -- the defendants' motion for sanctions, that

22  they might seek to appeal that ruling.

23          MR. BERGER:  Indeed.

24          For all I know, Your Honor, they might because of

25  the D.C. Circuit's consolidated disposition of these cases,

1    they might even wish to take a voluntary dismissal so that

2    they could get -- enjoin the party up in the

3    Court of Appeals.

4            But who knows?  All I'm saying, Your Honor, is by

5    virtue of our motion for reconsideration, we had wanted to

6    let the Court know; and, indeed, we filed the notice of

7    supplemental authority to let the Court know that four of

8    these cases are already up there occupying the

9    Court of Appeals' attention.

10           THE COURT:  Are you involved in any of those four

11   cases?

12           MR. BERGER:  We're involved in all of them,

13   Your Honor.

14           THE COURT:  You're involved in all four?

15           MR. BERGER:  Yes, we are.

16           THE COURT:  Okay.

17           MR. BERGER:  Thank you.

18           THE COURT:  All right.  Well --

19           MR. LOWELL:  Your Honor, please --

20           THE COURT:  -- this is all very informative.

21           MR. LOWELL:  Can I say one point to his last

22   point?  We're talking about the motion for reconsideration,

23   so I'd like to just say one line.

24           THE COURT:  Go right ahead.

25           MR. LOWELL:  Thank you.

1          All I wanted to remind the Court, and mostly maybe

2   remind Mr. Berger, because he's new, is that Your Honor's

3   opinion did not address the issues that are on appeal to the

4   D.C. Circuit in the other cases.  Your Honor's decision was

5   based squarely on the fact that given opportunity after

6   opportunity, the defendants waived whatever personal

7   jurisdiction arguments they had.

8          So putting aside the merits that we believe our

9   case facts are different in order for there to be

10  jurisdiction of these defendants in this case, something we

11  briefed but did not have to address because Your Honor

12  didn't rule on it, he's asking reconsideration.  That has

13  nothing to do with what the D.C. Circuit said.

14         The D.C. Circuit could rule any way they want and

15  it wouldn't affect your decision, because the fact specifics

16  of this case is that on multiple occasions, they told

17  Your Honor they wanted to litigate.  You ruled on that basis

18  that they waived any personal jurisdiction argument they

19  have.  I can assure you that's not what's going to be

20  decided by the D.C. Circuit.

21         MR. BERGER:  Well, that's a factual point,

22  Your Honor, and I'm afraid I have to beg to differ because,

23  in fact, the waiver argument is one of the issues before the

24  D.C. Circuit, because the waiver issue squarely presented in

25  the Gilmore case and, indeed, it's squarely presented in the

1   other cases because, shockingly, the plaintiffs in all these

2   cases make the same arguments in all of them because it's

3   the same cast of characters and they all argue waiver.

4           THE COURT:  Well, I'm sitting --

5           MR. LOWELL:  Oh, my gosh.

6           THE COURT:  Look, we're not going to -- this horse

7   has been beaten to death.

8           You can have a seat, Mr. Lowell.  There's no

9   reason for you to have to spend any more energy on this

10  issue.

11          I can't decide which will happen first, the

12  screenplay or the novel about this case.  But I know for

13  darn sure something:  Either one of those two is going to

14  come into existence.  That's for darn sure.  I'm trying --

15  I don't know who's going to play Lowell and who's going to

16  play Hibey, but I can imagine it's going to be somebody from

17  central casting.  That's for darn sure.

18          And, Berger, you're new to this; but, you know,

19  somebody will be playing you as well.  But...

20          MR. BERGER:  May I make some suggestions?

21          THE COURT:  No; no suggestions, no.  We've had

22  more than enough suggestions here today.  That's for sure.

23          So wait till you get the transcript.  I'm not

24  putting any pressure on my fabulous court reporter here.

25  But once you get it, you can have ten days from whenever he

1    gets it to you.  And he'll keep track of the date he issues

2    it.

3              You get ten days from then to submit whatever you

4    want to submit, but no more than 15 pages.  And it has to

5    relate to either statements made here that you made or your

6    opponent made that you didn't respond to or you wished you

7    had or whatever.

8              This is not like some commission to go on a roving

9    advocacy effort here, okay?  Keep it focused and limited to

10   what was said here in court that you either want to clarify

11   or respond to that you didn't when you were here.

12   That's all.  15 pages.

13             MR. HIBEY:  Simultaneous submissions?

14             THE COURT:  Yes, simultaneous.  No responses.

15   There will be no reply briefs, nothing like that.

16             Simultaneous.  Ten days later.  All right?

17   That's it.

18             Then at that point, I'll, you know, get a case of

19   beer, probably, and climb up in a mountain and sit down and

20   try to figure it out, because it's obviously, like I say,

21   this is turning into a textbook example of the back alleys

22   and byways of litigating cases like this.  That's for sure.

23             All right.  Have a good weekend.

24             DEPUTY CLERK:  All rise.

25             This Honorable Court now stands in recess until

1    the return of court.

2           (Proceedings concluded at 5:03 p.m.)

3                    C E R T I F I C A T E

4           I, William P. Zaremba, RMR, CRR, certify that

5    the foregoing is a correct transcript from the record of

6    proceedings in the above-titled matter.

7

8

9    Date: July 14, 2015_____  /S/__William P. Zaremba_____

10                           William P. Zaremba, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25