# Exhibit 45

In the U.S. District Court
District of Columbia

-------------------------------x
:
Shabtai Scott Shatsky, et al :
:
:
v. :NO. 1:02cv02280
:
The Syrian Arab Republic, et al :
:
-------------------------------x

February 11, 2013

DEPOSITION OF:

Bella Friedman,

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Miller and Chevalier, 655 15th Street, NW, Washington, DC 20005-5701

**A. What do you mean?**
MR. STEINER: Objection.
BY MR. HILL:
Q. When did you first enroll in Brooklyn College, to the best of your recollection?
**A. 1979.**
Q. You attended for one and a half years?
**A. Yes.**
Q. You completed the fall semester in 1980 and then had a child in February, is that what you're saying?
**A. I guess.**
Q. When did you get married?
**A. 1979, January.**
Q. When was the next time that you worked after February of 1981?
**A. 1995.**
Q. Is it fair to say that from the period 1981 until 1995 you were raising your family and taking care of your children?
**A. Yes.**



Q. And you were not working outside the home at that point?
**A. That's correct.**
Q. Were you doing any work in the home that you were getting paid for?
**A. No.**
Q. What job did you get in 1995?
**A. Marketing.**
Q. For what company were you working?
**A. Direx.**
Q. Where is Direx located?
**A. Petach Tikva.**
Q. Obviously at some point you moved from New York to Israel. When did that happen?
**A. 1983, July.**
Q. When you arrived in Israel in July of 1983 where did you live?
**A. Raanana.**
Q. How long did you live there?
**A. Two years.**
Q. Then where did you live after that?



**A. Ginot Shomron.**
Q. The address that you moved to in Ginot Shomron in 1985 is the one that you are still at today?
**A. That's correct.**
Q. You mentioned that you were working for Direx. What was your position there?
**A. Marketing department.**
Q. What were you doing?
**A. Helping out the marketing manager.**
Q. Did you have a title?
**A. No.**
Q. How long did you work at Direx?
**A. About ten years.**
Q. Did your position change over the ten years when you were working at Direx?
**A. Yes.**
Q. Tell me what other positions you held besides the initial one that you started at in 1995.
**A. Manager of marketing.**
Q. When did you receive that position?



**A. I don't recall.**
Q. Was it before or after the February 2002 bombing?
**A. Before.**
Q. Then you worked at Direx until approximately 2005, is that right?
**A. Approximately.**
Q. Did you get another job then?
**A. Yes.**
Q. Where did you work next after Direx?
**A. Could you repeat the question?**
Q. Where did you work next after you left Direx in 2005?
**A. There was a period that I overlapped with two jobs.**
Q. What's the name of the non-Direx job you are thinking of?
**A. Initia.**
Q. When did you start working at Initia?
**A. I was offered a position two weeks before the terror attack.**

Q. You were offered a job at Initia in early February or late January 2002?

**A. In January, that's correct.**

Q. Did you accept that position?

**A. Yes.**

Q. Had you started that position as of the time of the bombing on February 16, 2002?

**A. I couldn't, because of the bombing.**

Q. You had not started working at Initia at the time of the bombing on February 16, 2002, correct?

**A. I already had my contract but I had not begun working there.**

Q. When did you actually start working at Initia?

**A. Maybe half a year later. I don't recall exactly.**

Q. Approximately the late summer of 2002?

**A. Perhaps.**

Q. What position did you have when you started working at Initia in approximately the late



summer of 2002?

**A. Marketing communications.**

Q. There was a period of time when you worked at Initia and Direx, is that right?

**A. Correct.**

Q. Were you working part time at each job? Can you explain to me how you did that?

**A. Initia I was working part time.**

Q. Were you also part time at Direx?

**A. No. After the bombing attack, yes.**

Q. Let's back up. As of the summer of 2002 when you started working at Initia you were working there part time, right?

**A. What?**

Q. In the late summer of 2002 when you started your job at Initia that was a part time job for you?

**A. Correct.**

Q. You also had a full time job at Direx?

**A. At that time I was working part time at Direx because of the attack.**



Q. When did you start working part time at Direx?

**A. I wasn't working at all for three months after the attack and then for about two years I worked part time at Direx.**

Q. When the bombing happened in February of 2002 you stopped going to work altogether, right?

**A. Correct.**

Q. Then about three months after that you started working part time at Direx, right?

**A. Correct.**

Q. Then about six months after the bombing you started working part time at Initia?

**A. Correct.**

Q. So there was a period of time where you were working part time for both places?

**A. Correct.**

Q. How long did that arrangement continue?

**A. About two years.**

Q. Then two years later in approximately 2004 what changed?



**A. My daughter's condition was a bit more stable and I was able to leave home for longer hours.**

Q. At which job did you increase your hours?

**A. Eventually I left Direx and worked full time for Initia.**

Q. Is it correct, ma'am, that from the time you started Initia in approximately the late summer of 2002 until you left Direx in approximately 2005 you were working part time at both jobs?

**A. That's correct, because I couldn't work full time like I was supposed to.**

MR. STEINER: Just answer the question.

BY MR. HILL:

Q. Then what happened in 2005 is you left Direx altogether and you went full time at Initia?

**A. Yes.**

Q. Did you ever work more than full time?

**A. Yes. No, maybe not. I'm trying to figure out. Not that I recall.**

Page 46

**to look for my daughter.**
Q. Do you remember the names of any of those people?
**A. All blanks.**
Q. Have you now told me everything you can recollect about conversations you had on the scene of the bombing that evening?
**A. I just remember the local nurse screaming at me. She was the mother of one of my daughter's friends but I don't remember what she was shouting at me.**
Q. What was the name of the nurse that you just referred to?
**A. Dina Rand.**
Q. Do you know where Ms. Rand lives today?
**A. In Modiin.**
Q. Any other conversations you can recall having had on the scene of the bombing that night that you haven't yet told me about?
**A. After everybody had already gone, maybe a couple of hours later I eventually got a call from**

Page 47

**the hospital saying that they found her and she was admitted into the hospital and that she was still alive and that I could come and get her. I also recall the -- I don't remember. They told me they found Keren.**
Q. At some point Tsipi Shatsky told you that Keren had been found?
**A. Right.**
Q. I think you may have said that but that was the occasion where that caused you to think that maybe your daughter had been killed?
**A. Right. It wasn't just me. It was what everybody thought.**
Q. After some period of time you got a call indicating that your daughter was, in fact, alive and in the hospital, right?
**A. Correct.**
Q. Did you leave the scene at that point?
**A. Yes.**
Q. How did you get to the hospital?
**A. One of the local ambulances drove me**

Page 48

**there.**
Q. Did you yourself receive any medical treatment over the course of that evening?
**A. No.**
Q. You weren't given any drugs or anything like that?
**A. No. I had to be there for my daughter.**
Q. You were able to collect yourself on the way to the hospital?
MR. STEINER: Objection.
THE WITNESS: There was nothing to collect. They put me into the back of the ambulance.
BY MR. HILL:
Q. By the time you arrived at the hospital the hysteria had passed, is that right?
**A. Of course not because she wasn't in the hospital that they told me.**
Q. Where did you go after you left the scene?
**A. Belinson Hospital.**
Q. When you arrived there she wasn't there?

Page 49

**A. She wasn't there.**
**I had to go on a wild goose chase to see which hospital she was at and by then I didn't have a car so I was running by foot.**
**I didn't have the ambulance. Eventually they found her in another hospital in the intensive care unit.**
Q. Are you saying that you walked from Belinson to another hospital that night?
**A. I wouldn't call it walking.**
Q. What hospital did you travel to by foot?
**A. Schneider.**
Q. How far apart are these hospitals?
**A. I'd say it was about a 15 minute run.**
Q. They are in the same town?
**A. Yes.**
Q. Did you locate her at Schneider?
**A. Yes.**
Q. Did you have any other occasions in the evening other than on the scene where people told you you were hysterical and needed to be held down

or anything like that?
**A. When I arrived at the hospital I had to be told which was my daughter because she was all covered, her face also, and they didn't want to let me into the intensive care unit.**
**Even though she was extremely heavily sedated she kept waking up and screaming and asking where is Keren, where is Keren, and then the staff decided to allow me to stay with her because they couldn't calm her down which was very important for them.**
Q. Were you able to help calm her down?
**A. No, unfortunately, not. She was hysterical the whole time. She was unconscious also.**
Q. She was unconscious but she was still speaking?
**A. I don't know if it's unconscious but she was heavily sedated, that she should not have been able to keep walking up the way she was.**
Q. How long did your daughter remain in the



hospital?
**A. As an inpatient, ten days. As an outpatient, about three months.**
Q. When she was discharged after ten days where did you go?
**A. She came home and we were given nurses to come by every day to help feed her but she wouldn't let anybody touch her except me which was very, very, very traumatic for me. It was horrible to give her the kind of treatment she needed. It was extremely nauseating.**
Q. She insisted you administer the treatments only?
**A. She didn't want anybody to do it. If you know what the treatment entails, the way I best describe it is like taking steel wool and scrubbing a pot. Imagine doing that on human skin.**
Q. Your daughter wouldn't let the nurses do that and so you did it instead?
**A. Yes.**
Q. How long did that continue?



**A. They had to stay outside because they kept telling me that if it isn't on a certain level then she is open to infection and it would be very dangerous for her.**
Q. You performed the debridement treatments and the nurses would check your work?
**A. Yes. Most of the time it wasn't good enough because I couldn't bear to do it and knowing that I'm the one that's causing her all that pain. It was always a very long process.**
Q. How long did those treatments continue?
**A. Three months.**
Q. And --
**A. All-inclusive.**
Q. Did they taper off over time, the frequency of the treatments taper off over time?
**A. The amount of the different parts of the body because there were some parts of the body that were burnt more deeply than other parts so the ones that were less deep would heal quicker.**
Q. By the end of the three months the



debridement treatment was completed?
**A. Yes. Then she was left with ointments and stuff like that.**
Q. Was it painful to apply the ointments?
**A. I don't think so.**
Q. Any other care that she had in your home after she was discharged other than what we just described?
**A. I had to constantly take her to the hospital. She was in an outpatient clinic.**
Q. How frequently was she visiting the hospital as an outpatient?
**A. I think between two and three times a week.**
Q. What kind of treatments would she have when she went for these hospital visits?
**A. She was having audio exams, she was hearing noises in her ears all the time, all kinds of noises, and her hearing was affected.**
**She had exams with various eye specialists because she had shrapnel in her eyes and they had to**

**see what could be taken out and what can't be taken out.**

**She had skin doctors because we had to discuss the issue of grafting, skin surgery. I don't know.**

**The list was so long. I don't think I was able to keep track. It was sort of a robotic response, kept going from one doctor to the next. Each doctor's appointment was hours and hours because you had the waiting room and then she was not very cooperative.**

Q. Do you think you've now told me generally about the source of inpatient treatment she had over the three month period after her hospital discharge?

**A. We had a local hospital psychologist that we had to go to but she wasn't being cooperative but we had to go to anyway. I don't recall everything. You have all the paperwork.**

Q. You told me about all the ones you are recalling sitting here now?

**A. Sitting here, yes.**



Q. You mentioned that she was having treatment on her ears.

Did she ever have any surgery or corrective treatment for her ears?

**A. Not that I recall.**

Q. Did anyone ever recommend that she have surgery?

**A. Not that I recall.**

Q. You mentioned that she was seeing eye doctors because she had shrapnel in her eyes. Did she have it in both eyes?

**A. I don't recall.**

Q. Did anyone ever recommend that she have surgery or other treatment to remove the shrapnel?

**A. We did have shrapnel removed but they couldn't remove all of them.**

**Some of them were so deep that they said it would cause blindness and they couldn't take the chance.**

Q. When was the surgery that removed the shrapnel that you described?



**A. Some time between the bombing and the three months of the outpatient.**

Q. Did this happen while she was still in the hospital?

**A. I don't recall. It was in stages.**

Q. Any followup surgery recommended on the eyes?

**A. Unfortunately, she can't be helped.**

Q. She has had all the surgery that can help with that, as far as you know?

**A. She didn't have surgery on the eyes. It was too sensitive to deal with it.**

Q. She did not have any operations done on her eyes?

**A. She had shrapnel removed. I'm not sure if it's called an operation.**

Q. She had shrapnel removed by a doctor but you are not sure it qualified as a surgery, that's what you are saying?

**A. Yes.**

Q. You said that there had been discussions



about having a skin graft?

**A. Yes.**

Q. Did she, in fact, have any skin grafts?

**A. No, I didn't allow it. I just felt --**

MR. STEINER: Just answer the questions.

Q. She was a minor at the time, right?

**A. Yes.**

Q. You were making her medical decisions for her?

**A. Yes.**

Q. You said you were the one who decided not to have skin grafts?

**A. Yes.**

Q. Why did you make that decision?

**A. They explained to me that in order to do a good job they need to take her skin from another part of her body.**

**I figured she would be left with two areas that were deformed. This way she is left with one from the bottom and why should I force on her**

Page 58

**another?**
Q. Did your daughter agree with that decision?
**A. She didn't care about anything.**
**She wasn't dealing very well with the fact that she was left alive while her best friend was killed.**
Q. She did not object to your decision to disallow the skin grafting?
**A. No.**
Q. Apart from that recommendation for skin grafting were there any other recommendations by the doctors that you did not follow?
MR. STEINER: Objection.
THE WITNESS: I'm not sure what you mean by "recommendation."
The doctors gave me options of what can be done and this could be done and this could be done and this could be done and it was my responsibility to look into each option. She was left with a bad scar and grafting was an obvious

Page 59

option.
BY MR. HILL:
Q. Were there any other options for treatment presented to you other than skin grafting that you did not allow?
**A. Not that I recall.**
Q. When the doctors talked to you about potentially having a skin graft, what did they tell you this could do to improve her situation?
**A. It was an esthetics issue.**
Q. So they thought the skin grafting would improve her appearance?
**A. Correct.**
Q. Were there certain portions of her body they were recommending skin grafting for?
**A. Yes.**
Q. Which portions were skin grafts recommended for?
**A. Her leg.**
Q. Was it one leg or the other or both?
**A. I don't recall.**

Page 60

Q. The doctor, it's fair to say, was telling you if you did the skin grafting it would improve the appearance of her leg?
**A. That was the impression I received.**
Q. Was any other sort of cosmetic or reconstructive surgery proposed for your daughter?
**A. I don't recall.**
Q. You mentioned that she was not being very cooperative. What did you mean by that?
MR. STEINER: Objection.
THE WITNESS: I couldn't talk to her about these medical issues with her. She wasn't able to relate to it.
BY MR. HILL:
Q. What do you mean she wasn't able to relate to it?
**A. She wasn't able to grasp anything that could allow for her to make a decision.**
**She was emotionally still dealing with the fact that she found out only a week later that her friend was killed and eventually she was told her**

Page 61

**other friend was killed as well and a third friend was killed also who is an Israeli citizen.**
Q. Just for the record, who are the three friends that you are referring to?
**A. Keren, which was her best friend, even more than a best friend, two soulmates, and Rachel Thaler and a boy called Nehemia. I don't recall his last name.**
Q. How would you characterize the -- you said Keren was her best friend and soulmate. How would you characterize the relationship between Rachel and your daughter?
**A. Rachel was a very good friend of hers. Rachel would confide in Chani. Keren was Chani's friend since about the age of two. We lived across the street from each other and they were constantly with each other.**
Q. I take it you had occasion to speak to Keren Shatsky on a number of occasions prior to her death, right?
**A. Correct.**

Q. Did she ever express to you any career plans or career --
**A. Not that I recall.**
Q. Do you ever recall Rachel Thaler telling you something about career plans?
MR. STEINER: Objection.
THE WITNESS: I don't recall.
MR. STEINER: Same objection to the prior question regarding Keren's career goals.
BY MR. HILL:
Q. You mentioned that your daughter had seen the hospital psychiatrist after she was injured, is that right?
**A. I don't recall if it was a psychiatrist or a psychologist.**
Q. Some sort of mental health professional associated with the hospital?
**A. That's correct.**
Q. Do you remember that person's name?
**A. No.**
Q. Do you remember on how many occasions your



daughter saw that person?
**A. I know that she was present when they came to tell her of Keren's death.**
Q. Apart from that occasion, can you remember --
**A. There might have been one other meeting, the first meeting after which Chani refused to attend any more.**
Q. Which hospital was this person associated with?
**A. Schneider.**
Q. Was it a man or a woman?
**A. Woman.**
Q. If I want to try to find her can you tell me anything about her that would help me know who she was?
**A. A blank.**
Q. Do you know approximately how old she was?
**A. A blank. I don't remember.**
Q. You believe there were only two occasions when Chani met this woman from the hospital?



**A. There could have been more. There were so many meetings but I don't recall. I don't recall that she was agreeable.**
Q. You recall at least at the second meeting that Chani declined to have further meetings?
**A. Yes.**
Q. Do Chani's physical injuries affect her daily living today?
MR. STEINER: Objection.
THE WITNESS: Chani's injuries affect her daily living until today.
BY MR. HILL:
Q. In what way do her physical injuries affect her daily living today?
MR. STEINER: Objection.
THE WITNESS: I'm not sure how to separate.
The fact that she has nightmares twice a week to me is physical because she doesn't sleep at night properly.
BY MR. HILL:



Q. Okay.
**A. The fact that her eye two weeks ago -- she was complaining for two weeks straight that her eye was burning her, her eye was burning her, the one with the shrapnel.**
Q. Two weeks ago she was complaining that her eye was burning?
**A. For two weeks.**
**I recall that -- these are things that come and go. It's not something that seems to be never-ending. It's never-ending.**
**She has problems with her kidney. She has a dysfunctional kidney. She has a disease that they discovered in her eyes and I don't know yet how we can relate to it since she was shrapnel in the eye.**
**I don't know if she will be able to have any form of treatment. It's a degenerative disease.**
**The fact that she won't go swimming because she is embarrassed of her scars, the fact that her self-image is reduced because of her scars, to me those are physical.**

Q. Any other ways that you can think of that her physical injuries are affecting her daily living?

**A. I think the way she relates to how she behaves in a crowd, how she treats her children, she is very overly protective.**

**She has -- she can't stay in the mall for more than a certain period because she has a reaction to crowds. She has become very short tempered, very trigger easy. She is more mean than she used to be.**

Q. Any other ways you believe that her physical injuries are affecting her daily living now?

**A. She doesn't have the ability to develop close friendships with girls since she lost Keren, not to the level of best friends where there is some kind of a barrier where they can't go further than that and she does the same to her siblings.**

Q. Anything else?

**A. It really bothers her that she has this**



**black stain on her face, which is shrapnel. People are constantly telling her that she has a pen mark on her face and she should go wash it off.**

**She is constantly being reminded of it because people innocently bring it to her attention.**

Q. Any other ways you can think of that her physical injuries are currently affecting her daily living?

**A. I can't think of anything right at this minute.**

Q. You mentioned earlier that she was married. When did she get married?

MR. STEINER: Objection.

THE WITNESS: Five years ago.

BY MR. HILL:

Q. What's the name of her husband?

**A. Moshe.**

Q. What's Moshe's last name?

**A. Edri.**

Q. Where do they currently live?

**A. Kedumim.**



Q. Where is that?

**A. Samaria.**

Q. Is that also described by some people as being a settlement?

**A. Could be.**

Q. It's located in what some people describe as the West Bank, correct?

**A. Could be.**

Q. How long have they lived there?

**A. Maybe two and a half, three years.**

Q. Where did they reside prior to living there?

**A. Ginot Shomron.**

Q. Did they live with you for any period of time after they were married?

**A. She did.**

Q. They got married but there was a period of time where she was still living with you?

**A. Yes.**

Q. But he was not?

**A. That's correct.**



Q. Why were they in that living arrangement?

**A. Because he was in the Army and she was scared to be alone.**

Q. How long was he in the Army and unable to live with her in that fashion?

**A. Three years.**

Q. Then has he completed his military service?

**A. Yes.**

Q. After he mustered out then they moved to their current home, is that right?

**A. They moved to an apartment in Ginot Shomron.**

Q. How long did they live in the apartment?

**A. Not long.**

Q. When were her children born?

**A. Dates?**

Q. Approximately, if you can.

**A. Beginning of May.**

Q. May of 2012?

**A. No.**

Page 126

**A. No, not that I recall.**
Q. Do you know the names of the persons or entities which your lawsuit claims are responsible for the bombing?
**A. PLO.**
Q. Do you know the names of any other entities that are allegedly responsible for the bombing?
**A. Syrians.**
Q. Anyone else?
**A. Not that I recall.**
Q. You mentioned you had been previously deposed. Where did that deposition take place?
**A. In Israel.**
Q. I think you said you also had been deposed in the United States, is that correct?
**A. Yes.**
Q. Where did that take place?
**A. In New York.**
Q. Do you know who was alleged to have caused the bombing in the lawsuit that you filed in which

Page 127

you where deposed in New York?
**A. I don't recall. I blank out, I intentionally blank out things.**
Q. What do you mean?
**A. I blank out little details that are related to the bomber and stuff like that.**
Q. Are you saying you have intentionally forgotten who you sued?
**A. No. It means I don't absorb the information to begin with.**
Q. If I told you you had sued the Arab Bank, would that sound right?
**A. It's possible.**
Q. You, just sitting here today, don't know if you brought a lawsuit against the Arab Bank?
**A. Could be.**
Q. You mentioned you think you've sued the Syrians, is that right?
**A. I don't recall. Could be.**
Q. Are you aware of any evidence that the Syrians had something to do with the bombing of

Page 128

February 16, 2002?
MR. STEINER: Objection.
THE WITNESS: Repeat the question.
BY MR. HILL:
Q. Are you aware of any evidence that the Syrians had something to do with the bombing on February 16, 2002?
MR. STEINER: Objection.
THE WITNESS: I am aware of the fact that I was told or I had seen or read something that was related.
BY MR. HILL:
Q. Do you remember who may have told you that the Syrians were somehow involved?
**A. I don't recall if I was told or if I had read it.**
Q. Do you remember where you may have read such information?
**A. I don't recall.**
Q. Can you tell me anything at all about any evidence that Syria had something to do with this

Page 129

bombing?
MR. STEINER: Objection.
THE WITNESS: I don't recall.
BY MR. HILL:
Q. The question was can you tell me any information that Syria had something to do with the bombing?
**A. I don't recall anything.**
Q. Sitting here today you cannot tell me of any information that Syria was involved in this bombing, fair to say?
**A. I guess so.**
Q. Are you aware of any evidence that the PLO had something to do with this bombing?
MR. STEINER: Objection.
THE WITNESS: Say that again.
BY MR. HILL:
Q. Are you aware of any evidence that the PLO had something to do with this bombing on February 16, 2002?
**A. I recall reading or hearing about it.**

Page 130

Q. Do you recall where you may have heard that the PLO had something to do with this bombing?
**A. I don't recall.**
Q. Do you recall where you may have read that the PLO had something to do with this bombing?
**A. In some of the -- I don't recall.**
Q. Sitting here today you cannot tell me the source of any information that the PLO may have had something to do with the bombing, correct?
**A. I think some of the legal documents relate to it.**
Q. What legal documents are you referring to, ma'am?
**A. The lawsuit that we submitted.**
Q. Apart from the lawsuits themselves are you aware of any documents indicating the PLO had something to do with the February 16, 2002 bombing?
**A. I don't recall.**
Q. Sitting here today you cannot tell me of any such information, correct?
**A. At this time I don't recall.**

Page 131

Q. Right now you cannot think of any information that the PLO had something to do with this bombing, right?
**A. That's correct. Right now I'm under stress and I don't recall.**
Q. Do you want to take a break and think about it?
**A. No.**
Q. If you think of it before the end of the day would you please tell me?
**A. Yes.**
Q. Are you aware of any evidence that the Palestinian Authority had something to do with this February 16, 2002 bombing?
MR. STEINER: Objection.
THE WITNESS: I don't recall.
BY MR. HILL:
Q. Sitting here today you cannot think of any evidence that the Palestinian Authority had something to do with the bombing on February 16, 2002, is that correct?

Page 132

**A. At this moment I cannot recall anything, any details related to the terrorist and the organizations behind the terrorists but I know that he did not act alone, I know it was not a one man show.**
**I do not recall the names of the organizations that were behind him but I know that it was a large enterprise.**
Q. You said you believe that the person who caused the explosion did not act alone. Why do you believe that, ma'am?
**A. I don't recall why I believe that but it's something that I believe in.**
Q. Sitting here today can you tell me the source of any information that the person was not acting alone?
**A. Excuse me?**
Q. Sitting here today can you tell me the source of any information that the person who caused the explosion was not acting alone?
**A. To the best of my recollection, I believe**

Page 133

**that his family received money for his bombing and a dead man cannot provide money.**
Q. You said earlier that you believe the person who caused the explosion was not acting alone.
Are you aware of any information about who may have assisted him in any fashion?
**A. I don't recall at this time.**
Q. Sitting here today you cannot point me to any information indicating the person who caused the bombing was assisted by anyone, correct?
**A. At this time I cannot recall any such information.**
Q. You said something about the family received money from the bombing.
**A. That's correct.**
Q. What's the basis of that belief?
**A. I don't recall.**
Q. Have you spoken to the family members of the person who did the bombing?
**A. No.**

Page 134

Q. Sitting here today you cannot tell me the source of your belief that the family received money, correct?
**A. At this time I do not recall. At some time I had information that's seems to have evaded my memory at this specific moment.**
Q. Can you tell me anything about the information that you are referring to?
**A. At the time there were many articles and information that were going around that I looked over.**
Q. Where were you when you were looking over that information?
**A. I don't recall.**
Q. Have you given those articles and other information to your lawyers?
**A. I don't recall.**
Q. Were these articles and information at one time in your possession?
**A. My possession? I have a computer, if that's what you mean.**

Page 135

Q. Have you searched your computer to determine if it has information on it that's responsive to the discovery requests in the lawsuit?
**A. I usually mean the internet. I'm sorry if I wasn't clear.**
Q. You think you've read something on the internet about the family receiving money?
**A. I said it was possible. I don't recall where I read it.**
Q. Your best guess is it was something on the internet?
**A. It's one of, not my best.**
Q. What are the other ones?
**A. Could be newspaper articles, it could be regular articles.**
Q. What do you mean by regular articles?
**A. Could be something that was posted on our network, on a social network.**
Q. What social network are you referring to?
**A. We have an Anglo-Saxon social network.**
Q. Tell me what you mean by that.

Page 136

**A. That means Anglo-Saxons are -- they post articles or things that might be of interest to the other Americans, because it's in English.**
Q. Where is this social network that you've referred to located?
**A. On the internet.**
Q. Is this like an internet chat room or something like that?
**A. One of them is.**
Q. What's the other one?
**A. The other one is the community network.**
Q. What community?
**A. Neve Aliza.**
Q. Do you know what the internet address for the chat room is?
**A. No.**
Q. Do you know what the internet address for the community network that you described is?
**A. No.**
Q. But you've had access to both of these in the past?

Page 137

**A. Yes.**
Q. You believe that one or the other of those websites may have contained some information about the family member of the person who caused the explosion receiving money?
**A. It is possible.**
MR. STEINER: Objection.
BY MR. HILL:
Q. Do you currently own a computer?
**A. Own it? No.**
Q. Do you have access to a computer?
**A. Yes.**
Q. What kind of a computer do you presently have access to?
**A. Desktop.**
Q. Where is it located?
**A. In my home.**
Q. Who owns that computer?
**A. The company I work for.**
Q. How long have you had that computer in your home?

Page 142

**A. Before we flew here. Within the last two weeks.**

Q. You believe additional material was sent to --

**A. I didn't say it was additional material. If I did, then I stand corrected.**

**We reviewed the files and whatever she found that she wasn't sure if they had a copy she went and re-sent.**

**I don't know if it was new material or additional.**

**It might have just been reruns of material that we had submitted in the past because there was such a large timeframe from then and now, just to make sure we sent it anyway.**

Q. How was this material transmitted to Nitsana Leitner?

**A. I believe by e-mail.**

Q. Were you copied on that e-mail?

**A. No.**

Q. What e-mail addresses do you have?

Page 143

**A. WBmaster@Direxgroup.com.**

Q. How long have you had that e-mail address?

**A. Many years.**

Q. Since 2002 have you used any other e-mail addresses other than that one?

**A. Yes.**

Q. What other e-mail addresses have you used in that time period?

**A. Info@Initiamed.com.**

Q. Any other addresses, e-mail addresses, you used since February of 2002?

**A. Info@azimutherapy.**

Q. Any other e-mail addresses you've used since February 2002?

**A. Not that I recall.**

Q. Have you or anyone else been through those e-mail accounts to determine if there's material in there responsive to the discovery requests in this lawsuit?

**A. Yes.**

Page 144

Q. Who did that?

**A. Me.**

Q. When did you do that?

**A. Before I flew, within the last few weeks.**

Q. Did you find any information in there that was responsive to the discovery requests in this lawsuit?

**A. No.**

**I found copies of the files that we had submitted but nothing relating to discovery.**

Q. You described that your file contained communications with your lawyers, is that right?

**A. Yes.**

Q. Were those communications with your lawyers via any of these e-mail addresses?

**A. I believe so.**

Q. Was it all three or just one?

**A. I don't recall. Definitely not the last one.**

Q. You don't think you had any communications with your lawyers at the azimuth therapy address?

Page 145

**A. That's correct.**

Q. How about the others?

**A. I believe it would be the first.**

Q. You believe you communicated with your lawyers on the Direx e-mail?

**A. Yes.**

Q. Does anyone at Direx besides you have access to your e-mail account?

**A. Yes.**

Q. Who else at Direx can access your e-mail account besides you?

MR. STEINER: Objection.

THE WITNESS: Our IT specialist.

MR. HILL: Mr. Steiner, I would request that if any communications have been withheld from the Direx account based on a claim of privilege in light of the fact that they can be accessed by people other than the witness and counsel that they be produced because it appears the privilege --

MR. STEINER: I don't think you

flushed it out at all.

Because an IT person might be able to access an e-mail account, it's the same as saying we're having a conversation, the door is unlocked and somebody might be able to walk into the room.

MR. HILL: My request stands.

MR. STEINER: I think the witness was about to explain further something related to the issue.

BY MR. HILL:

Q. The computer that you use at home is owned by Direx, is that right?

**A. Yes.**

Q. Does Direx have the right to obtain that computer from you upon the conclusion of your employment?

**A. It was considered a gift.**

Q. It's been given to you?

**A. Yes.**

Q. It was bought by the company but they gave it to you?



**A. Yes.**

Q. If you ever stop working for them they are not expecting to get it back?

**A. No.**

Q. Sitting here today can you point me to any evidence that the Palestinian Authority had something to do with the February 16, 2002 bombing?

**A. I did not get involved in the who and the what of what was behind.**

**I was very, very busy, using up all my financial and emotional and physical resources in taking care of my daughter's physical and emotional health and that of the rest of my children as we were all very affected.**

**My family fell apart after the bombing. I don't recall having any left-over energies or time to invest in who was behind it and what was behind it at that point. It was really less important to me.**

Q. Sitting here today you cannot point me to any evidence that the Palestinian Authority had



something to do with the February 16, 2002 bombing, is that correct?

MR. STEINER: Objection.

THE WITNESS: Sitting here today I don't recall all the things that I read about at the time.

BY MR. HILL:

Q. Sitting here today you cannot tell me of any evidence that the Palestinian Authority had something to do with the February 16, 2002 bombing, is that correct?

MR. STEINER: Objection.

THE WITNESS: Sitting here today and at this time I don't recall.

BY MR. HILL:

Q. If you recollect something before the end of our time here today you'll tell me, right?

**A. That is correct.**

Q. Are you aware of any evidence that the Arab Bank had something to do with the bombing on February 16, 2002?



MR. STEINER: Objection.

THE WITNESS: I'm aware of the fact that they funded money.

BY MR. HILL:

Q. What evidence are you aware of that the Arab Bank funded monies to bring about that attack?

**A. I don't recall. It was based on paperwork that I read.**

Q. What paperwork?

**A. It could have been legal paperwork. I don't recall.**

Q. Apart from the legal paperwork are you aware of any evidence that the Arab Bank had something to do with the bombing on February 16, 2002?

**A. I don't recall at the time.**

Q. Sitting here today you cannot point me to any evidence apart from legal paperwork about the Arab Bank having something to do with that bombing?

MR. STEINER: Objection.

THE WITNESS: Sitting here today

after eleven years I do not recollect what I read and was aware of ten and eleven years ago.
BY MR. HILL:
Q. Sitting here today you cannot point me to any evidence that the Arab Bank had something to do with the February 16, 2002 bombing, is that right?
MR. STEINER: Objection.
THE WITNESS: I do not recollect what I read ten and eleven years ago in relation to who was behind the attack.
BY MR. HILL:
Q. Sitting hearing today you cannot point me to any evidence that the Arab Bank had something to do with the February 16, 2002 bombing, is that correct?
MR. STEINER: Objection.
THE WITNESS: Sitting here today I do not recollect.
BY MR. HILL:
Q. You can't tell me of any such evidence now, can you?



**A. At this moment, no.**
MR. HILL: Mark this as exhibit 18.
(Whereupon the proffered item was marked as exhibit 18.)
BY MR. HILL:
Q. You have in front of you a document that we've marked as exhibit 18. Have you had a chance to look at that?
**A. Just flipped through it.**
Q. The first page appears to be a fax from you to someone named Avi Leitner. Do you see that?
**A. Yes.**
Q. Dated June 16, 2005?
**A. Yes.**
Q. Who is Avi Leitner?
**A. Avi is Nitsana's husband.**
Q. Does he represent you in this lawsuit?
**A. Nitsana represents me.**
Q. Do you know the names of any other lawyers who are representing you in your lawsuits?
**A. Nitsana represents me. There are**



**different people I speak to, a secretary, maybe other lawyers in the office.**
Q. Can you tell me the names of any lawyers who are representing you other than Nitsana?
**A. Nobody represented me. Might have been people I spoke to.**
Q. The front page says "Hi, Avi, I'm faxing to you paperwork which I've collected during my meeting. During my meeting with Gary Osen he directed me to what he was looking for. I'm assuming you are in the same direction. If you have questions, feel free to call me on my cell phone." There's a number there.
**A. Yes.**
Q. Who is Gary Osen?
**A. Gary Osen is an American lawyer working with Nitsana on different cases.**
Q. Do you know what case Mr. Osen is involved in?
**A. I don't recall.**
Q. You mentioned earlier that you had sent



some material to Nitsana Leitner.
Is this the communication you were referring to?
**A. Yes.**
Q. This is dated June 16, 2005, right?
**A. Yes.**
Q. Since June 16, 2005 have you sent any additional documents to your lawyers?
**A. I believe already Chani was over 18 at that time so I didn't have access to any of the paperwork.**
Q. You cannot recollect sending additional material to your lawyers after June 16, 2005, is that correct?
**A. Not to my recollection.**
Q. Turn, ma'am, if you will, to the first two pages which are 2464 and 2465.
**A. Yes.**
Q. These appear to be some handwritten notes?
**A. Yes.**
Q. These are in Hebrew, right?

I honestly don't have any interest in your sex life but if you are, in fact, being asked to be paid money for your sex life I need to ask you about it.

Are you asking to be paid money in the lawsuit for an injury to your sex life related to the bombing?

MR. STEINER: Objection.

THE WITNESS: That specific thing as a stand-alone issue, I don't believe that we related to it as a stand-alone issue.

BY MR. HILL:

Q. You are not asking to be paid money for an injury to your sex life in the lawsuit, is that correct?

**A. That's correct.**

Q. Has anyone in your family --

**A. With him, with my husband. You asked about my husband.**

Q. Are you asking to be paid in any fashion for an injury to your sex life as a result of the



bombing?

**A. No, I never followed through on the subject but now that you raise it, one needs to look into it but it was not related to my husband because we got divorced soon thereafter.**

Q. Are you saying that you do want to be paid money in the lawsuit for an injury to your sex life?

**A. I don't know. I never related to specific subjects.**

MR. HILL: Let's go off the record for a minute.

(A discussion takes place which is held off the record)

THE WITNESS: The answer is no.

BY MR. HILL:

Q. Ma'am, you are not claiming any damages for an injury to your sex life in the lawsuit, correct?

**A. Correct.**

Q. Has anyone in your family ever been convicted of a crime?



**A. No.**

Q. Has anyone in your family ever been arrested?

**A. No.**

MR. STEINER: Objection.

BY MR. HILL:

Q. Has anyone in your family ever used illegal drugs to your knowledge?

**A. No.**

MR. STEINER: Objection.

MR. HILL: Mr. Steiner, subject to our demands for additional documents I have no further questions for Ms. Friedman at this time.

MR. STEINER: We reserve our right to review and sign.

THE WITNESS: Am I free to go?

(A discussion takes place which is held off the record)

(Deposition adjourned at 1:10 p.m.)



Reporter's Certificate

I, the undersigned, Certified Court Reporter, do hereby certify that the foregoing transcript of testimony was taken by me in stenotype and thereafter reduced to print under my direction, that said transcript is a full, true and substantially accurate record of the proceedings, to the best of my ability.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

/s/ Michael Feuer

____________________________

Certified Realtime Reporter