# Exhibit 46

In the U.S. District Court
District of Columbia

-------------------------------x
:
Shabtai Scott Shatsky, et al :
:
v. :NO. 1:02cv02280
:
The Syrian Arab Republic, et al :
:
-------------------------------x

January 29, 2013

DEPOSITION OF:

Joanne Shatsky,

a witness, called by counsel pursuant to notice, commencing at 9:14 a.m., which was taken at Miller and Chevalier, 655 15th Street, NW, Washington, DC 20005-5701

**remember exactly.**
Q. You filed a joint return for your husband's income when he was working in the United States?
**A. Yes, he filed.**
Q. Have you paid federal taxes on the income you've earned in Israel?
**A. We don't reach the amount that requires paying taxes.**
Q. Have you made any contributions to Social Security or any other federal program since you moved to Israel?
**A. Whatever contributions came out of my husband's salary when he was working here.**
Q. Apart from the work your husband did in the United States you haven't paid any other taxes in connection -- you haven't paid any other taxes to the United States since you moved to Israel?
**A. No, our income wasn't high enough.**
Q. Are you currently employed?
**A. Yes.**



Q. Where do you work today?
**A. I work at Eric Cohen Books.**
Q. What is the business of Eric Cohen Books?
**A. They publish course books for teaching English as a foreign language.**
Q. Where is Eric Cohen Books' offices located?
**A. In Raanana.**
Q. Is that in Israel?
**A. Yes.**
Q. Do you work at their office in Raanana or work out of your home?
**A. I work at the office.**
Q. How do you get from your home in the West Bank to the office?
MR. STEINER: Objection.
THE WITNESS: Drive.
BY MR. HILL:
Q. Do you own a gun?
**A. No.**
Q. Does anyone else in your family own a gun?



**A. My husband does.**
Q. When you travel in the car with your husband does he sometimes take his gun with him?
**A. Rarely.**
Q. Have you ever seen your husband fire his gun?
MR. STEINER: Objection.
THE WITNESS: I don't think so.
BY MR. HILL:
Q. Have you ever encountered any kind of violence that necessitated a gun?
MR. STEINER: Obviously. That's why we're here.
THE WITNESS: Personally, myself? No.
BY MR. HILL:
Q. Apart from your daughter's death, your family has had no violence directed against it, correct?
**A. Yes, that's correct.**
Q. How much do you currently earn for your



work at Eric Cohen Books?
**A. 12,600 shekels a month.**
Q. Approximately how many dollars would that be?
**A. Divide by four. I'm not sure what the exchange rate is right now. It's about $3000 a month.**
Q. How long have you held that position at Eric Cohen Books?
**A. Five years.**
Q. Where did you work prior to your employment there?
**A. At a girls high school called Ulpanat Lehava.**
Q. Is that where you were working at the time your daughter was killed?
**A. Yes.**
Q. What was your approximate salary while you worked at the high school?
**A. The last year that I worked there or over the 20 years? There was a big difference.**

Page 26

Q. How about the last year?
**A. Around 7 or 8000 shekels a month. I don't remember exactly.**
Q. Do you remember approximately how much you were making around the time your daughter was killed?
**A. No.**
Q. Was it more or less than the 7 or 8000 that you made at the end of your career there?
**A. I really don't remember.**
Q. Do you remember your pay falling following your daughter's death?
**A. No.**
Q. Do you believe, in fact, that you continued to receive the sort of normal raises that someone in your position would have had after your daughter died?
**A. I wouldn't know.**
Q. Do you have any reason to think that you earned less money after your daughter's death than you would have had she not died?

Page 27

**A. No.**
Q. In fact, since you've changed jobs you are actually making more money than you would have made had you remained in the high school, correct?
**A. Yes.**
Q. Why did you change jobs?
**A. I wasn't looking to change jobs. It just kind of came knocking at my door. I was doing reviewing for this company and they called and asked me if I was interested in a full time position and I tried it.**
Q. Are you happy with that job?
**A. Yes.**
Q. Did your decision to change jobs have anything to do with your daughter's death?
**A. It's hard to say.**
Q. Do you believe your employment after the date of your daughter's death was negatively affected in any way by her death?
MR. STEINER: Objection. By "employment" do you mean compensation for employment

Page 28

or the scope of the work or her relationship with the --
MR. HILL: Generally.
THE WITNESS: My work was definitely affected. My salary wasn't.
BY MR. HILL:
Q. In what way do you believe your work was affected?
**A. I couldn't concentrate, it took every last ounce of energy I had to walk into the classroom and try to pretend that everything was okay and teach.**
Q. The grief associated with your daughter's death affected your ability to work?
**A. Sometimes I'd be sitting at home trying to check the girls' assignments and check number one, all of a sudden I'll look at my watch and it would be 20, 30, 40, 50 minutes later and I hadn't even gotten on to number two. I didn't have a clue that time was gone.**
Q. Any other way in which your daughter's death affected your ability to do the work?

Page 29

**A. I depended on teachers providing me with work pages and their work plans and lesson plans and things.**
**I did absolutely nothing except walk into the classroom where I had to be, do whatever work the other teachers had planned and walk out. That was all I could do.**
Q. Others assisted you during this time?
**A. Yes.**
Q. Approximately how long did the circumstances you've described continue where you needed to rely on other people to help you with the planning and so forth?
**A. The whole rest of that year. The following year I was on sabbatical.**
Q. Your daughter was killed in February of --
**A. 2002.**
Q. And you went back and finished teaching that spring semester in 2002?
**A. Yes.**
Q. This is the period of time you are

describing where others helped you with lesson planning and so forth?
**A. Yes.**
Q. You took a sabbatical starting in the summer of 2002?
**A. Right.**
Q. You would have resumed teaching in the fall of --
**A. In September of 2004.**
Q. When you returned to teaching in September of 2004 were you still experiencing these difficulties?
**A. Different difficulties.**
Q. What other difficulties were you experiencing when you returned to teaching full time in September 2004?
**A. Some of the same feelings of -- my daughter went to this school. Some of the same feelings of walking in and seeing her friends and she is not there.**
Q. Were you able to deal with those feelings



and complete your assignments as a teacher?
**A. To the best of my ability.**
Q. In fact, you continued to teach at that school for several years after that, correct?
**A. Yes.**
Q. Did these effects that you described lessen over time?
**A. Probably somewhat.**
Q. They were not so debilitating that you decided to stop teaching?
**A. No. This was an exceptional school. I would not have had the same type of conditions any place else.**
**I wouldn't have had the same amount of support any place else.**
**As difficult as it was, in the beginning I never really thought of leaving.**
Q. Do you believe, ma'am, that it was actually good for you to continue teaching there because of the support network you had?
MR. STEINER: Objection.



THE WITNESS: Certainly was better than staying home alone.
BY MR. HILL:
Q. That was part of the reason you decided to continue teaching, was that you had friends and support at the school, correct?
**A. Yes.**
Q. Do you believe your husband has earned less money as a result of your daughter's death than he otherwise would have earned?
**A. I don't know.**
Q. Your husband decided to retire early, right?
**A. Yes.**
Q. He's happy with that decision?
MR. STEINER: Objection.
THE WITNESS: He was happier than he was when he was working.
BY MR. HILL:
Q. Are you happy with his decision to retire early?



**A. I accept it.**
Q. Does he appear to be more content retired than he was when he was working?
MR. STEINER: Objection.
THE WITNESS: Yes.
BY MR. HILL:
Q. Is your husband the sort of fellow who -- some people live to work, some people work to live.
Is he more in the category of he worked because he needed to support his family as opposed to his work was the thing that got him out of bed in the morning?
MR. STEINER: Objection.
THE WITNESS: I would say he worked because he had to to support the family.
BY MR. HILL:
Q. When he worked enough to support the family and was able to retire that's what he chose to do?
MR. STEINER: Objection.

Page 82

Q. Shira Hazan and Moriah, do you know where they live?
**A. They live in a town called Shavei Shomron.**
Q. How do you spell that?
**A. S-H-A-V-E-I S-H-O-M-R-O-N. I think that's where they live.**
Q. Is that town that you've just described part of the same complex that your town is part of?
**A. It's about half an hour away, 45 minutes away.**
Q. Is that also a settlement in the West Bank?
**A. It's a settlement in Samaria.**
MR. STEINER: Objection.
BY MR. HILL:
Q. When you say Samaria, you are referring to what other people refer to as the West Bank, correct?
MR. STEINER: Objection.
THE WITNESS: It's one small area of what other people refer to as the West Bank.

Page 83

BY MR. HILL:
Q. When you say Samaria you are referring to geographically an area that other people might refer to as the northern part of the West Bank?
**A. Yes.**
Q. It's near Nablus?
**A. I don't know what you mean by "near." Everything is near in Israel. It's a very small country.**
Q. When you say Samaria, the area you are referring to geographically is the northern part of the West Bank?
**A. Yes.**
Q. Do you have any other contact information for either Ms. Hazan or Moriah?
**A. No.**
Q. You said that they were friends of Ms. Friedman?
**A. They were visiting her. They were staying with her that Sabbath. I don't know how friendly they were.**

Page 84

Q. Can you tell me the names of anyone else that you know to have been on the scene at the time your daughter was killed?
**A. At the time of the attack itself or after?**
Q. At the time of the attack.
**A. I can't think of anybody else right now.**
Q. Do you know if any of the people that you have identified are able to identify the person or persons who caused the explosion?
MR. STEINER: Objection.
THE WITNESS: What do you mean by "identify"?
BY MR. HILL:
Q. Do you know if any of the people whose names you've given me here today are able to say what the name was of the person who caused the explosion?
MR. STEINER: Objection.
THE WITNESS: Probably. I could find the name easily enough.
I personally choose not to dignify this

Page 85

person with a name. I know it has appeared in the newspaper, my lawyers know who it is.
I don't want to know his name. There are plenty of people who know his name. I don't need to know.
BY MR. HILL:
Q. Is the person or persons who caused the explosion known to any of the people you have identified as being on the scene prior to that day?
**A. If anyone there knew this person beforehand?**
Q. Correct.
MR. STEINER: Objection.
THE WITNESS: You would have to ask them but I would say no.
BY MR. HILL:
Q. Are you aware of any evidence that your daughter experienced any conscious pain or suffering between the time of the explosion and the time of her death?
**A. This man came up to these kids sitting**

**eating pizza and said "I'll see you in heaven" and blew himself up.**
**Now, I have no way of knowing what my daughter felt for that minute until he set off that bomb. I have no way at all of knowing.**
**Was she scared? Did she know what was going to happen? You don't know that and I don't know that.**
Q. You've just described a statement by the person who set off the explosion. Who told you that that statement was made?
**A. People who were there.**
Q. Do you remember which person who was there told you that?
**A. No, I don't. I believe several people said the same thing but I don't remember who said it.**
Q. Are you aware of any other statements that the person who caused the explosion made other than the one you've just related to?
**A. No.**



Q. Are you aware of how much time passed between the statement you have described and the explosion itself?
**A. No.**
Q. Let me return to the prior question.
Between the time of the explosion and the time of your daughter's death are you aware of any evidence that your daughter experienced conscious pain and suffering during that period of time?
MR. STEINER: Objection, asked and answered.
It's obvious that the question when first posed caused an emotional response from the witness when she gave her answer.
If you are asking her to repeat the same emotional response, your questions are certainly close to intimidating, harassing, causing embarrassment, unnecessarily raising her emotions.
I'll ask you not to repeat verbatim the same question that caused the emotion before.
MR. HILL: The speaking objection is



improper. If you have an objection, state the objection.
MR. STEINER: Objection, asked and answered.
BY MR. HILL:
Q. Let's read back the question.
(Whereupon the requested portion of the record was read by the reporter)
MR. STEINER: Objection, asked and answered.
THE WITNESS: The doctor, one of the doctors who got to the scene after the attack was Keren's pediatrician.
I don't know how long it took him to get there. Keren was still alive when he got there. She was taking her last breaths. He realized he couldn't do anything to save her. Did she experience any pain or suffering? I personally cannot say.
BY MR. HILL:
Q. What was the name of the doctor that you



have identified who was on the scene?
**A. I think his name is Jerry Stein.**
Q. Where is Dr. Stein's practice?
**A. In Karnei Shomron.**
Q. Did Dr. Stein give you any indication of the period of time between the blast and when he arrived?
**A. No.**
MR. STEINER: Objection. She already testified she doesn't know. Please move on.
BY MR. HILL:
Q. Did Dr. Stein give you any indication of whether your daughter was conscious at the time he found her?
MR. STEINER: Objection.
THE WITNESS: I don't remember.
BY MR. HILL:
Q. The events you've just related about Dr. Stein, what he witnessed, is that something Dr. Stein told you or what somebody else told you?
**A. The part about she was taking her last**

**breaths?**
Q. Yes, ma'am.
**A. He told us.**
Q. When did you speak to Dr. Stein?
**A. The day after.**
Q. Would you agree with me, ma'am, that nothing that Dr. Stein told you indicated that your daughter was conscious at the time that he found her?
MR. STEINER: Objection. She just testified she was still breathing.
MR. HILL: Your objection is noted.
BY MR. HILL:
Q. You would agree with me, ma'am, that someone can be breathing and be unconscious, correct?
MR. STEINER: Objection.
THE WITNESS: Possible.
BY MR. HILL:
Q. Nothing Dr. Stein told you indicated that your daughter was, in fact, conscious at the time



that he found her, correct?
MR. STEINER: Objection.
THE WITNESS: I don't believe he was going to tell us anything that would cause us any more pain than we were already feeling.
BY MR. HILL:
Q. Ma'am, I don't wish to dwell on this any more than you do.
MR. STEINER: Then don't.
MR. HILL: I just want to get the record straight.
BY MR. HILL:
Q. Nothing Dr. Stein told you indicated that your daughter was conscious at the time he found her, correct?
MR. STEINER: Objection, asked and answered. Don't answer it again.
THE WITNESS: I don't remember that he told us anything, whether she was or wasn't.
BY MR. HILL:
Q. Has anyone else ever told you whether your



daughter experienced any suffering between the time of the blast and the time of --
**A. No.**
Q. Your husband mentioned a conversation with someone at a forensic institute about this subject. Were you present for that conversation?
**A. For part of it.**
Q. Do you remember the name of the doctor that your husband spoke with at the institute?
**A. Hess.**
Q. How do you spell it?
**A. H-E-S-S.**
Q. Do you know his or her first name?
**A. It's a him. I can't right now.**
Q. What, if anything, did Dr. Hess say about whether your daughter experienced any pain or suffering?
**A. I don't believe he said anything about it, not to my memory.**
Q. He didn't say anything that you recollect?
**A. No.**



Q. Do you know if he said anything to your husband about whether she had suffered?
**A. No.**
Q. Apart from Dr. Stein and Dr. Hess, have you ever heard of anyone else expressing an opinion about whether or not your daughter experienced pain and suffering from the time of the blast to the time of her death?
**A. No.**
Q. Was there any sort of autopsy or postmortem performed on your daughter?
**A. I believe there was.**
Q. Do you know if there is a written report of that?
**A. I don't know. I would assume so but I don't know.**
MR. STEINER: Don't guess.
THE WITNESS: I never saw one.
MR. HILL: Mr. Steiner, to the extent such a report does exist and is within the possession, custody and control of plaintiffs I

**A. Evidence, no.**
Q. Are you aware of something other than evidence indicating the Syrian Arab Republic had something to do with your daughter's death?
**A. I was only mentioning when you asked, I understood at one point that there were somehow involved in one of the cases but I don't remember which case and I don't know what the involvement was.**
Q. Did you, in fact, authorize a lawsuit against the Syrian Arab Republic in connection with your daughter's death?
MR. STEINER: She authorized this lawsuit. We've gone through this earlier.
THE WITNESS: They are party to one of the lawsuits. I don't remember which one.
BY MR. HILL:
Q. Why did you sue the Syrian Arab Republic?
MR. STEINER: If that response asks you to rely on communications you had with your attorneys I advise you not to answer it.



THE WITNESS: I can't answer it anyway. I don't know.
BY MR. HILL:
Q. You don't know why you sued the Syrian Arab Republic, is that correct?
**A. Again, I have kept as much as possible --**
MR. STEINER: That's not the question.
BY MR. HILL:
Q. You don't know why you sued the Syrian Arab Republic, is that correct?
**A. Specifically, no.**
Q. Do you have a general recollection of why you sued the Syrian Arab Republic?
**A. No.**
Q. Sitting here today you can't tell me at all why you authorized the lawsuit against Syria?
MR. STEINER: If that response requires that you rely on communications you had with your attorneys I'd advise you not to give it.
THE WITNESS: I think my answer is



no.
BY MR. HILL:
Q. Why did you sue the Palestinian Authority?
**A. The Popular Front for the Liberation of Palestine, part of the PLO, part of the PA, it's all one, all the same.**
**You are asking me why?**
Q. The question was why did you sue the PA?
**A. Specifically the PA? I put them all together.**
**The Palestinian Authority is because of the PLO, because of the Popular Front for the Liberation of Palestine.**
Q. Did you sue the Popular Front for the Liberation of Palestine?
**A. I don't know.**
Q. Did you sue the PLO?
**A. In my mind they are all the same thing.**
Q. Did you authorize a lawsuit against the PLO?
MR. STEINER: Objection.



THE WITNESS: I don't remember who specifically is in the lawsuit.
BY MR. HILL:
Q. Are you aware of any evidence that the PLO had something to do with your daughter's death?
MR. STEINER: Objection. If the response requires that you rely on communications you had with your attorneys then I'm telling you not to answer it.
THE WITNESS: I don't know what specific evidence there is anyway.
BY MR. HILL:
Q. I'd like to avoid having to bring you back so let me ask the question again.
MR. STEINER: Don't engage in narrative. Just ask questions and don't tell her what your personal feelings are in the case.
MR. HILL: I can't ask a question while you are talking.
MR. STEINER: I'll keep talking until I have an assurance that you are going to stop

Page 114

engaging in a narrative that's beyond the questions, to suggest to her that if she doesn't respond she is going to end up coming back. If she comes back, she comes back.

MR. HILL: She is going to come back if you instruct her not to answer questions that are properly placed because I am going to compel her and I am going to win that motion and she is going to return and answer the questions.

MR. STEINER: I don't notice a robe on you.

MR. HILL: You are entitled to make the instructions. You may continue to make them. You are doing so at the peril of the witness returning.

Let me pose a question.

MR. STEINER: I'm not going to breach attorney/client confidentiality because you are making threats to a witness having to come back based on what you believe to be your understanding of privilege.

Page 115

MR. HILL: Let me ask the question, ma'am.

BY MR. HILL:

Q. Are you aware of any evidence that the PLO had something to do with your daughter's death?

**A. I know what the answer is but I'm dying to give an explanation.**

MR. STEINER: This might relate to privilege.

Don't answer. Give me a moment to speak to the witness outside.

(Whereupon, a recess was taken from 11:01 a.m. to 11:05 a.m.)

MR. STEINER: There was a joinder of some privilege and some not privileged responses to that question. I will let the witness reveal the portion of the answer that does not relate to privileged information.

MR. HILL: Do you want the question again?

THE WITNESS: Please.

Page 116

BY MR. HILL:

Q. Are you aware of any evidence that the PLO had something to do with the death of your daughter?

**A. It was pretty much common knowledge, written about in all the newspaper articles at the time.**

Q. Apart from the newspaper articles are you aware of any other evidence that the PLO had something to do with the death of your daughter?

**A. I'm happy to leave evidence to my lawyers. I personally don't. I'm not sure what you want me to answer.**

MR. STEINER: You've answered it.

THE WITNESS: That's it. I know what I read in the newspapers and I trust my lawyers to find the evidence that they need.

BY MR. HILL:

Q. I'm not asking you about what your lawyers know.

MR. STEINER: Objection. Please ask a question.

Page 117

THE WITNESS: I don't have to know.

MR. STEINER: You don't have to respond any more. Next question, please.

THE WITNESS: I don't have to know.

MR. STEINER: You don't have to respond any more.

BY MR. HILL:

Q. Apart from what you've read in the newspapers are you aware of any evidence that the PLO had something to do with your daughter's death?

MR. STEINER: It's yes or no.

THE WITNESS: No.

BY MR. HILL:

Q. Are you aware of information that you are not telling me because of the privilege claim that Mr. Steiner has made?

MR. STEINER: Objection. Don't respond to it.

MR. HILL: Mr. Steiner, are you suggesting that it's not proper to learn whether there is, in fact, privileged information that the

witness is aware of.
MR. STEINER: It's not proper to assume she understands the meaning of "privilege."
BY MR. HILL:
Q. Mr. Steiner just qualified my question by saying something apart from privilege, yes or no. Do you remember that?
Would your answer be different if Mr. Steiner had not said that?
**A. I don't know. I stay as far away from the details as possible.**
**I don't want to know the details. I don't want to know the evidence. I don't want to see the evidence.**
Q. Apart from what you've read in the newspapers has anyone ever told you that there is evidence that the PLO had something to do with your daughter's death?
**A. I don't think so.**
Q. Apart from what you've read in the newspapers and what someone has told you verbally



has anyone ever communicated with you in any other fashion that there is evidence that the PLO had something to do with your daughter's death?
**A. I don't think so.**
Q. You've not received anything in writing or verbally to indicate to you that the PLO had something to do with your daughter's death other than newspapers, correct?
**A. I think so.**
Q. Are you aware of anything other than newspapers that indicate that the PLO had something to do with your daughter's death?
**A. No.**
Q. Which newspapers are you referring to?
**A. All of the Israeli newspapers.**
Q. Do you know their names?
**A. Maariv, Yediot Ahronot, Jerusalem Post, all the newspapers wrote about the attack.**
Q. Do you have copies of any of these newspaper articles that you are referring to?
**A. Probably. I don't know if I have all of**



**them.**
Q. Have your lawyers asked you to look at these newspaper articles so they can be turned over in this lawsuit?
MR. STEINER: Objection, don't answer that.
BY MR. HILL:
Q. Have you, in fact, given your lawyers these newspaper articles that you have so they could be produced in the lawsuit?
**A. I don't think so. I don't remember.**
MR. STEINER: Objection.
MR. HILL: Mr. Steiner, it appears that the witness has identified some newspaper articles that are responsive to our discovery request.
I would ask that a search be made and that they be produced.
MR. STEINER: I'll take it under advisement and request you ask for them in writing.
BY MR. HILL:



Q. Has anyone ever asked you to look for documents so they could be turned over to defendants in this lawsuit?
MR. STEINER: If your lawyers asked you to do that and the response requires you to divulge it I'm asking you not to answer it.
MR. HILL: I don't think that's a proper instruction. I'm reserving the right to compel.
BY MR. HILL:
Q. Have you ever actually looked for documents and turned them over to your lawyers so they could be produced in this lawsuit?
MR. STEINER: Objection. Why don't you just ask her if she looked for documents?
MR. HILL: Let me get an answer to this first.
MR. STEINER: Objection. Don't reveal what you've turned over or haven't turned over.
THE WITNESS: I don't even know what

Page 126

MR. STEINER: I'll take it under advisement and ask you to follow up in writing.
MR. HILL: I will do so.
BY MR. HILL:
Q. Are you aware of any evidence that the Arab Bank had something to do with your daughter's death?
**A. Wasn't that the question that you asked before?**
MR. STEINER: It was asked already and I told you if the response requires you to rely on communications you had with your attorneys not to respond to it.
BY MR. HILL:
Q. Please answer the question.
**A. The question?**
Q. Are you aware of any evidence that the Arab Bank had something to do with your daughter's death?
**A. I am aware, yes. I believe I answered that, that there is evidence.**

Page 127

Q. What evidence --
**A. They were funneling funds.**
Q. What evidence are you aware of that the Arab Bank had something to do with your daughter's death?
MR. STEINER: If you became aware of that evidence through conversations you had with your attorneys then don't answer the question.
BY MR. HILL:
Q. Does Mr. Steiner's instruction require you not to answer the question?
**A. He told me not to answer\lance\answer the question.**
MR. STEINER: Only if the response, only if you became aware of it --
THE WITNESS: Any evidence, I only became aware of it in conjunction with conversations with my lawyers.
BY MR. HILL:
Q. Is it the case that you are not aware of any evidence that the Arab Bank had anything to do

Page 128

with your daughter's death?
**A. Correct.**
Q. What did your lawyers tell you about the evidence that the Arab Bank had something to do with your daughter's death?
MR. STEINER: Don't answer that question.
MR. HILL: The basis?
MR. STEINER: The question itself requires divulging attorney/client confidentiality.
BY MR. HILL:
Q. Did any information about the Arab Bank's alleged involvement in your daughter's death originate with you?
**A. No.**
Q. Did any information about the Arab Bank's involvement, alleged involvement with your daughter's death originate with any member of your family?
**A. No.**
Q. What did your lawyers tell you about the

Page 129

Arab Bank's alleged involvement in your daughter's death?
MR. STEINER: Objection, don't answer that question, privilege.
MR. HILL: I disagree with the assertion and we'll reserve the right.
BY MR. HILL:
Q. Are you aware of any evidence that the Palestinian Authority had something to do with your daughter's death?
**A. What was in the newspapers.**
MR. STEINER: Asked and answered already.
BY MR. HILL:
Q. Apart from what was in the newspapers are you aware of any other evidence that the Palestinian Authority had something to do with your daughter's death?
**A. There's evidence and there's evidence. There's court of law evidence but if anyone was living in Israel at the time, seeing what was going**

**on, the support, whether financial to the families or emotional or praising these suicide bombers as martyrs and heroes, the whole culture supports, supported this terrorist activity.**

Q. Let me return to the question. I'm not sure whether I got an answer or not.

Are you aware of any evidence that the Palestinian Authority had something to do with your daughter's death apart from what you read in the newspapers?

MR. STEINER: She responded to the question. It's asked and answered. You are asking her the same exact question she just responded to. She began by telling you there's evidence and there's evidence and then went on to answer the question.

MR. HILL: I'd like an answer.

THE WITNESS: The question, please?

BY MR. HILL:

Q. Apart from what you read in the papers are you aware of any evidence that the Palestinian



Authority had something to do with your daughter's death?

MR. STEINER: You want the answer you just gave to that question read back?

THE WITNESS: My answer stands.

MR. STEINER: You asked the same question verbatim.

THE WITNESS: My answer stands.

As I've said before, specific legal court acceptable evidence, I stay away from. I cannot handle dealing with any of the details of the case.

I do not have any specific evidence.

BY MR. HILL:

Q. You said something about financials. What did you mean by that?

**A. Paying off families of the suicide bombers.**

Q. What evidence are you aware of that someone paid off the families of suicide bombers?

**A. General public knowledge.**



Q. Where did you obtain this knowledge?

**A. Newspapers.**

Q. Apart from newspapers?

**A. Newspapers, legal system, people in Israel.**

Q. You mentioned newspapers, legal system, people in Israel. Which newspapers are you aware of?

**A. All of them.**

Q. What newspapers are you aware of that indicates some financial connection between the Palestinian Authority and your daughter's death?

**A. Specific to my daughter's death, I don't know.**

Q. Is it the case that you --

**A. I do believe there were payments made to the family of the suicide bomber but I don't remember.**

Q. What's the basis for that belief that payments were made to the family of the suicide bomber?



**A. I don't remember the source of the information. I don't know it was the newspapers. I don't know.**

Q. Was it anyone in the Palestinian Authority itself that gave you that information?

**A. No.**

Q. Have you ever spoken to anyone from the Palestinian Authority?

**A. No.**

Q. You mentioned something about the legal system.

Are you aware of something within the legal system that indicates the PA had some financial connection to your daughter's death?

**A. Specifically, no.**

Q. Are you aware generally?

**A. Yes.**

Q. What is that?

**A. Just general public knowledge. It's known that the families of the suicide bombers are paid.**

Q. Apart from that general public knowledge

Page 134

are you aware of any other information in the legal system indicating the PA had some financial connection to your daughter's death?
**A. No, but I don't have to be.**
MR. STEINER: Just yes or no.
THE WITNESS: No.
BY MR. HILL:
Q. You mentioned something about people in Israel having information about a financial connection between the PA and your daughter's death. Which people are you referring to?
**A. No one specific.**
Q. Who are you referring to generally?
**A. General knowledge.**
Q. What's the source of this general knowledge?
**A. Newspapers.**
Q. Is it accurate to say that you are not aware of any financial connection between the PA and your daughter's death other than newspaper articles?
MR. STEINER: Objection. You can

Page 135

answer.
THE WITNESS: Correct.
BY MR. HILL:
Q. You mentioned something about an emotional connection between the PA and your daughter's death. What do you mean by that?
**A. Emotional?**
Q. I believe that's what you said.
MR. STEINER: Can we have the answer read back? Do you need to have the answer read back?
THE WITNESS: I don't remember saying that. I don't remember in what context.
BY MR. HILL:
Q. You said something about praising your daughter's death. What did you mean by that?
**A. Every time there's a terrorist attack in Israel the Palestinians would dance in the streets and hand out candy to the kids and honor the suicide bomber as a hero and a martyr.**
Q. Are you aware of these sorts of acts

Page 136

taking place in connection with your daughter's death?
**A. After my daughter's death I was not aware of anything.**
Q. Do you know if, in fact, what you've described as praising occurred in connection with your daughter's death?
**A. Specifically no, but there were suicide bombings every single week that year and the reaction was almost always the same.**
Q. Are you aware --
**A. It's very possible that our bombing wasn't big enough for them to have a big celebration.**
**Most of the bombings were 20 people killed here and there, a bus blown up, people killed at their Passover seder or people killed at a disco. Ours was considered small comparatively so maybe it wasn't worthy of a big celebration.**
Q. Are you aware of any evidence that the PA had anything to do with the celebrations that you've described?

Page 137

MR. STEINER: Objection.
**A. The only time the PA ever stopped celebrations was when it was bad PR for them. Then they tried to tone it down.**
Q. Are you aware of any evidence that the PA was involved in the sort of celebrations that you've described?
MR. STEINER: Objection.
THE WITNESS: Specific to this particular attack, no.
BY MR. HILL:
Q. How about relative to any attack?
**A. General overall atmosphere, definitely. They named streets after these people.**
Q. Did you ever attend any of these celebrations?
MR. STEINER: Objection. Don't answer that.
THE WITNESS: No.
BY MR. HILL:
Q. You were not present at these events?

Page 138

**A. No.**
Q. So you witnessed them over media or some other form?
**A. Yes.**
Q. You mentioned naming streets. What are you referring to?
**A. They named streets and town squares after these people like they are heroes.**
MR. STEINER: That was in response to your question whether or not she has knowledge of the Palestinian Authority.
BY MR. HILL:
Q. Are you aware whether any streets or squares have been named for the persons responsible for your daughter's death?
**A. No, and I don't want to know. I would not even want to know his name.**
**I don't think this was big enough to warrant a street named after him.**
Q. You said something about a culture. What did you mean by that?

Page 139

**A. The year that my daughter was killed there were suicide bombings every single week for months. There's the person who blows himself up, there's the person who made the bomb, there's the person who planned the attack, there's other people behind it providing supplies, transportation.**
**There was a whole -- every single suicide bomber, there are many people behind them. There are people encouraging this.**
**The fact that they name streets after them, that they pay the families, that's they honor them as martyrs. This whole culture is conducive to this type of activity. That's what I mean.**
Q. Who was responsible for the security at the location where your daughter was killed?
MR. STEINER: Objection.
THE WITNESS: I don't know.
Why should there be a need for security when young people are going and sitting down to eat pizza? Tell me why is there a need for security?
BY MR. HILL:

Page 140

Q. The way it works is I get to ask the questions.
MR. STEINER: Objection.
BY MR. HILL:
Q. It's true the area in which your daughter was killed, the Palestinian Authority, had no authority for the security in that area, is that correct?
**A. They had no responsibility for the security? Unbelievable. No, of course they didn't.**
Q. The responsibility for the security of that area was the State of Israel, correct?
MR. STEINER: Objection.
BY MR. HILL:
Q. Correct?
**A. Yes.**
Q. The Palestinian Authority was prohibited from operating in the town where you live, is that correct?
MR. STEINER: Objection.
THE WITNESS: I don't know what that means.

Page 141

MR. STEINER: She has already explained to you the Palestinian Authority caused this explosion.
BY MR. HILL:
Q. Your testimony indicated the Palestinian Authority caused the explosion -- are you aware of any evidence that the Palestinian Authority caused this explosion?
MR. STEINER: She has already responded to these questions.
THE WITNESS: The suicide bomber and the person who planned the attack belonged to the Popular Front for the Liberation of Palestine which is part of the PA.
It's all the same organization.
BY MR. HILL:
Q. Apart from your belief that the person who detonated the bomb or prepared the bomb were part of the PFLP --
**A. No, that's fact.**

Q. What facts are you aware of indicating that the person who detonated the bomb or prepared the bomb belonged to the PFLP?
**A. The fact that the police or the Army or whoever investigated, it was in the newspaper.**
Q. You say the police or the Army investigated?
**A. I don't know. I don't know who investigated. I don't remember.**
Q. What you just said about the person detonating the bomb or making the bomb being in the PFLP, that's something you read in the newspaper?
**A. Yes.**
Q. Apart from -- go ahead.
**A. Never mind.**
Q. Apart from reading that in the newspaper are you aware of any other evidence that the person who detonated the bomb or made the bomb was affiliated with the PFLP?
**A. Me personally, no.**
Q. Do you know anyone in the PFLP?



**A. No.**
Q. Do you know anyone in the PLO?
**A. No.**
Q. Have you ever spoken to anyone from the PLO?
**A. No.**
Q. Do you know anyone in the Palestinian Authority?
**A. No.**
Q. Have you ever spoken to anyone in the Palestinian Authority?
**A. No, and I never want to.**
Q. Have you ever seen any documents other than newspapers indicating that the PA had something to do with your daughter's death?
**A. No.**
Q. Have you ever seen any documents other than newspapers indicating the PLO had something to do with your daughter's death?
**A. No.**
Q. Have you ever seen any documents other



than newspapers indicating that the Arab Bank had something to do with your daughter's death?
**A. No.**
Q. Have you seen any documents at all indicating that Syria had something to do with your daughter's death?
**A. No.**
Q. I'll show you what was previously marked as exhibit number two.
MR. STEINER: This is exhibit number two from yesterday's deposition of her husband.
BY MR. HILL:
Q. Have you ever seen this article before?
**A. Yes.**
Q. When did you first see it?
**A. About a week ago.**
Q. Do you believe you saw it on or about the date it was first published?
**A. I believe so. It was put up on our local -- we have like a local, not a website, a local community board. Someone posted it.**



Q. On a computer board?
**A. Yes.**
Q. As you see in the article there, your husband appears to have been quoted by the author of the article.
**A. Yes.**
Q. Were you present when your husband spoke to the reporter?
**A. No.**
Q. Do you know if the reporter is accurately quoting your husband?
**A. I assume so.**
Q. Did your husband tell you what he had told the reporter?
**A. No.**
Q. Were you asked to speak to the press?
**A. No.**
Q. Do you know anything about the document that is the subject of this article?
**A. Only what it says here.**
Q. Apart from what you've read in the

newspaper articles do you know anything about the document that's the subject of these articles?
**A. No.**
Q. Have you ever spoken to any of your lawyers about the contents of that document?
MR. STEINER: Objection, don't answer.
MR. HILL: Whether she has spoken is not privileged.
I'm not trying to get the contents. I'm trying to get whether the conversation occurred.
THE WITNESS: No.
BY MR. HILL:
Q. Do you have an e-mail address?
**A. Yes.**
Q. What is it?
**A. Shatskys@012.CO.IL.**
Q. Do you have access to any other e-mail addresses other than that?
**A. My husband just opened a Gmail for me.**
Q. What's that?



**A. He just opened that like a week or two ago. Hava.Shatsky@Gmail.com.**
Q. Apart from those two e-mail addresses do you currently have access to any other e-mail addresses?
**A. No.**
Q. Since the date of your daughter's death in 2002 what other e-mail addresses have you accessed?
**A. I don't know how long we've had this 012 e-mail. We previously had one that was Netvision but I don't know how long ago that was.**
Q. Can you still access that Netvision e-mail account?
**A. I think so.**
Q. Any other e-mails that you've had since 2002 other than the three you've told me about?
**A. I had a previous Gmail account mainly for school things, English teachers network in Israel, but I hardly ever used it.**
Q. Do you know what the address was?



**A. No.**
Q. Can you still access that account today?
**A. I don't think so. I don't think it still exists.**
Q. Any other e-mail addresses that you've used since 2002?
**A. No.**
Q. Have you searched any of these e-mail accounts for e-mails or other documents that may be responsive to the discovery request in this case?
**A. No.**
Q. Do you know if anyone has made such a search?
**A. No.**
MR. HILL: Mr. Steiner, I would request that a search be made of these e-mail addresses to the extent that they can still be accessed by Mrs. Shatsky, to the accent they are still within the possession, custody or control of the Shatskys for documents that are responsive to our discovery request.



MR. STEINER: I'll take it under advisements and ask that you put that in writing.
BY MR. HILL:
Q. How many computers do you have?
**A. One.**
Q. Have you owned any other computers since 2002?
**A. Yes.**
Q. How many?
**A. Another one.**
Q. Since 2002 you've had two computers?
**A. I don't know if we had two computers the whole time.**
**I don't remember when we bought one of the laptops. My husband would know.**
Q. Do you recall having a different computer at the time of your daughter's death?
**A. Other than these two?**
Q. Yes.
**A. I don't know. I don't know how old the computers are.**

sensible person with any feeling or a brain in their head would understand that this kind of trauma affects every aspect of your life.

BY MR. HILL:

Q. Did the death of your daughter affect your ability to have sex with your husband?

**A. I'm not answering.**

Q. Did the death of your daughter affect your husband's ability to have sex with you?

**A. I'm not answering.**

Q. Prior to the date of your daughter's death did you have any difficulty having sex with your husband?

**A. I'm not answering.**

Q. Prior to the date of your daughter's death did your husband have any difficulty having sex with you?

**A. I'm not answering.**

Q. Did the death of your daughter in any way affect the quality of your sexual relations with your husband?



**A. I'm not answering.**

MR. HILL: Mr. Steiner --

MR. STEINER: Let's take two minutes. Mr. Shatsky is on the phone.

MR. HILL: Sure.

(Pause)

MR. HILL: Mr. Steiner, subject to the right to recall the witness to ask the questions that she refused to answer or that you instructed her not to answer and subject to the right to recall her based on documents that are within the possession, custody and control of the plaintiffs that have not been produced, I do not have any further questions for Mrs. Shatsky at this time.

MR. STEINER: We reserve the right to review and sign the transcript. We reserve the right for yesterday's deposition as well.

THE WITNESS: I would like you to take a good look at this picture.

MR. HILL: I've seen it before.

MR. STEINER: We're done.



(Deposition adjourned at 12:15 p.m.)



Reporter's Certificate

I, the undersigned, Certified Court Reporter, do hereby certify that the foregoing transcript of testimony was taken by me in stenotype and thereafter reduced to print under my direction, that said transcript is a full, true and substantially accurate record of the proceedings, to the best of my ability.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

/s/ Michael Feuer

______________________________

Certified Realtime Reporter