# Exhibit 47

In the U.S. District Court
District of Columbia

```
------------------------------x
                              :
Shabtai Scott Shatsky, et     :
al                            :
                              :
                v.            :NO. 1:02cv02280
                              :
The Syrian Arab Republic,     :
et al                         :
                              :
------------------------------x
```

January 28, 2013

DEPOSITION OF:

Shabtai Scott Shatsky,

a witness, called by counsel pursuant to notice, commencing at 2:06 p.m., which was taken at Miller and Chevalier, 655 15th Street, NW, Washington, DC 20005-5701

Page 10

**A. I think shortly before, maybe just after I got married they anglicized the name from Shatsky to Shaw.**
Q. Did Shatsky and Shaw have the same meaning in some language or did he pick it because it was shorter?
**A. I think it was the second case.**
Q. When you moved to Israel you took the name Shatsky back?
**A. Exactly.**
Q. Are your parents still alive?
**A. My mother is alive.**
Q. Where does she live today?
**A. She is in a nursing home in Brooklyn.**
Q. Do you have any living siblings?
**A. Yes, I have one brother.**
Q. What is his name?
**A. Bill.**
Q. Where does he reside?
**A. In Manhattan.**
Q. What is his full name?

Page 11

**A. Bill Robert Shaw.**
Q. Do you know his address?
**A. I think it's something like 601 East 86th Street, Upper Manhattan, Upper East Side.**
Q. Any other living siblings?
**A. No.**
Q. What is your wife's name?
**A. Joanne.**
Q. How long have you been married?
**A. Since 1973.**
Q. What is Joanne's full name?
**A. Joanne Chava Shatsky.**
Q. Do you know what her name was at her birth?
**A. Yes.**
Q. What was it?
**A. Joanne Poliqin.**
Q. Did your wife have a middle name?
**A. No.**
Q. When did she take her current name, Joanne Chava Shatsky?

Page 12

**A. She married me. She became Joanne Shatsky. Probably the Chava, the full legal name was at the same time I changed my name, she became Joanne Chava Shatsky at the same time.**
Q. She changed her name legally following your move to Israel?
**A. Yes.**
Q. Approximately what year was that?
**A. We actually hadn't moved to Israel yet. We were there as tourists on an extended visit and I think it was around 1975.**
Q. Was the decision to change your names associated with your decision to move to Israel?
**A. Not directly, no.**
Q. Why did you change your name?
**A. I think I just wanted to revert back to the original.**
Q. Why did you move to Israel?
**A. That was part of let's say my religious reawakening, taking on various practices of Judaism and moving to Israel was seen as part of those**

Page 13

**practices.**
Q. So it would be fair to say that your renewed interest in your faith was a reason to move to Israel?
**A. Yes.**
Q. Did you believe your faith required or encouraged you to move to Israel?
**A. Yes.**
Q. The area that you eventually moved to is called Karnei Shomron, is that correct?
**A. Yes.**
Q. That is located in territory that was conquered or occupied by Israel in the 1967 War, is that correct?
MR. STEINER: Objection.
THE WITNESS: It was liberated by Israel in the 1967 War.
BY MR. HILL:
Q. You chose the word "liberated." Why did you choose that word?
MR. STEINER: Objection.

THE WITNESS: Because I don't believe it had been all that long a possession of Jordan where Israel obtained that land from. It just reverted to Israel. That's certainly part of biblical Israel.
BY MR. HILL:
Q. You say reverted to Israel. When was the last time prior to 1967 that the land on which you now live belonged to Israel?
MR. STEINER: Objection.
THE WITNESS: I couldn't say exactly. I'm not that big on history.
BY MR. HILL:
Q. Some time prior to 1948?
**A. I don't know the exact years. Probably.**
Q. The modern State of Israel you understand was created in 1948?
**A. Yes.**
Q. When you say it reverted back to Israel, you are referring back to ancient Israel, is that correct?



MR. STEINER: Objection.
THE WITNESS: No, when I say revert back, I'm saying reverted back to the modern State of Israel.
BY MR. HILL:
Q. Did the modern State of Israel control the land on which you now reside prior to 1967?
MR. STEINER: Objection.
THE WITNESS: No, I don't think so because the modern state came about in 1948.
BY MR. HILL:
Q. The area in which you currently reside is known to some people as the West Bank, is that fair to say?
MR. STEINER: Objection.
THE WITNESS: It is known to some people as that.
BY MR. HILL:
Q. The town in which you reside is referred to by some people as a settlement, is that correct?
**A. That's correct.**



Q. Has anyone ever told you that the town in which you reside is illegal under international law?
**A. No.**
MR. STEINER: Objection.
BY MR. HILL:
Q. Do you know if anyone holds that sort of opinion?
**A. Possibly.**
MR. STEINER: Objection.
BY MR. HILL:
Q. You understood that when you moved to this town you were moving to an area that was disputed, is that fair to say?
MR. STEINER: Objection.
THE WITNESS: No, I don't believe that because in some people's minds all of Israel is disputed so I don't make the distinction.
BY MR. HILL:
Q. The area you moved to in particular is a source of dispute let us say between Israel and the Palestinians, is that correct?



MR. STEINER: Objection.
THE WITNESS: The whole country is a source of a dispute.
BY MR. HILL:
Q. In particular the West Bank is a source of dispute, right?
**A. That's one of the areas.**
Q. The area that you live in is not subject to any Palestinian control, is that correct?
MR. STEINER: Objection.
THE WITNESS: Correct.
BY MR. HILL:
Q. The Palestinian Authority doesn't operate in the town where you live?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. You are not subject in any way to the Palestinian Authority, is that correct?
**A. Yes.**
Q. You are subject to the State of Israel?

Page 18

A. **Yes.**
Q. Tell me the names of your children.
A. **Tzippora, Yosef, Sarah, Miriam, David and Keren who is deceased.**
Q. What are their approximate ages?
A. **36, 34, 32, 30, 28.**
Q. Those are the ages in the order that you gave them?
A. **Yes, descending.**
Q. Are you an American citizen?
A. **Yes.**
Q. Have you ever been a citizen of any other country?
A. **I'm a citizen of Israel.**
Q. Did you obtain your Israeli citizenship?
A. **Back when I moved there. I don't know what year that would have been.**
MR. STEINER: If you are not sure --
THE WITNESS: When I moved there I became a citizen.
BY MR. HILL:

Page 19

Q. What year did you move to Israel?
A. **We visited once around 1975 and we actually moved there the end of 1984.**
Q. Approximately 1984 you became an Israeli citizen as well?
A. **Yes.**
Q. Did you ever consider giving up your American citizenship?
A. **No.**
Q. Is your wife an American citizen?
A. **Yes.**
Q. Is she also an Israeli citizen?
A. **Yes.**
Q. How about your children, are all of them dual American-Israeli citizens?
A. **Yes.**
Q. Were any of your children born in the United States?
A. **Yes.**
Q. Which ones?
A. **Sarah, Miriam and David.**

Page 20

Q. The other children were born in Israel, the West Bank?
MR. STEINER: Objection.
THE WITNESS: True.
BY MR. HILL:
Q. They were born in the town where you live now?
A. **Just Keren was.**
Q. Keren was born in Karnei Shomron?
A. **We lived in Karnei Shomron. The hospital was not in that that town.**
Q. Do you speak any languages other than English?
A. **Yes, I speak Hebrew.**
Q. Does anyone else in your family speak a language other than English?
A. **We all speak Hebrew.**
Q. Are you currently employed?
A. **No.**
Q. When were you last employed?
A. **August of 2011.**

Page 21

Q. Why did your employment end?
A. **I decided to sort of retire early.**
Q. You say you sort of decided. Did you, in fact, retire?
A. **I say that because it's not a retirement in the sense of I'm collecting my pension.**
Q. You stopped working voluntarily?
A. **Yes.**
Q. You were not terminated?
A. **Right.**
Q. You had the option to continue at your work and chose not to?
A. **Yes.**
MR. STEINER: Objection.
BY MR. HILL:
Q. You said -- are you drawing a pension today?
A. **No.**
Q. Are you receiving any assistance from the Israeli government as a result of your retirement?
A. **Not as a result of my retirement.**

Page 22

Q. Are you entitled to receive Social Security benefits from the United States?
**A. Yes.**
Q. Is that based on the time that you were working in the U.S. before you moved to Israel?
**A. Yes.**
Q. Did you pay Social Security taxes to the United States after you moved to Israel?
**A. Yes. Well, there were times after I moved to Israel that I returned and worked here and, therefore, contributed more into Social Security.**
Q. Even though you moved to Israel in 1984 you also worked in the United States different periods of time between then and now?
**A. Yes.**
Q. While you were working in the United States you were paying federal taxes and Social Security taxes?
**A. Yes.**
Q. While you were working in Israel you were not, is that correct?

Page 23

**A. Right.**
Q. Approximately how many occasions did you work in the United States between 1984 and 2011?
**A. Well, I have my resume here. I can try to look it up for you but I would probably say maybe four or five.**
Q. You said you had a copy of your resume with you?
**A. I do.**
Q. Would you mind if I looked at it?
**A. I suppose you can. It's not privileged information or something? It's my work history basically.**
MR. STEINER: I have a three page document that appears to be a resume of Scott Shatsky.
MR. HILL: Let's mark this as exhibit one, please.
(Whereupon the proffered item was marked as exhibit 1.)
BY MR. HILL:

Page 24

Q. Mr. Shatsky, let me show you what we've marked as exhibit number one. Is this the resume that you just pulled out of your bag and we had marked here today?
**A. Yes.**
Q. Sometimes I have to ask you obvious questions. I apologize.
**A. Sure.**
Q. The pagination indicates one of three, three of three and four of three.
**A. I just pulled this off -- this is not from the original computer. I pulled it off my mom's computer.**
Q. Could you just verify for me that this is a complete copy of your work and education experience?
**A. It is.**
Q. Is this accurate, as far as you know?
**A. Yes.**
Q. Does it accurately depict the jobs for which you were working in the United States?

Page 25

**A. Yes, it does.**
Q. As you know, we're here today because you filed a lawsuit, right?
**A. Right.**
Q. Are you wanting to be paid money in this lawsuit for lost income to you?
MR. STEINER: Objection.
THE WITNESS: I'm going to leave that up to the lawyers to figure that out.
BY MR. HILL:
Q. As far as you know --
**A. Regarding the settlement, I'm going to defer to the lawyer.**
**I'm not going to specify what I'm hoping to get in a settlement.**
Q. I wasn't proposing a settlement, sir. I was just asking you.
You understand that you are a plaintiff in this lawsuit, right?
**A. Yes.**
MR. STEINER: Objection, asked and

answered.
BY MR. HILL:
Q. Are you asking the judge, the jury, anybody to pay you money for lost pages?
MR. STEINER: Objection, asked and answered.
THE WITNESS: I'm willing to defer to the lawyer on that question.
BY MR. HILL:
Q. You are not really allowed to defer to lawyers. You have to answer the questions.
MR. STEINER: He's responded.
BY MR. HILL:
Q. Are you saying that you don't know if you are claiming lost wages in the lawsuit?
MR. STEINER: Objection, asked and answered.
THE WITNESS: I'm not sure how to answer the question.
BY MR. HILL:
Q. Do you understand what lost wages are?



**A. Yes.**
Q. What do you understand that to be?
MR. STEINER: Objection, legal conclusion.
BY MR. HILL:
Q. Go ahead.
**A. Just a layman's guesses of what it sounds like.**
**A person who lost work due to whatever reason is claiming to be reimbursed for time lost.**
Q. Are you making a claim like you just described in this lawsuit?
MR. STEINER: Objection, asked and answered three times.
THE WITNESS: I'll just stick with what I've said until now.
BY MR. HILL:
Q. Sir, you are a plaintiff in the lawsuit?
**A. Yes.**
Q. You don't work any more today?
**A. That's right.**



Q. Are you claiming as a result of your daughter's death you made less money than you would have had she not died?
**A. That is an element. It's not a primary element in this lawsuit.**
Q. How much money do you believe you did not make that you would have made had your daughter not been killed in February of --
MR. STEINER: Objection.
THE WITNESS: That I really can't put a number to.
MR. STEINER: That's fine.
BY MR. HILL:
Q. That's what it is I'm trying to find out.
Sitting here today you can't tell me an amount of money that you believe you would have made --
**A. I don't know how long I might have continued working.**
**I don't know what might have been. It's hard for me to estimate exactly.**



Q. Just for Mr. Feuer and the record, you should wait until I finish talking before you start talking.
**A. Sure.**
Q. There will probably be occasions where you know what I'm going to ask.
**A. All right. I'll try to slow it down.**
Q. The natural tendency is to go ahead and answer without waiting for me to finish.
**A. Sorry.**
Q. Sitting here today, you cannot tell me an amount of money that you believe you would have earned had your daughter not been killed in February 2002, is that correct?
MR. STEINER: Objection.
THE WITNESS: Correct.
BY MR. HILL:
Q. Do you know if anyone could come up with the amount of money that you would have earned had your daughter not been killed in 2002?
MR. STEINER: Objection.

THE WITNESS: I don't know.
BY MR. HILL:
Q. Do you believe that you stopped working sooner than you would have had your daughter --
**A. Yes.**
Q. Why do you say that?
**A. As a result of losing my daughter I lost my, a lot of my drive and ability to just go out and be out there in the rat race, in the job market and focus.**
**It just became harder for me to deal with day to day life, tasks, including work.**
Q. Are you saying that one of the reasons you stopped working in August of 2011 was because your daughter had been killed?
**A. I think in part, yes.**
Q. What were the other reasons?
**A. Well, general burnout. I don't know if it's directly or indirectly related to my daughter being killed but that was a factor.**
**Another factor that stems from my daughter**



**being killed was in the years afterwards I sort of stopped working out, taking care of myself physically and I felt like after a while it was taking its toll on me and working is not helping and I just needed time to rehabilitate myself as well.**
Q. You've identified reasons for stopping working as your daughter's death, general burnout and a concern about your physical health?
MR. STEINER: Objection.
THE WITNESS: Yes.
BY MR. HILL:
Q. Are there other reasons that caused you to stop working in August of last year?
**A. No.**
Q. Since you've stopped working have you addressed the issues about your physical health that you mentioned?
**A. I try to work out more and eat better.**
Q. Since you stopped working in August of last year are you feeling less burned out?
**A. I think I still have the same burnout but**



**it's not hurting me as much, the fact that I'm not in the 9 to 5 or the 8 to 6 day to day routine.**
Q. Is it fair to say that you are happier being retired than you were when you were working in August of last year?
MR. STEINER: Objection.
THE WITNESS: Yes.
BY MR. HILL:
Q. You are not currently contemplating going back to work?
**A. Right.**
Q. You could go back to work if you chose to do so?
**A. If I could find work.**
Q. Your field of expertise is in database management?
**A. Yes.**
Q. Prior to August of last year did you ever have trouble getting a job in that field?
**A. I normally managed to get work.**
Q. In fact, the job that you left you could



have stayed at had you chosen to do so?
**A. Yes.**
MR. STEINER: Objection.
BY MR. HILL:
Q. You previously came to the United States to work in that field?
**A. Yes.**
Q. You can do that again if you chose to?
MR. STEINER: Objection.
THE WITNESS: I could try.
BY MR. HILL:
Q. Nothing is certain but --
**A. I don't know about find work but I could try.**
**I don't think I would be mentally up to it. Whether I could find work or not --**
Q. Has anyone ever told you that you were mentally unable to work?
**A. No.**
Q. Do you believe you have any mental impairments that would prevent you from going back

Page 34

to work?
**A. No. I'm not as sharp as I had been, I would say. I maybe can't focus as well as I used to but I wouldn't call myself disabled.**
Q. What's your current age?
**A. 60.**
Q. Do you believe the lack of sharpness that you've described is in any way related to your daughter's death?
**A. To a degree.**
Q. In what way?
**A. Just being less able to focus and sort of less of a feeling of well-being, sort of affects your general outlook.**
Q. How do you believe that's related to your daughter's death as opposed to age or normal life?
**A. Well, the feeling of sorrow and remorse is a result of her death as opposed to getting old. That's what I'm trying to say.**
Q. When you say you don't feel sharp, what you mean is that you are feeling grief?

Page 35

**A. Not necessarily.**
**I'm saying that I'm less able to focus for a long period of time or to concentrate deeply as well as I could have in the past.**
**Perhaps because of grief and things that go along with grief.**
Q. Did the inability to focus for long periods of time as you've just described it ever impair your ability to work prior to August of 2011?
**A. I might not have worked quite up to par as I had been prior to that.**
Q. Did you ever receive any poor reviews or negative feedback at work about a lack of focus?
**A. I did not receive negative reviews but I wasn't awarded like best in the group kind of a thing.**
Q. Do you believe that the failure to receive the award for the best in the group and that sort of thing was related to your daughter's death?
**A. I think so, in a way, yes.**
Q. Do you believe that you made less money

Page 36

while you were working as a result of your daughter's death?
**A. Just to the extent, and I mentioned this in the previous one, that in the aftermath I did reduce my hours.**
**The hourly wage itself was not reduced but the gross amount received was reduced by virtue of working fewer hours.**
Q. The decision to work fewer hours, was that a decision your employer made or a decision you made?
**A. For me it was sort of a fortuitous thing.**
**The employer was cutting back in that timeframe in the aftermath of her being killed and it suited me because I didn't feel up to working full time.**
Q. Just so the record is clear, this was a situation where your employer cut back your hours, correct?
**A. Yes.**
Q. This was not a situation where you asked

Page 37

to work less?
**A. It worked out that they were looking to cut back. I don't know if I came to him and said could I work less or he said we're cutting back. It just worked out like that.**
Q. Were you able to have worked more hours at that time if you had chosen to do so?
**A. If I absolutely had to I would have.**
Q. How would you --
**A. I just would have found it difficult.**
Q. Was this a situation where your employer had sort of capped the amount of time that they wanted you to spend on the job?
**A. There was a little, yes.**
Q. Are you saying that you could have worked over that cap had you chosen to do so?
**A. I had to support the family and if there were no choice I would have forced myself to try to work more.**
Q. How would you have worked more in a situation where your employer was limiting the

answered.
THE WITNESS: In facilitating the transfer of funds.
BY MR. HILL:
Q. What funds?
**A. I can't be more specific.**
Q. How did the Arab Bank transfer these funds?
**A. I don't know.**
Q. Who did the funds come from?
**A. I don't know.**
Q. Who did they go to?
**A. I don't know, except I do believe some funds, not necessarily all of the funds, went to the family of the terrorist who killed my daughter.**
Q. You believe that funds were transferred to the family of the terrorist who killed your daughter after your daughter's death or before?
**A. Possibly both. I don't know.**
Q. Are you aware of any evidence that the Arab Bank engaged in the transfers of funds that --



**A. I don't get involved in the details of the case. I leave it to the lawyer. I just don't involve myself.**
Q. There's nothing wrong with your answer, sir. I'm just trying to get this on the record.
**A. Yes.**
Q. You are not aware --
MR. STEINER: I point out for the record your tone and repeatedly rephrasing the same question and asking it a different way indicates to the witness that there is something wrong with his answer.
MR. HILL: It's not appropriate for you to narrate on the record. Let me make a question. Let's get an answer.
BY MR. HILL:
Q. The question is: Sitting here today you are not aware of any evidence that the Arab Bank had anything to do with your daughter's death, is that fair to say?
**A. I don't know about evidence. I'm not**



**saying there isn't evidence. I'm just saying I don't know about it.**
Q. Sitting here today you personally are not aware of any evidence that the Arab Bank had something to do with your daughter's death, is that right?
**A. Right.**
Q. Sitting here today you personally are not aware of any evidence that the Syrian Arab Republic had anything to do with your daughter's death, is that right?
**A. Right.**
Q. Is it also the case that sitting here today you personally are not aware of any evidence that the PLO had something to do with your daughter's death?
MR. STEINER: Objection.
THE WITNESS: I'm aware of the fact that they had something to do with her death. What the specific evidence is I don't know.
BY MR. HILL:



Q. You said you were aware of the fact that the PLO had something to do with your daughter's death.
What are you referring to?
**A. That the person who killed my daughter belonged to the PLO or one of its factions.**
Q. Anything else you are aware of about the PLO having something to do with your daughter's death?
**A. No.**
Q. What was the name of the person that killed your daughter?
**A. I don't know.**
Q. You said you believe this person was in the PLO?
**A. Yes.**
Q. Why do you believe that?
**A. I remember reading it.**
Q. Where?
**A. Newspapers.**
Q. Anywhere else you remember reading that?

**A. No.**
Q. Any other source of that belief that the person who killed your daughter was in the PLO other than something you read in the newspaper?
**A. Not that I recall.**
Q. Do you think there is another source other than newspapers?
**A. I wouldn't rule out that somebody called me, a friend or somebody like that and said so and so, you know, was convicted and this is the person who did it.**
**It might not have -- in other words, I'm trying to say not everything I know necessarily came from a newspaper but it's eleven years ago and I just can't remember any more.**
Q. You mentioned that a friend may have called and told you that someone was convicted in connection with your daughter's death?
**A. Convicted? I don't remember saying convicted. He died in the act so he wouldn't have been convicted.**



Q. Obviously if the person was killed on the scene they couldn't have been prosecuted, right?
**A. Yes.**
MR. STEINER: Objection.
BY MR. HILL:
Q. Are you aware of anyone who has been convicted in connection with your daughter's death?
**A. No.**
Q. You mentioned that you believe the person who had killed your daughter was a member of a PLO faction, is that right?
**A. I said PLO or PLO faction.**
Q. Do you remember anything about what faction this person may have been associated with?
**A. Popular Front.**
Q. The Popular Front for the Liberation of Palestine?
**A. Probably.**
Q. What is the source of your belief that the person who killed your daughter was in the --
**A. The same sources that I just referred to.**



Q. Either the newspapers or something a friend may have told you?
**A. Yes.**
Q. Apart from what you read in the newspaper or what a friend may have told you are you aware of any other evidence that the PLO had something to do with your daughter's death?
**A. No.**
Q. Let me ask you about the Palestinian Authority.
Are you aware of any evidence that the Palestinian Authority had something to do with your daughter's death?
**A. No.**
Q. Are you aware of any evidence that your daughter experienced any conscious pain or suffering between the time of the blast and the time of her death?
**A. Well, I just am aware of a local doctor who approached her and at the time she wasn't dead yet but he could not do anything to help her.**



Q. What's the name of this doctor?
**A. I believe it was Dr. Stein.**
Q. Do you know his first name?
**A. Jerry, I think.**
Q. Do you know where Dr. Stein lives?
**A. He lives in Karnei Shomron.**
Q. Do you know what kind of doctor he is?
**A. He's, I believe he's a pediatrician that also treats cancer victims.**
Q. You believe he was on the scene the night your daughter was killed?
**A. Yes.**
Q. Who told you this?
**A. I just remember reading it or hearing it way back then.**
Q. Do you know Dr. Stein?
**A. Yes.**
Q. How do you know him?
**A. I see him occasionally at synagogue.**
Q. Have you ever spoken to him about this?
**A. I don't know. I'm not sure.**

Q. Is it fair to say you cannot recall having a conversation with Dr. Stein about this issue?
**A. Right.**
Q. Do you know if anyone in your family has spoken to Dr. Stein about this?
**A. I don't think so.**
Q. What's your best recollection of how you came to hear this story about Dr. Stein attending your daughter on the day of her death?
MR. STEINER: Objection. Every response he's given has been in response to his best recollection.
THE WITNESS: I'm really not sure. It's just something I think I read in reports afterwards but I can't really recall any more.
BY MR. HILL:
Q. What reports are you referring to?
**A. Stories about what happened.**
Q. Where were these stories published?
**A. Newspaper articles.**
Q. Is it fair to say that your belief that



Dr. Stein may have attended your daughter Keren on the day of her death comes from something you read in the newspaper?
MR. STEINER: Objection.
**A. I think but I'm not 100 percent sure.**
Q. What is the other possibility other than a newspaper?
**A. Word of mouth, people talking, something like that.**
Q. You mentioned that he was there, that she had not yet died when he arrived.
Do you know approximately how long the period was between the time he attended her and the time of the blast?
**A. No.**
Q. Do you know whether she was conscious at the time he attended her?
**A. I think she was not.**
Q. Your understanding is that at the time that Dr. Stein arrived she had lost consciousness?
**A. I think so.**



Q. Has anyone ever told you that she was conscious and suffering for any period of time after her death -- between the time of the blast and the time of her death?
**A. No.**
Q. As far as you know, she was immediately rendered unconscious by the blast?
**A. I think so. I don't know if unconscious also means unfeeling.**
**I'm not sure if a person who is in a state of unconsciousness also means they don't feel something. I believe that was the state that she was in.**
**Whether she could feel something or not, I have no idea.**
Q. You mentioned what Dr. Stein had said. Have you ever heard from any medical professional that she did not suffer any pain?
**A. Yes. At the Forensic Institute the doctor there said she didn't suffer.**
Q. Do you remember the name of that doctor?



**A. It might come to me. It might come back to me. I should know his name. It's one of those things that your brain might spit out in a few minutes.**
Q. When did you first meet this doctor at the Forensic Institute?
**A. When we went to identify Keren's body.**
Q. Had you ever met this individual prior to that time?
**A. No.**
Q. Have you ever spoken to that individual since that time?
**A. No.**
Q. Was it a man or a woman?
**A. Man.**
Q. Approximate age?
**A. Upper 50s, 60.**
Q. Anything you remember about his appearance? Was he tall, bald, fat, short?
**A. Probably like white hair or balding. An elderly looking man I would say.**

Q. Do you know if he had conducted any sort of autopsy or postmortem on her body at the time he gave you this information?

**A. I don't believe there was an autopsy.**

**I don't know exactly what their procedures are there in the Forensic Institute and I didn't really inquire because I really didn't want to know.**

**To my knowledge there was not an autopsy.**

Q. Have you ever seen or heard that there has been a report about the cause of her death?

**A. The doctor there told me something about shrapnel or fragment from the blast hitting her from behind below the neck.**

Q. Why don't you tell me, to the best of your recollection, what the forensic doctor told you that night about her cause of death?

**A. It wasn't a long conversation. What I said pretty much sums it up.**

**The only other additional thing was prior to us viewing Keren he wanted to be sure that we are who we are and she is our daughter so he asked if we**



**could provide some sort of identifying sign that he could verify that that body in there is Keren and I told him that I remembered that she had a little birthmark on her pinky, a little brown spot, and then he went in and checked and confirmed that and then he allowed us to see her.**

Q. As part of the process of this viewing you were told that she had been killed with shrapnel in her neck, is that right?

MR. STEINER: Objection.

THE WITNESS: Below the neck possibly.

BY MR. HILL:

Q. You were told as a result of that wound she had not suffered, is that correct?

MR. STEINER: Objection.

THE WITNESS: The doctor at the Forensic Institute said he didn't believe that she had suffered.

He may have just been trying to comfort us. I don't know if what he said is medically



accurate or he was just trying to make us comfortable but that's what he did tell us.

BY MR. HILL:

Q. What you have heard about what Dr. Stein observed does not contradict what the doctor at the Forensic Institute told you?

**A. What do you mean contradicted?**

**I'm saying it may contradict it, basically repeating what I said earlier.**

**She was still alive when Dr. Stein came to her. I don't know to what degree she may have suffered before she actually died, even if she may have been unconscious when Dr. Stein came to her. I still don't know to what degree she may have suffered.**

**What Dr. Stein told me does contradict what the forensic doctor said.**

Q. That's because Dr. Stein said she was still breathing, correct?

**A. Right.**

Q. Dr. Stein did not say she was awake?



**A. That's correct.**

Q. He did not say she was suffering any indicia that she was in pain, right?

**A. Right.**

Q. She wasn't writhing or screaming or anything like that?

**A. No. I don't remember the expression he used. Maybe muffled breathing.**

**I don't remember the expression, but something along those lines that might indicate difficult breathing. I don't know how to describe it.**

Q. You are an administrator of your daughter's estate, correct?

**A. Yes.**

Q. On behalf of her estate are you making a claim in the lawsuit for pain and suffering prior to her death?

**A. Her pain and suffering? I actually don't know.**

Q. Sitting here today though, you cannot tell

me of any evidence that she suffered conscious pain and suffering prior to her death?

**A. What I've told you today is all I know. I don't know if it's evidence.**

Q. We've exhausted your knowledge on the subject of whether she suffered before she died?

**A. I think so.**

Q. Are you aware whether anyone else knows whether or not your daughter suffered conscious pain and suffering prior to her death?

**A. I don't know how much Dr. Stein knows beyond what he told us.**

**I never went back to him because honestly it would be a little bit painful for us to have to hear it.**

Q. That's perfectly understandable. I just want to make sure that you've told me about all the people that may know whether or not she suffered.

**A. That I know?**

Q. You've now told me about all the people who may know whether she endured any conscious pain



and suffering?

**A. I've told you all the people I know of.**

**Whether there are other people involved, whether another doctor came along, I don't know, I didn't ask.**

**I'm not saying -- I'm not saying I know everything about what happened in those minutes. I'm only saying what I'm aware of.**

Q. Mr. Shatsky, on behalf of yourself, are you claiming any damages for yourself other than grief associated with your daughter's death?

MR. STEINER: Objection.

THE WITNESS: Loss of a daughter. I'm not sure how wide "grief" is.

I feel affected in various ways. I don't know if that falls under the umbrella of grief or if there's another category. It's hard for me to answer that.

BY MR. HILL:

Q. What are the other ways that you are affected for which you are claiming damages in the



lawsuit?

**A. I think I may have mentioned a little bit earlier and I did certainly mention in my previous interview with the doctor who did the psychological analysis, so sometimes I might mix what I said in the last hour with you and earlier this morning but what I did say was in the aftermath of the trauma of losing our daughter I sort of lost the drive, competitive ability to deal with things in life, things along those lines which have held me back. I sort of physically may be deteriorated is a little bit strong, but diminished.**

**I haven't maintained myself the way I should have, things along those lines which don't necessarily sound like grief so I don't know if it comes under the umbrella claim of grief. It might come under another umbrella claim. I don't know anything about law.**

Q. Let me ask you a few questions.

**A. Can I have a drink of water, please?**

Q. Are you claiming to be mentally ill as a



result of your daughter's death?

**A. No.**

Q. Do you believe anyone in your family suffered from a mental illness as a result of your daughter's death?

**A. No.**

Q. Have you ever had any mental health treatment?

**A. No.**

Q. Have you ever had any kind of therapy as a result of your daughter's death?

**A. No, other than -- I don't think this falls under the category of therapy but I'm just going to mention it just so you don't think I'm trying to hide something.**

**There were some group sessions for terror victims that were held in the years following the rash of terror events and at those group sessions, at those get togethers there were some group sessions.**

**I don't think that's therapy.**

Q. This was like a small group of people that had suffered a loss from terrorism, you shared and things like that?
**A. Yes, it was just an hour or something at a hotel. It happened a few times and that's about it.**
Q. You mentioned that you had lost your drive to be competitive or your ability to deal with things in life.
**A. Yes.**
Q. Has that improved in the years since her passing?
**A. That actually hasn't.**
Q. Do you believe that's caused by her death?
**A. I think so.**
Q. What do you mean when you say you've lost your competitive ability?
**A. To go out there and pit myself against other people in any sort of competition or endeavor really.**
**I needed to be out of the rat race kind of thing. Along with that is sort of a lack of**



**tolerance for the hassles of life let's say or the ability to deal with the hassles of life. I don't think I could handle things like a car breaking down or an accident as well as I could have beforehand. It's just changed me.**
Q. You don't suffer fools the way you used to?
MR. STEINER: I didn't hear that.
BY MR. HILL:
Q. You don't suffer fools the way you --
**A. It's not just fools. Even ordinary things.**
Q. You are less patient is what you are saying?
MR. STEINER: Objection.
THE WITNESS: Tolerance to handle, let's say.
I'm not necessarily less patient with my wife or my kids. I don't want to imply that.
BY MR. HILL:
Q. Do you think that this has damaged your



marital relationship?
**A. Ultimately, no.**
Q. Do you think it's damaged your relationship with your other children?
**A. No.**
Q. You mentioned you feel physically diminished. Is that what you talked about before with the weight gain?
**A. Yes, and the lack of exercise, getting out of shape, other things.**
Q. Anything else that you mean when you say you were physically diminished?
**A. The combination of just leading a more sedentary lifestyle than I have, I guess, just sort of put me in a position of maybe being liable to higher sugar, being physically fit.**
Q. Do you believe that after Keren's death you've become more spiritually aware?
**A. Yes.**
Q. Do you view that as a positive?
**A. Yes, I do.**



Q. In what way is your spiritual awareness improved since Keren's death?
**A. I guess I've been seeking more, seeking reassurances of things like there's an afterlife or that the soul continuous to exist, sort of trying to comfort myself to say that it's an end but there's something beyond life and that sort of seeking is one of the things.**
Q. It's the sort of spiritual seeking that you are describing something you are doing during your sedentary periods?
MR. STEINER: Objection.
THE WITNESS: I am sedentary when I'm reading a book about it.
BY MR. HILL:
Q. Is it fair to say that some of the reasons you may have stopped the physical activities is because of these spiritual interests?
**A. I'm not sure if it's because of the spiritual interest.**
**I think it's more directly due to lack of**

Page 198

**not having her at their weddings and other life events and just in general. It's just a loss that's not replaceable.**

**The other metaphor I might use besides losing a limb is sort of like when this tragedy happens it's sort of getting hit by a Mack truck.**

**That sort of describes what I was trying to say about feeling like you can't really deal with everyday issues, problems of life.**

**It's hard to compete and still be in the rat race or perform totally well at work and other activities of life.**

**It sort of knocks you on your back and it's a little difficult to get up. Like I say, words, and certainly my words, really can't describe it and put it in its place.**

**It's nothing like the death of a parent which happens in the natural course of life normally.**

**It's a lot worse. I've experienced both so I could tell you.**

Page 199

**Parents love their children more than children love their parents. It's just the way it is.**

**When you lose a child, that's about the worst that can happen to you. That's about it.**

MR. STEINER: Nothing else.

MR. HILL: Subject to my reservations, no further questions.

(Deposition adjourned at 5:45 p.m.)

Page 200

Reporter's Certificate

I, the undersigned, Certified Court Reporter, do hereby certify that the foregoing transcript of testimony was taken by me in stenotype and thereafter reduced to print under my direction, that said transcript is a full, true and substantially accurate record of the proceedings, to the best of my ability.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

/s/ Michael Feuer

______________________________

Certified Realtime Reporter

Page 201

Certificate of Deponent

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary I will attach on a separate sheet of paper to the original transcript.

______________________________

Signature of witness

I hereby certify that the individual representing him/herself to be the above named individual, appeared before me this __________ day of ______________ and executed the above certificate in my presence.

______________________

Notary Public