# Exhibit 48

In the U.S. District Court
District of Columbia

| | |
|---|---|
| Shabtai Scott Shatsky, et al | |
| v. | NO. 1:02cv02280 |
| The Syrian Arab Republic, et al | |

February 5, 2013

DEPOSITION OF:

Ginette Lando Thaler,

a witness, called by counsel pursuant to notice, commencing at 2:50 p.m., which was taken at Miller and Chevalier, 655 15th Street, NW, Washington, DC 20005-5701

Page 30

**at the shopping mall, immediately.**
Q. Approximately how long do you think it took you to travel from where you were to the site of the explosion?
**A. Two minutes.**
Q. Do you believe you arrived within two minutes of when the explosion took place?
**A. No.**
Q. How long after the explosion took place do you believe you arrived at the scene of the explosion?
**A. Honestly, I don't know. But I think approximately 20 minutes.**
Q. When you arrived were you able to see either your daughter or Leor?
**A. No.**
Q. Were you able to see anyone who had been injured in the explosion?
**A. No.**
Q. At the time you arrived you did not see anyone who had been injured in the explosion,

Page 31

correct?
**A. Correct.**
Q. Are you aware of any evidence of the identity of the person or persons who caused the explosion?
MR. STEINER: Objection.
THE WITNESS: Ask that question again.
BY MR. HILL:
Q. Are you aware of any evidence of the identity of the person or persons who caused the explosion in which your children were injured?
MR. STEINER: Objection.
THE WITNESS: Evidence meaning physical evidence in my hand?
BY MR. HILL:
Q. Any kind of evidence at all, ma'am.
**A. I heard who it was through the media and through my attorneys.**
Q. Your attorneys?
**A. Lawyers.**

Page 32

Q. Apart from what you heard about in the media or from your lawyers, are you aware of the identity of the person or persons who caused the explosion?
**A. No.**
Q. Ma'am, are you aware of any evidence that your daughter experienced any conscious pain or suffering after the blast?
**A. Yes.**
Q. What evidence are you aware of?
**A. One of her friends who was hurt was next to her or near her and she heard her screaming.**
Q. What was the name of the friend that you described?
MR. STEINER: Let's have a couple of moments, please.
MR. HILL: Take your time.
THE WITNESS: Chani Friedman.
BY MR. HILL:
Q. Apart from Ms. Friedman's account of your daughter screaming, are you aware of any other

Page 33

evidence that your daughter may have experienced conscious suffering after the blast?
**A. It's possible one of the other girls also told me that but I'm not 100 percent sure.**
Q. Do you know the name of the other girl who told you this?
**A. I think it was Shira Hazan. It would have been Shira Hazan or Maria and I don't remember her last name.**
Q. Do you know where Shira Hazan currently resides?
**A. No.**
Q. Was she from your town?
**A. No.**
Q. Did you know her before this incident?
**A. No.**
Q. Does she have any connection to anyone else who was on the scene that day, that you are aware of?
**A. Sheila is friends with a group of the children.**

Page 34

Q. If I wanted to try to find Ms. Hazan who would you suggest I ask?
**A. Chani might know.**
Q. Anyone else you might know that knows Ms. Hazan?
**A. Leor knew her but I don't know if he knows where she lives. I don't think he's in touch with her.**
Q. You mentioned someone named Moriah?
**A. Yes.**
Q. Do you know her last name?
**A. No.**
Q. Do you know what her connection is to anyone in your town?
**A. The same as Shira.**
Q. She was a friend?
**A. Of Ms. Friedman, and I believe Rachel also was friends with them.**
Q. Do you know where Moriah lives today?
**A. No.**
Q. I understand that your son was also

Page 35

injured in the blast?
MR. STEINER: Objection.
THE WITNESS: Yes.
BY MR. HILL:
Q. Can you describe for me generally the sort of injuries that he sustained?
**A. His stomach. There were many nails that went into his stomach, nails and shrapnel. He had -- his gall bladder had to be removed. There was a problem with the bile duct to the liver and a complication from that. He had first and second degree burns of his face, his chest, his arms, and part of his legs, his eardrum was torn, a part of his ear was torn off, he had a nail in his neck, he had a nail in his bum.**
Q. His buttocks?
**A. In his buttocks. He had shrapnel in his arms, his legs, his body, his face, his neck. He had a hole in his arm the size of a golf ball. There were others that I don't remember all the details.**

Page 36

MR. STEINER: Was your question limited to physical injuries regarding Leor?
MR. HILL: Yes.
BY MR. HILL:
Q. I understand your son was hospitalized for a period of time. How long was he hospitalized?
**A. Three weeks.**
Q. After he was released from the hospital did he go to a secondary care facility, did he come home?
**A. He came home.**
Q. Did he have any sort of physical therapy following his discharge from the hospital?
**A. No.**
Q. Was any physical therapy recommended for him following his discharge?
**A. No.**
Q. You described a variety of injuries that he sustained. How do these physical injuries, if at all, affect his daily living, to your knowledge?
**A. When?**

Page 37

Q. Currently.
**A. He has a problem with hearing. He has a tingling sensation in his hands, I believe, and possibly his feet. Talking about physical, right?**
Q. Any other current effects of the physical injuries from the February 2002 bombing?
**A. That's what I can think of right now.**
Q. Does he have difficulty hearing with both ears or just one?
**A. I believe it's both ears, one more than the other.**
Q. Which one is worse?
**A. I don't remember which ear. Whichever had the membrane torn.**
Q. You mentioned that part of the ear was detached. Was it reattached?
**A. Yes.**
Q. Has your son had any further operations or other procedures related to these injuries after his discharge from the hospital?
**A. Yes, he did.**

Page 38

Q. Tell me about those procedures.
**A. He had several areas where shrapnel had to be removed and also he had to have the membrane of his ear repaired because it didn't repair itself.**
Q. Any other operations or other procedures he's had since his discharge from the hospital?
**A. That's what I remember.**
Q. You mentioned he had some continued trouble hearing. Are you aware whether any further treatment has been recommended to try and improve his hearing?
**A. No.**
Q. You are saying none is recommended or you don't know whether it has?
**A. None that I know of.**
Q. As far as you know, he's received all the treatment that he should in connection with his --
MR. STEINER: Objection.
THE WITNESS: What?
BY MR. HILL:
Q. As far as you are aware, has your son

Page 39

received all the treatment he should have received in connection with his injuries?
**A. I have a problem with the "should have." I don't know.**
Q. You are not aware of any treatment that was recommended for him that has not taken place, correct?
**A. Correct.**
Q. You mentioned that he has a tingling sensation in his hands and maybe his feet?
**A. Yes.**
Q. Has anyone ever, to your knowledge, told him there's something that can be done to redress that issue?
**A. I don't know.**
Q. Has he had -- was there ever an instance where an additional procedure or surgery was recommended that he did not have following this blast?
**A. No.**
Q. Do you anticipate that your son will need

Page 40

future medical treatment, setting aside for the moment psychiatric treatment, related to the injuries he received in February 2002?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Is your son Zvi a plaintiff in the lawsuit?
**A. Yes.**
Q. What injuries do you believe Zvi has sustained as a result of the bombing in February of 2002.
**A. Psychological.**
Q. What do you mean when you say that Zvi has received psychological injuries?
MR. STEINER: Can we have a timeframe? You mean presently today?
MR. HILL: I mean broadly.
BY MR. HILL:
Q. He was not present at the time of the blast, correct?

Page 41

**A. Present where?**
Q. When the blast went off that injured Rachel and Leor --
MR. STEINER: Objection. Rachel wasn't injured. She was murdered.
MR. HILL: Please don't interrupt.
MR. STEINER: You keep saying injured?
BY MR. HILL:
Q. She didn't die at the scene, did she, ma'am?
**A. She died from the injuries she received which still makes it murder.**
Q. Let me phrase the question this way. At the scene of the blast on February 16, 2002 your other son Zvi was not present, correct?
**A. At the scene of the blast? At the time of the blast?**
Q. Yes, ma'am. He was not present when the blast occurred?
**A. At the time of the blast, no.**

Page 42

Q. Did he travel to the scene later?
**A. Yes.**
Q. When did he go to the scene?
**A. With me.**
Q. While he was that the scene did he encounter anyone who had been injured?
**A. He saw people going into an ambulance.**
Q. Who did he see going into the ambulance?
**A. I don't know.**
Q. You were with him at the time this happened?
**A. Yes.**
Q. He saw someone going into the ambulance but you did not, is that what you are saying?
MR. STEINER: Objection.
THE WITNESS: Yes.
BY MR. HILL:
Q. You said you believe --
**A. One minute. I don't remember because I walked past the ambulances and my focus was somewhere totally different.**

Page 43

Q. Zvi has told you that he saw someone being loaded into an ambulance?
**A. Yes.**
Q. And you said that you believed Zvi has been psychologically injured as a result of the blast, is that correct?
**A. As a result of the blast or as a result of what happened to his brother and sister?**
Q. I thought it was the same thing but tell me what you mean.
**A. It's not the same thing.**
Q. Tell me how you believe he's been injured.
**A. He's been injured as a result of what happened to his sister and brother.**
Q. Obviously having a sister die --
**A. She didn't die.**
MR. STEINER: Objection.
BY MR. HILL:
Q. Are you saying that Zvi has suffered from a mental illness as a result of his sister's death or his brother's injury?

Page 44

**A. Yes.**
Q. What mental illness does Zvi suffer from?
**A. When you say mental illness, what do you mean? He needed psychological help.**
Q. When did Zvi first receive psychological help?
**A. About three years afterwards.**
Q. This was approximately 2005?
**A. Yes. Maybe even 2004. I don't remember exactly.**
Q. What was the nature of the psychological help that he received in 2004 or 2005?
**A. He went to a psychologist.**
Q. Do you know the name of the psychologist he saw?
**A. Michael Dolgin.**
Q. Where does Mr. Dolgin practice?
**A. In a town called Raanana.**
Q. How long did Zvi see Dr. Dolgin?
**A. I don't remember. About two or three years.**

Page 45

Q. How frequently was he seeing him over that two to three year period?
**A. Every week.**
Q. Why did those visits end?
**A. Excuse me?**
Q. Why did the visits end?
**A. It didn't end abruptly. They tapered off. He went for however long it was and then he went into the Army and when he went into the Army he wasn't able to go every week to see Dr. Dolgin. He still went to him when he would come home on an irregular basis.**
Q. When do you think the last time Zvi saw Dr. Dolgin was?
**A. I'm trying to think of the year.**
Q. Take your time.
**A. I can't remember what year but after he finished the Army he would go to him occasionally.**
Q. When did Zvi begin his service in the Army?
**A. I think 2007.**

Page 46

Q. This is the Israeli Army, right?
**A. Yes.**
Q. When did he finish his service with the Israeli Army, approximately 2010, is that correct?
**A. Yes, I think so.**
Q. You think Zvi has been seeing Dr. Dolgin off and on between roughly 2004 and 2010, is that what you're saying?
MR. STEINER: Objection.
THE WITNESS: Can you repeat that?
BY MR. HILL:
Q. Do you think Zvi has been seeing Dr. Dolgin off and on between 2004 and 2010?
MR. STEINER: Objection.
THE WITNESS: That's not right. He didn't see him off and on for the first few years. He saw him regularly, every week. When he went 0 the Army then it was off and on.
BY MR. HILL:
Q. Between the time he started with Dr. Dolgin in 2004 or 2005 until he went into the

Page 47

Army in 2007 he was seeing Dr. Dolgin every week or so?
**A. Yes, every week.**
Q. While he was in the Army he would see Dr. Dolgin occasionally?
**A. Yes.**
Q. Then since he has left the Army in 2010 has he continued to see the doctor?
**A. He saw him for a little while occasionally, again not on a regular basis, and I don't remember when.**
MR. STEINER: I have a standing objection to all questions relating to Zvi posed to this witness that reflects on time periods after the time period.
MR. HILL: Are you going to produce Zvi for a deposition in this case?
MR. STEINER: Did you request him?
MR. HILL: Are you offering him? If you objecting to him testifying about it --
MR. STEINER: She is going to answer

Page 48

all questions that you ask. I think they are improper if it goes beyond the point when he was of lawful age. If you want to notice him for a deposition -- I don't think you asked to have him produced.
BY MR. HILL:
Q. Has Zvi ever been diagnosed as having a mental illness?
**A. He was diagnosed with some kind of an illness. I don't remember what the diagnosis was.**
Q. Has he received any medication in connection with that?
**A. He did take medication for a little while.**
Q. Do you know what medication?
**A. Prozac.**
Q. Approximately how long was he taking Prozac?
**A. A year and a half, two years, but I'm not 100 percent sure.**
Q. That's fine. Approximately what period of time was he taking this? Is this when he was seeing

Page 49

him on a weekly basis?
**A. Yes.**
Q. Had he discontinued the Prozac use by the time he went into the Army?
**A. I don't remember exactly if he was taking it still when he went into the Army or not.**
Q. Do you know if he's taking any medication for psychological issues today?
**A. No, he's not.**
Q. Do you know if he's currently in any psychiatric or psychological treatment?
**A. No, he isn't.**
Q. Do you believe he needs additional psychiatric or psychological treatment?
**A. Currently not on a regular basis.**
MR. HILL: To the extent that Zvi is, in fact, making a claim for a psychological injury in the case, it would appear that the records of Mr. Dolgin are responsive to our outstanding document requests and I would request that they be produced.

MR. STEINER: I just ask you -- we'll take it under advisement. I'll ask you to follow up your request in writing.
BY MR. HILL:
Q. Did Zvi have any difficulty completing his schooling?
**A. No.**
Q. Did he graduate from high school?
**A. Yes.**
Q. Did he attend college or university?
**A. He is now.**
**BY MR. STEINER:**
Q. Where is he now?
**A. In Beer Sheva.**
Q. What kind of degree program is he in there?
**A. Engineering.**
MR. STEINER: Objection.
BY MR. STEINER:
Q. What year is he?
MR. STEINER: Objection.



THE WITNESS: First year.
BY MR. STEINER:
Q. What did he do between the time he got out of the Army and when he enrolled in this college?
MR. STEINER: Objection.
THE WITNESS: First he studied for the psychometrics and then he worked.
BY MR. STEINER:
Q. What is the psychometric?
**A. It might be the equivalent of the SATs.**
Q. College entrance exam?
**A. Yes.**
Q. What kind of work did he do?
MR. STEINER: Objection.
THE WITNESS: I have to remember. Telemarketing, waiting, catering and he did study for a year last year.
BY MR. STEINER:
Q. What did he study last year?
**A. Civil engineering.**
MR. STEINER: Objection.



BY MR. STEINER:
Q. Is he still in that program?
MR. STEINER: Objection.
THE WITNESS: Not in the same program he was in last year.
BY MR. STEINER:
Q. He's changed programs?
**A. Yes.**
MR. STEINER: Objection.
BY MR. STEINER:
Q. Where was he last year?
**A. In Eilat.**
Q. He was also studying civil engineering?
**A. Yes.**
Q. The same field but just at a different university?
**A. Yes.**
MR. STEINER: I haven't objected to the last few questions because Mr. Hill is asking them rapidly. Just note I have a standing objection to this line.



BY MR. STEINER:
Q. Do you expect him to graduate with a degree in civil engineering?
**A. I hope so.**
Q. When do you expect that he'll complete his studies in civil engineering?
**A. It's a four year course.**
Q. He's completed two years at this point?
**A. Where did you get that from?**
Q. He's completed one year at one school --
**A. Yes, he didn't manage to get into the continuation course of the second year of that school.**
Q. He's changed schools?
**A. Instead of repeating the same year again at the same school he decided to go to a different school and that's where he's just starting now, yesterday.**
MR. STEINER: Objection.
BY MR. STEINER:
Q. How long will it take him to complete the

Page 106

February 2002 bombing?
**A. What further medical treatment are you referring to?**
Q. Any kind that you anticipate you --
**A. Psychiatric and psychological.**
Q. Are the psychiatric and psychological treatments you anticipate Leor will need in the future covered by insurance?
MR. STEINER: Objection.
THE WITNESS: The psychological, yes. The psychiatric I pay.
BY MR. HILL:
Q. How much are you currently paying for the psychiatric treatment of your son?
**A. When he goes to the doctor it's 450 shekels and then there's medication.**
Q. Are you also maying for the medications?
**A. The last time he received samples. I don't know if that's going to be continued.**
Q. Do you know how much you will need to pay in the future for medication for Leor?

Page 107

MR. STEINER: Objection.
THE WITNESS: Medication he's currently taking I believe costs 200 shekels. I don't know for how long, if it's for a month or how long the medication is for.
BY MR. HILL:
Q. Do you know how long Leor is expected to take the medication that you described?
**A. I have no idea.**
Q. Do you know the name of the medication?
**A. You have to ask him.**
MR. STEINER: Objection.
BY MR. HILL:
Q. You mentioned you were paying for the psychiatrist that your son is seeing?
**A. Yes.**
Q. Do you anticipate how many future visits he will need?
**A. I have no idea.**
MR. STEINER: Objection.
BY MR. HILL:

Page 108

Q. Do you believe that your son Zvi will need future medical treatment as a result of the bombing in February 2002?
**A. I don't think so.**
Q. Do you know if Isaac Thaler will require future medical treatment as a result of the bombing?
**A. I have no idea.**
MR. STEINER: Objection.
BY MR. HILL:
Q. How many lawsuits have you filed in connection with the February 2002 bombing?
**A. This and one other.**
Q. Who have you sued?
**A. The Arab Bank.**
Q. Are you aware of any evidence that the Arab Bank had something to do with the February 2002 bombing?
MR. STEINER: Objection. If that response requires you to divulge communications that you might have had with any of your lawyers, I advise you not to answer it.

Page 109

THE WITNESS: I can't answer it.
BY MR. HILL:
Q. Apart from anything your lawyers may have told you, are you aware of any evidence that the Arab Bank had anything to do with the February 2002 bombing?
**A. No.**
Q. You mentioned that you filed two lawsuits. Do you know who you've sued in the other lawsuit?
**A. Yes, the Palestinian Authority, PLO.**
Q. Do you know if you've also sued the Syrian Arab Republic?
**A. That might have been on the caption of the case, I believe.**
Q. Are you aware of any evidence that the Syrian Arab Republic had something to do with the February 2002 bombing?
MR. STEINER: Objection.
THE WITNESS: Ask my attorneys.
BY MR. HILL:
Q. Your lawyers told you that the Syrians had

Page 110

something to do with the bombing?
MR. STEINER: Don't answer that.
THE WITNESS: I can't talk about them.
BY MR. HILL:
Q. Have your lawyers described to you any evidence they have that Syria had something to do with this bombing?
MR. STEINER: Objection, don't answer that.
THE WITNESS: I can't answer that.
MR. HILL: Mr. Steiner, what's the basis?
MR. STEINER: You are asking her to divulge communications she had with her attorneys. And it's certainly privileged.
MR. HILL: I disagree. We reserve our right to move to compel.
BY MR. HILL:
Q. Are you aware of any evidence that the Palestinian Authority had anything to do with the

Page 111

February 2002 bombing?
**A. Yes.**
Q. What is the evidence that you are aware of indicating that the PA had something to do with the February 2002 bombing?
MR. STEINER: If that answer requires that you rely on communications you had with your attorneys then I'm advising you not to answer it. If any of the answer might come from other sources then you can respond to it.
THE WITNESS: No.
BY MR. HILL:
Q. Apart from what your lawyers have told you, you are not aware of any evidence that the Palestinian Authority had something to do with the February 2002 bombing, is that accurate?
**A. I am aware, I believe, through the press.**
Q. Had you completed your answer?
**A. Yes.**
Q. What are you aware of through the press? What do you mean by that?

Page 112

**A. That it was committed through the Palestinian Authority, one of the organizations under the PLO.**
Q. What organization are you referring to?
**A. PFLP.**
Q. What press informed you that the PFLP had something to do with the February 2002 bombing?
**A. I read it.**
Q. Where did you read it?
**A. In the newspaper.**
Q. Which newspaper?
**A. I don't remember.**
Q. When did you read it?
**A. I don't remember.**
Q. Apart from what your lawyers have told you and what you've read in the newspaper, are you aware of any evidence that the PA had something to do with the February 2002 bombing?
**A. No.**
Q. Are you aware of any evidence that the PLO had something to do with the February 2002 bombing?

Page 113

**A. Outside of what we've just said, no.**
Q. You are not aware of any evidence that the PLO had something to do with the February 2002 bombing, is that correct?
MR. STEINER: Objection.
THE WITNESS: No.
MR. STEINER: That's not what she said.
THE WITNESS: It's not what I said.
BY MR. HILL:
Q. What evidence are you aware of that the PLO had something to do with the February 2002 bombing?
**A. I can't answer that because it's attorney/client privilege.**
Q. Your lawyers have given you some evidence that the PLO was implicated in the bombing?
**A. No, that's not what I'm saying. When you say evidence, are you saying they told me information or they gave me something?**
Q. Either?

**A. They've told me.**
Q. What evidence have your lawyers told you that the PLO had something to do with the February 2002 bombing?
**A. I can't answer.**
Q. Apart from what your lawyers have told you, are you aware of any evidence that the PLO had something to do with the February 2002 bombing?
**A. No.**
THE WITNESS: Can we take a break for a minute? Shoe.
MR. HILL: Of course.
(Whereupon, a recess was taken from 4:48 p.m. to 4:51 p.m.)
MR. HILL: Mark that as exhibit 10.
(Whereupon the proffered item was marked as exhibit 10.)
BY MR. HILL:
Q. If you would, take a look at that and tell me if that's something you recognize.
**A. Yes.**



Q. Do you know who wrote exhibit 10?
MR. STEINER: Let the record reflect the witness is crying.
(Pause)
THE WITNESS: I wrote this.
BY MR. HILL:
Q. At the bottom it indicates a date of May 2006. Is that the approximate date on which you wrote exhibit 10?
**A. It starts off it is now over four years since the death of Keren, Rachel and Nehemia. Four years after 2002 is when it was written.**
**Go ahead.**
Q. These appear to be remarks. Did you prepare these --
MR. STEINER: Objection to the characterization. Just pose a question, especially on such a sensitive topic.
BY MR. HILL:
Q. Do these appear to be remarks that you prepared to deliver on some public occasion, ma'am?



**A. They aren't remarks. They are my feelings about what happened to my daughter who was killed when she was 16 years old and this is four years afterward at a memorial.**
Q. Did you, in fact, speak the words that are written on exhibit 10 on a public occasion?
**A. Do you call the memorial at my daughter's gravesite a public occasion?**
Q. I was trying to establish where the speech or the remarks where given?
**A. Ask me rather than saying public occasion. Ask me where I read it.**
Q. Where did you read these remarks?
**A. At my daughter's gravesite.**
Q. The approximate date was May 2006, is that correct?
MR. STEINER: Objection, asked and answered.
THE WITNESS: No, that is not correct.
BY MR. HILL:



Q. What was the approximate date when you read these remarks at the gravesite?
**A. That's the date it was printed out.**
Q. The date on the bottom of exhibit 10 is the --
**A. My daughter died from her injuries in a bombing at the end of February.**
Q. Of 2002?
**A. Of 2002. She was buried the day after on the 28th of February 2002. Four years later at the memorial, that would be four years after February of 2002. It's a Jewish holiday called Purim. She died in injuries she received in a suicide bombing attack where she was murdered. Okay?**
Q. All I'm trying to do --
**A. Four years after Shushan Purim, this is when I read this, four years later. I'm sorry I'm getting angry.**
MR. STEINER: You don't have to apologize.
BY MR. HILL:

Page 118

Q. How would you prefer we describe the words that --
MR. STEINER: Let her describe them and you not characterize them.
THE WITNESS: This is something I wrote from my heart.
BY MR. HILL:
Q. Understood.
**A. About my feelings.**
Q. You read the words on this page on the occasion that you've described and what was the date of that?
**A. Shushan Purim of 2000 -- the day after.**
MR. HILL: Shushan Purim in --
MR. STEINER: Shushan Purim is a date that falls in accordance with a lunar calendar and it's approximately a week or two of February 28, depending on the calendar of that year.
BY MR. HILL:
Q. Exhibit 10 are things you said in approximately February of 2006, correct?

Page 119

**A. Yes.**
Q. Apart from that occasion have there been other occasions when you have spoken publicly about the events of February 12, 2002?
**A. Yes.**
Q. On what other occasions have you spoken publicly about the events of February 2002, February 16, 2002?
**A. I'm sorry.**
Q. Apart from exhibit 10, on what other occasions have you spoken publicly about the bombing from February of 2002?
MR. STEINER: Objection.
THE WITNESS: I was invited by an organization, One Family, to speak to several communities within the States. I don't remember the year. I don't remember the date.
BY MR. HILL:
Q. Did you travel to the United States in order to deliver those speeches?
**A. Deliver what speeches?**

Page 120

Q. You said you were contacted by an organization called One Family and asked to come to the United States to speak, is that correct?
**A. Not to give speeches.**
MR. STEINER: Are we done with the exhibit?
MR. HILL: Yes.
BY MR. HILL:
Q. Did you travel to the United States in connection with this request from One Family?
**A. Yes.**
Q. On how many occasions did you speak while you were in the United States in connection with this trip?
**A. I don't remember.**
Q. Do you remember in what cities or states you spoke?
**A. In Texas.**
Q. Do you remember speaking anywhere other than Texas on this trip with One Family that you described?

Page 121

**A. Possibly Baltimore but I don't remember.**
Q. Do you remember where in Texas you spoke?
**A. I think San Antonio.**
Q. Do you remember what venue in San Antonio you spoke at?
**A. No.**
Q. You said you think it's possible you spoke in Baltimore?
**A. Yes.**
Q. Do you recollect what venue in Baltimore you spoke at on this occasion?
**A. No.**
Q. Apart from speaking in San Antonio and Baltimore, do you remember speaking anywhere else in the United States in connection with this trip that One Family asked you to make?
**A. No.**
Q. Do you know if your speaking on those occasions was recorded in any fashion?
**A. I have no idea.**
Q. Do you yourself have a recording of those

Page 170

**doorstep that same night.**
Q. Apart from the need to add the word Jerusalem on the first line, do you believe anything else in paragraph four is inaccurate or incomplete?
MR. STEINER: I think she has already responded. Objection.
THE WITNESS: The same question two minutes ago, same answer.
BY MR. HILL:
Q. What you are saying is the first line of paragraph four where you are quoted as saying I kept telling her are you sure you want to go tonight, what you believe you said or what you should have said to the reporter is are you sure you want to go to Jerusalem tonight, correct?
MR. STEINER: Objection.
THE WITNESS: That's an incorrect statement.
BY MR. HILL:
Q. In what way is it incorrect?
**A. I don't believe I said anything to him. I**

Page 171

**don't know what I should have said. What I remember saying to Rachel, and I'm not quoting what I told him because I have no memory of this, I know that I said to Rachel that night are you sure you want to go to Jerusalem tonight?**
Q. Tell me what she said back to you.
MR. STEINER: Objection.
THE WITNESS: What's written here pretty much. Everything is written up above. That's what Rachel would have said. Probably some of the last words she ever said to me.
MR. HILL: Let's mark this as exhibit 15.
(Whereupon the proffered item was marked as exhibit 15.)
BY MR. HILL:
Q. I'm showing you what's been marked as exhibit number 15, ma'am. Take a look at that and tell me when you finished reviewing it and I'll ask you a few questions about it.
(Pause)

Page 172

BY MR. HILL:
Q. Have you now had a chance to review the whole document?
**A. Pretty much.**
Q. This appears to be a printout from Haaretz, a newspaper in Israel, correct?
**A. Yes, it is.**
Q. You appear to be quoted in the fifth paragraph and the sixth paragraph on the first page, is that correct?
**A. Yes.**
Q. Do you believe you were accurately quoted in the fifth and sixth paragraph of the first page of the exhibit?
**A. No.**
Q. In what way do you believe you were inaccurately quoted in the fifth paragraph on that page?
**A. It's a wonderful thing. I don't know what that's in relationship.**
Q. Feel free to read the preceding paragraph

Page 173

if you want.
**A. We donated her organs. I don't remember the words I used at the time.**
Q. It's your testimony that you do not believe you told the reporter it's a wonderful thing. I think Rachel would have liked it.
**A. This was written on the 13th of March, less than two weeks after Rachel died. I would have said that it was a good thing that we donated her organs. I don't remember word for word.**
Q. Do you have any reason to think what you are quoted as saying in paragraph five of this exhibit was something -- is an inaccurate quotation of what you did say?
**A. I don't know.**
Q. Do you have any reason to think what you are quoted as saying in the sixth paragraph on this page is an inaccurate quotation of what you said?
**A. The one that starts she records her daughter's 16th birthday just two weeks before?**
Q. Yes.

**A. (document read) I'm sure I would have said you should have seen her face. It was wonderful. That's what it says I said. I don't remember saying those words.**
Q. Then if you look on the last paragraph of the second page, the last sentence appears to contain a quotation from you in which you are quoting your son Zvi. The question to you is, do you believe that accurately reflects what you told the reporter?
**A. Maybe not.**
Q. In what respect is that inaccurate?
**A. She says she told her younger son, 13 year old Zvi, that then the family will be able to get back to a normal life again. I definitely would not have said that.**
Q. Then there appears to be a quote from your son. Do you believe that that's an accurate quotation?
MR. STEINER: Objection.
THE WITNESS: I can see him saying



that.
BY MR. HILL:
Q. You just don't believe you said what preceded it in that --
MR. STEINER: Objection.
THE WITNESS: Absolutely not. If I said that that was taken totally out of context. How is life normal again when your daughter has just been murdered by a suicide bomber when she is 16 years old in two weeks? No, life is never normal again and I would never have said life will go back to normal.
MR. STEINER: Next question, please.
BY MR. HILL:
Q. You mentioned earlier that you recollected two press interviews shortly after your daughter's death. We've now looked at exhibit 15 which is an article in which you are quoted in Haaretz, exhibit 14, an article in which you are quoted in the Baltimore Jewish times. Do you believe these are the two press interviews you were recollecting



earlier?
MR. STEINER: Objection.
THE WITNESS: What I believe is that these might have been taken from something else. I don't remember.
BY MR. HILL:
Q. Having now looked at exhibit 14 and 15, has your recollection been refreshed in any way about what other press organizations you may have spoken to in that timeframe?
**A. I believe that I spoke to one press organization that I remember, I believe. I believe all the others take quotes from that. I didn't speak to all these different people.**
Q. Can you recollect the name of the press organization that you spoke to in this timeframe?
**A. I remember a phone call from the Jewish Chronicle in London. That's the one I remember a few days after it happened.**
Q. Have you ever seen an article published in the Jewish Chronicle in which you were quoted?



**A. Yes. I remember things being inaccurate in it, absolutely, and I was very angry about what I saw. At the time I didn't do anything about it because I didn't care about that article.**
Q. Is what you are saying that you think you were misquoted originally in the Jewish Chronicle in London and those incorrect quotations were carried forward into the other publications?
**A. I believe so. I don't remember talking to those people. I know from reading things in the press that they definitely misquote you.**
MR. HILL: I don't know if it's within the possession, custody, or control of the Thaler family but obviously if the Jewish Chronicle from London article that the witness has described is within their possession, custody, or control it would be responsive to our discovery requests and I ask it be produced.
MR. STEINER: I believe all your discovery requests have been complied with and all searches have been conducted. However, we'll take

It might be twice. I don't remember.
BY MR. HILL:
Q. Any other occasions where Leor has had problems with the police that you haven't told me about?
MR. STEINER: Objection.
THE WITNESS: None that I know of.
MR. HILL: Mr. Steiner, subject to our request for additional documents, I don't have any further questions for Ms. Thaler at this time.
MR. STEINER: We reserve our right to review and sign the transcript.
(Deposition adjourned at 6:20 p.m.)



Reporter's Certificate

I, the undersigned, Certified Court Reporter, do hereby certify that the foregoing transcript of testimony was taken by me in stenotype and thereafter reduced to print under my direction, that said transcript is a full, true and substantially accurate record of the proceedings, to the best of my ability.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

/s/ Michael Feuer
___________________________
Certified Realtime Reporter



Certificate of Deponent

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary I will attach on a separate sheet of paper to the original transcript.

____________________________
Signature of witness

I hereby certify that the individual representing him/herself to be the above named individual, appeared before me this __________ day of ______________ and executed the above certificate in my presence.

____________________
Notary Public



Errata Page of Deponent

Please note any errors on this sheet. The reasons may be general, such as "to correct stenographic error" or "to clarify the record." When completed, send this page to the attorney who took your deposition, NOT the court reporter.

Page Line Correction Reason For Change