# Exhibit 49

In the U.S. District Court
District of Columbia

-------------------------------x
:
Shabtai Scott Shatsky, et al :
:
v. :NO. 1:02cv02280
:
The Syrian Arab Republic, et al :
:
-------------------------------x

February 6, 2013

DEPOSITION OF:

Leor Thaler,

a witness, called by counsel pursuant to notice, commencing at 9:07 a.m., which was taken at Miller and Chevalier, 655 15th Street, NW, Washington, DC 20005-5701

Page 78

BY MR. HILL:
Q. Which grandmother?
**A. My mother's.**
Q. What was her name?
**A. Angela.**
Q. What mental illness was your grandmother Angela diagnosed as having?
**A. I have no idea.**
Q. Do you know if anyone else in your family has ever been diagnosed as having a mental illness?
**A. No.**
MR. STEINER: Objection.
BY MR. HILL:
Q. Have you ever heard whether your father Michael was diagnosed as having a mental illness?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Have you ever heard that your mother has been diagnosed with having a mental illness?
**A. My mother hasn't.**

Page 79

Q. Your mother has not?
**A. No.**
Q. Have you ever heard whether Zvi has been diagnosed as having a mental illness?
**A. No.**
Q. Have you ever heard whether Isaac has been diagnosed as having a mental illness?
**A. No.**
MR. HILL: Let's take a break here because I'm going to get into a new area.
(Whereupon, a recess was taken from 10:08 a.m. to 10:18 a.m.)
MR. HILL: Mr. Steiner, I believe we have received some, but not all, the records associated with the psychological and psychiatric treatment that Mr. Thaler has described as a result of the court order, with Eyal, with Dr. Kronenberg, and at the Ger Hospital.
I also don't believe we've received the records associated with his rehab that he's previously described.

Page 80

I would, therefore, ask that those records be searched for if they are within his possession, custody, or control and be produced.
MR. STEINER: We will take it under advisement and ask for you to please follow up in writing.
BY MR. HILL:
Q. Mr. Thaler, you were present on February 16, 2002 at an explosion in Karnei Shomron, correct?
**A. Correct.**
Q. Did you see the person or persons who were responsible for causing the explosion before it took place?
**A. No.**
Q. You were unable to identify the person or persons who was responsible for that explosion?
MR. STEINER: Objection.
THE WITNESS: I was looking to the other side.
BY MR. HILL:

Page 81

Q. At the time of the blast you were facing away from the source of the blast, correct?
**A. My face was looking to the left.**
Q. You were not able to observe the person who caused the blast before it took place, right?
**A. No.**
Q. You are agreeing with me?
**A. What?**
Q. You did not see the person before the blast?
**A. Right.**
Q. Did you see Keren Shatsky after the blast that day?
**A. No.**
Q. Did you see your sister Rachel after the blast that day?
**A. No.**
Q. Did you see Ronit Trattner after the blast that day?
**A. No.**
Q. Did you see Hillel Trattner after the

blast that day?
**A. No.**
Q. Did you lose consciousness at the time of the blast?
**A. No.**
MR. STEINER: Objection.
MR. HILL: What's the objection?
MR. STEINER: To the medical definition of "conscious," the witness' understanding of it.
BY MR. HILL:
Q. Do you believe you were awake after the explosion took place or was there a period of time you were blacked out?
**A. What?**
Q. Do you believe that you were continuously awake after the blast?
**A. Yes.**
Q. Your testimony is to the best of your recollection you do not believe that you blacked out at the time of the blast?



**A. I flew back and I got up straightaway.**
Q. After the blast took place did anyone attend to your injuries on the scene?
**A. Yes.**
Q. Do you know the name of the person or persons who helped you?
**A. No.**
Q. Were these like paramedics?
**A. Yes.**
Q. Then I understand you were transported to the hospital, is that correct?
**A. Yes.**
Q. Can you remember being awake from the time of the blast until you arrived at the hospital?
**A. No.**
Q. At what point in time do you believe you may have lost consciousness?
MR. STEINER: Objection.
THE WITNESS: After a few minutes.
BY MR. HILL:
Q. So you were awake for a while on the scene



and then lost consciousness, is that right?
**A. I didn't lose conscious. I just blacked out.**
Q. At what point did you again become awake?
**A. On and off.**
Q. Can you recollect being put into an ambulance?
**A. Yes.**
Q. Can you recollect traveling in an ambulance?
**A. Yes.**
Q. Can you recollect arriving at the hospital?
**A. Yes.**
Q. At some point I understand you had surgery at the hospital?
**A. Yes.**
Q. I assume that you were unconscious for the surgery?
**A. Yes.**
Q. Do you recollect the names of any of the



people that treated you that day?
**A. No.**
Q. Could you describe for me generally the nature of the injuries you sustained that day?
**A. Nails and shrapnel all over my body, nails and shrapnel inside my gall bladder, took out my gall bladder. That left an infection somewhere inside.**
**My ear was ripped partly. My eardrum burst totally. Burns, second degree on my body, and one degrees.**
Q. You do not appear to me to have any scarring. There is no video camera here. Do you believe you have scarring?
MR. STEINER: Objection.
The record should reflect that the witness is sitting with his sleeve rolled up to his right elbow and on his right forearm there is a clearly visible scar.
THE WITNESS: Scars all over my body that you could see.

BY MR. HILL:
Q. Do you have any scars on your face?
**A. My neck and the top of my eyebrow.**
Q. You mentioned that there was an injury to your ear. Was that surgically repaired?
**A. Yes.**
Q. In what way do the injuries you sustained on February 16, 2002 affect your daily living now?
**A. I have stomach problems plus hearing problems.**
Q. Anything else?
**A. My arm.**
Q. What's the nature of the issue with the arm?
**A. I get tingling through my arm.**
Q. Any other ways that the injuries you sustained on February 16, 2002 affect your daily living today?
**A. No. Mental mostly.**
Q. You mentioned that you have stomach problems. What's the nature of your stomach



problems?
**A. Diarrhea.**
Q. Regular condition that you've had since --
**A. Lately it's been better, yes.**
Q. Have you had any treatment for it?
**A. No.**
Q. But it's been improving?
**A. Yes.**
Q. Do you know why it's getting better?
**A. No.**
Q. Has anyone ever recommended a treatment for the diarrhea?
**A. No.**
Q. When was the last time you saw a doctor about the diarrhea?
**A. A year ago.**
Q. Did the doctor tell you that there was anything that could be done to help it?
**A. No.**
Q. Do you know why you have the diarrhea after the attack?



**A. No.**
Q. You mentioned that you had an infection after the attack.
**A. Yes.**
Q. What was the nature of the infection?
**A. I don't know the details.**
Q. Did it have something to do with your stomach or your intestines?
**A. My gall bladder.**
Q. Do you know what caused the infection?
**A. No.**
Q. Do you know if the infection you had in the hospital is related to the problem with diarrhea?
**A. I don't know.**
Q. Has anyone ever looked into whether the diarrhea could have been caused by the infection in the hospital?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:



Q. You mentioned that you have some hearing problems.
**A. Yes.**
Q. What's the nature of the hearing problems?
**A. Both ears have loss of hearing.**
Q. Does the loss of hearing prevent you from working?
**A. Working, no.**
Q. It's not preventing you from hearing me here today?
**A. No.**
Q. Has anyone ever measured how much of your hearing has been lost?
**A. Yes.**
Q. Do you recollect approximately what amount of hearing you've lost?
**A. No.**
Q. Do you know if you've lost it over certain ranges or what the nature of the loss is?
**A. I don't know the details.**
Q. Has anyone ever recommended that you have

a hearing aid?
**A. No.**
Q. Do you believe you need a hearing aid to hear?
**A. No.**
Q. Has anyone ever recommended any treatment for the ears?
**A. No.**
MR. STEINER: Objection. With the exception of the surgery that he had?
BY MR. HILL:
Q. You did have surgery on one of the ears, right?
**A. Yes.**
Q. Did the hearing improve as a result of the surgery?
**A. Approve?**
Q. Improve.
**A. I don't know.**
Q. Was your hearing better after the surgery than it had been before the surgery?



**A. I didn't have an eardrum.**
Q. Before the surgery you did not have an eardrum in that ear?
**A. And after the surgery, yes.**
Q. Then after the surgery there was an eardrum there?
**A. After a few months they put in a new air drum.**
Q. After you received a new eardrum did that improve the hearing in that ear?
**A. Yes.**
Q. Since the surgery where you got the new eardrum have your hearing levels remained constant?
**A. I don't hear the best.**
Q. Has it gotten worse since then or gotten better?
**A. Yes.**
Q. Which?
**A. Worse.**
Q. When was the last time you saw a doctor about problems with your hearing?



**A. A few years ago.**
Q. Do you feel like you need to see a doctor to try and improve your hearing?
**A. Nothing can improve it.**
Q. You mentioned that you have a tingling sensation in your arm.
**A. Yes.**
Q. Which arm?
**A. Left arm.**
Q. How frequently do you have this sensation?
**A. Once every half a year and when I work out.**
Q. This happens approximately twice a year?
**A. Yes.**
Q. And this happens while you are exercising?
**A. No. That happens whenever I get banged on my hand and when I work out I lose, get tingling through my arm and don't have strength in my arm.**
Q. Is there any treatment that's been recommended for this tingling sensation?
**A. No.**



Q. Does the tingling sensation prevent you from working?
**A. No.**
Q. You mentioned that you had scars.
**A. Yes.**
Q. You mentioned one on your face and Mr. Steiner called my attention to one on your arm. Where else on your body do you have scars?
**A. My face, my neck, all over my arm, the second arm, my stomach, my legs, and my ass.**
Q. Do the scars prevent you from your daily living in any way?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Does the scarring prevent you from engaging in any activities that you otherwise would like to engage in?
**A. No.**
Q. Doesn't keep you from going to the beach or anything like that?

**A. No.**
Q. Do you anticipate you will need future medical treatment as a result of the physical injuries you sustained in February of 2002?
MR. STEINER: Objection.
THE WITNESS: Yes, I believe so.
BY MR. HILL:
Q. What additional future medical treatment for your physical injuries do you believe you will need in the future?
**A. My arm, my ear.**
Q. You don't currently have any plans, though, to have treatment on your ears, right?
**A. No.**
Q. You don't currently have plans to have any treatment on your arm, right?
**A. No.**
Q. As long as you are living in Israel those treatments will be covered by the Israeli National Insurance, is that your understanding?
MR. STEINER: Objection.



THE WITNESS: I don't know.
BY MR. HILL:
Q. Are your medical expenses typically covered by the Israeli National Insurance?
**A. Not all of them.**
Q. Have you incurred medical expenses because of your physical injuries that have not been covered by insurance?
MR. STEINER: Objection.
THE WITNESS: I don't know.
BY MR. HILL:
Q. We talked earlier that you are currently under some psychological or psychiatric care. Do you anticipate that that will continue in the future?
**A. Yes.**
Q. You anticipate that you'll continue to see Eyal and Dr. Kronenberg?
**A. Yes.**
Q. Do you know how long that treatment will continue?



**A. As long as it needs.**
Q. Are you currently paying anything for those treatments?
**A. Yes.**
Q. How much are you paying?
**A. 450 for a session with Seffi and Eyal is paid by Bituach Leumi.**
Q. So you are not paying anything for the treatment with Eyal, right?
**A. Once I get -- I'm not paying him -- we're not paying him a full price. Once I get -- when I get money, when I won't have money issues, I'll be paying Eyal a little bit more.**
Q. How much do you expect to pay Eyal in the future for your treatment?
**A. 70 shekels extra.**
Q. 70 shekels on a weekly or bi-weekly basis?
**A. Yes.**
Q. Then you said it's 450 shekels to see Dr. Kronenberg?
**A. Yes.**



Q. You see him now every other month?
**A. Yes.**
Q. Are you paying any other money for your current psychological, psychiatric treatment?
**A. No.**
Q. Are you paying anything for the drugs you are taking?
**A. Yes.**
Q. How much are you paying for those?
**A. 600 shekels for two months on Abilify and something like 50, 60 shekels for Respiradal for a month.**
Q. Any other medication expenses that you are currently paying for treatment that you believe is related to the February 2002 bombing?
**A. No.**
Q. Are you aware of any evidence that your sister Rachel experienced any conscious pain or suffering between the time of the blast on February 16, 2002 and the time of her death?
**A. Yes. She was screaming after the attack.**

Q. Did you hear her screaming that night?
**A. Yes.**
Q. I believe you told me earlier you didn't see her that night. How do you know it was her that you were hearing?
**A. I know my sister's voice.**
Q. You said you heard her scream. How long did she scream?
**A. I don't know. I don't know the time.**
Q. Was she saying anything or just screaming?
**A. I don't remember.**
Q. Are you aware of any other evidence that your sister may have experienced conscious pain or suffering between the time of the blast and the time she lost consciousness?
**A. Rephrase that.**
Q. Are you aware of any other evidence that your sister experienced conscious pain or suffering between the time of the blast and the time of her death?
MR. STEINER: Objection. Do you



understand the question?
THE WITNESS: I understand but -- I half understand. From the bomb attack to the hospital she was very badly injured and of course she went through pain and of course she went through suffering all the way through.
BY MR. HILL:
Q. Are you aware of any evidence that she was awake or conscious at that time other than what you said about hearing her scream?
MR. STEINER: Objection.
THE WITNESS: Not that I saw.
BY MR. HILL:
Q. Are you aware whether anyone else saw anything that indicated she was awake between the blast and the --
**A. Yes, two of her best friends said that she was awake.**
Q. Who told you that?
**A. Chani and Shira.**
Q. Chani Friedman?



**A. Yes.**
Q. Do you know her last name?
**A. Hassan.**
Q. Did Chani Friedman talk to you about whether your sister was awake after the attack?
**A. A long time ago.**
Q. Tell me, to the best of your recollection, what Chani told you about that.
**A. I don't remember.**
Q. Did Shira Hassan talked to you about whether your sister was awake after the bombing?
**A. I heard from Chani.**
Q. Chani told you that Shira had witnessed this, right?
**A. I don't remember if it was Shira or someone else.**
Q. Chani told you that someone else had also observed your sister being awake?
**A. Yes.**
Q. Tell me to the best of your recollection what Chani told you about whether your sister was



awake after the bombing.
**A. I don't remember.**
Q. You don't remember?
**A. No.**
Q. Apart from what Chani told you and what you recollect about your sister screaming after the bombing, are you aware of anything else that indicates she may have experienced conscious pain or suffering?
MR. STEINER: Objection. He testified to more than what your characterization is.
He testified she was in the ambulance, that she was suffering then.
If you are going to make a conclusion about what he said so far and follow it up with anything else, I would ask that you include everything he said thus far.
BY MR. HILL:
Q. You were not with your sister in the ambulance, were you?

**A. No.**
Q. Have you talked to someone who was with her in the ambulance?
**A. No.**
Q. Has anyone ever told you about your sister's condition when she was in the ambulance?
**A. I was told but I don't remember exactly. She was in very critical condition.**
Q. Did anyone ever tell you that she was awake while she was in the ambulance?
**A. I don't remember.**
Q. Can you think of anything else that you haven't told me about so far that may indicate that your sister experienced any conscious pain or suffering after the blast?
**A. From hearing what she went through, what she had, with all of her injuries, her face all ripped up, with her jaw broken, with the shrapnel, big shrapnel inside of her head, all of her body, burns all over her body, of course she felt something. Of course she went through something**



**horrible.**
Q. I understand that.
MR. STEINER: Objection.
BY MR. HILL:
Q. I'm just trying to ask if you know of any other evidence that she was awake after the blast other than what you've told me about?
MR. STEINER: Objection, asked and answered five times.
THE WITNESS: I answered the question.
BY MR. HILL:
Q. Are you aware of anything you haven't told me about so far?
**A. No.**
Q. Are you aware of any evidence that Keren Shatsky may have experienced conscious pain and suffering after the blast?
**A. No.**
Q. Your sister was 16 when she was killed, right?



**A. Right.**
Q. Had she expressed to you any views or opinions about what she would like to do for a living?
**A. No.**
Q. Do you have any idea, had she not been killed what she might have done for a living?
**A. The best she could.**
Q. Are you aware of any efforts to try and calculate what she might have earned had she not been killed?
**A. She wasn't working. She died before she would be able to work so how could she -- how could I know something like that?**
Q. I'm just asking you are you aware of any efforts by anyone to try and calculate what she might have earned had she not been killed?
**A. How could she earn money if she was not working and if she was killed at 16?**
Q. I'm just asking do you know if anyone has tried to come up with such a calculation?



**A. No.**
Q. Are you claiming in the lawsuit that you will earn less money over your working life than you would have earned had you not been injured on February 16, 2002?
MR. STEINER: Objection.
THE WITNESS: I didn't understand the question.
BY MR. HILL:
Q. Obviously since the bombing you've done some work, right?
**A. Yes.**
Q. I assume you anticipate working in the future, right?
**A. Yes.**
Q. Are you asking the jury in this lawsuit to pay you money because you will earn less money over your working life?
MR. STEINER: Objection.
BY MR. HILL:
Q. Than you would have earned had you not

been injured in February 2002?
**A. It has nothing to do with one or the other.**
Q. What do you mean, sir?
**A. We're claiming my injury, mental injury, physical injury, my sister, losing my sister, losing my best friend, that's what we're claiming, nothing to do with how much I'm making in my life.**
MR. STEINER: Objection.
BY MR. HILL:
Q. I just want to be clear. You are not claiming that you've lost wages as a result of the injuries you sustained on February 16, 2002, is that correct?
**A. Wages?**
Q. Money that you get from a job.
MR. STEINER: Objection.
THE WITNESS: I believe if I didn't go through what I went through I would have been somewhere else.
BY MR. HILL:



Q. At the time of the bombing on February 16, 2002 did you have any career plans?
**A. No.**
Q. Can you think of a way that we could calculate how much money you might have earned had you not been injured in February 2002?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Do you know if anyone has attempted to come up with such a calculation for your future earnings had you not been injured?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. How many lawsuits have you filed as a result of this attack in February 2002?
**A. Two.**
Q. Do you know who you sued?
**A. I don't remember the names.**
Q. Do you know if you've sued the Syrian Arab



Republic?
**A. I don't remember names.**
Q. Are you aware of any evidence that the Syrian Arab Republic had something to do with the bombing in February 2002?
**A. I don't know.**
Q. Do you know if you've sued the Arab Bank?
**A. Yes.**
Q. Are you aware of any evidence that the Arab Bank had something to do with the bombing in which you were injured?
**A. My lawyers know.**
Q. Apart from what your lawyers know, are you aware of any evidence that the Arab Bank had something to do with the February 2002 bombing?
**A. Not that I know.**
Q. Do you know if you've sued the Palestinian Authority?
**A. I don't know.**
Q. Are you aware of any evidence that the Palestinian Authority had something to do with the



bombing in which you were injured?
**A. Ask that again.**
Q. Are you aware of any evidence that the Palestinian Authority had something to do with the bombing in which you were injured?
MR. STEINER: Objection. I suggest you use the acronym for the Palestinian Authority as well.
THE WITNESS: A Palestinian kid 16 years old blew up, did a suicide attack.
BY MR. HILL:
Q. You said that you believed the attacker was a 16 year old Palestinian kid?
**A. That's what I heard.**
Q. Where did you hear that?
**A. A long time ago.**
Q. Do you remember the source of that information?
**A. No.**
Q. Was this from a media report?
**A. I don't remember.**

Q. Did a Palestinian tell you this?
**A. No.**
Q. Do you think a person told you this or do you think it's something you read or heard on the TV?
**A. Also on TV and also from people.**
Q. Do you remember the names of the people that told you this information?
**A. No.**
Q. Apart from the information you've just related about the person being 16 years old and being Palestinian, are you aware of any other information that the Palestinian Authority or as it's known as, the PA, had something to do with the attack in which you were injured?
**A. I didn't hear the question.**
Q. Apart from what you've just described, the information that you may have read or someone may have told you about the identity of the person that did this, are you aware of any other evidence that the Palestinian Authority had something to do with



the attack in which you were injured?
**A. No.**
Q. Do you know if you've sued the Palestine Liberation Organization?
**A. Don't know.**
Q. Are you aware of any evidence that the PLO had something to do with the attack in which you were injured?
**A. I don't know.**
Q. Have you ever spoken publicly about your sister's death or about the injuries that you received in February of 2002?
**A. Yes.**
Q. On how many occasions do you believe you've publicly spoken about those events?
**A. A few times.**
Q. Where do you recollect speaking about those events?
**A. Texas, England, and South Africa.**
Q. Do you recall in what city in Texas you spoke about this?



**A. No.**
Q. Do you remember approximately when you spoke in Texas?
**A. I don't know, I was 16, 17.**
Q. You were 16 or 17 years old?
**A. Don't know.**
Q. Was this before you moved to Florida to work?
**A. Yes.**
Q. Did you travel with anyone to Texas to give these remarks?
**A. My mother.**
Q. Did your mother also speak on those occasions?
**A. Yes.**
Q. Did you speak more than once in Texas?
**A. I don't remember.**
Q. Do you remember what type of place you spoke in? Was it a hotel, was it a synagogue?
**A. From what I remember, it was a school.**
Q. Do you remember what you said?



**A. I didn't speak. I more answered questions.**
Q. You took questions from the audience and answered them?
**A. Yes.**
Q. Did you make any notes or prepare any remarks in advance of that speaking in Texas?
**A. No.**
Q. Did you travel to Texas in association with an organization?
**A. Yes.**
Q. What organization?
**A. I think One Family.**
Q. Who paid for the expenses for your trip to Texas?
**A. Whoever sent us.**
Q. You and your mother didn't pay for that trip, as far as you know?
**A. I don't know.**
Q. Did you receive any money in connection with speaking?

**A. No.**
Q. Do you know if your mother received any fees for that speech?
**A. No.**
Q. Do you know if your mom prepared remarks in advance of the speaking in Texas?
**A. I don't know.**
Q. Do you recollect what she said on that occasion?
**A. What?**
Q. Do you remember what she said at the speech in Texas?
**A. No.**
Q. You mentioned that you had also spoken in England.
**A. Yes.**
Q. Approximately when was that?
**A. A month and a half ago.**
Q. In what city did you speak in England?
**A. I don't remember.**
Q. What place did you speak at, what type of



place?
**A. Synagogue.**
Q. Do you remember the name?
**A. No.**
Q. What did you say a month and a half ago at the synagogue?
**A. A little information about me and more about the organization we flew with.**
Q. Was that One Family again?
**A. One Family.**
Q. Were you soliciting donations for One Family?
MR. STEINER: Objection.
THE WITNESS: What's that?
BY MR. HILL:
Q. Were you asking people to give money to One Family?
**A. We weren't asking. We were saying our stories.**
Q. What did you say about One Family on the occasion that you spoke in England?



**A. How they helped us, how they helped me recover, how good the trips are for us, for our healing, traveling with people that was going through the same injuries, different bombing attacks, different attacks all over Israel.**
Q. You mentioned that you had told the audience in England that One Family had helped you, is that correct?
**A. Yes.**
Q. In what way did One Family help you?
**A. They helped me going to all kind of meetings. Not meetings.**
**Going to all kind of therapy treatments, trips that they gave to us.**
Q. You mentioned that One Family had helped you go to meetings or therapy trips, is that right?
**A. All kind of therapy and calming your body, stuff like that.**
Q. You said that One Family had also sent you on trips.
**A. Yes.**



Q. On how many occasions do you think One Family sent you on a trip?
**A. Three times.**
Q. Where did you go on those trips?
**A. Once to France, England, and Eilat.**
Q. When was the trip to France?
**A. I don't remember.**
Q. What did you do on that trip to France?
**A. Had fun.**
Q. Do you remember where in France you went to?
**A. No. Yes, Marseille.**
Q. Marseille?
**A. Yes.**
Q. What time of year did you go?
**A. I don't remember.**
Q. Who were you traveling with?
**A. Different injured people.**
Q. Was anyone in your family on that trip with you?
**A. No.**

is about the injuries, physical and psychological, I received and what happened to me because my sister and my best friend died.
Do you remember being asked that question and giving an answer like that?
**A. Yes.**
Q. Can you explain to me what effect on you the death of Rachel has caused, how you feel about that today?
**A. Of course. In the beginning it didn't bother me. We weren't good friends. We didn't like each other.**
**With time, growing up without a sister became a big issue, very sensitive for me.**
**I do miss her. I want her to be here. It's a big shame that she is not here.**
**Mentally it did a lot of, lot of, lot of issues basically, makes me regret all the stuff I said about her, all the stuff I did to her. Mentally it changed everything.**
MR. STEINER: Thank you.



RE-DIRECT EXAMINATION:
BY MR. HILL:
Q. You mentioned that you had regrets about stuff you said to Rachel.
What is it you are thinking of that you regret saying to her now?
**A. Cursing her, also after the attack, it didn't bother me that she died, giving pain to my mother, telling her all kind of stuff like she cares more about her dead daughter than her living sons, stuff I said that hurt my mother mostly. I miss my sister at the end of everything.**
Q. Anything else that you are thinking of that you said that you regret saying in connection with Rachel other than what you just told me?
**A. A lot of stuff but nothing that pops to my mind right now.**
Q. You said you also regret stuff you did relating to Rachel. What do you mean by that?
**A. Hitting her, fighting with her, not getting along together, being a nasty teenager to my**



**sister.**
Q. You mentioned that you had told your mother that you felt like she cared more about her dead daughter than her living sons, is that right?
**A. Yes.**
Q. When did you say that to her?
**A. Plenty of times.**
Q. At the time you said that did you believe it to be true?
**A. Yes.**
MR. HILL: I don't have any further questions.
MR. STEINER: Nothing else.
(Deposition adjourned at 11:39 a.m.)



Reporter's Certificate

I, the undersigned, Certified Court Reporter, do hereby certify that the foregoing transcript of testimony was taken by me in stenotype and thereafter reduced to print under my direction, that said transcript is a full, true and substantially accurate record of the proceedings, to the best of my ability.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

/s/ Michael Feuer
____________________________
Certified Realtime Reporter