# Exhibit 52

In the U.S. District Court
District of Columbia

-------------------------------x

Shabtai Scott Shatsky, et al :

v. :NO. 1:02cv02280

The Syrian Arab Republic, et al :

-------------------------------x

February 12, 2013

DEPOSITION OF:

Ronit Trattner,

a witness, called by counsel pursuant to notice, commencing at 1:15 p.m., which was taken at Miller and Chevalier, 655 15th Street, NW, Washington, DC 20005-5701

Mainsoft?
**A. I don't recall precisely. At the end of the year 2000.**
Q. How long did you work there?
**A. A few months.**
Q. Do you remember approximately what your salary was?
**A. No.**
Q. What was your next job after Mainsoft?
**A. I worked at RIT Technologies.**
Q. Why did you leave Mainsoft?
**A. It was a temporary student kind of job.**
Q. What position did you have at RIT?
**A. I was a programmer.**
Q. How long did you work there?
**A. Approximately two and a half years, I think.**
Q. Why did you leave RIT?
**A. Terminations, cutbacks.**
Q. Were you given a reason why you were let go from RIT?



MR. STEINER: Objection.
THE WITNESS: There were general terminations and I was part of that.
BY MR. HILL:
Q. Were you ever told whether your performance was a reason for your termination from RIT?
**A. That was not the reason.**
Q. You understand that your performance at RIT was acceptable?
**A. To you or to them?**
Q. To RIT.
**A. Yes.**
Q. Did you receive performance reviews while you were at RIT?
**A. I don't recall precisely but I assume that I did.**
Q. Do you recall receiving any bad performance reviews while you were at RIT?
MR. STEINER: Objection.
THE WITNESS: I certainly did not.



BY MR. HILL:
Q. What was your next job after RIT?
**A. Tegrity.**
Q. What was your position there?
**A. I was a software checker.**
Q. How long did you work at Tegrity?
**A. A few months. It was a temporary job.**
Q. When did you stop working at Tegrity?
**A. In June 2003 -- July 2003 I mean.**
Q. Do you remember how much you were paid when you worked at Mainsoft?
**A. No.**
Q. Do you remember how much you were paid when you worked at RIT?
**A. Yes.**
Q. How much were you paid when you were working at RIT?
**A. It was approximately 15,000.**
Q. 15,000 shekels?
**A. Yes, per month.**
Q. Do you remember how much you were being



paid for your work at Tegrity?
**A. No.**
Q. Where did you work after Tegrity?
**A. At MB Simulations.**
Q. What was your position at MB Simulations?
**A. Programmer.**
Q. How long did you work there?
**A. One year.**
Q. When did you leave MB Simulations?
**A. When Hodea was born.**
Q. August of 2003?
**A. In May 2005.**
Q. Why did you leave MB Simulations?
**A. I didn't really like that place.**
Q. Did anyone ask you to leave?
**A. No.**
Q. Where did you work next after MB Simulations?
**A. At ECI.**
Q. What was your position at ECI?
**A. Programmer.**

Q. How long did you work there?
**A. Approximately five and a half years.**
Q. When did you stop working at ECI?
**A. In December 2011.**
Q. Why did you stop working at ECI?
**A. Terminations.**
Q. Were you told why you were being terminated?
**A. It was part of the general terminations.**
Q. Did anyone tell you that you were being terminated for performance reasons?
**A. No, I was told that it was not for that reason.**
Q. Where did you work after ECI?
**A. At Cadence.**
Q. Are you still employed at Cadence?
**A. Yes.**
Q. What positions have you held there?
**A. Programmer.**
Q. How much are you being paid to work as a programmer at Cadence?



**A. 20,000.**
Q. 20,000 shekels a month?
**A. Yes.**
Q. How much did you make when you were working at ECI?
**A. Approximately 14 and a half.**
Q. 14,500 shekels a month?
**A. I think so. I don't really remember.**
Q. How much were you paid when you worked at MB Simulations?
**A. I don't remember.**
Q. Do you remember how much you were paid when you worked at Tegrity?
**A. No.**
Q. Ma'am, I understand that you were present when there was an explosion on February 16, 2002 in Karnei Shomron, is that correct?
**A. Yes.**
Q. Prior to the explosion did you see the person or persons who caused the explosion?
**A. No.**



Q. After the explosion did you lose consciousness?
**A. No.**
Q. I understand that you yourself were injured in the explosion, is that correct?
**A. Yes, my face was burned, my hands and my legs were also burned and I have shrapnel in different parts of my body.**
Q. Were you hospitalized as a result of these injuries?
**A. Yes, I was hospitalized for ten days in the plastic surgery department.**
Q. Did you have any operations performed as a result of these injuries?
**A. It was not surgery. They attempted to remove shrapnel from my leg and they were unsuccessful so they left it there.**
Q. Apart from the attempt to remove the shrapnel, have you had any other surgeries or operations related to the injuries from February 2002?



**A. No.**
Q. Has anyone ever suggested to you that you should have additional surgeries or operations as a result of the injuries from February 2002?
**A. No.**
Q. Do the injuries that you received in February of 2002 affect your daily life today?
**A. Currently, not significantly.**
Q. Do the injuries you received in February of 2002 prevent you from doing anything today that you would like to do?
MR. STEINER: Objection. I would ask that you clarify what injuries you are asking about, whether they are physical or emotional and psychological.
MR. HILL: Any injuries.
MR. STEINER: Ask that the witness be -- it be clear that the injuries you are discussing are limited to not only physical.
THE WITNESS: I can't, for example, be with my husband the way I would like to be. I

Page 22

have to be on his right side because he was injured in his left ear so I always have to think about how to position myself next to him.
In addition, whenever his eyes hurt or if something gets into his eye, I'm always -- my consciousness is -- I'm always aware of what will happen to the other eye and it's always somewhere on my mind worrying me.
BY MR. HILL:
Q. Did you finish your answer?
**A. I'm still thinking.**
**(Pause)**
THE WITNESS: That's it.
BY MR. HILL:
Q. Ma'am, I had asked you about your injuries and I think your answer actually answered about your husband's injuries.
MR. STEINER: Why don't you just pose the question, please? I wouldn't agree with your conclusion.
MR. HILL: Let her answer.

Page 23

THE WITNESS: As far as I'm concerned, emotionally speaking the very fact that I'm always thinking about what will happen to Hillel's other eye, that has a tremendous impact on me in terms of my daily life.
BY MR. HILL:
Q. Let's have a conversation about protocol here. I think the question did not get translated on that occasion, is that right?
THE INTERPRETER: There was a conversation between the two of you that was not translated and then Ms. Trattner started to say something which I interpreted for you.
MR. HILL: Maybe what we should do is if you can wait until the interpreter gets done with the translation.
Otherwise I'm afraid the witness is not actually getting everything in Hebrew and that the goal of this is to make sure she has it all in Hebrew.
MR. STEINER: I think she should be

Page 24

translating your questions, not your commentary.
MR. HILL: I didn't actually pose a question.
I was posing a predicate and then you interrupted and the witness responded.
MR. STEINER: Your predicate was commentary on her response.
MR. HILL: Why don't you wait until the question is interpreted. Then if you have an objection, make the objection.
MR. STEINER: Okay.
BY MR. HILL:
Q. Ma'am, as far as the physical injuries you received, the issue you described with having to be on your husband's right side, that's something that's because of his injuries, right?
**A. Correct.**
Q. You mentioned that you are concerned about your husband's eye, right?
**A. Yes.**
Q. That's a concern you have about his

Page 25

injuries, right?
**A. But I'm the one who is worried.**
Q. I understand.
The physical injuries you received, the burns and the shrapnel that you received, do the physicals injuries you received prevent you from doing anything on a regular basis that you would like to do?
**A. No.**
Q. You were with your husband on February 16, 2002 at the time of the explosion, right?
**A. Yes.**
Q. After the explosion did your husband remain conscious?
MR. STEINER: Objection.
THE WITNESS: Yes, he doesn't really recall but he did remain conscious.
BY MR. HILL:
Q. How long did he remain conscious after the blast?
MR. STEINER: Objection.

THE WITNESS: I don't know.
I know that when we got on the ambulance I constantly spoke to him so that he would remain conscious.
BY MR. HILL:
Q. Were his eyes open while you were in the ambulance with him?
**A. I don't remember.**
Q. Did he say anything to you between the time of the blast and the time you arrived at the hospital?
**A. No.**
Q. Can you describe generally the type of injuries your husband received that night?
**A. Shrapnel went into his eye and as a result of that he lost his vision and he still has shrapnel in his head.**
**He was injured in his ear.**
**He was injured in his hand. He has shrapnel there. He's hypersensitive in his hand.**
**Shrapnel entered into his foot and the nerve**



**there was severed which has an effect on his feeling there.**
**And he has more shrapnel in different places throughout his body. I'm trying to think.**
**(Pause)**
THE WITNESS: It took time until he went back to speaking like normal and to use his hands and his legs normally.
BY MR. HILL:
Q. Did you finish your answer?
**A. I think so.**
Q. Ma'am, today is he able to use his hands normally?
MR. STEINER: Objection.
THE WITNESS: Not entirely.
BY MR. HILL:
Q. In what respect is he not able to use his hands normally?
**A. In terms of the feeling when he touches things he doesn't always feel heat and cold or pain. He feels it but in a different kind of way.**



Q. Which hand does he have this issue with?
**A. I think his right hand.**
Q. Have the difficulties with his hand that you described ever prevented him from doing something that you wished him to do?
**A. I can't think of anything at the moment.**
Q. Have the difficulties you described with his hand ever prevented him from doing something he wished to do?
**A. I think not.**
Q. How long was it before he was able to use his legs normally?
MR. STEINER: Objection.
THE WITNESS: A great deal of time. He had to undergo physiotherapy. Perhaps even half a year, five, six months.
BY MR. HILL:
Q. Is he able to use his legs normally today?
MR. STEINER: Objection.
THE WITNESS: When he puts shoes on, yes. Without shoes, if he's walking barefoot on



things, he feels it differently and it's more of a hinderance to him.
BY MR. HILL:
Q. Has the issue with his legs that you've just described prevented him from doing anything you wanted him to do?
**A. No.**
Q. Have the issues with his legs that you've described prevented him from doing anything that he wanted to do?
MR. STEINER: Objection.
THE WITNESS: I think not.
BY MR. HILL:
Q. You mentioned that there was a period of time where he had some difficulty speaking, is that correct?
**A. Yes.**
Q. Is he able to speak normally today?
MR. STEINER: Objection.
THE WITNESS: Yes.
BY MR. HILL:

Q. You mentioned that he had lost vision in one of his eyes, is that correct?
**A. Yes.**
Q. Which eye?
**A. The left eye.**
Q. Does the loss of vision in his left eye prevent him from doing anything that you would like him to do today?
**A. No.**
Q. Does the loss of vision in the left eye prevent him from doing anything that he would like to do, so far as you know?
MR. STEINER: Objection.
THE WITNESS: I think not.
BY MR. HILL:
Q. You mentioned that he still has some shrapnel in his hand, is that correct?
**A. Yes.**
Q. Do you believe the shrapnel in his head prevents him from doing anything he would like to do today?



**A. No.**
Q. Do you believe the shrapnel in his head prevents him from doing anything he would like to do?
MR. STEINER: Objection.
THE WITNESS: I know that it prevents him from undergoing an MRI.
BY MR. HILL:
Q. Apart from --
**A. If necessary.**
Q. Has he ever needed an MRI that you are aware of?
**A. No.**
Q. Apart from the inability to have an MRI, can you think of any other way that the shrapnel in his head limits his activities?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Has the shrapnel in his head damaged his brain in any way that you are aware of?



MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. While you were on the scene of the blast on the night of February 16, 2002 did you observe someone named Keren Shatsky?
**A. I don't recall.**
Q. Do you know Keren Shatsky?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Do you know someone named Rachel Thaler?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. Do you know if you saw Rachel Thaler on the scene on February 16, 2002?
**A. I don't recall.**
Q. Do you know someone named Leor Thaler?
**A. No.**
Q. Do you know if you saw Leor Thaler on the



scene on February 16, 2002?
**A. I don't know.**
Q. Do you know someone named Steven Braun?
**A. No.**
Q. Do you know if you saw Mr. Braun on the scene on February 16, 2002?
**A. I do not know.**
Q. Do you remember meeting anyone on the scene on February 16, 2002?
**A. There were a lot of people around me. I didn't pay any attention to them.**
Q. Do you know the names of any of the people you encountered that night?
**A. I didn't meet them. I have no idea who they were.**
Q. Did you aid anyone on the scene that night?
**A. Only Hillel.**
Q. Do you want to take a break?
**A. No.**
Q. Do you believe you have a mental illness

Page 62

a promotion because of the injuries that you received in February 2002, is that correct?
MR. STEINER: Objection.
THE WITNESS: Correct.
BY MR. HILL:
Q. Do you have any reason to think that you did not get a raise at any job you had after 2002 because you were injured in February of 2002?
**A. All the rest of my jobs, no. At RIT I don't know.**
Q. Again, the reason you think you might have gotten a raise at RIT is because you missed time there because you were injured, correct?
MR. STEINER: Objection.
THE WITNESS: After my injuries and because I was working on a part time basis.
BY MR. HILL:
Q. Did anyone ever tell you that if you hadn't been injured or hadn't worked part time that you would have gotten a raise?
**A. No.**

Page 63

Q. When you were terminated at RIT do you know if anyone was hired to take the job you had held?
**A. Nobody.**
Q. That position was eliminated?
**A. You could say that.**
Q. Were any persons who had positions higher than you in RIT terminated as part of that same cutback?
**A. Yes, my team leader did too.**
Q. If you had been promoted at RIT what was the next position that you could have been promoted to?
**A. Perhaps a more senior programmer.**
Q. Were there more senior programmers who were terminated as part of the cutbacks in which you were terminated?
**A. I don't recall.**
Q. Approximately how many people were terminated from RIT at the same time that you were?
**A. I don't recall how many but it was**

Page 64

**widespread cutbacks.**
Q. How large of a company was RIT at the time that you were terminated?
**A. I don't recall.**
Q. Was it more than a hundred employees?
**A. I think so.**
Q. Do you think it was more than a thousand?
**A. No.**
Q. Are you aware of any evidence that Keren Shatsky experienced any conscious pain or suffering after the blast on February 16, 2002?
MR. STEINER: Objection.
THE WITNESS: I have no idea.
BY MR. HILL:
Q. I probably know the answer but let me state it for the record.
Are you aware of any evidence that Rachel Thaler experienced any conscious pain or suffering between the time of the blast -- after the blast on February 16, 2002?
**A. I have no idea.**

Page 65

Q. Ma'am, how many lawsuits have you filed as a result of the events of February 16, 2002?
**A. Two.**
Q. Who have you sued?
**A. This case and another case involving Arab Bank.**
Q. Are you aware of any evidence that the Arab Bank had something to do with the bombing in which you were injured?
**A. To the best of my knowledge, the money that was paid to the family of the suicide bomber was taken from there.**
Q. You said that was to the best of your knowledge. What's the source of that knowledge?
**A. I don't recall.**
Q. Did someone tell you that?
**A. I don't know how I know.**
Q. Did anyone from the Arab Bank tell you that?
**A. No.**
Q. Have you ever spoken to anyone from the

Page 66

Arab Bank?
**A. No.**
Q. What is your best guess as to the source of the information you just related to me about the Arab Bank?
MR. STEINER: Objection.
THE WITNESS: I really don't recall.
BY MR. HILL:
Q. Did you believe you learned this from a person?
**A. I have no idea.**
Q. Do you believe you read it somewhere?
**A. I don't know.**
Q. Can you tell me the name of anyone who told you what you just told me?
**A. No.**
Q. Can you identify any document that contains the information you just shared with me?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:

Page 67

Q. Anything at all you can recall about the source of your belief that money was paid to the suicide bomber by the Arab Bank?
MR. STEINER: Objection.
THE WITNESS: I don't recall.
BY MR. HILL:
Q. Do you know the name of the person who caused the explosion in which you were injured?
**A. I knew it but I don't recall it now.**
Q. Have you ever spoken to anyone from his family?
**A. No.**
Q. Have you ever spoken to anyone who had any responsibility in your mind for the bombing?
MR. STEINER: Objection.
THE WITNESS: No.
BY MR. HILL:
Q. You mentioned that you also brought this case. Do you know who the defendants are in this case?
**A. The Palestinian Authority and the PLO.**

Page 68

Q. Are you aware of any evidence that the Palestinian Authority had something to do with the bombing in which you were injured?
MR. STEINER: Objection.
THE WITNESS: It's a well known fact that the Palestinian Authority encourages terrorists to commit suicide bombings and subsequently pays their families, calls streets after them and very much encourages it.
BY MR. HILL:
Q. Did you finish your answer?
**A. Yes.**
Q. What is the source of the information that you just provided to me?
**A. Common knowledge. It's obvious. It's a well known fact.**
Q. You say it's common knowledge and it's a well known fact. How did you become aware of this common knowledge?
**A. I live in Israel. I hear news all the time. I assume that it was from there.**

Page 69

Q. Can you identify any source of the information you just provided to me about the Palestinian Authority other than the news?
**A. I don't know.**
Q. So you can't think of any source for the information you just provided me other than news reports, is that right?
**A. I don't know about the source of the information but it's very well known information.**
Q. Ma'am, I just want to make sure that you can't tell me of any sources of information about the Palestinian Authority that you related here today other than the news. Can you tell me another source other than the news?
**A. No.**
Q. Have you ever spoken to anyone from the Palestinian Authority?
**A. No.**
Q. You mentioned you also sued the PLO. Are you aware of any evidence that the PLO had something to do with the bombing in which you were injured?

**A. To the best of my knowledge, the terrorist was affiliated with the PLO.**
Q. What is the source of your belief that the terrorist was affiliated with the PLO?
**A. I don't recall. I simply know it.**
Q. Did someone tell you that the terrorist was affiliated with the PLO?
**A. I don't recall where I know it from.**
Q. Did anyone from the PLO tell you that?
**A. No.**
Q. Was this something you read in the news or saw in the media?
**A. I don't recall.**
Q. Can you think of anywhere that you could have learned about the affiliation of the terrorist with the PLO other than the media?
**A. I don't know.**
Q. Sitting here today you cannot identify a source for the belief that the terrorist was affiliated with the PLO other than the media, is that correct?



**A. I can't think of any at this moment.**
Q. You have not seen any documents indicating that the terrorist was affiliated with the PLO, is that correct?
**A. I did not see any such documents.**
Q. You can't recall anyone ever telling you that the terrorist was associated with the PLO, can you?
**A. No.**
Q. Are you aware of any evidence that the Syrian Arab Republic had something to do with the bombing in which you were injured?
**A. I don't know.**
Q. Do you know if you sued the Syrian Arab Republic?
**A. I think that they were related to this case but I don't recall at the moment, and they are currently not affiliated with it.**
**However, I'm not proficient in all of the details.**
Q. Do you know if, in fact, you have a



lawsuit pending against the Syrian Arab Republic?
MR. STEINER: Objection.
THE WITNESS: No, I don't. I think no.
(A discussion takes place which is held off the record)
THE WITNESS: No, there's not.
BY MR. HILL:
Q. Is there a dispute about the translation?
THE INTERPRETER: No.
BY MR. HILL:
Q. I'm sorry?
**A. No, there's not.**
Q. Ma'am, have you ever spoken to the press or media about the events of February 16, 2002?
**A. We were once interviewed for a newspaper. I don't recall which one.**
Q. Let me show you what was previously marked as exhibit number 23.
The document is in English. Are you able to read it sufficiently to tell me whether you've seen



it before?
**A. Yes.**
Q. Is this the newspaper interview that you were referring to?
**A. Yes.**
Q. Apart from this newspaper interview, did you have any other interviews or occasions where you spoke to the press?
**A. No.**
Q. Has your husband ever spoken to anyone in the press apart from the interview that's exhibit 23?
**A. No.**
Q. Do you know if your mother-in-law or father-in-law have ever spoken to anyone from the press apart from the interview in exhibit 23?
**A. No.**
Q. Have you ever given a speech about the events of February 16, 2002?
**A. No.**
Q. Has your husband ever spoken publicly

**A. Yes.**
Q. Ma'am, what is your best estimate of how frequently you and your husband were having sex on a monthly basis prior to the injuries you received in February of 2002?
**A. Four.**
MR. HILL: Subject to our outstanding requests for additional documents I don't have any further questions for Ms. Trattner at this time.
MR. STEINER: Reserve the right to review and sign. I need a copy still of exhibit 23.
MR. HILL: We'll take a break.
The record is closed.
(Deposition adjourned at 3:40 p.m.)



Reporter's Certificate

I, the undersigned, Certified Court Reporter, do hereby certify that the foregoing transcript of testimony was taken by me in stenotype and thereafter reduced to print under my direction, that said transcript is a full, true and substantially accurate record of the proceedings, to the best of my ability.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

/s/ Michael Feuer

____________________________

Certified Realtime Reporter



Certificate of Deponent

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary I will attach on a separate sheet of paper to the original transcript.

____________________________

Signature of witness

I hereby certify that the individual representing him/herself to be the above named individual, appeared before me this __________ day of ______________ and executed the above certificate in my presence.

____________________

Notary Public



Errata Page of Deponent

Please note any errors on this sheet. The reasons may be general, such as "to correct stenographic error" or "to clarify the record." When completed, send this page to the attorney who took your deposition, NOT the court reporter.

Page Line Correction Reason For Change