IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SHABTAI SCOTT SHATSKY, ET AL.,          )
                                        )
          Plaintiffs,                   )     CV No. 02-2280
                                        )
                                        )     Washington, D.C.
          vs.                           )     July 26, 2016
                                        )     3:15 p.m.
SYRIAN ARAB REPUBLIC, ET AL.,           )
                                        )
          Defendants.                   )
_____)


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          Abbe David Lowell
                             Joy Langford
                             CHADBOURNE & PARKE LLP
                             1200 New Hampshire Avenue, NW
                             Suite 300
                             Washington, D.C. 20036
                             (202) 974-5605
                             adlowell@chadbourne.com


For the Defendant:           Mitchell R. Berger
                             Amy Brown
                             Alexandra E. Chopin
                             SQUIRE PATTON BOGGS (US) LLP
                             2550 M Street, NW
                             Washington, D.C. 20037
                             (202)457-5601
                             mitchell.berger@squirepb.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba, RMR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
1                    P R O C E E D I N G S

2              DEPUTY CLERK:  All rise.  This Honorable Court is

3    now in session.  The Honorable Judge Richard J. Leon

4    presiding.  God save the United States and this Honorable

5    Court.  Please be seated and come to order.

6              Your Honor, we have Civil Action 02-2280,

7    Shabtai Shatsky, et al., versus the Palestine Liberation

8    Organization.

9              Counsel, please approach the lectern and identify

10   yourselves for the record.  Thank you.

11             MR. LOWELL:  Good afternoon, Your Honor.

12   Abbe Lowell and Joy Langford of Chadbourne & Parke LLP for

13   the plaintiffs.

14             THE COURT:  Welcome back.

15             MR. BERGER:  Good afternoon, Your Honor.

16   Mitchell Berger from Squire Patton Boggs, along with my

17   colleagues, Amy Brown and Alexandra Chopin for Palestinian

18   Authority and the PLO.

19             THE COURT:  Welcome back.

20             MR. BERGER:  Thank you.

21             THE COURT:  You can stay, because it's your

22   motion.  So you can have 20 minutes, you can reserve up to

23   five of it for rebuttal.

24             MR. BERGER:  Thank you, Your Honor.

25             If I could, then, I would like to reserve that
```

1   five minutes for rebuttal.

2          And with the Court's permission, I'd like to

3   focus, in my opening time, on seven summary judgment hurdles

4   that, in our submission, plaintiffs can't overcome, and, as

5   a result of that, they don't have a case they can take to

6   trial.

7          Now, I'm going to cover the seven reasons, and

8   there are a number of subparts.  If the Court would find it

9   at all useful, I do have a checklist of the points I'm going

10  to cover I'd be happy to hand up.  Happy to proceed without

11  it.  Whatever is the Court's pleasure.

12         THE COURT:  That's fine.  You just go right ahead.

13         MR. BERGER:  Thank you, Your Honor.

14         Of the seven hurdles, plaintiffs' first hurdle is

15  an evidentiary one; in other words, in particular, they rely

16  on inadmissible hearsay.

17         Beyond the hearsay rule, the plaintiffs face six

18  other hurdles to trial, each involving a different legal

19  gateway issue under the Anti-terrorism Act.

20         Three of those remaining six hurdles relate to the

21  criminal predicate acts, which, as the Court knows, have to

22  be pled as a foundation for any ATA civil case.

23         The remaining three hurdles all deal with the

24  additional civil action requirements; proximate cause,

25  scienter, and the like that have to be built on that

1   foundation for criminal predicate acts in order to have an

2   ATA civil action.

3           Let me start with the first hurdle, namely

4   hearsay.

5           The hearsay rules materially narrow the summary

6   judgment factual record for the reasons that we've explained

7   exhibit by exhibit in our response to the plaintiffs'

8   reconstituted statement of material facts for trial.

9           In a way, the hearsay hurdle is a book end to what

10  Your Honor did in the November 2015 sanctions order, where

11  Your Honor narrowed the factual record that the Court is

12  going to address on summary judgment.

13          In the sanctions ordered, the Court precluded use

14  of late produced documents.  The Court didn't reach issues

15  at that time of hearsay.  The hearsay rules further narrow

16  the summary judgment record.  In fact, as I'll say in a

17  moment, narrows it down to five facts, really, that

18  plaintiffs' case rests on.

19          The Court knows, of course, that under the

20  D.C. Circuit's decision in the *Greer* case, hearsay counts

21  for nothing, in the Circuit's words, in opposition to

22  summary judgment, when, as in this case, the plaintiffs

23  don't satisfy any hearsay exception to go along with the

24  monumental amount of hearsay on which they're relying.

25          Interesting, though, same hearsay rules were

```
 1    applied by Judge Kessler in the Gilmore case when she
 2    granted summary judgment in a look-alike case against the PA
 3    and PLO.  And those same hearsay rules really are at the
 4    core of the appeal that the plaintiffs in Gilmore have
 5    taken.
 6            The Court may or may not know that the Circuit has
 7    scheduled argument in the Gilmore appeal for September 14th.
 8    I think it's fair to say that how the Court of Appeals deals
 9    with the Gilmore appeal will provide some instructive
10    guidance on the hearsay rules here to the extent the Court
11    has any disagreement with what Judge Kessler did in Gilmore.
12            Now, as I said, once you wash out the hearsay from
13    plaintiffs' case, plaintiffs --
14            THE COURT:  Let me just -- on that point, let me
15    just ask you this quick question.  And I'll ask opposing
16    counsel the same question too.
17            Some suggestion has been made in the briefs that
18    it might be better for this Court to wait and see what the
19    Court of Appeals does before ruling in this case.
20            Now, of course, we all know that you can't predict
21    when the Court of Appeals' opinion is going to come out.
22    They're going to have the argument in September.  But that
23    opinion could be three or four months later.  So that would
24    put off resolving this case for, really, quite a few months.
25    And this case has been around a long time.
```

1          What's your thinking?  Is it better for this Court

2     to wait or just to go ahead and rule on summary judgment in

3     this case?

4          MR. BERGER:  Well, that's an easy one for me to

5     answer, because we think Judge Kessler got it right in

6     *Gilmore*, and we don't think the Circuit is going to disturb

7     that.

8          We argue the *Gilmore* principals in our summary

9     judgment papers.  And so, as I say, I think the Court can

10    go ahead and decide this motion on the Court's own schedule,

11    unless the Court has any disagreement with what

12    Judge Kessler did, in which case it might be more efficient

13    just to see how the Circuit resolves it.

14         But we think Judge Kessler's application of the

15    hearsay rules were straightforward and correct, so we'd

16    certainly urge the Court to go ahead and apply *Gilmore* and

17    decide the case on that basis.

18         THE COURT:  Okay.

19         MR. BERGER:  So, Your Honor, when you do apply

20    that hearsay screen from *Gilmore* and from the hearsay rules

21    and, indeed, from other cases that Your Honor's decided,

22    plaintiffs' case really boils down to only five facts:

23    They probably had the same five facts before they embarked

24    on the long period of discovery, because the discovery

25    didn't really show much of anything except for hearsay, but

1  let's talk about what those five facts are, because, in many

2  ways, they explain why they can't get over the remaining six

3  hurdles to summary judgment.

4        The first one is that the Palestinian authority

5  provided a job to someone named Raed Nazal, who had been a

6  security prisoner of the Israelis.

7        And as part of a policy that the Palestinian

8  authority had to absorb and rehabilitate former prisoners,

9  they gave him a job.  Turned out to be a no-show job, never

10  showed up to get a uniform, never did any work, but he got a

11  job from the Palestinian authority.

12        Second fact, after Nazal was killed by the

13  Israelis, the Palestinian authority gave him a posthumous

14  promotion in that job.  He'd been given the rank of a

15  captain in the Palestinian security services.  After the

16  Israelis killed him, he was posthumously promoted to major.

17        Third fact.  The MO, the record, is a little bit

18  fuzzy on this.  Then provided welfare payments to the

19  surviving family members of Nazal.  And also provided

20  welfare payments to the surviving family members of someone

21  named Hafez, who is allegedly the bomber who committed the

22  attack that's at issue in this case.

23        Fourth fact is that the PA or the PLO -- the PA

24  funds the PLO, that's why I use them interchangeably here --

25  made a one-time rent payment directly to the landlord of a

1  field office for the PFLP, and it was covering a period from

2  early 2001 to mid-2002.

3       The fourth fact is that the PLO provided a driver

4  at an apartment for the delegate to the PLO executive

5  committee representing the PFLP, a political faction in

6  Palestine, just as the PLO provided a car and -- an

7  apartment, rather, to all the other delegates from all the

8  other political factions.

9       That's it.  Those are their five facts.  And on

10  the strength of those five facts, the plaintiffs say they

11  can make out three criminal predicate acts, and that they

12  can surmount all the requirements for an ATA civil action.

13       They can't.  So let me start with the first

14  predicate act that they put at issue, and that's 18 U.S.C.

15  2339B.

16       That claim is not alleged anywhere in the

17  complaint.  It was also never disclosed at any time in

18  connection to discovery responses in response to

19  interrogatories that the defendants had propounded.

20       Frankly, in our submission, it's just another

21  example, as the Court pointed out in the sanctions order, of

22  plaintiffs waiting until discovery was over and then using

23  the summary judgment process to say, we have something we

24  haven't disclosed during discovery.

25       Now, I know they've got an argument that says, oh,

1   we should have known all along.  But, frankly, Your Honor,

2   nothing in this court's prior proceedings ever alluded to

3   the 2339B claim.

4           Your Honor, when you vacated the default in this

5   case, alluded to the allegations about a relationship

6   between the PFLP and the PLL, Your Honor said, I understand

7   loud and clear, there's no relationship.  That's the defense

8   that the defendants are putting forward.  But no mention of

9   2339B.  They're trying to advance a 2339B claim, having

10  never disclosed it.

11          But let's jump over that part of this hurdle,

12  because even if they get the benefit of the doubt from the

13  Court and the Court is willing to entertain a 2339B claim on

14  its merits to assess its legal sufficiency, it can't apply

15  here.

16          Recall the five facts.  The money -- 2339B

17  involves support to a foreign terrorist organization.  The

18  PFLP is a U.S. designated foreign terrorist organization.

19  Even though within Palestine, there's a military wing and a

20  political wing, the Palestinian government doesn't give any

21  money to the military wing, it only gives support to the

22  political wing.  Think Sinn Féin and an IRA, that kind of

23  distinction, that's really what you're dealing with there.

24          But all of that support, the car, the apartment,

25  the field-office rental was all provided within the West

1    Bank, in Palestinian territory.  And it's quite clear that

2    2339B applies only when support to a foreign terrorist

3    organization was given either in whole or in part within the

4    United States.  None of that occurs here.

5            The plaintiffs say, oh, no, no, the Anti-terrorism

6    Act, when you look at the civil action provision, applies

7    extraterritorially.  And, frankly, that's an answer to the

8    wrong question.

9            Your Honor's fully familiar with the

10   Supreme Court's recent decision in *RJR Nabisco*.  It looked

11   at extraterritorially under RICO.  RICO is very similarly

12   structured to the Anti-terrorism Act.  It has predicate act;

13   and on top of the predicate acts, it has civil action

14   requirements.

15           What the Supreme Court said in RJR Nabisco is you

16   don't even answer the question of whether there's an extra

17   territorial civil action, unless the underlying predicate

18   offense applies extraterritorially.

19           Here, 2339B, by its very terms, in 2339B(d)(1)(D),

20   makes it clear that the support has to be rendered in whole

21   or in part in the United States, and that's not so here.

22           And, indeed, interestingly, the pre-2004 amendment

23   version of 2339B was even more express.  It said, support

24   for a foreign terrorist organization needed to take place

25   within the United States or by a person subject to the

1    jurisdiction of the United States.  That's important,

2    because the attack here occurred in 2002.  So it's the

3    pre-2004 version of the law that has to apply.

4           And, indeed, in a very similar case, another case

5    against the Palestinian authority in the PLO, *Parsons*,

6    Judge Rothstein said, you know, the ex post facto clause

7    prohibits me from applying any predicate act language in its

8    current form if it was different at the time of the offense.

9    So for those reasons, they can't establish a 2339B predicate

10   offense.

11          Let me move quickly to the other two predicate

12   offenses.

13          The other one is 2339A.  Now, that's your typical

14   material support for terrorism statute.  That's the one that

15   we see in most of these cases.

16          And the Supreme Court's decision in *Humanitarian*

17   *Law Project versus Holder*, but also many other decisions of

18   many other courts and circuit make it clear that that's a

19   specific intent offense.

20          In other words, in that statute, to be found

21   guilty -- because we're dealing with a criminal predicate

22   act -- of material support for terrorism, someone has to

23   give aid to an individual, specifically intending to aid

24   either a terrorist group or to aid in the commission of a

25   terrorist attack.  There is no evidence here to support

1  specific intent.

2        Now, as Your Honor pointed out in the *In Re:*

3  *Fannie Mae* litigation, scienter like this, state of mind

4  like this is entirely appropriate for summary judgment

5  resolution.

6        Here, it's relatively easy to find that there's no

7  evidence of specific intent, because all the plaintiffs

8  point to is, they say, well, in your files, you knew.  You

9  had intelligence files and you knew that Nazal was hanging

10 out with the PFLP, that he was a bad guy, that he had bad

11 things in mind.  Well, all that does is say, at most, that

12 the Palestinian authority was on notice of some potential

13 wrongdoing by Nazal, at a time when he also had a no-show

14 job.

15       But it's quite clear, under 2339A, that notice

16 does not equal specific intent.  The standards for specific

17 intent are much higher.

18       Now, they also say, well, wait a minute, somebody

19 in the Palestinian authority knew he was hanging out with

20 the PFLP, and another person knew he was getting money from

21 the Palestinian authority.  They should have put two and two

22 together, knowing that somehow this guy was doing bad

23 things.

24       Well, collective knowledge is also not an

25 appropriate specific intent theory, the Circuit told us in

1    the *Science Applications* case.

2         Fundamentally, what's needed in the case like this

3    is evidence of an intentional pass-through.  I give money to

4    Mr. Bradley, and Mr. Bradley gives money to a foreign

5    terrorist organization, and we know that he's just a

6    conduit.  There is no evidence of a conduit type of

7    operation here, and that's what they need.

8         Or, as Judge Rothstein put it in the remand

9    decision in *Parsons*, there has to be some evidence of

10   coordination with the terrorist group, joint action with the

11   terrorist group, or an understanding with the terrorist

12   group.  And, again, they don't have anything like that.

13   Even their hearsay evidence is only, well, you must have

14   been on notice that Nazal was doing bad things.  That knocks

15   out 2339A.

16        The last predicate act they have is 2332(b), which

17   is a conspiracy offense.  This is precisely the type of

18   claim the Circuit threw out in *Parsons*.  That was about the

19   only thing that a majority of the Court of Appeals agreed on

20   in *Parsons*.

21        But Your Honor's fully familiar with what a

22   conspiracy count requires.  It requires knowledge.

23   It requires an agreement.  It requires acts in furtherance

24   of that agreement.  They have no evidence on any of that

25   trifecta.  No evidence of knowledge that Nazal was part of

1   an agreement to kill U.S. nationals.  And the offense

2   requires an agreement to kill U.S. nationals.  No evidence

3   that they were part of any agreement to kill U.S. nationals.

4   No evidence of actions taken by the PA or the --

5           THE COURT:  Is there even any evidence that

6   they -- that he knew that there were going to be Americans

7   at this pizza parlor where this bomb went off?

8           MR. BERGER:  No, Your Honor, and that's an

9   excellent point.

10          I mean, the best they come up with on that is,

11  well, this is a settlement that had some number of Americans

12  living there.

13          But, again, there has to be an agreement to kill

14  U.S. nationals.  Mere notice wouldn't ever rise to the level

15  of either an agreement or knowledge.  So that knocks out the

16  conspiracy predicate act.  So they're done at the end of

17  those three.  Without a predicate act, you don't even have

18  to go on to the 2333 civil action requirements.

19          But there's more.  One of the things, and

20  Judge Lamberth said this in his *Wultz* opinion, that it's

21  quite clear that the ATA requires, for a civil action, once

22  you've built that foundation of predicate acts, you have to

23  prove proximate cause.

24          What's proximate cause?  We all know what

25  proximate cause is, but a lot of the ATA cases have

1   distilled it to there needs to be a substantial factor

2   shown, that the defendant's actions were a substantial

3   factor in causing a terrorist attack.

4          There are a couple of cases, *Gill* and *Rothstein*,

5   we cite to in our papers that say, well, okay, in order to

6   apply that to the facts, there has to be something more than

7   incidental support.

8          Remember the plaintiffs' five facts here:

9   It's all small and incidental stuff.  It's a salary for

10  no-show job, it's a one-time rental payment for an office.

11  It's welfare payment to families.  It's all so remote in

12  time.

13         The support that is allegedly given to the PFLP,

14  even if we can still talk about it, because there's a

15  foreign terrorist organization claim out of this case, it

16  was a one-time rental payment, it was given to a landlord,

17  it wasn't given in cash to PFLP, so there's no question of

18  fungible money.  There's no way that a one-time rental

19  payment in 2001 could be said to be a substantial factor for

20  a bombing in 2002.  Or it's not just remote in time on the

21  front end, it's after the fact.

22         So we have the welfare payments given to families

23  of Hafez and Nazal after their deaths.  Well, after the fact

24  payments can't causally result in the bombing.  It's an

25  after-the-fact payment, and, indeed, that's Judge Daniels in

1  the *Sokolow* case said, look, after-the-fact payments don't

2  amount to causation, they don't amount to even ratification

3  of the action.

4          But, importantly also, all of these small

5  payments, you might wonder, why is there a no-show job, why

6  is there a welfare payment?  It's because of the high

7  unemployment in Palestine, and it operates like a welfare

8  state with social welfare programs.

9          One of the interesting holdings from the Seventh

10  Circuit in the *Boim* case is that welfare payments really

11  can't be seen as causing an attack because there's --

12  welfare is provided all of the time.  So they were either

13  welfare in nature or they were political in nature.  They're

14  supporting the faction for the delegates' attendance to the

15  PLO executive committee.

16          If that weren't enough, what we always hear in

17  cases involving terrorism is, money is fungible.

18          Okay.  So maybe they paid this money for

19  non-terrorist purposes, but that enables terrorists to

20  commit other offenses.

21          The problem with that is the United States

22  government, during this period of time, was the No. 1 donor

23  to the Palestinian authority.  And as the Assistant

24  Secretary of State for that bureau testified, we heavily

25  audit all of that.

1          The aid to Palestine continue throughout that

2    period.  Aid to Palestine wouldn't have continued if the

3    U.S. Government believed that by putting fungible dollars

4    into the hands of the PA, which, in turn, funded the PLO,

5    that we were supporting terrorism.  This is the same kind of

6    attenuated connection that you have in this case.

7          Likewise, you have a situation where the

8    United States Government annually certifies that it's in the

9    national security interest of the United States to continue

10   aid to Palestine, and it's in the national security interest

11   of the United States to let the PLO mission operate here in

12   the United States.

13         If assisting the PA and the PLO financially is not

14   aiding terrorism by the United States, when we know that

15   it's going to welfare programs like these, then they're --

16   clearly negates any suggestion of causation that money going

17   into the PA or money coming out of the PA, in this kind of

18   attenuated fashion, have causation.

19         Let me move quickly to the last two elements,

20   these last of the seven hurdles.

21         A civil action has to involve violent action that

22   appears objectively to be intended to support terrorism.

23         Nothing, none of the plaintiffs' five facts, not

24   the notion of a job, not the posthumous promotion, not the

25   welfare payment, not the payment to the landlord, not the

1   delegate's car and apartment, appears to be intended

2   objectively to support terrorism.  Really, same issues that

3   we talked about under proximate cause.

4         *Boim* says welfare payments do not objectively

5   appear to be intended to support terrorism.

6         And, again, if this kind of welfare program did

7   appear to be intended to support terrorism, then the

8   United States Government is complicit in that, too, in

9   funding the PA and PLO.

10        Last of the seven hurdles -- and this relates only

11   to Nazal's no-show job -- is, there's no respondeat superior

12   claim here, no way to hold the PA liable because Nazal, at a

13   time he had a job, allegedly was complicit in this attack.

14   Indeed, there's really no admissible evidence that he was

15   complicit in this attack, but let's assume that for the

16   moment.

17        Respondeat superior claim for ATA hasn't even been

18   recognized in this circuit yet.  Only Judge Brown, in her

19   dissent in the *Parsons* case, would have recognized it.

20        But it doesn't really matter, because, again,

21   Judge Kessler, in *Gilmore*, dealt with a similar respondeat

22   superior claim.  She said, okay, in order to have respondeat

23   superior, you need three things:  You need to be providing

24   services to your employer.  No evidence that Nazal did that.

25   You need to be under the control of your employer.

1    No evidence that the PA ever controlled Nazal.  He never

2    even showed up for his job, never gotten a uniform, never

3    reported for duty.  And, lastly, it has to be within the

4    scope of employment for the employee.

5            And there's two undisputed facts here that would

6    show anything Nazal did to help this bombing was outside the

7    scope of his employment.

8            Number one, four months before the attack -- and

9    Your Honor mentioned this in the opinion vacating default in

10   this case -- the PA and the PLO had outlawed the military

11   wing of the PFLP.  So anything that an employee did to help

12   the military wing of the PFLP was, by definition, outside

13   the scope of employment.

14           Lastly, the Oslo II Agreement bound the

15   Palestinian side to take all measures necessary to prevent

16   acts of terrorism.  That's your duty if you're a security

17   officer for the PA is to make sure that terrorism doesn't

18   happen.  So it has to be outside the scope of employment if

19   a PA employee is pursuing terrorism.

20           Your Honor, those are seven different hurdles; the

21   case falls at every one of them.  And we respectfully

22   request the Court grant summary judgment for the PA and the

23   PLO for that reason.  I'd like to reserve whatever time I've

24   got left for some rebuttal, Your Honor.

25           THE COURT:  Well, I'll let you go a little longer.

1    And I'll give Mr. Lowell an extra five minutes so that you

2    can have your five minutes for rebuttal.

3              MR. BERGER:  Thank you, Your Honor.

4              THE COURT:  Mr. Lowell.

5              MR. LOWELL:  Thank you, Your Honor.

6              Let me start with the question you asked the

7    defendants, in terms of waiting for the Court of Appeals.

8              It seems to me that one of the things that would

9    require that waiting would be to determine that the case

10   that's on appeal, in all of its dimensions, are dispositive

11   or equal to the one that's in front of this Court.

12             So if you look at the factors in the *Gilmore* case,

13   both in terms of the jurisdictional argument, that

14   defendants keep trying to put forward to this Court and

15   you've rejected on two or three or four occasions and then

16   the issues of evidence, you'll find that the *Gilmore* case

17   and this case are different, even on the evidentiary points.

18             Just to name a couple, for example, the issue of

19   whether or not statements in the record that the *Gilmore*

20   plaintiffs wanted to have admitted on the basis of them

21   being party admissions, we argue are admissible on a number

22   of grounds, including the grounds that these are statements

23   against penal interests.  You'll have to do that kind of

24   evidentiary-by-evidentiary point to determine that those are

25   the cases that, if you wait, will be dispositive.  I wanted

1   to make sure I started with that.

2            As to the issue of whether or not the entire

3   statutory structure under which this case has been put

4   forward can't succeed, because it doesn't apply unless the

5   events occur with impact immediately in territorial

6   United States, that would turn the Anti-terrorism Act

7   statutes and all the cases decided under on its head.

8            Basically, transporting into the ATA framework

9   that which has been held for some other reason, RICO or for

10  any other reason, distorts the whole congressional purpose

11  in having had a statute passed which says that if you kill

12  an American with the intent to kill an American and you

13  happen not to kill them in territorial United States but you

14  do it on the basis of the criteria of terrorist criteria,

15  you can be held responsible for it in the United States.

16           That was the argument that the defendants put

17  forward in the *Goldberg* case in New York, where the Court

18  said, Congress clearly intended 2339B to have

19  extraterritorial impact, and said it was the whole point of

20  the statute.

21           So they held the bank, UBS, responsible for having

22  provided the means by which terrorist organizations were

23  able to pull their funds for activities that occurred

24  outside the United States.

25           The other courts, like the Ahmed Court and others,

1  have pointed out that by having made the designation of some

2  of the defendants here as being, or at least the defendant's

3  entities, of being foreign terrorist organizations through a

4  process of United States statutes and procedure, it was

5  showing the United States' interest in making sure that

6  there was extraterritorial reach.

7          As to whether or not we have properly pled 2339B,

8  we put in our papers the cites to the various paragraphs in

9  the complaint, which put them, as it did the Court, on pure

10  notice that these are the elements about which we are

11  putting forward our claims.

12          So if you look at paragraphs 29 and 60 and 48,

13  among others, it makes abundantly clear, as this Court

14  concluded, when you struck their vacatur, based on their

15  coming forward and stating why they're vacatur should be --

16  why that should be vacated, the default judgment, this is

17  what you said.

18          You said, "I find defendants' assertions are

19  sufficient to constitute a defense against" -- and then you

20  characterize plaintiffs' allegations.

21          And this is the way you characterize them.

22  "Plaintiffs' allegations that the PA and the PLO were

23  responsible for the attacks through their wide-ranging

24  support of and conspiracy with the FLP."

25          And so in that phrase, you acknowledge all of the

1   various roots of the 2333 -- 2333 statute into 2339B,

2   providing support for a terrorist organization, 2339A, that

3   organization that commits terrorist acts, and the

4   conspiracy, which you cited as one of the reasons that you

5   were able to say they had a meritorious defense to come

6   forward with.

7          So if they put forward that as the vacatur and

8   that's the ruling on which you made your decision, it's

9   hard-pressed to say that neither they nor the Court or

10  anybody were in any way confused about what were the

11  elements.

12         Having said that, defense counsel says there are

13  five facts on which this case holds.  I think he's got it

14  wrong by 11.  I'd like to put forward to the Court the 16

15  facts that get us to trial and why none of them are excluded

16  at this point.

17         To begin with, I noticed that when defense counsel

18  puts forward the names of cases that it wants you to

19  consider in order to support their motion for summary

20  judgment, they always exclude one.  And they exclude the

21  case that is most on all fours with the facts and the

22  procedural circumstance of this case.  It's one you've heard

23  before.  It's the *Sokolow* case decided by Judge Daniels in

24  the Southern District of New York.

25         In that case, these same defendants, at the time

1   represented by counsel who were the same counsel here, made

2   the same arguments of non-admissibility, hearsay nature of

3   evidence, the conclusions by which you could draw inferences

4   that take you to trial, almost on a point-by-point basis.

5          Indeed, Mr. Berger may have taken the notes of the

6   counsel in New York, because that's what they said there.

7   If you look at the transcript and then you look at

8   Judge Daniels' decision, you saw that he had no problem

9   deciding on what is the very strict basis of granting

10  somebody summary judgment that it would not prevail on

11  summary judgment, because, looking at all the factors in the

12  best frame, looking at the plaintiffs' claims, you got past

13  each of the hurdles that Mr. Berger says.  And they were the

14  exact same ones then.

15         So what are those 16 facts?  They are as follows,

16  Judge:  First, that there is an intertwined relationship

17  between the PLO and the PA that leads to the activities of

18  the PFLP.  And that proposition, which, again, they sought

19  to dismiss the PLO in these other cases as being

20  disconnected to the activities of the PA or the terrorist

21  bombings, Judge Daniels said, is not to be decided on

22  summary judgment.

23         But even if it was to be decided on summary

24  judgment in this case, between the admissions of their

25  representative, Abdel Malouh, I guess is the same that we

1    have put in Exhibit 5, the intertwining nature of these

2    three organizations to show unitary decision-making has been

3    established in the record by non-hearsay.

4            Fact number two, the PFLP is a foreign terrorist

5    organization and/or commits acts of terrorism.  They don't

6    contest that.

7            Number three, that the PLO and the PA knew that

8    the PFLP is a foreign terrorist organization or engaged in

9    terrorism.

10           There's no hearsay worry about that proposition,

11   Your Honor.

12           And, by the way, with your permission, I have

13   summarized this in what are the elements and what are the

14   facts and will provide to both of you so you could use it as

15   a summary.

16           So fact number three, that they knew about this

17   PFLP activity is established by the deposition of their own

18   30(b)(6) witnesses, Amayra, and also Dahbour, who say, among

19   other things, that they were aware that members of the PA

20   law enforcement who have, at some time, been members of the

21   PFLP, and that there are members there who have engaged in

22   terrorism while employed by PA.

23           Fact number four, then on February 16th, 2002, the

24   plaintiffs' principals or themselves were killed or severely

25   injured in a suicide bombing in the pizzeria at

1    Karnei Shomron.  I'll come back to how you know that there's

2    enough evidence as to the intended targets being Americans

3    in a bit.

4          Number five -- here's one of them, the plaintiffs

5    were speaking American English at the time of the bombing.

6    And the individual who came wearing a bomb around his body

7    heard and knew that to be the case.  That's established by

8    the deposition testimony of the plaintiffs in the case.

9          Number six, that Sadeq Hafez was the bomber and

10   was a member of the PFLP, who was then -- that is that

11   organization -- responsible for the bombing.

12         Defendants may attempt to now claim that's

13   contrary.  But to use a phrase you used last time we were

14   together, that's a lot of dollars and ten years short.

15         In the No. 77 on the docket, which was their

16   motion and your decision to vacate the default, they used,

17   as their meritorious defense, that it wasn't them that

18   committed the bombing, but it was the wing called the PFLP.

19   So they put forward the notion that it's the PFLP that saves

20   them from the default and now, ten years later, want to say,

21   I'm not sure that the PFLP ever did this.

22         Even if that were not the case, the testimony of

23   their own deponents, some of whom were their 30(b)(6), for

24   the very issue of security and who was in charge, again,

25   pointing to the deposition of Dahbour, points out that when

1    he was preparing for his deposition, what did he decide to

2    review to become able to give their 30(b)(6) deposition but

3    the investigative files of the two individuals who we name,

4    that of Raed Nazal and that of Sadeq Hafez.  When asked why

5    he did that, his answer was, "Even a little child on the

6    street would know who was responsible."

7          If that were not enough, we put forward in

8    Exhibits 25 and others, again, their own documents, so they

9    are not hearsay in the sense that this is either a party

10    admission or it is coming from their files, which, as

11    Judge Daniels pointed out, you look to determine whether or

12    not there are events which could make the documents which

13    somebody claims in a summary judgment proceeding not to be

14    admissible, to be admissible.

15          On that, I want to point out a couple of the

16    points that the judges have made.

17          In *Sokolow* itself, Judge Daniels said that the

18    opinion assumes the admissibility of plaintiffs' evidence.

19    If certain evidence is deemed to be inadmissible during

20    trial and is necessary for the plaintiffs to prove their

21    claims, then the defendants may be entitled to a directed

22    verdict.

23          In the *Wilburn* case, the D.C. Circuit case with

24    Judges Henderson, Rogers, and Brown said, a non-movement is

25    not required to produce evidence in a form that would be

1    admissible at trial, rather the evidence need only be

2    capable of being converted into admissible evidence at

3    trial.

4           And in another case in this district, having

5    prevailed to have the evidence cabined in the way they have

6    just asked you to cabin the evidence that we've put forward,

7    which is the *Parsons* case, the Court of Appeals reversed the

8    District Court Judge for doing what the defendants here have

9    now asked you to do.

10          And when the D.C. Circuit reversed that decision

11   and sent it back to the District Court, the District Court

12   then said that that motion for summary judgment would be

13   denied as the evidence given the value of the D.C. Circuit

14   indicated it should have carried the weight.

15          Having said that, let me turn to the next fact

16   that they ignored.  That is fact No. 7, which was Raed Nazal

17   was both a member of the PFLP and the Palestinian authority

18   operating in Qalqilya.

19          He's a member of the PFLP, because, again, the

20   investigative report done by their own investigative

21   service, the GIS, indicates that he was a hardliner member

22   of the popular front, that he was very active on a military

23   level.

24          Their deponent, Dahbour, again, says, Nazal was a

25   well-known member of the PFLP.  As he is also a member of

1   the Palestinian authority directly, Dahbour concludes that

2   they, the Palestinian authority, negotiated his prison

3   release in 1999.  He was a well-known member of the PFLP at

4   the time, and the head of the Mustapha brigade; and, as you

5   heard arguments for the defense, that he was hired and paid

6   a salary as a captain with no duties.  In the records of

7   that, it indicates that, therefore, he was a salaried

8   employee, maybe a no-show employee, but, nevertheless, an

9   employee of the Palestinian authority.

10         The next fact number eight, Raed Nazal recruited

11   the bomber, Sadeq Hafez.

12         We have Exhibit 13 about which they object, which

13   is the Israeli report of Mohammed Wasef Nazal.  In that

14   statement, which was an interrogation by the investigators

15   into the very bombings that are the basis of this lawsuit,

16   the individual, Wasef Nazal, indicated his own involvement

17   in creating the conspiracy around which this bombing

18   occurred, which included the recruitment, with his help, by

19   Raed Nazal of the bomber Sadeq Hafez.  It was not, as

20   defendants would have you say, the statements in *Gilmore* and

21   other cases in which you have an exculpatory statement in a

22   custodian interrogation by somebody saying, it wasn't me, it

23   was them, which is the kind of, as he says, hearsay that's

24   not allowed.  The exception is when the statement is not

25   exculpatory but it's inculpatory.

1          So in an interrogation mode, this individual was

2   saying that I, the person speaking, was responsible for

3   hooking these two people up, and these two people were the

4   people who, down the road, ended up creating the bombing.

5          It is not an exculpatory statement.  Sure, he

6   says, I didn't actually do the bombing myself, but that's

7   not the point.  The point is, he creates the facts in which

8   he is including himself and makes it an admissible statement

9   beyond any objection of hearsay.

10          Number nine, the Palestinian authority paid for

11   the rent of the PFLP offices at Qalqilya, because it was in

12   "financial straits and in dire need."

13          And this payment was signed off personally by

14   then-Chairman Arafat, who was, at the time, the chairperson

15   of the PLO and the President of the PA at the exact same

16   time, going to the intertwining of those two organizations

17   for purposes of determining whether they provided material

18   support for a terrorist organization.

19          That comes, again, from their documents and from

20   the testimony of their formal legal Counsel of Ministry of

21   Finance, a man named Nadeem Al Barami, who is the one who

22   points out that Arafat played this double role and signed

23   off on the rent payment.

24          I know that defense counsel would like to have

25   this rent payment called de minimis, as if making de minimis

1    payments somehow doesn't make it support for a terrorist

2    organization.

3            But whether they were de minimis or not, among

4    other things, has got to be a jury question, because I will

5    point the Court to the following:  If it was de minimis, why

6    is it that the record shows two things.  One is that the

7    documents that call for the payment say that the PFLP was in

8    dire straits for this money.  And, second of all, why was

9    there no office without this funds, which was closed in 2002

10   when the Palestinian authority stopped funding this

11   particular cell or this particular office.

12           If it was so de minimis, then why when their

13   payments ended, did the office end?  I don't know the answer

14   to that, but it's a jury question.

15           Number ten, the Palestinian's payment of rent for

16   this office was part of its overall responsibility for the

17   PFLP as a faction of the PLO, and it made other

18   expenditures, including offices.

19           This is, again, some of the other charges that

20   were put in when, for example, again, Mr. Barami, who is

21   their 30(b)(6), not a hearsay statement, says that there

22   were other expenditures, along with these kinds of

23   expenditures.

24           And as I will point out when we get to proximate

25   cause, the fungibility of money on the 2339B, as courts have

1   indicated, doesn't require me to show that the payment to

2   the Qalqilya office went to purchase a piece of equipment,

3   which was then transported to Karnei Shomron, which then

4   blew up and killed my clients.  What it has to show is that

5   the money went to the organization which defrayed its need

6   to pay other money so it could use whatever it had to to do

7   that bombing.

8           No. 11, Qalqilya was approximate -- was the

9   approximate PSLP officer sale to Karnei Shomron where the

10  bombing occurred.  One, the Court can take judicial notice

11  of the map that will show that.  But Exhibit 2, which the

12  Palestinian authorities ministry of information points out,

13  that they are the close proximity between these two

14  locations.

15          No. 12, Karnei Shomron was a place known to have a

16  lot of Americans.  You asked the defense.  Let me show you

17  what the record indicates about that.

18          You have the depositions of three plaintiffs that

19  talked about why they settled there or why they were there.

20  It was because that's where Americans settle.

21          You have, in addition to which the statistics

22  cited by these individuals would show that in other cases

23  where three percent of the population known to be American

24  was enough to show the foreseeability that you would hurt

25  Americans if you took to the terrorist act.  Here in

1    Karnei Shomron, it's three times that amount.

2            Number 13, after the bombing, the Palestinian

3    authority created martyr payments.  I know that the defense,

4    as it did with the rent, would call that by some other name.

5    So rent is de minimis and martyr payments are social program

6    stipends in the nature of welfare payments.

7            I don't think you'll find in Israel or the

8    United States the government paying people who go into

9    places and blow people up and call them social welfare

10   programs.  Certainly not in Dallas, certainly not in

11   Baton Rouge, not in Jerusalem, and not in Tel Aviv.

12           And so these martyr payments, which every court,

13   including the *Sokolow* Court, has indicated have the

14   following impacts:  They show, at the very least, that

15   somebody who's being paid that is providing incentive for

16   people to commit those same acts.  It shows that its

17   ratification of the activities that the entity did.  And it

18   shows that this person was acting in the scope of employment

19   for purposes of the defense saying, there's no respondeat

20   superior.  Why pay somebody after he's killed for the

21   purposes of what he did if it wasn't because he was carrying

22   out that which you wanted him to do prior to the fact that

23   he killed somebody.

24           14, after the bombing and Nazal's later death, the

25   Palestinian authority promoted him to Major instead of

1    Captain and changed the money coming to his family from that

2    of a salary to martyr payments.  Again, that comes by way of

3    admissions, it comes by way of non-objected-to documents

4    that show the payments going to his family.

5              15, the Palestinian authority also made payments

6    to other people, including Wasef Nazal, who I've mentioned

7    to you before, and a man named Jamal Hindi, who were those

8    who introduced Hafez to Nazal and were with Nazal in

9    Qalqilya right before the bombing.

10             This comes from the payment documents that they

11   have no objection to, which is Exhibits 30 and 34, being in

12   the detainee affairs.

13             Number 16, the Palestinian authority provided and

14   stocked safe houses for the PFLP members.  Same documents

15   reflected that also is the payment to Qalqilya, signed off

16   by Chairman Arafat.

17             And, lastly -- that is the last -- 17, I'm sorry.

18   Palestinian authority paid expenses, additional expenses,

19   such as the car and the apartment of PFLP officials, like

20   Mr. Malouh, the PFLP representative to the PLO.  Again, the

21   significance of that in 2339B will be the offsetting of one

22   set of costs to another.  But there's no objection to that

23   evidence.  It is not hearsay.  And even if it was, they have

24   not objected to it, but it's not.

25             And, 18, the PLO and PA have been sued for its

1   providing support to foreign terrorist organizations and

2   terrorists are, therefore, aware that Americans are among

3   the Israeli populations that they target and who end up

4   being killed.

5          I give you those 16 or 18 different facts, because

6   they're not just five, and they set up the chain of events

7   from the time that the PLO and PA intertwine their finances,

8   to the time that the bombing occurred, to the time that the

9   martyr payments occurred, to the time that they offset other

10  offenses.

11         And each one of those facts, while they may

12  include one aspect of which, if the proof at trial had to be

13  hearsay, would show to be an exception.

14         Also, on many occasions as I've put forward, has a

15  basis that doesn't even go to the hearsay, because it comes

16  from their own deponents, their own 30(b)(6), the documents

17  from their files which are not hearsay within hearsay but

18  their own records.

19         Let me turn to the three causes of action, all

20  under 2333 [sic].  The first one is 2339B, that is,

21  providing material support for a terrorist organization.

22         The cases, *Goldberg* and *Sokolow* in particular,

23  point out the following things which cause this to have

24  summary judgment being denied.  The following are the things

25  that were found to defeat summary judgment.  For purposes of

1    the three things that we have to do, there has to be

2    unlawful actions, there has to be the requisite scienter,

3    and there has to be proximate cause.  Let me go briefly

4    through each of those three for the cause of action.

5           For 2339B, unlawful acts.  These are the kinds of

6    things that have been found to defeat summary judgment.

7           The provision of funds.  Here, funds to the PFLP

8    were Nazal's salary.  This was a fact specifically found by

9    Judge Daniels in *Sokolow*.

10          The provision of personnel.  Personnel to the

11   PFLP, Nazal's salary, his post-bombing promotion, his martyr

12   payments, and those to Hafez.  Also considered to be a

13   specific factor found in *Sokolow*.

14          Three, services to the PFLP.  These were like in

15   the *Parsons* case, allowing people to exist in their

16   jurisdiction, where they are supposed to be providing the

17   security and they look the other way.  Here, they more than

18   look the other way, they provided funds to have that office

19   remain open.

20          Fourth, provide a safe house.  Again, the safe

21   house is the facility at Qalqilya, which was funded directly

22   by the Palestinian authority.

23          Fourth, provided other payments to offset PFLP

24   offenses.  The defendants already point that they understand

25   that there were cars and drivers to another individual.

1          Defendants are wrong that the payments have to

2     actually be linked to the actual event of the terrorism.

3     What there has to be is the support for the organization

4     that commits the terrorist act.

5          Let me turn to the scienter requirement for 2339B

6     and 2339A, they're very similar.  One is to a foreign

7     terrorist organization, the other is to the organization

8     which commits terrorist acts.

9          Generally, as the case law points out, you don't

10    get to scienter in a summary judgment proceeding.  It's one

11    of the things in terms of intent and motive that a jury gets

12    to see in order to explain the acts of a defendant.

13         And defendants want to cabin that requirement in

14    the requirement that it be a deliberate act.  But the courts

15    have said that it's more than that.  It's not just

16    intentional.  It's like in every other tort in every other

17    crime that you deal with every week in this courthouse.

18    You could be willfully blind to the events that are taking

19    place, and you can recklessly disregard them.

20         Here, again, pointing to the *Goldberg* case,

21    because it fit the parameters of what we're putting forward,

22    the Court said, the defendant has to know that the entity it

23    is assisting has been either designated a terrorist

24    organization or commits terrorism, and deliberately

25    disregarded that fact while continuing to provide financial

1   assistance.

2          Here we had Exhibit 2, which was the Amayra

3   deposition of their own legal advisor, who said that he knew

4   the PFLP does terrorism; that they monitor it, because,

5   just, they understand that it does terrorism.  And he's the

6   one who said people hired by them, the Palestinian

7   authority, continue to be active in the PFLP and carried out

8   terrorist acts.

9          As to the need to show the additional element

10  of -- so the scienter requirements is right there.  You have

11  their spokesperson indicating they know they're giving

12  support to an entity that has individuals in it that are

13  PFLP and who commit terrorism.

14         As to proximate cause, the defendants reach too

15  much.  This is, again, they want to show that the payments

16  to Nazal's salary was the salary that was used by Nazal

17  himself setting off the bomb.  That requirement doesn't

18  exist.

19         They want to create a higher bar for causation,

20  I understand that, but that's not what the law has put

21  forward.

22         I've already mentioned to you the theory of

23  fungibility.  They like to cite the *Boim* case to you, but

24  the *Boim* case also stands for that proposition.

25         And here as opposed to the other cases that we put

1   in our brief, there's evidence of direct support for the

2   terrorist organization, the rent payments alone provides

3   that, the ability to have put somebody on salary provides

4   that.  It's not one off, it's a direct payment.

5          There is no such defense at this stage, maybe it

6   is in front of a jury, of something being de minimis.

7          There is no defense, at this stage, of something

8   being incidental.  And there is no defense at this point

9   saying that martyr payments are really social welfare, or,

10  my favorite -- I don't know if it's my favorite, there's so

11  many of my favorites, but this is right up there with my

12  favorites -- that the payments that they made to Raed Nazal

13  for him to sit around and do nothing, except recruit bombers

14  to blow up Americans, was to "rehabilitate him so that he

15  wouldn't be a recidivist when he got out of jail."  If there

16  was ever a statement of defense by a defendant for the

17  proposition of tell it to the jury, it's that one.

18         So if you look at all of these elements and

19  compare them to the case that's most on all fours, which is

20  the *Sokolow* case, this is what Judge Daniels said.

21         Let's agree that there's no evidence of PA or PLO

22  participating before or while.  So the test is whether

23  there's circumstantial evidence raising all reasonable

24  inferences from what might be admissible evidence.  And he

25  found summary judgment to be denied because no one was fired

1    after the bombing, not Raed Nazal or nobody.

2              In fact, as in *Sokolow*, people were promoted and

3    paid more.

4              As in *Sokolow*, there were martyr payments.  As in

5    *Sokolow*, individuals involved were employed and paid

6    directly by the defendants.

7              These are the kinds of factors he found looking at

8    the inferences and looking for what gets you past a motion

9    for summary judgment that he ruled did not allow for summary

10   judgment.

11             Quickly let me get to the conspiracy of 2332(b),

12   because there are three legs, (b), (a), and 2332(b).

13             Of course, like in every conspiracy, you don't

14   have to have evidence of an explicit agreement, but the

15   activities of people can create the inference that an

16   agreement occurred.

17             What are those?  Hiring Nazal, knowing that he was

18   PFLP, and knowing all the internal reports say what he did;

19   what he did before he was in jail, what he did in jail.

20   He killed somebody in jail, walks around with guns, is

21   involved in the incidental activities that the reports

22   indicated he did; Amayra acknowledging that they hire people

23   just like him in the PA security apparatus, and that these

24   individuals continue to commit acts of terror.

25             As to the mental state requirement of 2332, the

1   scienter here is, by definition, an agreement to kill U.S.

2   individuals either in actual agreement to be determined by

3   circumstantial evidence such as:  Providing a safe-harbor

4   place for people to come and escape, giving individuals jobs

5   without duties, promoting them and making martyr payments.

6          Again, the *RF* case in the Second Circuit said you

7   only have to have one example to support the notions of

8   scienter or of proximate cause.  Here, we have more than

9   one.

10          So as to your question, the foreseeability of

11  damage to the United States individuals that are the

12  plaintiffs in this case, the *Gill* case, which they cite,

13  says it is not necessary with regard to these claims, 2339A

14  and 2332B, for plaintiffs to show that the defendants knew

15  that American nationals would be harmed as a result of its

16  actions.  Combined recklessness on the part of the defendant

17  and the terrorist organization would be sufficient.

18          In *Sokolow*, the jury in this case -- remember*,*

19  *Sokolow* was the summary judgment, then it went to trial, and

20  the defendants lost.

21          And there were findings of fact by the jury.

22  And there are consequences to the defendants for the

23  findings of fact made by the jury in the nature of

24  collateral estoppel.

25          Among other things, the jury found that the PA and

1   the PLO knowingly provided material support of resources for

2   terror attacks.  They found that the PA and PLO harbored or

3   concealed people who the PA knew or should have known had

4   grounds to believe committed or were about to commit a

5   bombing.

6           In the *Boim* case that they cite -- I mentioned

7   earlier that the *Boim* case indicated that the foreseeability

8   that a terrorist act would impact or injure an American was

9   on the basis of the *Boim* facts of there being three percent

10  of Americans among the population.  Karnei Shomron has over

11  10 percent.

12          *Goldberg*, the Court took judicial notice of the

13  fact that a large number of Americans are located in Israel

14  as both visitors or permanent residents.  The *Parsons* case

15  took judicial notice of the same event.

16          And the evidence in this case, based on the

17  plaintiffs' own depositions, indicated why they settled in

18  the place that they ended up, as well as in terms of

19  foreseeability.

20          If a bomber is looking to kill people and wants to

21  make sure that there are Americans in the group, going to a

22  place known to be frequented by people who are American, who

23  he can hear speaking English, would be a pretty good

24  indication that it was foreseeable that it would have that

25  damage.

1           And, finally, on 2332(b) in terms of proximate

2   cause, it only requires proof that the resources and support

3   went to a person or entity who killed or conspired to kill a

4   U.S. national.

5           Knowing the aims of a person in a conspiracy and

6   joining in those aims by the support you give is enough to

7   create the threshold.

8           And what are those acts?  Again, they not only

9   negotiated for but they got Nazal freed from jail.  They

10  didn't just do that but they paid him.  They just didn't do

11  that, but they paid him to do nothing for them.

12          So if they were paying him to do nothing for them

13  and their defense is because they were trying to

14  rehabilitate him, one could question how it's not reasonable

15  for a jury to conclude that they paid him, gave him nothing

16  to do, not for rehabilitating him but to allow him to do

17  exactly what the facts of this case will show he did.

18          Now, I agree with one thing, maybe only one thing

19  that defense counsel had said, which is that the law of

20  respondeat superior is evolving.

21          But if you look at the cases that have passed

22  summary judgment and went to trial, *Sokolow* being among

23  them, respondeat superior was one of the bases of letting

24  that case go forward.

25          And here, you have the same kind of events in

1  *Sokolow* as you have in the elements that we've put forward

2  in our opposition to motion for summary judgment.

3          You have a PA employee acting within the scope of

4  his employment, because he was paid, and we say paid to do

5  exactly what he did.  In furtherance of the PA's goals, he

6  carried out or knowingly provided support of resources for

7  the individuals in the events that I basically had pointed

8  out before.

9          So I guess in the end of the day, Your Honor --

10  and we will provide you with Your Honor's permission -- when

11  I sit down, I'll pass up to both of you what I just said in

12  summary form.

13          If you had just that which they concede, just that

14  they concede, this is what I think they concede, that the

15  PLO and PA have documents that they've given us that have

16  both emblems on it that make for the payments to Qalqilya

17  and also the detainee payments and some of the martyr

18  payments.

19          That they hired Nazal out of jail with no real

20  duties; that they paid the rent to Qalqilya; that they made

21  the payments I indicated from -- in general; and that they

22  provided other expenses.

23          If nothing else, these five elements support the

24  issue of providing support for a terrorist organization, de

25  minimis or not.  They provide support for material support

1    to if not an FTO by designation, an entity known by them to

2    commit terrorist acts.  And by having Nazal and Hafez,

3    together with Wasef Nazal, sorry that there are two Nazals,

4    be in the same conspiracy together of recruitment, indicates

5    that that conspiracy is enough to survive.

6          I understand the thresholds and the obstacles the

7    defense will throw in the way of the plaintiffs to get each

8    piece of the evidence that we have in our statement of facts

9    into evidence.  I understand that.  It's been that slog from

10   the very beginning, and certainly since I've come on to the

11   case.

12         But at the point at which summary judgment exists

13   and if you look at the case law as to what is possible to

14   convert evidence into admissible evidence and compare that

15   to what's different in *Gilmore* and what's the same in

16   *Sokolow*, you'll see that at this threshold, we go forward.

17   We may not go forward with all the evidence we had when we

18   started based on your ruling, but we go forward with enough

19   to get past summary judgment and take this to the next

20   place.

21         And after all this time and after all this paper

22   and all the trees that were killed, we deserve at least that

23   opportunity, because my clients have been waiting a long

24   time.  Thank you.

25         THE COURT:  Thank you, Mr. Lowell.

1           I gave him a little extra, so you can have a

2    little extra.

3           MR. BERGER:  Thank you.

4           THE COURT:  You can have ten minutes.

5           MR. BERGER:  Thank you, Your Honor.

6           First of all, I would say that the overarching

7    theme I heard from Mr. Lowell was on the factual side to

8    slice and dice my five facts into 18 that don't say anything

9    different.  In fact, when you heard him sum up, what he

10   basically gave you is my same five facts.  But I'll go

11   through those in a minute.

12          While we're engaging in cellular mitosis on the

13   factual side, we're doing a mash-up on the legal side.

14          One of the things that Mr. Lowell is trying to

15   convince you of is forget what the express language of the

16   predicate acts requires in terms of scienter, look only at

17   what courts have held about what the civil action requires.

18          Let me give you a perfect example.

19          2339B.  He talks about congressional intent.

20   Well, Congress wrote 2339B.  Congress is the one who put

21   into 2339B that support for a foreign terrorist organization

22   has to be rendered either in whole or in part in the

23   United States.

24          The *Goldberg* case that Mr. Lowell mentioned

25   doesn't deal with that language.

1        *Goldberg* made the same mistake that the

2   Supreme Court reversed the Second Circuit for doing in the

3   *RJR Nabisco* case.  It says, wait a minute, you don't look at

4   whether the civil action requirement is intended to reach

5   extraterritorial conduct.  Start down in the foundation of

6   the house, not on the super structure of the house.

7        What does the predicate act require?  Is there an

8   indication in the predicate act that it's supposed to apply

9   extraterritorially.

10       2339B(d)(1)(D) says, in whole or in part in the

11  United States.  *Goldberg* doesn't talk about that language.

12  *Goldberg* sailed right past it.  *Goldberg* is in error under

13  exactly what the Supreme Court told us in *RJR Nabisco*.

14  Same thing.  When he says "recklessness."  That's all you

15  really need, recklessness, foreseeability.

16       Again, there's case law debating whether or not

17  intentional misconduct or whether recklessness suffices when

18  you get to the elements of a civil action, 2333.  Has

19  nothing to do with the specific intent requirement that sits

20  below it, that is the first hurdle before you ever get to

21  whether there's an additional element of recklessness.

22       2339A says you have to specifically intend that

23  what you give to an individual -- forget terrorist

24  organizations, that's 2339B.  If you give something to an

25  individual under 2339A, you have to do it intentionally as a

1   conduit to a foreign terrorist organization.

2           You know, one of the things that *Parsons* said up

3   in the Circuit was that you can't get to a jury just because

4   you hope the plaintiffs will speculate in your favor.

5           And, you know, I apologize for saying this,

6   Your Honor, but I do a lot of these defenses, and terrorism

7   cases have become modern day McCarthyism.  It's just enough

8   for plaintiffs to say, oh, wait a minute, I love this one.

9           Fact 11, Qalqilya, the town where there was an

10  office from the PFLP to which the PLO paid the landlord, it

11  was near to where the bombing took place.  That's the basis

12  at which they're going to take this case to trial?  That

13  said, oh, something really bad happened nearby to where you

14  paid rent on an office.  That's not a fact.  That's just

15  like -- that's a short story.  You can't take a case like

16  that to the jury.

17          And for them to say, fact number one, the PA and

18  the PLO are intertwined with the PFLP.  What the heck does

19  that mean?  That's a legal conclusion.  They don't have

20  facts to show they're intertwined.  What do they have?

21  They have the facts that I mentioned:  That the PFLP is one

22  of many political factions that belongs to the PLO; that the

23  delegate from that faction, just like every other delegate

24  from every other faction, gets a car and gets an apartment.

25  That's -- they got one field office rental paid, okay?

1   So that makes it intertwined?

2          Oh, another one of his facts:  Yasser Arafat was

3   the President of the PA and the PLO.  That's a case they're

4   going to take to the jury.  You, members of the jury, should

5   find the PA and PLO liable because Yasser Arafat sat on top

6   of both organizations?

7          You know, these cases are terrible cases.  They

8   involve catastrophic injuries to people we all care about.

9   But that's not enough to take a case to the jury.  You've

10  got to have some evidence.

11         And for him to stand up here and say, on behalf of

12  the plaintiffs, you know, we're entitled to every inference

13  at summary judgment, guess what's wrong about that?

14  The evidentiary decisions, when they're relying on hearsay,

15  as most of their 18 facts relies on hearsay, that's

16  Your Honor's call, that's not the jury's call.  That is a

17  question of law, and that's why the abuse of discretion

18  standard applies to the admissibility of evidence.  And the

19  Supreme Court said that in the *GE versus Joiner* case,

20  522 U.S. 136, 143.

21         It's the Court's call.  They can't get to a jury.

22  They can't ask a jury to speculate about hearsay, because

23  Your Honor is the gatekeeper on the hearsay issues.

24         The *Sokolow* case.  You know, I hope they don't put

25  too much faith in the *Sokolow* case, because you know what

1    the big difference between the *Sokolow* case and this one is?

2            In the *Sokolow* case, the Court said, okay, you got

3    this whole mess of stuff.  You got these GIS files and maybe

4    they've got some hearsay in it.  I don't really know what to

5    do.  You have these martyr payments.  But they don't prove

6    anything.  They just prove people have got money.

7            But at least what you have here, and the reason

8    I'll let you take this to the jury is, you have experts who

9    are going to wind all of this stuff up to together, and

10   they're going to give their view on what all this means to

11   the jury.

12           Well, they don't have an expert here, because

13   Your Honor told them they were a day late and a dollar short

14   and then some when they nominated experts.

15           So all you get with this 18 set of discrete bits

16   and pieces that don't add up to a case is you've got

17   Mr. Lowell's powerful advocacy, without any evidence.

18   And he's going to have to have evidence to go to a jury.

19   And the only ones who tied it up all together in the *Sokolow*

20   case were the experts.

21           And one of the issues we presented to the Second

22   Circuit on appeal was that the experts were allowed to go

23   way beyond what they should have done.

24           And, indeed, we argued the *Sokolow* appeal on

25   April 12th.  We're waiting for a decision out of the

1   Second Circuit.  The Court could easily reverse also on

2   jurisdictional questions, which was the focus of the Court's

3   questions there.

4            But I wouldn't put too much faith in *Sokolow* if I

5   were them, because even if you get past the jurisdictional

6   questions you have in *Sokolow*, the experts tell the

7   difference between that case and this case.  They've got

8   nobody to put these 16 facts together to make a case out of

9   it.

10           And some of them, they just don't -- I mean, they

11  get to double and triple count here.  It's like the new

12  math.  The PA paid for the rent for the Qalqilya field

13  office.  Okay.

14           The PA provided safe houses.  Guess what the safe

15  house is?  It's the same office, okay?  So now we're double

16  counting.

17           And then the PA paid expenses.  Now we're triple

18  counting.  These are the same facts simply recycled so that,

19  as they say, we're undergoing cellular mitosis to get to 16

20  of them here.

21           Ultimately, there are serious hearsay issues.

22  He says, oh, they knew that Hafez was the bomber or they

23  knew that Nazal was engaged with the PFLP.  That comes out

24  of raw intelligence files of the general intelligence

25  surface of the PA, multilevel hearsay.

1          Just because it's in their file doesn't make it

2     any more true than when the police beat a confession out of

3     somebody and they say, oh, I did it.

4          You have to prove at every level of multilevel

5     hearsay that something in a police file meets a hearsay

6     exception.  They haven't done that.  They haven't done it,

7     for example, with the Israeli confession that they point to.

8     It's not really a confession when it says, I didn't do it,

9     Nazal did it.  Well, that's exactly what Judge Kessler held

10    in *Gilmore* was not a statement against penal interest.

11          What Mr. Lowell says is, wait a minute now, I've

12    got a theory for you.  Way back when, this guy claims that

13    he put Nazal together with Hafez and they became friendly.

14    And guess what, fast-forward months later, years later, they

15    are the ones that were alleged to be involved in the

16    bombing.  That didn't implicate him in a conspiracy.

17    Doesn't make it a statement against penal interest.

18          That's why the hearsay screen is so important,

19    because these are the judgment calls that are exclusively

20    the Court's to make about whether evidence like that can go

21    to a jury to invite the jury to speculate, because that's

22    what Mr. Lowell is asking for.  His impassioned plea at the

23    end is, let us throw this all in front of the jury,

24    let's see if any of it sticks.  We may not have all our

25    evidence, but give me a chance to try to argue it.

1   Speculation by the jury is not permitted.  That's what

2   summary judgment is designed to root out.

3        I guess my last point is that this notion that

4   there's collateral estoppel from *Sokolow*.  I guess this

5   really does sum up the notion of let's just throw the PA and

6   the PLO into the bad-guy pot.

7        There was a verdict rendered against them in a

8   different case.  We think the verdict will be overturned by

9   the Second Circuit.

10        But none of the attacks in that case, none of the

11   evidence in that case has anything to do with the attacks of

12   the evidence in this case.  That's not collateral estoppel.

13   He's arguing for guilt by association, and that's not a

14   proper basis on which to proceed to trial.

15        Your Honor, I could go on but I've abused the

16   Court's hospitality, and I appreciate you hearing me out.

17        THE COURT:  You've still got a minute if you want

18   to use it.

19        MR. BERGER:  All right.  Well, then, Your Honor --

20        THE COURT:  It's up to you.

21        MR. BERGER:  -- I think what I'll do is quit while

22   I'm ahead.

23        THE COURT:  Up to you.

24        MR. BERGER:  I think I made all the points that I

25   care to make at this point, and I appreciate the Court's

1   indulgence.

2           THE COURT:  Well, it's been my experience, in

3   cases of this kind, cases of this magnitude, in terms of its

4   complexity, factually and legally, that invariably sometime

5   this afternoon or this evening you'll be having a drink

6   somewhere and you'll say, I wish I'd said this or I wish I'd

7   said that.

8           And so in cases of this kind, which are an

9   overwhelming minority of the cases we have argument on,

10  I always give the parties a chance to file a supplemental

11  pleading.  They're not required to.  They're not required

12  to.

13          But I know from personal experience years ago that

14  invariably you wish, you know, I'd said this or that or the

15  other thing in a situation like this.  So not rounds of

16  supplemental pleadings, not at all.

17          So what I'll do is, after you get the transcript,

18  that's when the clock starts.  You got two weeks from

19  whenever the transcript comes out to file whatever

20  supplemental pleading you want to file.  Not no back and

21  forth rebuttals or anything, just one shot, 15-page maximum,

22  nothing more than that.

23          And you can put any supplemental hindsight

24  reactions you want to add in there to your -- and I think

25  Mr. Lowell had something he wanted to include, and he can

1    put that in there too, and that way we can all have an

2    all-in-one package.

3              And you said you had something.

4              MR. BERGER:  I do too.

5              THE COURT:  You can wrap that into that too.

6              So that way, it will all be in one neat pile.

7              But I want to compliment both advocates for doing

8    an outstanding job.  We have a lot of interns here today and

9    some law clerks.  And we don't usually get -- as they can

10   attest, we don't usually get arguments quite so good.

11             So I can assure you, they appreciate it, as do I,

12   and I'll take it under advisement.  And I can't promise you

13   when you'll get a decision, but I'll do my level best.

14             MR. BERGER:  Thank you, Your Honor.  You had me at

15   some day later today, I'd be having a drink.

16             THE COURT:  All right, everyone.  Have a good day.

17             DEPUTY CLERK:  All rise.

18             This Honorable Court will stand in recess until

19   the return of court.

20             (Proceedings concluded at 4:20 p.m.)

21

22

23

24

25

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: August 23, 2016_____   /S/__William P. Zaremba_____

                 William P. Zaremba, RMR, CRR