# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, *et al.*,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　) **Civil Case No. 02-2280 (RJL)**
　　　　　　　　　　　　　　　　　　)
PALESTINE LIBERATION ORGANIZATION　)
and PALESTINIAN AUTHORITY,　　　　　) 
　　　　　　　　　　　　　　　　　　) **FILED**
　　　　Defendants.　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　**JUN 2 0 2017**

## MEMORANDUM OPINION

(June **20**, 2017) [Dkts. ##247, 340]

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

On February 16, 2002, a suicide bomber detonated an explosive device inside a crowded pizzeria in the West Bank village of Karnei Shomron. The blast killed two people, both U.S. nationals, and wounded thirty others, including four other U.S. nationals. The U.S. victims and their personal representatives initiated the instant suit against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively, "defendants"), alleging that the bombing was enabled by those entities, and asserting violations of the Anti-Terrorism Act, 18 U.S.C. §§ 2331–2339D, and related common law torts. Before the Court is defendants' Motion for Summary Judgment [Dkt. #247]. Also before the Court is plaintiffs' Motion to Strike Defendants' Personal Jurisdiction Argument from Defendants' Supplemental Brief in Support of Summary Judgment and for Leave to File Supplemental Summary Judgment Briefing [Dkt. #340]. Upon consideration of the pleadings, relevant law, and the entire record herein, the Court

will DENY plaintiffs' motion, GRANT defendants' motion, and enter judgment for the defendants.

## BACKGROUND

### A.     Factual Background[1]

On February 16, 2002, Sadeq Ahed Mahmoud Abdel Hafez ("Hafez" or "Sadeq Hafez") detonated an explosive device that killed Rachel Thaler and Keren Shatsky, both U.S. nationals. Pls.' Reconstituted Statement of Mat. Facts ¶ 5 ("Pls.' SOF") [Dkt. #331]; Defs.' Resp. to Pls.' Reconstituted Statement of Purported Mat. Facts ¶ 5 ("Defs.' Resp. SOF") [Dkt. #332-1]; Defs.' Statement of Mat. Facts ¶ 7 ("Defs.' SOF") [Dkt. #247-5]; Pls.' Resp. to Defs.' Statement of Mat. Facts ¶ 7 ("Pls.' Resp. SOF") [Dkt. #331]. It injured U.S. nationals Leor Thaler, Hillel Trattner, Steven Braun, and Chana Friadman. Defs.' SOF ¶ 7; Pls.' Resp. SOF ¶ 7. It also wounded Ronit Trattner, Defs.' SOF ¶ 7; Pls.' Resp. SOF ¶ 7, and, according to contemporaneous press reports, approximately twenty-five other persons who are not involved in this case, see Pls.' Ex. 22 [Dkt. #330-22].

Defendants are the PA and PLO. The PA is a government established by the 1993 Oslo Accords between Israel and the PLO that administers civilian and internal security services in parts of the West Bank and the Gaza Strip. Defs.' SOF ¶ 2; Pls.' Resp. SOF ¶ 2; *Livnat v. Palestinian Auth.*, 851 F.3d 45, 47 (D.C. Cir. 2017). The PLO was founded

---

[1]     The facts in this section are drawn from the parties' reconstituted briefs, statements of fact, and accompanying exhibits. Some of the items treated as fact here have been stipulated or conceded by the parties for the purpose of summary judgment only. *See* Fed. R. Civ. P. 56(c)(1)(A). Some of the other items recounted in this section are in dispute, and proof depends on whether certain exhibits are admissible under the Federal Rules of Evidence, an issue for the Court, not a jury, must decide. *See* Fed. R. Evid. 104(a). Because the resolution of defendants' motion turns in large part on the admissibility of this evidence, I include these disputed facts and exhibits here in order to provide the background for my evidentiary rulings.

in 1964 by Egypt and the Arab League and is the international representative of the Palestinian people. Defs.' SOF ¶ 1; Pls.' SOF ¶ 14. It is recognized by the United States as a Foreign Mission pursuant to Section 205 of the Foreign Missions Act, 22 U.S.C. § 4305. *See In re Designation and Determination*, Pub. Notice 2035, 59 Fed. Reg. 37121-03 (U.S. Dep't of State, July 20, 1994). The PLO is comprised of seven "factions" including, as relevant here, the Popular Front for the Liberation of Palestine ("PFLP"). Pls.' SOF ¶ 2; Defs.' Resp. SOF ¶ 2. The PFLP has been designated by the United States as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189. Pls.' SOF ¶ 10; Defs.' Resp. SOF ¶ 10; *In re Review of the Designation of Popular Front for the Liberation of Palestine (and Other Aliases) as a Foreign Terrorist Organization*, Pub. Notice 9124, 80 Fed. Reg. 25766-01 (U.S. Dep't of State, Apr. 27, 2015).[2]

Plaintiffs believe the Karnei Shomron bombing was planned and carried out by the PFLP using resources provided by the PA and PLO. Pls.' SOF ¶¶ 1–5. Plaintiffs allege that the "mastermind behind the attack" was a "known PFLP military leader" named Ra'ed Nazal. Pls.' SOF ¶ 7. Several facts about Nazal are undisputed. He was hired by the PA as a Captain in the Preventive Security Service ("PSS") sometime prior to the bombing; killed during an Israeli military raid (apparently unconnected to the events at issue in this case) in April 2002; and posthumously promoted by the PA to the rank of Major. Pls.'

---

[2]     The parties in this case also describe the PFLP as comprised of both political and military wings. The PA and PLO claim to support only the political wing of the PFLP and to have outlawed its military wing. Defs.' SOF ¶¶ 3–6. Plaintiffs dispute these contentions. They assert, among other things, that "any such outlawing of the military wing of the PFLP was in word only." Pls.' Resp. SOF ¶ 6. As my decision turns on the issue of causation, discussed *infra*, I need not resolve this dispute.

SOF ¶¶ 9, 26, 36–37; Defs.' Resp. SOF ¶¶ 9, 26, 36–37. It is also undisputed that Nazal's employment with the PSS entitled him to receive a salary from the PA even though he never reported to work, never received a uniform, and never was available to receive any assignment. Pls.' SOF ¶ 28; Defs.' Resp. SOF ¶ 28. According to defendants, the purpose of this no-show arrangement "was to control anti-Israeli violence by bringing suspected and/or convicted militants inside the security or police forces where there would be a better chance of reforming their behavior." Defs.' Resp. SOF ¶ 28. Plaintiffs, of course, disagree; they say Nazal's "job" was structured by the PA in a manner designed to leave him free to pursue terrorist activities with the PFLP. Pls.' Reconstituted Mem. of Law in Opp'n to Defs.' Mot for Summ. J. 11 ("Pls.' Mem.") [Dkt. #331]; Pls.' SOF ¶ 28. Plaintiffs allege that Nazal used this free time to plan the bombing and to recruit and prepare Hafez as the bomber. Pls.' SOF ¶¶ 7–8.

Plaintiffs' theory that Nazal planned the bombing on behalf of the PFLP is based primarily on the statements of two individuals. The first is a custodial statement given to Israeli police by an individual named Mohammad Wasef Nazal ("Wasef" or "Mohammad Wasef"), an alleged member of the PFLP. In this statement, Wasef stated that he introduced Sadeq Hafez to Nazal in or about the first of part of 2000, and that he also introduced other potential suicide bombers to Nazal. Pls.' Ex. 13 [Dkt. #330-13]. Wasef stated that Hafez carried out the attack "in the name of the Popular Front" and that Nazal sent Hafez to "the Balata Refugee Camp and there [Nazal's] friend . . . prepared Sadeq [Hafez] to carry out the attack and placed the explosive belt on Sadeq's body." Pls.' Ex. 13, at 3. The second statement is the deposition testimony of Ibrahim Abdullah Hamad

4

Dahbour ("Dahbour"), Deputy Director of the PA's General Intelligence Service ("GIS") Qalqilya Governate. Dahbour testified that there was information in GIS files and in media reports connecting Nazal and Hafez to the bombing and to each other. Pls.' Ex. 4 [Dkt. #330-4]. He also testified that an alleged militant named Jamal Hindi was with Hafez prior to the bombing. Pls.' Ex. 4, at 141:22–142:1. In addition to the statements of these two individuals, plaintiffs cite a PFLP website praising Nazal generally as a martyr for the Palestinian cause. Pls.' Ex. 17 [Dkt. #330-17].

The PA and PLO provided some funding to the PFLP and to certain individuals during the relevant time periods. *See* Pls.' Mem. 10–18. Specifically, the PLO paid rent for the PFLP office in Qalqilya, a city in close geographical proximity to Karnei Shomron, from June 2000 through May 2002. Pls.' SOF ¶¶ 40–43; Defs.' Resp. SOF ¶¶ 40–43. This payment was approved by Yasser Arafat. Pls.' SOF ¶¶ 19, 41, 43; Defs.' Resp. SOF ¶¶ 19, 41, 43. The PLO also paid for a car and apartment for Abdel Rahim Malouh, the PFLP's representative to the PLO Executive Committee. Pls.' Mem. 29 (citing Pls.' Ex. 5); Defs.' Reconstituted Reply in Further Supp. of Their Mot. for Summ. J. 6 ("Defs.' Reply") [Dkt. #332]. The PA made payments to the families of Ra'ed Nazal and Sadeq Hafez following their deaths, and to the families of Mohammad Wasef and Jamal Hindi while they were detained in prison for unspecified activities. Pls.' SOF ¶¶ 5, 37, 50; Defs.' Resp. SOF ¶¶ 5, 37, 50.

## B. Procedural Background

Plaintiffs filed this lawsuit on November 18, 2002. In addition to the PA and PLO, plaintiffs named various Syrian entities and individuals as defendants. *See generally* Compl. [Dkt. #3]. Only the PA and PLO now remain in this action.[3]

At the outset of this lawsuit, the PA and PLO failed to answer the complaint, prompting the Clerk of Court to enter default against them in September 2003. The Court vacated the default in 2004, *see* Min. Order (June 23, 2004), and denied a motion to dismiss for lack of personal jurisdiction in 2005, *see* Min. Order (Feb. 7, 2005). Counsel for the PA and PLO subsequently informed the Court that they intended only to litigate the question of jurisdiction, possibly through an interlocutory appeal. *See* Tr. of Status Conf., at 11:21–12:1, 16:17–20 (Mar. 29, 2005) [Dkt. #56]. However, a motion seeking such an appeal was never filed, and in April 2005, plaintiffs again obtained an entry of default from the Clerk. Two years later, plaintiffs moved the Court for default judgment. Defendants, by then having obtained new counsel, opposed plaintiffs' motion, and the parties began discovery. Defendants moved to vacate the Clerk's entry of default. Plaintiffs, in turn, moved to compel continued discovery. In a bench ruling following oral argument, the Court denied plaintiffs' motion to compel continued discovery and ordered them to respond to defendants' motion to vacate. *See* Tr. of Mot. Hr'g at 23:3–8 (June 13, 2008) [Dkt. #95]. After briefing was complete, the Court again held oral argument, ultimately vacating the

---

[3]     As I have previously explained, *see* Mem. Order 2 & n.4 (Oct. 31, 2013) [Dkt. #249], plaintiffs voluntarily dismissed the Syrian defendants and refiled those claims in a separate action that remains pending before the Court as *Shatsky v. Syrian Arab Republic*, Civil Case No. 08-0496 (D.D.C.).

Clerk's second entry of default in a published memorandum opinion. *See Shatsky v. Syrian Arab Republic*, 795 F. Supp. 2d 79, 85 (D.D.C. 2011) ("*Shatsky I*").

Following vacatur of the second default, the Court adopted on joint motion of the parties a scheduling order which mandated the completion of fact discovery by September 19, 2012. Sched. Order ¶ 5 (Sept. 19, 2011) [Dkt. #136]. Unfortunately, discovery did not proceed smoothly. Plaintiffs "waited until the eleventh hour" to produce responsive documents. *Shatsky v. Syrian Arab Republic*, 312 F.R.D. 219, 221 (D.D.C. 2015) ("*Shatsky II*"). Indeed, although plaintiffs had, by the close of discovery, produced approximately 3,000 pages of material in response to defendants' requests, "[t]his proved to be just the beginning of their discovery efforts." *Id.* at 222. "[I]n the weeks, months, and even years after discovery closed, plaintiffs furnished an additional 6,627 pages of materials." *Id.* Meanwhile, and once again on joint motion by the parties, the Court had set a briefing schedule for summary judgment. *See* Min. Order (June 26, 2013). Plaintiffs' discovery tactics would soon upend that schedule.

On August 12, 2013, defendants filed the instant motion for summary judgment, arguing that plaintiffs lack admissible evidence to prove the essential elements of their claims. *See* Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") [Dkt. #247-1]. Plaintiffs filed their first opposition on November 12, 2013. Appended to the opposition, however, was the Declaration of Attorney Robert J. Tolchin. Plaintiffs used this declaration as a vehicle to authenticate reams of late-produced documents relied upon in their brief. Defendants filed a motion for sanctions. Following briefing and oral argument on the motion for sanctions, the Court issued a published opinion ordering the

exclusion of seventy-three late-filed exhibits. *See Shatsky II*, 312 F.R.D. at 229. The Court gave plaintiffs the opportunity to reconstitute their opposition without the excluded evidence. *See id.* On January 29, 2016, plaintiffs filed their reconstituted opposition. *See* Pls.' Reconstituted Mem. of Law in Opp'n to Defs.' Mot for Summ. J. ("Pls.' Mem.") [Dkt. #331]. Defendants timely replied. *See* Defs.' Reconstituted Reply in Further Supp. of Their Mot. for Summ. J. ("Defs.' Reply") [Dkt. #332]. The Court held oral argument on July 26, 2016, inviting further briefing at the close of argument, which was promptly filed. *See* Pls.' Suppl. to July 26, 2016 Hr'g ("Pls.' Suppl. Mem.") [Dkt. #337]; Defs.' Am. Suppl. Br. in Supp. of Summ. J. ("Defs.' Suppl. Mem.") [Dkt. #338-1]. The Court took defendants' motion under advisement shortly thereafter.

## STANDARD OF REVIEW

### A.   Summary Judgment

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Upon the filing of a motion for summary judgment, "[t]he task of the [district] court is to review the factual material the parties present in support of and opposition to the motion, in light of the parties' legal claims and defenses, and assess whether the record contains disputes calling for resolution by a factfinder." *Johnson v. Perez*, 823 F.3d 701,

8

705 (D.C. Cir. 2016). "In making that determination, the court must view the evidence in the light most favorable [to the nonmoving party], draw all reasonable inferences in their favor, and eschew making credibility determinations or weighing the evidence." *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011) (internal quotation marks omitted). The movant may carry its initial burden by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also* Fed. R. Civ. P. 56(c)(1). The non-moving party must then come forward with "evidence showing that there is a triable issue as to an element essential to that party's claim." *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006) (citing *Celotex*, 477 U.S. at 322). "While a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis removed). "Otherwise, the objective of summary judgment—to prevent unnecessary trials—would be undermined." *Id.*

District courts are assigned the task of deciding whether evidence would be admissible at trial. *See* Fed. R. Evid. 104(a); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 968–69 (D.C. Cir. 2016) ("*Gilmore II*"). "In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). Decisions pertaining to the admissibility of evidence must be established by a preponderance of proof. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993). If evidence is determined by the court to be hearsay, then, absent an applicable hearsay exception, the evidence is not capable of being converted into admissible evidence and cannot be

considered by the court in evaluating a motion for summary judgment. *See Gilmore II*, 843 F.3d at 973 (citing *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)); *Gleklen*, 199 F.3d at 1369 ("Verdicts cannot rest on inadmissible evidence.").

## B. The Anti Terrorism Act

The ATA authorizes "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs" to sue "in any appropriate district court of the United States and . . . recover threefold the damages he or she sustains." 18 U.S.C. § 2333(a). On its face, this cause of action requires a plaintiff to prove three things: (1) injury to a U.S. national, (2) causation, and (3) an act of international terrorism. The statute defines "international terrorism" as activities that

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1).

"In other words," to prevail in showing an act of international terrorism that is cognizable under the statute, "a plaintiff must prove that the defendant would have violated any one of a series of predicate criminal laws had the defendant acted within the jurisdiction

of the United States." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 200 (D.D.C. 2014) ("*Gilmore I*") (quoting *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 122 (D.C. Cir. 2011)), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016). "In addition, the plaintiff must meet the territorial requirements set forth in Section 2331(1)(C) and prove that the conduct constituting the predicate criminal offense satisfies one of three intent requirements in Section 2331(1)(B)." *Id.*

## ANALYSIS

Defendants advance three arguments in support of summary judgment. First, they contend that the Court lacks personal jurisdiction. Second, they argue that they are entitled to summary judgment on the ATA claims because plaintiffs lack enough admissible evidence to prove the essential elements of these claims. Third, defendants argue that they are entitled to summary judgment on the non-federal tort claims because they lack legal capacity for suit as to these claims. I will address each argument in turn.

### A.    Personal Jurisdiction

Defendants once again raise the issue of personal jurisdiction. *See* Tr. of Mot. Hr'g 52:1–52:6 (July 26, 2016) [Dkt. #335]; Defs.' Suppl. Mem. 1–3. As such, I will address this argument first. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).").

I have on several occasions over the course of this litigation determined that defendants waived their challenge to personal jurisdiction by "repeatedly manifest[ing]

their consent to the Court's jurisdiction through their conduct." Mem. Order 2 (Oct. 29, 2014) [Dkt. #300]; *see also* Min. Order (July 12, 2016); Min. Order (Feb. 7, 2005). Defendants contend, however, that I should reevaluate these rulings in light of a recent decision by the Second Circuit vacating a determination by the Southern District of New York that it had personal jurisdiction over the PA and PLO. *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016). I disagree. As our Circuit recently explained, the vacatur decision in *Waldman* resulted from a change in Second Circuit precedent pertaining to general personal jurisdiction. *See Gilmore II*, 843 F.3d at 965. Under the old Second Circuit precedent, in effect when that litigation began, the PA and PLO lacked a legal basis for asserting their personal jurisdictional defense; thus, when an intervening Supreme Court decision cast doubt on the old precedent, the defense was made "available" for the first time, and the Second Circuit held that the PA and PLO had not waived the defense by not asserting it when it was unavailable. *See id.* Defendants do not face similar circumstances in this case. My prior determinations have not rested on the scope of general personal jurisdiction but, as noted above, on defendants having "repeatedly manifested their consent to the Court's jurisdiction through their conduct." Mem. Order 2 (Oct. 29, 2014). Moreover, unlike the Second Circuit, "[n]o similar precedent existed in this Circuit and, therefore, the 'legal basis' for" a similar defense was never unavailable. *Gilmore II*, 843 F.3d at 965 (affirming personal jurisdiction over the

PA and PLO). In other words, *Waldman* is simply not relevant to the personal jurisdiction issues raised in this litigation. My prior rulings remain correct.[4]

Having confirmed my jurisdiction over defendants, I will now proceed to the merits.

## B. Anti Terrorism Act Claims

Defendants contend that they are entitled to summary judgment because plaintiffs lack sufficient admissible evidence to prove the essential elements of their ATA claims. Specifically, defendants claim that the evidence would not permit a reasonable jury to find that their actions proximately caused the Karnei Shomron suicide bombing, nor that they possessed the degree of scienter necessary to be held liable for any act of international terrorism. Because, as discussed below, plaintiffs do indeed lack sufficient admissible evidence that would permit them to establish causation under the ATA, I will grant summary judgment for the defendants without reaching the question of scienter.

### 1. The ATA's Causation Requirement

The private civil cause of action created by the ATA, quoted in full above, authorizes suit for treble damages by any United States national injured "by reason of" an

---

[4] Plaintiffs assert that I should strike defendants' personal jurisdiction defense from their supplemental papers. *See* Pls.' Mot. to Strike Defs.' Personal Jurisdiction Argument from Defs.' Suppl. Br. in Supp. of Summ. J. and for Leave to File Suppl. Summ. J. Br'g 1–4 [Dkt. #340]. I will deny plaintiffs' motion to strike, but, as discussed, will reject defendants' jurisdictional challenge. Plaintiffs also seek leave to file additional summary judgment briefing "to supplement their summary judgment opposition filings with the evidence that the Court excluded in 2015 as late disclosed but which is relevant to the intent, proximate cause[,] and material support issues." *Id.* at 2. They argue supplemental briefing is necessary because defendants' reconstituted reply, in plaintiffs' view, cites "new evidence" not disclosed during the discovery phase of this litigation. Mem. in Supp. of Pls.' Mot. to Strike Defs.' Personal Jurisdiction Argument from Defs.' Suppl. Br. in Supp. of Summ. J. and for Leave to File Suppl. Summ. J. Br'g 4–17 [Dkt. #341]. I disagree. There is no need for additional supplemental briefing, and I will deny plaintiffs' request for leave to provide it. In the interest of fairness however, and out of an abundance of caution, I will not rely on any documents presented by defendants for the first time in their reconstituted reply.

act of international terrorism. 18 U.S.C. § 2333(a). Defendants contend, and plaintiffs purport to concede, that this language establishes proximate cause as the appropriate standard. Defs.' Mem. 22–23; Pls.' Mem. 35–36. Despite this apparent agreement, it is clear both from the parties' briefs and from their positions at oral argument that they have vastly different understandings of what proximate cause requires. As our Court of Appeals has not yet had opportunity to construe the phrase "by reason of" in the context of adjudicating an ATA claim, I must do so before turning to the question of whether a reasonable jury could find that the evidence here meets that standard.

As an initial matter, the parties are right to recognize that the ATA establishes proximate cause as the applicable standard under the statute. "It is a 'well established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.'" *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1305 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)). Courts generally assume Congress is familiar with the common-law rule and does not mean to displace it *sub silentio* when it creates a federal cause of action. *See id.* (construing Fair Housing Act to incorporate the common law rule); *Lexmark*, 134 S. Ct. at 1390 (construing Lanham Act to incorporate the common law rule). The ATA—which creates a federal cause of action akin to a tort action—is no exception. *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010) (holding ATA requires a showing of proximate cause); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105–06 (D.D.C. 2003) (same). "Proximate-cause analysis is controlled by the nature of the statutory cause of action." *Bank of Am.*, 137 S. Ct. at 1305. "The question

14

it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.*

That said, I turn to the dispute between the parties. Defendants contend that liability under the proximate cause element of the ATA obtains only where a defendant's actions were a "substantial factor in the sequence of responsible causation" and the plaintiff's "injury was reasonably foreseeable or anticipated as a natural consequence" of those actions. Defs.' Reply 12 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013)); *see also* Defs.' Mem. 22–23; Tr. of Mot. Hr'g 15:24–18:18 (July 26, 2016). This is a traditional proximate cause test that has been applied in our Circuit outside of the ATA context. *See Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 312 (D.C. Cir. 2009) (applying a "substantial factor" test to determine whether absence of security personnel proximately caused injuries suffered at the hands of third parties); *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 657 F. Supp. 2d 104, 110 (D.D.C. 2009) (recognizing violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") "proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence."), *aff'd*, 383 F. App'x 1 (D.C. Cir. 2010). In *Rothstein*, the Second Circuit held that Congress incorporated this test into the text of the ATA. The court explained that when Congress enacted the ATA in 1992, "[t]he 'by reason of' language had a well-understood meaning, as Congress had used it in creating private rights of action under RICO and the antitrust laws, and it had historically been interpreted as requiring proof of proximate cause." 708 F.3d at 95 (citing, *inter alia*, *Holmes v. Sec. Inv'r Prot.*

15

*Corp.*, 503 U.S. 258 (1992)). "[I]f, in creating civil liability through § 2333, Congress had intended to allow recovery upon a showing lower than proximate cause, we think it either would have so stated expressly or would at least have chosen language that had not commonly been interpreted to require proximate cause for the prior 100 years." *Id.* Thus, the court concluded, the ATA requires a showing of proximate cause "as that term is ordinarily used." *Id.*; *accord Owens v. BNP Paribas S.A.*, No. CV 15-1945 (JDB), 2017 WL 394483, at *9 (D.D.C. Jan. 27, 2017) (following *Rothstein*), *appeal docketed*, No. 17-7037 (D.C. Cir. Feb. 28, 2017).

Not surprisingly, plaintiffs reject the Second Circuit's approach. In their view, the traditional understanding of proximate cause "create[s] a higher bar for causation" than the ATA requires. Tr. of Mot. Hr'g 39:18 (July 26, 2016); *see also* Pls.' Mem. 35–36. Plaintiffs cite favorably to a pair of cases from the Seventh Circuit which adopted a "relaxed" standard of causation under the ATA in order to account for "the fungibility of money." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 697–98 (7th Cir. 2008) (en banc); *see also Hussain v. Mukasey*, 518 F.3d 534 (7th Cir. 2008). In these cases, the Seventh Circuit took the view that a lesser standard was permissible in ATA cases involving allegations of financial support to organizations that engage in terrorism because "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." *Boim*, 549 F.3d at 698. So, for example, "[i]f you give money (or raise money to be given) for the teaching of arithmetic to children in an elementary school run by Hamas, you are providing material support to a terrorist organization even though you are

not providing direct support to any terrorist acts." *Hussain*, 518 F.3d at 538. The Seventh Circuit reasoned that such support was enough to show causation under the statute "because otherwise there would be a wrong and an injury but no remedy because the court would be unable to determine which wrongdoer inflicted the injury." *Boim*, 549 F.3d at 697.

Notwithstanding the delicate policy concerns raised by the Seventh Circuit and by plaintiffs here, in my view the Second Circuit's interpretation is more faithful to the words Congress chose when enacting the ATA. That judgment will therefore control my decision. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994) ("Policy considerations cannot override our interpretation of the text . . . ."). In *Rothstein*, the Second Circuit carefully documented the interpretation given by the Supreme Court and the lower courts, for well over a century, to instances of the phrase "by reason of" where it appears in federally created private rights of action. In each instance, courts had construed this language as setting forth a traditionally rigorous proximate cause requirement. *See Holmes*, 503 U.S. at 268 (RICO); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534–35 (1983) (Clayton Act); *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d. Cir. 1910) (Sherman Act). Congress "used the same words" when it enacted the ATA, "and we can only assume it intended them to have the same meaning that courts had already given them." *Holmes*, 503 U.S. at 268; *see also Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1122 (D.C. Cir. 2017) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (quoting Felix Frankfurter, *Some Reflections on*

the *Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947))).[5] Accordingly, I conclude that § 2333 of the ATA requires proof of proximate cause, as that term is typically defined. A defendant proximately causes an act of international terrorism if his actions are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence of those actions. *See, e.g.*, *Rothstein*, 708 F.3d at 97; *Lopez*, 657 F. Supp. 2d at 110.

## 2. Plaintiffs' Evidence

Having resolved the statutory interpretation question raised by the parties' competing views of proximate cause, I now must determine whether any reasonable jury could find the PA and PLO legally responsible for the bombing on the evidence available in this case. In response to defendants' arguments that there is insufficient evidence to establish proximate cause, *see* Defs.' Mem. 22–23, plaintiffs claim that there is a triable issue, even as proximate cause is ordinarily understood. Specifically, plaintiffs claim that (1) "the salary paid to Ra'ed [Nazal]," (2) "the rent paid for the Qalqilya PFLP office," and (3) the "payments to the families" of Ra'ed Nazal, Mohammad Wasef, Jamal Hindi, and Sadeq Hafez, "went directly towards facilitating the attack that caused Plaintiffs' injuries." Pls.' Mem. 37–38.

---

[5]     Even apart from the well-established historical interpretation, at least one court in our District has found that "the words 'by reason of' indicate that the adverse action must be the principal cause—*the* reason—for the loss." *Breeden v. Novartis Pharm. Corp.*, 714 F. Supp. 2d 33, 36 (D.D.C. 2010) (holding Family Medical Leave Act requires proximate cause), *aff'd on other grounds*, 646 F.3d 43 (D.C. Cir. 2011).

### a. Nazal's Salary

Plaintiffs allege, and defendants concede, that the PA paid a salary to Ra'ed Nazal. Pls.' SOF ¶ 28; Defs.' Resp. SOF ¶ 28. Even when viewed in the light most favorable to plaintiffs, however, this fact is only relevant to the issue of causation if there is admissible evidence that connects Nazal to the bombing. Plaintiffs appear to be relying on three exhibits to make that connection. *See* Pls.' SOF ¶¶ 7–8 (citing Pls.' Exs. 4, 13, and 17).[6] Unfortunately for plaintiffs, all three are inadmissible hearsay. How so?

First, plaintiffs cite portions of a custodial statement given to Israeli police by Mohammad Wasef, which implicates Nazal in the bombing. *See* Pls.' Ex. 13. These out-of-court statements, offered to prove the truth of the matters asserted, are hearsay. *See* Fed. R. Evid. 801(c). Contrary to plaintiffs' contentions, they are not excepted from the hearsay rule as statements against interest pursuant to Federal Rule of Evidence 804(b)(3). Plaintiffs have offered no reason to think that Wasef is "unavailable as a witness," as that rule requires. And, more fundamentally, the statements are not against Wasef's interests. Wasef does not take any responsibility for the bombing; he blames Nazal (among other individuals). His purported "confession" is thus exculpatory, not inculpatory. "As the Supreme Court has held, Rule 804(b)(3) 'does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-

---

[6] Plaintiffs' brief refers broadly to "the evidence . . . discussed throughout this Opposition" but does not cite to any specific evidence when discussing the purported relevance of Nazal's salary to the issue of causation. Pls.' Mem. 37. Although "it is not the Court's role to mine the record in an effort to identify potentially helpful evidence not identified by the parties," *Achagzai v. Broad. Bd. of Gov's*, 170 F. Supp. 3d 164, 178 (D.D.C. 2016); *see also Allaithi v. Rumsfeld*, 753 F.3d 1327, 1334 (D.C. Cir. 2014), I have done my best—based on review of plaintiffs' entire opposition, the record, and the exhibits highlighted in plaintiffs' reconstituted statement of material facts—to identify evidence plaintiffs believe is relevant.

inculpatory.'" *Gilmore I*, 53 F. Supp. 3d at 211 (quoting *Williamson v. United States*, 512 U.S. 594, 600–01 (1994)).

Nor do the statements Wasef made qualify under the exceptions for public or business records merely because they are contained within an Israeli police report. *See* Fed. R. Evid. 803(6), (8). To be sure, the report itself could likely come in under one of these exceptions if it were properly "authenticated at trial." *See* Pls.' Mem. 25. It would then be "presumed that [the Israeli police officer] accurately transcribed and reported [Wasef's] story," *Latif v. Obama*, 666 F.3d 746, 768 (D.C. Cir. 2011) (quoting *United States v. Smith*, 521 F.2d 957, 964–65 (D.C. Cir. 1975)), and the report could be used to show, for example, "the date [the] crime was reported, or the fact that it was reported at all," *Smith*, 521 F.2d at 964. But it could not be used to prove the truth of Wasef's story. A "complaining witness'[s] description of the crime, recorded by the police officer in his report, is not made in the regular course of the witness'[s] business and does not deserve the presumption of regularity accorded a business record." *Id.*; *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) ("[I]t is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted [as a public record under Fed. R. Evid. 803(8)] *but that statements made by third persons under no business duty to report may not.*"). There is no evidence, and plaintiffs do not argue, that Wasef made his statements in the regular course of his business or under some legal duty to report. "Therefore, that part of the [Israeli police report] containing [Wasef's] description is not admissible as substantive evidence." *Smith*, 521 F.2d at 964.

20

Second, plaintiffs cite testimony by Ibrahim Abdullah Hamad Dahbour asserting that Nazal was "involved" in the bombing. Pls.' Ex. 4, at 87:4–6, 87:23–91:8. These statements are also inadmissible. When Dahbour was asked *how* he knew of Nazal's involvement with the bombing, he said "I know from the media." *Id.* at 88:19. He also suggested that he may have learned about it from his review of intelligence files kept by the GIS. *Id.* at 85:9–12. In either case, the statements are hearsay if offered to prove Nazal's role in the bombing. "[C]ourts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay." *Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005); *see also Konah v. D.C.*, 971 F. Supp. 2d 74, 80 (D.D.C. 2013); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123–24 (D.D.C. 2002). And courts in our Circuit have likewise considered intelligence sources hearsay where, as here, there is no information given to support their bottom-line conclusions. *See Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008) (acknowledging certain "intelligence reports plainly are" "hearsay evidence"); *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010) (granting summary judgment where anonymous intelligence report was inadmissible), *aff'd*, 651 F.3d 118 (D.C. Cir. 2011). The statements by Dahbour are thus inadmissible to prove Nazal's role in the bombing.

Third, plaintiffs cite a seven-page translated printout from the PFLP website identifying Nazal as a PFLP military leader and crediting him with various militant and/or terrorist actions. *See* Pls.' Ex. 17. These pages make no mention of Karnei Shomron or the bombing. Moreover, although the webpages appear intended to honor Nazal for various

(mis)deeds in service to the Palestinian cause, they "offer no information explaining who made the[se] findings or how they were made." *Gilmore II*, 843 F.3d at 969 (affirming exclusion of pages from the Israel Ministry of Foreign Affairs website). Without such information, I cannot conclude that these pages set forth matters personally observed by any member of the PFLP, let alone matters the individual would have a legal duty to report, or factual findings from a legally authorized investigation. *See* Fed. R. Evid. 803(8). For the same reason, I cannot conclude that the writer is unavailable or that the statements are against interest. *See* Fed. R. Evid. 804(b)(3). The webpages are thus inadmissible hearsay.

In short, plaintiffs have identified no admissible evidence supporting their theory that Nazal planned the bombing. Without such evidence, no reasonable jury could conclude that the PA proximately caused the bombing by paying Nazal a salary.

### b.     Rent Payment and Support

Plaintiffs also allege, and defendants concede, that the PLO paid rent for the PFLP office in Qalqilya through May of 2002. Pls.' SOF ¶ 40; Defs.' Resp. SOF ¶ 40. Defendants argue that this fact is immaterial because plaintiffs have not proffered evidence demonstrating a connection between the payment and the bombing, for example, "any evidentiary support that the PFLP office in Qalqilya, or anyone working in that office, had any involvement in the Karnei Shomron bombing." Defs.' Resp. SOF ¶ 42. Plaintiffs respond that "[g]iven Qalqilya's [geographic] proximity to Karnei Shomron, a jury might reasonably conclude, based on the preponderance of the evidence standard, that the particular support at issue . . . went to advance the particular suicide operation at issue." Pls.' Mem. 37; *see also id.* (arguing "spatial and temporal closeness . . . *alone* might lead

a jury to" find proximate causation) (emphasis added); Pls.' Suppl. Mem. 12–13 ("Defendants' material support has a strong temporal and geographical link to the bombing."). In other words, plaintiffs posit a connection between the rent payment and the bombing based solely on the fact that Qalqilya is nearby to Karnei Shomron. To say the least, that is a stretch !

However, assuming it were proved "that the suicide bombing was, in fact, carried out by a militant wing of the PFLP," *Shatsky I*, 795 F. Supp. 2d at 84, plaintiffs' proffered evidence still remains insufficient to establish proximate cause. I have already found that the ATA requires a defendant's acts to be a "substantial factor" in the sequence of responsible causation. Under that standard, no reasonable jury could find that the PLO's payment of rent for the Qalqilya office "caused" the bombing simply because that office is located in a place physically "proximate" to the attack. The cases cited by plaintiff are distinguishable because they involved no such argument, and also because, unlike this case, they concerned contributions in the "millions of dollars," *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013), or applied a "relaxed" standard of causation, *Boim*, 549 F.3d at 697.

Nor are plaintiffs helped by their assertion that "the evidence establishing the provision of material support in this case," taken as a whole, "is easily traceable from the Defendants to . . . the Qalqilya cell" of the PFLP. Pls.' Mem. 37. Indeed, to recite plaintiffs' argument is almost sufficient to refute it, as the argument "wrongly equates injury 'fairly traceable' to the defendant[s] with injury as to which the defendant[s'] actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69

23

(1997). That error is fatal to plaintiffs' traceability argument because "the burden of showing that plaintiffs' injuries were proximately caused by [the alleged support] is higher than the burden of showing that plaintiffs' injuries were fairly traceable to" that support. *Rothstein*, 708 F.3d at 96; *accord Lexmark*, 134 S. Ct. at 1391 (holding plaintiffs have standing but have not shown proximate causation); *Bank of Am.*, 137 S. Ct. at 1306 (same). Plaintiffs' traceability argument thus does nothing to alter my conclusion that the proffered evidence of support to the Qalqilya office is insufficient to establish the existence of the proximate cause element of plaintiffs' case.

### c. Family Payments

Plaintiffs also allege, and defendants concede, that the PA made payments to the families of Ra'ed Nazal, Mohammad Wasef, Jamal Hindi, and Sadeq Hafez. *See* Pls.' SOF ¶¶ 37, 50; Defs.' Resp. SOF ¶¶ 37, 50. As plaintiffs have not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron bombing, I have no trouble concluding that payments to the families of these individuals could not have proximately caused the bombing.[7]

The payments to the family of Hafez undoubtedly pose a closer question. Defendants have conceded for the purpose of resolving this motion that Hafez was the bomber, Defs.' Resp. SOF ¶ 5, and evidence in the record shows that the PA's Ministry of Social Affairs allocated his family 600 shekels per month following the so-called

---

[7] In regard to Jamal Hindi, plaintiffs point to a document produced by defendants which states that Hindi was imprisoned by the Israelis in 2002. *See* Pls.' SOF ¶ 7 (citing Pls.' Ex. 62 [Dkt. #330-45]). There is no information in that exhibit, however, concerning the reason Hindi was imprisoned.

"[m]artyrdom operation at the Karnei Shomron Settlement," Pls.' Ex. 25 (PA payment record) [Dkt. #331-1]. This evidence is, to say the least, disturbing. But, without more, these after-the-fact payments are not sufficient for a reasonable jury to conclude that defendants proximately caused the Karnei Shomron bombing. *See Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014) ("A showing of support— even post-attack financial support to the families of terrorists—is not sufficient to demonstrate that Defendants were somehow responsible for the attacks."). I have already found that the ATA requires plaintiffs to show that the defendants' acts were a "substantial factor" in the sequence of responsible causation. Here, plaintiffs have pointed to no evidence suggesting that Hafez knew his family would receive martyrdom payments, or that Hafez was motivated by the prospect of such payments. Without such evidence, I am forced to conclude that no reasonable jury could rule in favor of plaintiffs based on these payments.

### 3. Non-Federal Tort Claims

Defendants contend that they are entitled to summary judgment on plaintiffs' non-federal tort law claims because the PA and PLO lack the legal capacity to be sued in tort. Defs.' Mem. 30. I agree.

The parties acknowledge that the PA and PLO "both are unincorporated associations." *Waldman*, 835 F.3d at 332; *accord Safra v. Palestinian Auth.*, 82 F. Supp. 3d 37, 48 (D.D.C. 2015), *aff'd sub nom. Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017). Pursuant to the Federal Rules of Civil Procedure, the legal capacity of unincorporated associations is determined "by the law of the state where the court is

located." Fed. R. Civ. P. 17(b)(3). In the District of Columbia, unincorporated associations cannot be sued in their own name. *See, e.g.*, *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 91 (D.D.C. 2006) (collecting cases and dismissing non-federal claims against Hamas). "And, as far as this Court is aware, there is no recognized exception to that rule for situations such as this, where there is a *non-federal claim* against the unincorporated association that arises out of the same core of operative facts as a *federal claim* against the organization and capacity to be sued exists for the latter but not the former." *Id.* Thus, because the PLO and the PA are unincorporated associations that "lack legal capacity to be sued, they are entitled to judgment as a matter of law" on plaintiffs' common law tort claims. *EEOC v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 79 (D.D.C. 1999), *aff'd*, 254 F.3d 315 (D.C. Cir. 2000).

Plaintiffs argue that defendants waived their capacity defense by not pleading it with adequate specificity when they answered the complaint. Pls.' Mem. 43. Federal Rule of Civil Procedure 9(a)(2) provides that a capacity defense must be raised by a "specific denial" which states "any supporting facts that are peculiarly within the party's knowledge." This requirement, however, "is not especially onerous." 5A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2004). "A direct statement that the pleader denies the . . . capacity to sue or be sued . . . has been held sufficient to raise the issue." *Id.* In their answer, defendants stated that they "lack the capacity to be sued in this Court with respect to the" plaintiffs' tort law claims. Answer 2 [Dkts. ##77-10, 128]. I find this statement sufficiently direct to raise the issue of capacity. It undoubtedly put plaintiffs on notice as to the defense. And, despite plaintiffs'

protestations that defendants failed to adequately plead supporting facts, both defendants' answer and plaintiffs' own complaint pled descriptions of the PA and PLO. Compl. ¶¶ 25–26; Answer ¶¶ 25–26. There was no need for more, because the status of the PA and PLO as unincorporated associations is not a fact "peculiarly within [defendants'] knowledge." Fed. R. Civ. P. 9(a)(2). Indeed, numerous courts have described them as such, *see, e.g.*, *Waldman*, 835 F.3d at 323, 332; *Safra*, 82 F. Supp. 3d at 48; *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 89 (D.R.I. 2001), and neither plaintiffs' briefs, nor the Court's own research, has identified any authority to the contrary.

To be sure, defendants did not reassert their lack of capacity defense at the motion to dismiss stage. *See* Defs.' Rev'd Mem. of P. & A. in Supp. of Mot. to Dismiss [Dkt. #28]. But that is not, as plaintiffs contend, an obstacle to their asserting it now. A capacity defense is "usually considered timely if raised . . . by motion for summary judgment." 2 James Wm. Moore et al., *Moore's Federal Practice* § 9.02 (Matthew Bender 3d ed. 2016); *see also St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d at 79 (holding at summary judgment that defendant lacked capacity for suit). As plaintiffs do not put forward any reasoning that would justify departing from the general rule in this case, I conclude that defendants' capacity defense is indeed timely.

Plaintiffs' argument on the merits fares no better. According to plaintiffs, the PLO and PA can be sued in their own name because, in plaintiffs' view, they are not merely unincorporated associations but unincorporated *nonprofit* associations rendered capable of suit by the District of Columbia Uniform Nonprofit Association Act. Pls.' Mem. 44–45 (citing D.C. Code §§ 29-1109(a), 29-1105(a)). That statute, however, expressly provides

that its definition of unincorporated nonprofit associations "shall not include" any "organization formed under any other statute." D.C. Code § 29-1102(5). Obviously, neither the PA nor the PLO was formed under D.C. statute. The PA was established by the Oslo Accords, and the PLO was founded by Egypt and the Arab League. District courts have consistently found that the PA and PLO lack capacity for suit on nonfederal claims, *see, e.g.*, *Estate of Parsons v. Palestinian Auth.*, Civ. Action No. 07-1847, 2008 U.S. Dist. LEXIS 124833, at *14 (D.D.C. Sept. 30, 2008) (dismissing D.C. tort law claims against the PA and the PLO for lack of capacity); *Sokolow*, 60 F. Supp. 3d at 523 (similar), and plaintiffs' novel argument in this case does not alter my conclusion that defendants are entitled to summary judgment.

## CONCLUSION

The events of February 16, 2002 are indeed heartbreaking. The lives of Rachel Thaler and Keren Shatsky were cut tragically short. The lives of Leor Thaler, Hillel Trattner, Steven Braun, Chana Friadman, and Ronit Trattner, and of all victims' families and friends, were undoubtedly changed forever. Sadly, as plaintiffs point out, even all these years later the "victims of the Karnei Shomron bombing [have] received nothing" in compensation for their losses. Pls.' Mem. 6.

It is not my role, however, to weigh these equities. "By the time a party files a summary judgment motion, all parties should have had the opportunity to investigate the case thoroughly and should have done so." *Johnson*, 823 F.3d at 705. There is, at the summary judgment stage, no longer the hope of any new evidence—"[e]ach party's hand is dealt." *Id.* "The task of the court is to review the factual material the parties present in

support of and opposition to the motion, in light of the parties' legal claims and defenses, and assess whether the record contains disputes calling for resolution by a factfinder." *Id.* Unfortunately for plaintiffs, there are no such disputes presented here. Accordingly, the Court will GRANT defendants' motion for summary judgment.

An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge