UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHABTAI SCOTT SHATSKY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **Civil Case No. 02-2280 (RJL)** |
| | ) |
| PALESTINE LIBERATION ORGANIZATION | ) |
| and PALESTINIAN AUTHORITY, | ) |
| | ) |
| Defendants. | ) |

**FILED**

**NOV 1 7 2017**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION

(November **16** , 2017) [Dkt. #354]

On June 20, 2017—following years of unnecessarily protracted litigation, distinguished, at times, by the parties' use of dilatory tactics rather than their commitment to "the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1—I granted summary judgment for defendants. The cornerstone of my ruling was the determination that plaintiffs lacked sufficient admissible evidence to prove the essential elements of their claims. Before the Court is plaintiffs' Motion to Alter or Amend Judgment ("Pls.' Mot.") [Dkt. #354], through which plaintiffs seek to introduce new evidence and alter that ruling. Upon consideration of the pleadings, relevant law, and the entire record herein, the Court will DENY plaintiffs' motion.

## BACKGROUND

The Court presumes familiarity with its prior opinions and will not belabor the facts. *See, e.g., Shatsky v. Palestine Liberation Org.*, Civil Case No. 02-2280 (RJL), 2017 WL 2666111 (D.D.C. June 20, 2017) ("*Shatsky III*"); *Shatsky v. Syrian Arab Republic*, 312

F.R.D. 219 (D.D.C. 2015) ("*Shatsky II*"); *Shatsky v. Syrian Arab Republic*, 795 F. Supp. 2d 79 (D.D.C. 2011) ("*Shatsky I*"). On February 16, 2002, a suicide bomber detonated an explosive device inside a crowded pizzeria in the West Bank village of Karnei Shomron. The blast killed two people, both U.S. nationals, and wounded thirty others, including four U.S. nationals. The U.S. victims and their personal representatives initiated the instant suit against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively, "defendants"), alleging that the bombing was enabled by those entities. Plaintiffs asserted violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331–2339D, and related common law torts.[1] As relevant here, plaintiffs' theory of liability posits that defendants proximately caused the bombing by paying a salary to Ra'ed Nazal, a Captain in the Palestinian Preventative Security Services, while structuring his no-show job in a manner that left him free to plan the Karnei Shomron bombing and recruit the suicide bomber. *See Shatsky III*, 2017 WL 2666111, at *2.

On June 20, 2017, I granted summary judgment for defendants. As stated above, the cornerstone of my ruling was the determination that plaintiffs lacked sufficient admissible evidence to prove the essential elements of their claims. I found, among other things, that "no reasonable jury could conclude that the PA proximately caused the bombing by paying Nazal a salary" because plaintiffs had "identified no admissible

---

[1]    Plaintiffs also sued various Syrian entities and individuals. As I have previously explained, *see* Mem. Order 2 & n.4 (Oct. 31, 2013) [Dkt. #249], plaintiffs voluntarily dismissed the Syrian defendants and refiled those claims in a separate action that remains pending before the Court as *Shatsky v. Syrian Arab Republic*, Civil Case No. 08-0496 (D.D.C).

evidence supporting their theory that Nazal planned the bombing." *Id.* at \*9.[2]  The instant

Motion seeks to remedy this evidentiary deficiency by propounding new evidence which,

in plaintiffs' view, "establish[es] proof of Ra'ed Nazal's involvement in the Karnei

Shomron bombing."  Pls.' Mem. Supp. Mot. to Alter or Amend J. 4 ("Pls.' Mem.")

[Dkt. #354-1].

Plaintiffs' new evidence consists of statements made by an individual named Allam

Kaabi during an audiovisual interview he gave on December 17, 2016.  Kaabi is a member

of the Central Committee for the Popular Front for the Liberation of Palestine ("PFLP"), a

faction within the PLO that has been designated by the United States as a Foreign Terrorist

Organization. *See Shatsky III*, 2017 WL 2666111, at \*1.  According to plaintiffs, Kaabi

has a decades-long history of personal involvement in violent extremist and terrorist

activities. *See* Pls.' Mem. 8–13.[3]  The interview, which the Court has viewed in full,

together with its English-language translation, *see* Pls.' Mot., Exs. 7 & 7A, Certified

Translation and Video File [Dkt. #354-9], was streamed live on Facebook by the PFLP,

*see* Pls.' Mot., Ex. 10, PFLP Facebook Page [Dkt. #354-12], and maintained in a video

archive on that site, Pls.' Mot., Ex. 11, PFLP Facebook Page [Dkt. #354-13].  It is unclear

---

[2]      That finding, as plaintiffs correctly acknowledge, *see* Pls.' Mem. 1 n.1, also precluded recovery on any theory of *respondeat superior* that survived my separate holding that defendants lacked capacity to be sued in tort under D.C. law, *see Shatsky III*, 2017 WL 2666111, at \*10–11.  (All of that assuming, *arguendo*, that the ATA permits assignment of vicarious liability—a question our Circuit has "avoid[ed] deciding." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, J., concurring in part and dissenting in part); *see also Livnat v. Palestinian Auth.*, 851 F.3d 45, 47 (D.C. Cir. 2017) (affirming dismissal for lack of personal jurisdiction without comment on plaintiffs' theory of vicarious liability).)

[3]      Although, as plaintiffs acknowledge, *see* Pls.' Mem. 8 n.5, much of this information about Kaabi is not admissible, I may consider it in deciding whether Kaabi's statements are admissible, *see* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

from the exhibits and briefs whether Kaabi's interviewer was "in-house" with the PFLP or just a friendly member of the Palestinian press.

In the interview, Kaabi recounts events occurring in 2001 and 2002 during the Second Intifada. Kaabi's narrative begins with the death of Abu Ali Mustafa, then Secretary General of the PFLP. According to Kaabi, Mustafa "planted a bomb inside a watermelon" that an unnamed individual then placed "on a Zionist bus in Jerusalem." Pls.' Mot., Ex. 7, Certified Translation, at 4. Israeli intelligence discovered the booby-trapped watermelon and killed Mustafa. *Id.* at 4–5. Within hours of Mustafa's death, members of the PFLP retaliated by killing a rabbi. *Id.* at 5. After that, the PFLP renamed its militant elements as the "Abu Ali Mustafa Brigades" and launched a campaign of terror attacks where, in Kaabi's words, "the cells fired at bypass roads, at vehicles of settlers, at settlements, at military posts and bases." *Id.* at 7–8. According to Kaabi, "[t]he most significant operation carried out by the Front was the assassination of Rehavam Ze'evi," Israel's Minister of Tourism. *Id.* at 8.

Kaabi also reports in his interview that PFLP cells began using suicide bombers in the wake of Mustafa's death. Kaabi's narrative describes three such attacks, including, of most relevance here, the bombing of the pizzeria in Karnei Shomron:

> The first suicide attack was carried out in the settlement of Ariel by *istish'hadi* [suicide attacker] Shadi Nassar, a resident of Madama village in Nablus. He was recruited and prepared by Comrade Yamin Faraj. I think that he had been in jail and was a member of the Yamin Faraj cell. A lot of people were killed and injured in that operation, but the occupation chose not to reveal the number of those killed and injured in that operation.
>
> **After that, the Karnei Shomron operation was executed by comrade Raed Nazal from Qalqilya** in coordination with the comrades in the

Brigades in Nablus. It was a joint, distinguished effort. I think it was carried out by *istish'hadi* [suicide attacker] Sadeq Abd al-Hai. Many settlers were killed inside the settlement. After the operation the Israeli army attacked several Front headquarters in Nablus with aircraft and artillery fire.

The Brigades in Nablus was the first organization to carry out a suicide attack within the '48 borders – in Netanya's city market – after Operation Defensive Shield and after Sharon boasted that he had destroyed the resistance and that the resistance would not be heard of anymore, telling the Zionists to enjoy a long, undisturbed sleep.

The now-liberated comrade Duaa al-Jayyousi participated in the operation. I was among the members of the cell. . . .

*Id.* at 9 (bold emphasis added). Not surprisingly, plaintiffs seek to introduce the statement attributing the Karnei Shomron bombing to Ra'ed Nazal. They contend, naturally, that the admission of this statement would enable them to overcome the evidentiary deficiency identified in my prior opinion granting summary judgment for defendants.

Plaintiffs are less than forthcoming, however, about the circumstances surrounding their discovery of the Kaabi interview. In their memorandum, they state that it was "recently discovered" by counsel. Pls.' Mem. 3. In response to questions raised by defendants, plaintiffs report that they "stumbl[ed] upon" the interview "shortly before the release of this Court's June 20, 2017 Memorandum Opinion." Pls.' Reply to Defs.' Opp'n to Pls.' Mot. to Alter or Amend J. 1 ("Pls.' Reply") [Dkt. #356]. In a footnote, they clarify that counsel "became aware" of the interview on May 22, 2017. *Id.* at 10–11 n.3. They also state that a rough draft of a translation was completed by May 25, 2017, and that counsel "was in the midst of determining whether the evidence would be admissible and therefore could and should be brought to the Court's attention" when my summary judgment opinion issued. *Id.* Unfortunately, plaintiffs do not describe how they "stumbled

5

upon" or "became aware" of the interview, or what steps they took, if any, that could have allowed them to discover it sooner.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(e) permits "motion[s] to alter or amend a judgment [that are] filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "Rule 59(e) motions are disfavored[.]" *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 13 (D.D.C. 2010). "A district court need not grant a Rule 59(e) motion unless there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)). Even then, "[r]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Id.* (quoting 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1 (3d ed. 2012)).

The instant Motion is premised on discovery of new evidence. "Rule 59(e) motions on the basis of new evidence are restricted to evidence that is 'newly discovered or previously unavailable despite the exercise of due diligence.'" *Johnson v. District of Columbia*, Civil Case No. 14-677 (JDB), 2017 WL 3084378, at *3 (D.D.C. July 19, 2017) (quoting *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 29 (D.D.C. 2001)). They "may not be used to . . . present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1 (2d ed. 1995)). "Courts routinely deny Rule 59(e) motions where all relevant facts were known or should

have been known by the party prior to the entry of judgment[.]" *Johnson*, 2017 WL 3084378, at *3 (collecting cases).

## ANALYSIS

Plaintiffs' motion seeks to present additional evidence that was not before me when I granted defendants' motion for summary judgment. Specifically, plaintiffs seek to introduce the statement in Allam Kaabi's interview linking Ra'ed Nazal to the Karnei Shomron bombing. Although plaintiffs concede that this out-of-court statement is hearsay, they argue that it is admissible as a statement against interest pursuant to Federal Rule of Evidence 804(b)(3).

Before reaching the issue of admissibility, I must pause briefly to address the timing of plaintiffs' Motion. Kaabi's Facebook interview was given on December 17, 2016—six months *prior* to entry of summary judgment. Plaintiffs' failure to bring this evidence to the Court's attention sooner raises a serious concern that they may be using Rule 59(e) to "present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping*, 554 U.S. at 485 n.5. Oddly, plaintiffs make little effort to assuage that concern. They report that they "became aware" of the Kaabi interview on May 22, 2017. Pls.' Reply 10–11 n.3. But, as noted previously, they never recount *how* they became aware of the interview, or what steps they took, if any, that could have allowed them to become aware of it sooner. Plaintiffs' decision to omit that information, even when pressed by defendants, makes it difficult for the Court to conclude, as I must under Rule 59(e), that plaintiffs' late-produced evidence "is newly discovered or previously unavailable *despite the exercise of due diligence.*" *Niedermeier*, 153 F. Supp. 2d at 29 (emphasis added).

Putting aside the difficulties imposed by plaintiffs' delay, it is clear that Kaabi's statement about Nazal is not admissible.  Assuming, without deciding, that Kaabi is in fact "unavailable" as Rule 804(b)(3) requires,[4] plaintiffs must still demonstrate that a "reasonable person in the declarant's position" would think the statement was "contrary to the declarant's proprietary or pecuniary interest," or likely to "expose the declarant to civil or criminal liability."  Fed. R. Evid. 804(b)(3).  "The rationale of the statement against interest exception," as our Circuit recently explained in *Gilmore v. Palestinian Interim Self-Government Authority*, 843 F.3d 958 (D.C. Cir. 2016) ("*Gilmore II*"), "is that a reasonable person will not make a damaging statement against himself or herself unless it is true," *id.* at 971 (quoting 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 804.06[4][c] (Joseph M. McLaughlin ed., 2d ed. 2013)), *cert. denied*, No. 16-1359, 2017 WL 1955929 (U.S. Oct. 2, 2017).  Bearing that rationale in mind, it is clear that Rule 804(b)(3) does not permit admission of the statement identifying Nazal.

Kaabi asserts that "the Karnei Shomron operation was executed by comrade Ra[']ed Nazal from Qalqilya in coordination with the comrades in the Brigades in Nablus" and then "carried out by . . . Sadeq Abd al-Hai."  Pls.' Mot., Ex. 7, Certified Translation, at 9.  He reports that "[m]any settlers were killed" and that Israel responded "with aircraft and artillery fire" against PFLP targets.  *Id.*  Plaintiffs contend that these statements reveal

---

[4]       The parties hotly contest Kaabi's availability.  Plaintiffs argue Kaabi is "unavailable" because he lives in the Gaza Strip, an area outside the subpoena power of the U.S. courts, and because he would likely assert the Fifth Amendment privilege against self-incrimination if he were compelled to testify.  Pls.' Mem. 13–15; Pls.' Reply 11–20.  Defendants counter that plaintiffs cannot assert the Fifth Amendment privilege on Kaabi's behalf, and that plaintiffs have failed to show whether they have made reasonable efforts to procure Kaabi's testimony by means other than subpoena.  Defs.' Opp'n to Pls.' Mot. to Alter or Amend J. 8–10 [Dkt. #355].

Kaabi's "inside knowledge," Pls.' Mem. 16, and show that Kaabi and Nazal "were both members of the same conspiracy," *id.* at 18, thereby exposing Kaabi to liability. I disagree.

To begin, it is not at all clear that Kaabi's statements regarding the Karnei Shomron bombing reveal the type of inside knowledge or association with a conspiracy that plaintiffs seek to impute. After all, many innocent people who were living in the West Bank or Gaza Strip during the Second Intifada are likely familiar, fifteen years later, with the names of individuals or groups believed responsible for various attacks. Knowledge, or repetition of such information, does not necessarily indicate their involvement in the attacks.

More fundamentally, Kaabi's statement *about Nazal* is not so self-inculpatory that a reasonable person would have made it only if he believed it to be true. "Rule 804(b)(3) 'does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.'" *Gilmore II*, 843 F.3d at 971 (quoting *Williamson v. United States*, 512 U.S. 594, 600–01 (1994)). In other words, as the leading commentator on our Rules of Evidence has helpfully explained, "a statement which shifts a greater share of the blame to another person (self-serving) or which simply adds the name of a partner in crime (neutral) should be excluded even when closely connected to a statement that assigns criminality to the defendant." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 804.06[4][d][iii] (Joseph M. McLaughlin ed., 2d ed. 2013); *accord Williamson*, 512 U.S. at 600 ("[T]he fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability."). Thus, even if Kaabi's narrative about the Karnei Shomron bombing is generally self-inculpatory, the collateral statement identifying Nazal cannot be

admitted to prove Nazal had a role in the bombing because *that statement* does not inculpate Kaabi in anything.

In addition, even if the statement identifying Nazal did inculpate Kaabi, there is much reason to doubt whether Kaabi would have perceived that inculpation as "contrary to . . . [his] interest." Fed. R. Evid. 804(b)(3); *see* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 804.06[4][d][i] (Joseph M. McLaughlin ed., 2d ed. 2013) ("At the moment the statement is made the declarant must believe that the statement is against the declarant's interest."). As other courts have observed, "'under the perverse assumptions of terrorists, an armed attack on civilians reflects glory. Taking "credit" for such an attack is deemed a benefit, not a detriment.'" *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 205 (D.D.C. 2014) ("*Gilmore I*") (brackets omitted) (quoting *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 569 (E.D.N.Y. 2012) (Weinstein, J.)), *aff'd on other grounds*, 843 F.3d 958 (D.C. Cir. 2016); *see also Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013) ("While admitting to a violent attack on innocents typically is detrimental to a declarant's interests, the interests and motives of terrorists are far from typical."). The record in this case confirms that warped reality. Kaabi's interviewer treated him like a heroic celebrity. *See, e.g.*, Pls.' Mot., Ex. 7, Certified Translation, at 2 ("You mobilized the furious youth to confront the enemy. Please tell us about that role . . . ."). And viewers of the program responded with praise for the PFLP's terror campaign. *See* Pls.' Mot., Ex. 10, PFLP Facebook Page ("Well done," "Well done, Allam," and "Allah will make your evening happy, comrades"). In such a morally-twisted environment, Kaabi likely expected that any apparent insider-

knowledge of recent terrorist attacks would help, not hurt, his proprietary and pecuniary interests, not to mention the cause to which he is so dearly committed. That expectation created an incentive to lie, thus undermining "the commonsense notion" of reliability on which Rule 804(b)(3) is founded. *Williamson*, 512 U.S. at 599.

Compounding this problem further is the likelihood that Kaabi would not have perceived any risk of increased "expos[ure] to . . . liability" flowing from the Facebook interview. Fed. R. Evid. 804(b)(3). Kaabi resides in the Gaza Strip, an area the parties agree is outside the subpoena power of the U.S. courts. Pls.' Reply 11–12; *see* Defs.' Opp'n to Pls.' Mot. to Alter or Amend J. 9–10 [Dkt. #355]. Moreover, as plaintiffs explain, at the time Kaabi gave the interview, he had already been sentenced by Israel for the role he played in the Second Intifada and subsequently released through a prisoner exchange program. Pls.' Reply 11–12. On this record, then, it appears there was no reason for Kaabi to believe that associating himself with the terrorist attacks discussed in his interview, including the Karnei Shomron bombing, exposed him to any additional liability. *Cf. United States v. Slatten*, 865 F.3d 767, 805–06 (D.C. Cir. 2017) (affirming district court's determination that immunized statements against co-conspirator were not admissible as statements against interest). As such, any presumption that Kaabi would not have made the statement identifying Nazal unless it was truthful, is further undermined.

To summarize, I conclude that Kaabi's statement identifying Nazal is not admissible because that particular statement does not inculpate Kaabi. In the alternative, if the statement were found to inculpate Kaabi, I would join with the district courts that have found that the ulterior motives at work in a claim of "credit" for a terrorist attack undermine

that claim's trustworthiness and prevent admission under Rule 804(b)(3), *see, e.g., Gilmore I*, 53 F. Supp. 3d at 205; *Strauss*, 925 F. Supp. 2d at 449; *Gill*, 893 F. Supp. 2d at 569—at least on the facts presented here.  Either way, Kaabi's statement identifying Nazal must be excluded, and plaintiffs' Motion must be DENIED.

## CONCLUSION

For the reasons set forth above, the Court will DENY the extraordinary post-judgment relief sought by plaintiffs.  An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge